UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| TRIANTAFYLLOS TAFAS, <br><br>         **Plaintiff,** <br><br>    v. <br><br> JON W. DUDAS, in his official capacity as Under-Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, and the UNITED STATES PATENT AND TRADEMARK OFFICE, <br><br>         **Defendants.** | CIVIL ACTION: 1:07cv846 (JCC/TRJ) and Consolidated Case (below) |
| SMITHKLINE BEECHAM CORPORATION, <br><br>         **Plaintiff,** <br><br>    v. <br><br> JON W. DUDAS, in his official capacity as Under-Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, and the UNITED STATES PATENT AND TRADEMARK OFFICE, <br><br>         **Defendants.** | |

## DECLARATION OF TRIANTAFYLLOS TAFAS IN OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS

STATE OF CONNECTICUT    )
                          )   ss: New Haven
COUNTY OF NEW HAVEN   )

TRIANTAFYLLOS TAFAS, being duly sworn, deposes and says:

1.      I am over the age of eighteen (18) years and I understand the obligations of an oath. I submit this Declaration in support of Plaintiff's Opposition to Defendants' Motion to Dismiss in the above-referenced action. The statements made in this Declaration are true and correct and are made on the basis of my personal knowledge, unless indicated to be based upon information and belief, in which case I believe them to be true.

Dockets.Justia.com

## BACKGROUND

2.      I presently reside in Rocky Hill, Connecticut. I am an inventor and entrepreneur. I am a named inventor on eight (8) issued United States patents and forty-one (41) United States patent applications.

3.       I am originally from Greece and was educated in Athens, receiving a Ph.D. in Biological Sciences from the University of Athens in 1991. I authored my first patent in that same year.

4.      Upon receiving my Ph.D., I took a teaching position at the University of Athens, teaching courses in Biology, emphasizing the use of Computers in the study of Biology.

5.      During my time at the University of Athens I developed an interest in automating microscopy and worked on related academic projects that were funded by different European and American research support organizations, which interest then expanded into the study of science and medical diagnostics. In the mid-1990's I began traveling between Greece and the United States seeking to raise venture capital for the development of diagnostic products using robotic microscopy. During that time, I also served as a Visiting Professor at the University of Connecticut.

6.      In 1999 I started a company named Ikonisys, Inc. ("Ikonisys"), which is headquartered in New Haven, Connecticut and is in the business of inventing, designing and building cell-based diagnostic systems that use robotic microscopes.

7.      In 2000, I made the decision to leave Greece permanently and come to the United States full-time in an effort to expand the business of Ikonisys.

8.      When I began raising funds to start the business that was to become Ikonisys, I quickly became aware that I would need patent protection for my inventions in order

to protect my intellectual property and to have any reasonable prospect chance of raising the outside venture capital needed to get Ikonisys off the ground.

9.      Like any technology company, the value in Ikonisys in its earliest stages lies in its intellectual property. In order to secure this value, I pursued patent protection on a robotic microscope that I invented. I am a named inventor on thirty-four (34) patent applications relating to this robotic microscope, as well as on eight (8) U.S. issued patents assigned to Ikonisys. I consider myself a regular and consistent filer of patent applications with the United States Patent and Trademark Office ("USPTO) and anticipate that I will continue to be so for many years into the future.

10.     As a result of my above referenced efforts, as well as the protections granted by the United States patent laws, Ikonisys is growing, employs approximately fifty-five (55) people, and is marketing a high throughput, robotic microscope that allows automated review of multiple microscope slides for medical diagnostics and other purposes.

11.     I believed that the Ikonisys high throughput, automated microscope will enable the diagnosis of serious medical conditions more rapidly than conventional microscopy. More importantly, I am involved in research using such microscope which I believe will enable earlier diagnosis of cancer, through the detection of rare cancer cells, otherwise impossible using conventional manual microscopy and could change the world of cancer research and therapies.

12.     I maintain a substantial pecuniary interest in Ikonisys, and act as the company's Chief Technology Officer, overseeing the company's product development, as well as directing all of the company's patent prosecution on its products.

13.     In accord with my standard practice, before I file any patent application on an inventive concept, I weigh the advantages, and possible disadvantages, of filing for a patent as

compared to the alternative of simply keeping the inventive concept as a trade secret. In addition to the significant cost involved, one of the downsides to filing for a U.S. patent is the loss of trade secret rights with respect to the underlying disclosed invention. In cases where I have authorized a patent application to be filed, I ultimately have determined, in reasonable reliance on the various benefits and protections afforded by Congress in the Patent Act (35 U.S.C. § 1 *et seq.*) to inventors such as myself, that the benefits of applying for a patent, and the protections and benefits that flow from an issued patent, outweigh the substantial application costs and the benefits of keeping the inventive concept as a trade secret.

