# EXHIBIT 16

# PART 1 OF 3

By Email:
To: BPAI.Rules@uspto.gov, Fred.McKelvey@uspto.gov, Allen.MacDonald@uspto.gov, Robert.Clarke@uspto.gov

**Ex parte Appeal Rules**

October 15, 2007

RE:   RIN: 0651-AC12
      TITLE: *Rules of Practice Before the Board of Patent Appeals and Interferences in Ex Parte Appeals.* (*"Appeal Rules"*)

Dear Sirs:

I am an inventor and an entrepreneur who has used the US patent system for a quarter of a century. I am writing to express my deep concerns about the proposed Appeal Rules standing alone, and also as being part of a more comprehensive rules package that will have an unprecedented adverse effect on inventors' ability to prosecute and obtain patent claims for their inventions. The rules were published in a Notices of Proposed Rulemaking for public comment on July 30, 2007[1], (the "Appeal NPRM"). My comments are timely, as shown in Appendix A.

In the following sections, I show why the proposed USPTO rules are economically significant under Executive Order 12,866 and why the USPTO failed to adhere to rulemaking procedural requirements. I also show the inextricable link between the proposed Appeal Rules and the continuation rules as recently adopted[2] by the USPTO ("Continuation Rules"). I explain why both must be considered together as a package. Whether intended or accidental, the effect of several aspects of the rulemaking process has been to deprive the public and the Office of Information and Regulatory Affairs ("OIRA") in the Office of Management and Budget of a meaningful or fair opportunity to comment on or evaluate the full implications of the Continuation Rules. Because the interactions between these USPTO's rulemakings were not made visible to the public or to OIRA until after proceedings on the Continuation Rules were completed, the economic rationale and compliance of that latter rulemaking with E.O. 12,866 are now suspect as well.

---

[1] USPTO, *Rules of Practice Before the Board of Patent Appeals and Interferences in Ex Parte Appeals*, 72 Fed. Reg. 41472, (July 30, 2007).
[2] USPTO, *Changes to Practice for Continued Examination Filings, Patent Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent Applications, Final rule*, 72 Fed. Reg. 46716, (Aug 21, 2007).

1

# 1  HISTORY OF APPEALS WORKLOAD AND THE RULEMAKING

For a number of years, the USPTO has conveyed the message that *Ex parte* appeal to the Board of Patent Appeals and Interferences ("BPAI") is one of the bright spots in the agency, where everything is working, backlogs are decreasing, and efficiencies are increasing at a rate sufficient to meet any additional load. Importantly, the USPTO has represented to the public that the appeals process has such flexibility and procedural power to cure all errors by all examiners that no petitions will be entertained to provide oversight of examiners' discretionary or procedural decisions in the examination of claims.[3] USPTOs' bright picture on the appeal front is shown in Figure 1 through Figure 3.



**Figure 1.** USPTO Board of Patent Appeals and Interference appeal workload by fiscal year. Received appeal rates were obtained by dividing the number of appeals received in the fiscal year by the number of final rejections issued in that year. *Source*: USPTO data as reported in Appendix B.

Figure 1 shows USPTO's annual report that the raw workload of appeals submitted for the BPAI's review has been trending down in absolute terms for most of the last 14 years and that even a sharper decline was experienced relative to the number of examiners' final rejections.

Figure 2 shows USPTO's self-reported success at bringing down the backlog before the BPAI, from a high backlog of over 9200 cases in 1997 to a low of less than 1/10th of that as of October 1, 2005, with only a slight increase since then:

Things were so rosy for the BPAI that senior USPTO officials proudly showed the remarkable success in reducing appeal backlog and pendencies in their presentations on the proposed Continuation Rules, as a primary rationale for suggesting that applicants should use the appeal process rather than file requests for continued examinations. See Figure 3.

---

[3] *See* MPEP §1201.



**Figure 2.** USPTO Board of Patent Appeals dispositions and backlog by fiscal year. Note that despite historic increases in received appeals, the Board was able to process more appeals and reduce its backlog. The number of appeal dispositions in a fiscal year was obtained by adding the appeal backlog at the beginning of the year to the number of appeals received that year and subtracting the appeal backlog at end of the year. Dispositions per employee in a fiscal year were obtained by dividing the number of appeal dispositions in that year by the total employee count of the BPAI as reported for that year by the Trilateral Patent Office Statistical Reports. See Appendix B for detail. *Source*: USPTO data as reported in Appendix B.



