Tafas v. Dudas et al
Case 1:07-cv-00846-JCC-TRJ   Document 66-27   Filed 11/14/2007   Page 1 of 10
Doc. 66 Att. 26

# EXHIBIT 16

# PART 2 OF 3

Dockets.Justia.com

The "existing assumptions" and the conclusive projections they led to were concealed from OMB/OIRA and from the public during Continuation Rules and the Appeal Rules proceedings. The matter-of-fact workload reasons stated in the Appeal NPRM for the Appeal Rules appear as mere obfuscation in an attempt to avoid stating the actual reasons for these rules and reveal the plan the USPTO had all along to suppress the appeal surge due to the Continuation Rules - a problem of its own making. There is evidence that USPTO management believed it should adopt policies that suppress actions of applicants who use multiple continuations and RCEs because they are held by the USPTO as "*outliers*" who do not use "*best practices*". A senior official[30] at the USPTO said so and has indicated that the Office intends to exert "*leverage*" on such "outliers" not only by limiting their right to multiple continuations, but also by "*surrounding*" them with other rules and suppressive measures to keep their alternatives in check.[31] The content and timing of the proposed Appeal Rules are in fact consistent with such efforts by the USPTO to exert "leverage" and "surround" applicants who would otherwise file continuation applications.

Had the USPTO not attempted to exert a *simultaneous* "leverage", suppress and "surround" applicants who seek relief through the BPAI appeal alternative to the practice of continued examination, it would not have proposed to adopt these rules at this time. Instead, it would have enabled applicants to navigate through their already difficult choices without also having 'tied their hands behind their back' by piling up arbitrary burdens and last minute changes in *all other rules of the game.* The USPTO proposes to deny applicants the ability to engage in defenses with which they have been familiar – the existing appeal practices, at the exact time that they are entering an otherwise unfamiliar and uncharted territory of patent prosecution. This only exacerbates the burdens even further, setting patent practitioners up for more failures to meet new and unfamiliar burdens. The USPTO failed to show that this is necessary.

The USPTO could have avoided harming applicants by letting the appeal practice take its course under the existing rules while the Continuation Rules take effect so that the actual trends of appeals could be ascertained and the record established. As Figure 2 shows, the BPAI has already demonstrated capability of appeal disposition rates larger than those projected in the Appeal NPRM. Moreover, the USPTO's budget requests of the recent two consecutive fiscal years earmarked funds for expanding the BPAI and those should be allowed to run their course of enabling even further enlargement of BPAI staff.[32] At that later time, the record of the appeal

---

[30] John M. Whealan, USPTO's Deputy General Counsel for IP Law and Solicitor, *5th Annual Hot Topics In Intellectual Property Law Symposium*, Duke University School of Law, (Feb 17, 2006), http://realserver.law.duke.edu/ramgen/spring06/students/ 02172006a.rm, at time mark 53:38-54:55.

[31] John M. Whealan remarks, Duke Symposium, note 30 supra, at 58:57 ("In your comments, if you want to suggest how people are going to plan to game the system, please tell us. We try to think of some of the ways. … I am trying to figure out the ways people are going to try to get around these [rules]"); At 1:01:30-1:01:38 ("I don't care whether you gave us four filing fees, we're going to issue just one, - its going to be surrounded").

[32] This fact has been conveniently left out from the USPTO discussion of future BPAI workload projections in the Appeal Rules proceeding. In addition to its FY 2007 budget request discussed above, USPTO's FY 2008 budget request states: "The Patent Examining Corps will implement a number of initiatives in FY2008 that will significantly expand its workload. This will result in a significant increase in the workload of appeals to the Board. This projected workload increase at the Board results in the need for 27 additional Administrative Patent Judges (APJs) and 10 paralegals and one Legal Instruments Examiner to perform the associated activities of processing and reviewing appeals to maintain current pendency goals". The requested amount for FY 2008 was $5.25M, projected to be $9.97M, $11.05M, $11,3M and $11.54M in FY 2009, FY 2010, FY 2011 and FY 2012 respectively. *See* USPTO, FY2008 President's Budget Request, (February 2007), p. 21.

practice in the new regulatory environment can be examined and may be considered ripe for possible action in conjunction with any other changes required in the Continuation Rules. USPTO's rush to change *all* the rules before it has assessed the effects of the earlier proposed rules is simply bad policy and the real consequences of its thrashing around these rules must be questioned.

