# EXHIBIT 17

# PART 4 OF 4

Dockets.Justia.com

In response, the final rule modifies the time period within which any divisional application must be filed. An applicant may currently and under the final rule file a divisional application to each non-elected invention if the USPTO issues a requirement that an application containing claims to multiple inventions be restricted to a single invention (a restriction requirement). The USPTO changed the divisional filing period requirement from during pendency of initial application (proposed rule) to during the pendency of the initial application or its two continuing applications (final rule). As a result, the costs incurred by affected entities will be spread over a longer time period, which will ease the cost burden on these entities.

The final alternative the USPTO implemented in the final rule changes the application of the continued examination filing provisions from any continued examination filing (any continuation, continuation-in-part, or RCE) filed on or after the effective date (proposed rule) to at least "one more" continuation or continuation-in-part application after the effective date, regardless of the number of previous continued examination filings (final rule).

## 7.2  Alternatives Considered But Not Adopted

The USPTO considered changing the proposed claims requirements to instead provide expedited examination to applications containing less than a set number of claims. The USPTO currently has an accelerated examination program for applicants who limit the number of claims in their applications (to no more than three independent claims and no more than twenty total claims) and who also provide an ESD. Therefore, the USPTO did not pursue this alternative in the final rule.

In addition, the USPTO considered another alternative to the proposed claims requirements. To minimize the impact on small entities, the USPTO considered not applying the ESD requirement to pending applications that have not yet been examined (the backfile). However, the final rule's ESD applicability threshold (i.e., applications having more than five independent claims or more than twenty-five total claims) means that most small entity applicants will not be impacted by the final rule or the decision to apply the final rule to the backfile. Given the current backlog of over 700,000 unexamined applications, a decision to not apply the changes to the backfile would mean that it would be calendar year 2010 before the USPTO would see any benefit from the change, and that the USPTO (and applicants) would be in a transition state until late calendar year 2011.

The USPTO also considered a change that affected both the claims and continued examination filing requirements. The alternative would have imposed additional fees for continued examination filings and/or a graduated excess claims fee schedule. Currently, patent application and excess claims fees are set by statute (35 U.S.C. 41(a)). In 2002, the USPTO proposed a patent fee structure that included a graduated excess claims fees schedule and additional fees for continued examination filings. The USPTO was unable to garner sufficient support from patent user groups for a patent fee structure including a

graduated excess claims fees schedule or any additional fees for continued examination filings. Therefore, the USPTO did not adopt the alternative.

The final alternative the USPTO considered but did not adopt addressed the continued examination filing requirements. The change would have expanded the deferral of examination provisions to allow a longer deferral of examination. The USPTO currently has a provision (37 CFR 1.103(d)) under which an applicant may request deferral of examination for up to three years from the earliest filing date for which a benefit is claimed. The USPTO continues to study whether changes (e.g., an increased deferral period, third party request for examination, and patent term adjustment) to the deferral of examination procedure would be appropriate, but notes that patent user groups have historically not favored increases in the deferral of examination. Therefore, the final rule does not contain this alternative.

