# EXHIBIT 4-a

Dockets.Justia.com

13

1  THE COURT: Well-- That's true.
2  MR. NEALON: I will tell you, the reason, the reason
3  that we put the notices of deposition out is we were in the
4  middle of trying to negotiate a scheduling order for the case.
5  And one of the dates that was being proposed or propounded was
6  at that point in time a summary judgment as early as
7  November 8. And there was some discussion about it being done
8  in December.
9  I wanted to get on the record that we wanted to take
10 depositions in this case so that we didn't get 90 percent of
11 the way down the road and then say, well, wait a second,
12 everything we have been talking about won't work because we
13 want to take these depositions.
14 So, part of it was putting the other side on notice
15 that we wanted to take them. And I would say to the Court,
16 you know, that I certainly did have discussions with Ms.
17 Wetzler where I said, look, we can certainly, the dates that
18 we proposed were arbitrary, I assume we are going to have
19 litigation over whether we can do this with the Court. You
20 know, we are certainly open to other, you know, intermediate
21 avenues.
22 But we didn't know what the scheduling order was
23 going to end up being, and there seemed to be a decided
24 possibility we could be having a summary judgment as early as
25 Christmas.

14

1   So, we wanted to get on record, you know, so that we
2   could start to get these issues considered by the Court.  We
3   certainly were not intending to overstep our bounds or to--
4   THE COURT:  And I am not suggesting that you did
5   intend to do that.
6   Let's move on to talk about, I know who Mr. Dudas
7   is, tell me who the other three proposed deponents are and
8   what it is that you think you need that Fourth Circuit and
9   other authority would allow you to get in the circumstances of
10  this case.
11  MR. NEALON:  Well, of course, Mr. Dudas is the
12  defendant.
13  John Love is the Deputy Commissioner for Patent
14  Examination Policy for the United State Patent and Trademark
15  Office.  We believe that he would have had extensive
16  involvement in crafting these rules as far as the underlying
17  rationale for the rules and, you know, a substantial amount of
18  activity, you know, that may be outside the administrative
19  record.  He would have been--
20  THE COURT:  I don't doubt that.
21  MR. NEALON:  Right.  Well, I am going to tie it all
22  together in a minute, Your Honor, I am just telling you who
23  the deponents are.
24  THE COURT:  All right.
25  MR. NEALON:  Mr. Bahr is a senior patent attorney

15

1  and, you know, his name is all over the administrative record.
2  He was the person who many of the comments were directed to
3  and presumably was involved in the processing of those
4  comments and the handling of the comments.
5          And then we also have Mr. Doll, D-o-l-l, who again
6  was extensively involved in speech making concerning these
7  rules, we believe was an instrumental player in formulating
8  them, and we think would have knowledge, you know, concerning
9  the rule making process, the substance of why the PTO did what
10 it did.
11         THE COURT: And what is his position again?
12         MR. NEALON: Mr. Doll is the-- I am trying to give
13 you the exact-- Commissioner of Patents for the United States
14 Patent and Trademark Office.
15         THE COURT: All right.
16         MR. NEALON: So, they were all folks who we believe
17 would have comprised the inner circle of this rule making.
18         And one of the things Ms. Wetzler mentioned is,
19 well, why should we be permitted to depose senior officers of
20 the Patent and Trademark Office. And the reason is, under our
21 theory of the case, they were the ones who were most
22 instrumental in devising these rules and pushing them through
23 the system.
24         I mean, this was not a closed, formal rule making
25 process where the panel sat down, exhibits were presented and

