# EXHIBIT 5-a

11

1          MR. NEALON: It gets us to the deliberative process
2    privilege. But here is my concern. I mean, I took a close
3    look at the McDowell declaration that was submitted in support
4    of the PTO's latest round of papers. And in that particular
5    thing, it is a very sweeping assertion of privilege that is
6    being made. They talk about, well, nonprivileged responsive
7    documents relating to the final rules are being produced.
8    That is not everything that was considered.
9          And what they are basically saying is, it is so
10   burdensome, it would take 25 to 30 people working countless
11   hours to try to go through and gather all of the documents and
12   figure out if they are privileged.
13         So, what they are doing is the PTO is essentially
14   saying, what we have done is we by-passed, you know, all the
15   internal materials, essentially. And the internal materials
16   that we have provided you, we have plucked and redacted them
17   and taken cover sheets off in a way that we don't have to log.
18         So, what we end up with is this kind of
19   unintelligible maze. And as far as-- So, and they are just
20   saying it is all deliberative.
21         The other thing is, I suspect there is also
22   attorney/client privileges that are being asserted here. We
23   don't know what documents are being withheld on
24   attorney/client, what are being withheld on deliberative
25   process, but we do know that Mr. Whealan, who is the General

12

1  Counsel to the PTO and the Solicitor previously, and Mr.
2  Toupin went all over the country making speeches and engaging
3  in groups, group discussions about these rules. There may
4  well have been a waiver, you know, of certain attorney/client
5  privileges.
6      I found on the Internet, I have it in this pile
7  here, which is not part of the record, a PowerPoint by Mr.
8  Whealan that he gave where he said, look, this is way back in
9  January 2006, and this is not part of the administrative
10 record as far as I can tell, he is saying, look, we anticipate
11 litigation over these rules and the Solicitor's Office will be
12 involved right from the beginning, and we will be involved in
13 promulgating the rules.
14     Now, it may well be there are legitimate
15 attorney/client privileges, but it may well be they decided to
16 issue these rules right out of the Solicitor's Office in
17 substantial part. And if they are one of the rule makers, I
18 am not sure they can hide behind the attorney/client
19 privilege. They may with respect to some things, they may not
20 with respect to other things.
21     So--
22     THE COURT: How can you make the record that you
23 want to make and you say you are entitled to make prior to
24 litigating summary judgment without either yourself going
25 through everything that the PTO generated or requiring the PTO

13

1   to go through everything the PTO generated.
2           MR. NEALON:  Well, I think if the PTO wants to
3   withhold things that were considered directly or indirectly,
4   it is their burden--
5           THE COURT:  When you say "things that were
6   considered," let's separate that from the records of
7   deliberations.  What things, and back to my in-your-wildest-
8   dreams characterization, what do you hope to find out there
9   that is something the PTO considered?
10          Not a record of their consideration, not a record of
11  their deliberation, but what do you hope to find that they
12  considered and didn't include in the administrative record?
13          MR. NEALON:  Well, what we hope to find is internal
14  deliberative-- Well, I don't want to say deliberative
15  materials.  But internal materials reflecting what we think is
16  the truth here.  Which is that one of the primary drivers of
17  these new rules, which is contrary to their stated reasons
18  which the PTO put so much weight on, is cutting down on the
19  workload of the PTO.
20          And in fact, I mean, just indicative of what I think
21  could be missing, we went on the Internet and were pulling up
22  transcripts of speeches by PTO officials, I think it was Mr.
23  Doll, where he comes right out, and this is not part of the
24  record, saying, we are hoping to get rid of 140 examiners
25  through this.

