# EXHIBIT 17-a

Dockets.Justia.com

11

1    is that they need to protect, the scope of

2    the claims and so forth.  Some will say that

3    because of the youth of our examiners that

4    they're not getting to the real issues early

5    enough and it's causing more continuations.

6    That's a concern of some individuals.

7             COMMISSIONER DOLL:  What's

8    interesting, though, is that when we go out

9    and talk to bar associations, we hear that it

10   takes two, three, four continuations before

11   the examiner understands the invention.  When

12   I come back and we have town halls with the

13   examiners, the examiners say: it takes us

14   three, four, five continuations to get the

15   claims narrowed down to something that's

16   reasonable that we can search and that we can

17   actually give a good office action on.  And

18   both those statements are probably true,

19   because we have a spectrum of problems, and

20   we have a spectrum of quality.  And I think

21   both are true.

22            CHAIRMAN RIVETTE:  Robert, are you

12

1    seeing the same thing?  From your site?

2         MR. BUDENS:  I think what John has

3    said I would tend to agree with.  And, also,

4    the trunk of that is just prosecution in some

5    of the tech centers; you know, 1,600 -- we

6    have a lot of continuations just because

7    prosecution continues on while the companies

8    are looking for FDA approval, for example.

9    They just keep the cases alive.

10        CHAIRMAN RIVETTE:  Do we have any

11   breakdown on this by TC?

12        MR. LOVE:  Yes.

13        CHAIRMAN RIVETTE:  Have we?  Where

14   are we finding the most continuations?

15        MR. LOVE:  Well, the first

16   continuations are relatively even across the

17   TC's: it's 1600s that subsequent really stick

18   out.

19        MS. NORTON:  Do you think that's

20   related significantly to the quality

21   initiatives?  That more rejections are going

22   out because of quality review?

Anderson Court Reporting
706 Duke Street, Suite 100
Alexandria, Virginia
Tel. (703) 519-7180   Fax (703) 519-7190

13

1          MR. LOVE:  No, I don't think so.

2     But I don't have the experience in 1600s, so

3     I couldn't really say.

4          CHAIRMAN RIVETTE:  Well, we were

5     talking right over here.

6          MR. LOVE:  Yes.

7          MR. BUDENS:  I don't think -- I

8     mean, the quality initiatives are playing a

9     part in the last two years, but I think the

10    other issue really is a case of the

11    companies' taking time to overcome enablement

12    rejections; for example, collecting the data

13    they need in order to overcome the rejections

14    that are being made.  That would be my view

15    from an examiner's point of view.  We can get

16    the industry point of view also, but -- but

17    that's, I think, where we mostly would see

18    them.

19         MS. RYAN:  And I think it's a

20    combination of things.  I think that there's

21    a great pressure in the pharmaceutical and

22    biotech industry to file early, and there's

14

1   the weighing of do you have enough to file?

2   Do you wait?  And so there is that balance.

3           MR. BUDENS:  In reply to that, too,

4   I would also point out: this one also

5   includes divisionals; 1600 does a lot of

6   restrictions and stuff, and some of the

7   electrical areas do.  So by factoring in the

8   divisionals in that statistic, you've also

9   increased that somewhat.

10          CHAIRMAN RIVETTE:  So let's just --

11  for the people that are just joining us --

12  one of the things we're trying to do is get

13  rid of the acronyms, get rid of the

14  priesthood jargon.  Doug, are you familiar

15  with what a "continuation" is, and what a

16  "divisional" is?

17          MR. PATTON:  Yes.

18          CHAIRMAN RIVETTE:  Okay.  Fine.

19  Thanks.

20          MR. LOVE:  Okay, moving on then to

21  the next slide -- this, Jerry, shows some of

22  the targets of the past year in terms of

15

1 quality goals.  The goal for '06 was to be

2 less than 4 percent with respect to our

3 allowance error, and to be greater than 86

4 percent in the in-process compliance number.

5 And that has to do with -- the difference is,

6 allowance error has to be with allowed

7 applications that are reviewed by our quality

8 review examiners.  The in- process review

9 compliance number has to do with reviews of

10 applications before they're allowed; in other

11 words, first office actions, restriction

12 requirements, final rejections -- that sort

13 of thing.  So that's the two different

14 numbers and what they're looking.  And in '06

15 you see -- and, by the way, one of the things

16 we really want to do, and we'd like the

17 board's input -- the PPAC -- go from

18 characterizing it as an "allowance error" to

19 a compliance factor for allowances also.

20        One goal is expressed in terms of

21 "compliance," and the other is "error rate."

