# Defendants' Exhibit 2

Dockets.Justia.com



# *AIPLA*

AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION

2001 JEFFERSON DAVIS HIGHWAY ▪ SUITE 203 ▪ ARLINGTON, Virginia 22202

April 24, 2006

The Honorable Jon Dudas
Under Secretary of Commerce for Intellectual Property
 and Director of the United States Patent and Trademark Office
Mail Stop Comments
P.O. Box 1450
Alexandria, VA 22313-1450

> Attn: Robert W. Bahr
> Senior Patent Attorney
> Office of the Deputy Commissioner
>  for Patent Examination Policy

> Comments on Proposed Rules: "Changes to Practice for
> the Examination of Claims in Patent Applications"
> 71 Fed. Reg. 61 (January 3, 2006)

Dear Under Secretary Dudas:

The American Intellectual Property Law Association (AIPLA) appreciates the opportunity to offer comments regarding the U.S. Patent and Trademark Office ("PTO") proposed rules directed to changes to practice for the examination of claims of patent applications published at 71 Fed. Reg. 61 (January 3, 2006).

AIPLA is a national bar association whose 16,000 members are primarily lawyers in private and corporate practice, in government service, and in the academic community. AIPLA represents a wide and diverse spectrum of individuals, companies, and institutions involved directly or indirectly in the practice of patent, trademark, copyright and unfair competition law, as well as other fields of law affecting intellectual property. Our members represent both patent owners and users of intellectual property.

## General Comments

The PTO has proposed dramatic and complex changes to the claim examination process to "focus its initial examination on the claims designated by the applicant as representative claims" presented in an application for patent. At

the proposed representative claim examination practice because of the actions of these very few.

Given the small minority of applications using unusually difficult claiming practices, the problem should be addressed on a case-by-case basis in a balanced and reasonable way. It is neither balanced nor reasonable to penalize all applicants and burden the PTO staff that must administer these complex proposals based on the "excessive practices" of a small minority of applicants.

We suggest that the Office address excessive claiming concerns in a simple and straightforward manner. This could be done most directly by limiting the number of claims permitted and fully examined under the basic fee structure to, for example, 6 independent and 30 total numbered claims, and allowing multiple-dependent on multiple-dependent claims, each counting as a single numbered claim. To the extent that an applicant believes that a particular invention cannot be appropriately protected within these constraints, allow such applicants to opt to file additional numbered claims at a very high per-claim cost. The higher fees would discourage inadvertent or unnecessary excess claiming. Additional examiner time and credit could be given in the few cases in which this would occur. This approach would permit applicants to effectively claim their inventions and have all claims examined in a first Office action on the merits. Our combined initiative would obviate any need for the complex proposed rules and the piecemeal examination that would result from them.

### Greater Efficiency and Improved Quality Are Doubtful

In addition to the concerns about the inefficiencies of piecemeal examination, the PTO should determine whether the PTO and applicants would be the beneficiaries of greater efficiency and improved quality of examination if an examiner is given more time to initially focus on some claims and ignore others. It is far from clear that this would result in either improved efficiency or an improved work product from the examining corps as a whole.

The following comments address the specific provisions of the proposed rules along with alternative suggestions for implementation if these proposals are adopted.

*Section 1.75(b) Dependent Claim*

The proposed amendment to this paragraph specifies that unless a dependent claim has been designated for initial examination prior to the time when the application has been taken up for examination, the examination of such dependent claim may be held in abeyance until the application is otherwise in condition for allowance. The mere presentation of a dependent claim in an application containing only ten claims would not act as a designation of that dependent claim for initial examination. This places an affirmative duty on an

5

MAY-03-2006  16:58          APPLE                    1 408 974 5436    P.02/02



May 3, 2006                                    *Via Facsimile 571-273-7735*

Mail Stop Comments - Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22315-1450

Dear Commissioner Doll:

I write on behalf of Apple Computer, Inc. to express Apple's support for the Patent Office's proposed rules regarding patent prosecution practice.[1] Apple has distinguished itself throughout the world with a long string of innovative products and services -- from the original Macintosh, to the iMac line of computers, the iPod line of media players, and the iTunes Music Store. Apple invests heavily to bring these products to the public, and depends on patents to protect them from copyists. Apple is thus very interested in having the Office issue high quality patents on high quality inventions on a timely basis. Apple also believes that such patent policy is beneficial to the public as a whole.

The Office has made a convincing point that its fast-growing docket threatens to prevent it from focusing proper attention on true innovations, and from having the time to sort such innovations from applications that do not deserve a patent. The proposed rules are aimed at reducing ancillary loads on the examination process so that examiners can focus on important core issues, and Apple believes they are a reasonable means to that end. Although they will place some additional burdens on applicants, they are flexible in allowing applicants to obtain continuations if they can show why they could not have presented claims earlier. And they do not eliminate continuation practice, which does have numerous appropriate purposes. In addition, the rules are aimed at providing applicants with the benefit of faster and better examination than they otherwise would have.

In this case, the Office is in a good position to determine how to balance the prosecution process so as to ensure timely and high-quality examination of patent applications. We commend the Office for taking on this difficult task.

Very truly yours,

Richard J. Lutton, Jr.
Chief Patent Counsel

---

[1] "Comments on Proposed Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims, Notice of proposed rulemaking" published at 71 Fed. Reg. 48 (Jan. 3, 2006).

Sender's Return Address:
Apple
1 Infinite Loop, MS 3-PAT
Cupertino, CA 95014-2084
Phone: 408-974-9453
Fax: 408-974-5436

2/2 * RCVD AT 5/3/2006 8:06:28 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-6/26 * DNIS:2737735 * CSID:1 408 974 5436 * DURATION (mm-ss):00-54

-----Original Message-----
**From:** Fish, Robert [mailto:rfish@rutan.com]
**Sent:** Thursday, March 09, 2006 11:00 AM
**To:** AB93Comments
**Subject:** Comments on proposed rule changes regarding CIP practice.

I am opposed to limiting the number of continuation applications to one or two.  In my 17 years of experience, RCE type continuations are usually due to intransigence, inexperience, or illogic on the part of the exminer, and CIP type continuations are usually the result of the inventor having developed a significant improvement.  In both cases the patent office should enourage rather than limit further prosecution.

My suggestion is that the Patent Office limit the total number of claims of any application to twenty or thirty, and the total number of independent claims to two or three.  Yes, that would require patent attorneys to do the heavy mental lifting of actually figuring out what the "invention" is when filing the application.  But we know they can do that.  Patent applicants already re-write their claims to meet similar requirements in several foreign countries.

The total number of applications on a single subject matter should also be limited in some manner, perhaps to five or six.  "Single subject matter" could well be difficult to define, but could be defined by claims that overlap sufficiently to require a terminal disclaimer.

Robert D. Fish
**Rutan & Tucker, LLP**
611 Anton Boulevard, 14th Floor
Costa Mesa, CA 92626
714-641-3433 Direct
714-546-9035 Fax
rfish@rutan.com
www.rutan.com



Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

*Via Electronic Mail*
*AB93Comments@uspto.gov*

April 28, 2006

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Attn: Robert W. Bahr

Comments on Notice of Proposed Rule Making: "Changes To Practice for Continuing
Applications, Requests for Continued Examination Practice, and Applications
Containing Patentably Indistinct Claims"
Federal Register/Vol.71, No. 1/January 3, 2006

Microsoft Corporation appreciates the opportunity to offer comments on the notice of
proposed rule making relating to changes to practice for continuing applications
published in the Federal Register on January 3, 2006. As addressed in our comments
below, we support much of the proposed changes relating to continuation practice, and
commend the USPTO for its commitment to improve the quality of issued patents and
significantly reduce the backlog of unexamined patent applications.

Within the past several years, Microsoft has grown to be one of biggest customers of the
USPTO. In 2005, we had the third largest number of published patent applications by
the USPTO and are currently prosecuting well over 10,000 pending applications. We
employ the services of over 100 patent practitioners around the country, were the 18th

largest recipient of U.S. patents for 2005, and just recently received our 5,000th U.S. patent.

As articulated in the Notice, these proposed rule changes would permit the Office to reduce the backlog of unexamined new applications. Reducing the time between the filing of a patent application, receiving a first office action from an examiner, and the granting of a patent is vital to the proper functioning of the patent system. With the growing backlogs, particularly in our areas of technology, we are now waiting almost four years to receive an initial office action on the vast majority of our applications. Reducing this time has significant benefits for us in defining the protection of our innovations and enhancing our business opportunities, and for the public in providing a much more timely legal certainty.

The availability to the filing of at least one true continuation application as a matter of right addresses the vast majority of Microsoft's patent applications. However, a distinction needs to be drawn between a RCE, which is the continued examination of the same patent application under 35 U.S.C. 132(b), and a continuation, divisional, or continuation-in-part application, which are separately filed patent applications relying on the benefit of the filing date of an earlier filed patent application under 35 U.S.C. 120. Most of Microsoft's RCE requests are a result of the current Office compact prosecution practice of a second action final rejection taken together with the examiner's production crediting system. RCE practice, in the current examination practice environment, allows for efficiency in the examination process by avoiding unnecessary appeals or petitions for premature final rejections, and likewise addresses the examiner's fair examination credit concerns and the proper search, examination, and allowability of the claims.

While having addressed the RCE issue under the Office's current practice and crediting system, it is appreciated, however, that an unlimited number of requests for continued examination places a disproportionate burden on the patent system. Should a RCE be limited to one request as a matter of right as put forth in the proposed changes, the second office action final rejection practice needs to be carefully reviewed and reformed along with the examiners production crediting system. Along those lines, it may be appropriate to institute an examination conference to review an examiner's action for completeness and correctness before an action is made final, and adjust the examiner credit system by giving more credit for the first office action in the initial application and less credit for office actions in RCE applications.

With the additional allowance for a single continuation application as a matter of right to depend from an "involuntary" divisional application filed as a result of a requirement for restriction under proposed Rule 1.178(d)(1) and the noted RCE comments above, Microsoft generally supports the requirement for applicants to justify the need for second and subsequent continuing applications. For the most part, these long strings of continuation application filings, particularly in our technology area, lead to a greater

amount of legal uncertainty and costly, wasteful litigation. We tend to agree with the Office that these practices defeat the public notice function, and to the extent that they inhibit the efficiency of the examination process, they need to be eliminated.

The proposed rules fairly require that any second or subsequent continuation be accompanied by a petition and a showing as to why the amendment, argument, or evidence could not have been submitted prior to the close of prosecution in the prior-filed application, and we support such changes. In looking at the whole examination prosecution picture with today's practices and those complex instances where applicants may need that second or extremely rare subsequent continuing application, the Office could potentially reduce those second or subsequent instances by aggressively limiting restriction requirement practices and examining more of the claims presented in the initial application. In addition, the USPTO needs to publish a set of examples showing what meets the threshold criteria for a proper second or subsequent continuing application.

We agree with the Office that there needs to be limitations placed on the filing of multiple applications that contain redundant, patentability indistinct claims to circumvent the proposed changes to practice on continuing applications. Applicant is in the best position with the information set forth in proposed Rule 1.178(f)(1) and should be required to identify related applications. This is particularly true as an effective mechanism for addressing examination efficiencies since these applications could be examined together.

While there needs to be more of a sharing of the examination burdens between the applicant and the examiner, the mere fact that two applications have similar disclosures, close filing dates, and one inventor in common does not in itself establish a presumption that the applications were filed to circumvent the continuation practice changes or that there is a presumption of double patenting. As has been pointed out by the Federal Circuit, the examiner has the initial burden of presenting a *prima facie* case of unpatentability, and without such, applicant is entitled to the grant of a patent. Prior to a rejection being made by the examiner, any comments as required by proposed Rule 1.78(f)(2) could have significant impacts on future patent validity and enforcement issues. However, in helping the examiner understand the applications and share examination burdens, this may be an opportunity for the granting of a pre-first office action personal interview to review the inventive concepts claimed in the applications and save the examiner time in delineating the differences.

