**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| TRIANTAFYLLOS TAFAS,<br>    Plaintiff,<br><br>         v.<br><br>JON W. DUDAS, et al.,<br>    Defendants. | Civil Action No. 1:07cv846(L) (JCC/TRJ) |

CONSOLIDATED WITH

| | |
|---|---|
| SMITHKLINE BEECHAM<br>CORPORATION, et al.,<br>    Plaintiffs,<br><br>         v.<br><br>JON W. DUDAS, et al.,<br>    Defendants. | Civil Action No. 1:07cv1008 (JCC/TRJ) |

**BRIEF OF *AMICUS CURIAE*
MICRON TECHNOLOGY, INC.,
IN SUPPORT OF THE DEFENDANT'S ANTICIPATED MOTION
<u>FOR SUMMARY JUDGMENT</u>**

*Amicus curiae* Micron Technology, Inc. respectfully submits this brief in support of the legal authority of the United States Patent & Trademark Office ("USPTO") to promulgate Final Rules[1] related to claims and continuations, and urges the court to reconsider and reverse its Memorandum Order of October 31, 2007.

---

[1] "Changes to Practice for Continued Examination Filings, Patent Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent Applications; Final Rule," 72 Fed. Reg. 46716, 46716-46843 (Aug. 21, 2007) (hereinafter referred to as the "Final Rules").

1

**INTEREST OF AMICUS CURIAE**

*Amicus curiae* Micron Technology, Inc. ("Micron") has a dual interest in USPTO's proposed treatment of continuing applications. First, Micron is a frequent patent applicant and a leading patentee. Micron designs and manufactures state-of-the-art CMOS image sensors and DRAM and flash memory solutions that are used in today's most advanced photographic and video, computing, networking, and communications products. Micron invests over $600 million every year in research and development. For the past five years, Micron has been among the top ten recipients of U.S. patents, and for the last several years, MIT's Technology Review (now published by ipIQ) has ranked Micron's patent portfolio as the strongest in the semiconductor industry. In addition to being one of the most prolific applicants in the PTO, Micron has taken advantage of continuation application practice to facilitate more strategic prosecution of the many claims related to its advances. Nevertheless, Micron has been concerned that applications relating to many of its most valuable inventions have been stalled at USPTO, awaiting even initial consideration by a patent examiner. Those delays have been lengthening in recent years, postponing issuance of patents and its ability to enforce them.

Second, Micron also is the subject of others' efforts to enforce their patents, and Micron has been quite vocal in expressing concerns that USPTO is allowing applicants to "invent patents" rather than "patent inventions." Micron has learned from painful first-hand experience how "patent stalkers" will file a broadly worded initial application, wait and see where industry heads, and then add or amend claims to cover technologies that others developed independently. Multiple continuing applications are often critical to this strategy of predatory delay.

## SUMMARY OF THE ARGUMENT

The Final Rules address, and go a very long way to solving, two very real problems afflicting the United States patent system—a large and growing backlog of patent applications that sit unexamined in the USPTO, and predatory claiming practices by some applicants who seek to hold entire industries hostage to cleverly crafted claims that cover technologies not remotely within the inventor's contemplation at the time the application was first filed.

The pendency/backlog problem is alarming. Several recent reports have pointed to a 32-month total pendency for US patent applications. *See* GAO Report No. GAO-07-1102, September 2007, "US Patent and Trademark Office Hiring Efforts Are Not Sufficient to Reduce the Application Backlog" (hereinafter, the "GAO Report"). *See also* United States Patent and Trademark Office Patent Public Advisory Committee, November 30, 2007, Annual Report, at 9. USPTO's own projections show pendency increasing to 38 months in the next five years, and total backlog of unexamined applications increasing from 730,000 today to over 1.3 million by 2013 (!). GAO Report at 12. Even though, as numerous opponents of the Final Rules have noted, and as the Court itself noted in its Memorandum Opinion,[2] the number of continuation applications that would be impacted by the Final Rules represent a small part of that problem (less than 3% of annual filings), the Final Rules are nothing more than an effort to encourage more judicious resort to continuation practice and are well within the purview of USPTO's rule making authority.

The so-called "predation" problem wherein unscrupulous applicants improperly game the system to ensnare technology that others developed independently and reasonably believed they were entitled to exploit is widely recognized by all sides. Opponents of the Final Rules,

---

[2] *SmithKline Beecham Corporation v. Dudas,* No. 1:07cv1008, (E.D. Va. October 31, 2007), slip op. at 25 (Court's opinion hereinafter referred to as "Memorandum Opinion").

