# EXHIBIT 1
# PART 7

**46812** Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

*Nashua*, 185 F.3d 884 (Fed. Cir. 1999) (nonprecedential decision). Some comments suggested that the Office should not adopt sweeping changes unless and until Congress acts to address the issues through the pending patent reform legislation, which would ensure consistency with previous legislative acts. Some comments argued that questions regarding the Office's statutory authority to make the proposed changes would likely lead to litigation and a period of uncertainty until the matter can be resolved either judicially or legislatively. Several comments also suggested that the proposed changes to continuation practice will ultimately result in an even larger backlog at the Office should the Federal Circuit hold the proposed changes to be contrary to law, arguing that applicants in the meantime are left in a state of limbo until the courts finally resolve the matter. One comment argued that the Office's stated rationale regarding the public notice function of claims is not consistent with the law and is more appropriately addressed by Congress or the courts. Two comments also suggested that rules limiting the number of continuing applications are unconstitutional because they exceed the rule making authority of the Office, thereby suggesting that the Office should have sought these changes via legislation, not rule making.

*Response:* The Office is not usurping the legislative role of Congress, but instead acting consistently with the authority given to the Office by Congress. Pursuant to 35 U.S.C. 2(b)(2)(A), Congress has given the Office the authority to establish regulations that "govern the conduct of proceedings in the Office." By the grant of authority in 35 U.S.C. 2(b)(2)(A), "Congress [is understood] to have 'delegated plenary authority over PTO practice' * * * to the Office." *Stevens v. Tamai*, 366 F.3d 1325, 1333, 70 U.S.P.Q.2d 1765, 1771 (Fed. Cir. 2004) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1527 n.3, 24 U.S.P.Q.2d 1912, 1915 n.3 (Fed. Cir. 1992)). Therefore, the decision to make these changes via rule making is not an unconstitutional exercise of the Office's rule making authority under 35 U.S.C. 2(b)(2).

Additionally, the provisions of § 1.78, which concern continuing applications, govern proceedings in the Office because they set forth the process by which an applicant can file a continuing application. *See Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims*, 71 FR at 50, 1302 *Off. Gaz. Pat. Office* at 1320 (noting that continuation practice is "a procedural device that permits an applicant to amend his application after rejection and receive examination of the 'amended' (or new) application") (citing *In re Bogese I*, 22 U.S.P.Q. 2d at 1824). Specifically, under revised § 1.78, an applicant may automatically file a first and second continuing application and then may file any number of third and subsequent continuing applications as long as the applicant justifies each filing by a showing as to why the amendment, argument or evidence sought to be entered could not have been previously presented. Furthermore, as an alternative, an applicant may choose to file an appeal when confronted with a rejection that he or she feels is improper. The changes adopted in this final rule do not impede or block an applicant's statutory right to a patent.

The Office is responsible for the granting and issuing of patents and has the authority and responsibility to establish regulations that govern the conduct of proceedings in the Office and facilitate and expedite the processing of patent applications. *See* 35 U.S.C. 2(a)(1) and (b)(2). The Office has the responsibility to take appropriate action in the near term to improve patent quality and pendency issues rather than wait for possible legislative solutions to these issues. The Office is implementing the rule changes via the rule making procedures set forth in 35 U.S.C. 2(b)(2)(A) and 5 U.S.C. 553 by publishing the proposed rules in the Federal Register and giving the public the opportunity for comment. Thus, the Office is acting under the broad rule making authority delegated to it by Congress. Were the Office to sit idle and not set forth procedures to govern a continuing application practice that has become problematic, the Office would be ignoring the responsibility imposed on it by Congress in 35 U.S.C. 2(b)(2)(A). Finally, inaction by Congress is not a tacit endorsement of the current continuing application practice (*see United States v. Price*, 361 U.S. 304, 310–11 (1960) ("nonaction by Congress affords the most dubious foundation for drawing positive inferences")), and the Federal Circuit has cautioned against reliance upon nonprecedential decisions such as *Ricoh Co., Ltd. v. Nashua* (*see Symbol I*, 277 F.3d at 1368, 61 U.S.P.Q.2d at 1520, declining to consider the nonprecedential opinions *Ricoh Co., Ltd. v. Nashua* and *Bott v. Four Star Corp.*, 848 F.2d 1245 (Fed. Cir. 1988)).

*Comment 261:* A few comments suggested that patent reform legislation indicates that the Office does not have the authority to limit the number of continuing applications, citing *The Patent Reform Act of 2005*, H.R. 2795, 109th Cong. § 8 (2005). One comment specifically suggested that Congress' decision to remove authority to limit continuations from later patent reform legislation indicates that Congress is still debating the issue and that the Office does not have that authority. One comment suggested that Congress' intent is not to limit the number of applications that an applicant may file or the number of inventive concepts that an application may pursue, because that would stifle inventors' rights to protect their inventions.

*Response:* The Office notes that legislation was pending before the 109th Congress (*The Patent Reform Act of 2005*) which, as introduced on June 8, 2005, contained a provision (section 8) that expressly authorized the Office to limit certain continuing applications. The Office also notes that the House Subcommittee on Courts, the Internet, and Intellectual Property held a hearing on September 15, 2005, on a proposed substitute that did not contain such a provision. No further action, however, was taken on this legislation by the 109th Congress. The Office does not consider this course of events as constituting any evidence of "congressional intent" because the legislation at issue (*The Patent Reform Act of 2005*) was not voted on by either House of Congress, or even a Committee or Subcommittee of either House of Congress. Thus, this change between the legislation as introduced and as amended is at most evidence of the intent of a drafting committee. In any event, the 109th Congress did not enact changes to the provisions of 35 U.S.C. 2(b), 120, 121, 131, 132, or 365. Rather, the provisions at issue were enacted by earlier Congresses. The views of a subsequent Congress have little relevance in determining the intent of an earlier Congress. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 170 (1968) ("The views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance."). This is especially true when the gap is as broad as the one here, spanning more than half a century (*i.e.*, 1952–2005).

Furthermore, this final rule does not stifle inventors' rights because it provides inventors with ample opportunity to present their claims and secure protection for their inventions. In fact, this final rule encourages inventors to fully disclose and fully claim their inventions promptly, on first filing. Applicants may file two continuation or continuation-in-part applications and a

Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations  46813

request for continued examination in an application family, without any justification and may file additional continuing applications or requests for continued examination on a showing that the amendment, evidence or argument could not have been earlier presented. Finally, this final rule does not affect the patentability requirement of title 35, United States Code.

*Comment 262:* A few comments asserted that the doctrine of prosecution *laches*, originally set forth by the Federal Circuit in *Bogese II*, and more recently endorsed by the Federal Circuit in *Symbol II*, does not extend the Office's authority to deny benefit claims to legitimate continuing applications.

*Response:* The Office is not using the doctrine of prosecution *laches* as a sword to sever an applicant's priority claim. Nor are the changes adopted in this final rule an attempt to codify *Bogese II* or to combat extreme cases of prosecution *laches*. *See Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims*, 71 FR at 50, 1302 *Off. Gaz. Pat. Office* at 1320. Applicants and practitioners have a duty to refrain from submitting an application or other filing to cause unnecessary delay or needless increase in the cost of prosecution before the Office. *See* § 10.18(b)(2). Applicants also have a duty throughout prosecution of an application for patent to make a *bona fide* attempt to advance the application. *See Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims*, 71 FR at 49, 1302 *Off. Gaz. Pat. Office* at 1319. In *Symbol I, Symbol II*, and *Bogese II*, the Federal Circuit recognized that an applicant has a duty of good faith in advancing the prosecution of an application. The Federal Circuit likewise held that an applicant does not have the right to file an endless stream of continuing applications in order to prolong prosecution for the purpose of gaming the system. That is, applicants should not rely on an unlimited number of continuing applications to either correct deficiencies in the claims and disclosure, or to delay the conclusion of examination in a calculated manner. By requiring applicants to show why the amendment, argument, or evidence sought to be entered in a third or subsequent continuing application or second or subsequent request for continued examination could not have been presented earlier, the Office is ensuring that applicants are not unnecessarily prolonging prosecution of the application before the Office.

The possibility that, without justification, a string of continuing applications could last as long as two decades has created inefficiencies and opportunities for the delay of proceedings before the Office that, as a practical matter, can only be addressed by general rule making. Requiring that, at a given stage in the continuing application process, an applicant must make an affirmative showing of need is necessary for the Office to assure an effective examination process. Relying only on a case-by-case approach to address the most egregious cases of abuse would not be sufficient when continued examination filings (other than divisional applications) have grown from less than twelve percent of total filings in 1980 to over twenty-nine percent of total filings in fiscal year 2006. The Federal Circuit specifically indicated in *Bogese II* that the Office has the inherent authority to set reasonable deadlines and requirements for the prosecution of patent applications. *See Bogese II*, 303 F.3d at 1368 n.6, 64 U.S.P.Q.2d at 1452 n.6 ("The PTO is the administrative agency that is 'responsible for the granting and issuing of patents * * *' 5 U.S.C. 2 (2000). Like other administrative agencies, the PTO may impose reasonable deadlines and requirements on parties that appear before it. The PTO has inherent authority to govern procedure before the PTO, and that authority allows it to set reasonable deadlines and requirements for the prosecution of applications."). Thus, consistent with the Office's inherent authority to set reasonable deadlines and requirements for the prosecution of applications, and to improve the effectiveness of the patent examination process, the Office is revising the rules of practice to require that an applicant make an affirmative justification for a third or subsequent continuing application or second or subsequent request for continued examination.

*Comment 263:* Two comments argued that the proposed rules prevent an applicant from filing even a single continuation application of an application in which a request for continued examination was previously filed, thereby eliminating access to the benefits conferred by 35 U.S.C. 120.

*Response:* The Office has modified the proposed changes such that an applicant is permitted under this final rule to file a first and second continuation application or continuation-in-part application without any justification, and is also permitted to file a request for continued examination in any one of the initial application, the first continuing application, or the second continuing application without any justification. Thus, under § 1.78 as adopted in this final rule, an applicant may file two continuation applications without any justification, even if a request for continued examination was previously filed in the initial application.

*Comment 264:* Several comments suggested that the definition of a "divisional application," as specified in proposed § 1.78, is inconsistent with 35 U.S.C. 121 because, under proposed § 1.78, a divisional application is limited to only one application, whereas 35 U.S.C. 121 permits applicants to file a divisional application for each invention restricted out. Another comment suggested that 35 U.S.C. 121 permits applications that are both a divisional application and a continuation-in-part application and any rule to the contrary is void.

