# EXHIBIT 12

Dockets.Justia.com

**RESPONSE TO REQUEST FOR COMMENTS**
**PROPOSED PTO RULES ON CLAIM LIMITS**
Submitted by: <u>The National Association of Patent Practitioners</u>
**Ron Reardon, President**
**Louis J. Hoffman, Government Affairs Liaison**
**May 3, 2006**

<u>**Introduction**</u>

The following comments are presented in response to the request for public comments published by the United States Patent & Trademark Office (PTO) in the Federal Register Vol. 71, No. 1 (70 Fed. Reg. 61) dated January 3, 2006, concerning proposed changes to implement certain claim limits under consideration.

The National Association of Patent Practitioners (NAPP) is a nonprofit trade association for patent agents and patent attorneys. NAPP has approximately 500 members in 13 countries. The patent practices of the practitioner members are focused primarily on patent prosecution, namely practice before the PTO. As part of NAPP's mission statement, we aim to create a collective nationwide voice to address issues relating to patent prosecution practice. For more information about NAPP, visit www.napp.org.

NAPP speaks for a significant share of patent agents and a fair number of patent attorneys. Approximately one in every 20 active U.S. patent agents is a member of NAPP. NAPP's roster also includes hundreds of patent attorneys, generally those actively involved in patent prosecution before the PTO. NAPP practitioners who are attorneys represent clients not only in patent prosecution but also in defending clients against infringement charges, licensing patents, and advising on patent strategy.

In preparing this document, comments from members of NAPP, who participate in our daily e-mail discussion group, were solicited and collected. Those members most interested in the subject volunteered to work on drafting or reviewing the comments. Accordingly, we believe that the information provided here is representative of the prevailing wisdom of NAPP members, as reflected in postings on the daily e-mail discussion list.

NAPP welcomes the opportunity to comment on the PTO's proposed rules and hopes that the detailed nature of its comments will assist the PTO in its work.

NAPP also refers the PTO to its comments on PTO's proposed rules on continuations. Some of the suggestions and information in that document have application here as well.

A01210

## Executive Summary

NAPP acknowledges the PTO's interest in reducing backlog and the significance of the backlog to the detriment to PTO operations and the integrity and relevance of the U.S. patent system. NAPP recalls that previous PTO administrations sought or advocated for legislative changes like early publication (at 18 months) at a time when the average first action pendency for an application was 14 months, and the PTO essentially promised Congress and the American people and inventor community that it would reduce the backlog. *See* 35 USC §154(b)(1)(A)(i). Unfortunately, for a variety of reasons, some outside PTO control, the average backlog has grown to nearly 22 months, for applications examined in the last calendar quarter of 2005. http://www.research.usf.edu/pl/FAQ2.html

NAPP opposes PTO's suggestions for addressing the backlog by adjusting the rules by placing limits and restrictions on claiming. The proposed rules, if passed, would leave a large number of questions open, make adequate protection for patents more difficult, yet achieve only marginal improvement in – indeed, more likely worsen – the backlog problem. The proposed rules suffer from a myriad of significant problems, in procedure, in concept, and in details.

NAPP presents a variety of separately numbered comments, for the PTO's ease in summarizing and considering them in its response to comments. The comments are divided into several categories, summarized in the table of contents that follow this executive summary.

NAPP urges the PTO to shelve, or at least more carefully reconsider, this ill-conceived attempt at backlog improvement.

Although obviously seriously concerned with the problems posed by the present rule proposal, NAPP pledges to work closely with the PTO to address the growing pendency problem creatively and more effectively. At the PTO's request, NAPP and its members would be willing to help in any way deemed appropriate.

A01211

## Table of Contents

A. THE CONCEPT OF FORCING APPLICANTS TO CHOOSE BETWEEN LIMITING CLAIMS AND PREPARING EXAMINATION SUPPORT DOCUMENTS IS MISGUIDED ............................................................................... 1

   _Comment #1._   *The main motivation for the rule is insufficient because the PTO ought not to pass a rule restricting application filings for the purpose of reducing its workload.* ............................................................................................. 1

   _Comment #2._   *The secondary motivation for the rule is insufficient because more than ten claims are frequently needed to protect legitimate inventions in good faith, and abuse appears relatively rare.* .......................................................... 1

   _Comment #3._   *The proposed rule fails to take into account that deciding which claims are important "up front" is not always possible or realistic.* ............... 4

   _Comment #4._   *The proposed rule sets an unrealistic limit on unassisted initial examination, namely ten claims.* .............................................................. 4

   _Comment #5._   *The alternative, namely the examination support document (ESD), is also unrealistic, principally because ESDs will be quite expensive and simply invite charges of inequitable conduct.* ...................................................... 5

B. THE PROCEDURE IN PROPOSING THIS RULE SHOULD BE IMPROVED ............................................................................................................ 5

   _Comment #6._   *The PTO should solicit input through requests for comment on a "green paper" or issue a notice of intent, and hold hearings, to develop consensus on backlog-reduction and claiming strategies.* ................................................ 5

   _Comment #7._   *The PTO should not pass this rule without a cost-benefit analysis.* ... 6

   _Comment #8._   *The PTO should consider implement changes to claiming practice only after pilot program testing.* ...................................................... 6

C. THE PROPOSED RULE WOULD BE INEFFECTIVE .................................... 7

   _Comment #9._   *The proposed rule will increase, rather than reduce, pendency because of the need to examine the rest of the claims later.* ............................ 7

   _Comment #10._  *The proposed rule will cause applicants to file more applications, thereby offsetting or eliminating any backlog reduction.* ............................ 7