14.     One of the factors I have considered in connection with the type of cost-benefit analysis described above with regard to any patent application which I have filed or overseen the filing thereof in the past, is the importance of the fact that United States patent laws enacted by Congress guarantee an inventor, among other things, a limited period of exclusivity on patentable inventions, and also allow for the filing of unlimited continuations should the initially disclosed research and invention subsequently be found during the sometimes lengthly pendency of the patent application to include more than one (1) patentable invention.

15.     In addition to my interest in microscopy technology, I also developed an interest in the automotive arts and, more particularly, utilizing technology to capture waste heat. In addition to my interest in microscopy technology, I also developed an interest in the automotive arts and, more particularly, utilizing technology to capture heat that radiates from an automobile's manifold.

16.     In November 2005, I submitted one (1) patent application to the United States Patent and Trademark Office (USPTO) for this technology -- U.S. Patent Application Serial No. 11/266,948 (the "Energy Recovery Patent Application" or "ERA Invention"), which

is presently pending with the USPTO. As is reflected in my patent application, my ERA Invention starts with capturing waste heat. Once that heat is captured, it can be utilized in any number of ways to improve the automobile's performance. The proposed concept has the potential to improve fuel consumption by the automobile's engine with a significant effect in the miles-per-gallon performance. Additionally, acceptance of this concept by the automotive industry, will reduce exhaust gas emission and thus contribute in addressing concerns related to the rise of atmospheric carbon dioxide and global warming.

17.    In August 2007, I requested that my patent firm file a number of continuation filings with the USPTO seeking certain subject matter that was disclosed but not claimed in my original ERA Patent Application filed in November 2005. I also sought to add to the specification new ideas that that were linked to the original disclosure. I understand that three (3) of these applications were filed on August 10, 2007, and a fourth was filed on September 7, 2007. In accord with my attorneys' instructions, I have carefully guarded the confidentiality of each of my ERA Invention until the date of the publication of the application.

### THE ADVERSE IMPACT OF THE USPTO'S REVISED RULES

18.    When I filed my Heat Recovery Patent Application with the USPTO in November 2005, I reasonably assumed that I would be able to satisfy the statutory criteria for patent eligibility laid down by Congress and that the USPTO's procedural rules pertaining to the processing of my above referenced application imposed by the USPTO were within the scope of their delegated authority and that I would be capable of complying with these rules at a cost that would not be prohibitive.

19.    I never anticipated that the USPTO, which I understand is part of the Executive Branch, would later purport to unilaterally impose burdensome new *substantive* restrictions on my eligibility to obtain a patent – the so called "Revised Rules" (as referenced in my Amended Complaint).   The USPTO's Revised Rules appear to fundamentally change the pre-existing statutory ground rules set by Congress by imposing new substantive limitations on eligibility criteria to obtain a patent (*e.g.*, such as, among other ways, sharply and seemingly arbitrarily limiting, in a "one size fits all manner" the ability of a patent application to file as many continuation applications as an applicant deems necessary or appropriate).

20.    Since I first heard about the proposed new rules after they were proposed by the USPTO in January 2006, I had been in contact with my patent law firm numerous times, discussing certain USPTO regulations proposed in January 2006 and how their enactment might effect my Energy Recovery Patent Application estate, as well as the patent application estate of Ikonisys.   As a result of these discussions, and numerous similar discussions my counsel had with other firm clients who believed they would also be adversely affected if the newly proposed USPTO rules went into effect, my attorney agreed to submit comments to the USPTO concerning the proposed rule on behalf of himself and his entire effected client base (including myself and Ikonysis.).

21.    On or about August 21, 2007, the USPTO enacted a substantially modified version of the rules originally proposed  (again referred to collectively in my Amended Complaint as the "Revised Rules").   As set forth below, I authorized my counsel to commence the present action to challenge the Revised Rules because I believe that I had been seriously injured as a present and future patent applicant by the USPTO's enactment of oppressive new substantive rules, which among other things, I understand to substantially circumscribe the

existing protections afforded to patent applicants by Congress with a resulting loss of value to patent estates, as well as imposing a chilling effect on the ability of small companies, emerging companies, research-intensive companies, and small and independent inventors (such as myself) to successfully prosecute their pending applications and to file and prosecute future patent applications.