**Figure 3.** Senior USPTO officials proudly showed the remarkable success in reducing appeal backlog and pendencies in their presentations on the proposed continuation rules, suggesting that applicants should use the appeal process rather than file requests for continued examinations. *Source*: USPTO slide presentations[4].

---

[4] Slide presentation by Robert Spar regarding Continuation Practice and Claims Practice, (March 29, 2006). Available at http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/connipla032906.ppt .

USPTO described several reasons for these very promising declines. For example, USPTO instituted several intermediate steps in the appeal process, including appeal conference program[5] and adopting a pre-brief appeal conference program[6] and stated that these were an essential part of USPTO's improvement. Another important reason is the actual decline in the *appeal rate* as measured by the ratio between the number of appeals to the BPAI in a fiscal year and the number of examiners' final rejection actions in that fiscal year (see the appeal rate plot for Utility, Plant and Reissue ("UPR") applications in Figure 1). Therefore, the available record to date shows that the underlying factors affecting demand for appeals are in check and have been moving in the right direction and that measures already adopted by the USPTO have been effective.

The plan to promulgate the Appeal Rules was first presented in the Department of Commerce's Unified Agenda on April 30, 2007, with a rather vague indication as to the reasons for changing the patent appeal process. Note that the only problem identified was a *current* "appeal backlog and pendency":

> The USPTO is revising the rules of practice with respect to ex parte appeals before the Board of Patent Appeals and Interferences. For example: (1) the requirements for filing an appeal brief are changed to *reorganize* the manner in which the appeal brief and reply brief are presented, (2) lengths of briefs would be established to *shorten briefs*, (3) times for taking action in an appeal would be *reduced*, and (4) authority to decide requests for extensions of time to file certain documents would be assigned to the Chief Administrative Patent Judge obtained by petition. The change is not related to the USPTO's Strategic Plan. The change is *expected to have some positive impact on the USPTO's appeal backlog and pendency*.[7] (Emphasis added).

There is no suggestion here of any future problem to be addressed, or any suggestion of any interaction with the Continuation Rules. Further, the regulatory plan designated this rulemaking "not significant," and therefore OIRA in the Office of Management and Budget was not alerted to the existence of these Appeal Rules, or the interaction that these Appeal Rules would have with the Continuations Rules that were then-pending for OIRA Review, or that USPTO was proposing to curtail the precise appeal rights on which the Continuation Rules were relied for support.

Thee April 30th notice indicated that the Appeal NPRM was to be published sometime in May 2007 with final action taken in July 2007. However, no further details were given. The Appeal NPRM was *not published* in May, as initially planned. Publication was delayed until July 30th, 2007 – after OMB's review of the Continuation Rules concluded earlier in July.

The Appeal NPRM as published July 30, 2007 lacks any causal explanation of any current "workload problem" that the Appeal Rule purports to address. The only discussion of any "specific problem that [the agency] intends to address" is a brief mention of a future fear based on recent upward fluctuation of incoming appeals. No rationale or explanation for the future fear is identified, let alone any supporting data or the models used to justify the future fear, or any reason to believe that a decade of positive trend is about to materially change course:

---

[5] *See* MPEP §1208 (8th ed. 2001) (Rev. 3, August 2005).
[6] *See* New Pre-Appeal Brief Conference Program, **1296** *Off. Gaz. Pat. Office* 67 (July 12, 2005).
[7] Unified Agenda of the Department of Commerce, *Changes To Rules Of Practice Before The Board Of Appeals And Interferences In Ex Parte Appeals.* 72 *Fed. Reg.* 22423, col. 2, (April 30, 2007).

4

> "The Board is currently experiencing a large increase in the number of ex parte appeals. In FY 2006, the Board received 3,349 ex parte appeals. In FY 2007, the Board *expects* to receive more than 4,000 ex parte appeals. In FY 2008, the Board *expects* to receive over 5,000 ex parte appeals. These rules are proposed to change procedures in such a way as *to allow the Board to continue to resolve ex parte appeals in a timely manner*".[8] (Emphasis added).

The Appeal NPRM addressed solely backlog problems that USPTO *expects* will exist *in the future*. The NPRM disclosed no explanation or justification for this estimate, let alone any data or analytical basis for these expectations, or what factors and assumptions were used to model and derive future growth of appeals at the BPAI. There is no discussion of how "existing regulations (or other law) have created, or contributed to, the problem" as required by E.O. 12,866.