### 2.3 The USPTO concealed and delayed the publication of the Appeal Rules, evading review and public scrutiny in conjunction with the Continuation Rules.

As the text of the USPTO budget request quoted above[29] establishes, the USPTO had projected that the Continuation Rules will cause a collateral rise in appeals to the BPAI in magnitudes that had not been experienced by the BPAI for years. The BPAI collateral workload concerns were therefore fully developed by February 2006 to merit a budget request and therefore must have been a consideration early in formulating the Continuation Rules. Yet, the USPTO kept silent about this significant collateral effect in any of its relevant rulemaking proceedings. Evidently, if there were any BPAI workload concerns purported to form the underlying basis for the Appeals Rules, they were fully developed and did not have to wait for a year and a half to be raised in such rulemaking. With only a modest increase in appeals in FY 2006 and very little data from FY 2007, no new information more significant than the 33% projected collateral increase in BPAI workload has been developed by the time the USPTO had began the official process of the Appeals Rules.[33] Therefore, as explained above, the USPTO was actually only operating on its February 2006 projection predicting 33% surge in appeals but it delayed its publication of the smaller package Appeal Rules until after the Continuation Rules were completed, including their OMB review.

The sequential timing coordination within days is remarkable, as Figure 5 shows. Therefore, the public and OMB were both denied an opportunity to consider and comment on the Continuation Rules in *light of* the severe barriers and restrictions to be imposed on the very alternative to continuations that the USPTO suggested applicants should pursue.[34] It is doubtful that the USPTO could have made this suggestion with a straight face, had the public and OMB been aware of USPTO's simultaneous attempt to restrict and burden the appeal opportunity. Public comments and OMB's scrutiny prior to the close of the Continuation Rules' proceeding would likely have exposed the USPTO's untenable suggestion for the "alternative" as disingenuous at best. Moreover, both public comments and OMB's scrutiny would have required that USPTO account in the Continuation proceeding for the economic impact of the incremental appeal costs on applicants who would have to file appeals rather than continuations. Therefore, one should hardly be surprised by the timeline shown in Figure 5. The incompatibility between the two rule packages suggests that both rule packages are arbitrary and capricious.[35]

---

At http://www.uspto.gov/web/offices/ac/comp/budg/fy08pbr.pdf

[33] U.S. General Services Administration's records show that the Appeal Rules RIN establishment (0651-AC12) was made on February 21, 2007.

[34] Continuation NPRM as quoted above in reference to footnote 26.

[35] See *Mid-Tex Electric Cooperative Inc. v. Federal Energy Regulatory Comm'n*, 773 F.2d 327, 357-60 (D.C. Cir. 1985) ("double whammy" that catches parties between two different rules is invalid, and cannot be left to case-by-case resolution; rule is further infirm for failure to consider balance of economic effects).

12



**Figure 5.** The temporal coordination of USPTO's Appeal and Continuation rulemaking. It is argued that while the USPTO was apparently acting on its February 2006 fully developed projections of appeals surge, the Appeal Rules' publication was delayed until OMB had completed its review and modification of the Continuation Rules. See text for the significance of this. *Sources*: The dates specified are from the respective Federal Register publications referred to throughout this document. OMB review period dates are based on OMB's regulatory information.[36] USPTO's projection of an appeal surge was published in its FY 2007 budget request, note 27 at 32.