## Appendix A: Input Cost Estimates

| Cost elements | Estimate | Description/Source |
|---|---|---|
| Patentability search - Simple | $1,000 | AIPLA Report 2005, Table Q39o, 25th percentile, All Individuals |
| Patentability search - Complex | $2,500 | AIPLA Report 2005, Table Q39o, 75th percentile, All Individuals |
| Applicant's time, prepare and attend client interview - Simple | $450 | 3 hours @ $150 (range from 3-21 hours) |
| Applicant's time, prepare and attend client interview - Complex | $2,400 | 16 hours @ $150 (range from 3-21 hours) |
| Attorney's fee for patent application - Simple | $7,000 | AIPLA Report 2005, Table Q39e, 25th percentile, All Individuals |
| Attorney's fee for patent application - Complex | $15,000 | AIPLA Report 2005, Table Q39c, 75th percentile, All Individuals |
| Application Filing Fee (Initial/Cont/CIP) (USPTO) | $500 | USPTO FY2006 Fees |
| Excess independent claims fee (USPTO)** | $1,300 | USPTO FY2006 Fees |
| Excess total claims fee (USPTO)** | $1,400 | USPTO FY2006 Fees |
| Response to First Office Action - Simple | $1,000 | AIPLA Report 2005, Table Q39f, 25th percentile, All Individuals |
| Response to First Office Action - Complex | $4,500 | AIPLA Report 2005, Table Q39g, 75th percentile, All Individuals |
| Prepare CIP application, lawyer's fees | $3,500 | USPTO staff estimate, September 12, 2006 |
| Response to Final Office Action - Simple | $1,000 | AIPLA Report 2005, Table Q39f, 25th percentile, All Individuals |
| Response to Final Office Action - Complex | $4,500 | AIPLA Report 2005, Table Q39g, 75th percentile, All Individuals |
| Issue Fee (USPTO) | $700 | USPTO FY2006 Fees |
| Lawyer fee to pay an Issue Fee - Simple | $350 | AIPLA Report 2005, Table Q39l, 25th percentile, All Individuals |
| Lawyer fee to pay an issue Fee - Complex | $1,000 | AIPLA Report 2005, Table Q39l, 75th percentile, All Individuals |
| First Maintenance Fee (USPTO) | $450 | USPTO FY2006 Fees |
| Second Maintenance Fee (USPTO) | $1,150 | USPTO FY2006 Fees |
| Third Maintenance Fee (USPTO) | $1,900 | USPTO FY2006 Fees |
| Lawyer fee to pay Maintenance Fees - Simple | $150 | AIPLA Report 2005, Table Q39n, 25th percentile, All Individuals |
| Lawyer fee to pay Maintenance Fees - Complex | $300 | AIPLA Report 2005, Table Q39n, 75th percentile, All Individuals |
| RCE Fee (USPTO) | $395 | USPTO FY2006 Fees |
| Petition Fee | $400 | USPTO FY2006 Fees |
| Petition Preparation | $1,000 | USPTO staff estimate, September 11, 2006 |

**Estimates of incremental costs are calculated based on the number of claims contained in each application. Estimated baseline costs, however, conservatively assume the application has 76 total claims and 16 independent claims, and therefore may understate the baseline costs.

# Appendix B: Estimating the Value of Patent Applications

One way to measure the incremental cost of the proposed rule is to express the cost as a percentage of the expected value derived from the patent over its lifetime. Economists have been studying the expected lifetime market value of patents in order to measure the impact of technological innovation on the macro-economy. For reasons discussed below, however, estimates of patent value show significant variation among various studies and approaches.

One measure of the expected value is derived from estimating the total income from patented ideas. Eaton and Kortum (1995) estimated the value of all patented ideas in the U.S. to be about $197 billion in 1998. According to USPTO data, there were 84,272 patents granted in 1988 in the U.S. whereas the total number of patent applications in that year was 151,491. Thus, based on the income earned from patented ideas, the average value of a patent in 1988 was about $2.3 million per patent granted, and about $1.3 million per patent application.

Because of the hazard of imitation in some of the developing countries, economists estimating the worldwide value for patents (as opposed to in the domestic country only) find the average expected value to be significantly lower. For example, McCalman (2005) analyzed the worldwide value of patent applications filed by U.S. inventors in the same year as above, and estimated it to be about $163,700 per application in 1988.

Perhaps the most realistic measure of the market value of patents is provided by Hall, et al (2000). They matched USPTO's patent database to publicly traded firm-level data from Compustat to estimate the market value of patents. Using data from 1976 – 1992, they found the marginal shadow value of a patent to be $370,000. Drawing on USPTO data for this period, the ratio of patents granted to total applications was 59 percent. Therefore, the marginal shadow value of patent per application in this period was about $220,000.

This discussion illustrates the wide variation in the economics literature on lifetime patent values. One reason for such differences is whether the value of the patent is estimated for the U.S. only or for values accruing to patents around the world. Moreover, as Griliches, Hall, and Pakes (1987) point out, the distribution of the patent values is known to be extremely skewed with a few patents being very valuable, and many worth almost nothing. Any exercise in estimating the future value of patents or patent applications is, therefore, fraught with uncertainty and likely to produce extremely noisy measures.

**References:**

Eaton, J, S. Kortum. 1995. "Trade in Ideas: Patenting and Productivity in the OECD." National Bureau of Economic Research Working Paper Series, No. 5049.

Griliches, Z, A. Pakes, and B. Hall. 1987. "The Value of Patents as Indicators

of Inventive Activity," in Dasgupta, Partha, and Paul Stoneman (eds.), Economic Policy and Technological Performance. Cambridge, England: Cambridge University Press, 97-124.

Hall, B, A Jaffe, M Trajtenberg. 2000. "Market Value and Patent Citations: A First Look." Institute of Business and Economic Research, University of California, Berkeley. Working Paper E00'277.

McCalman, P. 2005. "Who Enjoys 'TRIPS' Abroad? An Empirical Analysis of Intellectual Property Rights in the Uruguay Round." Canadian Journal of Economics: 574-603.