16

1  it was a closed record.
2          Our theory of the case is that there was an agenda
3  here.  And the agenda was, there had been a long-standing
4  effort to try to get Congress to change these rules.  And
5  there was frustration within the PTO with their inability to
6  get Congress to do it.
7          So, the senior management of the PTO decided and
8  took it upon themselves to reduce their backlog, you know,
9  essentially, we have got too much backlog, it's not good for
10 our statistics, by reducing the number of continuation
11 statements that were being filed and reducing the number of
12 claims.
13         We believe that there was an understanding that they
14 didn't have the power to do that.  There was case law, they
15 had a number of problems in trying to do that.
16         THE COURT:  Well, does it matter --
17         MR. NEALON:  Yes, it does matter.
18         THE COURT:  -- what they understood?  I mean, if
19 your contention that they didn't have the power is correct,
20 then isn't that just an argument that you need to make to
21 Judge Cacheris?
22         MR. NEALON:  Well, Your Honor, of course, one of the
23 standards here is arbitrary and capricious.  You know, were
24 these rules that were promulgated arbitrary and capricious
25 under the circumstances based on the record?  Okay.

```
                                                                17
 1              It is our view that the actual record that has been
 2    produced to us does not reflect everything that was considered
 3    or indirectly considered.  That most of that, and this is set
 4    forth in our papers, most of the material that would have
 5    resulted in the creation of these rules would have predated
 6    them being proposed in the Federal Register in January of
 7    2006.
 8              There is hardly anything within the record that was
 9    produced.  There are really no deliberative materials.  And
10    you heard Ms. Wetzler talk about a deliberative process
11    privilege.  There is a deliberative process privilege, but it
12    is very specific, it can be document by document.
13              We asked for a privilege log recently.  And the
14    response we got was, well, who says you are entitled to a
15    privilege log?  What's your authority?
16              We believe there is a significant body of
17    information that is being withheld.  And it may be within
18    their rights to withhold it, but we have to have an
19    opportunity to vet it.  And what we are seeing is in this
20    pre-January 2006--
21              THE COURT:  Well, where does that right arise?  From
22    what source does that right arise?
23              MR. NEALON:  Well, this wasn't a direct issue in the
24    papers, but there are, there is numerous cases, and actually I
25    think I have them here, there are numerous cases that provide
```

1    for in camera inspection of withheld documents under a
2    deliberative process privilege.  Trout Unlimited versus Lohn--
3         THE COURT:  Is that an APA case?
4         MR. NEALON:  That is, I believe, an APA case.
5    Center for Biological Diversity, 336 F.Supp.2d 1149.  There is
6    the Elkem Metals Company case.
7         THE COURT:  Are those cases in which the Court has
8    already found that discovery was appropriate?
9         MR. NEALON:  No.  Those are, those were cases,
10   basically, I believe, where there was an issue about whether,
11   some of them, folks were trying to get, you know, documents
12   that were being withheld by the agency under the record.  And
13   essentially privilege logs were required, an in camera
14   inspection was undertaken.
15        It is a very specific privilege which doesn't apply
16   on a blanket basis, but the theory of our case here is that
17   most of the decision making for these rules occurred behind
18   closed doors prior to January 2006.
19        The case law is very clear.  In an APA case, we are
20   entitled to all the information and factors that were
21   considered by the rule makers directly or indirectly.
22        And the gist of our argument is we think, and we
23   have set it forth in our papers, based on the record that has
24   been produced to date, particularly the absence of any
25   privilege log identifying, and I would be glad to separately,

19

1  you know, send in something to the Court on that particular
2  issue, we are not seeing where these rules came from. They
3  seemingly arise out of nowhere if you just look at the record.
4         There are 55 documents out of 800 and I think it was
5  45 that predate January 2006. And if you look at most of
6  them, you would have no idea where these rules came from.
7         So, we are in a position where on summary judgment
8  we have to take this administrative record, which we do not
9  think that the key decision makers who came up with these
10 rules, who are the deponents here, really paid much attention
11 to. You know, we think it was based on independent
12 considerations that they had, their agenda to reduce their
13 workload.
14        So, we think many of these specific items--
15        THE COURT: Is it disputed by the defendants that
16 that was part of the goal here?
17        MR. NEALON: What is that, to reduce the workload?
18        THE COURT: Reducing the Patent and Trademark
19 Office's workload was part of what was going on?
20        MR. NEALON: Well, I think, what they try to say is
21 that we were trying to make the office more efficient, you
22 know, among other things.
23        I mean, the rub of whole this case in a way is, and
24 this goes back to the problem that the PTO had in passing
25 these rules, under the Constitution only Congress has the