1  So, our position is and our theory of the case is
2  that this is something that goes back many years to something
3  that certain officials in the PTO wanted to do.  They knew
4  that they couldn't do it because it was a substantive change
5  in the rules that only Congress could made, could make.  And
6  they essentially said, look, we'll come up with a whole bunch
7  of different reasons as to why this is, we will go through a
8  rule making process, but the decision is set in stone.
9       We don't think it was a good faith basis to do it.
10 We think that numbers either had to be ignored, not considered
11 or were manipulated to come up with the conclusion this would
12 have no dramatic economic impact.
13      And what we are essentially saying both on the RFA
14 and on the rule making is that we think that there is bad
15 faith.  And here is the problem, I can't prove bad faith
16 without either testimony or documents from which inferences
17 can be drawn.
18      And if the PTO is permitted to arbitrarily just wall
19 off entire areas without even having us an opportunity to look
20 at a log or to figure out whether we have legitimate arguments
21 to pierce a privilege, it is very hard to do it.
22      And what they have done is they have taken a very
23 sweeping approach of saying, look, we really don't think you
24 can have anything prior to January of 1996 because it doesn't
25 relate to the final rules.

15

1  We gave you some things after the rules were
2  proposed in January 2006. We gave you some PowerPoints and
3  other town hall meeting type of materials. But what is
4  missing is anything internal. And the little bit of data that
5  we were given has been stripped of its contends. We don't
6  even know who the decision makers are here.
7      THE COURT: What do you think they could produce
8  that wouldn't be covered by the deliberative process
9  privilege?
10     MR. NEALON: I think that there could certainly be
11 memoranda and e-mails where they are discussing evidence that
12 they are considering that goes to the facts, the analysis that
13 they are doing that is not deliberative in nature per se.
14     You know, and the privilege is very clear on this
15 deliberative process privilege, it is not to shield facts, it
16 is just to shield communications that are of a nature that to
17 have them disclosed would intrude upon the inner workings of
18 government.
19     I think that a lot of this material in a lot of
20 these memoranda that we would expect to find is probably of a
21 factual nature and should be produced in part. In fact, I
22 think you probably saw it in the record, there was one
23 document that GSK referenced that was heavily redacted. So,
24 there seems to be an inconsistency there.
25     So, I think that there is a very real possibility

16

1   that we would discovery factual information, analysis, things
2   that were considered as different things they could look at,
3   different alternatives. But I don't think they can just wall
4   off for a 36-month period and say, this is all deliberative.
5         Because then what are we doing at the final analysis
6   of the case? We are trying to figure out if the decision
7   making was arbitrary and capricious. And to analogize it to a
8   jury trial, let's say you had a six-month jury trial,
9   certainly maybe you can't go in the box the day of their
10  deliberations, but we are certainly entitled to find out what
11  happened at the trial.
12        This is an informal rule making. And what they have
13  done is they have essentially walled off all the decision
14  makers here. They have not given us all the data that was
15  considered. And we are entitled to find out what they
16  considered, you know, from a factual matter, what alternatives
17  they considered, what due diligence they did, and whether
18  their stated reasons are plausible and credible. And we think
19  that in many cases they are not.
20        So, I think the first step here is, they need to
21  certify a proper record. What we have tried to do is we have
22  gone through and identified what we think are some glaring
23  holes. Certainly they can come back and say, we think there
24  is a deliberative process privilege, there is an
25  attorney/client privilege. And we can try to go through a

17

1  document stage perhaps before jumping to, you know, whether we
2  actually need to solve this through depositions.
3         But we need, if we are going to assert bad faith,
4  which we think we have the right to assert, we need some
5  opportunity to pursue those type of claims.
6         So, it is not a fishing expedition. These are items
7  that we think should have been part of the record or, if it is
8  going to be withheld from the record and we ask for a
9  privilege log to make sure that it shouldn't be part of the
10 record, we should certainly have an opportunity to look at
11 that.
12        And again, it was interesting in the McDowell
13 affidavit, they said it could be hundreds of documents, it
14 could be thousand of documents. And what that tells me is,
15 they don't know. And I find that troubling.
16        And again, maybe it presents a little bit of a
17 practical problem because, obviously, it is a lot of work for
18 someone to go through and figure out whether particular
19 documents that may have been considered are privileged or not,
20 but what I keep coming back to is, what does it mean, the
21 command, that the parties and the Court have to consider the
22 entire record, which is everything considered or not
23 considered. I mean, everything that was considered directly
24 or indirectly.
25        If the government can say, well, look, this is an