22 So we'd like to be consistent and also

16

1    express it in terms of compliance with

2    respect to the allowance error rate.  But the

3    overall is 3.5 percent for the corps for the

4    allowance error rate, which is below the 4

5    percent, which means we surpassed our goal --

6    significantly.  And the compliance rates for

7    the in- process reviews were 90 percent,

8    which is again exceeding the goal by a

9    significant amount.

10           CHAIRMAN RIVETTE:  Why don't you

11    give us an idea of what the numbers are.

12    1600 is bio?

13           MR. LOVE:  It's biotech-1700 is

14    traditional chemistry;  21 is computer

15    software, computer architecture; 26 is

16    telecommunication -- any communication-type

17    system; 28 is the traditional electrical

18    areas; 3600 is -- they have business methods,

19    they have civil engineering -- a lot of the

20    traditional transportation arts; then 3700

21    has the other mechanical arts.

22           CHAIRMAN RIVETTE:  So you get

17

1    software in 21 and 26?

2         MR. LOVE:  Yes.

3         CHAIRMAN RIVETTE:  36?

4         MR. LOVE:  36 has the business

5    methods area.

6         CHAIRMAN RIVETTE:  So, as I look at

7    this, in the high-tech area it looks like

8    we're doing real well?  Is that what I'm

9    seeing?  And the question then becomes: why

10   is that different than 1600 and 1700?  Is it

11   we've got different people?  Is it the

12   problems are different?  Are we attacking it

13   differently?

14        MR. LOVE:  Well, it's the same

15   review process.  There are different

16   reviewers that specialize in certain

17   technologies.

18        CHAIRMAN RIVETTE:  Because you get

19   a 2 percent differential.

20        MR. LOVE:  Right.

21        CHAIRMAN RIVETTE:  It seems like a

22   lot -- especially when you're talking about

18

1    the high-tech stuff.  I mean, I commend the

2    office; 2.8 is great.  I just wonder why the

3    4.8 -- why the difference of almost 50

4    percent.  Any ideas?

5            MR. LOVE:  Well -- in the complex

6    arts, the people that file the applications

7    really know what the state of the art is, and

8    perhaps the examiners start from a better

9    point in terms of what the state of the art

10   is.  And the other areas, where they don't

11   get enough information that's good

12   information up front, and it certainly may be

13   a little bit more difficult to search and to

14   find the art; whereas in the high tech, it's

15   a narrow field, the scope of the art is

16   really pretty well defined, and they might be

17   in a better starting point than the other

18   examiners.

19           COMMISSIONER DOLL:  One of the

20   things that I like to mention -- and this

21   relates to the chemical and the biotech, is

22   that the number one error that we have is

19

1    that quality review finds prior art that the

2    examiners did not find.  And they find prior

3    art the examiner did not find because the

4    examiner misinterpreted the scope of that

5    claim; they didn't read the claim broadly

6    enough.  When you get into the extremely

7    complex areas -- digital encryption, computer

8    architecture -- things are much better

9    defined.  When you look at a Markush claim

10   that contains, you know, 10 to the 6,000

11   species, it's hard to search the scope of

12   that claim; it's hard to appreciate.  We're

13   working on -- and those are some of the

14   things about, quality initiatives to help the

15   examiners search, help them understand the

16   scope of a claim -- and in the higher tech

17   art areas, such as the satellite

18   communications, things seem to be much better

19   defined, which gives the examiner a much

20   better opportunity to zero in on what they

21   should search.  Because they don't have a

22   claim that reads "On the sun, the moon and

20

1    the stars," which is the typical pharma or

2    biotech case.

3            MR. PATTON:  I have a layman's

4    question: are there Google-like search

5    engines designed for each one of these areas

6    by the Patent Office to do this?  It would

7    seem that with technology now -- is that

8    something that exists?  Or not?

9            COMMISSIONER DOLL:  We have search

10   engines.  We usually use East or West, which

11   is our primary search engines.  We search

12   databases such as Dialogue, Questell.  I

13   mean, we search every database that's

14   possible.  Mostly it's through Boolean logic.

15   Again, one of the strategic initiatives that

16   we're looking at is going out to

17   universities, corporations, and art-specific

18   areas to see: what are they using to search

19   their particular art to see if we couldn't

20   important that technology here to help in a

21   particular area, or to see what's the best

22   search engine for mechanical devices, or

Anderson Court Reporting
706 Duke Street, Suite 100
Alexandria, Virginia
Tel. (703) 519-7180   Fax (703) 519-7190