Finally, we would like to take this opportunity to commend the USPTO for its action, in concert with the proposed rules changes, of discontinuing the first action final rejection practice in continuing applications.

We appreciate the opportunity to provide comments on the proposed rule changes and encourage USPTO's efforts to provide for a more focused, efficient, complete, and

improved quality examination process.  Should you have any questions concerning our response, please contact us at the address below.  We are always available to assist the USPTO in any further partnership needs.


Respectfully submitted,


Bart Eppenauer
Chief Patent Counsel
Associate General Counsel
IP & Licensing - Patent Group
Legal and Corporate Affairs
barte@microsoft.com
• Tel 425-703-0645
• Fax 425-936-7329

COMMENTS OF

# MICRON TECHNOLOGY, INC.

## ON THE PTO'S

## "PROPOSED CHANGES TO PRACTICE FOR CONTINUING APPLICATIONS, REQUESTS FOR CONTINUED EXAMINATION PRACTICE, AND APPLICATIONS CONTAINING PATENTABLY INDISTINCT CLAIMS"

May 1, 2006

## I.     Introduction and Summary

Micron Technology, Inc. ("Micron") wholeheartedly supports the PTO's proposals to reform continuation practice.  Reform is essential both to stop the abuse of claim tailoring and to eliminate the inefficiency, redundancy and expense incurred by the PTO in examining claims having the same effective filing date and essentially similar disclosures as earlier filed claims.

Micron recognizes that continuation practice was developed with the twin goals of efficiency and equity in service of the public interest.  Indeed, allowing an applicant to craft claims in light of a give and take with the patent examiner, whether in an original application or in a continuation application, ensures that patent claims serve their public-notice function of precisely indicating the reach and breadth of the claims.  The failure of current continuation practice results from abusive practices by applicants—primarily the practice of expanding the scope of patent claims during an extended prosecution of a "family" of patent applications by tailoring claims to read on innovations first seen in the marketplace.  This abuse presents one of the most serious obstacles to competition facing industry today.  The courts have largely acquiesced, but it has led to a glut of continuing applications and has contributed to unprecedented backlogs within the PTO.  The PTO is uniquely positioned to stop the abuse, and the time has come for it to do so.  The PTO plainly has statutory and inherent regulatory authority to ensure that applicants diligently pursue their claims.

The PTO's proposed regulation is a sensible compromise that does not ban continuing applications altogether, but instead requires an applicant to explain why the claims in a second or subsequent continuing application "could not have been submitted during the prosecution of [a] prior-filed application."  In essence, it requires applicants to show good cause for filing more than one continuing application and thereby additionally burdening the already overburdened PTO.

Micron suggests, however, that the proposed regulation be clarified in one respect.  Under the proposed language, applicants might argue that they "could not have submitted" certain claims earlier because they did not know what products or processes others were developing.  As the PTO's background discussion recognizes, an applicant's desire to cover technologies that others have developed in parallel is *not* a valid excuse for delaying prosecution or for failing to present claims earlier.  The regulation accordingly should clarify that recent knowledge of developments by others will *not* be deemed good cause for filing an additional continuing application.

## II.     Micron's Interest in and Support for
##          Continuation Practice Reform

Micron has a dual interest in the PTO's treatment of continuing applications.

First, Micron is a frequent patent applicant and a leading patentee.  We design and manufacture state-of-the-art CMOS image sensors and DRAM and flash memory solutions that

– 1 –

are used in today's most advanced photographic and video, computing, networking, and communications products. We invest over $600 million every year in research and development. Patenting our technological advances helps protect those large investments. For the past five years, we have been among the top ten recipients of U.S. patents, and for the last several years, MIT's *Technology Review* (now published by ipIQ) has ranked our patent portfolio as the strongest in the semiconductor industry. In addition to being one of the most prolific applicants in the PTO, we have taken advantage of continuation application practice to facilitate more strategic prosecution of the many claims related to our advances. Nevertheless, we have been concerned that applications relating to many of our most valuable inventions have been stalled in the PTO, awaiting even initial consideration by a patent examiner. Those delays have been lengthening in recent years, postponing issuance of patents and our ability to enforce them.

Second, Micron also is the subject of others' efforts to enforce their patents, and we have been quite vocal in expressing our concerns that the PTO is allowing applicants to "invent patents" rather than "patent inventions." We have learned from painful first-hand experience how "patent stalkers" will file a broadly worded initial application, wait and see where industry heads, and then add or amend claims to cover technologies that others developed independently. Multiple continuing applications are often critical to this strategy of predatory delay.

Both of those interests lead Micron to support the PTO's efforts to regulate continuation practice and prevent its abuse. Micron recognizes that continuing applications have a valid place in the patent prosecution system. Micron also believes, however, that reducing *unnecessary* continuing applications will speed up processing of worthy patent applications and improve the quality of patents that ultimately issue. Micron further expects that policing multiple or unduly delayed continuing applications will have the salutary effect of preventing unscrupulous applicants from improperly gaming the system to ensnare technology that others developed independently and reasonably believed they were entitled to exploit.

## III.   Micron's Concurrence in the Need for Regulatory Reform

Micron believes that continuation practice reform is long overdue. The PTO's discussion of the proposed regulation well explains the prevalence of continuation practice and the delays and backlogs it causes for examiners and other applicants. The PTO may be less familiar, however, with how (and how frequently) continuation practice is abused for improper purposes.

Repeated continuing applications allow a patent applicant to "invent a patent" instead of patenting a preexisting invention. An applicant intent on developing a patent as a litigation and licensing weapon can use repeated continuing applications to obtain patent claims far removed from whatever the applicant had in mind when preparing the disclosure. This process, sometimes called "patent stalking," is simple under current PTO rules. First the "stalker" files a patent application with a broadly worded disclosure. That original application includes a general description of technology that the applicant expects will be significant to a particular industry. Then the stalker monitors that industry, watching how the pioneering companies develop and market new products. During this time, the stalker keeps a chain of continuation applications alive and periodically amends or adds claims to match what the industry is doing.

- 2 -

Claims presented in continuation applications receive the same filing date as the claims presented as part of the original application. This creates a fiction in which a belatedly drafted claim will be deemed to antedate an otherwise invalidating reference, even when the reference may have been the very input on which the belatedly drafted claim was modeled. The stalker thus emerges from the PTO with tremendous advantage, both in alleging infringement (because the claims were drafted expressly to cover a target company's activities) and in maintaining validity (because of the benefit of a filing date well before the claims were actually drafted). Patent stalking is an unfair abuse of the system, yet it is commonplace—in some quarters even recommended practice.[1]

A related abuse arises as a practical consequence of unfettered continuation practice. Under the current rules, no rejection issued by an examiner is ever really final. A patent applicant can simply keep filing continuing applications until it wears down the examiner and convinces him or her to issue at least some claims. According to a recent analysis, patents eventually issue in more than 85% of applications filed.[2]

These abuses of continuation practice reverberate throughout the patent system. Continuation patents are more likely to be litigated: patents based on continuing applications account for 52% of all litigated patents.[3] Further, patents that are ultimately litigated typically issue after a longer chain of continuing applications than other patents: each litigated patent issues from an average of 2.57 applications, while patents in general issue from an average of only 1.54 applications.[4] Abuses of continuation practice thus have far-reaching impacts.

In short, current continuation practice is easily abused, with no negative consequences to the abuser. Unscrupulous patent applicants are using continuing applications to obtain claims specifically intended to cover the independent—and novel—activities of true innovators.

---

[1] *See, e.g.*, Paul Gillette, Note, *"Maximum Security": Continuation and Reissue as Means of Obtaining Optimum Patent Protection After Festo*, 27 T. Jefferson L. Rev. 371 (2005) (suggesting that broadest claims be reserved for continuation applications, or perhaps even reissue); Symposium, *The End of Equivalents? Examining the Fallout from Festo*, 13 Fordham Intell. Prop. Media & Ent. L.J. 727, 742 (2003) (quoting Harold C. Wegner: "[Y]ou take whatever claims you can, you file a continuation with a disclaimer, and then you keep that new case pending forever and ever and ever, and then you add new claims when you need them. Now, that is not a very good public policy. But, it is something that is an effective way to deal with the problem. We do it all the time.")

[2] Cecil D. Quillen, Jr. et al., *Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office — Extended*, 12 Fed. Cir. B.J. 35, 38 (2002); *see also id.* at 50 ("the USPTO can rid itself of determined applicants only by allowing their applications").

[3] Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63, 70 (2004).

[4] John R. Allison et al., *Valuable Patents*, 92 Geo. L.J. 435, 457 (2004).

- 3 -

## IV. Micron's Concurrence that the PTO Has Statutory and Inherent Authority to Regulate Continued Examination Practice

While some have questioned the PTO's regulatory authority to combat abuses of continued examination practice, the PTO in fact has both statutory and inherent authority to ensure that such practice serves the practical and equitable purposes for which it was created in the first place.

Congress granted the PTO express authority to "establish regulations, not inconsistent with law, which . . . shall govern the conduct of proceedings in the Office."[5]  By this provision, Congress "delegated plenary authority over PTO practice . . . to the [PTO]."[6]  Furthermore, the Patent Act expressly authorizes the PTO to promulgate regulations which "shall facilitate and expedite the processing of patent applications . . . ."[7]  The proposed rule is a direct effort to expedite the processing of legitimate applications, in keeping with the plain text of the statute.

The Federal Circuit has deferred to the PTO's statutory authority to make procedural rules governing the treatment of patent applications.  For example, in the context of interferences, the Federal Circuit approved PTO regulations that established a motion procedure for interference proceedings and required patent applicants to prove entitlement to the priority date of an earlier disclosure.[8]  The proposed rule governing the number of continuation applications that an applicant may file similarly falls squarely within the ambit of the PTO's procedural regulatory authority.

Apart from this express statutory authority, the Federal Circuit has also recognized the PTO's *inherent* authority to regulate continuation practice and ensure that continuation applications are pursued without unreasonable delay.  In *In re Bogese*,[9] the court recognized that "[t]he PTO is the administrative agency that is 'responsible for the granting and issuing of patents,'"[10] and that "[l]ike other administrative agencies, the PTO may impose reasonable deadlines and requirements on parties that appear before it."[11]  Thus, it held, "[t]he PTO has inherent authority to govern procedure before the PTO, and that authority allows it to set reasonable deadlines and requirements for the prosecution of applications."[12]  *Bogese* upheld the PTO's authority to reject claims based on unreasonable delay in prosecution (prosecution laches) even without a specific regulation in place, as long as the applicant is afforded notice and an opportunity to respond.  Predictably, the applicant's misconduct in that case included repeated

---

[5] 35 U.S.C. § 2(b)(2)(A) (formerly 35 U.S.C. § 6(a)).

[6] *Gerritsen v. Shirai*, 979 F.2d 1524, 1527 n.3 (Fed. Cir. 1992).

[7] 35 U.S.C. § 2(b)(2)(C) (emphasis added).

[8] *Stevens v. Tamai*, 366 F.3d 1325, 1332-34 (Fed. Cir. 2004).

[9] 303 F.3d 1362 (Fed. Cir. 2002).

[10] *Id.* at 1367-68 (quoting 35 U.S.C. § 2 (2000)).

[11] *Id.* at 1368.

[12] *Id.*

A02246

filing of continuation applications.[13]  Given that holding, the PTO clearly has authority to adopt regulations designed to streamline patent prosecution practice and to refuse to allow continuation applications that are unduly delayed or pursued for improper purposes.