3

including the present plaintiffs, argue however that "there are less-drastic and less-damaging alternatives to restricting abusive continuation applications" and that USPTO's failure first to investigate these options before pursuing so draconian a solution as the Final Rules demonstrates the arbitrary and capricious nature of the Final Rules.  Memorandum Opinion, at 25.  Of course, the only basis for this assertion is an unwarranted distrust of USPTO, and wholly unsubstantiated speculation that USPTO will "deny a petition [to file the third and later continuation application] in 'almost all circumstances.'"  *Id.* at 22.

The question obviously becomes whether USPTO has any authority at all to solve the pendency and predation problems that threaten to undermine the innovation leadership of the United States.  This Court's Memorandum Opinion appears to accept that the Final Rules are within USPTO's rule-making authority if they are "not inconsistent with statute."[3]  Thus, the fundamental question is "are they, or are they not, inconsistent?"

As the answer to that fundamental question depends on the controlling statute, Amicus restates the issue in terms of two straightforward and simple questions that various parties and amici who have already appeared before this Court have complicated and confused:

1. Does Section 120 of the Patent Statute[4] grant to patent applicants a twenty-year window within which to mold and craft patent claims to cover that which the applicant first sees practiced in the market place after the original filing date?

---

[3] See discussion, Memorandum Opinion, at 21, of *In re Van Ornum*, 686 F.2d 937 (CCPA 1982), where the Court acknowledges that USPTO's rules are almost always substantive in nature, and not invalid for that reason if they are consistent with the Patent Statute.

[4] References herein to the "Patent Statute" shall refer to Title 35, United States Code, and citations to specific sections of the Patent Statute shall refer to sections in Title 35.

4

      2.      Does the mere filing of an application within the timing parameters of Section 120 remove an application so filed from any and all requirements imposed by other statutory or regulatory provisions?

The answer to both questions is clearly "no." This Court should allow a co-equal branch of government to police its own jurisdiction and to manage its own docket. In the event USPTO mismanages by denying rights that should not be denied, the system allows ample protections by way of appeal.

## ARGUMENT

In addition to the significant innovation incentives offered by the promise of exclusionary patent rights, patents serve a highly useful function both by providing the springboard from which future innovation can occur, and by providing notice to the public of that which the applicant regards as her invention. An extended delay in the presentation of patent claims adequate to define the metes and bounds of the invention frustrates both objectives. The Final Rules are designed to encourage applicants to be as expeditious as possible in this task.

**A. Substantial Abuse of the System Justifies the Final Rules.**

The Final Rules are necessitated by abusive practices by applicants—primarily the practice of expanding the scope of patent claims during an extended prosecution of a "family" of patent applications by tailoring claims to read on innovations first seen in the marketplace. This abuse presents one of the most serious obstacles to competition facing industry today. The courts have largely acquiesced, and the practice has led to a glut of continuing applications and has contributed to unprecedented backlogs within USPTO.

The Final Rules do not permanently foreclose a later presentation of such claims in a third or later continuation application, but do require that applicants explain why such claims

could not earlier have been presented. That applicants with a legitimate reason for the submission of additional continuation applications will be required to provide the explanation is not a reason to enjoin the implementation of the Final Rules. Indeed, to do so now on the paranoid assertion that USPTO has an agenda to declare the explanation inadequate in a predetermined number of cases raises serious questions of ripeness.

The filing of repeated continuing applications allows a patent applicant to "invent a patent" instead of patenting a preexisting invention. An applicant intent on developing a patent as a litigation and licensing weapon can use repeated continuing applications to obtain patent claims far removed from whatever the applicant had in mind when preparing the initial disclosure. This process, sometimes called "patent stalking," is simple under current USPTO rules. First the "stalker" files a patent application with a broadly worded disclosure. That original application includes a general description of technology that the applicant expects will be significant to a particular industry. Then the stalker monitors that industry, watching how the pioneering companies develop and market new products. During this time, the stalker keeps a chain of continuation applications alive and periodically amends or adds claims to match what the industry is doing.

Claims presented in continuation applications receive the same filing date as the claims presented as part of the original application. This creates a fiction in which a belatedly drafted claim will be deemed to antedate an otherwise invalidating reference, even when the reference may have been the very input upon which the belatedly drafted claim was modeled. The stalker thus emerges from USPTO with tremendous advantage, both in alleging infringement (because the claims were drafted expressly to cover a target company's activities) and in maintaining validity (because of the benefit of a filing date well before the claims were actually drafted).

Patent stalking is an unfair abuse of the system, yet it is commonplace—in some quarters even recommended practice.[5]

These abuses of continuation practice reverberate throughout the patent system. Continuation patents are more likely to be litigated: patents based on continuing applications account for 52% of all litigated patents. Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63, 70 (2004). Further, patents that are ultimately litigated typically issue after a longer chain of continuing applications than other patents: each litigated patent issues from an average of 2.57 applications, while patents in general issue from an average of only 1.54 applications. John R. Allison et al., *Valuable Patents*, 92 Geo. L.J. 435, 457 (2004). Abuses of continuation practice thus have far-reaching impacts.