*Response:* This final rule defines a "divisional application" as an application "that discloses and claims only an invention or inventions that were disclosed and claimed in a prior-filed application, but were subject to a requirement to comply with the requirement of unity of invention under PCT Rule 13 or a requirement for restriction under 35 U.S.C. 121 in the prior-filed application and not elected for examination and not examined in any prior-filed application." *See* § 1.78(a)(2). This definition is consistent with 35 U.S.C. 121, which states that the divisional application resulting from a restriction requirement is "entitled to the benefit of the filing date of the original application," where the "original application" within the context of 35 U.S.C. 121 is the application from which the divisional application has been restricted. Additionally, §§ 1.78(a)(2) and (d)(1)(ii) permit there to be as many divisional applications as there are inventions restricted out of the prior-filed application. Therefore, the changes adopted in this final rule allow an applicant to file a plurality of divisional applications resulting from a restriction requirement in the prior-filed application so that the applicant may obtain examination of the claims that were withdrawn from consideration in the prior-filed application due to the requirement for restriction. Section 1.78(d)(1)(ii) as adopted in this final rule also does not require that any divisional application be filed during the pendency of a single prior-filed application, but permits a divisional application to be filed as long as it meets the copendency requirement of 35 U.S.C. 120. Therefore, the definition of divisional application set forth in

**46814**    Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

§ 1.78(a)(2) is consistent with 35 U.S.C. 121.

This final rule also permits an applicant to file an application that is in substance both a divisional application and a continuation-in-part application. Specifically, § 1.78(d)(1)(i) as adopted in this final rule permits an applicant to file an application directed both to an invention that was disclosed and claimed, but not elected for examination, in a prior-filed application, and an invention or subject matter that was not described or claimed in the prior-filed application. Such an application would be subject to the conditions applicable to other applications that disclose subject matter that was not disclosed in the prior-filed application (i.e., the conditions applicable to continuation-in-part applications). This is, because such application is not limited to inventions that were subject to a requirement for restriction by the Office in the prior-filed application, but instead includes subject matter not disclosed in the prior-filed application and thus was not subject to any requirement for restriction by the Office in any prior-filed application, it is a continuation-in-part application rather than a divisional application. The provisions of § 1.78(d)(1)(ii) apply to divisional applications that disclose and claim only an invention or inventions that were disclosed and claimed in a prior-filed application, but were subject to a requirement to comply with the requirement of unity of invention under PCT Rule 13 or a requirement for restriction under 35 U.S.C. 121 in the prior-filed application and not elected for examination and not examined in any prior-filed application.

*Comment 265:* A number of comments argued that requiring an applicant to designate a limited number of (ten) representative claims for examination is contrary to statute, specifically, 35 U.S.C. 131 and 112, as well as contrary to *In re Wakefield*, 422 F.2d 897, 164 U.S.P.Q. 636 (C.C.P.A. 1970), because the rules limit an applicant's ability to claim the full scope of his or her invention and that it is the applicant, not the Office, who should determine the proper number of claims that particularly point out and distinctly claim the subject matter that applicants regard as their invention. Two comments argued that the courts have not recognized any statutory authority for rejecting claims as being "unnecessary," citing *Wakefield* where the court held that the forty claims presented in the application at issue were not unduly multiplied. One comment also argued that Congress intended for each claim to be examined on the merits when it enacted 35 U.S.C. 112, ¶ 2, citing *In re Weber*, 580 F.2d 455, 198 U.S.P.Q. 328 (C.C.P.A. 1978), and one comment suggested that limiting the number of claims to be examined is contrary to 35 U.S.C. 131 because the invention is defined by all of the claims. A few comments suggested that the Office has a duty to examine all of the claims in a patent application when the applicant has paid the search, examination, and claim fees because Congress has authorized dependent claims and specified charges for those claims, and the Office is required to examine all claims, not just the designated ones. A number of comments argued that the Office lacks the statutory authority under 35 U.S.C. 102, 103, 131, and 132 to presume that claims are patentably indistinct by requiring the applicant to designate representative claims from among copending, related applications. Finally, one comment argued that the patent statutes do not permit the Director to examine part of an application or less than the whole invention, and that the Director does not have statutory authority under 35 U.S.C. 2(b)(2) or 112, ¶ 2, to cause an application to be examined only if it does not result in too much work for the examiner, and then if it does, to shift the burden to the applicant to do the search and the examination.

*Response:* The Office notes the concerns expressed by the public comment concerning the proposed "representative claims" examination approach. The Office also recognizes numerous comments suggested a claim threshold in place of representative claims. The Office took these comments into consideration and is not implementing a "representative claims" examination approach. Instead, this final rule provides that if the number of independent claims is greater than five or the number of total claims is greater than twenty-five (a strategy based upon whether an application contains more than a given number of independent and total claims), the applicant must provide additional information about the claims to the Office in an examination support document to enable the Office to efficiently and effectively examine the application.

Thus, the changes adopted in this final rule do not limit the number of claims that will be examined in an application because an applicant is always free to file as many claims as necessary to adequately protect the invention provided that applicant files an examination support document before the first Office action on the merits of the application. This final rule simply provides that an applicant who puts a disproportionate burden on examination by presenting more than five independent claims or twenty-five total claims must provide additional information to the Office to facilitate effective examination of the application. The Office, in turn, will ensure that every claim submitted in an application is examined prior to the issuance of a patent. Neither 35 U.S.C. 112 nor 131 provides that an applicant has an unfettered right to submit an unlimited number of claims. In contrast to *Wakefield*, where the Office declined to examine certain claims due to undue multiplicity, the changes adopted in this final rule do not limit the number of claims that will be examined in an application because an applicant is always free to file as many claims as necessary to adequately protect the invention.

While this final rule does not implement a "representative claims" examination approach, that proposal approach was simply a mechanism to focus the examination process and in no way impacted the merits of the examination. Even under a "representative claims" approach, the Office would examine and determine the patentability for every claim in an application before issuing a patent on the application. Thus, a "representative claims" approach would have altered the examination process (i.e., determining when examination of certain claims takes place), but would not have changed the merits requirements of examination (i.e., the statutory standards of patentability).

*Comment 266:* A number of comments suggested that the rationale presented in the Claims Proposed Rule is contrary to 35 U.S.C. 2(b), 102, 131 and 132, in that the Office is responsible for granting and issuing patents. These comments stated that the examiner bears the initial burden of presenting a *prima facie* case of unpatentability, that the search is not the duty of the applicant but rather is the Office's responsibility under 35 U.S.C. 131, and the rules are inconsistent with the new fee structure which contemplates filing of additional claims with higher fees. A few comments suggested that the examination support document requirement improperly shifts the burden of assessing patentability to an applicant when that burden resides with the Office in the first instance under 35 U.S.C. 102. A few comments asserted that requiring an applicant to submit an examination support document constitutes an abdication of an inherently governmental function,

A09489

Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations    46815

moves the United States one step closer to a registration system, and places an affirmative duty on an applicant to perform searches, ultimately exposing the applicant to a greater risk of an inequitable conduct challenge.

*Response:* The changes adopted in this final rule do not mandate the submission of an examination support document. That is, an examination support document is only required if an applicant chooses to present more than five independent claims or more than twenty-five total claims for examination in an application. If an applicant will not present more than five independent claims and no more than twenty-five total claims for examination in any particular application, an examination support document is not required.

The requirement for submission of an examination support document is not an abdication of the examination function, or a shifting of the burden to applicant to make a *prima facie* case of entitlement to a patent. The examination support document simply requires the applicant to provide additional information to the Office so that the Office may more effectively conduct a substantive examination of the application. The Office will examine and determine patentability for every claim in an application before issuing a patent.

*Comment 267:* A few comments stated that the examination support document requirement transfers the costs of examination to applicants when applicants already pay filing fees.

*Response:* The changes to § 1.75(b) do not impose any additional Office fees on the applicant. The changes to § 1.75(b) may increase costs for an applicant who presents more than five independent claims or twenty-five total claims in an application. The Office, however, considers it appropriate for applicants who place a disproportionate burden on examination by presenting more than five independent claims or twenty-five total claims to bear these additional costs to facilitate effective examination of the application. In any event, the Office's actual cost of examining an application for patent far exceeds the "filing fees" (*i.e.*, the filing, search, examination, excess claims, and application size fees) charged to applicant. *See United States Patent and Trademark Office Performance and Accountability Report Fiscal Year 2005* at 23 (2005) (Patent Efficiency Table).

*Comment 268:* Several comments objected to the rebuttable presumption in § 1.78(f)(2) as being contrary to the judicial precedent in other areas of patent law such as obviousness and enablement. One comment suggested that the patentably indistinct presumption is contrary to 35 U.S.C. 101, which allows a "patent on an invention." One comment objected to the rebuttable presumption as being contrary to the patent statute that states in part that "a person is entitled to a patent unless * * *." The comment suggests that these words in the patent statute evidence that the burden is on the Office to establish a *prima facie* case of unpatentability. A number of comments stated that as part of its statutory duty to determine patentability, the Office has the burden to determine patentable distinctness, and even under the conditions of § 1.78(f)(2), it is improper to shift that burden to applicants. Further, some of the comments argued that the patentably indistinct presumption is contrary to case law because the Federal Circuit has repeatedly held that the burden of showing that the claims recited in copending, related applications are patentably indistinct rests with the Office, citing *In re Kaplan,* 789 F.2d 1574, 229 U.S.P.Q. 678 (Fed. Cir. 1986); *In re Longi,* 759 F.2d 887, 225 U.S.P.Q. 645 (Fed. Cir. 1985); *In re Epstein,* 32 F.3d 1559, 31 U.S.P.Q.2d 1817 (Fed. Cir. 1994); *In re Oetiker,* 977 F.2d 1443, 24 U.S.P.Q.2d 1443 (Fed. Cir. 1992); and *In re Piasecki,* 745 F.2d 1468, 223 U.S.P.Q. 785 (Fed. Cir. 1984).

*Response:* The presumption of patentably indistinct claims appearing in multiple applications as set forth in § 1.78(f)(2) of this final rule is not contrary to the cited statutes or case law. Even if the applicant shows that the claims in question are patentably distinct from each other, it does not mean that the claims are also patentable over the prior art. That is, the rebuttable presumption is not a merits determination of patentability. It is simply a procedural tool requiring the applicant to help focus and consolidate the examination process.

When the Office is faced with multiple applications containing overlapping subject matter, it is in the best interest of the applicant, the Office, and the public to ensure that patentably indistinct claims are identified early in the examination process. The applicant is responsible for drafting the application, including the claims, and is in the best position to identify indistinct claims spanning across multiple applications so that they can be consolidated in a single application, or so that the Office will at least be alerted to evaluate them for double patenting. Further, requiring the applicant to ferret out which claims are indistinct from each other is procedural in nature and assists the Office with processing multiple related applications, but should not be confused with a patentability determination on the merits. Such a procedural requirement is not contrary to statute or case law, but is fully within the Office's authority to regulate the procedure of examination.

*Comment 269:* One comment suggested that 35 U.S.C. 116 provides for the filing of continuation applications and the Office does not have the authority to make changes.

*Response:* 35 U.S.C. 116 provides for joint inventorship (35 U.S.C. 116, ¶ 1), application for patent by the remaining inventors in the absence of a joint inventor (35 U.S.C. 116, ¶ 2), and correction of inventorship in an application for patent (35 U.S.C. 116, ¶ 3). 35 U.S.C. 116 does not pertain to continuing applications.

*Comment 270:* One comment suggested that the changes to § 1.114 violate 35 U.S.C. 133 because the Office would be assuming authority to hold an application "abandoned" even when a *bona fide* reply was timely filed.