D. VARIOUS ASPECTS OF THE PROPOSED RULE REQUIRE CHANGE AND CLARIFICATION ...................................................................................... 8

   _Comment #11._  *The PTO should amend Rule 56 to ensure that no charges of inequitable conduct can occur from statements made or omitted in examination support documents (ESDs).* ...................................................................... 8

   _Comment #12._  *The rule should not apply to applications filed before enactment of the rule, to mitigate unfairness from retroactive rule application and avoid practical problems.* .......................................................................................... 8

   _Comment #13._  *The proposed rule provides no assurance or procedure for examining non-designated claims, whose examination has been deferred.* ...................... 9

   _Comment #14._  *In lieu of the proposed rule, the PTO should simply allow applicants to designate voluntarily claims that stand or fall together and, better, financially encourage such designations.* .......................................................... 9

   _Comment #15._  *Markush claims should be counted as a single claim.* ....................... 10

A01212

E.   THE PROPOSED RULE WILL IMPOSE MORE COST THAN PLANNED 11
    *Comment #16.*   *The proposed rule will require searches, as a practical matter, which
    will increase cost significantly.*...................................................................................... 11
    *Comment #17.*   *The rule will require higher attorney/agent fees for ESD preparation
    in many cases, making applications much more expensive.* .......................................... 11
    *Comment #18.*   *The rule will impose costs for reviewing all pending applications.* . 12
    *Comment #19.*   *The rule will disproportionately impact important inventions or
    inventions that are difficult to claim.* ......................................................................... 13
F.   THE    PROPOSED    RULE    WILL    HARM    SMALL    BUSINESS
SIGNIFICANTLY .............................................................................................................. 13
    *Comment #20.*   *The cost from searching and higher application fees will fall
    disproportionately on individuals and small businesses.* ............................................. 13
G.   ALTERNATIVES TO THE PROPOSED RULE CAN MORE LIKELY
ACHIEVE BACKLOG REDUCTION.............................................................................. 13
    *Comment #21.*   *To reduce backlog, the government should fully fund the PTO and
    subsidize, not tax, its operations.* ............................................................................... 14
    *Comment #22.*   *To help reduce backlog, the PTO should continue to expand its hiring
    and training programs.* ................................................................................................. 14
    *Comment #23.*   *To help reduce backlog, the PTO should reconsider its "count
    system."* ....................................................................................................................... 15
    *Comment #24.*   *To help reduce backlog, the PTO should continue to explore remote-
    location hiring and off-premises work.* ........................................................................ 15
    *Comment #25.*   *To help reduce backlog, the PTO should look for ways to reverse the
    trend towards increased attrition.* ................................................................................ 16
**Conclusion** ............................................................................................................................ 16

A01213

**NAPP's Specific Comments**

## A.    THE CONCEPT OF FORCING APPLICANTS TO CHOOSE BETWEEN LIMITING CLAIMS AND PREPARING EXAMINATION SUPPORT DOCUMENTS IS MISGUIDED

NAPP believes that the proposed rule is flawed conceptually and that any benefits are far outweighed by the disadvantages of passing this proposed rule at all. NAPP presents the following comments on that general subject.

> *Comment #1.*    *The main motivation for the rule is insufficient because the PTO ought not to pass a rule restricting application filings for the purpose of reducing its workload.*

Explanation: The main argument presented by the PTO for the rule is that the PTO must do something about the growing backlog and that other alternatives to this rule (such as increased hiring) would not help sufficiently. It seems clear that the PTO would not consider passing this rule absent the difficult backlog problem. In essence, the thrust of the PTO's proposed rule is to reduce the number of applications that it examines to match more closely its perceived ability to examine applications.

NAPP challenges the underpinnings of the PTO's entire thinking on this subject. The main purpose of the PTO's patent operation is to examine patent applications. If application filings increase, in all likelihood, this will provide added benefits to the American people from the increased innovation. The PTO should work hard to adapt to larger numbers of applications, rather than trying to encourage inventors to file less often.

The PTO's proffered motivation of reducing the backlog would justify even more extreme rules that no reasonable person would consider appropriate, such as permitting each applicant to file only a certain number of applications per year, or restricting each application to only a single claim.

Using the backlog of patent applications as the justification for the rule raises difficult questions that the PTO has not answered: For example, if the backlog worsens even more, will the PTO consider yet further restrictions on claim flexibility? By contrast, if the backlog improves for other reasons, will the PTO remove the restrictions on claims? These unanswered questions highlight that tying rule changes to a possibly temporary backlog problem is not justifiable.

In sum, NAPP believes that backlog reduction (although a salutary goal) is an entirely inappropriate motivation for changing rules relating to how the PTO will examine claims. The PTO should not shirk its duty to examine all claims, no matter how difficult that task becomes.

> *Comment #2.*    *The secondary motivation for the rule is insufficient because more than ten claims are frequently needed to protect legitimate inventions in good faith, and abuse appears relatively rare.*

A01214

<u>Explanation:</u>    PTO's secondary argument is that the proposed rule would reduce problems arising from excessive numbers of claims. NAPP observes that this argument fails to recognize the true need for fairly large claim sets (meaning applications having more than the usual 3-5 independent and 10-40 total claims) in some cases. There are legitimate reasons for using fairly large claim sets, including the following:

1.    Applications often disclose more than one aspect that can qualify as an advance over prior art yet are sufficiently related to justify disclosing together. In such cases, claims must be presented to address each aspect separately. Although restriction requirements often occur in such applications, an applicant and practitioner cannot reliably predict whether restriction will occur in advance.