### THE TYPES OF HARM SET FORTH IN MY AMENDED COMPLAINT ARE NOT HYPOTHETICAL OR SPECULATIVE

22.    I understand from my attorneys that Defendants are seeking to prevent me from having my day in Court because they claim that I am unable to show actual imminent harm with respect to my presently pending patent application filings.  I entirely disagree in that several harms have already befallen me, and will befall me after November 1, 2007.

23.    I understand that Defendants take the position that I somehow lack legal "standing" to pursue my present action, among other reasons, because certain of my applications within my Energy Recovery patent estate at this moment do not have some of these problems I complain of with respect to the USPTO's actions in promulgating the Revised Rules, and the *ultra vires* nature of the Revised Rules.  I further understand that Defendants take the position that my lawsuit is premature or not yet "ripe".   Before detailing more specifically the harms that I face now, and will face in the future, I will address each of the primary defenses raised by Defendants with regards to standing and ripeness.

24.    I am told that the USPTO alleges that my Amended Complaint fails to allege that I have any plans to file more continuing applications after November 1, 2007.  I have read the assertions made in the Amended Complaint and entirely disagree.  Furthermore, my historical actions in the handling of patent estates belies such assertion.

25.     In the past, I have frequently requested the filing of continuation applications numerous times. In fact, in a number of instances I have requested multiple continuation filings. With respect to applications on which I am a named inventor and which are assigned to Ikonisys, I have authorized filings of more than one continuation filing in at least two (2) cases. With respect to my Energy Recovery Patent Applications, four (4) of my five (5) applications comprise continuing applications.

26.     Furthermore, since I was notified that as a result of the new Revised Rules my original Energy Recovery parent application will become prior art against any continuing application filing that I may file after May 10, 2008, I have been in conversations with my law firm about filing yet another continuation-in-part application for my Energy Recovery patent application estate. This process is underway (with attendant legal cost), but given current time constraints, I will not have such patent application filed until sometime after November 1, 2007. Again, the very fact that I need to be going through this analysis and process as a defensive measure is proof-positive of the immediate negative impact the Revised Rules are already having on my pending patent applications.

27.     I also understand that the USPTO is asserting that I may not raise the *ultra vires* effect of the Revised Rules to prevent me from authorizing after November 1, 2007 the filing of a continuation-in-part application from a divisional application simply because to date in my Energy Recovery patent estate I have not done so. However, it is clear from my actions at Ikonisys wherein I have authorized such filings with respect to applications naming me as an inventor (see, U.S. Patent Application Nos. 11/264,273 and 11/233,200), that this assertion is not a "speculative" possibility. I would authorize such a filing in respect of my Energy Recovery patent estate if I felt the need to do so. Before the new Revised Rules this was not even a

"worry" in that I understood there were no substantive restrictions preventing unlimited filings in the divisional application process.

28.    The USPTO asserts that I do not have the right to raise the issue of the effect of these rules on the early commercialization of inventions by entities receiving federally supported research grants pursuant to the Bayh-Dole Act. Again, I disagree. In fact, I have been instrumental in the past in obtaining federal funding for a research project conducted by Ikonisys, and would pursue federal funding with respect to my Energy Recovery inventions if I could obtain the same.

29.    I also do not understand the USPTO's argument that because my patent application filings for my Energy Recovery inventions are so new and, therefore, have not yet been examined by the USPTO, that I have no standing to raise the issue of the USPTO's violation of my rights under the applicable statute to utilize the Request for Continued Application ("RCE") process. I have used the RCE process several times in connection with my past activities in the patent field. With respect to applications naming me as an inventor, I understand that I have used the RCE process at least three times after the issuance of a final office action.

30.    Paragraph 56(h) of my Amended Complaint reflects my concern that the identification of patentably indistinct claims in an Examiner's Office Action would impermissibly disclose, before publication, subject matter that the USPTO is held by statute to keep confidential. The USPTO argues that this problem does not exist with respect to any application in my Energy Recovery Patent Application estate as I have not filed a non-publication request with respect to any of these applications. Respectfully, this makes little sense. Since I understand that a USPTO Examiner may take one of these applications for

examination before it is published, I am confused why the USPTO believes that this problem only exists if a patent applicant files a non-publication request when filing an application.

31.    I further understand that the USPTO is asserting that I have no multiple dependent claims pending in my Energy Recovery Patent Application and, as such, this somehow precludes me from raising the issue that the USPTO has impermissibly changed the cost of such making claims under the Revised Rules. In this regard, I note that one of my continuation filings does presently contain a multiple dependent claim. While I do not presently have claim sets pending in my Energy Recovery applications, nor to my knowledge in the Ikonisys estate, that assert different statutory classes that might eventuate in having me or my company pay a greater fee for a claim than mandated by statute, nonetheless I assert that as a regular applicant to the USPTO, that I certainly will run into such situation in the future.