The USPTO Annual Report for FY 2006, published in late December, 2006 painted a totally different picture of the patent appeal process:

> "The BPAI had a very successful FY 2006. The average pendency for decided patent appeals *continued to be less than six months*. Similarly, the average pendency for interferences remained below 12 months. Furthermore, the final decisions in over 90 percent of all interferences were mailed within 24 months. During the course of the year, the BPAI was restructured to streamline the internal processing of both patent appeals and interferences. The Board also opened its oral hearings to the public for the first time. Additionally, the Board's e-government initiatives continued to progress. Patent appeals are now entirely processed electronically.[9] (Emphasis added).

Moreover, well after the Unified Agenda notice this spring, and weeks *after* the publication of the Appeal NPRM on July 30, 2007, the USPTO *continued* to bolster the excellent status of the BPAI patent appeal backlog and pendency by stating the following:

> The Office also appreciates that applicants sometimes use continued examination practice to obtain further examination rather than file an appeal to avoid the delays that historically have been associated with the appeal process. The Office, however, *has* taken major steps *to eliminate such delays*. First, the Board of Patent Appeals and Interferences (BPAI) *has radically reduced the inventory of pending appeals and appeal pendency* during the last five fiscal years. Second, the Office has adopted an appeal conference program ... [and t]hird, the Office has also adopted a preappeal brief conference program ... . These changes provide for *a relatively expeditious review of rejections in an application under appeal*. Thus, for an applicant faced with a rejection that he or she feels is improper, the appeal process offers *a more effective* resolution than seeking continued examination before the examiner.[10] (Emphasis added).

This August 21, 2007 statement indicated that the USPTO *has already* taken major steps to reduce delays and radically reduced backlog. Neither the August 21 Continuation Rules notice or the July 30 Appeals NPRM refer directly to the other, let alone explains the apparent contradictions in reason. This is remarkable because this writer recalls no other instance in the last 25 years, where an agency proposed to adopt regulations having a stated reason that is directly contradicted in its own publications a few months prior and even three weeks later.

---

[8] Appeal NPRM at 41472, col. 2.
[9] United States Patent and Trademark Office, *Performance and accountability report: fiscal year 2006*, Available at http://www.uspto.gov/web/offices/com/annual/2006/2006annualreport.pdf, at 23.
[10] USPTO, Final Continuation Rules, note 2 at 46720, col. 2&3, (Aug 21, 2007).

## 2  THE STATED REASONS FOR THE PROPOSED APPEAL RULES ARE NOT CONSISTENT WITH EXECUTIVE ORDER 12,866, OR WITH OTHER CONTEMPORANEOUS USPTO STATEMENTS IN THE PUBLIC RECORD

Executive Order 12,866[11] (the "EO"), Section 1, requires agencies to promulgate only regulations "made necessary by compelling public need." The agency must identify in writing the "specific problem that it intends to address". Most relevant to this Appeal Rules, §1(b)(2) of the EO requires that "Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively." Only after an agency has determined that regulation "is the best available method of achieving the regulatory objective" may it regulate at all, and then "it shall design its regulations in the most cost-effective manner to achieve the regulatory objective." I am very concerned that USPTO has failed all.

### 2.1  In proposing the Appeal Rules, the USPTO failed to adequately describe the problem it is attempting to solve and failed to show how the specific rules will achieve their stated objective.

The available data of patent appeals at the USPTO is inconsistent with the stated reasons for making the Appeal Rules, as both backlog and pendency have recently reached record lows. As USPTO's own data in figures Figure 1 through Figure 3 show, the proposed Appeal Rules lack nexus in the record of the BPAI appeal workload. Both appeal backlog and the number of appeals received by the BPAI had fluctuated with magnitudes far more significant than the modest increases recently seen in FY '05-'06. Moreover, the largest annual number of appeals that the Appeal NPRM projects for the future is 5,000. But according to Figure 2, the BPAI has already demonstrated ability to dispose of more than that number annually with a *significantly smaller employee force* than it has today. Thus, by merely stating these projected increases as a basis for changing the rules, the USPTO presumes that one should take leave of one's realistic perspectives of the small relative magnitude of these changes compared to historical fluctuations in appeal demand and backlog. Because, if one accepts as probable the higher number of appeals that the USPTO expects the BPAI to receive in FY 2007 and FY 2008, the projected absolute numbers of appeals per year are no larger than those experienced in the 1990's. This, even though the number of applications filed per year from which appeals can materialize will have more than doubled since the 1990's. The USPTO has failed to explain what it would consider a natural growth for appeals in view of the growing base from which they arise. If the growth in appeals to the BPAI is no more than proportional to the growth in the number of patent applications (or final rejections), the USPTO must explain why the rule changes are necessary and why appropriate assignment of BPAI resources as required to meet increased user demand (accompanied with increased paid-in fees) would not suffice.[12]