Despite the fact that the proposed Appeal Rules require substantial incremental expenditures (as shown in Section 3 below), and despite USPTO's admission that it would cost more for appellants to comply with the rules, the USPTO has been silent on its own assessment of the incremental costs. It merely made the unsupported assertion that the rules relate solely to procedures and that the changes involve interpretive rules[37] that would not significantly increase the cost of filing or prosecuting an appeal.[38] By such unsubstantiated assertion and by characterizing the proposed rule changes as non-substantive, the USPTO evaded its responsibility to submit these economically significant rules for OMB review. Further, by the sequential promulgation of these Continuation Rules and Appeal Rules, the USPTO has separated the gross economic impact of the packages of rules, intended or not, to misrepresent the true effect of its packages of rules. This has deprived the public and OMB from properly addressing the additional effects of the Appeal Rules on the Continuation Rules in combination, and by doing so has circumvented OMB and the Regulatory Flexibility Act for both packages of rules.

---

[36] OIRA Conclusion of EO 12866 Regulatory Review, RIN: 0651-AB93 at http://www.reginfo.gov/public/do/eoDetails?rrid=114344 .
[37] Appeal NPRM at 41483, col. 3.
[38] Appeal NPRM at 41484, col. 1, ("The proposed rules which change the format and content of briefs may require the appellant to spend additional time in preparing a compliant brief. ... These proposed procedural rules do not significantly increase the cost of filing or prosecuting an appeal before the Board. Accordingly, these proposed rules do not have significant economic impact on a substantial number of small entities").

## 3  THE PROPOSED APPEAL RULES ARE ECONOMICALLY SIGNIFICANT UNDER EXECUTIVE ORDER 12,866

Section 3(f) of Executive Order 12,866[39], (the "EO"), defines in pertinent part *"Significant Regulatory Action"* as "any regulatory action that is likely to result in a regulation that may [h]ave an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities". I show below that the proposed Appeal Rules meet the test for being economically Significant Regulatory Action because they may have an annual effect on the economy of $100 million or more and because they may adversely affect in a material way the economy, and in particular, those sectors of the economy that develop and rely on technical innovation and intellectual property.

I present the results of my analysis of the proposed rules that show that the costs would exceed the "Economically Significant" threshold in the first year of implementation and are expected to reach levels that more than double the threshold by 2012. I conservatively calculate only the increases in the preparation costs of Appeal Briefs and the Reply Briefs as incremental costs pertaining to compliance with the proposed rules. Not included in this analysis are the costs of extra petitions and pleadings associated therewith that would arise out of these excessively restrictive rules. More importantly, not included are the costs to patentees from the loss of patent rights due to irreversible procedural barriers that may deny appellants a full and fair adjudication of patentability. These patent rights, which would otherwise be retained under current rules, could reach amounts far larger than those estimated in this section.



Figure 6. Actual (solid) and projected (broken lines, open circles) number of Appeal Briefs and Reply Briefs filed with the USPTO. The upward 'bump' projected in 2008 is based on USPTO's own projections of a 33% collateral increase in patent appeals when the continuation rules are in effect. *Sources*: See text in Sections 3.1-3.2.

---

[39] Executive Order 12866, *Regulatory Planning and Review*, of September 30, 1993, as amended by E.O. 13258 of February 26, 2002 and E.O. 13422 of January 18, 2007.

...