20

1  power to pass substantive rules of patent law. Okay. So, the
2  PTO does not have that authority.
3       Under Section 2 of the Patent Act, the PTO does not
4  have the authority to pass substantive rules. They only have
5  the power to pass procedural rules.
6       So, it was critical that a record be created
7  basically suggesting these rules were procedural and not
8  substantive. And one of--
9       THE COURT: Well, do you need discovery in order to
10 argue successfully to Judge Cacheris that these rules are
11 substantive and not procedural?
12      MR. NEALON: Well, we certainly think, you know, and
13 a lot of this ties into the bad faith, I certainly think it
14 would be helpful if we were able to generate admissions
15 through depositions, if we were able to get some of the
16 deliberative material that may be outside of the deliberative
17 process privilege. That we would be able to substantially
18 increase our odds if we could show that what the PTO was
19 saying as its public reason, that they did not believe that
20 they had the power to do it. And that in fact they were
21 trying to masquerade what they knew or reasonably should have
22 known was substantive as procedural.
23      Because if you look at the test as to how you
24 determine what's substantive and procedural, one of them is,
25 you know, what is the impact on the regulated parties? You

21

know, does it have a substantial economic impact?

And this goes to the RFA issue. You know, under the RFA it's our view, here again, it was critical since they had to portray this as procedural, to say, to certify this does not have a substantial impact on small entities.

We have presented in our papers I think a very compelling argument that they knew or should have known that this was going to have a substantial impact on small entities, and went ahead and certified anyway that there wouldn't be such an impact.

So, again, it's another area of bad faith that ties into a substantive claim.

So, essentially what we are saying is, the administrative record here was presumably compiled after the fact, but what we are saying is, there is a lot of material that was put into the public record through notice and comment, but what we are not seeing is any of the internal processes. And again, some of that may be privileged, but we have no log despite the fact that we have asked for one, you know, as to how they came up with these.

Another thing that we went through fairly exhaustively and gave some examples of in our paper, they would say certain things to the OMB and then they would say certain things, you know, in their rule making analysis that it doesn't add up. I mean, we think that that amounts to bad

22

1  faith.
2           They need to create an appearance, you know, as far
3  as some of the particular issues here, that there is no
4  absolute limitation on the number of continuations that could
5  be filed or the number of claims that can be filed.  That's
6  their justification.
7           What they are saying is, all we are doing is
8  regulating the process as to how those claims are submitted,
9  but we are really not fundamentally restricting your ability
10 to do them.  We have created some safety valves, such as the
11 ESD, the examination support document for claims.  And as far
12 as petitions go, the folks will have the right to petition for
13 good cause shown to file a third statement.
14          What we have tried to show in our papers is that
15 although they suggest over and over again in the record that
16 those are safety valves that permit folks to continue--  No,
17 that do not impose an absolute limitation, that in fact in the
18 PTO's own statements made to the public in various speeches,
19 they have said the opposite.  They said people won't be able
20 to file ESDs.  Patent applicants will not be able to do so
21 without exposing themselves to risk of inequitable conduct.
22          THE COURT:  Mr. Nealon, I think I understand why you
23 are unhappy with what the agency did.  Tell me what it is that
24 you would expect, not hope, but expect to get from each of
25 these deponents that would keep any of these depositions from

23

1  being anything more than a fishing expedition.
2          MR. NEALON:  Well, what we would want to explore
3  with them--  And again, I think probably it would be necessary
4  for us to get a privilege log first.  And again, I can supply
5  supplemental authority for that proposition so we could
6  determine what is legitimate, what legitimately should be part
7  of the record and what should not.
8          But assuming that we get a certain amount of
9  supplemental document production and supplementation of the
10 record, we would want to explore with them what the
11 considerations were that they considered, be able to
12 cross-examine them concerning some of the inconsistent
13 statements that were being made by the office to the OMB and
14 to the public.  Those are the kind of things that we would
15 want to cover.
16         I wouldn't imagine that these would be terribly long
17 depositions.  And it may well be that it should be, you know,
18 a process where we take one and we see where it goes.  I mean,
19 we could certainly do it in a graduated fashion.
20         But we have serious bad faith claims here.  We have
21 a constitutional claim, which is separate and apart from the
22 APA, notwithstanding what Ms. Wetzler said, where basically
23 there is authority saying that the PTO is subject to the exact
24 same substantive limitations as Congress in terms of complying
25 with the patent laws.  Which is what they do is limited by and