18

1  informal rule making, we are going to decide the scope of
2  deliberative process, we are going to determine when this
3  process starts and ends, even if it started years before, we
4  are going to give you selected items, PowerPoint presentations
5  that were made to the public, but we are not going to give you
6  other things. I mean, I have a pile here of different
7  speeches and PowerPoints that aren't part of the record that I
8  can't figure out why they are not.
9       So, what they are basically saying is, we have carte
10 blanche to decide this issue and you have no ability to
11 challenge it. We are going to give you what we are going to
12 give you. You are going to have to trust us that we are right
13 in interpreting the scope of deliberative process, even though
14 we are basically telling you we haven't looked at anything.
15 You are going to have to trust us on attorney/client
16 privilege, even though two of our main attorneys for this
17 thing have gone all over the planet giving speeches and
18 engaging in discussion groups on this. Again, there may or
19 may not be waiver.
20      And it seems like right from the beginning a lot of
21 the rule making operations may have been operated right out of
22 the Solicitor's Office.
23      So, it is troubling--
24      THE COURT: Do you have anything, on the
25 attorney/client privilege aspect of it, do you have any

19

1  information that suggests that one of the agency's attorneys
2  has revealed privileged materials to anyone who wasn't covered
3  by the privilege?
4        MR. NEALON:  Well, what I have is I have got
5  substantial evidence that we pulled off of the Internet that
6  Mr. Whealan, who is the General Counsel, spoke at numerous,
7  you know, public events, meet and greets, to talk about these
8  rules.
9        Now, we have his PowerPoint presentation, but that's
10 part of the problem.  To have a privilege, something, as I
11 understand it, has to be--  Well, it has to be confidential.
12 And what we don't know here is, and really the person who is
13 logging it has to make that determination, is this something
14 that's already in the public domain that everybody already
15 knows?
16        I mean, if Mr. Whealan has gone out and given
17 speeches about all different aspects of this rule and has been
18 quoted in law review articles--
19        THE COURT:  Do you want them to include in a
20 privilege log every--  I will withdraw the question.
21        MR. NEALON:  Well, I don't want--  Obviously, it's
22 difficult for me to say what should be in the privilege log
23 other than things that they considered that the agency deems
24 to be privileged.  Otherwise it would seem to fall within the
25 command that the parties and the Court should be reviewing

20

1  everything that was directly or indirectly considered.
2          Now, certainly it's like the Federal Rules for a
3  regular document discovery.  I don't think it says
4  nonprivileged responsive documents, but that's the common
5  understanding.  But when challenged, you have to substantiate
6  it.
7          And the difficulty here again is, you know, we have
8  serious concerns about some of the different cutoffs, you
9  know, they are making here.  But it is clear to us that they
10 haven't gone and actually looked at the privileged material or
11 the allegedly privileged material.  All we are hearing is,
12 there is a lot of it and it would be too burdensome to review.
13         Which begs the question of, well, how did they come
14 up with what they came up with, in my mind.  You know, that
15 you have to start somewhere.  Presumably there is a process.
16 Again, this is an informal rule making that was considered for
17 many years.  And, you know, this is probably a record that was
18 created and gathered subsequent to this case being started.  I
19 doubt there was a drawer that you could go to and say, here is
20 the record.
21         THE COURT:  Can you give me a hypothetical example
22 of a conversation or communication that was covered by, in the
23 context of this dispute, a communication that was covered by
24 the attorney/client privilege and that even though the
25 privilege be waived by disclosure, wouldn't still be covered