To be sure, all regulations must be "not inconsistent with law," but nothing in the proposed regulation conflicts with the section of the Patent Act that codified continuation practice, 35 U.S.C. § 120.  Section 120 simply states that proper continuation applications shall receive the benefit of the earlier filing date of the first application.  As the Federal Circuit held in *Bogese*, Section 120 does not eliminate the PTO's authority to determine whether continuation applications are procedurally proper or pursued with due diligence.  Indeed, Section 120 expressly grants the Director of the PTO authority to regulate the content and timing of continu-ation applications:  it states that "[n]o application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director."[14]

The PTO was correct in concluding that the nearly 40-year-old Court of Customs and Patent Appeals decision in *In re Henriksen*[15] is not to the contrary.  In that case, the Office had construed the text of Section 120 to limit continuation practice to at most three generations.  That is, it read Section 120 to authorize child and grandchild continuation applications, but to forbid all great-grandchild applications and beyond.[16]  The C.C.P.A. reversed, holding that the text of Section 120 said no such thing and that the legislative history and prior practice suggested no such thing.[17]  The court further noted that nothing in the Office's regulations, including the Rules of Practice and Manual of Patent Examining Procedure, suggested the limits that the Office had imposed, making the Office's action "akin to a *retroactive* rule change."[18]

The situation here is quite different.  The PTO is not construing Section 120 itself to impose hard-and-fast, categorical limits on the number of continuation applications.  Nor is it attempting to impose a retroactive rule change.  It is simply creating a presumptive limit on the number of continuation applications an applicant may file, with the goal of expediting prosecution practice and cutting down on dilatory behavior and abuse.  The proposed limit is not absolute:  if an applicant can show good cause for filing a second continuation application, the application will be allowed and the applicant will be permitted to claim priority to the earlier application under Section 120.

Notably, in *Bogese* the Federal Circuit similarly distinguished *Henriksen*, calling the holding there "limited" and "based on a detailed review of the legislative history of . . . 35 U.S.C.

---

[13] *Id.* at 1364-65.

[14] 35 U.S.C. § 120.

[15] 399 F.2d 253 (C.C.P.A. 1968).

[16] *Id.* at 255-56.

[17] *Id.* at 256-61.

[18] *Id.* at 261-62.

A02247

120 and the long-standing interpretation by the Patent Office and patent bar . . . ." [19] *Henriksen* did not "suggest or imply that the PTO must allow dilatory tactics in the prosecution of applications or that the PTO lacks inherent power to prohibit unreasonable delay in prosecution."[20] In Bogese's case, "the PTO did not adopt a mechanical rule based on a misconception of the statutory requirements."[21] Nor is the PTO doing so here.

## V.    Micron's Support for the Proposed Regulations and Its Suggestions to Strengthen Them

Micron believes that the PTO's proposed regulation would improve prosecution practice without imposing undue burdens on applicants who are diligent and act in good faith. Indeed, Micron believes the PTO should go further and clarify that even though substantive law does not forbid applicants from adding broader claims in order to cover technology used by others, that goal itself is not sufficient to justify an additional or belated continuing application. Independent good cause should be required.

Even though some in Congress are debating the merits of a legislative solution to continuation abuses, there is no reason for the PTO not to exercise its rulemaking authority to reform continuation practice.[22] As shown in the PTO's analysis and above, the excesses of continuation practice and the burdens it imposes on the entire patent system are undeniable and well documented. The PTO is overwhelmed, and patent prosecution simply takes too long. As a result, even diligent applicants unfairly suffer due to the dilatory and strategic behavior of others. Furthermore, the "submarine" patents that belatedly issue from continuation practice all too often blind-side honest competition.

On the other hand, Micron does not support abolition of continuation practice. Continuing applications can serve legitimate purposes such as refining claims and avoiding unnecessary appeals. Moreover, insisting that all claims be brought in a single application would often delay patent issuance, which would be unfair to applicants and might even exacerbate problems with "submarine" patents suddenly emerging into the marketplace.

The proposed regulation wisely balances the benefits of continuation practice against its potential costs and abuses. The proposed rules recognize the legitimate uses of continuation applications by allowing one continuation with no questions asked. Applicants and examiners would thereby retain the flexibility to have some claims issued while examination of the remainder continues, and to continue examinations when further examination seems likely to be fruitful. In Micron's view, first continuations are not necessarily suspect or a sign of delay.

---

[19] 303 F.3d at 1368 n 6.

[20] *Id.*

[21] *Id.*

[22] Micron has supported various proposed statutory reforms of the patent system. Those proposals are still stirring in Congress, but as explained above, the PTO plainly has regulatory authority to control the procedures of practice before it.

- 6 -

Most of the abuse—and much of the burden on the system—comes from second, third, fourth, and even fifth or sixth continuations.

Micron is also pleased to see that the PTO does not propose to ban multiple continuation applications outright, but simply to require the applicant to explain why the new claims could not have been submitted earlier and why it should be entitled to place an additional burden on the corps of examiners. If an applicant cannot offer a good reason, it is fair for the examiner to conclude that the applicant unduly delayed and has forfeited its right to additional claims. The PTO has indicated that applicants will be allowed to appeal examiners' rejections of continuing applications, so the danger of arbitrary examiner behavior is minimal.

The proposed regulation also harmonizes well with the judicially recognized doctrine of prosecution laches. Some have criticized the Federal Circuit's decision in *Bogese* on grounds that the PTO has not given sufficient guidance on what delays are permissible. The proposed regulation and decisions implementing it would provide a welcome first step toward providing such guidance as to what is and is not undue delay in prosecution of a patent application.

In that regard, the PTO should clarify that the desire to cover other companies' products or services is *not*, in and of itself, a sufficient excuse for the delayed filing of additional claims. To be sure, the Federal Circuit has held that it is not *per se* wrong to present in the PTO additional claims designed to cover particular competitors' products.[23] But such a commercial desire does not excuse applicants from asserting claims promptly and prosecuting them diligently.[24] Continuation practice has never been considered a license to dawdle—especially when a patent based on the same specification has issued and the public reasonably expects that technology disclosed but not claimed is in the public domain.[25]

The PTO's proposal recognizes this in principle. The commentary to the proposed rules correctly observes that current rules "permit[] applicants to keep applications in pending status while awaiting developments in similar or parallel technology and then later amending the pending application to cover the developments," and that "the practice of maintaining continuing applications for the purpose of adding claims after such discoveries is not calculated to advance prosecution before the Office."[26] The proposal likewise recognizes that "when the continued examination process fails to reach a final resolution . . . the public is left uncertain as to what the set of patents resulting from the initial application will cover."[27]

---

[23] *See Bogese,* 303 F.3d at 1369; *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 874 (Fed. Cir. 1988).

[24] *See Kingsdown,* 863 F.2d at 874 ("Any such amendment or insertion [of claims] must comply with all statutes and regulations . . . .").

[25] *See Kendall v. Winsor,* 62 U.S. 322, 329 (1858) (an inventor "may forfeit his rights by a wilful or negligent withholding of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others").

[26] 71 Fed. Reg. 48, 49 (Jan. 3. 2006).

[27] *Id.*

- 7 -

The text of the proposed regulation itself, however, does not specify what will and will not be viewed as good cause to file an additional continuing application. The regulation says only that the applicant must "show[] to the satisfaction of the Director that the amendment, argument, or evidence could not have been submitted during the prosecution of the prior-filed application."[28]  Given the ambiguity, applicants may argue that they did not submit expanded or modified claims earlier because they did not know that others had used or developed certain technology.  The proposed regulation should be amended to clarify that such new commercial knowledge is *not* a proper excuse for having failed to submit a claim previously.  This could be done by adding the following sentence to 37 C.F.R. § 1.78(d)(1)(iv):

> Evidence that an applicant had not previously learned or known that others had developed similar or parallel technology will not be considered as evidence that an amendment, argument or evidence could not have been submitted previously.

## VI.    Conclusion

The PTO is charged with managing prosecution practice, including ensuring that examination of applications proceeds without unnecessary obstacles and delays.  Part of that responsibility involves regulating applicants' conduct in applying for patents so that they do not unduly burden the PTO or prevent it from running smoothly.  Continuation practice has now grown out of hand, and it is high time that the PTO steps in to ensure that continuing applications promote efficiency and equity rather than impede them.  The proposed amendment is a good first step toward restoring the balance.  Micron urges the PTO to adopt it, and to go further by clarifying what is (and more importantly is *not*) good cause for submitting a further continuing application.

---

[28] *See* proposed 37 C.F.R. § 1.78(d)(1)(iv) (set forth at 71 Fed. Reg. 59 (Jan. 3, 2006)).

- 8 -

## Chang, Joni

**From:**    dwestergard@micron.com
**Sent:**    Tuesday, May 02, 2006 12:07 PM
**To:**      AB93Comments
**Subject:** Micron Comments in Support of PTO's Notice of Proposed Rule Making

The Honorable Jon Dudas
Under Secretary of Commerce for Intellectual Property
  and Director of the United States Patent & Trademark Office
Mail Stop Comments
P.O. Box 1450
Alexandria, VA  22313-1450

> Attn:  Robert W. Bahr
>        Senior Patent Attorney
>        Office of the Deputy Commissioner
>        for Patent Examination Policy

Dear Under Secretary Dudas:

Attached hereto are the comments of Micron Technology, Inc. in support of the U.S. Patent and Trademark Office proposed rules relating to changes in continuation practice, published at 71 Federal Register 48 (January 3, 2006).

Micron thanks the Under Secretary for this opportunity for comment and expresses its willingness to take other action deemed appropriate or helpful by the Under Secretary in support of PTO's proposed rules.

Respectfully submitted,

Micron Technology, Inc.
W. David Westergard
Director of Patent Licensing

<<PTOContinuationReform (4).pdf>>

5/4/2006

**Chang, Joni**

| | |
|---|---|
| **From:** | Rich Wolfson [rwolfson@clarcor.com] |
| **Sent:** | Tuesday, May 02, 2006 11:59 AM |
| **To:** | AB93Comments |
| **Cc:** | Norm Johnson; Sam Ferrise; Dan Schulte; Andrew J. Heinisch |
| **Subject:** | CLARCOR Inc comments to proposed revision to 37 C.F.R. Sec 178 |



Richard M. Wolfson
Vice President – General Counsel and Corporate Secretary

May 2, 2006

<u>VIA ELECTRONIC MAIL</u>

Mr. Robert W. Bahr
Mail Stop Comments -Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**Re: CLARCOR Inc. comment to proposed revision to 37 C.F.R §1.78**

Dear Mr. Bahr:

I am writing you today to voice the support of CLARCOR, Inc. for the new "continuation proposal" of the U.S. Patent & Trademark Office (i.e. the proposed revision to 37 C.F.R §1.78).

CLARCOR Inc. is a publicly traded U.S.company (NYSE: CLC) and a large manufacturer of filtration and consumer packaging products. Through our several subsidiaries, we have obtained numerous patents from, and currently have numerous patent applications pending before, the U.S. Patent & Trademark Office. We pride ourselves on being innovative in our various industries and we recognize patent protection as an important tool for protecting our investments in technology and new designs.

That said, we have serious concerns that the patent laws are being misused, particularly in the area of continuation patents. We share the concerns voiced by the U.S. Patent & Trademark Office that too often companies intentionally delay prosecution of claims and repeatedly file continuation patent applications without patentably distinct claims for the purpose of creating a "moving target" for their competitors and delaying the consideration of new claims through the sheer volume of their continuation applications. It is clear to us that parties in our industry

5/4/2006

use the current continuation practice as a strategic "block" rather than a legitimate tool to protect patentably distinct innovations.

We also share the U.S. Patent & Trademark Office's view that the current continuation practice does not serve the public notice function. In our own experience, we have suffered several instances where we invested substantial amounts of time and money to pursue technologies that would not violate published patents, only to be "sandbagged" when the patent holders sought continuation patents after the fact in order to counterattack our own innovations. Ultimately, we believe that U.S. business and the public are better served when parties can rely on published patents to make their investment decisions, without having to intuit how a patent might ultimately be "continued".