In short, current continuation practice is easily abused, with no negative consequences to the abuser. Unscrupulous patent applicants are using continuing applications to obtain claims specifically intended to cover the independent—and novel—activities of true innovators.

### B. USPTO Has Statutory and Inherent Authority to Regulate Continuation Practice.

Congress granted the PTO express authority to "establish regulations, not inconsistent with law, which . . . shall govern the conduct of proceedings in the Office." 35 U.S.C. § 2(b)(2)(A) (formerly 35 U.S.C. § 6(a)). By this provision, Congress "delegated plenary authority over USPTO practice . . . to the [USPTO]." *Gerritsen v. Shirai,* 979 F.2d 1524, 1527 n.3 (Fed. Cir. 1992). Furthermore, the Patent Act expressly authorizes USPTO to promulgate regulations which "shall facilitate and expedite the processing of patent applications . . . ." 35

---

[5] *See, e.g.,* Paul Gillette, Note, *"Maximum Security": Continuation and Reissue as Means of Obtaining Optimum Patent Protection After Festo*, 27 T. Jefferson L. Rev. 371 (2005) (suggesting that broadest claims be reserved for continuation applications, or perhaps even reissue); Symposium, *The End of Equivalents? Examining the Fallout from* Festo, 13 Fordham Intell. Prop. Media & Ent. L.J. 727, 742 (2003) (quoting Harold C. Wegner: "[Y]ou take whatever claims you can, you file a continuation with a disclaimer, and then you keep that new case pending forever and ever and ever, and then you add new claims when you need them. Now, ***that is not a very good public policy***. But, it is something that is an effective way to deal with the problem. We do it all the time." (emphasis added))

7

U.S.C. § 2(b)(2)(C). The proposed rule is a direct effort to expedite the processing of legitimate applications, in keeping with the plain text of the statute.

The Federal Circuit has deferred to USPTO's statutory authority to make procedural rules governing the treatment of patent applications. For example, in the context of interferences, the Federal Circuit approved USPTO regulations that established a motion procedure for interference proceedings and required patent applicants to prove entitlement to the priority date of an earlier disclosure. *Stevens v. Tamai,* 366 F.3d 1325, 1332-34 (Fed. Cir. 2004). The proposed rule governing the number of continuation applications that an applicant may file similarly falls squarely within the ambit of USPTO's procedural regulatory authority.

Apart from this express statutory authority, the Federal Circuit has also recognized USPTO's *inherent* authority to regulate continuation practice and ensure that continuation applications are pursued without unreasonable delay. In *In re Bogese,* 303 F.3d 1362 (Fed. Cir. 2002) the court recognized that "[t]he USPTO is the administrative agency that is 'responsible for the granting and issuing of patents," *Id.* at 1367-68 (quoting 35 U.S.C. § 2 (2000)) and that "[l]ike other administrative agencies, the USPTO may impose reasonable deadlines and requirements on parties that appear before it." *Id.* at 1368. Thus, it held, "[t]he USPTO has inherent authority to govern procedure before the USPTO, and that authority allows it to set reasonable deadlines and requirements for the prosecution of applications." *Id. Bogese* upheld USPTO's authority to reject claims based on unreasonable delay in prosecution (prosecution laches) even without a specific regulation in place, as long as the applicant is afforded notice and an opportunity to respond. Predictably, the applicant's misconduct in that case included repeated filing of continuation applications. *Id.* at 1364-65. Given that holding, USPTO clearly has authority to

adopt regulations designed to streamline patent prosecution practice and to refuse to allow continuation applications that are unduly delayed or pursued for improper purposes.

To be sure, all regulations must be "not inconsistent with law," but nothing in the proposed regulation conflicts with Section 120. Section 120 simply states that proper continuation applications shall receive the benefit of the earlier filing date of the first application. As the Federal Circuit held in *Bogese,* Section 120 does not eliminate USPTO's authority to determine whether continuation applications are procedurally proper or pursued with due diligence. Indeed, Section 120 expressly grants the Director of USPTO authority to regulate the content and timing of continuation applications: it states that "[n]o application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director." 35 U.S.C. § 120.

Nor does Section 120 free a continuation application from other rigors and requirements of the Patent Statute. Thus, despite the statement in Section 120 that continuation applications must satisfy "the first paragraph of section 112 of this title," no one has suggested that other paragraphs of Section 112 are inapplicable to a continuation application, or that the claims in a continuation application need not "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, second paragraph. Other requirements of Section 112 are surely just as applicable to continuation applications.