*Response:* 35 U.S.C. 133 provides that: "[u]pon failure of the applicant to prosecute the application within six months after any action therein, of which notice has been given or mailed to the applicant, or within such shorter time, not less than thirty days, as fixed by the Director in such action, the application shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Director that such delay was unavoidable." An applicant's reply in prosecuting an application under a final Office action is limited to either appealing in the case of rejection of any claim (§ 41.31 of this title), or amending the claims as specified in § 1.114 or 1.116. *See* § 1.113(a). The admission of, or refusal to admit, any amendment after final rejection (§ 1.116) will not operate to save the application from abandonment. *See* § 1.135(b). Therefore, a reply to a final Office action other than an appeal, an amendment after final (§ 1.116) that places the application in condition for allowance, or a request for continued examination in compliance with § 1.114 (including the requirement that any second or subsequent request for continued examination be accompanied by a grantable petition under § 1.114(g)) is not a *bona fide* reply to the final Office action.

*Comment 271:* A few comments suggested that the Office has a duty to examine all of the claims in a patent application when the applicant has paid the search, examination, and claim fees. The comments also argued that because Congress has authorized dependent claims and specified charges for those

A09490

**46816** Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

claims, the Office is required to examine all claims, not just the designated ones. One comment also argued that the recently revised fee structure was put in place based on an allocation of resources for search workload on the examiner and therefore the Office is obligated to perform the search and cannot shift the burden to the applicant.

*Response:* The Office recognizes the concern expressed in the public comments that the "representative claims" examination approach could be perceived as allowing claims to be issued that had not been fully examined. The Office is not adopting the "representative claims" examination approach in this final rule. This final rule instead provides that an applicant who puts a disproportionate burden on examination by presenting more than five independent claims or twenty-five total claims must provide an examination support document to the Office before the first Office action on the merits to facilitate effective examination of the application. An applicant who presents five or fewer independent claims and twenty-five or fewer total claims need not provide an examination support document or other additional information to the Office. In either situation, the Office will ensure that every claim submitted in an application is examined prior to the issuance of a patent.

Further, neither the excess claim fees nor the search fee is directly proportional to actual agency costs. The fee provisions are not a restriction on the agency's ability to promulgate reasonable regulations governing the application process.

*Comment 272:* A few comments stated that the rules are arbitrary, capricious, and represent an overly aggressive interpretation of statutes, are beyond the power of the Office permitted under 35 U.S.C. 2(b)(2), expose the Office to legal action under 5 U.S.C. 706(2)(c), and may require the Office to reimburse attorney fees under the Equal Access to Justice Act.

*Response:* The changes adopted in this final rule are not arbitrary, capricious, an overly aggressive interpretation of the patent statute, or beyond the power of the Office rule making authority under 35 U.S.C. 2(b)(2) for the reasons previously discussed in detail. Concisely put, the Office considers the changes being adopted in this final rule to be an appropriate exercise of its rulemaking authority under 35 U.S.C. 2(b)(2). *See, e.g., Lacavera v. Dudas,* 441 F.3d 1380, 77 U.S.P.Q.2d 1955 (Fed. Cir. 2006), *Star Fruits S.N.C. v. United States,* 393 F.3d 1277, 73 U.S.P.Q.2d 1409 (Fed. Cir. 2005), and *Arnold P'ship v. Dudas,* 362 F.3d 1338, 70 U.S.P.Q.2d 1311 (Fed. Cir. 2004).

*J. Changes to Internal Practice*

*Comment 273:* A number of comments expressed support for the elimination of the first Office action final practice, and one comment encouraged the Office to adopt a practice of no first action final rejection in any continuing application where the factual record has changed. A number of comments, however, stated that a first action final may be appropriate where no effort has been made to advance prosecution, *e.g.,* by adding to the factual record with additional evidence or amendments to the claims. One comment supported developing rules whereby an applicant's failure to prosecute could result in the close of prosecution unless adequate and sustained progress is being made in the application.

*Response:* This proposed change has not been adopted. As discussed previously, this final rule, however, provides that an applicant may file two continuing applications plus a request for continued examination in any one of the initial application or two continuing applications (rather than only one continuing application or request for continued examination as proposed) without any showing. Therefore, the Office is retaining its first action final rejection practice.

*Comment 274:* Several comments recommended that the Office develop procedures whereby an Office action could not be made final until the examiner was applying the exact same rejection as in the previous Office action, and/or to encourage the Office to issue non-final second Office actions. Several comments suggested reforming examination procedures so that the examiner does not issue a final rejection as long as prosecution is advancing.

*Response:* The practice suggested by the comments would unduly prolong prosecution, which is counter to the Office's goal for reducing pendency. Thus, the Office and the applicants need to be efficient to reduce the backlog of applications and most importantly, to meet the public notice function of patent claims as quickly as possible. Further, as one comment recognized, a practice under which an Office action could not be made final until the examiner was applying the exact same rejection would result in an applicant being able to avoid a final Office action by continually amending the claims.

*Comment 275:* A number of comments proposed that the Office permit amendments after final as matter of right, and assess a modest fee for the added examination burden. Most of these comments are in the context of a graduated credit system for continuation filings, with more credit being given during the first application and fewer "counts" or less time given in subsequent continuations. Several comments proposed that applicants should be permitted to respond to any new ground of rejection made in the final Office action without having to file a continuation application. Several comments suggested that the examiner should not make an Office action final whenever new art is applied, and one comment suggested an examiner must explain why the new art could not have been located during the first search.

*Response:* To permit entry of amendments after final as a matter of right would unduly delay prosecution. An applicant may file an amendment to place the application in condition for allowance or in better form for consideration on appeal under § 1.116. Furthermore, a new ground of rejection is only permitted in a final Office action under the limited circumstances. As discussed previously, in this final rule, the Office is revising second action final practice to provide that a second or any subsequent Office action on the merits may be made final, except when the Office action contains a new ground of rejection that is not: (1) Necessitated by applicant's amendment of the claims, including amendment of a claim to eliminate unpatentable alternatives; (2) necessitated by applicant's providing a showing that a claim element that does not use the phrase "means for" or "step for" is written as a function to be performed and does not otherwise preclude application of 35 U.S.C. 112, ¶ 6; (3) based on information submitted in an information disclosure statement filed during the period set forth in § 1.97(c) with the fee set forth in § 1.17(p); (4) based upon double patenting (statutory or obviousness-type double patenting); or (5) necessitated by applicant's identification of the claim or claims in a continuation-in-part application for which the subject matter is disclosed in the manner provided by 35 U.S.C. 112, ¶ 1, in the prior-filed application. Since the applicant is often adding limitations that raise new issues that would require further consideration and/or search, it has long been the Office practice to make the action final at this point. Allowing an expanded practice in this area would undermine the goal of reducing patent pendency.

*Comment 276:* A number of comments suggested providing examiners with additional time to consider replies after final rejection and

A09491

Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations    46817

to provide a new full evaluation of the content of those replies.

*Response:* No changes in after final practice are planned at this time. Under current practice, examiners consider any requests for reconsideration submitted after final rejection in accordance with § 1.116.

*Comment 277:* A number of comments suggested that the Office require a patentability review conference with others, similar to the pre-appeal conference proceeding, prior to an Office action being made final, in order to address the problem of improper final Office actions and to expedite indication of allowable subject matter. One comment noted that the statistics show that less than half of applications that had a pre-appeal conference are going forward to appeal and indicate that many improper finals are being made. One comment stated that a supervisor should review all first Office actions in a second request for continued examination to determine if prosecution is proper.

*Response:* The Office recognizes that it is important to make sure the final Office action is proper. The pre-appeal brief conference program is still an ongoing pilot program. The results of that program will help to determine whether the Office replaces it with, or adds, a "pre-final conference" as suggested. Further, the pre-appeal brief conference program is designed for situations in which the applicant believes that the rejections of record are clearly not proper (and is not designed for "close cases"). *See New Pre-Appeal Brief Conference Program,* 1296 *Off. Gaz. Pat. Office* at 67. Thus, data collected during pre-appeal brief conferences (*e.g.,* with respect to re-opening rates) cannot validly be extended to all applications.

In addition, the Office has an ongoing "in process review" of applications to identify problems and trends. Each Technology Center develops ongoing action plans and training each year to address the problems/trends found via the "in process reviews" and the pre-appeal brief conferences. Additionally, the Office will reinforce, during the training on this final rule, issues such as proper final rejection practice, the importance of making proper final rejections, and the importance of indicating allowable subject matter at the earliest possible time. Furthermore, if an applicant believes a rejection was improperly made final, applicant may seek review by filing a petition under § 1.181.

*Comment 278:* A number of comments stated that the Office should continue and expand ongoing efforts to hire and retain patent examiners. One comment suggested that "[h]iring should be the centerpiece of the Office's strategy." A number of comments stated that the Office has not provided sufficient evidence to show why the Office could not solve the backlog problem by hiring more examiners. One comment argued that the Office should have sufficient funding to pay for additional resources (*e.g.,* more examiners) needed to examine the backlog of applications in view of the recent increase in patent fees. One comment stated that the Office has not supported its assertion that it cannot hire enough examiners to reduce pendency. Another comment stated that the Office should seriously consider hiring retired or former examiners or patent practitioners to be trainers or to assist examiners. In particular, one comment stated retired examiners should be hired to work on specific big applications to reduce the burden on examiners. Another comment stated the Office should hire "generalists" instead of "ultra specialized advanced degree scientists and engineers" to obtain more flexibility in the workforce.

*Response:* Hiring additional examiners remains an important component of the Office's overall plan to reduce pendency of patent applications. The Office is committed to the hiring of as many examiners as resources permit. The ability to hire qualified new examiners is affected by many components, such as budget, the economy, the availability of scientists and engineers, and the ability to absorb and train new employees. Furthermore, it will take many years to develop an experienced patent examining corps of sufficient size to address the growing backlog of unexamined patent applications. The Office recognizes that hiring alone will not reduce the backlog of pending applications in the near future. As a result, the Office is actively seeking ways for retaining more employees, such as retention bonuses. The Office continues to become more efficient by implementing many initiatives, such as the current regulatory changes, to reduce pendency.

The Office plans to hire 1,200 examiners each year for the next five fiscal years. *See United States Patent and Trademark Office Fiscal Year 2008 President's Budget* at 20–21 (2007). This will result in the number of patent examiners increasing from 4,779 at the end of fiscal year 2006 to 7,118 at the end of fiscal year 2012 (accounting for attrition). *See id.* Even with this increase in the size of the Patent Examining Corps, the Office anticipates that average pendency to first Office action will increase from 22.6 months in fiscal year 2006 to 28.9 months in fiscal year 2012, and that average total pendency will increase from 31.1 months in fiscal year 2006 to 38.6 months in fiscal year 2012. *See id.*

*Comment 279:* A number of comments stated that the current examiners' production system in the Office encourages the filing of continuing applications and requests for continued examination. In addition, several comments stated that the production system also encourages more restrictions and unwillingness to consider any after-final amendment. The comments suggested several alternative accounting schemes to encourage examiners to examine more non-continuing applications and provide more thorough first Office actions, including giving less credit for work done in continuation applications, divisional applications and requests for continued examination, giving examiners more credit for first Office actions as opposed to disposals, giving examiners credit for claims disposed as opposed to applications disposed, or giving examiners credit based on numerous application factors such as specification length, technology complexity, number and complexity of the claims, and pertinence of prior art submitted. One comment suggested only having team examination and production goals. One comment suggested the Office should use a performance system, such as the system recently established by the Department of Defense. One comment suggested that examiners should not have any time constraints. Another comment stated the hours per disposal should be decreased to improve production. Several comments argued that timesaving for examiners needs to be tied with an agreement with the Patent Examining Corps to increase productivity and decrease pendency due to the amount of time saved in light of the proposed changes to the examination of claims. One comment argued the rule changes will likely result in less time for the examiners and it is unclear how this will result in more thorough and reliable examination. The comments strongly suggested that any changes to the examiners' production system should be transparent to the public to install public confidence in such changes.