2.    Even for a single inventive aspect of a given disclosure, the statute and ordinary practice allow for many different types of claims, and practitioners agree that adequate protection of inventions requires presenting claims in many statutory classes. The reason is that different types of claims provide for different scope of protection, apply against different parties, and have different defenses. For example, an inventor can claim the benefit of the Process Patent Act (35 USC §271(g)) by securing method claims, while an inventor can cut off the "earlier inventor" defense (35 USC §273) by securing apparatus claims. The understanding that various sorts of claims are available and should be secured is particularly strong in certain technological areas, such as software inventions. Types of independent claims typically, or at least frequently, secured for a software invention include claims directed to a:

- ✓ Computer disk holding software (*Beauregard* claim)
- ✓ Computer programmed with operational software
- ✓ Linked computer system with operational software controlling interaction
- ✓ Means plus function apparatus claim
- ✓ Method of doing something accomplished by the software
- ✓ Method of programming a computer or retrofitting a computer or other program with the software
- ✓ Propagated signal claim

3.    Even for a single inventive aspect of a given disclosure and even within one statutory class, there are several claim formats available to practitioners, each with distinct advantages and disadvantages. A practitioner can choose a *Jepson* format or a listed-elements format for an apparatus invention, for example. Foreign practice often governs such choices, because different foreign countries have different preferences and applicants often would prefer to have a single claim set for several national applications.

A01215

4.      Even for a single inventive aspect of a given disclosure, within one statutory class, and for a given claim format, the invention may have several different distinctions from the prior art. In such cases, the practitioner typically will include claims addressing each distinction.

5.      Even for a single inventive aspect of a given disclosure, within one statutory class, for a given claim format, and for just one distinction from the prior art, the practitioner may wish to direct a claim to a different target actor. For example, in some cases, practitioners will prefer not to have only claims that are directly infringed by end users, against whom it would be difficult to enforce the invention as a practical matter, or only claims that are infringed outside the country. Relying on indirect infringement only, such as inducement to infringe, can create difficulties in enforcement. In such a case, a practitioner may choose to include a claim directed to the manufacturer, or distributor.

6.      Even for a single inventive aspect of a given disclosure, within one statutory class, for a given claim format, for just one distinction from the prior art, and for a single target actor, a practitioner typically will present an array of claims, in varying combinations, often in dependent form. This is important because it is not possible to know about all prior art or foresee all possible commercial designs. Presenting narrower claims increases the likelihood of maintaining a valid claim if new prior art turns up, while presenting a broad claim increases the odds that attempts at design-around will fail. Conventional wisdom holds that a practitioner should present a claim set varying from broad to narrow, but even that aphorism simplifies the problem, because the problem is typically a multi-dimensional one – inventions often can be implemented by making varying choices for each of multiple features.

For all of the above reasons, it is not reasonable to expect that solid or even adequate protection can exist, in all cases, with only a few claims.

The pursuit of adequate protection also can result in multiplied claim sets where an examiner allows some but not all claims. In those instances, particularly in view of the *Festo* case, applicants and practitioners have incentive to pursue claim sets derived from the rejected claims. This can cause doubling the number of claims protecting a single invention.

NAPP believes that those commenting parties who represent infringement defendants seek to inveigle the PTO to cut off applicants' rights to present an array of claims so that they and their clients can have an even more free hand to evade patent protection on legitimate inventions. Such results-oriented reasoning ought not to influence the PTO's thinking. The PTO ought not to use its rulemaking authority to protect accused infringers against patentees.

On the other side of the equation, there is little evidence of any significant quantity of unfair abuse from applications with excessive numbers of claims. It is true that a few

NAPP Comments on Claim Limit Rules                                      Page 3

applications have large numbers of claims. However, in most instances, such large claim sets are characterized by claims sharing one or more common features, and there is little practical damage from the large number of claims. In short, there is no evidence in the PTO record that patents with large numbers (hundreds) of claims are in way abusive, much less that abusive applications exist in sufficient quantities to justify restricting claim sets generally. The PTO can handle any abusively large claim sets (or special problems arising from certain areas, *e.g.*, gene patent claim sets) through other means, including targeted rules. The PTO has already discouraged large claim sets through a sharp increase in the examination fees for "excess" claims.

In sum, NAPP believes that claim sets with dozens of claims, more often than not, assist in protecting legitimate inventions. It is not a legitimate justification for this rule, therefore, that it would reduce inventors' ability to file large claim sets.

> *Comment #3.*     *The proposed rule fails to take into account that deciding which claims are important "up front" is not always possible or realistic.*

Explanation: The proposed rule requires applicants to select claims for the examiner to examine first. The PTO seems to think that it is possible in all cases for applicants and their practitioners to choose which claims are potentially patentable before an examiner, who is an expert in the field, performs a search. That is not so.

Even after an initial PTO search, without seeming to denigrate PTO examiners, it is also the case that PTO searches are of widely varying quality. If a patent search fails to uncover a significant reference or set of references, then the patent applicant may believe that the invention can be claimed more broadly than appropriate and choose different claims than those that application would have picked had the search been more complete. While subsequent events might alter applicant's view, such may not occur in time to permit a more judicious selection of which claims should be examined first.

> *Comment #4.*     *The proposed rule sets an unrealistic limit on unassisted initial examination, namely ten claims.*

Explanation: The proposed rule imposes additional requirements on applications having more than ten claims. Independent claims are examined always, and if all ten slots are not filled up with independent claims, the applicant may select dependent claims to make up the balance. As indicated in comment #2 above, with the wide array of claim possibilities, for legitimate reasons, it will sometimes be the case that applications have 5-15 independent claims for legitimate reasons. Many or most applications will have more than ten claims that should be examined legitimately.