32.    Lastly, I acknowledge that I have never authorized the filing of a reissue application from which a divisional application might ultimately spring. However, again, given the many patent filings that I have filed in the past, and that I am responsible for, it is my opinion that such an issue certainly might arise in the future.

### ADDITIONAL REPRESENTATIVE HARM TO ME FLOWING FROM THE REVISED RULES

**I am Forced to Chose Between Obtaining the Claim Coverage I have Determined in The Past to Adequately Cover Inventions, or Risk Filing an Examination Support Document After November 1, 2007, the Requirements of Which Are Vague and Indeterminate**

33.    The Revised Rules published on August 21, 2007 differed significantly from the Proposed Rules. Of particular applicability to my continuation-in-part filings was the change by the USPTO to require an Examination Support Document (ESD) if the claims in an application exceeded either five (5) independent claims, or twenty-five (25) claims in total. All of my Energy Recovery patent continuation-in-part application filings which were filed before

August 21, 2007 contain either more than five (5) independent, or twenty-five (25) total claims, making each susceptible to an ESD after November 1, 2007.

34.     When I filed three (3) of my Energy Recovery continuation-in-part applications, which occurred prior to the publication date of the Revised Rules, *viz.*, August 21, 2007, such filings were made with the Proposed Rules in mind.  The Proposed Rules allowed an applicant to file as many claims as desired, while permitting the applicant to only designate ten (10) claims for examination, unless the applicant supplied a pre-examination search.  The proposed rules did not inform me, or any other patent applicant or attorney, that the USPTO was about to issue Revised Rules that would limit the number of independent claims to five (5), and total claims to twenty-five (25), in any application unless an ESD was filed.  The Proposed Rules also did not indicate that any pre-examination search would encompass a search of all of the limitations of all of the claims (whether in independent or dependent form).

35.     Under the Revised Rules, I understand that all non-provisional applications, including my continuation-in-part applications, which were filed before November 1, 2007, and in which a first Office Action on the merits was not mailed before November 1, 2007, are subject on and after November 1, 2007 to the 5/25 rule with respect to claims and the filing of ESDs.  As none of my continuation-in-part applications will receive a first Office Action on the merits before November 1, 2007 (with respect to each of my continuation-in-part applications filed before November 1, 2007),  I understand that I am left the choice of either reducing the coverage I am seeking to protect the inventions asserted in each application, or to subject myself to the filing of an Examination Support Document.

36.     In attempting to determine if an Examination Support Document ("ESD") is a viable option, I asked my counsel to obtain a quote for such search from a reputable search

firm, and to estimate the cost for reviewing any uncovered prior art, and performing any actions required by the Revised Rules. I received an estimate of about $25,000 based on a "bare bones" search of only the elements which were not known to be clearly in the prior art. Thus, if I was to transact an ESD for each of the four (4) applications exceeding the 5/25 limitation, I estimate that I would have to spend initially approximately $100,000. I also understand from my attorneys, that the Revised Rules require a supplemental ESD each time I amend my claims, which should also be factored into the cost of filing an ESD.

37.    I also understand that the search firm contacted by my attorneys refused to provide a certification that their search would be ESD compliant, suggesting that they deemed the ESD requirements to be too unclear. For example, I understand the Revised Rules do not specify whether both a manual and electronic search need to be performed, do not specify the extent of the search that must be performed with respect to all of the documents available on the faced of the Earth, and do not specify what it meant by directing the search to "all of the limitations of all of the claims."

38.    Thus, due to the retroactive application of the Revised Rules to applications filed before November 1, 2007 which have not received a first Office Action, I am now faced with the Hobson's choice of either accepting less than I am entitled to in terms of patent coverage (by reducing the number of claims in my applications), or alternatively filing an ESD with its attendant costs and uncertainties with respect to compliance. Given the enormous cost and burden that would be attendant in preparing and filing an ESD, it is very questionable whether it is even reasonable to list this as a plausible alternative.

39.    In any event, in determining whether my applications were an aberration in respect to the number of claims filed, I instructed my attorneys to uncover art pertaining to the

12

filing pattern of persons and entities well known in the art. Such data supports my belief that my the claim numbers residing in my patent applications are not outside of the norm. Many of the most prolific inventors of our time have filed numerous applications with more than 5/25 claims.