---

[11] Executive Order 12866, *Regulatory Planning and Review*, of September 30, 1993, as amended by E.O. 13258 of February 26, 2002 and E.O. 13422 of January 18, 2007.

[12] The USPTO's burden in answering this question prior to adopting its rules is particularly elevated in view of the unique workload related record shown in Figure 2, indicating that the BPAI appeal productivity per employee has *declined* by 40% for some unexplained reason and in view of the additional fact that the USPTO had already acted to expand even further its BPAI resources through its budget requests, specifically earmarking increases in BPAI

Assuming the proposed rules are adopted, it is doubtful that they will have an impact on appeal pendency or workload. For example, the NPRM neglected to characterize the length of Appeal and Reply Briefs now filed by appellants but its proposal to limit Appeal Briefs to 25 pages and Reply Briefs to 15 pages is touted as a means of reducing the BPAI workload. However, the NPRM failed to discuss the frequency or amount with which these limits are exceeded, thereby failing to establish that the aggregate workload savings are of any significance. Yet it would impose severe hardships and inequities on applicants who need the additional appeal breadth to adequately present their case. As Figure 4 shows, the flow of appeals to the BPAI is a result of an intricate procedure at the USPTO and the Appeal NPRM does nothing to explain how the proposed rules will affect all its components. For example, no consideration is given in the NPRM to the fact that the restrictive burdensome rules would apply to a volume of applicants' briefs that is *more than a factor of five larger* than that actually reaching the Appeal Board. (Compare the sum of Appeal Briefs and Reply Brief, about 15,400, to the 2,834 Appeals entering the BPAI in Figure 4).



**Figure 4**. Ex Parte Appeal Process flow at the USPTO. The unit flow numbers in red indicate the number of cases in each flow category during FY 2005 and are not necessarily the same cases, due to accumulation and delays. The cases that the BPAI affirmed-in-part or reversed-in-part are aggregated under the unit flow labeled "Modified". *Source*: USPTO data described in Appendix B and USPTO answer to FOIA Request, note 40.

In order to reduce the number of Appeal Briefs, the USPTO must also improve the examination process. Pre-Appeal Brief Reviews and Appeal Conferences find examiner error (either return

---

staff to handle workload increases. (See Section 2.2 and footnote 32 below for discussions on these requests).

for reopened examination, or for allowance) considerably more often than it finds the minimal merit in the examiner's position to warrant allowing the appeal to go forward. (See Figure 4). The NPRM is silent as to whether it seeks to improve the initial examination process or Appeal Conferences in Figure 4 and what impact its proposed rules will have on that process. USPTO must provide cost-benefits analysis of its proposed rules' impact on elements shown in Figure 4, which affect the flow of appeals to the BPAI. It should also provide estimates of efficiencies it expects to obtain including those at the BPAI, which would justify the costs to applicants, as shown in Section 3.

These rules rest merely on USPTO's unsupported *forecast of future* workload. No support for this forecast is provided – for all the record reveals, this forecast is either the raving of a "chicken little," or deliberate data hiding by the agency. Neither of these is a legally permissible basis for rulemaking. A reviewing court will not be permitted to assume agency rationality where the agency failed to make a record of rational decision making during notice-and-comment.[13] Promulgating these rules in reliance on internal undisclosed USPTO predictive models for future appeal workload denies the public an opportunity to challenge the assumptions and the models' details during the comment period[14], and is therefore illegal under the Administrative Procedure Act[15], the Information Quality Act[16], and OMB's[17] and USPTO's information quality guidelines[18]. I assume that this is a mere oversight, and that the BPAI, being "persons of competent legal knowledge" would wish to fully comply with the law. The entire rule package, along with all supporting data and models should be republished for meaningful notice and comment.