### 3.1 Appeal Briefs

As Figure 4 shows, appeals that reach the BPAI are but a small fraction of cases for which an Appeal Brief is submitted. However, the economic impact of the proposed Appeal Rules would have broad effect on all appellants filing Appeal Briefs and Reply Briefs. Evidently, the number of Appeal Briefs grew more rapidly than the number of cases reaching the BPAI in recent years. To estimate the total number of Appeal Briefs filed, the USPTO historical data on the number of such appeals as provided in a recent answer to a Freedom Of Information Act ("FOIA") Request[40] was used for determining the growth trends in recent years. The numerical values are tabulated under the "Actual" segment of Table 1. The actual number of Appeal Briefs in FY 2006 was provided by the USPTO in the Appeal NPRM.[41] It reflects an upward deviation from prior trend that is in part likely due to USPTO's institution of pre-appeal conference proceedings, elevating demand for the appeal process. The projected number of Appeal Briefs relies on the growth trend over the four fiscal years ending in FY 2005. As shown in Figure 6, the exponential regression analysis for these years results in an annual growth rate of 16.88%. A model of future Appeal Briefs filings assumes this 16.88% growth rate after FY 2006 and includes a step increase of 33% in FY 2008. The relative magnitude of this upward step is based on the USPTO's own projection of a collateral appeal surge due to the continuation rules taking effect[42]. Because these continuation rules are expected to take effect after the first month of FY 2008, the model assumes the collateral "bump" in Appeal Briefs to be in FY 2008. Because the continuation rules are expected to continue to have their effect on appeals every year thereafter, there is no projected decline in appeals and the historic growth rate was applied for projecting the Appeal Brief load in later years.

The Average Incremental Appeal Brief Cost assumed in Table 1 is based on the sum of estimates for each proposed rule as further described in Table 4 of Appendix C. By multiplying this estimate by the number of Appeal Briefs filed in each year, the total incremental costs per year for all appellants is shown in the appropriate column in Table 1.

---

[40] USPTO, *Appeal Conference Effects - Examiner Actions in Response to Appeal Brief.* Response letter dated March 14, 2006 to FOIA Request No. 06-146.
[41] Appeal NPRM at 41484, col. 1.
[42] USPTO projection was published in its FY 2007 budget request, note 27 at 32. Although the USPTO projected the collateral increase in appeals reaching the BPAI, it is assumed that such relative increase would be a result of a proportional increase in Appeal Briefs.

15

| | FY | Appeal Briefs Filed | Reply Briefs Filed | Incremental Appeal Costs | Incremental Reply Costs | Total Incremental Costs Due to Proposed BPAI Rules |
|---|---|---|---|---|---|---|
| Actual | 2002 | 7,001 | 2,709 | Average Incremental Appeal Brief Cost: $3,180 | Average Incremental Reply Brief Cost: $930 | |
| Actual | 2003 | 8,289 | 3,248 | | | |
| Actual | 2004 | 9,470 | 3,676 | | | |
| Actual | 2005 | 11,263 | 4,120 | | | |
| Actual | 2006 | 18,500 | 5,607 | | | |
| Projected | 2007 | 21,622 | 8,269 | (Thousands) | | |
| Projected | 2008 | 33,612 | 10,559 | $106,885 | $9,820 | $116,705 |
| Projected | 2009 | 39,285 | 15,024 | $124,925 | $13,973 | $138,898 |
| Projected | 2010 | 45,915 | 17,560 | $146,010 | $16,331 | $162,341 |
| Projected | 2011 | 53,665 | 20,524 | $170,654 | $19,087 | $189,741 |
| Projected | 2012 | 62,722 | 23,988 | $199,457 | $22,309 | $221,765 |
| Projected | 2013 | 73,309 | 28,037 | $233,121 | $26,074 | $259,195 |
| Projected | 2014 | 85,682 | 32,769 | $272,467 | $30,475 | $302,942 |
| Projected | 2015 | 100,143 | 38,299 | $318,455 | $35,618 | $354,073 |
| Projected | 2016 | 117,045 | 44,763 | $372,204 | $41,630 | $413,834 |
| Projected | 2017 | 136,800 | 52,319 | $435,024 | $48,656 | $483,681 |

**Table 1.** The economic impact of the Appeal Rules is significant. Incremental costs for preparing compliant briefs. *Sources*: For actual and projected number of briefs, see text in Sections 3.1-3.2. The average incremental costs for Appeal Brief and Reply Brief are derived in Appendix C.