In light of the foregoing, we support the efforts of the U.S. Patent & Trademark Office to change the current continuation practice under the proposed revisions to 37 C.F.R §1.78.

Despite this support, we do offer the following editorial suggestion vis-à-vis the proposed amendment to 37 C.F.R §1.78. Currently, the proposed amendment states that second or subsequent continued examination filings, whether a continuation application, a continuation-in-part application, or a request for continued examination, "*be supported by a showing as to why the amendment, argument, or evidence presented could not have been previously submitted.*" To make it clearer, we would suggest expressly including the term "new claim" to this passage, so that it would require "*a showing as to why the new claim, amendment, argument, or evidence presented could not have been previously submitted.*" (emphasis added.) While we believe that the intent of the current proposal is to include new claims, expressly addressing the concept would help resolve any potential ambiguity.

We applaud the initiative of the USPTO with respect to this matter and appreciate your consideration of our comments. Naturally, if you would like any additional information or input, please feel free to contact us.


Very truly yours,


Richard M. Wolfson
Vice President, General Counsel and Corporate Secretary


5/4/2006

Via email to AB93Comments@uspto.gov

RE: Changes To Practice for Continuing Applications, Requests for
Continued Examination Practice, and Applications Containing Patentably
Indistinct Claims

CCIA supports the PTO's proposed regulations on continuations and applauds PTO
efforts to discipline and delimit the opportunities for tactical behavior.

Although we believe that legislation, such as the provisions in the original HR 2795, are
needed to curtail the worst abuses of continuation practice, PTO's proposed regulations
represent a commendable effort to manage the problems of continuation patents with
administrative tools.  The proposed regulations raise a number of questions about the
efficient management of patent-related knowledge, but it is important that PTO assume
responsibility for the integrity of the system as a whole without being unduly influenced
by practitioner and applicant demands for maximum maneuverability.

The PTO's obligations for stewardship are especially important as a corrective to the
"help customers get patents" mission that the agency embraced in the 1990s.  That
excursion, along with certain, unfortunate decisions of the Court of Appeals for the
Federal Circuit, has fostered a perception that applicants and their attorneys are entitled
to abuse the system.  In many of the practitioner responses, we see an inappropriate
concern for maneuverability to the detriment of disclosure and transparency.

While submarine patenting has been curtailed by the adoption of a fixed term from filing
and 18-month publication, continuations remain a useful tool for extending the patenting
process for tactical reasons.  By monitoring solutions that are adopted in standards
processes or by competitors, patent applicants can rewrite claims to capture the value of
economic activity performed by others.  This use of patents to misappropriate the work
of others was never intended to be part of the patent incentive.

Furthermore, as the FTC hearings made clear, disclosure in the IT sector is failing of its
essential purpose.  Written description and enablement requirements may be the law in
individual cases, but it seems that most innovators in IT conclude that it is simply not
cost-effective to read patents for their technical content.  This is not only due to the risks
of willful infringement but because there are simply too many patents, and many of them
are of questionable validity or quality.  Continuation practice contributes to the problem
by allowing applicants to expand the scope of the patent over time, thereby undermining
the practical ability of innovators to avoid inadvertent infringement.  We are hopeful that,
in the future, post-grant review will help PTO gain a broader, systemic perspective on
the patent system that will better attune the agency to the need for better balance
between patent applicants and other innovators – including the need to respect, monitor,
and reinvigorate the disclosure function.

No other country follows the U.S. practice of continuation applications, and scholars
have been highly critical of continuation applications for a wide variety of reasons. See
Mark A. Lemley and Kimberly A. Moore, Ending Abuse of Patent Continuations, 84
*Boston U. L. Rev.* 63 (2004).  Others suggest that continuations may be especially
damaging to open source software development; see "The Use of USPTO 'Continuation'

Applications in the Patenting of Software: Implications for Free and Open Source." with David C. Mowery, in *Law & Policy*, Vol. 27 (1), pp. 128-151.

The best solution may be to abolish continuations prospectively, since there are other procedural tools that can be used in their place. However, we are aware that the case for continuation applications may be stronger in other sectors, such as biotechnology, where the patenting process takes place in the unfolding of science-based knowledge. In information technology, by contrast, there are usually many different ways to achieve similar results and therefore an arbitrariness to particular solutions. If innovators know about where patents lie in advance, they can avoid them, but there is seldom a practical means for doing so. The use of continuations (as well as other means of amending patent claims) is especially dangerous in the IT sector, because continuations can be used undermine large sunk investments by competitors, or, even worse, industry-wide investments in common standards.

We appreciate the agency's willingness to grapple with the problem. If the PTO deems it advisable to proceed more cautiously, it should consider implementing the new rules for the IT sector where continuations are especially dangerous and less accepted by industry. Given the accrued complexity of patent law and the rampant opportunism in patent prosecution, the PTO should be willing to experiment and to learn from experience. We hope that the PTO is willing to monitor and evaluate solutions to the anomalous use of continuations in the U.S. so that the public can benefit from coherent, reviewable information on reform.

A02716



May 3, 2006

<u>Via e-mail</u>: AB93comments@uspto.gov

Commissioner for Patents
United States Patent & Trademark Office
Mail Stop Comments-Patents
P.O.Box 1450
Alexandria, VA, 22313-1450

Re: <u>Comments on Proposed Rules, 71 Fed. Reg. 48 (January 3, 2006)</u>

Dear Commissioner Doll:

These comments are presented on behalf of Intel Corporation ("Intel") in support of the United States Patent & Trademark Office's Notice of proposed rule making entitled "Changes to Practice for Continuing Applications . . ." published on January 3, 2006, at 71 Fed. Reg. 48. For the reasons outlined below, Intel strongly supports these rules and the policies behind them.

## Introduction

Intel is ranked 50th in the Fortune 500, and has nearly 105,000 employees worldwide. For over 35 years, Intel has developed technology enabling the computer and Internet revolution that has changed the world. Founded in 1968 to build semiconductor memory products, Intel introduced the world's first microprocessor in 1971. Today, Intel is the world's largest chip maker and is also a leading manufacturer of computer, networking, and communications products.

Intel is a major customer and partner of the United States Patent & Trademark Office ("the Office"). In both 2004 and 2005, Intel received over 1,500 issued patents, ranking 7th in the top 10 private sector recipients each year. Intel files thousands of new patent applications and pays millions of dollars in fees to the Office on a yearly basis. Because Intel strives to file focused, succinct applications, we will be minimally affected by the proposed continuation rules.

greater. Over 1100 patents were part of a chain with a length greater than 10. And 15 continuation chains were found with a length of 50 or greater. Clearly, such conduct goes far beyond the reasonable incentive contemplated by the patent laws. The unduly long continuation chains consume Office resources more appropriately spent on new applications that have never been examined. These chains result in real, likely intentional, uncertainty on the scope of patent protection.

That such chains of continuations unduly and undeservedly delay the examination and issuance of newer patent applications with earlier filing dates but later priority dates is beyond argument. Under Manual of Patent Examining Procedure § 708, examiners are almost always required to examine applications based upon their earliest priority date first. Thus, continuation applications in such lengthy chains are ordinarily examined first. Given that such "re-work" found by the Office's study is approaching one-third of the total workload, this substantially delays new applications in favor of the re-work. As a result, the current policy favors old applications that have already been disclosed to the world through the issuance of the parent, grand-parent or even great, great, great great-grandparent patent, while the newer applications languish. Common sense and public policy dictate that the newer applications should be preferred over these continuations.

While chains of multiple continuations may not represent a large fraction of total patents, they are among the most problematic applications to examine. For example, recently up to 14% of examiners have left the Office each year, and half of those departing examiners have been with the office less than 3 years. "Improvements Needed to Better Manage Patent Office Automation and Address Workforce Challenges," United States Government Accountability Office, Testimony before the House Committee on the Judiciary, GAO-05-1008T (September 8, 2005), pp. 22-23. While the Office is working to reduce attrition, it is clear that multiple continuation chains are much more likely to involve new examiners who must re-start the examination of the second or later continuation without the benefit of having examined the original application. Similarly, as in the lengthy chains cited above, strings of multiple continuing applications tend to include lengthy applications with many claims. This point is underscored by comments from the public that emphasize the strategy of some filers to include multiple inventions in a single application, in an effort to delay payment of filing fees through a series of related divisional applications. These factors disproportionately increase the

3

**Intel Corporation**
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

complexity and burden of examining the chains of multiple, and often badly outdated, continuing applications, as opposed to focused, new filings directed to an unexamined, distinct invention.

**Policy Considerations Support the Reduction of Perpetual Continuation Chains that Inhibit Settlement of Patent Disputes and that Deprive Patent Claims of Their Public Notice Function**

Perpetuating continuation applications deprives the public of the notice function of patent claims and also inhibits settlement discussions of patent assertions. It is for this reason that the Supreme Court in promulgating the doctrine of prosecution laches held that unnecessarily delaying the presentation of claims denies the public the benefit of the notice function of patents and their claims:

> The limits of a patent must be known for the protection of the patentee, the encouragement of the innovative genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertain as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted so that it may be known which features may be safely used or manufactured without a license and which may not.' The claims 'measure the invention.'

General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364,369,37 USPQ 466, 468-69 (1938) (citation omitted). Yet these perpetual chains of continuations do just the opposite by permitting patents to issue that seem to dedicate technology to the public due to the failure to claim disclosed subject matter (Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc., 285 F.3d 1046 (Fed. Cir. March 28, 2002)(en banc)), and then belatedly claim (perhaps even a decade later) that which was thought to be dedicated to the public. Particularly in fields where networking effects predominate, such as computing and communications where products have to interoperate with each other, continuation applications that belatedly revoke from the public domain what the public thought was freely available to all are particularly pernicious.

Many take advantage of the delays obtained from continuations to game the system. As one well-known commentator put it in a lecture on how to continually keep patent applications before the Office:

> Your competitors need to overcome your first line of defense, and worry about what claims in your pipeline will issue in the future and create additional problems. To take advantage of the comparative ease of subsequent prosecution,

4

Intel Corporation
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

> while keeping your options open, it makes sense to keep at least one application pending in important cases, *even after you are running out of new ideas for claims that are likely to be patentable.* One reason for keeping the tree alive, after you think you have harvested all the apples, is that you may find a way to "recapture" and patent a claim you conceded (or failed to think of) earlier in prosecution.

George Wheeler, Creative Claim Drafting: Claim Drafting Strategies, Specification Preparation, and Prosecution Tactics  http://www.jmls.edu/ripl/vol3/issue1/wheeler-middle.html (Emphasis added).

It is not uncommon for a licensing entity to keep Mr. Wheeler's perpetual chain or tree of continuation applications alive while they embark on a licensing campaign. Since the licensing entity has kept its options alive, the target companies of those licensing efforts are faced with a Hobson's choice. Either they can explain their non-infringement position and know that the licensing entity will submit a continuation application that omits the words that led to the non-infringement argument or they can remain silent and run the risk of litigation. And further, once they are sued, those companies know that any arguments made during the litigation will result in a new continuation being filed, presenting additional claims.

This is not a hypothetical situation. For example, in 1995 MicroUnity, Inc. filed an application that first issued as U.S. Patent No. 5,742,840 ("the '840 patent"). This application included a 387-sheet architecture manual that was submitted as an "Appendix" on microfiche. Over the course of the next decade, as Intel released a number of products, the '840 patent spawned more than 30 continuation applications purportedly claiming priority to the '840 Patent. Over time, these continuations sought increasingly broad interpretations that had little resemblance to the original claims. Microunity's conduct changed from patenting its own purported inventions to inventing patents with hindsight that were, Intel believes, attempting to read on products that were already in the marketplace. MicroUnity eventually asserted these patents and their 370 page appendix against Intel and others, demanding billions of dollars in alleged damages. Intel believes that limiting continuation practice to two opportunities will provide applicants a fair opportunity to patent their inventions but will deprive patent attorneys and others, who some might view as trying to game the system, of the opportunity to invent patents on others' products.