## CONCLUSION

Under the Final Rules, USPTO is simply creating a presumptive limit on the number of continuation applications an applicant may file, with the goal of expediting prosecution practice and cutting down on dilatory behavior and abuse. The proposed limit is not absolute: if an applicant can show good cause for filing a later continuation application, the application will be allowed and the applicant will be permitted to claim priority to the earlier application under Section 120. Complaints that USPTO will reject proffered explanations for why claims could not earlier have been presented are rank speculation and do not present a case or controversy necessary to the exercise of this Court's jurisdiction.

Respectfully submitted,

MICRON TECHNOLOGY INC.

Dated: December 20, 2007

_____/s/_____
M. F. Connell Mullins, Jr. (VSB #47213)
Email: cmullins@spottsfain.com
Hugh M. Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
Attorneys for Micron Technology, Inc.
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
P.O. Box 1555
Richmond, Virginia 23218-1555
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2007, I will electronically file the foregoing document with the Clerk of the Court using the CM/ECF System, which will then send a notification of such filing (NEF) to the following:

Joseph D. Wilson, Esq.
Kelley Drye & Warren LLP
3050 K. Street, NW, Suite 400
Washington, D.C. 20007-5108
Email: jwilson@kelleydrye.com
***Attorney for Plaintiff in Case No. 1:0 7cv846***

Elizabeth M. Locke, Esq.
Kirkland & Ellis LLP
655 l5th Street, NW, Suite 1200
Washington, D.C. 20005
Email: elocke@kirkland.com

and

Craig C. Reilly, Esq.
Richard McGettigan Reilly & West PC
1725 Duke Street, Suite 600
Alexandria, Virginia 22314
Email: craig.reilly@rmrwlaw.com
***Attorneys for Plaintiffs in Case No. 1:07cv1008***

Chuck Rosenberg, Esq.
United States Attorney
Lauren A. Wetzler, Esq.
R. Joseph Sher, Esq.
Andrew Price, Esq.
Assistant United States Attorneys
United States Attorney's Office
2100 Jamison Avenue
Alexandria, Virginia 22314
Email: lauren.wetzler@usdoj.gov
***Attorneys for Defendants in Case Nos. 1:07cv846 and 1:07cv1008***

Rebecca Malkin Carr, Esq.
Pillsbury Winthrop Shaw Pittman LLP
2300 N. Street, NW
Washington, D.C. 20037
Email: Rebecca.carr@pillsburylaw.com

and

Scott J. Pivnick, Esq.
Pillsbury Winthrop Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4856
Email: scott.pivnick@pillsburylaw.com
***Attorneys for Amicus Elan Pharmaceuticals, Inc.***

James Murphy Dowd, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
1455 Pennsylvania Avenue, NW
Washington, D.C. 20004
Email: james.dowd@wilmerhale.com
***Attorney for Amicus Pharmaceutical Research***
***and Manufacturers of America***

Dawn-Marie Bey, Esq.
Kirkpatrick Stockton LLP
700 13th Street, NW, Suite 800
Washington, D.C. 20005
Email: dbey@kslaw.com
***Attorney for Amicus Hexas, LLC, The Roskamp***
***Institute and Tikvah Therapeutics, Inc.***

Randall Karl Miller, Esq.
Arnold & Porter, LLP
1600 Tysons Boulevard, Suite 900
McLean, Virginia 22102
Email: randall_miller@aporter.com
***Attorney for Amicus Biotechnology Industry***
***Organization and Amicus Monsanto Company***

Charles Gorenstin, Esq.
Birch, Stewart, Kolasch and Birch, LLP
8110 Gatehouse Road, Suite 100 East
FaUs Church, Virginia 22042
Email: cg@bskb.com
***Attorney for Amicus Intellectual Property Institute***

Thomas J. O'Brien, Esq.
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Email: to'brien@morganlewis.com
***Attorney for Amicus American Intellectual
Property Law Association***

Robert E. Scully, Jr.
VA Bar No. 19218
Stites & Harbison PLLC
1199 North Fairfax Street, Suite 900
Alexandria, Virginia 22314
(703) 739-4900
Fax: (703) 739-9577
rscully@stites.com
***Counsel for Amicus Curiae Human
Genome Sciences, Inc.***

                                                  /s/
                    M. F. Connell Mullins, Jr. (VSB #47213)
                    Attorney for Micron Technology, Inc.
                    Spotts Fain PC
                    411 East Franklin Street, Suite 600
                    P.O. Box 1555
                    Richmond, Virginia 23218-1555
                    Telephone: (804) 697-2000
                    Facsimile: (804) 697-2100
                    Email: cmullins@spottsfain.com