*Response:* The Office expects to gain a more focused quality examination as a result of these rule changes. It is expected that these rules will make the exchange between the examiner and applicants more efficient and effective. Issued patents will be examined more

**46818**    Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

thoroughly, making them easier to evaluate, enforce and litigate. Furthermore, the patents will issue sooner, giving the public a clearer understanding of what is patented. In any event, the Office is in the process of reassessing patent examiner production goals, appraisal plans, and award systems. Absent significant changes to the patent examination process, the Office does not consider it reasonable to expect that changes to patent examiner production goals, appraisal plans, and award systems alone will be sufficient to address the growing backlog of unexamined patent applications while maintaining a sufficient level of quality.

*Comment 280:* Several comments stated that examiners should be given more production time for certain situations, such as for applications with more than twenty claims, for consideration of over fifteen to twenty cited references and for responding to after-final amendments. One comment stated that primary examiners should be given more time to review a junior examiner's work.

*Response:* Changes to patent examiner production goals are beyond the scope of the proposed changes to the rules of practice. Therefore, whether examiners should be given more production time for certain situations is not discussed in this final rule. An examination support document in compliance with § 1.265 will assist the examiner in the examination of an application that contains more than five independent claims or more than twenty-five total claims, resulting in a more effective and focused examination. For example, citing the most relevant references and identifying all of the limitations of each of the claims that are disclosed by the references will help the examiner to consider the most relevant prior art more thoroughly. The Office already provides time for training junior examiners and reviewing their work. Furthermore, a sampling of "in process reviews" for each Technology Center helps identify training needs in a focused manner. The Office of Patent Training is thoroughly preparing each new examiner in proper practice and procedure with access to a dedicated trainer for the first eight months; after that, the examiner is placed in a traditional setting with proper supervision and review of his or her work.

*Comment 281:* A number of comments suggested that the Office could retain more examiners by increasing compensation and offering better working conditions. A number of comments also suggested that if it is necessary to increase examiner salaries, changes to Title 5 of the United States Code should be requested by the Office. One comment stated that the salary for starting examiners should also be doubled. One comment stated that the Office should seek authority to increase salaries through either existing OPM processes or through restructuring to a quasi-government corporation. One comment suggested charging fees for responding to an Office action and for interviews, and using this money to hire more examiners and pay for retention initiatives. Another comment suggested establishing a salary increase when an examiner passes a test at a number of pay grades. One comment stated that a bonus system should be established. Another comment has suggested increased salary levels for art units with high backlogs. Several comments stated that increased filing fees should go towards increased salary for examiners. One comment explained that the Office could give examiners better working conditions by placing less stress on the more experienced examiners. Another comment suggested the Office should explore more flexible work schedules, including part-time arrangements.

*Response:* The Office already provides many first rate benefits to its employees. The Office is at the forefront in government for teleworking opportunities for the staff. The Office has also adopted a variety of creative work schedules such as: Maxi-flex, compressed and alternate work schedules, part-time and flex-time for all employees. Additionally, the Office offers paid overtime, compensatory time and credit hours programs. The Office has transitioned into a paperless environment and deployed state-of-the art technology to its employees. The Office has relocated to a new campus, and provides amenities such as a first class child-care facility, a state-of-the-art fitness center and a cafeteria.

The Office already provides a robust bonus system for examiners that enables one to earn up to ten percent of one's salary per year in bonus compensation. Examiners are already on a special pay scale, with the most recent increase of seven percent for all patent professionals, granted in December 2006. In addition, an examiner receives regular salary increases upon promotions to increasing levels of responsibilities.

*Comment 282:* Several comments stated the Office should authorize overtime to work on the backlogs. One comment specifically suggested that overtime pay should be 125 percent of the current pay rate, and should only be available to work on first Office actions on the merits.

*Response:* Examiners who have been certified as capable of working independently by their supervisors are currently authorized to work overtime. The overtime pay rate is set by statute. See 5 U.S.C. 5542. The Office has recently begun distributing laptop computers to examiners to further encourage overtime.

*Comment 283:* A number of comments encouraged the Office to consider establishing satellite offices in different areas in the United States to assist in recruiting and retaining of examiners. The comments further explained that satellite offices could tap into a greater pool of potential new examiners, as there would be multiple working locations. In addition, the comments stated that satellite offices could specialize in certain technologies that are prevalent in the area of the satellite office. Another comment pointed out that a satellite office would facilitate more personal interviews, which would expedite prosecution. The comments also stated that salary structures could be adjusted depending on the cost of living within the area surrounding the satellite office.

*Response:* The Office is considering establishing satellite offices as reflected in the Office's 2007–2012 Strategic Plan.

*Comment 284:* A number of comments stated that the Office should increase training requirements for examiners in order to improve patent quality and retain more examiners. One comment suggested using any increase in patent fees to provide training. Several comments offered assistance in providing technical and legal training to the examiners. One comment suggested that examiners should receive more training on making proper rejections under 35 U.S.C. 103, and also suggested testing examiners periodically. Another comment stated that examiners' prior art searching is poor, and that the Office is not making efforts to stem poor rejections, which lead to rework. One comment suggested that the Office should train examiners using self-training programs utilizing videos. Another comment stated that training should be outsourced. Several other comments suggested training potential new examiners by creating a patent examination curriculum for universities.

*Response:* The Office has redesigned the training program of new examiners and increased technical and legal training for other examiners and patent professionals. Currently, the first classes of new hires have completed their training in the new Patent Training Academy program, wherein examiners

A09493

go through eight months of intensive training prior to being assigned to an art unit. Mirroring a collegiate environment, examiners are trained in a variety of disciplines, including technology skills, legal skills, and procedural requirements.

For non-first year examiners, the Office has expanded training to include patent law and evidence. Each employee must attend a specified number of training hours in a variety of pertinent legal and technical subjects. Additionally, the Office also offers a Law School Tuition Assistance Program (LSTAP) to qualified employees as an extension of the Office's internal training program. Reimbursements for university technical training courses related to the technology being examined are also available for employees. Creating a partnership between the Office and interested universities to offer an undergraduate course in patent law and examination practice to highlight career opportunities in the intellectual property field is also being investigated.

*Comment 285:* A number of comments stated that the Office did not address improvements in the internal examination process. One comment alleged that the Office did not consider any changes to address examiners' errors that extend the prosecution. Several comments suggested that the Office should improve the examination process before implementing the rule changes.

*Response:* The Office is implementing many initiatives including improvements in the internal examination process as well as the rule changes in this final rule. To realize the effectiveness of these initiatives in the near term, the Office is implementing many of them simultaneously. The Office seeks ways to improve internal examination processes by providing training created as a result of internal reviews that identify areas where challenges exist.

*Comment 286:* Several comments encouraged the Office to take additional measures to improve the quality and clarity of Office actions, in particular first Office actions. One comment stated that examiners should use "plain English" in explaining the rationale behind rejections.

*Response:* The Office recognizes that the quality of Office actions is of great importance. There are several quality initiatives in place to insure that quality continues to improve. The new Patent Training Academy emphasizes the importance of high quality Office actions. Current interview practice encourages the use of interviews to clarify the examiner's position, as necessary. The Office also has writing classes available to employees.

*Comment 287:* Several comments stated that examiners should be encouraged to allow an application, or to point out allowable subject matter, in the first Office action, if appropriate. Several comments also suggested requiring examiners to propose amendments when prosecution reaches a certain point, such as the filing of a second request for continued examination.

*Response:* The Office has previously adopted, in part, these comments. It is current Office policy to encourage examiners to suggest allowable subject matter as early as possible in the prosecution in order to achieve the Office's goal of compact prosecution. It has long been a standard in the examiner's performance appraisal plan, and it is indeed an indicia of outstanding performance, to indicate allowable subject matter at the earliest time possible. (*See also, e.g.,* MPEP § 707.07(j)(III) EARLY ALLOWANCE OF CLAIMS, "Where the examiner is satisfied that the prior art has been fully developed and some of the claims are clearly allowable, the allowance of such claims should not be delayed"; MPEP § 2106 (II), "Whenever practicable, Office personnel should indicate how rejections may be overcome and how problems may be resolved * * *."; and MPEP § 2164.04, "In other words, the examiner should always look for enabled, allowable subject matter and communicate to applicant what that subject matter is at the earliest point possible in the prosecution of the application.").

*Comment 288:* There were a number of comments pertaining to the quality review of examiners' work product. A number of comments stated that the Office should limit its "second-pair-of-eyes" review to the work of examiners that have been identified as needing more review in their annual performance appraisal. The comment further explained that the Office should focus more intensive review on an examiner's work if it is the principal cause for the failure to close prosecution on an invention (*e.g.,* by making poor rejections). Another comment suggested eliminating the review of allowed applications and having the "review" examiners work on the backlog. One comment stated that supervisors should review all Office actions for examiners that have fewer than three years experience unless they have passed a proficiency examination. Another comment stated the review should spot factual issues instead of just legal issues to better improve Office action quality.

*Response:* The Office already has focused "second pair of eyes" reviews only for those examiners and/or technology areas where it has been determined necessary. Additionally, the Office has an ongoing "in process review" of applications to identify problems and trends. Each Technology Center develops ongoing action plans and training each year to address the problems/trends found via the "in process reviews" and other sources, such as the pre-appeal brief conferences. Supervisors, or their designated primary examiners, currently review all the work of examiners who do not have signatory authority. All of these reviews do encompass both factual and legal issues.

*Comment 289:* A number of comments stated that examiners should be encouraged or required to conduct more interviews throughout the prosecution, including preexamination interviews and after-final interviews. Several comments suggested that all interviews should include the supervisor of the examiner or a person with signatory authority. Several other comments suggested giving examiners a count, or credit, for an interview, and charging a fee for interviews. Another comment stated that examiners should be trained to give more productive interviews.

*Response:* Interview practice is set forth in § 1.133 and MPEP §§ 713 through 713.10. Normally, one interview after final rejection is permitted. *See* MPEP § 713.09. The Office also provides examiners extra time to conduct an interview. In June 2006, this practice was expanded to allow extra time for telephone interviews initiated by applicants or their representatives; it had previously only been available for personal (face-to-face) interviews. The Office conducted a pilot program permitting an interview before the first Office action in applications that were assigned to certain art units in Technology Center 3600. *See Notice of Pilot Program to Permit Pre-First Office Action Interview for Applications Assigned to Art Units 3624 and 3628 and Request for Comments on Pilot Programs,* 1281 *Off. Gaz. Pat. Office* 148 (Apr. 27, 2004). Section 1.133(a)(2) was amended in November of 2005 to permit an interview before the first Office action in any application if the examiner determines that such an interview would advance prosecution of the application. *See Provisions for Claiming the Benefit of a Provisional Application With a Non-English Specification and Other Miscellaneous Matters,* 70 FR at

**46820** Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

56121, 56128, 1299 *Off. Gaz. Pat. Office* at 144, 150. As discussed previously, if the examiner, after considering the application and any examination support document, still has questions concerning the invention or how the claims define over the prior art or are patentable, the examiner may request an interview before the first Office action.