The rule also restricts applicant flexibility by insisting that the independent claims be counted towards the ten selections. In some cases, one independent claim might have limitations that parallel another, and an applicant might prefer to secure the examiner's earlier review on a dependent claim instead.

A01217

> *Comment #5.     The alternative, namely the examination support document (ESD), is also unrealistic, principally because ESDs will be quite expensive and simply invite charges of inequitable conduct.*

Explanation:  The proposed rule allows applicants to present more than ten independent claims or more than ten selected claims, but only if the applicant submits an examination support document (ESD).  While preferable to an absolute ban, that alternative does not cure the problem because ESDs will be quite expensive (*see* comment #17 below) and will invite frequent charges of inequitable conduct.

In a patent lawsuit involving a patent in which applicant has filed an ESD, it is just too easy for accused parties to make inequitable conduct arguments in the following categories:  (1) applicant intentionally performed an inadequate search; (2) applicant intentionally included in the ESD statements misleading the PTO examiner about the results of the search or the content of cited prior art documents; or (3) applicant intentionally failed to raise in the ESD other patentability problems.

Charges of inequitable conduct continue to plague the patent system.  *Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988) ("The habit of charging inequitable conduct in almost every major patent case has become an absolute plague"); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed. Cir. 1998) ("As discussed in *Kingsdown*, the charge of inequitable conduct before the patent office had come to be attached to every patent prosecution, diverting the court from genuine issues and simply spawning satellite litigation"); *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997) ("The potential for prejudice flowing from unwarranted charges of improper conduct led this court to establish objective rigor in *Kingsdown*," requiring a showing of intent, "in response to the 'plague' of litigation-inspired attacks that fed on the unfamiliarity of decision-makers with the complex procedures of patent examination").

NAPP believes that the fact that only 1,225 applicants in FY2005 (about one half of one percent) took advantage of the PTO's accelerated examination offer by filing ESD-type documents (71 FR 63) derives from the problems ESDs present for inequitable-conduct charges.

## B.     THE PROCEDURE IN PROPOSING THIS RULE SHOULD BE IMPROVED

NAPP believes that the procedure in issuing this notice of proposed rulemaking has been inadequate and requests the PTO to reconsider its procedure.  NAPP presents the following comments on that general subject.

> *Comment #6.     The PTO should solicit input through requests for comment on a "green paper" or issue a notice of intent, and hold hearings, to develop consensus on backlog-reduction and claiming strategies.*

<u>Explanation:</u>  In soliciting comment on a similarly difficult problem, namely on the question of possible changes to restriction practice, the PTO issued a "Green Paper" with alternatives and requested comments from the public. Federal Register, Vol. 70, No. 107 (70 Fed. Reg. 32761) (June 6, 2005). Prior rules of equal significance have been implemented only after significant public hearings. Various PTO officials have traveled the country discussing the proposed rule package, but those "roadshow" events have given no significant opportunity for practitioners and members of the public to comment.

A process similar to the "Green Paper" should have been followed here, where the proposed rule solicits comments preparatory to a final rule without any consensus among PTO examiners, management, and interested stakeholders (to put it mildly). It is not too late to "return to the drawing board" and solicit input for creative ways to improve claiming practice or reduce backlog.

If the main goal of the proposed rule is to reduce backlog, then the PTO should not consider these changes -- which many believe would significantly harm the ability of inventors to protect their inventions adequately, at least in some cases -- without consideration of alternatives that might offer at least equal backlog reduction with less chance of damage.

> **Comment #7.**    *The PTO should not pass this rule without a cost-benefit analysis.*

<u>Explanation:</u>  Nothing in the proposed rulemaking reveals that the PTO has considered the cost-benefit of the proposed rule as a whole (as opposed to mere paperwork collection costs). The proposed rule will have significant impact, pro and con, on the patent system, and (for reasons explained herein) will impose significant burden, not only in terms of the examination support documents for cases where applicants wish to select more than ten claims for examination but also in terms of increased attorney hours in selecting claims up front, even in applications that might never become patentable or important to the client. The PTO should not implement a rule of this magnitude without careful consideration or estimates of the costs to applicants compared to the level of proposed benefit.

> **Comment #8.**    *The PTO should consider implement changes to claiming practice only after pilot program testing.*

<u>Explanation:</u> PTO's notice of proposed rule includes a number of assumptions that could profitably be tested using pilot programs. For example, people can be asked to volunteer for a program, or a sample of applications could be drawn, where the practitioner identifies significant claims for examination first, with the promise that all claims will be examined eventually. Quantitative studies could be performed, and examiners and applicants interviewed, in both the pilot and a control group, to determine whether the change produced faster and easier examination. Such an experiment would give some estimate of the maximum amount of time that could be gained if the procedure were essentially mandated as in the proposed rule.

A01219

For another example, PTO could log time spent, for a sample of applications, examining or checking claims after a first ten.

The PTO can study how long examination actually takes as a function of the number of claims. NAPP believes that additional claims do not add as much to the total time spent in examination as the PTO may think.

## C.    THE PROPOSED RULE WOULD BE INEFFECTIVE

NAPP believes that limiting claims in the way specified in the proposed rule (as is or with any small modifications) will not achieve the purposes that the proposal was designed to achieve, especially with respect to purported reduction of backlog or average pendency. NAPP presents the following comments on that general subject.