40.    For example, I have learned that, based solely on the claims that issued in his patents, Thomas Edison would have violated the 5/25 threshold at a minimum of 394 occasions had the Revised Rules been in effect during his era. (See Exhibit A) (http://www.legalmetric.com/presentations/edison_patent_output.xls). Likewise, based solely on the claims in their patents, I understand that seventeen (32%) of the fifty-three inventors honored by the USPTO in its National Inventors' Hall of Fame also would have violated such a restriction (http://www.nipra.org/ddpatents06.htm).

41.    Furthermore, I have seen data suggesting that the limitation to 5/25 claims will have a detrimental effect on the Bayh-Dole goal "to use the patent system to promote the utilization of inventions arising from federally supported research or development ... [and] to promote the commercialization and public availability of inventions made in the United States ..." 35 U.S.C. §200. For example, based on issued patents alone, 870 out of 2531 applications (34.4%) from federally funded research at MIT and California Universities since 2000 would run afoul of the new 5/25 threshold limitation (Exhibit B). Most interestingly since 2000, 26% percent of all patents that issued to the Department of Commerce have more than 5/25 claims, and 23% percent of all patents issued to the Department of Commerce after 1990 have more than 5/25 claims (Exhibit C).

42.    I also have been told by my attorneys that another factor arguing against the filing of an ESD, is that the ESD may open me and my attorneys to possible allegations of inequitable conduct in, for example, failing to perform an adequate search, failing to take into

account certain references noted by the search but not adequately reviewed, or failing to bring certain passages in the references uncovered by the applicant to the Examiner's attention. This fact was brought home by a short video clip shown to me from a presentation made at Duke Law school, February 2006, by USPTO's former Deputy General Counsel for Intellectual Property and Solicitor, John M. Whealan, (while he was still the Deputy General Counsel and Solicitor for the USPTO) concerning the Proposed Rules, wherein Mr. Whealan admits that attorneys most likely would not file ESD's due to a fear of inequitable conduct charges that could be raised (Exhibit I – Video 2):

> If you want your claims examined up front, you can have it done – but it is going to cost you. Your are going to have to do some work, which in the current law of inequitable conduct, <u>nobody is going to want to do.</u> (emphasis added)

The quip is certainly suggestive of the fact that even the USPTO does not believe that the ability to file an ESD is an actual practical alternative for most inventors.

43.    I have also reviewed non-confidential documents portions of the administrative record provided by the USPTO in this case, which also argues that the USPTO has raised the ESD bar to such a level that it recognizes this option as a phantom right. Particularly, I reviewed an email dated March 22, 2007 (Def. No. A05028; Exhibit D), wherein a Robert Bahr of the USPTO reports to Gregory Morse of the USPTO that as of February 28, 2007, of the 708,321 applications in the backlog, of all the 5/25 non-compliant applications identified, 29% were large entity cases, and 30% small entity cases.

44.    In yet another document which I reviewed from the OMB, the USPTO certifies to the Office of Management and Budget, in justifying a minimal effect of its Revised Rule's ESD requirement on information collection burden of the public, that it anticipated NO

(<u>O</u>) small entities would file an ESD (Exhibit E).  I understand the information provided in the OMB is provided pursuant to statute under the Paper Reduction Act, 35 U.S.C. 3501 *et seq.*

45.    I have been advised and otherwise understand that under the Paper Reduction Act that the head of the particular agency supplying the information (which with respect to the USPTO, I understand to be Director Jon W. Dudas) is responsible for complying with all requirements of the Act, including certifying to the Director of the Office of Management and Budget that the record supporting the collection of information supplied to OMB is based on "effective and efficient statistical survey methodology appropriate to the purpose for which the information is collected."

### I Must Overcome A Rebuttable Presumption That Exists in Respect To Three of My Continuation Application Filings Simply Because these Filings Were Made on the Same Day, And Even After Rebuttal of Such Presumption, the A Non-Distinct  Claim Objection May be Raised Continually Everytime I Amend Any of the Claims of Such <u>Continuation Applications in Prosecution</u>

46.    I understand that three (3) of my continuation-in-part Energy Recovery applications invoke a rebuttable presumption pursuant to the Revised Rules that patentably non-indistinct claims exist between applications simply because these applications were filed on the same day.  The rebuttable presumption applies even though the laws under which I filed my applications did not specify such a presumption.