The most striking aspect of the historical record of appeals is that these Appeal Rules are proposed at a time when even the most aggressive realistic projections for appeal numbers would place the backlog at several factors below that experienced at the USPTO in the latter half of the 1990s. Yet, throughout that time, the USPTO had opportunities to amend its patent appeal rules, to address the "workload problem". When the USPTO last proposed to overhaul its appeal rules in 2003[19], it had an appeal backlog that significantly exceeded recent levels. Subsequently, it had "significantly overhauled its operations to *address concerns about the duration of*

---

[13] *Connecticut Light and Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982) ("In order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules. To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport. An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."); *American Medical Ass'n v. United States*, 887 F.2d 760, 767 (7th Cir. 1989) ("It is not consonant with the purpose of rule-making proceeding to promulgate rules on the basis of inadequate data or data that in critical degree, is known only to the agency.")
[14] *Eagle-Picher Industries, Inc. v. U.S. E.P.A.* 759 F.2d 905, 921, C.A.D.C.,1985. ("An agency may utilize a predictive model so long as it explains the assumptions and methodology used in preparing the model; if the model is challenged, agency must provide a full analytical defense").
[15] 5 U.S.C. § 500 et seq.
[16] Pub. L. 106-554, Section 515.
[17] Office of Management and Budget, "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Notice; Republication, 67 Fed. Reg. 8452-8460, (Feb. 22. 2002).
[18] USPTO, "Information Quality Guidelines," online at http://www.uspto.gov/web/offices/ac/ido/infoqualityguide.html .
[19] **68** *Fed. Reg.* 66648, (Nov. 26, 2003), Final rule: 69 *Fed. Reg.* 49960, (August 12, 2004).

8

*proceedings before the Board*".[20] (Emphasis added). In addressing the Appeal Board workload issues by regulatory means, it could have proposed, but chose not to propose, any of the restrictive and burdensome rules of the instant Appeal NPRM. Given the historical record shown in Figure 1, if the real reasons for the instant Appeal NPRM rules were primarily workload related, these rules would have been proposed years ago, not at a time of record low backlog.[21] Clearly, there is another agenda behind these rules that had not been disclosed in the Appeal NPRM.

An agency must give a reasoned basis for adopting a regulation. See 5 U.S.C. § 553(c). The fact that these Appeal Rules are proposed to replace existing rules that have been in place during times of appeal workloads that exceeded the highest loads projected in the Appeal NPRM, places a special burden on the USPTO to provide a reasoned justification for departing from its existing practice.[22] The USPTO's reasons for adopting the proposed Appeal Rules are not only contrary to its other pronouncements and less than ideal in clarity, but as explained above, its path from the factual record to the proposed regulations cannot be reasonably discerned. Furthermore, the Appeal NPRM stated no new objectives underlying statutory scheme it purports to construe that require the adoption of the Appeal Rules.[23]

### 2.2 USPTO's reason for the proposed rules appears to be directed at suppressing applicants' appeals as they seek alternatives to the continued examination practice.

As shown above, none of the reasons given in the Appeal NPRM for adopting the Appeals Rules appear supportable by the record. It turns out that the most relevant fact has not been disclosed in the Appeal NPRM, although it is evident from USPTO statements and its senior officials' pronouncements made elsewhere. Evidently, most relevant to the reason for the proposed Appeal Rules is the USPTO's anticipation of a future surge in appeals *due to a problem of its own making*. It is the adoption of the Continuation Rules scheduled to become effective on November 1, 2007[24], and the USPTO's efforts that appear directed at erecting new barriers and burdens, substantially curtailing applicants' use of alternatives to the continued examination practice. Because the use of such continuation practice would be severely limited by the USPTO under its newly adopted Continuation Rules, some applicants have planned to challenge final

---

[20] 69 *Fed. Reg.* 49960, Col. 1.
[21] *Schurz Communications, Inc. v. F.C.C.*, 982 F.2d 1043, 1053, C.A.7, 1992, (It is not enough that administrative rule might be rational; statement accompanying promulgation must show that it is rational--must demonstrate that reasonable person upon consideration of all points urged pro and con would conclude that rule was reasonable response to problem that agency was charged with solving).
[22] *Macon County Samaritan Memorial Hosp. v. Shalala* 7 F.3d 762, 765-766, (8th Cir. 1993) ("When a new rule reflects a departure from the agency's prior policies, the agency is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." Citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)); *Simmons v. I.C.C.*, 829 F.2d 150, 156 (D.C. Cir. 1987) (While agency is always expected to rationalize its action in rulemaking context, new rule constituted departure from past policy or practice amplifies need for adequate explanation); *American Soc. of Cataract & Refractive Surgery v. Sullivan*, 772 F.Supp. 666, 671 (D.D.C. 1991) (Administrative Procedure Act imposes on agency requirement that, when promulgating rule, agency must examine relevant data and articulate satisfactory explanation for its actions, including rational connection between facts found and choice made; this requirement is particularly stringent when agency is changing long-established policy or practice).
[23] *See supra* note 22, *Simmons v. I.C.C.*, at 156 (Agency which adopts new rule, constituting departure from past policy or practice, must at minimum explain its actions with reference to objectives underlying statutory scheme it purports to construe).
[24] *See supra* Final Continuation Rules, note 10.