## 3.2 Reply Briefs

As shown in Figure 4, less than 38% of Appeal Briefs actually receive an Examiner Answer. Appellants submit Reply Briefs only in response to Examiner's Answers. In this model, it is assumed that the number of Reply Briefs filed is virtually equal to the number of Examiner's Answers because the latter are invariably directed at sustaining the Examiner's rejection of at least one of the claims on appeal. Therefore, the "Actual" section of the Reply Briefs column in Table 1 identifies the number of Reply Briefs with the number of Examiner's Answers for which information is available in the USPTO's FOIA response.[40]

Because the number of Reply Briefs appears (and is functionally) proportional to the number of Appeal Briefs, a simple model is adopted in which the number of Reply Briefs $RB(t)$ filed in the fiscal year $t$ is given by:

$$RB(t) = r\left[\frac{1}{4}AB(t) + \frac{3}{4}AB(t-1)\right]$$

wherein $AB(t)$ is the number of Appeal Briefs filed in fiscal year $t$ and wherein $r$ is a proportionality fraction determined by ratio regression of the data of prior years. Because of delays in processing briefs, this model assumes that Reply Briefs are mostly related to cases for which Appeal Briefs were filed in the prior year and only fractionally to those in filed in the same fiscal year. The proportionality fraction $r$ found by the regression of the ratios between the observed Reply Brief counts and the Appeal Brief counts in the "actual" segment was $r = 0.429$. The above equation was then used to project the number of Reply Briefs in the future and the results are shown in the "Projected" section of Table 1 and in the projected curve sector of Figure 6. The Average Incremental Reply Brief Cost assumed in Table 1 is based on the sum of estimates for each proposed rule as further described in Table 5 of Appendix C.

16

### 3.3   Economic significance under Executive Order 12,866

The USPTO offers no facts whatsoever to support its "determination" that the proposed Appeal Rules are "economically insignificant"[43] – this appears to be another case of USPTO rulemaking machinery simply making up any "fact" that is convenient for the day. Any careful analysis shows that the proposed Appeal Rules are "economically significant" under the EO.

The summary column in Table 1 shows that even in the first year of the implementation of the proposed Appeal Rules, the aggregate incremental cost for appeals subject to these rules would exceed the EO's threshold of $100 Million, and more than double it by 2012. As stated earlier, this analysis is conservative, as it does not include other significant cost elements discussed above. As shown in Table 1, right from the start, the proposed rules constitute an economically *Significant Regulatory Action* under the EO.

### 3.4   USPTO's proposed rules were accompanied by no regulatory analysis of social benefits and costs

Section 1(b)(6) of the EO requires that:

> "Each agency *shall* assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a *reasoned determination* that the benefits of the intended regulation justify its costs". (Emphasis supplied)

The Appeal NPRM contains no competent or supported analysis of social benefits and costs, only a "rabbit out of the hat" assertion:

> "The proposed rules which change the format and content of briefs may require the appellant to spend additional time in preparing a compliant brief. The effect of such rules, however, will be to enhance the likelihood that the appealed claims will be allowed without the necessity of further proceeding with the appeal and improve the efficiency of the decision-making process at the Board. *Any additional time burden* that is imposed by the proposed rules relating to briefs is believed to be *de minimus* [sic] in comparison to the *reduction in pendency that appellant gains* as a result of early identification of allowable claims or a more efficient decision-making process.".[44] (Emphasis added).

Setting aside the patently wrong assertion that the imposed burdens are de minimus (see the economic analysis above), the *advantages* to applicants in adopting the proposed rules are identified in the Appeal NPRM as *reduction of pendency*. While this assertion has not been supported, the opposite and conflicting characterization of what constitutes an advantage to applicants is made only five pages before:

> [Under the existing practice], "appellants have *taken advantage* of the provisions of Rule 136(a) to file a reply *to maintain the appeal* [*increase its pendency*]. The length of possible patent term adjustment (35 U.S.C. 154(b)(2)(iii)) is based on the time an appeal is pending."[45]

Which is then an advantage to applicants? Extending or shortening appeal pendency? If the USPTO does not even know what constitutes an advantage to applicants, how can it establish that the proposed rules will benefit applicants? In any event, the assertion that applicants would

---

[43] Appeal NPRM at 41484, col. 1. ("This rule making has been determined to be not significant for purposes of Executive Order 12866").
[44] Appeal NPRM at 41484, col. 1.
[45] Appeal NPRM at 41479, col. 3.