**Intel Corporation**
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

**The Proposed Rules Present a Reasonable Solution within the Office's Authority**

Clearly, these significant problems need to be addressed in order to maintain the viability of the patent system, and the Office's proposed rules are an appropriate solution. The Office has the authority to issue lawful regulations that "facilitate and expedite the processing of patent applications." 35 U.S.C. § 2(b)(2)(C). Consistent with this authority, the Office has set forth extensive regulations on procedural requirements regarding patent prosecution. While the Patent Act provides that continuing applications shall have the benefit of the earlier-filed application, it does not grant applicants an absolute right to unregulated continuation filings. 35 U.S.C. § 120. In fact, section 120 of the 1952 Patent Act did not create the right to continuation filings, but merely codified a practice developed by the Office and the courts. Commentary on the New Patent Act, P.J. Federico, 1952 U.S. Code Cong. & Adm.News, p. 2394.

Given the statute's silence on the issue, the Office may reasonably regulate continuation practice as set forth in the proposed rules. See, e.g., Lacavera v. Dudas, ___ F.3d. ___, 2006 U.S. App. LEXIS 2821, *7-8, citing Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984). The Federal Circuit has recognized that the Office "has inherent authority to govern procedure before the PTO, and that authority allows it to set reasonable deadlines and requirements for the prosecution of applications." In re Bogese, 303 F.3d at 1367-68. The proposed rules fall squarely within that authority, and as the Federal Circuit noted in Bogese, the Office's "authority to sanction undue delay is even broader than the authority of a district court to hold a patent unenforceable." Id. Thus, the Office need not point to an express statutory provision for each exercise of its authority. For example, the Office may lawfully reject claims on the grounds of inequitable conduct or obviousness-type double patenting, despite the lack of express statutory authority to do so. See In re Jerabek, 789 F.2d 886, 892 (Fed. Cir. 1986).

The proposed rules are reasonable because they provide the notice to all applicants required by Bogese, they address important problems identified by the Office, and they place no absolute numerical or temporal limits on continued examination filings. Every applicant will have the right to at least one continuation filing, and every applicant will have the right to petition for additional filings. In the event the Office abuses its discretion in deciding such a petition, the applicant will have the right to judicial review. The proposed rules are thus distinguishable from the situation in Henriksen, in which the Office sought to place an absolute numerical limit on continuations, cutting off the application chain in all circumstances. In re

6

Intel Corporation
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

<u>Henriksen</u>, 399 F.2d 253, 256 (CCPA 1968). Moreover, unlike the proposed rules at issue, the Office's position in <u>Henriksen</u> was adopted in a PTO Board decision, without the opportunity for notice and comment of the formal rule-making process. <u>Id.</u>

Similarly, prior unpublished cases dealing with continuation practice are also inapplicable to the legality of the proposed rules. In both <u>Ricoh Co. v. Nashua Corp.</u>, 1999 U.S. App. Lexis 2672 (Fed. Cir. 1999), and <u>Bott v. Four Start Corp.</u>, 848 F.2d 1245, 1988 WL 54107 (Fed. Cir. 1988), an infringement defendant argued that broader claims sought through continuations should be subject to the two-year limitation and intervening rights provisions of reissue applications. This issue is irrelevant to the proposed rules, which place no time limit on the filing of continuations. Neither <u>Ricoh</u> nor <u>Bott</u> stands for the proposition that the Office cannot reasonably regulate multiple continuation practice as in the proposed rules. To the extent it is argued that <u>Ricoh</u> or <u>Bott</u> establish an absolute right to unregulated continuation filings with no consequences, this idea has been expressly rejected by the Federal Circuit in the subsequent <u>Lemelson</u> and <u>Bogese</u> cases discussed above.

Under the new rules, applicants will still have ample, guaranteed opportunities (two applications and up to four office actions), as a matter of right, to present and obtain claims to their inventions in up to two issued patents. The Board's appeal process and appeal conferences are available where necessary. And finally, patentees will still have the opportunity to seek claim amendments (broadening where appropriate) through the reissue process. In our view, these options and safeguards will provide more than enough leeway to obtain appropriate patent protection, particularly if applicants draft efficient and focused filings.

Lastly, the new rules proposed by the Office to restrict applications containing patentably indistinct claims are necessary to avoid abusive filing tactics by applicants seeking to circumvent the proposed restrictions on continued examination filings.

7

**Comments Critical of the Proposed Rules are Not Persuasive**

In comments submitted to the Office and other public forums, some have criticized the proposed continuation rules. These criticisms are not well-founded. As explained below, the proposed rules are practical and appropriate despite the comments.

Effects on filing practices:

Some comments argue that the proposed rules would adversely change the way practitioners prosecute applications before the Office. Some practitioners, for example, prefer the availability of multiple continued examination filings as a mechanism to extend negotiating with an Examiner and/or prosecuting an application prudently in light of current law (e.g., Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d 1359 (Fed. Cir. 2003)). Obviously any new rules package may change how practitioners prosecute applications. The proposed rules, however, would only substantially impact those practitioners who do not prosecute applications with diligence toward final resolution. The Office has a substantial interest and a duty to promote efficient and purposeful prosecution. Indeed, practitioners who prosecute applications diligently toward final resolution would still be able to extend prosecution to a third or subsequent application under the proposed rules when circumstances warrant continued examination.

While some proposals call for allowing 2 or possibly 3 continued examination filings as a matter of right, we think this extension of the proposed rules is unnecessary. Practitioners under the proposed rules would still have at least 3 opportunities to amend their claims in any desired manner and/or submit evidence in light of the prior art uncovered by the Office before having to make a showing that further examination is necessary.

Examination Quality:

Some comments also argue that poor examination quality leads to increased continued examination filings. These comments ignore, however, that the Office already provides reasonable safeguards available to practitioners in various instances where practitioners disagree with an Examiner's position. Practitioners, for example, can appeal rejections and petition for review of the finality of Office Actions. Use of such safeguards helps hold Examiners accountable for their decisions, helps educate both Examiners and practitioners, and helps resolve issues to bring finality to prosecution. While they may not be preferred by all

8

Intel Corporation
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

practitioners, the use of such safeguards is nonetheless effective, and preferable to extending prosecution indefinitely as a matter of right.

We realize petitions and appeals would likely increase under the proposed rules, but continued examination filings will certainly decrease. When weighed against the Office injecting more certainty in the important public notice function of our patent system, however, Intel believes this shift is justified whether or not the Office actually realizes a reduced total workload. We also note that the Office has substantially reduced the appeals backlog, and implemented pre-appeal conferences to promote bringing finality in prosecution.

Applicants' Lack of Certainty as to Market, Product, or Invention:

Several comments have advocated that unlimited continuation applications should continue due to the presence of market uncertainty, product uncertainty, and even applicant uncertainty as to their own invention. These comments, in summary, state that unlimited continuations are needed to respond to innovations in the market, to claim a final product with a long development cycle, or simply because applicants need a lengthy time to determine what their invention is.

While these are undoubtedly important to some applicants, the greater legal certainty for the public that will result from the proposed rules far outweighs the concerns of any applicant or group of applicants. The public (including fellow patent holders, innovators, and others who "promote the progress of . . . useful arts" (US Const, Art.1, Sect. 8)) should not have to bear the costs of applicants' uncertainty or intentional delay during prosecution. 35 U.S.C. § 112, ¶2 requires "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention" upon filing of the application. Moreover, inventors are required to sign an oath, swearing that they have read and understood the application, and that they are inventors of the claimed subject matter. 37 CFR § 1.63. Execution of such an oath by an applicant who has not yet decided what the invention is hardly seems appropriate. The applicant, and not the public, is in the better position to know, and distinctly claim, their invention at the time of filing.

Furthermore, the proposed rules offer ample opportunity for applicants to observe the market, develop their product, or otherwise figure out what their invention is. In 2005, the average pendency (filing to issue) of an application was 29.1 months (2005 Patent Public Advisory Committee Annual Report), and the Office has predicted that this time will increase.

9

**Intel Corporation**
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

Assuming that a provisional application is filed, an applicant may have up to 6 years, on average, to determine what their invention is before his first continuation of right issues as a patent. If circumstances exist for a grantable petition, an applicant may have even longer for a patent issuing from a second continuation. Intel believes that the better part of a decade is sufficient time for applicants to "figure it out," and the Office has struck an appropriate balance in view of the public's legitimate expectation of legal certainty in the property rights granted by US patents.

Continuations-in-part (CIPs):

Several comments have advocated that CIPs should be treated differently under the proposed rules. CIPs are conceptually similar to other types of continuation applications that claim priority under 35 U.S.C. § 120. Given their necessary claim of priority under Section 120, there is no principled reason for treating CIPs differently from other continuing applications that claim priority under this section. If the Office allowed this approach, such an exception would surely swallow the proposed rules. Applicants could simply add matter that is either not patentably distinct or is unclaimed in a parent, and could circumvent the proposed rules' limit of one continuation of right. Further, with the recent amendments to 35 U.S.C. § 103(c), the need to file continuation in part applications has been greatly mitigated.

Possible effects:

Several comments have speculated that the proposed rules would result in multiple new application filings "up front" instead of serial continuation applications under the current regime. Some comments further opined that this would somehow be unfair to "small" applicants in favor of "large" applicants.

Such unfounded speculation does not identify any infirmity in the proposed rules. It is at least as likely, and more consistent with the intent of the proposed rules, that applicants will file a similar number of new applications, and prosecute them more diligently. Even if more applications were filed up front, the proposed rules permit this, provided that all of the applications were directed toward patentably distinct inventions. If not, the proposed rules have provisions preventing such abuse.

At least one comment suggests that the proposed rules would favor large entities with presumably more money to spend on initial filing fees, over small entities that attempt to include multiple inventions in fewer applications to delay filing fees. This argument ignores the reality that large entities still operate within limited filing budgets, and the effects of the rules will apply

**Intel Corporation**
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

across the board. Any applicant, large or small, must decide what level of filing activity it can reasonably afford, and make filing decisions accordingly. Small entities already receive a 50% discount on prosecution fees, and can take advantage of inexpensive provisional applications to delay paying filing fees. The proposed rules are properly crafted to reduce overall pendency and increase public certainty and finality, which are far more important than trying to maintain a perceived differential in treatment between classes of applicants.

Still others argue that as a result there will be many more appeals and instead of facing delays in examination, applicants will face delays before the Board. This argument ignores the excellent reforms instituted last year of having appeal conferences. If the examiner has done an inadequate job examining the case, the appeals conference provides a quick and effective remedy under the guidance of the Office's most experienced examiners to bypass the appeals process and have examination completed expeditiously.

<u>Necessity/Legality of the Proposed Rules:</u>

Some comments assert that the 20-year patent term measured from the filing date resolved any potential problems caused by continuations, but this is not the case. While it is beneficial to have some outside limit on pendency, 20 years is nonetheless an extremely long time in terms of many product and technology development cycles. Those who would use continuation practice to keep a "placeholder" application on file during the development of a technology still have the incentive to do so. Thus, pendency, notice, and finality are still adversely affected.

Others argue that the pre-grant publication of non-provisional applications solves all finality and public notice problems. This notion is incorrect for two reasons. First, not all applications are published, as there is a broad exception for applications in which foreign counterpart applications are not desired. Second, even publication does not solve the finality problem. Even assuming actual knowledge by each industry of all relevant published applications, the potentially unlimited pendency (regardless of secrecy) of an application chain prevents meaningful resolution of patent conflicts.

At least one person's comments proposed an alternative of a time limit during which unlimited continuations could be filed, and after which no continuations could be filed. This idea misses the point of the proposed rules, which is to provide one continuing application as of right, and potentially unlimited additional applications for good cause. The time-limit proposal

11

**Intel Corporation**
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

would encourage unlimited abuse of the process up until the deadline, and then cut off even legitimate continuing applications after that.