*Comment 290:* One comment stated that the Office should encourage the submission of more useful information disclosure statements, which contain statements of materiality and have provisions to discourage "dumping" of references. Such an information disclosure statement may be filed at a reduced fee amount. Another comment questioned whether the Office has considered a rule that states that duty of disclosure terminates at the close of prosecution.

*Response:* The Office recently published proposed changes to the information disclosure statement practice which will encourage the submission of more useful information. *See Changes To Information Disclosure Statement Requirements and Other Related Matters,* 71 FR at 38812–16, 38820–22, 1309 *Off. Gaz. Pat. Office* at 27–31, 34–36.

*Comment 291:* A number of comments suggested that the Office should make better use of search and examination reports from other intellectual property offices and PCT search and examination authorities. On the other hand, one comment stated that the Office should not rely on foreign office searches. Several comments further suggested separating the search and examination functions and outsourcing the search function. One comment stated that U.S. and PCT prosecution should be done at the same time.

*Response:* The Office recognizes the importance of leveraging the search results from other intellectual property offices. One of the specific action plans of the United States Patent and Trademark Office 21st Century Strategic Plan is to share search results with other intellectual property offices. Since the beginning of 2003, the Office, the European Patent Office and the Japan Patent Office (the Trilateral Offices) have participated in search exchange projects aimed at promoting the mutual exploitation of search results. The Office implemented the Patent Prosecution Highway pilot program in July 2006. *See Patent Prosecution Highway Pilot Program between the United States Patent and Trademark Office and the Japan Patent Office,* 1307 *Off. Gaz. Pat. Office* 61 (June 13, 2006). Under the Patent Prosecution Highway pilot program, an applicant whose claims are determined to be patentable by the Japan Patent Office may request that the corresponding application filed in the Office be advanced out of turn for examination provided certain conditions are met. The Patent Prosecution Highway pilot program allows the Office to exploit the search and examination results of the Japan Patent Office and applicants to obtain corresponding patents faster and more efficiently. Additionally, whenever the Office is designated as the International Searching Authority, both the international application and the application filed under 35 U.S.C. 111(a) are assigned to the same examiner, if possible.

*Comment 292:* A number of comments stated that all related applications should be assigned to the same examiner, including applications with overlapping disclosures.

*Response:* The Office will continue to make reasonable efforts to ensure that related applications are assigned to the same examiner, if possible. However, the Office normally assigns divisional applications to the technology area most appropriate for the claimed subject matter. In fact, this is in part why this final rule requires applicants to identify certain related applications. *See* § 1.78(f).

*Comment 293:* A number of comments suggested creating a new or modified accelerated examination procedure. One comment requested a procedure to permit accelerated examination for applications that enter the national stage under the Patent Cooperation Treaty. Another comment stated that accelerated examination could be available to applications containing ten or fewer representative claims. Another comment suggested allowing accelerated examination if the applicant permits an *inter partes* submission of a prior art statement and applicant provides either an examination report from either the European Patent Office or the Japan Patent Office, or pays a high fee for a special search. One comment stated high technology areas should be given examination priority. Another comment suggested requiring expedited replies in continued examination applications and not giving extensions of time under § 1.136(a). Another comment requested accelerated examination for independent inventors.

*Response:* The Office has long provided for advancement of examination upon granting a petition to make special. *See* § 1.102 and MPEP § 708.02. The Office also announced a revised accelerated examination procedure, and the goal is to complete examination within twelve months of the filing date of the application under this program. *See Changes to Practice for Petitions in Patent Applications To Make Special and for Accelerated Examination,* 71 FR at 36323–27, 1308 *Off. Gaz. Pat. Office* 106–09. Any applicants, including independent inventors, may participate in the revised accelerated examination program which provides an expedited reply procedure. As discussed previously, under the Patent Prosecution Highway pilot program, an applicant whose claims are determined to be patentable by the Japan Patent Office may request that the corresponding application filed in the Office be advanced out of turn for examination provided certain conditions are met.

*Comment 294:* Several comments suggested that examiners should strictly follow the guidance set forth in MPEP section 708 and examine applications with the oldest effective filing date first. On the other hand, several comments stated the Office should promote earlier examination of non-continuing applications by giving continuation applications a lower priority in the examination queue.

*Response:* The Office will continue to follow the guidance set forth in MPEP section 708 pertaining to the order of examination of applications, including that "[e]ach examiner will give priority to that application in his or her docket, whether amended or new, which has the *oldest effective U.S. filing date.*" An exception to this guideline is an application in which examination has been advanced pursuant to § 1.102.

*Comment 295:* One comment suggested examiners should not just search the claimed invention, but also subject matter that might be reasonably claimed at a later time.

*Response:* MPEP § 904 sets forth that "[t]he first search should cover the invention as described and claimed, including the inventive concepts toward which the claims appear to be directed." Additionally, MPEP § 904.02(a) states that "[t]he field of search extends to all probable areas relevant to the claimed subject matter and should cover the disclosed features which might reasonably be expected to be claimed."

*Comment 296:* Several comments encouraged the Office to hire efficiency experts, or a task force, to find the best ways to improve the quality and efficiency of examination.

*Response:* The Office expects these rule changes to improve the quality and efficiency of examination. The Office will evaluate the effectiveness of the rule changes in partnership with the

A09495

Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations    46821

Office's customers and employees as all gather experience in operating under these adjustments. The Office is currently studying all suggestions, including those in the various studies made of the Office.

*Comment 297:* One comment requested that the panel involved in a pre-appeal brief conference be required to provide legal and factual reasoning for the decision to both the examiner and the practitioner so as to better make the decision a teaching tool.

*Response:* The Pilot Pre-Appeal Brief Conference Program has been extended until further notice. *See Extension of the Pilot Pre-Appeal Brief Conference Program,* 1303 *Off. Gaz. Pat. Office* 21, (February 7, 2006) (notice). Since this program is still in the pilot phase, it would be premature to make any changes until a full evaluation of the entire program is completed. Furthermore, the purpose of this program is to provide a quick relief for applications that are clearly not in condition for appeal, so that applicant does not have to go through the expense of preparing and filing an appeal brief. Preparing a written decision of the conference would unduly delay the process.

*Comment 298:* Several comments stated that the Office should create an Ombudsman position to decide issues regarding examination errors by examiners.

*Response:* The Office has many effective mechanisms to decide issues regarding alleged "examination errors" by examiners. Practitioners have several options, including but not limited to, responding on the record, calling a supervisor, requesting a pre-appeal brief conference, filing a petition, and filing an appeal.

*Comment 299:* One comment requested a return to the appeal rules where the examiners are not able to make new grounds of rejection during appeal.

*Response:* The rules of practice for the appeal process were changed in 2004 to permit a new ground of rejection in an examiner's answer. *See Rules of Practice Before the Board of Patent Appeals and Interferences,* 69 FR 49960, 1286 *Off. Gaz. Pat. Office* 21 (September 7, 2004) (final rule). The approval of the appropriate Technology Center Director, or his or her designee, is needed for such a new ground of rejection, which should be rare. In response to any new ground of rejection made in an examiner's answer, appellant has the options to request that prosecution be reopened and to request that the appeal be maintained under § 41.39(b). There have been no demonstrated problems to date, thus the Office does not plan to change this practice.

*Comment 300:* One comment suggested accepting more "variations" in filings to reduce the number of non-compliant notices sent.

*Response:* The Office waives certain requirements set forth in § 1.121(c) and may accept certain non-compliant amendments. *See Acceptance of Certain Non-Compliant Amendments Under 37 CFR 1.121(c),* 1296 *Off. Gaz. Pat. Office* 27 (July 5, 2005). Practitioners and applicants, however, are responsible to know the laws and rules relating to prosecuting patent applications and to keep current with any changes. The Office will continue to review common problems that arise, and implement solutions as appropriate.

*Comment 301:* One comment requested that the Office publish, once a month, a projection of when a new application will be taken up for examination so that applicants can better manage the filing of preliminary amendments.

*Response:* The Office currently publishes in each issue of the *Official Gazette* the average filing date of the applications that received a first Office action during the preceding three months for each Technology Center Work Group.

*Comment 302:* One comment suggested that the Office should allow more documents to be filed via the Office electronic filing system. Another comment stated the Office should require electronic filing and that all prosecution be performed electronically.

*Response:* The Office permits applicants to file many applications, fees, and correspondence (*e.g.,* amendments and replies) electronically via the Office electronic filing system (EFS–Web) with a few exceptions (*e.g.,* Credit Card Authorization Form (PTO–2038), maintenance fees, new plant applications and color plant drawings). There are no plans to make electronic filing mandatory, although special programs (*e.g.,* accelerated examination) do require electronic filing. *See Changes to Practice for Petitions in Patent Applications To Make Special and for Accelerated Examination,* 71 FR at 36323–27, 1308 *Off. Gaz. Pat. Office* 106–09.

*Comment 303:* One comment proposed requiring applicants to give an opinion of the usefulness or commercial potential of the invention.

*Response:* The Office is not adopting the requirement that an examination support document contain a concise statement of the utility of the invention. An opinion from the applicant on the commercial potential of the invention is generally unnecessary in determining the patentability of the claimed invention. However, applicant may submit objective evidence of commercial success when applicant seeks to rebut an obviousness rejection under 35 U.S.C. 103. *See* § 1.132 and MPEP § 716.03.

*Comment 304:* One comment requested prioritizing the order of examination based on such factors as the economic impact and value to society, the quality of the technical description of the invention and the quality of prior art cited. The comment also suggested requiring applicants to state in their application how the invention will be distributed to the public.

*Response:* It would be very difficult to evaluate and assess these subjective factors for each application filed. In addition, most of this information would not be helpful in determining the patentability of the claimed invention.

*Comment 305:* One comment suggested creating an electronic search tool that would automatically compare the claim language to prior art and provide complete searches in under ten minutes.

*Response:* The Office has been evaluating tools to improve the examination practice. Although the Office is routinely seeking ways to improve automated tools, the resources needed for implementation and the applicability of the tools must be considered and weighed. Often, the application of search tools is limited to specific technologies. For example, in many biotechnology applications, the Office employs an Automated Biotechnology Sequence Search System (ABSS) to compare genetic sequences submitted with applications to a number of sequence databases. The Office's Scientific and Technical Information Center (STIC) conducts between 10,000 and 15,000 of these searches a year. Due to the number of requests and because the search runs against multiple databases, ABSS searches can be time-consuming. In other technologies, such as electrical and mechanical arts, STIC provides the option of conducting a Patent Linguistic Utility Service (PLUS) search, which runs significant words from sections of the specification against the full text of the United States Patent and United States Pre-Grant Publication databases. STIC is performing over 20,000 of these searches a year. While these searches are done quickly, limitations in key word searching are not always reliable in finding relevant prior art.