Comment #9.    *The proposed rule will increase, rather than reduce, pendency because of the need to examine the rest of the claims later.*

Explanation: In cases where applicant selects only some claims, under the proposed rule the examination proceeds only on the selected claims, and the rest of the claims are held in abeyance until allowable subject matter is identified. Then, the examiner will examine the remaining claims.

That two-stage process will result in delay for significant numbers of applications. Most applications result in one or more patents. In some unknown fraction of allowed applications, issuance will be delayed somewhat because of disputes over claims previously held in abeyance. Absent the proposed rule, many such disputes can be resolved before the case is ready for allowance of any claims. Thus, the proposed rule can be expected to result in an increase in pendency for some applications, or at least an offset to any gains from easier initial examinations.

Comment #10.    *The proposed rule will cause applicants to file more applications, thereby offsetting or eliminating any backlog reduction.*

Explanation: Under the proposed rule, applicants will more likely file separate original applications for multiple aspects of an invention. Such a strategy would increase the number of selected claims that might be examined without the need to prepare ESDs. If an applicant files two applications with the same specification, he or she is entitled to two twenty selected claims, whereas if the applicant files only one application, he or she is entitled to only ten selected claims.

NAPP recognizes that the proposed rule (specifically §1.75(b)(4)) purports to establish a process whereby two applications with patentably indistinct claims will be treated somehow together, which would restrict the applicant back to the ten selected claims for purposes of determining whether an ESD is required. However, that approach introduces yet further complications and will not cure the tendency of applicants to try to avoid both

A01220

the ten-claim limit and the ESDs, principally because that part of the proposed rule applies only to instances where the two applications contain "patentably indistinct claims," but the PTO does not say how examiners will determine whether claims are patentably indistinct, before any search and examination has been done (and, if done after the search and examination, there is no time savings).

## D.   VARIOUS ASPECTS OF THE PROPOSED RULE REQUIRE CHANGE AND CLARIFICATION

NAPP believes that the proposed rule contains a variety of other defects or open issues that require change or clarification. NAPP presents the following comments.

> *Comment #11.   The PTO should amend Rule 56 to ensure that no charges of inequitable conduct can occur from statements made or omitted in examination support documents (ESDs).*

Explanation: If the PTO requires or encourages ESDs in the rules, it should not allow charges of inequitable conduct arising from their content. *See* comment #5 above.

The PTO should follow this suggestion even if opponents argue that to do so would give applicants a "free pass" to mislead examiners intentionally. First, absent such protection, applicants will not choose to submit ESDs, and the PTO will not gain the assistance for its examiners that it intends. Second, the fact remains that an ESD is not intended to substitute entirely for the examiner's review of the application – ESDs are intended only as an organizational tool to permit examiners to do their jobs more effectively. Presumably, for example, the examiner must search for art and study the art located, even in cases where an ESD is present. If an examiner has the ability to locate and study art references, then whatever an applicant says or neglects to say in an ESD is not determinative or material to the decision.

> *Comment #12.   The rule should not apply to applications filed before enactment of the rule, to mitigate unfairness from retroactive rule application and avoid practical problems.*

Explanation: The proposed rule applies to all pending applications as well as newly filed applications. That will require applicants to file papers in each pending application (even those in which first or more office actions on the merits have been issued) to select claims or submit ESDs. Such a process would be quite expensive and will cause more havoc than it would save. Papers can be expected to cross in the mail with office actions, some fraction of applications will be "bounced back" for missing ESDs or claim elections, and examinations already under way would be disrupted.

It would pervert the main purpose of the proposed rule – to reduce the backlog in the near term – if the perfectly predictable transitional problems were to cause a short-term backlog increase, precisely at a time when the PTO is frantically hiring a large quantity of

A01221

new examiners to try to make up for past funding shortages. The best way for PTO to avoid such problems is to apply the proposed rule, if it is finalized, prospectively only.

> *Comment #13.    The proposed rule provides no assurance or procedure for examining non-designated claims, whose examination has been deferred.*

Explanation:  The proposed rule (37 CFR §1.104(b)) states that claims other than the ones designated as "representative" will be "held in abeyance" until allowable subject matter is identified. However, the rule provides no explanation about how that will happen, nor even any assurance that it will happen for sure. Left unanswered are questions like: Can examiners somehow refuse to examine non-designated claims on the grounds that they are insufficiently related to the ten (or other number of) designated and previously examined claims? When will examiners review the non-designated claims? How will applicants receive notice of the results of such review? Will applicants have an opportunity to respond to examiner-identified problems with previously unexamined claims? Can applicants enter amendments to add more dependent claims after allowable subject matter is identified? When and how can applicants amend non-designated claims? Are applicants expected to amend such claims during prosecution, even though they are not being examined (such as to avoid issues like antecedent basis caused by a change to an independent or designated claim)? Will the examination of non-designated claims occur before or after an appeal?

> *Comment #14.    In lieu of the proposed rule, the PTO should simply allow applicants to designate voluntarily claims that stand or fall together and, better, financially encourage such designations.*

Explanation:  The notice compares the proposed rule to the process before the Board of Appeals, where applicants are required to identify which claims stand or fall together, else explain why they do not. 71 FR 62. Although there are some similarities, the comparison is not exact. For example, nothing in the Board rules limits in any way the number of categories that applicants may identify as subject to separate treatment, as the proposed rules purport to do. Conversely, the Board rules apply to claims that the examiner has fully searched and examined, allowing the applicant sufficient information to determine which claims can be grouped together, whereas the proposed rules apply to claims pre-examination, when it is much more difficult to know which claims are most important.