47.    I have reviewed the seemingly relevant portions of the Manual of Patent Examining Procedure ("MPEP"), USPTO manual for its Examiners.  MPEP 802.1 instructs that claims are "patentably distinct" where "the inventions *as claimed* are not connected in at least one of design, operation, or effect (*e.g.*, can be made by, or used in, a materially different process) AND wherein at least one invention is PATENTABLE (novel and non-obvious) OVER THE OTHER (though they may each be unpatentable over the prior art)."  I understand from

such definition that the three applications which I had filed on the same day (which were filed before August 21, 2007 -- the date the Revised Rules were first published) that even if I overcome the presumption once, every time I amend the claims of any of such applications, or new prior art is uncovered, the issue of indistinct claims may be raised once more.

48.    I also understand that the raising of such presumption under the Revised Rules has a rather draconian effect on how the USPTO will treat my applications. Under the Revised Rules, the USPTO will treat each application presumed, or determined, to have patentably indistinct claims as having the total number of claims present in all the applications for determining whether each application exceeds the 5/25 claim threshold. Thus I may repeatedly be subject to an ESD requirement or cancellation of claims as the prosecution of any one of the applications filed on the same day continues so long as one or more amendments are made to the claims (or new references surface that call into question the patentability of previous discerned distinct patentable elements)

### I Also Presently Face An Expensive Requirement With Respect to All of My Continuation-In-Part Applications

49.    I am required under the Revised Rules with respect to the four of my continuation-in-part applications to identify "the claim or claims in a continuation-in-part application for which the subject matter is disclosed in the manner provided by the first paragraph of 35 U.S.C. 112 in the prior-filed application." This rule applies even though no similar rule existed under the patent regime under which such applications were originally filed. I understand that the patent office in a "Clarification" of its Transitional provisions issued October 11, 2007 has waived this requirement for any continuation-in-part application in which a first Office action on the merits has been mailed before November 1, 2007. However, none of my Energy Recovery continuation-in-part applications fits within this "clarification" waiver.

**The Revised Rules Are Affecting the Valuation of My Patent Application Estate and Make the Processing of My Patent Applications Far More Expensive and Burdensome**

50.     Due to the Revised Rules, I now face the prospect of filing far more applications, each of which will undoubtedly assert and disclose far less subject matter. This is because both the claim limitations imposed by the Revised Rules, and the limitation on continuations imposed by the Revised Rules, force me to seek each invention in a separate application rather than to run the risk that I might not be able to seek protection on such invention simply because I have no continuation application opportunities to turn to, or the Examiner does not give me a restriction requirement (which is needed in order to file a divisional application). Thus instead of paying one filing fee, examination fee, and publication fee, I will be forced in the future to face a multiplicity of fees as I attempt to protect my inventions with far fewer claims, and fewer continuing applications.

51.     Furthermore, due to the limitation on continuations imposed by the Revised Rules, I will assuredly have to file many more expensive appeal briefs than would have if the Revised Rules were not in effect.  That is because, it would make little sense to file all of your continuations before appealing a "Final Office Action."  By maintaining a continuation application opportunity after appeal, an applicant would preserve the opportunity to make one more filing before the Examiner after receiving input from the Patent Board of Appeals and Interferences.

52.     The Revised Rules have already affected the valuation of my Energy Recovery patent estate.  First, the mere fact that I will be allowed only a small number of attempts to get these patent applications issued, affects the valuation of my patent estate.  As any baseball player knows, it is far more valuable to swing at the ball three times then just once.  The same is true of patent applications.  With lesser chances at the bat, I will be pushed to accept far

less protection for my inventions than I would before enactment of the Revised Rules. In my

experience, investors have always taken keen interest in determining the scope of possible

protection and the odds of obtaining that protection.

53.     In conjunction with the Revised Rules, the USPTO has proposed a number

of rules with respect to the appeal process from an Examiner's final rejection (72 Fed. Reg.

41472 et seq.), which I have discussed with my attorneys, that I understand restrict my right to

appeal from an adverse determination by an Examiner. I understand that these "appeal proposed

rules" were not taken into account by the USPTO together with the Revised Rules when

determining whether the Revised Rules would have a substantial impact on small entities.   The

restriction of my right to appeal a final rejection from an Examiner by any means, in conjunction

with the restriction of the number of times I may take up my case in front of the examining corp,

in my opinion decreases significantly the valuation of my patent filings.

54.     Without capital investment, it is very unlikely that I will bring this

invention, or other of his inventions, to fruition.

### Under the Revised Rules, I Cannot File and Maintain Another Continuation Application After November 1, 2007 Due to My Continuation-in-Part Filing Made After August 22, 2007

55.     One continuation-in-part application which I authorized to be filed with

respect to my Energy Recovery inventions was not ultimately filed until September 7, 2007, that

is until after the publication of the Revised Rules.