9

examiner rejections by filing an appeal rather than file, or petition to file, a Request for Continued Examination ("RCE") or a continuation application with new claims.

As early as 2005, the USPTO knew and expected that in reaction to the planned limits set in its Continuation Rules, applicants would have no choice but to use the appeal channel more heavily. In fact, in its January 3, 2006 publication of the Notices of Proposed Rulemaking for the Continuation Rules [25] ("Continuation NPRM"), the USPTO suggested as much:

> "The Office also appreciates that applicants sometimes use continued examination practice to obtain further examination rather than file an appeal to avoid the delays that historically have been associated with the appeal process. The Office, however, has taken major steps to eliminate such delays. The Board of Patent Appeals and Interferences (BPAI) has radically reduced the inventory of pending appeals from 9,201 at the close of fiscal year 1997 to 882 at the close of fiscal year 2005. The Office has also adopted an appeal conference program to review the rejections in applications in which an appeal brief has been filed to ensure that an appeal will not be forwarded to the BPAI for decision absent the concurrence of experienced examiners. See Manual of Patent Examining Procedure section 1208 (8th ed. 2001) (Rev. 3, August 2005) (MPEP). The Office is also in the process of adopting a pre-brief appeal conference program to permit an applicant to request that a panel of examiners review the rejections in his or her application prior to the filing of an appeal brief. See New Pre-Appeal Brief Conference Program, 1296 Off. Gaz. Pat. Office 67 (July 12, 2005). These programs provide for a relatively expeditious review of rejections in an application under appeal. Thus, for an applicant faced with a rejection that he or she feels is improper from a seemingly stubborn examiner, the ***appeal process offers a more effective resolution than seeking further examination*** before the examiner.[26]

In offering these appeal alternatives to continued examination, the USPTO neglected to disclose that it would foreclose on the appeal practice with which applicants were familiar with, by erecting new barriers for appellants, as in the instant Appeal NPRM. Apparently, this "invitation" to use the appeal channel that was about to be severely constricted appears disingenuous at best. At that time, the USPTO had expected that the Continuation Rules would be in place in FY 2007 and that it would cause major systemic shifts in applicants' behavior, flooding the BPAI with appeals. That information was formulated by the USPTO as early as February 22, 2006, and quietly inserted in the USPTO budget request document[27] (posted on the USPTO Budget Plans & Reports web site[28]). However, no specific news alert about its availability appeared on the USPTO news page, and at no time did the USPTO provide any indication in the context of its relevant rulemaking proceedings that the public should read its proposed budget document to gleam information about its appeal projections due to the Continuation Rules. The USPTO budget request document stated (Emphasis added):

> "[D]uring fiscal year 2007, the Board of Patent Appeals and Interferences (BPAI) anticipates it will begin to receive an increased level of appeals following continuation rulemaking to bring greater finality to patent application prosecution. Based on *existing assumptions*, the office anticipates BPAI's appeal workload to *increase by approximately one-third*. Therefore, in order to maintain a level of timeliness in appeal processing while initializing post-grant review, the office estimates an increase of 10 [Administrative Patent Judges], or other legal professionals, and seven paralegals to support continuation reform".[29]

---

[25] USPTO Notice of Proposed Rulemaking, "*Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims*", 71 Fed. Reg. 48, (January 3, 2006).
[26] **71** *Fed. Reg.* 51, col 1-2.
[27] USPTO, *2007 Budget* at http://www.uspto.gov/web/offices/ac/comp/budg/fy07pbr.pdf
[28] USPTO, Budgets, Plans & Reports. (February 22, 2006). At http://web.archive.org/web/20060619145310/http://www.uspto.gov/web/offices/ac/comp/budg/index.html.
[29] USPTO 2007 Budget, note 27 at 32.