17

benefit by pendency reductions simply ignores the fact that pendency is already compensated for by patent term adjustments of 35 U.S.C. § 154(b).

# 4 THE PROPOSED RULES CONTRAVENE THE PAPERWORK REDUCTION ACT

The proposed Appeal Rules include information collection that is illegal under the Paperwork Reduction Act[46] ("PRA"). Proposed rules 41.37(t) and (u) and 41.41(h)(2) and (3) would require appellants to repackage and re-submit documents that are already in USPTO's records. (See the relevant column in Table 4 and Table 5). Under the PRA, the Office of Management and Budget cannot approve Information Collection Requests that are duplicative[47]: For example, proposed rule 41.37(t) ("The 'evidence section' shall contain only papers which have been entered by the examiner.") demands information collection that is unambiguously duplicative. Not only is the requested information accessible to the BPAI, it is maintained electronically by the USPTO in a form and format that the USPTO itself prescribed. These requirements contravene the PRA.

# 5 CONCLUSION

The President himself has instructed the USPTO to "examine whether existing regulations… have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively." To carry out the President's instructions, USPTO must withdraw these proposed rules and the Continuation Rules. The agency must examine, in writing, the train-wreck that its own regulations are causing, and develop new regulations.

In developing new regulations, USPTO must immediately examine powerful alternative regulatory solutions to its workload problem such as Examination on Request, a workload savings program[48] that it has failed to seriously and publicly consider, despite specific congressional authorization under the Consolidated Appropriations Act of 2004.[49] It may also consider an entire new package, covering continuations, numbers of claims, and appeals in a new Notice of Proposed Rulemaking, with adequate factual support and analysis of the economic effect and interactions. USPTO should make very clear how the newly-proposed rules allow applicants to obtain the full patent protection granted by Congress, and how USPTO has guaranteed that it has not usurped the substantive rights granted to inventors.

---

[46] 44 U.S.C. § 3501 et seq.
[47] "To obtain OMB approval of a collection of information, an agency shall demonstrate that it has taken every reasonable step to ensure that the proposed collection of information: (i) Is the least burdensome necessary for the proper performance of the agency's functions to comply with legal requirements and achieve program objectives; (ii) Is not duplicative of information otherwise accessible to the agency;…" See 5 C.F.R. § 1320.5(d)(1).
[48] Analysis of Examination On Request program described in a Letter from R.D. Katznelson to Susan Dudley of June 29, 2007, available at http://www.whitehouse.gov/omb/oira/0651/comments/460.pdf at 30. (Patent applications are examined only if requested within a set period, projecting 20% immediate savings in USPTO workload).
[49] Pub. L. 108–447, 118 Stat. 2809 (2004). (Provides that 35 U.S.C. 41 shall be administered in a manner that separates user fees to permit deferred payment of examination and search fees. Based on senior USPTO officials' comments to this author, an Examination On Request proposal was presented to AIPLA members (*Ex Parte*), who were reported to have opposed it, persuading USPTO management to abandon such rulemaking proceeding. This undocumented *Ex Parte* conduct in which Examination on Request ideas were presented only to one interest group and not to the public as a whole is a serious lapse in USPTO's responsibility to the public to address its workload problems as provided by law).

In the alternative, USPTO should correct the procedural defects outlined above and it should designate these rules as economically "Significant Regulatory Action". A Regulatory Impact Analysis fully compliant with OMB Circular A-4 should be prepared and published for public comment. All influential information used to support this analysis should adhere to the principles of OMB's and USPTO's Information Quality Guidelines.

Respectfully submitted by

/s/Ron Katznelson/

Ron D. Katznelson, Ph.D.
Encinitas, CA
Office: (760) 753-0668
Mobile: (858) 395-1440
rkatznelson@roadrunner.com