Some comments argue that the Office does not have the authority to enact the proposed rules. However, as explained above, the proposed rules are reasonable and within the Office's regulatory power.

<u>Alternatives</u>

Others have suggested that other alternatives should be considered. For example, one group has proposed that the Office try this approach on a trial basis for certain limited art units and evaluating its success. We do not believe that such an experimental approach would comply with Article 27(1) of the TRIPS Agreement (Trade-Related Aspects of Intellectual Property Rights), which prohibits discrimination as to the field of technology.

Other suggestions point to legislative fixes. While true patent reform would be desirable, it is not currently clear when that reform will happen as major industry players disagree on the parameters of that reform. The problem of the Office's backlog and the delays new applications are encountering exist today. They require a solution today.

Some might argue that the Office's policy of taking up continuations for examination before newly-filed applications should be reversed. While this would provide much-needed attention to newly-filed inventions, it would be a disaster in terms of prosecution delays and resultant patent-term extensions in the continuing applications. Especially given the Office's pendency challenges, moving continuations to the back of the line would effectively undo the 20-year patent term established by Congress in 1995, and play directly into the hands of those who seek delay and obfuscation through continuation practice.

Yet others assert that the Office can hire its way out of the problem by simply hiring more examiners. However, experienced examiners, unlike the goddess Athena, are not created spontaneously. It takes years to grow an experienced examining corps. Hiring even more inexperienced examiners will not solve the problem but will lower dramatically the quality of the services offered by the Office even if the Office were to receive permission from Congress to hire even more.

12

**Intel Corporation**
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052

Conclusion

In summary, Intel believes the new rules as proposed by the Office strike an appropriate balance among patent applicants' interest in obtaining optimal coverage for their inventions in a timely manner upon application, the Office's interest in efficiently processing new applications toward disposal as mandated by Congress, and the public's interest in having notice as to what technology is and is not available for use.

Sincerely,

David Simon

Chief Patent Counsel

Intel Corp.

13

Intel Corporation
2200 Mission College Blvd.
SC4-203
Santa Clara, CA 95052







1150 16th Street, NW
Suite 700
Washington, DC 20036

p. 202/872.5500
f. 202/872.5501

May 3, 2006

The Honorable Jon W. Dudas
Under Secretary of Commerce for Intellectual Property
And Director of the United States Patent and Trademark Office
Mail Stop Comments
P.O. Box 1450
Alexandria, VA 22313-1450

Attn:   Robert W. Bahr
        Senior Patent Attorney
        Office of the Deputy Commissioner
        For Patent Examination Policy

Comments on Proposed Rules:  "Changes to Practice for Continuing
Applications, Requests for Continued Examination Practice, and
Applications Containing Patentably Indistinct Claims" 71 Fed. Reg. 48
(January 3, 2006)

Dear Under Secretary Dudas:

The Business Software Alliance (BSA)* appreciates the opportunity to
offer comments regarding the U.S. Patent and Trademark Office
("USPTO") proposed rules directed to changes to practice for continuing
applications, requests for continued examination practice, and
applications containing patentably indistinct claims published at 71 Fed.
Reg. 48 (January 3, 2006).

As the National Academy of Public Administration ("NAPA") report for
the U.S. Congress noted "[a]lthough continuations have a legitimate role
in the patent prosecution process, increasingly they are the subject of
debate because of their growing volume, their effect on pendency, and
the opportunistic use of them."[1]  **BSA recognizes these trends and
supports the changes aimed at ending abuses of continuation
practices whether by rule-making or through legislation.   The
use of continuations to expand an applicant's monopoly after
surveying developments in the marketplace is especially
troubling for innovators and the public.**

_____

[1] _U.S. Patent and Trademark Office: Transforming to Meet the Challenges of
the 21ˢᵗ Century_, NATIONAL ACADEMY OF PUBLIC ADMINISTRATION (Aug. 2005) at
50.

WWW.BSA.ORG



The Honorable Jon W. Dudas
May 3, 2006
Page 2

We commend you for your leadership and ongoing efforts to improve the patent examination process, manage the limited resources afforded to you by Congress, and reduce the manipulation of the patent process that hurts innovation and the public.

We support the USPTO business plan which focused on three areas to guide the agency into the 21ˢᵗ Century: productivity, quality, and e-government. You and your USPTO management team are to be highly commended as you continue to innovate and strive to improve productivity and enhance quality as evidenced by this proposed rule concerning continuations.

BSA believes that the patent system is fundamentally sound and works well for most innovators, whether they toil in their garage, experiment in a university laboratory, or work for a large corporation that provides goods and services to consumers. We believe that a periodic review and recalibration of the patent law is not only a good idea, but also essential to ensuring that patents remain a vital incentive for innovation.

The suggestion to reform continuation practice and its abuses is hardly novel and has been suggested by a number of academic papers and government reports for decades, including:

- REPORT OF THE PRESIDENT'S COMMISSION ON THE PATENT SYSTEM (1966).
- *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, A REPORT BY THE FEDERAL TRADE COMMISSION, (Oct. 2003).
- *U.S. Patent and Trademark Office: Transforming to Meet the Challenges of the 21ˢᵗ Century*, NATIONAL ACADEMY OF PUBLIC ADMINISTRATION (Aug. 2005).

Currently, a patent applicant may file follow-on patent applications with broader and broader claims long after the publication or issuance of its original patent application. Through these mechanisms, some applicants keep their applications pending for extended periods while monitoring the developments in the relevant market. By modifying their claims to cover other companies' products, often after those other companies have invested significant funds in their products, such applicants can legally abuse the system. In some cases, the applicants seek to obtain patent protection for ideas that they never considered before seeing them in the marketplace. While this practice is currently permitted and even sanctioned by the courts, a reform curtailing the ability to broaden claims beyond the scope of the broadest claim previously published or issued would roll back significantly the invitation to abuse created by the current system. Hence current continuation practice discourages



The Honorable Jon W. Dudas
May 3, 2006
Page 3

innovation, research and development investment, and business certainty. It is hoped that the USPTO will not make a practice of granting further continuations solely on the basis of an applicant's request to broaden an application, and potentially resulting in the abuses previously described.

As frequently noted by legal scholars, there is no other mechanism in the U.S. legal system that provides "endless bites at the apple." The terrible truth is that the current system provides no finality to the review process, encourages unlimited chains of applications, and anticompetitive marketplace abuses.

Previous governmental reports and former USPTO officials considered proposing legislation to Congress that would eliminate continuations entirely. BSA would encourage a vigorous public debate on that suggestion and its potential merits in solving the worsening conditions of the U.S. patent system. The consequences of a patent system with a million-plus application backlog and 8 year average pendency in art areas relating to the technologies being developed by our members is very troubling and particularly burdensome to the highly innovative technology companies in the software and hardware sectors.

BSA supports the proposed rule making to enact the following modest reforms to continuation practice. In our view, these modest reforms strike the proper balance between the needs of applicants who desire reasonable flexibility in the process against the aforementioned potential abuses and USPTO workload concerns: *Continuing Applications*, requiring that the second or subsequent continuation or continuation-in-part application include a petition and a fee with a showing to the satisfaction of the Director as to why the amendment, argument, or evidence could not have been submitted prior to the close of prosecution; *Requests for Continued Examination ("RCE")*, requiring that any second or subsequent RCE include a petition and a fee with a showing to the satisfaction of the Director as to why the amendment, argument, or evidence could not have been submitted prior to the close of prosecution; and, finally, *Patentably Indistinct Claims*, requiring that applicants in some cases must either include an explanation of how the claims are patentably distinct, or a terminal disclaimer and explanation of why there are patentably indistinct claims in multiple applications.

These narrowly-tailored proposed changes will advance the needs of our patent system, including improving the USPTO's productivity, enhancing patent quality, eliminating growing abuses in the patent prosecution process, and accelerating innovation by U.S. software and hardware companies. While critics may argue that this is not a perfect solution,



The Honorable Jon W. Dudas
May 3, 2006
Page 4

the silence regarding alternative solutions has been deafening for forty years.

BSA and its members appreciate the opportunity to submit our comments on the proposed rules and your ongoing efforts to ensure that the U.S. patent system remains the envy of the world.

Sincerely,

Robert W. Holleyman II.
President and CEO

*The Business Software Alliance (www.bsa.org) is the foremost organization dedicated to promoting a safe and legal digital world. BSA is the voice of the world's commercial software industry and its hardware partners before governments and in the international marketplace. Its members represent one of the fastest growing industries in the world. BSA programs foster technology innovation through education and policy initiatives that promote copyright protection, cyber security, trade and e-commerce. BSA members include Adobe, Apple, Autodesk, Avid, Bentley Systems, Borland, Cadence Design Systems, Cisco Systems, CNC Software/Mastercam, Dell, Entrust, HP, IBM, Intel, Internet Security Systems, McAfee, Microsoft, PTC, RSA Security, SAP, SolidWorks, Sybase, Symantec, Synopsys, The MathWorks, and UGS.

 FEDERAL TRADE COMMISSION 

# To Promote Innovation:
## The Proper Balance of
## Competition and Patent Law and Policy



## A Report by the Federal Trade Commission
## October 2003





*b.*    *Analysis*

Critics of current disclosure requirements in particular industries typically argued that the Federal Circuit has an erroneous view of the predictability of the art or the skill of the PHOSITA.[152] They observed that these variables change over time as industries develop and mature, and they suggested that the patent system has not always kept current in its assessments.[153] They directed their criticisms toward the *application* of the disclosure requirements, not toward any fundamental problem inherent in the basic standards.

The role of disclosure requirements in shaping patent breadth and the consequences of that breadth for potential market power and cumulative innovation make the nature and effective application of the disclosure requirements a matter of significant competitive concern. Accurate, up-to-date assessments of the predictability of the art and of the abilities of the PHOSITA in evolving industries are

important elements for achieving efficiency goals and harmonizing the patent and antitrust regimes.

## C.    Other Doctrines that Affect Patent Breadth

Other doctrines, beyond the disclosure requirements, also set and interpret the scope of a patent's claims and thus affect patent breadth. This section highlights two of these doctrines. The first is the use of "continuing applications" – that is, "continuations" – to redefine the scope of a patent's claims. The second is the application of the doctrine of equivalents in interpreting claims. Both can significantly affect competition.

### 1.    Continuations and the Formulation of Claims

*a.*    *Hearings Record*

The patent system has long struggled with problems that flow from delay and secrecy in handling patent applications. Until recently, patent applications were not public information. Years might pass between the filing of an application and the issuance of a patent. An applicant's competitors may have invested substantially in the interim in designing and developing a product and bringing it to market, only to learn, after the patent finally issues, that they are infringing someone else's claims. At that point, redesign might be prohibitively expensive, and the newly announced patentee might be in position to extract large

---

disclose enough to allow practice of the invention without some work); Barr 2/28 at 756 ("I've actually never met an engineer that learned anything from a patent.").

[152] *See, e.g.,* Burk 3/30 at 133 (seeing an underestimate of the difficulty of writing software) and 7/10 at 155 (same); Rai 4/10 at 106 (Federal Circuit thinks everything in biotech is "incredibly unpredictable").

[153] *See, e.g.,* Burk 3/20 at 111-12 ("courts developing standards that might have applied 5, 10, 15 or even 20 years ago") and 7/10 at 198-99 (courts have not kept up with growing predictability of some biotech techniques); Kesan 4/10 at 120 (software has become more complex since the early cases governing enablement); *see also* Kunin 7/10 at 192-93 (increasing complexity of software inventions may have reduced the predictability); Burk & Lemley, 17 BERKELEY TECH. L. J. at 1199-1201 (explaining how reliance on precedent rather than the particulars of each case may lead to outdated conceptions of the PHOSITA's level of skill).