*Comment 306:* One comment stated that the Office should create a better

A09496

46822    Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

search engine so inventors can more easily perform better searches.

*Response:* The Office continues to explore various ways to disseminate information and improve the searching capabilities of the public. Currently, the Office allows applicants and inventors to search on-line using Patent Full-Text and Full-Page Image Databases (*http://www.uspto.gov/patft/index.html*) and works in concert with eighty-three Patent and Trademark Depository Libraries (*http://www.uspto.gov/go/ptdl/*) throughout the United States to offer the public extension research capabilities. The Office also has a library and tools at the Alexandria campus for the public to use.

*Comment 307:* One comment suggested that procedures for appeals and petitions should be changed to be less costly and to result in more timely decisions. One comment suggested the Office waive the notice of appeal fee and the appeal brief fee while the applicant awaits a decision on petition to invoke supervisory authority relating to a premature final rejection in an Office action.

*Response:* Most petition fees are set by regulation. The petition fee amounts that are set by regulation are set at an amount based upon the resources required to handle and decide the petition. *See Changes to Support Implementation of the United States Patent and Trademark Office 21st Century Strategic Plan*, 69 FR 56482, 56491–93 (Sept. 21, 2004), 1287 *Off. Gaz. Pat. Office* 67, 75–76 (Oct. 12, 2004). The notice of appeal fee and the appeal brief fee are set by statute and cannot be waived. Additionally, the appeal fees recover only a fraction of the Office cost of handling and deciding the appeal.

With respect to petitions, the Office is taking the necessary steps to minimize the backlog and to respond to petitions in a timely fashion. Within the Technology Centers, almost all petitions for relief from improper final rejections or restrictions are answered in a timely fashion. The Office is working to ensure that most of the petitions for relief from improper final rejections or restrictions are decided within four months from when they are filed, and continues to work on ways to make the process consistent across the different Technology Centers. The Office has also taken major steps to eliminate delays with the appeal process. The BPAI has radically reduced the inventory of pending appeals during the last five fiscal years.

The Office also recognizes that it is important to make sure that the finality of any final Office actions is proper. It is the Office's experience that applicants who seek review of the finality of an Office action also request review of the merits of the rejections contained in the final Office action. The propriety of the finality of an Office action is purely a question of Office practice that is wholly distinct from the merits of the rejections contained in the final Office action rejection. *See* MPEP § 706.07(c). The propriety of the finality of an Office action is properly raised in a petition under § 1.181, and is not a proper basis for an appeal or complaint to the BPAI during an appeal. *See id.* Likewise, arguments relating to the merits of the rejections contained in the final Office action rejection are properly raised in an appeal to the BPAI, and are not a proper basis for a petition under § 1.181 or for contesting the propriety of the finality of an Office action.

The rules of practice provide that the mere filing of a petition under § 1.181 will neither stay any period for reply that may be running against the application, nor act as a stay of other proceedings. *See* § 1.181(f). While the Office has put in place procedures to decide the appeals and petitions in a timely manner, the applicant is responsible to continue to prosecute the application consistent with § 1.181(f). Thus, there may be situations in which it is necessary for an applicant to file a notice of appeal to maintain the pendency of an application while a petition under § 1.181 requesting review of the finality of an Office action is being decided. The filing of a notice of appeal, however, does not moot such a petition under § 1.181, so the Office will decide a petition under § 1.181 requesting review of the finality of an Office action even if the applicant has filed a notice of appeal in the application. In such a situation, applicants should also request a pre-appeal brief conference with the filing of a notice of appeal. The pre-appeal brief conference will be conducted and the applicant will be notified of the result of the pre-appeal brief conference before the appeal brief and appeal brief fee must be filed. This should ensure that any petition under § 1.181 requesting review of the finality of an Office action is decided before the applicant must file the appeal brief and appeal brief fee. If the Office determines that the finality of the rejection was premature, the finality of the Office action will be withdrawn and any fees paid for the notice of appeal and the appeal brief can be applied to a later appeal on the same application. *See* MPEP § 1207.04.

*Comment 308:* Several comments stated that the Office should exercise better control over restriction practices. Several comments stated that the Office should encourage claims of different statutory classes to be filed in one application to improve examiner efficiency. One comment asserted that disposal pressures on examiners in the biotechnology area are totally unrealistic and have led to legally ridiculous restriction requirements. Several comments suggested that restriction reform is needed. Several comments suggested that the Office adopt the unity of invention standard. Several comments suggested an interim standard based on current PCT unity of invention practice should be available at the option of the applicant as an alternative to adopting unity of invention practice. Some comments expressed the opinion that current restriction practice in Technology Center 1600 (biotechnology and organic chemistry) requires applicants to file too many continuing and divisional applications. One comment expressed the opinion that current restriction practice is a result of the examiners' production system. Several comments stated that restriction is necessary to avoid abusive filing tactics by applicants seeking to circumvent the proposed regulation of continued examination filings. Several comments suggested that the Office eliminate restriction practice. Another comment stated that if proposed § 1.78(d)(1)(ii) is adopted, the Office should be bound by an initial restriction requirement and § 1.146, authorizing species restrictions, should be repealed. One comment suggested that if restriction practice must be maintained, it should be limited to applications in which two claimed inventions are literally unrelated, and all divisional applications should be examined by the same examiner.

*Response:* As part of the United States Patent and Trademark Office 21st Century Strategic Plan, restriction reform was studied extensively. *See Request for Comments on the Study of Changes Needed to Implement a Unity of Invention Standard in the United States*, 68 FR 27536 (May 20, 2003), 1271 *Off. Gaz. Pat. Office* 98 (June 17, 2003) (notice). A revision of the study was posted in November 2003, and the study was expanded to include four restriction reform options. *See Notice of the Availability of and Request for Comments on Green Paper Concerning Restriction Practice*, 70 FR 32761 (June 6, 2005), 1295 *Off. Gaz. Pat. Office* 146 (June 28, 2005) (notice) and the extension of the comment period announced at 70 FR 45370 (August 5,

A09497

2005) (notice). There were sixteen responders, and there was no consensus as to which of the four options to adopt. In addition, the restriction reform study concluded that a change to unity of invention under PCT Rule 13 under any of the four restriction reform options would significantly increase patent pendency. Thus, the Office is maintaining its current practices with respect to requirements for restriction under 35 U.S.C. 121 or unity of invention under PCT Rule 13.

Technology Center 1600 (biotechnology and organic chemistry) has implemented a comprehensive restriction training plan. This includes training examiners on proper restriction practices, including proper grouping of claims and rationale supporting the restriction requirement, using Art Unit and Work Group specific examples. Training has been ongoing, using materials that are published on the Office's Internet Web site. Feedback from the training to date has been incorporated into the initial patent examining training given to new hires.

Although the Office will continue to assign divisional applications to the technology area most appropriate for the claimed subject matter, they are not necessarily assigned to the same examiner.

*Comment 309:* Several comments asserted that restriction practice will increase as a result of the rule changes. One comment suggested that the Office needs to coordinate any changes in continuation practice with restriction reform. Another comment expressed the opinion that the proposed rule changes will exacerbate problems with the current restriction practice. One comment suggested that divisional application filings would likely drop in view of designating ten representative claims because examiners usually do not bother to make restriction requirements when they only have a few claims to examine. Another comment stated that an increase in restrictions is a desirable alternative to the rule changes. Another comment argued that current restriction practice adequately limits the claims for examination. The rules would complicate restriction practice resulting in multiple exchanges between the examiner and applicant when designated claims are subject to restriction.

*Response:* The Office is not adopting the "representative claims" examination approach in this final rule. As noted previously, the Office received comments that restrictions would increase and comments that restrictions would decrease as a result of the changes to the rules. The changes being adopted in this final rule do not encourage more or fewer restrictions. Thus, the Office is maintaining its current practices with respect to requirements for restriction under 35 U.S.C. 121 or unity of invention under PCT Rule 13. *See* §§ 1.141, 1.142, and 1.499.

*Comment 310:* One comment suggested that the Office require all restriction requirements to be made within six months of filing, with no excess claim fees charge until after that period. Another comment stated that excess claims fees should only be determined after any restriction requirement has been made.

*Response:* In fiscal year 2006, the average pendency to first Office action was 22.6 months for the entire Patent Examining Corps. Therefore, the Office's current first Office action pendency does not allow for an examination of the application to determine whether restriction is appropriate within six months of filing in most applications. Excess claims fees are required by the statutory requirement "on filing or on presentation at any other time." *See* 35 U.S.C. 41(a)(2). In response to a restriction requirement, applicant may file an amendment canceling the non-elected claims and request a refund of any excess claims fees paid on or after December 8, 2004, for the non-elected claims, if the amendment is filed before an examination on the merits has been made of the application. *See* § 1.117.

*K. Suggestions Relating to Legislative Changes*

*Comment 311:* A number of comments suggested that Congress should adequately fund the Office by making the United States Patent and Trademark Fee Modernization Act of 2005 (H.R. 2791, 109th Cong. (2005)) permanent and eliminating fee diversion. One comment also suggested that Congress provide additional funds (outside of fees collected) to the Office. A number of comments suggested that the fees for continued examination filings in excess of one should be increased (*e.g.,* graduated fee schedule for subsequent filings). A number of comments suggested charging a fee for each priority claim made. One comment suggested that the fee would be proportional to the years of benefit requested. Several comments suggested that the current fee structure encourages continuations since it is cheaper to file multiple applications than to file a large number of claims (*e.g.,* sixty total claims with nine independent claims) in a single application, and that the Office should revisit the fee structure if it wants to encourage filing the claims in a single application. A number of comments suggested that there should be higher fees on claims exceeding a certain minimal number, which is proportionate to the increased burden on the Office. One comment suggested permitting applicant to pay additional search and examination fees for those who want to submit more than ten representative claims. At least one comment suggested increasing fees based on complexity of the claims and art. One comment suggested that the Office should permit an applicant to file a third or subsequent continuing application with an appropriate higher fee. One comment suggested a three-tiered system: The first tier would allow three independent claims and twenty total claims; the second tier would activate a very high surcharge; and the third tier, in applications of more than ten independent and thirty total claims, would require a showing as to why such additional claims are necessary. Several comments suggested an overall general fee increase, especially for those areas with high workloads. One comment suggested that doubling the basic filing fee, search and examination fees would not be a hardship for applicants. Several comments suggested a number of changes to the fee schedule: Tripling fees for large entities; instituting a graduated fee scale for adding new matter rather than limiting the number of continuation-in-part applications; charging a higher filing fee for an application with greater than five claims and more than 1200 words in the specification; raising fees if more than ten or more than twenty claims are submitted; increasing fees for independent claims in excess of three; increasing fees on all non-Jepson claims; and eliminating search and examination fees if an examination support document is submitted.

Several comments stated that surcharges should be imposed on independent claims in excess of three and total claims in excess of twenty in order to address the problem of applications with excess numbers of claims. Several comments argued that the current fees appear to be having a significant impact in reducing the number of claims filed, that the Office has not fully evaluated that impact, and that the Office should give the fee increase more time to see if it will be effective.