Nevertheless, the PTO could improve the proposal by adopting a better-tailored version of the rules applicable to claims on appeal, customized to take account of the different situation. Specifically, NAPP proposes that, if the PTO believes that claim reduction or grouping would substantially improve examiner productivity (as noted in comment #8, above, this assumption should be tested and proven), it should adopt a new rule with the following characteristics:

> 1.    Claim grouping. Applicants could divide submitted claims into groups, identifying for each group common characteristics deemed as identifying

A01222

characteristics and a single claim representative of the group. Claims within one of the groups would stand or fall together during examination. This parallels Board of Appeals practice.

2.     No limitations or penalties.     There would be no penalty for applicants who decline to group claims together, and no limit on the number of groups applicants could pick. There would be no requirement that applicants file ESDs for exceeding a certain number of claim groups, nor that applicants explain how each group is patentable. This parallels Board of Appeals practice.

3.     Fee incentives. The PTO could revise the application fee structure to provide incentives for applicants to group claims. The fewer groups, the more the fee decreases. This would encourage applicants to group claims.

4.     No sequential examination. Because of the claim groupings, the examiner would not need to "defer" examination of the grouped claims, and there would be no need to perform a second phase examination of deferred claims. Instead, the examiner could examine claims other than the one representative claim in each group only for limited purposes, to ensure compliance with 35 USC §112(1), (2), and would not need to check those claims separately under 35 USC §§101-103, 135.

5.     Ability to adjust. An appropriately drafted rule would permit an applicant to adjust the claim groupings in response to an office action. Fee adjustments might be applicable, parallel to the charges for "excess" claims that often occur as a result of amendments under existing practice.

Such an alternative rule would do far more, NAPP submits, to reduce examination burden than the PTO's original proposal, without the cost and detriment to applicants arising from restricting claims or requiring ESDs.

Comment #15.     Markush claims should be counted as a single claim.

Explanation:     The notice requests comment on whether Markush claims should be counted as a single claim for purpose of the proposed rule. 71 FR 64.

The PTO suggests, as one alternative, that each branch be counted separately unless applicant "shows that each alternative in the claim includes a common core structure and common core property or activity, in which the common core structure constitutes a structurally distinctive portion in view of existing prior art and is essential to the common property or activity." Id. That approach seems excessively difficult to test, particularly at the earliest stage of examination at which the counting occurs. Indeed, the PTO presumably would prefer to have a clerk check the number of designated claims, and clerks are hardly positioned to decide this test.

A01223

The PTO suggests, as another alternative, that each branch be counted separately, period. This would be inappropriate. A typical Markush claim with five branches, say, does not present the same degree of difficulty in examination as five separate claims. A typical Markush claim is far more closely equal to a single claim in terms of difficulty of examination. Moreover, counting Markush branches separately will inappropriately discourage applicants from using Markush format, with the consequent result of increasing the numbers of dependent claims, *e.g.*, one claim directed to each Markush branch. Markush format is very useful, particularly in certain fields (e.g., chemical) and should be encouraged, not discouraged.

## E.    THE PROPOSED RULE WILL IMPOSE MORE COST THAN PLANNED

Overall, NAPP believes that the calculation of the cost of the rule in the PTO's notice of proposed rulemaking underestimates the cost that the rule would impose on the public. NAPP presents the following comments on that general subject.

> *Comment #16.    The proposed rule will require searches, as a practical matter, which will increase cost significantly.*

Explanation:  Whether to select claims for examination or prepare an ESD, as explained above, an applicant needs good working knowledge of the prior art. For those reasons, patent applicants and practitioners are much more likely to consider patent searches a requirement before first application filing. It is perfectly predictable, therefore, that the passage of this rule will motivate nearly all applicants to perform patent searches.

The PTO's analysis of the cost of the rule completely ignores this predictable effect. The cost of additional patent searches can be quite high.

Although NAPP members typically support performing patent searches and believe that they benefit patent prosecution, the timing and extent of searching ought to be decided by the applicants. For example, the importance of a particular patent application can change over time – if a product becomes popular unexpectedly, a routine patent application may become much more significant; if a product fails, a patent application may become unimportant. Passing a rule that would strongly encourage extra precautionary patent searching, even for applications that are considered less important (because, who knows, they might turn out to be significant later) or for applications that are later abandoned (because the product failed), imposes additional, unnecessary cost that could be avoided in many instances.

> *Comment #17.    The rule will require higher attorney/agent fees for ESD preparation in many cases, making applications much more expensive.*

Explanation:  The proposed rule would require that registered practitioners prepare ESDs in many cases, when ten designated claims are insufficient. Accordingly, the fees that practitioners must charge their clients for preparing claims sets is expected to increase significantly.

A01224

The PTO estimates the cost of preparing an ESD at $2,500, which it derives from an AIPLA study of the cost of a novelty search and opinion. 71 FR 66. However, an ESD is substantially more difficult to prepare than a novelty opinion, and the expected fee increase would be a multiple of the PTO's assumed cost.

The PTO also underestimates the frequency with which ten claims will be insufficient, by noting that only slightly more than one percent of applications have more than ten independent claims. *Id.* However, that figure has little bearing on the situation, because the PTO provides no estimate or prediction of the number of <u>dependent</u> claims that applicants would wish to designate. NAPP believes that applicants would prefer, if given the option, to have examiners look at a relatively substantial fraction of dependent claims as part of the initial application, in case the independent claims are considered unpatentable. Applicants and practitioners cannot feel confident enough that the examiner will find allowable subject matter by reviewing only ten claims, NAPP believes, in a sizable fraction of the applications. NAPP does not have a specific estimate, however.