56.     On or about October 19, 2007, I was notified that the publication of my

parent application would act as prior art against any continuation filing I would make after May

10, 2008. Shortly thereafter, after discussing what subject matter was not already disclosed in

my other continuation filings, I indicated that I would be filing such an application before May

10, 2008. Presently I am contemplating the filing of an application that both includes subject

matter disclosed, but not claimed, in the parent application (nor for that matter in any of its continuing application progeny), as well as considering adding some new subject matter that may or may not be obvious in light of my parent application disclosure. I will not be able to formulate such application until after November 1, 2007, when the Revised Rules go into effect.

57.    I understand that the Revised Rules allows the USPTO to "delete if present, any specific reference to a prior-filed application" that does not meet certain requirements. I further understand that the USPTO has waived this requirement with respect to a certain category of applications into which my applications do not fit.

58.    As I will not be ready to file until after November 1, 2007, I understand that the only mechanism for me to file a new continuation-in-part application under the Revised Rules without loosing my priority date is to file a petition as specified under the Revised Rules.

59.    My attorneys have explained to me that under the Revised Rules a petition to support a continuing application can be filed only if one can make a showing that the application was "filed to obtain consideration of an amendment, argument or evidence that <u>could not have been submitted</u> during the prosecution of the prior-filed application."

60.    As I am seeking to claim material that was fully disclosed in the parent application, my attorneys have told me that such a petition would not be grantable. They have pointed me to 72 Fed. Reg. at 46768 ("The submission of an amendment to the claims or new claims to different subject matter alone will not be sufficient to meeting the showing requirement").

61.    I also understand that my attorneys believe that the filing of such a petition would risk violation of 37 CFR 10.85 (35 USC 32), the PTO's rules of conduct. This interpretation appears to be supported by reports supplied to me (I/P Updates, William Heinze,

BillHeinze@yahoo.com, October 2007; PatentlyO, Dennis Crouch, www.patentlyo.com, October 15, 2007) that indicate that the Director of the UPSTO's Office of Enrollment and Discipline, in a September 11, 2007 presentation, has stated: "Patent attorneys and agents are subject to discipline  for not complying with adopted regulations."

   62. I have reviewed documents provided in this case, which indicate to me that the USPTO understood the overwhelming difficulties attendant to filing a petition, particularly for a small entity, and that its repeated statements that Revised Rules do NOT restrict continuation practice is simply untenable.  In particular, I note an email dated March 15, 2007 from Gregory Morse to John Doll, the Commissioner of Patents, (Def. No. A08227; Exhibit F), which indicates that small entities comprised thirty percent of all filers in fiscal year 2006 that had patent application families with three (3) or more continuations (3,320 small entity filers to 8,006 large entity filers).

   63. On the other hand, the USPTO certifies in an Information Collection Certification to the Office of Management and Budget (Exhibit G) that it expects NO (0) petitions from small entities seeking the filing of a third or subsequent continuation for the Fiscal Year.  I understand that the information provided to the OMB is provided pursuant a statute, the Paper Reduction Act, 35 U.S.C. 3501 *et seq.*  I further understand from my attorneys that under the Paper Reduction Act that the head of the particular agency supplying the information, which with respect to the USPTO I understand to be Director Jon W. Dudas, is responsible for complying with all requirements of the Act, including certifying to the Director of the Office of Management and Budget ("OMB") that the record supporting the collection of information supplied to OMB is based on "effective and efficient statistical survey methodology appropriate to the purpose for which the information is collected."

64.     The USPTO in its own "Certification Analysis Under the Regulatory Flexibility Act," dated June 29, 2007, has adopted an average value of the market value of a patent application to be at least $220,000 (based on data from 1976 – 1992) (Exhibit H) indicating substantial harm in limiting the ability of an applicant to file a patent application

**The Revised Rules Impose Stringent and Requirements That Are Sowing Confusion**

65.     I also suffer, and continue to suffer, from the reporting requirements imposed by the Revised Rules. Many of these are required to be met before February 1, 2008. For example:

a.     I must identify by February 1, 2008 all applications having a common owner and at least one common inventor which were filed within a two month window before and after the filing date, or any priority date asserted in the application. Such rule as promulgated applied to all applications, although on October 11, 2007 the USPTO in a "clarification" waived the "or within two months of" provision with respect to applications filed before November 1, 2007.

b.     I must rebut before February 1, 2008 a presumption of indistinct claims with respect to applications having: (a) a filing/priority date that is the same as the filing/priority date of another pending application or patent; (b) at least one inventor in common with another pending application or patent; (c) the same assignee (or subject to an assignment to the same entity); and (d) having written description support of at least one claim in the application. Or in the alternative, I can file a terminal disclaimer and "explain why there are two or more pending … applications naming at least one inventor in common and owned by the same person, or subject to an obligation of assignment to the same person, which contain patentably indistinct claims."