26

royalties.[154] Such a scenario raises the potential for what some panelists have termed "a hold-up."[155]

A statutory change that now requires all patent applications (other than those filed only in the United States) to be published 18 months after filing[156] may have considerably eased this problem with unanticipated "submarine" patents.[157] A PTO panelist indicated that 90% of current applications are so published.[158] Several panelists anticipated that the new publication rule would help substantially with submarine concerns,[159] although some indicated dissatisfaction with the remaining 18-month delay[160] and with excepting from publication patents filed only domestically.[161]

Another potential hold-up problem remains, however. Through the use of claim amendments during the prosecution process, a patent that states broader claims than those published at 18 months can still emerge.[162] To maintain the filing date of the original application, the original specification must contain support for the new claims.[163] If that is the case, the applicant may enlarge or otherwise modify the scope of its claims during the examination process.[164] The potential for anticompetitive hold-up increases the longer it takes for the broader claims to emerge. By filing one or more continuing applications[165] the applicant may extend the prosecution period – and the potential for working mischief by broadening claims – for years.

Panelists explained that continuations can serve legitimate functions when the applicant, or the applicant's attorney, has in

---

[154] See, e.g., Stallman 4/9 at 18-19 (describing unknowing infringement of patents kept secret during the application period as "stepping on . . . a land mine"); Barr 2/28 at 675-76.

[155] See, e.g., Shapiro 11/6 at 15-16, 176.

[156] 35 U.S.C. § 122(b)(1). Applications that are filed only domestically, however, need not be made public. 35 U.S.C. § 122(b)(2)(B).

[157] See also supra Ch. 1(III)(A)(2)(a).

[158] John Love 2/28 at 647.

[159] See, e.g., id.; Kohn 2/27 at 429; Gable 3/20 at 118-19; Casey 4/9 at 32.

[160] See Oehler 2/26 at 254 ("18 months can seem like an eternity when you're caught in the middle of it trying to answer 'am I free to operate'").

[161] See infra at Ch. 5(II)(C)(4).

---

[162] See, e.g., Katsh 4/10 at 193; Barr 2/28 at 676.

[163] 35 U.S.C. § 120. Similarly, novelty requirements prevent issuance of a patent on inventions "known or used by others in this country . . . before the invention thereof by the applicant for a patent," and the prohibition on derivation in theory bars issuance of a patent to one who "did not himself invent the subject matter sought to be patented . . . ." 35 U.S.C. §§ 102(a) and (f). See MERGES & DUFFY, PATENT LAW & POLICY: CASES AND MATERIALS at 398-403, 437-39.

[164] See, e.g., Merges 2/26 at 156-58; Chen 2/28 at 718; Rai 4/10 at 135-36.

[165] The filing may take various forms. It may involve a new application, which might take the form of a "continuation application," retaining the original written disclosures and the original filing date; a "continuation-in-part," which adds some new matter to the disclosures and loses the original filing date insofar as its claims rely on the new matter; or a "divisional," which carves out what had been a separate invention within the original application while retaining the original filing date. See 35 U.S.C. §§ 120-21; 37 C.F.R. § 1.53(b); Chambers 2/8 (Patent Session) at 101-02. Alternatively, the filing may involve a request for continued examination, which works to extend the examination of the original application. 37 C.F.R. § 1.114. For ease of exposition, this discussion will refer to all of these variants, including those portions of continuations-in-part that maintain the original filing date, as "continuing applications" or "continuations."

27

essence missed its own product in the initial application[166] or when the applicant and examiner need to maintain an extended dialogue.[167] Several panelists expressed concern, however, regarding the use of continuation practice in ways harmful to competitors. They explained that some applicants keep continuations pending for extended periods, monitor development of the market, and modify their claims to ensnare competitors' products after sunk costs have been incurred.[168] One panelist voiced the further worry that continuations could be used to undercut standard setting organizations' disclosure rules.[169] None of the testimony offered justification for the use of continuation practice to broaden claims to cover competitors' subsequent products and to exploit the consequences of their subsequent sunk investments. As American Intellectual Property Law Association

President Ronald Myrick summarized, "[T]he continuation practice we have today is not good. It's out of control."[170]

### b.    *Analysis*

*Implications for Competition and Innovation* Continuation practice can allow opportunistic behavior, such as post-filing modification of patent claims to capture competitors' products or processes that would not have infringed the original claims. Such opportunistic behavior can disrupt competitive activity. It wastes inventive resources that a competitor could have redirected, had it fully known the scope of an applicant/patentee's claims. It imposes redesign costs that might have been avoided if the competitor had had greater lead time. It fosters high royalties, inflated by a competitor's exposure to operational disruption from injunctive relief after sunk investments have been made. It magnifies potential competitors' risks and reduces their incentive to develop substitutes for the patentee's invention. Moreover, competitors' uncertain ability to predict from the written description at 18 months what the patentee ultimately will claim limits any opportunity to anticipate and avoid this exposure. Such behavior wastes resources, raises costs and risks, and potentially deprives consumers of the benefits of

---

[166] *See* Barr 10/30 at 146; Chambers 2/8 (Patent Session) at 103; Telecky 2/28 at 720-21 (finding nothing wrong with "chang[ing] your mind as you see the art, and as you think about it, as to what your invention is," as long as the claims are supported by the disclosure). *But see* Poppen 2/28 at 692 ("an inventor ought to know what his invention is and shouldn't have to wait to see what everybody else is doing").

[167] *See* Armbrecht 3/19 at 68-69; *cf.* Myrick 10/30 at 179-80 (explaining possible use of continuations to correct the prosecution history).

[168] *See, e.g.,* Poppen 2/28 at 687-88; Mar-Spinola 2/28 at 715-16; Quillen 3/19 at 70-71; McCurdy 3/20 at 37; Rai 4/10 at 136; Barr 10/30 at 79, 146; Myrick 10/30 at 178 (warning that divisionals may be similarly used to "game the system"), 180; Cecil D. Quillen Jr. & Ogden H. Webster, *Continuing Patent Applications and Performance of the U.S. Patent and Trademark Office,* 11 FED. CIR. BAR J. 1, 6 (2001). *See generally* Banner 10/30 at 181-82 (continuations a problem).

[169] *See* Stoner 10/30 at 145-46 (noting that continuations might be used "to spring a new patent claim on firms that are producing pursuant to a standard" absent a controlling disclosure requirement).

---

[170] Myrick 10/30 at 177; *see also* Myrick 10/30 at 180 (use of continuation practice as marketplace develops to capture what was never in the applicant's mind "an exceedingly troublesome thing"). Such conduct, however, may not give rise to an offense under patent law. *See, e.g., Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 874 (Fed. Cir. 1988) (holding that amending a claim to cover a competitor's product learned about in the course of the prosecution process was not in itself evidence of deceitful intent relevant to charges of inequitable conduct and stating, in *dictum,* that it was not "in any manner improper"), *cert. denied,* 490 U.S. 1067 (1989).

28

innovation and competition.[171]

*Suggestions for Reform of
Continuation Practice*  Patent reform efforts
have long focused on how to remedy the
opportunistic broadening of patent claims to
capture competitors' products. The 1967
President's Commission on the Patent
System determined that "it is desirable that
claims never be broadened after publication,"
but concluded that it might be impossible to
enforce an all-inclusive prohibition.[172] The
Hearings suggest that the same types of
concerns persist and will likely remain a
problem in the future unless changes are
implemented.[173] Suggestions for dealing
with the problems identified in continuation

practice include extending and making
greater use of the doctrine of prosecution
laches,[174] imposing time limits on broadening
claims,[175] and creating intervening rights to
protect competitors who become exposed to
infringement claims by virtue of
continuations.[176]

*Analysis*  Any of the remedies listed
above could address competitive concerns.
A remedy, however, should protect
legitimate uses of continuing applications, as
well as deter anticompetitive uses of
continuations. Creating intervening or prior
user rights[177] would most directly cure

---

[171] For a general discussion of hold-up problems
raised by unanticipated patents *see* Carl Shapiro,
*Navigating the Patent Thicket: Cross Licenses, Patent
Pools, and Standard-Setting*, in 1 INNOVATION POLICY AND
THE ECONOMY 119 (Adam Jaffe et al. eds., 2001). Indeed,
the Commission's complaint in a pending administrative
proceeding cites continuations as an element contributing to
broader, alleged anticompetitive conduct involving claim
modifications during a patent applicant's participation in
standard-setting activities. *Rambus Inc.*, No. 9302 at ¶¶ 37-
38, 47-69 (Complaint June 18 2002), *available at*
http://www.ftc.gov/os/adjpro/d9302/020618admincmp.pdf.

[172] REPORT OF THE PRESIDENT'S COMMISSION ON
THE PATENT SYSTEM, *reprinted in* To PROMOTE THE
PROGRESS OF THE USEFUL ARTS, SUBCOMM. ON PATENTS,
TRADEMARKS AND COPYRIGHTS OF THE SENATE COMM. ON
THE JUDICIARY, 90TH CONG., 1ST SESS. 39 (1967). The
President's Commission recommended imposing time limits
on continuing applications. *Id.* at 26.

[173] Although some panelists suggested that a 1995
change in patent term – from 17 years after issuance to 20
years after filing – limits the ability to prolong
examinations, *see, e.g.,* Telecky 2/28 at 721 and Detkin
2/28 at 729, other testimony indicated that 20 years was
more than enough time to abuse continuation practices. *See*
Poppen 2/28 at 693. Moreover, some predicted that the use
of continuations to broaden or otherwise add to literal
claims will increase, given current trends toward narrowing
the doctrine of equivalents (discussed *infra* in Ch.
4(II)(C)(2)). *See, e.g.,* Mossinghoff 10/30 at 144-45;
Myrick 3/19 at 48; Thomas 10/30 at 105-06.

[174] The Federal Circuit has approved a PTO
rejection of patent claims on grounds that the applicant had
forfeited his right to a patent under the doctrine of
prosecution laches by filing twelve continuations over a
period of eight years without advancing the prosecution of
his application. *See In re Bogese II*, 303 F.3d 1362 (2002);
*see also* Chen 2/28 at 718-19 (PTO exploring possibilities
for rejecting applications based on prosecution laches). The
doctrine of prosecution laches also potentially provides a
defense to an infringement action when the patentee has
engaged in unreasonable and prejudicial delay in securing
the patent's issuance. *See Symbol Technologies, Inc. v.
Lemelson Med., Educ., & Research Found.*, 277 F.3d 1361
(Fed. Cir.), *cert. denied*, 123 S. Ct. 113 (2002).

[175] *See* Poppen 2/28 at 692-94 (suggesting barring
broadening of claims 18 months after filing); Chen 2/28 at
718 (18-month limit on broadening claims "an interesting
idea . . . one way to promote some level of certainty"); *cf.*
Katsh 4/10 at 139 (suggesting a time limit on
continuations).

[176] *See* Myrick 10/30 at 180-81 (suggesting
"intervening rights or some such thing that would protect
the later entrant in the marketplace against these patents that
show up so tardily").

[177] Analysts have not always distinguished these
terms with consistency. For present purposes, we use "prior
user rights" to refer to absolute defenses against
infringement actions and "intervening rights" to refer to
protections that, in whole or in part, depend on a court's
weighing of the equities, as exemplified, respectively, by
provisions in 35 U.S.C. § 273(b) and 35 U.S.C. § 252,
discussed below.

29

potential competitive problems without interfering with legitimate needs for continuations, reducing business uncertainty without increasing costs of error. Such rights should shelter inventors and users that infringe a patent only because of claim amendments following a continuation, provided that the sheltered products or processes are developed or used (or the subject of substantial preparation for use) before the amended claims are published.[178] This would protect third parties from hold-ups derived from any extended period of secrecy made possible by continuations, while allowing the patent to be enforced against those who would have infringed a properly described pre-continuation claim[179] or who had timely opportunity to gain knowledge of the amendments.