*Response:* Patent fees are primarily set by statute, and Congress has considerable authority in setting patent fees and funding of the Office. *See Figueroa v. United States,* 466 F.3d 1023, 1031–32, 80 U.S.P.Q.2d 1437, 1443 (Fed. Cir. 2006). Thus, patent fee

A09498

**46824**  Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

and Office funding issues are beyond the scope of the proposed changes to the rules of practice.

In 2002, the Office proposed a patent fee structure that included a graduated excess claims fees schedule and additional fees for continuing applications. The House Subcommittee on Courts, the Internet, and Intellectual Property held a hearing on July 18, 2002, at which patent user groups expressed strenuous opposition to the Office's 2002 proposed patent fee structure. *See The U.S. Patent and Trademark Office: Fee Schedule Adjustment and Agency Reform: Oversight Hearing Before the Subcommittee on Courts, the Internet, and Intellectual Property of the House Committee on the Judiciary,* 107th Cong., 2nd Sess., Final Print Serial No. 92 (2002). The Office was unable to garner public support for a patent fee structure including a graduated excess claims fees schedule or any additional fees for continuing applications. Therefore, the patent fee structure proposed in the United States Patent and Trademark Fee Modernization Act of 2003 (introduced as H.R. 1561) included the former "flat" excess claims fee schedule (with an adjustment to the fee amounts) and no additional fees for continuing applications.

Section 801 et seq. of Division B of the Consolidated Appropriations Act, 2005, provided that 35 U.S.C. 41(a), (b), and (d) shall be administered in a manner that revises patent application fees (35 U.S.C. 41(a)) and patent maintenance fees (35 U.S.C. 41(b)) during fiscal years 2005 and 2006. *See* Public Law 108–447, 118 Stat. 2809 (2004). In essence, the Consolidated Appropriations Act, 2005, made the patent fees set forth in the United States Patent and Trademark Fee Modernization Act effective during most of fiscal year 2005 and all of fiscal year 2006. The Revised Continuing Appropriations Resolution, 2007 (Pub. L. 110–5, 121 Stat. 8 (2007)), kept the patent fee and fee structure provisions of the Consolidated Appropriations Act, 2005, in effect during fiscal year 2007.

Moreover, the examination fee in effect under this legislation does not recover the entire cost of examination. The excess claims fee structure in effect under this legislation does not provide sufficient incentive for all applicants to keep the number of claims in an application at a reasonable number. The application filing fees in effect under this legislation provide no incentive for applicants to keep the number of continuing applications to a reasonable number. Thus, increasing fees, as suggested by many of the comments, is not, by itself, a sufficient solution for the large and growing backlog of unexamined applications.

*Comment 312:* One comment suggested permitting applicants to pay an additional search fee for inventions that are restricted.

*Response:* The Office studied such a proposal and determined that it would result in an unacceptable increase in patent pendency. *See Green Paper Concerning Restriction Practice* at 14–18 (2005). The *Green Paper Concerning Restriction Practice* is available on the Office's Internet Web site at: *http://www.uspto.gov/web/patents/greenpaper.htm*. Thus, the Office is not pursuing such a change to patent practice.

*Comment 313:* One comment suggested that fees for small entities should be maintained and that fees for others should be increased.

*Response:* The Office believes that Congress has set an appropriate discount for fees paid by small entities. 35 U.S.C. 41(h)(1) currently provides for a fifty percent reduction in patent fees charged under 35 U.S.C. 41(a), (b), or (d)(1) for applicants who qualify as a small entity under 35 U.S.C. 41(h)(1), and 35 U.S.C. 41(h)(3) further provides a seventy-five percent reduction in the filing fee charged under 35 U.S.C. 41(a)(1)(A) for small entity applicants who file their applications electronically. The Office notes that small entity applicants file excess claims and continuing applications at virtually the same rate as other (non-small entity) applicants.

*Comment 314:* One comment suggested that if a specification is a poor-quality literal or machine translation of a non-English language application, the examiner should be permitted to reject the specification as indefinite and provide a time period for applicant to provide a better quality translation.

*Response:* The goal of the changes in this final rule is to increase quality and decrease pendency of patent applications. To assist the Office in meeting that goal, applicants should file applications that are in condition for examination, or provide corrections no later than the time they are taken up for examination. It should not be necessary for the Office to issue an Office action rejecting or objecting to an application due to informalities. However, if a specification is a poor quality literal translation of a non-English application, the examiner has the authority to object to the specification.

*Comment 315:* One comment suggested that the Office adopt a "utility model" type of patent as used in Australia in which a patent issues without a search being done, and a search is only conducted when the patent is enforced.

*Response:* The Office is currently studying the concept of alternative types of patents, thus allowing an applicant to select a patent product based upon the applicant's needs. *See Draft 2007–2012 Strategic Plan* (Objective 2 of Goal 1). A copy of the Office's draft proposed five-year (2007–2012) strategic plan can be found at *http://www.uspto.gov/web/offices/com/strat2007/*. However, implementing such a practice would need legislative changes.

*Comment 316:* One comment indicated that Congress recently endorsed and expanded opportunities for double patenting via the CREATE Act (Cooperative Research and Technology Enhancement Act (Pub. L. 108–43, 118 Stat. 3596 (2004)).

*Response:* The legislative history of the CREATE Act (Cooperative Research and Technology Enhancement Act (Pub. L. 108–43, 118 Stat. 3596 (2004)) indicates that Congress appreciated that the CREATE Act would result in additional double patenting situations. *See* H.R. Rep. No. 108–425, at 6 (the Office may require a terminal disclaimer when double patenting is determined to exist for two or more claimed inventions for any application for which the applicant takes advantage of the "safe harbor" provision in 35 U.S.C. 103(c) as amended by the CREATE Act). Congress' acknowledgment of the possibility of double patenting is not, however, an expression of support for applicants to intentionally submit claims that would result in a double patenting situation. Instead, it shows that the Congress is aware of the problems created by multiple patents covering the same or substantially the same invention, and expects the Office to address these issues.

*Comment 317:* Several comments suggested eliminating the two-year limit for filing a broadening reissue. One comment suggested amending the "reissue" or "reexamination" statute to permit broadening of claims at any time for a number of reasons such as: (1) To replace continuing applications which are now being filed to avoid the two-year statutory period for broadening patent claims; (2) to allow correction of simple drafting mistakes which may not be caught before the patent issues; and (3) to provide certainty to industry. The comment stated that to encourage participation by patentee, legal (as opposed to equitable) intervening rights should be provided that are linked to the date of the amendment. Also, such an amendment should provide for

A09499

Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations    46825

intervening rights after eighteen months to patent applications as well as patents to put an end to the submarine patent situation.

*Response:* The suggested changes to reissue or reexamination practice are not consistent with the Office's goals of increasing quality and reducing pendency. The Office, nevertheless, appreciates that continuing application practice may currently be used improperly to avoid the two-year bar and the broadening "error" requirement of the reissue statute (35 U.S.C. 251). The changes to continuing application practice in this final rule will reduce a patentee's ability to end-run the reissue statute via continuing application practice.

*Comment 318:* One comment suggested instituting a tiered search and examination procedure, which provides for a refund of the examination fee if applicant decides to abandon the application after the search but before the examination. If applicants can save money by abandoning applications no longer deemed viable, applications will drop out of the application process, thereby freeing up valuable Office examination resources to focus on quality examination of the remaining applications, as well as reducing pendency.

*Response:* The current fee legislation authorizes the Office to refund the search fee but not the examination fee if the applicant chooses not to pursue an application after it has been filed. *See* 35 U.S.C. 41(d)(1)(D). This provision has been implemented in § 1.138(d). Under § 1.138(d), applicant may file a petition for express abandonment before an examination has been made of the application to obtain a refund of the search fee and excess claims fee paid in the application. The feedback received by the Office indicates that the examination fee is too low to provide any additional incentive for an applicant to withdraw from the examination process and seek a refund.

*Comment 319:* One comment suggested charging more money for voluminous IDS submissions, and additional surcharges for particular technologies where "second pair of eyes" review has had a significant impact on examination quality at an increased cost to the Office.

*Response:* The Office is addressing the problem of large IDS submissions in a separate rule making. *See Changes To Information Disclosure Statement Requirements and Other Related Matters,* 71 FR at 38812–16, 38820–22, 1309 *Off. Gaz. Pat. Office* at 27–31, 34–36. As for increasing fees for particular technologies where "second pair of eyes" review has had a significant impact on examination quality at an increased cost to the Office, Office funding is subject to appropriations by Congress, and charging additional fees will not necessarily provide more funding for the Office. *See Figueroa,* 466 F.3d at 1031, 80 U.S.P.Q.2d at 1442 (there is no requirement that the revenue resulting from patent fees be appropriated to fund the Office). Furthermore, the limitation currently facing the Office is not a lack of funds to hire new examiners, but rather the ability to hire and train new examiners in the numbers necessary to lower patent pendency while maintaining patent quality.

*Comment 320:* One comment suggested modifying the relevant statutes to bar a continuing application or request for continued examination after thirty months from the filing date (other than a divisional application, which would be given a different period). The comment also indicated that continuation-in-part applications filed more than thirty months after the initial application should be barred under 35 U.S.C. 102(b) based on the eighteen-month publication of the initial application.

*Response:* First, the statutes cannot be modified without legislative action by Congress. Further, this final rule provides applicant sufficient opportunities to present claims during the prosecution of the initial application, two continuing applications, and a request for continued examination without justification. The prosecution of these applications and the request for continued examination will most likely extend more than thirty months from the earliest claimed filing date, particularly in certain areas such as biotechnology. The changes as adopted in this final rule appropriately balance an applicant's need for opportunities to present claims and the Office's need to utilize its examining resources more efficiently to reduce the backlog of unexamined applications and improve quality.

*Comment 321:* One comment suggested developing a practice where new matter can be added to an existing application with a request for continued examination. The comment explained such a practice would eliminate the need to file continuation-in-part applications, would not take the application out of the examining queue, and would be more efficient because the same examiner, rather than different examiners, would examine the application, and would also avoid double patenting issues.

*Response:* A request for continued examination is not a new application, but is instead a means to continue examination of an existing application. Thus, such a change could not be made, because 35 U.S.C. 132(a) prohibits introduction of new matter into an application. Furthermore, even if 35 U.S.C. 132(a) did not prohibit such a practice, such a practice would create problems in determining the filing date of the new matter.

*Comment 322:* One comment suggested that the Office should seek the authority from Congress to limit the number of claims in any particular application.

*Response:* The Office is not seeking to limit the number of claims in an application. Instead, the Office aims to improve the quality of examination. The changes to § 1.75 in this final rule permit an applicant to present up to five independent claims and twenty-five total claims in the application without submitting an examination support document in compliance with § 1.265. The changes to § 1.75 in this final rule also permit an applicant to present more than five independent claims or more than twenty-five total claims if the applicant submits an examination support document in compliance with § 1.265. If an examination support document in compliance with § 1.265 is not filed before the issuance of a first Office action on the merits of the application, the application may not contain or be amended to contain more than five independent claims or more than twenty-five total claims. Thus, the changes being adopted in this final rule are not placing a limit on the number of claims.

*Comment 323:* One comment suggested that the Office should permit all claims to be filed in an application without any excess claims fees, and then after restrictions are made, calculate the needed fee for "additional claims" so applicants are not penalized by paying claims fees twice.