To illustrate how the above points will impose significant cost: Assuming that each ESD requires 40 hours of practitioner time, at an average of $150/hr., the added cost would be $6,000 per application. If done in 100,000 applications (about a third of the annual total), the added cost exceeds $600 million/year. NAPP considers that estimate as conservative.

Because many applications never result in any patent, and other applications result in patents that never have any commercial value, most of this extra cost for ESDs will go wasted.

> <u>Comment #18.</u>    *The rule will impose costs for reviewing all pending applications.*

<u>Explanation:</u> As indicated, if the PTO wishes to apply the rule retroactively, reviewing all pending applications will be required. That will impose significant cost on clients. (Again, if the PTO announces its intent to apply the rule prospectively, the cost from this item can be deferred or mitigated.)

When applicants filed their applications (at least those filed before 1/3/06 or so), they had no idea that the PTO would impose a rule that would require them to bear thousands of dollars of extra cost. To the contrary, they had legitimate expectations that substantial added burden would not be required. To impose such costs now would be draconian.

The proposed rule requests comments on how to mitigate the "inconvenience." 71 FR 66. There is no realistic way to accomplish that feat.

The total cost would be extreme. To illustrate, suppose it takes four hours per pending application to select the designated claims, and one third of the time an ESD would be required, which would result in an extra 40 hours per application. Assuming $150/hr.

A01225

and approximately 600,000 pending applications, the proposed rule, if applied retroactively, would impose $1.56 billion in extra "inconvenience." NAPP believes that this illustration is conservative.

> *Comment #19.    The rule will disproportionately impact important inventions or inventions that are difficult to claim.*

**Explanation:** The PTO rulemaking suggests that the proposal will not create significant mischief because a relatively small percentage of applications have more than ten independent claims. (On the other hand, this also goes to show that the benefit to backlog reduction is correspondingly small.)  But this argument ignores the fact that the applications with large numbers of claims are expected to be disproportionately likely to fall into one of two categories:  (a) the most significant, groundbreaking, far-ranging, and pioneering inventions; and (b) inventions that are the most difficult to claim or define properly, because of complex technology or limitations on the precision of English words and phrases. Thus, even if the percentage is small, the damage from the rule can be much more significant, because it targets the very inventions that need careful patent protection the most. Thus, the economic harm from the rule will be quite high.

## F.    THE PROPOSED RULE WILL HARM SMALL BUSINESS SIGNIFICANTLY

NAPP believes that the rule will cause significant harm to a significant number of small business entities. NAPP presents the following comments on that general subject.

> *Comment #20.    The cost from searching and higher application fees will fall disproportionately on individuals and small businesses.*

**Explanation:** Large companies perhaps can readily react to the proposed rule simply by filing more applications, each one addressing a particular aspect of an invention. Such a strategy will make larger claim sets less likely to be needed. Already, many of the largest companies file large numbers of applications, each addressing very narrow inventions, and many such applications often arise from a common commercial product or project. For application filing strategies of this sort, larger claim sets are less needed.

Individuals and small business, on the other hand, often for cost considerations, more typically file one original application per product, with the application discussing a variety of improvements or aspects of an improvement to the product. Accordingly, it is more likely that prosecution will result in a need to rely on larger numbers of claims for adequate protection.

## G.    ALTERNATIVES TO THE PROPOSED RULE CAN MORE LIKELY ACHIEVE BACKLOG REDUCTION

NAPP believes that backlog reduction and pendency shortening, which is presented as the main purpose of the proposed rule, can be achieved far more effectively,

A01226

at lower cost and adverse impact, through a variety of alternative strategies. NAPP presents the following comments on that general subject.

> *Comment #21.     To reduce backlog, the government should fully fund the PTO and subsidize, not tax, its operations.*

Explanation:  One option for reducing backlog is to fund the PTO fully. At a minimum, Congress should allow the PTO to keep all of its revenue; to do otherwise represents a tax on invention, which is damaging to the economy. NAPP recognizes that the PTO has sought to keep its revenue.  However, NAPP suggests that the PTO should begin lobbying Congress to grant the PTO even *more* revenue than it collects, to offset the losses from past years.

Between fiscal year 1992 and 2004, the PTO lost access to $741 million of the fees it collected. House Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 11.
*See* http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

The backlog and increasing pendency of patent applications derives in large part from past under-funding. For example, a report by the GAO concluded that the PTO has fully or partially implemented only 8 of 15 initiatives aimed a reducing pendency of applications.  "USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain," U.S. Government Accountability Office Report No. GAO-05-720 (June 2005). *See* http://www.gao.gov/new.items/d05720.pdf  The PTO cited lack of funding as the primary reason for not accomplishing all initiatives. *Id.*[1]

The PTO should seek necessary funding now to implement backlog-reduction programs.

> *Comment #22.     To help reduce backlog, the PTO should continue to expand its hiring and training programs.*

Explanation:  NAPP is aware that, in connection with this proposed rule, PTO management has repeated the refrain that it cannot "hire its way out of the backlog." Yet, this statement does not appear entirely accurate. For example, an August 2005 report by the National Academy of Public Administration entitled, "U.S. Patent and Trademark Office: Transforming to Meet the Challenges of the 21st Century" contains a ten-page discussion (pp. 40-49) entitled, "Consistent Hiring is the Key to Reducing Pendency and Maintaining Desirable Pendency." *See* http://www.napawash.org/Pubs/PTO-8-25-05.htm

In testimony before the House last year, PTO Director Jon Dudas stated, "If we go to a situation where we are, instead of hiring 860 to 750 a year, if we hire 1,000 new examiners per year, and work on reducing attrition, we can ... turn the pendency corner. This is without competitive sourcing, but with dramatically increased hiring." House

---

[1]     While NAPP does not intend here to endorse all of those initiatives, the point remains that adequate funding is required to reduce pendency.