66.     Confusion seems to be rampant with respect to the Revised Rules. Such confusion is resulting in significant costs to me and other applicants. For example, on September 26, 2007, I understand the USPTO put out a manual entitled "Claims and Continuations Final Rule," in which it maintained at (C11) that "if applicant filed a Demand and paid the additional examination fees and all of the inventions were examined in the international application, the

applicant may not file a divisional application," under the Revised Rules. This rapidly led to nearly every attorney, including my own, reviewing each of their clients files to determine whether a demand had been filed in the international application, and a restriction requirement in the corresponding U.S. patent, and to undertake efforts to prepare divisional applications in such cases before November 1, 2007 (when this certain provision of the Revised Rules was to go into effect). On October 11, 2007, the USPTO sent out yet another "clarification" of the Revised Rules indicating that the term "examined" as used in this provision did not include international phase examination under PCT Article 31.

67.    It has been pointed out to me that one portion of the New Rules, 37 CFR 104(a)(1), asserts that examination of applications must be undertaken by Examiners with respect to applicable statutes, rules, "and other requirements." It has further been pointed out to me that the definition of "other requirements" is set forth Federal Register publication of the New Rules to include the Manual For Patent Examination Procedure, a manual which the

68.    USPTO puts out without any notice and comment given to the public. Clearly, such provision cannot provide the USPTO the authority to change patent examination in the United States irrespective of the mandates of the statutes, and in derogation of its own regulations which the public is free to challenge when promulgated.

## CONCLUSION

69.    In view of the foregoing, it is my opinion that I have suffered, and continue to suffer significant, tangible, and irreparable harm from the retroactive and prospective actions of the Revised Rules that become fully effective on November 1, 2007.

70.    The Revised Rules diminish my rights to obtain the scope of protection I am entitled to under the statutes, by both restricting my ability to file continuing applications without the filing of a petition (which has few chances of being granted), and in effectively limiting the number of claims that I may pursue without the need to file an indeterminate ESD (which the USPTO's own Deputy General Counsel and Solicitor (retired) has acknowledged may open me and my attorneys up to charges of inequitable conduct in the future (Exhibit I _Video II).  I am further harmed in having to comply with provisions in the Revised Rules that do not specifically set forth the metes and bounds of their requirements, and that are so confusing, even the United States Patent and Trademark Office has felt the need to "clarify" away their prior interpretation of provisions of the Revised Rules.

71.    I am further harmed in having to comply with new patent regulations that are clearly *ultra vires*, as set forth in a particularized fashion in the Amended Complaint to this action.  I note the USPTO's own Deputy General Counsel and Solicitor (now retired), John Whelan, has acknowledged in a speech he made at Duke Law school in February 2006 that the USPTO is changing the "patent system" through the promulgation of "rules," without the need for the USPTO to turn to the courts or the legislature for permission:

> I went to the patent office to argue cases at the Federal Circuit, and after doing that for a while, you realize well, that's interesting, but its hard to make policy that way because you have to get a case up, win it, and get them to write it your way.

What we have realized is that we are an agency, and we write rules, and we can actually change policy a lot quicker by making some rules that might change the patent system. That is what I am going to talk about.

Brian did a nice job in referring to some patent legislation up on the hill – that is stalled. We don't have that problem. We write rules, and they issue, and maybe they get overturned, but we can actually try to move forward and I think it would be irresponsible not to do that.

(A copy of this video clip is attached as Exhibit I – Video 1).

73.    The Revised Rules devalue my Energy Recovery patent estate in reducing my ability to contest patentability determinations before the Examiner, and in working in conjunction with other rules proposed by the USPTO to restrict the appeal of such determinations to the Patent Board of Appeals and Interferences. It also makes the patent estate of the automated microscopy company in which I have invested so much of my life, and which I have a proprietary interest, subject to devaluation. Devaluation of the worth of either patent portfolio, makes it significantly more difficult to raise funds needed to develop my inventions, and puts my prior investment at jeopardy.

## VERIFICATION

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of October, 2007, in New Haven, Connecticut.

TRIANTAFYLLOS TAFAS