Protections sheltering the legitimate expectations and investments of third parties affected by late-date claim amendments have substantial precedent. Limited intervening rights already are available under 35 U.S.C. § 252 to third parties who infringe a patent because of a broadening of claims through post-grant reissue, a procedure that, in cases of "error without any deceptive intention," allows certain claim amendments *after* a

patent has issued.[180] The intervening rights proposed herein would provide protection to third parties similarly confronted with late-date claim amendments *during* the course of the prosecution process. The courts, however, have applied existing intervening rights narrowly[181] and likely would need to broaden them to confer meaningful protection in light of investments made or business commenced by the third party and the likely costs and full economic consequences of any redesign to avoid infringement. Regarding prior user rights, Congress in 1999 enacted such protections to shelter some third parties from infringement claims based on business method patents.[182] More broadly, the 1992 Advisory Commission on Patent Law Reform, in conjunction with a separate recommendation to determine patent priority on a first-to-file basis, proposed conferring prior user rights on those who "in good faith" use, or make

---

[178] Whether amended claims are published upon the filing of continuations depends upon the specific continuation format used and the way that amendments are presented, and often is "[a]t applicant's option." *See* 37 C.F.R. § 1.215; American Inventor's Protection Act of 1999 Questions and Answers § C (Eighteen-Month Publication), *available at* http://www.uspto.gov/web/offices/dcom/olia/aipa/infoexch.htm.

[179] The phrase "properly described claim" refers to claims that satisfy the written description requirement of 35 U.S.C. § 112. The intervening or prior user right would not be defeated by a pre-continuation claim that exceeds the applicant's written description.

---

[180] *See* 35 U.S.C. § 251.

[181] *See, e.g., Shockley v. Arcan, Inc.,* 248 F.3d 1349, 1361 (Fed. Cir. 2001) (refusing to consider intervening rights in view of defendant's unclean hands from willful infringement); *Seattle Box Co. v. Industrial Crating and Packing, Inc.,* 756 F.2d 1574 (Fed. Cir. 1985) (leaving unanswered whether intervening rights would have been available for anything more than bundles made from pre-reissue inventory); J. Christopher Carraway, *The Uncertain Future of Enforcing Patents that Have Been Broadened through Reissue,* 8 FED. CIRCUIT B.J. 63, 68, 74 (1998) ("The grant of equitable intervening rights is extremely rare, however, most likely out of discomfort with allowing a party to continue to infringe a patent. . . . Although one who has designed around the original claims may be protected from paying damages on any pre-reissue activity, . . . equitable intervening rights to continue production of the originally noninfringing product are almost universally denied, thereby destroying investments made in creating and building the market for the product.").

[182] *See* 35 U.S.C. § 273(b) (sheltering those who reduced a business method to practice at least a year before the patent application and used the method before the effective filing date).

30

substantial preparation for using, an invention before the filing date of a subsequently issued patent.[183]

    *Recommendation.* Accordingly, the Commission recommends the enactment of legislation to protect from infringement claims a third party who reduces to practice, uses, or makes substantial preparation for using a process, machine, manufacture, or composition of matter ("product or process") prior to first publication of a claim covering that product or process in a continuing application, provided that no parent application[184] contained a properly described claim covering the product or process prior to the third party's reduction to practice, use, or substantial preparation for use.[185]

## 2.    Doctrine of Equivalents

### a.    *Hearings Record*

    Several panelists addressed claim interpretation issues under the doctrine of equivalents.[186] The doctrine of equivalents "protects [a patent holder] against efforts of copyists to evade liability for infringement by making only insubstantial changes to a patented invention."[187] It does so by allowing a claim to be construed to cover more than its literal language, thereby extending patent breadth.[188] The answer to the question of when changes are "only insubstantial" thus can become an important determinant of patent breadth.

    Some panelists favored the doctrine of equivalents as a means to protect patentees from imitators who might otherwise escape infringement by tinkering in trivial ways with patented products or

---

[183] ADVISORY COMMISSION ON PATENT LAW REFORM, A REPORT TO THE SECRETARY OF COMMERCE 11, 21 (1992) (Recommendation I-A), *available at* http://world.std.com/obi/USG/Patents/overview.

[184] "Parent application" is used broadly here to encompass all predecessors in a string of continuing applications.

[185] The Hearing record does not permit assessment of the extent to which reissue proceedings have been used to broaden patents to cover competitors' products after the competitors have made their sunk investments, nor does it explore the justifications for broadening reissue. It nonetheless appears that reissue in some instances may be used like continuations "to encompass activity by a competitor." *See* United States Patent and Trademark Office 21st Century Strategic Plan, *Permit Assignees to File Broadening Reissue* 1 (April 2, 2003), *at* http://www.uspto.gov/web/offices/com/strat21/action/lr1fp5 5.htm. To the extent that reissue poses, or develops in a way that poses, comparable competitive problems to those raised by continuations, corresponding protections, including a possible broadening of existing intervening rights, ought to be considered.

[186] Other discussion dealt with literal claim interpretation, in particular the effects of the ruling in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), that claim interpretation is a matter of law, not fact. Although panelists noted that the ruling had been expected to increase certainty by vesting interpretation issues in judges rather than juries, *see e.g.*, T.S. Ellis 7/11 at 113 (finding that certainty has increased) and Barr 10/30 at 185, some observed that achieving certainty has now been delayed until appeal of the trial judge's conclusions. *See, e.g.*, Weinstein 2/27 at 451; Katsh 4/10 at 103-04; Kunin 7/10 at 37; Banner 10/30 at 182-83; *see also* Kimberly A. Moore, *Are District Court Judges Equipped to Resolve Patent Cases?*, 12 FED. CIRCUIT B.J. 1, 32 (2002) (advocating statutory reform that would permit "[e]xpedited appeals of a limited number of claim construction issues"). Neither the Hearing record nor the academic literature permits a sorting of competitive consequences.

[187] *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 727 (2002).

[188] *See, e.g.*, Sung 2/8 (Patent Session) at 128; Wamsley 7/10 at 14; *Festo*, 535 U.S. at 731-32; HARMON, PATENTS AND THE FEDERAL CIRCUIT § 6.3(a)(ii) at 343.

31

*A Report of the*

## NATIONAL ACADEMY OF PUBLIC ADMINISTRATION

*for the United States Congress and the*
*   United States Patent and Trademark Office*

August 2005

# U.S. PATENT AND TRADEMARK OFFICE: TRANSFORMING TO MEET THE CHALLENGES OF THE 21ST CENTURY

**Panel**
Thomas H.Stanton, *Chair**
Marilu Goodyear*
Bernard Ross*
Daniel L. Skoler*
Charles Van Horn

\* *Academy Fellow*

One reason for the gap between applications received and FAOMs issued is that staffing levels for examiners did not keep pace with application growth. For example, examiners increased from 1,681 in 1990 to 2,905 in 2002 (73 percent, at a time that applications rose 79 percent), and from 3,538 to 3,681 from 2002 to 2004 (4 percent, when applications grew 7 percent). While examiner numbers grew in total during this period, there was high attrition and the growth in staff was often not in tandem with application growth. (These issues are discussed in Chapters 2 and 4.)

At this juncture, the recent increase in the number of USPTO staff cannot quickly influence pendency, since new examining staff go through intense classroom and on-the-job training before they can be fully productive. Over time, additional resources will make a difference in FAOM pendency, but in the short term, new examiners require that more experienced staff take time away from production to train them.

As applications have increased, the number of claims accompanying the applications (which describe how the invention differs from prior art) have increased, as has the volume of material submitted with them (information on prior art, which the applicant believes may be relevant to patentability). This increases the complexity of the application and can increase the time it takes to search prior art and examine the application properly.

## INFORMATION TECHNOLOGY TO SUPPORT PATENT OPERATIONS

To respond to the growth in work and adapt to advances in information technology, Congress authorized funds[17] for USPTO to create databases to search prior art in patent and non-patent literature, provide information to the public on issued patents and applications, and create an electronic application filing system. USPTO has one of the largest enterprise storage systems for e-government[18] in the nation. However, it has had little success in creating an e-filing system for patents that stakeholders are willing to use; Trademark applicants filed electronically 73 percent of the time in FY 2004, while patent applicants did so only 1.5 percent of the time. Stakeholders say this is because the system is complicated to use and unique to USPTO.

USPTO developed an image-based application processing system (IFW), completed in August 2004, through which contractors scan all applications and then examiners review them on a

---

[17] In 1980 (in P.L. 96-517) Congress directed the Commissioner of Patents and Trademarks to report to Congress within two years on a plan to identify and develop computerized data and retrieval systems to be applied to all aspects of PTO operations. This was after USPTO had spent tens of millions to develop a series of internal information systems that did not get past the development stage. The then-PTO set a goal to have fully electronic patent searching by 1987, and did not achieve this until 2000, after spending hundreds of millions more than anticipated. While some other system development has gone more smoothly, Congress has become wary of USPTO IT system projections.

[18] A storage architecture in which data items can be retained in separate files but linked together to allow greater flexibility in organizing, comparing and rapidly retrieving information. For USPTO—which has massive amounts of data that relate to topics as diverse as patent statistics, content of issued patents or published applications, and the patent classification system—it is essential that staff and the public be able to interrelate the information quickly with a minimum set of complex and saved queries.

13

Reclassification has not been as vigorous in all art areas because USPTO plans to outsource the function and because USPTO, JPO, and EPO are negotiating development of a joint classification system. Finally, when USPTO does outsource classification, some PEs may become available to prosecute applications. However, some highly skilled PEs will still be needed to oversee contractor activities and results. USPTO staff said the impact of outsourcing classification on pendency will probably be minimal because some examiner staff will be diverted to oversee contractor activities.

### Continuations

A continuation is a second application for the same invention claimed in a prior, nonprovisional application and filed before the first application becomes abandoned or patented. Although continuations have a legitimate role in the patent prosecution process, increasingly they are the subject of debate because of their growing volume, their effect on pendency, and the opportunistic use of them. Academic papers, USPTO officials, and the 2003 FTC report have suggested that the opportunistic use of continuations should be remedied.

The prosecution process for each application provides at least two, and generally more, opportunities for the applicant to justify the patentability of the claims to an invention. These come either through the existing amendment process or in response to an initial rejection and or a final rejection. However, even if an applicant has received an initial or final rejection, patent law (35 U.S.C. Sec. 120, Sec. 132b) allows applicants to continue the prosecution process for the same invention claimed in a prior application through the use of continuations. The continuation process has many purposes, including ensuring that the PE understands the application or sees the best prior art. Several patent attorneys with whom the Academy Panel spoke believed some examiners did not fully understand the invention in the initial application and thus inappropriately issued initial rejections even after the applicant provided extensive explanation and documentation.

In FY 2004, 72,544 continuations were filed for the same invention that was submitted in an earlier application. The associated FY 2004 workloads and definitions for two types of continuations are:

- Request for continued examination (RCE)—44,438 requests to continue the examination process for the same invention that was claimed in a prior application. The applicant submits this request after the examination of the prior application has been completed. The applicant pays a fee but is not required to submit a new application.

- Continuation—28,106 new applications for the same invention claimed in a prior application that was filed before the earlier application was abandoned or patented.

By using continuations, the applicant receives a significant benefit because the second application (or RCE) skips the queue and receives the same priority for processing as the original application. Therefore, although the percent of continuations has been fairly constant over the last few years, as the absolute number has increased and those "skip the queue," other applications in the backlog age even further. However, despite the benefit of receiving the same

# "To Promote The Progress of ...Useful Arts"

## In An Age of Exploding Technology

**REPORT OF
THE PRESIDENT'S COMMISSION
ON THE PATENT SYSTEM**



US PATENT & TRADEMARK OFFICE

3 0402 00096490 0

**WASHINGTON, D.C.
1966**

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price 65 cents