*Response:* An applicant can request a refund for excess claims canceled prior to a first action on the merits. *See* § 1.117. Thus, an applicant does not need to pay claim fees twice, if applicant cancels the non-elected claims in reply to a restriction requirement.

*Comment 324:* One comment suggested providing for the addition of dependent claims after allowance for a reduced fee with the requirement that applicant identify support for the claims in the specification.

*Response:* The comment did not provide an explanation as to how such a strategy would reduce pendency and promote quality. Even assuming

**46826** Federal Register / Vol. 72, No. 161 / Tuesday, August 21, 2007 / Rules and Regulations

applicant would file less claims under this suggested practice, examination of the newly added claims after allowance would be required. Thus, it is not clear how the suggested strategy would serve these goals more effectively than the changes being adopted in this final rule.

*Comment 325:* One comment suggested to bar, by statute, more than three independent claims and ten total claims, provided that amendments may be made in the regular course of prosecution and after grant to end claim gaming. The comment further indicated that the proposed rule changes will be subject to administrative challenge, leading to several years of uncertainty and chaos.

*Response:* A number of comments indicated that there are situations in which more than three independent claims and more than ten total claims are needed. Thus, the Office recognizes that it would be inappropriate to seek such legislation to place an absolute limit on the number of claims at this juncture.

*Comment 326:* One comment suggested that reducing the filing and maintenance fees would reduce filings. The comment stated that the backlog has gotten so large due to the increases in excess claims fees, there has been a tendency among practitioners to segment applications into multiple related filings, each having twenty or so claims. This segmenting, the comment explains, has significantly increased the number of filings within the Office.

*Response:* It is unclear how reducing fees would reduce the number of filings. The experience of the Office is that reducing patent fees would not lead to reduced filings.

*Comment 327:* One comment suggested including a patent term reduction while an application remains pending.

*Response:* Section 1.704 currently provides for reduction of patent term adjustment for processing delays attributable to the applicant.

*Comment 328:* One comment suggested moving to a first-to-file system.

*Response:* As part of global patent law harmonization efforts, the Office has sought public comment on whether the first to invent (used in the United States) or the first inventor to file (used in the remainder of the world) standard in determining the right to a patent represented a "best practice" for a harmonized global patent system. *See Request for Comments on the International Effort to Harmonize the Substantive Requirements of Patent Laws,* 66 FR 15409 (Mar. 19, 2001) (request for comments). The Office is continuing to consider the issues related to the first to invent versus the first inventor to file standard in determining the right to a patent in the context of international harmonization efforts.

*Comment 329:* One comment suggested elimination of all forms of continuing applications except divisional applications.

*Response:* The changes to continuing application practice adopted in this final rule seek a balanced approach between the needs of applicants for patents and the goals of the Office to increase quality and decrease pendency.

*Comment 330:* One comment suggested reducing the shortened statutory period for an applicant's response to three months without any extension of time. One comment suggested implementing a thirty-day reply period for both the Office and applicants.

*Response:* The Office is considering whether it should change the shortened statutory period for Office actions on the merits to less than three months.

*Comment 331:* Several comments expressed support for publication of all applications. One comment suggested limiting secrecy of a patent application to one month. One comment suggested that some form of intervening rights legislation might better address the problem of repetitive filings. One comment suggested elimination of 35 U.S.C. 135(b). One comment suggested amending 35 U.S.C. 271 so that a variety of claim forms are not necessary for direct infringement to be found, arguing that current 35 U.S.C. 271 is the reason why software-based inventions require claims to different statutory classes, thus increasing the number of claims in an application. One comment suggested that the Office should work with Congress to legislatively overturn *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131, 71 U.S.P.Q.2d 1065 (Fed. Cir. 2004), to promote the use of dependent claims and not construe the rewriting of an objected to dependent claim in independent form narrowly under the doctrine of equivalents. One comment suggested granting rights to regulate the use of an Internet patent to the assignee and the enforcement of such regulation would be based on a fee and would not include the right to prevent others from using the invention.

*Response:* The changes suggested by the comments are beyond the scope of the proposed changes to the rules of practice. It is not clear, however, how the changes suggested by the comments would address the increased usage of continuing application practice or have an appreciable impact on quality or pendency.

*L. Effective Date of the Changes in This Final Rule*

*Comment 332:* One comment stated that the Office does not have any authority to promulgate retroactive rules because the Administrative Procedures Act does not confer such power on the Office. Several comments asserted that Congress never expressly authorized the Office to promulgate retroactive rules, citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265 (1994) and *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988). A number of comments also suggested that the retroactive effect of proposed rule § 1.78 is contrary to judicial precedent, citing *Henriksen* and *Hogan.* Several comments argued that applying the changes to § 1.75 retroactively would be unfair to the applicants and a violation of due process because applicants were not given sufficient notice of the changes when they filed applications. Lastly, one comment argued that applying the rule changes to pending applications is an unconstitutional denial of due process.

*Response:* The Office is not engaging in retroactive rule making. This final rule has a prospective effect only. The Office's decision to grandfather only pending applications in which a first Office action on the merits was mailed before November 1, 2007 (the effective date of the changes in this final rule) with respect to the changes to § 1.75 does not constitute retroactive rule making. Likewise, the Office's decision to grandfather only continuing applications and requests for continued examination that were filed before the effective date of the final rule with respect to §§ 1.78 and 1.114 (with a provision that allows for at least "one more" continuation application or continuation-in-part application of an application filed before the publication date of this final rule) does not constitute retroactive rule making.

"A statute [or regulation] does not operate 'retroactively' merely because it is applied in a case arising from conduct antedating the statute's enactment." *Landgraf,* 511 U.S. at 255. Rather, a statute (or regulation) is retroactive if it takes away or impairs vested rights acquired under existing law, creates a new obligation, imposes a new duty, or attaches a new disability with respect to transactions already completed. *See Landgraf,* 511 U.S. at 269. The filing of an application for patent does not create a vested right or amount to a transaction already completed. *See Community TV, Inc. v. FCC,* 216 F.3d 1133, 1143 (D.C.

Cir. 2000) (the Federal Communications Commission is free to alter the criteria for consideration of pending "upgrade" applications because the mere filing of an application does not vest the applicant with a legally cognizable expectation interest); *Chadmore Communs. v. FCC*, 113 F.3d 235, 240–41 (D.C. Cir. 1997) (the mere filing of an application does not vest an applicant with a legally cognizable expectation interest). In addition, the Office is not changing the substantive criteria of patentability. The Office is simply revising the procedures an applicant must follow for presenting more than five independent claims or more than twenty-five total claims in an application, and for seeking continued examination of an application via a continuation application, continuation-in-part application, or a request for continued examination. *See Landgraf*, 511 U.S. at 275 (changes in procedural rules may generally be applied in actions arising before the change without raising retroactivity concerns).

Finally, this final rule does not raise constitutional due process concerns. This rule change does not preclude an applicant from filing an application or receiving a patent containing any number of claims. Rather, the changes to § 1.75 in this final rule simply revise the procedures for presenting more than five independent claims or more than twenty-five total claims. As for the changes to § 1.78 in this final rule, the filing of an application does not vest an applicant with a due process right to obtain continued examination via a continuation application, continuation-in-part application, or a request for continued examination for purposes of presenting amendments, arguments, or evidence that could have been submitted prior to close of prosecution in the initial application (or the prior-filed application).

*Comment 333:* A number of comments suggested that the Office should not retroactively affect any pending applications when adopting the changes to § 1.78. Specifically, the comments disagreed with the Office's decision to apply the changes to § 1.78 to any applications filed on or after the effective date of the final rule, which would result in an applicant being able to file only one continuation or continuation-in-part application (and not "one more" continuation or continuation-in-part application) on or after the effective date of the final rule without meeting the requirements specified in § 1.78(d)(1)(i) or (d)(1)(iii) or including a petition under § 1.78(d)(1). The comments argued that the changes would retroactively affect the prosecution of many pending applications, particularly those that are continued examination filings, precluding any opportunity for subsequent continued examination filings. A number of comments also argued that retroactively affecting the pending applications would be unfair to applicants because it would deprive applicants of timely notice of the rule changes and it would be a violation of due process. Several comments argued that retroactively affecting the pending applications would require applicants to review the pending applications to determine whether to file additional continuing applications to preserve the patent rights of unclaimed subject matter or restricted inventions and to file many continuing applications before the effective date. The comments further argued that this would increase the cost of prosecution and the Office's backlog of applications. One comment estimated the cost of reviewing the pending applications to be 180 million dollars based on 600,000 pending applications. A number of the comments suggested that the changes should be applicable only to claiming the benefit of applications filed on or after the effective date (*i.e.*, the changes should be applicable only to non-continuing applications filed on or after the effective date). One comment suggested that the changes to § 1.78 should apply to applications filed on or after the effective date with an exception for any applications that have a filing date earlier than one year from the effective date. One comment suggested that in the determination of the number of continued examination filings permitted without a petition and a showing, the Office should count only the continued examination filings filed on or after January 3, 2006. One comment suggested that the Office should permit applicants to file one more continued examination filing on or after the effective date.

*Response:* This final rule provides that an applicant is not required to meet the requirements set forth in § 1.78(d)(1) if: (1) The application claims the benefit under 35 U.S.C. 120, 121, or 365(c) only of nonprovisional applications or international applications filed before the publication date of this final rule in the Federal Register; and (2) there is no other application filed on or after the publication date of this final rule in the Federal Register that also claims the benefit under 35 U.S.C. 120, 121, or 365(c) of such prior-filed nonprovisional applications or international applications. This will provide applicants with "one more" continuation application or continuation-in-part application of an application that was filed prior to the publication date of this final rule in the Federal Register without a petition and showing. Thus, applicants are also permitted to file a divisional application in compliance with § 1.78(d)(1)(ii) of an application that was filed prior to the effective date of this final rule without a petition and showing.

The rules of practice currently provide that by presenting any paper (including any continuation application, continuation-in-part application, or request for continued examination) to the Office, the party presenting the paper is certifying that to the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that the paper is not being presented for any improper purpose, such as to harass someone or to cause unnecessary delay or to needlessly increase the cost of prosecution before the Office. *See* § 10.18(b)(2)(i). Thus, as part of the reasonable inquiry, the Office expects a party to review applications to ensure that the desired amendments, arguments, or evidence that can be submitted during the prosecution of the prior-filed (or before the close of prosecution in the) application are submitted rather than waiting to make such submission in a later-filed continuation application. Therefore, it is unclear why the final rule would impose any significant additional cost on applicants.

*Comment 334:* Several comments suggested that if the Office adopts the proposed changes to § 1.78, the Office should publish the final rule well in advance of the effective date to provide sufficient time for applicants to adjust their prosecution strategies in any pending applications. A few comments further suggested a time period of six months to one year between the publication of the final rule and the effective date. Furthermore, a few comments suggested that the changes to § 1.78 should be implemented in phases. One of the comments provided an example that the changes would initially apply only to non-continuing applications filed on or after the effective date, and then six months after the effective date, the changes would apply to applications that have an effective filing date more than four years before the effective date.

*Response:* This final rule has been published well (more than sixty days) in advance of the November 1, 2007, effective date of the changes in this final rule. As previously discussed, this final rule permits applicants to file "one