NAPP Comments on Claim Limit Rules                                    Page 14

A01227

Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 19.
See http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

NAPP agrees with NAPA and Director Dudas. NAPP believes that the PTO can do far more to help reduce backlog by continuing to expand its hiring and training programs than it can ever hope to achieve through difficult and painful rule adjustments directed to claim selection and ESDs.

Funding can help the PTO to attract more qualified examiner candidates, through pay or hiring incentives and funding more frequent exposure to the PTO as a valid career. Funding can help the PTO integrate new examiners into the corps as well.

> _Comment #23._    _To help reduce backlog, the PTO should reconsider its_
> _"count system."_

Explanation:  A number of reports have commented on the difficulties arising from the PTO's antique "count system" for evaluating and compensating examiners. "USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain," U.S. Government Accountability Office Report No. GAO-05-720 (June. 2005), p. 5. See http://www.gao.gov/new.items/d05720.pdf ("Patent examiners' awards are based largely on the number of applications they process, but the assumptions underlying their application processing quotas have not been updated since 1976"); "USPTO should Reassess How Examiner Goals, Performance Appraisal Plans, and The Award System Stimulate and Reward Examiner Production," U.S. Dept. of Commerce Office of Inspector General Final Inspection Report No. IPE-15722 (September 2004). See http://www.oig.doc.gov/oig/reports/2004/USPTO-IPE-15722-09-04.pdf NAPP members have frequently reported and discussed on NAPP's practice mail-list instances in which understandable examiner action driven by the hunt for "counts" has warped and delayed prosecution.

Revamping and updating the examiner compensation and evaluation system to reflect modern realities could produce far bigger benefits for backlog reduction than difficult and painful rule adjustments directed to claim selection and ESDs.

> _Comment #24._    _To help reduce backlog, the PTO should continue to_
> _explore remote-location hiring and off-premises work._

Explanation:  Hiring and recruitment is made more difficult by the fact that the PTO can hire examiners only at its Virginia location. Establishing remote locations for examiners, in desirable areas of the country, could do far more to permit much faster action on applications than difficult and painful rule adjustments directed to claim selection and ESDs.

NAPP applauds the PTO for taking partial steps toward loosening the location issue, by implementing and expanding work-at-home or flex-time programs, but suggests that it devote management time to more fundamental change.

NAPP Comments on Claim Limit Rules

A01228

*Comment #25.    To help reduce backlog, the PTO should look for ways to reverse the trend towards increased attrition.*

<u>Explanation:</u> As Cong. Berman noted, "[A]ttrition remains a serious problem. Only 45 percent of the Patent Office workforce has 5 or more years of service, and in an agency where it takes roughly 5 or 6 years before an employee becomes fully productive, this is a troubling statistic." House Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 12.
*See* http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

The PTO should take seriously the reasons for such attrition. The GAO referred to several "challenges to retention," including "the lack of an effective strategy to communicate and collaborate with examiners"; "According to patent examiners, the lack of communication and a collaborative work environment has resulted in low morale and an atmosphere of distrust that is exacerbated by the contentious relation ship between management and union officials," and "examiners told [GAO] they have to contend with a highly stressful work environment and work voluntary overtime to meet their assigned quotas." "USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain," U.S. Government Accountability Office Report No. GAO-05-720 (June 2005). *See* http://www.gao.gov/new.items/d05720.pdf

Those words should motivate the PTO to focus immediately and seriously on this issue, in collaboration with examiners and the POPA union. Such efforts would seems to have potential to cure, far more promptly and effectively, the productivity and backlog problems than difficult and painful rule adjustments directed to claim selection and ESDs.

## Conclusion

NAPP appreciates the PTO's concern about increasing pendency and backlog and thanks the PTO for the opportunity to provide comments. However, for the reasons stated above, NAPP urges that the PTO reconsider its presently proposed approach. NAPP remains willing to work with the PTO to explore methods for improving the current system and facilitating implementation of such improvements.

Respectfully submitted,

Ron Reardon, President
Louis J. Hoffman, Government Affairs Liaison
NATIONAL ASSOCIATION OF PATENT PRACTITIONERS
napp@napp.org
May 3, 2006

A01229

**Chang, Joni**

| | |
|---|---|
| **From:** | Don Hertz [duff@patentit.com] |
| **Sent:** | Wednesday, May 03, 2006 8:19 PM |
| **To:** | AB93Comments |
| **Cc:** | advocacy@sba.gov; BARNES@SBA.GOV |
| **Subject:** | Comments on Continuation Proposal |

Attached please find a "Response To Request For Comments - Proposed PTO Rules On Claim Limits" from the National Association of Patent Practitioners (NAPP).

Copies with attachment to:

Donald R. Arbuckle, Acting Administrator
THE OFFICE OF INFORMATION AND REGULATORY AFFAIRS
OFFICE OF MANAGEMENT AND BUDGET
New Executive Office Building, Room 10202
725 17th Street, NW.
Washington, DC 20503
Attention: Desk Officer for the Patent and Trademark Office
**Via fax (202) 395-6566**

Thomas M. Sullivan
Chief Counsel for Advocacy
SMALL BUSINESS ADMINISTRATION
advocacy@sba.gov

Carrol L. Barnes
Assistant Chief Counsel for Advocacy
SMALL BUSINESS ADMINISTRATION
BARNES@SBA.GOV

5/5/2006

A01230