# EXHIBIT 13

Dockets.Justia.com

**Chang, Joni**

| | |
|---|---|
| **From:** | Don Hertz [duff@patentit.com] |
| **Sent:** | Wednesday, May 03, 2006 3:54 PM |
| **To:** | AB93Comments |
| **Cc:** | advocacy@sba.gov; BARNES@SBA.GOV |
| **Subject:** | Comments on Continuation Proposal |

Attached please find comments on the continuation proposal from the National Association of Patent Practitioners (NAPP).

Copies with attachment to:

Donald R. Arbuckle, Acting Administrator
THE OFFICE OF INFORMATION AND REGULATORY AFFAIRS
OFFICE OF MANAGEMENT AND BUDGET
New Executive Office Building, Room 10202
725 17th Street, NW.
Washington, DC 20503
Attention: Desk Officer for the Patent and Trademark Office
**Via fax (202) 395-6566**

Thomas M. Sullivan
Chief Counsel for Advocacy
SMALL BUSINESS ADMINISTRATION
advocacy@sba.gov

Carrol L. Barnes
Assistant Chief Counsel for Advocacy
SMALL BUSINESS ADMINISTRATION
BARNES@SBA.GOV

A02611

**RESPONSE TO REQUEST FOR COMMENTS**
**PROPOSED PTO RULE ON CONTINUATION PRACTICE**
Submitted by: <u>The National Association of Patent Practitioners</u>
**Ron Reardon, President**
**Louis J. Hoffman, Government Affairs Liaison**
**May 3, 2006**

## <u>Introduction</u>

The following comments are presented in response to the request for public comments published by the United States Patent & Trademark Office (PTO) in the Federal Register Vol. 71, No. 1 (70 Fed. Reg. 48) dated January 3, 2006, concerning proposed changes to continuing practice under consideration.

The National Association of Patent Practitioners (NAPP) is a nonprofit trade association for patent agents and patent attorneys. NAPP has approximately 500 members in 13 countries. The patent practices of the practitioner members are focused primarily on patent prosecution, namely practice before the PTO. As part of NAPP's mission statement, we aim to create a collective nationwide voice to address issues relating to patent prosecution practice. For more information about NAPP, visit www.napp.org.

NAPP speaks for a significant share of patent agents and a fair number of patent attorneys. Approximately one in every 20 active U.S. patent agents is a member of NAPP. NAPP's roster also includes hundreds of patent attorneys, generally those actively involved in patent prosecution before the PTO. NAPP practitioners who are attorneys represent clients not only in patent prosecution but also in defending clients against infringement charges, licensing patents, and advising on patent strategy.

In preparing this document, comments from members of NAPP, who participate in our daily e-mail discussion group, were solicited and collected. Those members most interested in the subject volunteered to work on drafting or reviewing the comments. Accordingly, we believe that the information provided here is representative of the prevailing wisdom of NAPP members, as reflected in postings on the daily e-mail discussion list.

NAPP welcomes the opportunity to comment on the PTO's proposed rule and hopes that the detailed nature of its comments will assist the PTO in its work.

A02612

## Executive Summary

NAPP acknowledges the PTO's interest in reducing backlog and the significance of the backlog to the detriment to PTO operations and the integrity and relevance of the U.S. patent system. NAPP recalls that previous PTO administrations sought or advocated for legislative changes like early publication (at 18 months) at a time when the average first action pendency for an application was 14 months, and the PTO essentially promised Congress and the American people and inventor community that it would reduce the backlog. *See* 35 USC §154(b)(1)(A)(i). Unfortunately, for a variety of reasons, some outside PTO control, the average backlog has grown to nearly 22 months, for applications examined in the last calendar quarter of 2005. http://www.research.usf.edu/pl/FAQ2.html

NAPP opposes the PTO's suggestions for addressing the backlog by adjusting the rule on continuations. The proposed rule, if passed, would take a meat axe to an important aspect of the American patent system yet achieve only marginal improvement in – indeed more likely even worsen – the backlog problem. The proposed rule suffers from a myriad of significant problems, in procedure, in concept, and in details.

NAPP presents a variety of separately numbered comments, for the PTO's ease in summarizing and considering them in its response to comments. The comments are divided into several categories, summarized in the table of contents that follow this executive summary.

NAPP urges the PTO to shelve, or at least more carefully reconsider, this ill-conceived attempt at backlog improvement.

Although obviously seriously concerned with the problems posed by the present rule proposal, NAPP pledges to work closely with the PTO to address the growing pendency problem creatively and more effectively. At the PTO's request, NAPP and its members would be willing to help in any way deemed appropriate.

A02613

**Table of Contents**

**A.   THE PROPOSED LIMITS ON CONTINUATIONS WOULD BE UNWISE.... 1**
*Comment #1.    The main motivation for the rule is insufficient because the PTO ought not to pass a rule restricting application filings for the purpose of reducing its workload.* ......................................................................................................................... 1
*Comment #2.    The secondary motivation for the rule is insufficient because continuations provide a valuable tool for inventors trying to protect legitimate inventions in good faith, and abuse appears relatively rare.* ............................................................ 2
*Comment #3.    The proposed rule fails to take into account that writing claims "up front" is not always possible or realistic.* ................................................................. 3
**B.   THE PROCEDURE IN PROPOSING THIS RULE SHOULD BE IMPROVED** ......................................................................................................................... 4
*Comment #4.    The PTO should solicit input through requests for comment on a "green paper" or issue a notice of intent, and hold hearings, to develop consensus on backlog-reduction and continuation strategies.* ............................................................... 4
*Comment #5.    The PTO should not pass this rule without a cost-benefit analysis.* ....... 4
*Comment #6.    The PTO should consider changes to continuing application practice only in coordination with its work on restriction requirements.* ........................................ 5
*Comment #7.    The PTO should consider implementing changes to continuing application practice only after pilot program testing.* ......................................................... 5
**C.   THE PROPOSED RULE WOULD BE INEFFECTIVE** ...................................... 5
*Comment #8.    The proposed rule will increase, rather than decrease, backlog because of the relatively small frequency of second or later continuations and the likely reactions of applicants to the proposed rule.* .................................................................................. 6
*Comment #9.    The proposed rule will cause applicants to file more applications, thereby offsetting or eliminating any backlog reduction.* .................................................... 7
*Comment #10.    The proposed rule will cause applicants to file permitted continuing applications more frequently, thereby offsetting or eliminating any backlog reduction.* .... 8
*Comment #11.    The proposed rule will cause applicants to file more frequent appeals, thereby offsetting or eliminating any backlog reduction and increasing appeal backlogs.* . ......................................................................................................................... 8
*Comment #12.    The proposed rule will cause some applicants to file original applications with at least one defect, to reduce the chance of receiving a first action allowance, thereby offsetting or eliminating any backlog reduction.* ................................... 9
*Comment #13.    The proposed rule will create uncertainty from, and divert PTO resources to, litigation on the question of whether the PTO has the power to decline to examine applications permitted under Section 120.* ....................................................... 10
**D.   THE PETITION PROCESS IN THE PROPOSED RULE REQUIRES IMPROVEMENT** ................................................................................................... 11
*Comment #14.    The proposed rule should specify what standards will be applied in allowing exceptions through petitions.* ........................................................................... 11
*Comment #15.    The proposed rule's "could it have been filed earlier" test is inappropriate because it is essentially impossible to meet and undefined.* ...................... 12
*Comment #16.    The proposed rule should allow for additional continuations if reasonably necessitated by health or disability of at least one co-inventor who applicant considers necessary to prepare claims.* ......................................................................... 13

A02614

*Comment #17.*  *The proposed rule should allow for additional continuations if the delay in filing the claims arose from excusable neglect.* ........................................................... 13

*Comment #18.*  *The proposed rule should allow for additional continuations if the delay in filing the claims arose from practitioner error or inaction or other reasons not the fault of the applicant or assignee.* ..................................................................................... 13

*Comment #19.*  *The proposed rule should allow for additional continuations if new claims are deemed appropriate to address newly located prior art references, whether brought to applicant's attention by the examiner, by a third party, by chance, or through a search.* ..................................................................................................... 14

*Comment #20.*  *The proposed rule should allow for additional continuations if applicant learns of an interfering patent or application and wishes to copy the claims.* . 15

*Comment #21.*  *The proposed rule should allow for additional continuations if an applicant switches practitioners in good faith and certifies that he or she was dissatisfied with the original practitioner's claim drafting for the application.* ................................. 15

*Comment #22.*  *The proposed rule should allow for additional continuations if, at any time, an applicant wishes to issue a subset of the claims that the PTO has allowed and pursue the remainder in a continuation.* ......................................................................... 16

*Comment #23.*  *The proposed rule should allow for additional continuations if an applicant wishes to have a terminal disclaimer apply to some but not all claims; alternatively, the PTO ought to amend its rules on terminal disclaimers to allow the disclaimer to apply to less than all of the claims.* ........................................................ 16

*Comment #24.*  *The proposed rule should allow for additional continuations if filed within a "safe harbor" period after the first non-provisional filing date, say three or five years.* ............................................................................................................................ 17

*Comment #25.*  *The rule should provide an exception for RCEs designed to further prosecution, not treat them the same way as voluntary continuations adding a brand new claim set.* ...................................................................................................................... 18

*Comment #26.*  *For common fact patterns justifying an exception, the applicant should not have to file a petition to gain the extra continuation.* ................................................ 19

*Comment #27.*  *If circumstances justifying an exception exist, the applicant should be allowed to file an extra continuation, no matter when, and in which application, such circumstances occurred.* .................................................................................................. 20

E.   OTHER   ASPECTS   OF   THE   PROPOSED   RULE   REQUIRE IMPROVEMENT ........................................................................................................... 21

*Comment #28.*  *Transitional rules should be created, not counting continuation applications filed before 2006, to mitigate unfairness for pending applications and to avoid a "bump" in continuation filings.* ........................................................................ 21

*Comment #29.*  *If the number of sequential applications must be limited to a specified number, the number should be three, not two.* ................................................................ 22

*Comment #30.*  *A continuation should be permitted even if an RCE has been filed in the parent application.* ...................................................................................................... 23

*Comment #31.*  *The PTO should rethink the rules on "patentably indistinct claims" and review double-patenting rejections in their entirety.* ................................................. 24

A02615

F.    THE PROPOSED RULE WILL IMPOSE MORE COST THAN PLANNED ....
................................................................................................................ 25
*Comment #32.* *The rule will require searches, as a practical matter, which will increase cost significantly.* ............................................................................. 26
*Comment #33.* *The rule will require higher attorney/agent fees for claim drafting, making applications and responses to office actions more expensive.* ............................. 26
*Comment #34.* *The rule will require filing of all divisional applications at once.* ....... 27
*Comment #35.* *The rule will cause an increase in malpractice litigation for failing to draft claims soon enough.* .................................................................................. 27
*Comment #36.* *The rule will impose costs for reviewing all presently pending applications.* ................................................................................................ 28
*Comment #37.* *The rule will disproportionately impact important inventions or inventions that are difficult to claim.* ................................................................... 28
G.    THE   PROPOSED   RULE   WILL   HARM   SMALL   BUSINESS
SIGNIFICANTLY ........................................................................................ 28
*Comment #38.* *The statistics show that second and subsequent continuations, essentially banned by the proposed rule, are disproportionately filed by individuals and small businesses.* ................................................................................................ 28
*Comment #39.* *The cost from searching and higher claim-drafting fees will fall disproportionately on individuals and small businesses.* ................................................ 29
H.    ALTERNATIVES TO THE PROPOSED RULE CAN MORE LIKELY
ACHIEVE BACKLOG REDUCTION ................................................................ 29
*Comment #40.* *To reduce backlog, the government should fully fund the PTO and subsidize, not tax, its operations* ........................................................................... 29
*Comment #41.* *To help reduce backlog, the PTO should continue to expand its hiring and training programs.* .................................................................................... 30
*Comment #42.* *To help reduce backlog, the PTO should reconsider its "count system."* ................................................................................................................ 30
*Comment #43.* *To help reduce backlog, the PTO should continue to explore remote-location hiring and off-premises work.* .................................................................. 31
*Comment #44.* *To help reduce backlog, the PTO should look for ways to reverse the trend towards increased attrition.* .................................................................... 31
*Comment #45.* *To help reduce long-pending series of continuations, the PTO should follow the MPEP's stated standard of examining applications by effective filing date.* .. 32
*Comment #46.* *The PTO should consider rules disallowing continuations filed without substantive prosecution (Bogese-type) or where intentional applicant stalling seems present.* ................................................................................................ 33
*Comment #47.* *The PTO should consider rules allowing continuations-IN-PART only in exceptional cases.* .................................................................................... 33
*Comment #48.* *The PTO should consider rules requiring applicants to specify the text or drawings added to provisional or foreign applications in non-provisional U.S. applications.* ................................................................................................ 34
*Comment #49.* *The PTO should impose extra fees on later continuations instead of abolishing them.* ............................................................................................. 35
*Comment #50.* *The PTO should carefully analyze the option of generating significant backlog reduction by allowing applicants to defer requests for examination.* ................... 35

A02616

**NAPP's Specific Comments**

## A.    THE PROPOSED LIMITS ON CONTINUATIONS WOULD BE UNWISE

NAPP believes that the benefits of limiting continuation filings are far outweighed by the disadvantages of passing this proposed rule at all. NAPP presents the following comments on that general subject.

> *Comment #1.    The main motivation for the rule is insufficient because the PTO ought not to pass a rule restricting application filings for the purpose of reducing its workload.*

<u>Explanation:</u> The main argument presented by the PTO for the rule is that the PTO must do something about the growing backlog and that other alternatives to this rule (such as increased hiring) would not help sufficiently. It seems clear that the PTO would not consider passing this rule absent the difficult backlog problem. In essence, the thrust of the PTO's proposed rule is to reduce the number of applications that it examines to match more closely its perceived ability to examine applications.

NAPP challenges the underpinnings of the PTO's entire thinking on this subject. The main purpose of the PTO's patent operation is to examine patent applications. If application filings increase, in all likelihood, this will provide added benefits to the American people from the increased innovation. The PTO should work hard to adapt to larger numbers of applications, rather than trying to encourage inventors to file less often.

The PTO's proffered motivation of reducing the backlog would justify even more extreme rules that no reasonable person would consider appropriate, such as permitting each applicant to file only a certain number of applications per year, or restricting each application to only a single claim. NAPP recognizes that there is a difference between an application filing and a continuation application, which involves a refiling. Yet there is no principled distinction: If continuation filings benefit the American patent system, on balance – and NAPP believes that they do (*see, e.g.,* comment #2 below) – then the PTO should not restrict those benefits for the purpose of backlog reduction.

Using the backlog of patent applications as the justification for the rule raises difficult questions that the PTO has not answered: For example, if the backlog worsens even more, will the PTO consider yet further restrictions in application filings? By contrast, if the backlog improves for other reasons, will the PTO remove the restrictions on continuations? These unanswered questions highlight that tying rule changes to a possibly temporary backlog problem is not justifiable.

In sum, NAPP believes that backlog reduction (although a salutary goal) is an entirely inappropriate motivation for changing rules relating to what sorts of applications the PTO will examine. The PTO should not shirk its duty to examine all applications, no matter how difficult that task becomes.

A02617

*Comment #2.*     *The secondary motivation for the rule is insufficient because continuations provide a valuable tool for inventors trying to protect legitimate inventions in good faith, and abuse appears relatively rare.*

Explanation:  The PTO's secondary argument is that the proposed rule would reduce the delayed issuance of claims, through continuation filings, which often presents a problem for industry.  A few early-commenting parties have mentioned such difficulties presented by continuations.

NAPP observes that this argument fails to recognize the benefits from continuation filings.  There are legitimate reasons for not restricting continuation applications through the proposed rule, including the following:

1.     Continuation practice enables the prompt issue of allowed claims, even if the applicant and PTO disagree on the allowability of other patent claims.  The early issuance of allowed claims benefits inventors and the public alike.

2.     Continuations allow applicants to adjust claims to accommodate prior art references discovered relatively late in the prosecution process.  *See* comment #3 below.

3.     Continuations allow applicants to protect an invention from a "design-around" attempt by potential competitors that would otherwise act as a fraud on the patent by evading the coverage of original claims while practicing the core or spirit of the invention.  The courts have become increasingly sparing in protecting inventions through the doctrine of equivalents, issuing a number of rulings precluding reliance on that doctrine.  As the courts have cut back on the doctrine of equivalents, which was designed to protect inventors against such conceptual theft without literal infringement, inventors have relied increasingly on continuations to protect inventions with additional claims, drafted with specificity, thus providing public notice of any expanded scope of protection.

NAPP believes that those commenting parties who represent infringement defendants seek to inveigle the PTO to cut off the continuation vehicle so that they and their clients can have an even more free hand to evade patent protection on legitimate inventions.  Such results-oriented reasoning ought not to influence the PTO's thinking.  The PTO ought not to use its rulemaking authority to protect accused infringers against patentees.

On the other side of the equation, there is little evidence of any significant quantity of unfair abuse from continuation filings.  In no more than a handful of cases has there been even the slightest shred of evidence that an applicant used continuation practice to delay issuance of claims intentionally or sought to cover an invention that he or she did not have a right to cover.  The problem of abusive continuation refiling has diminished as a result of the 20-year term (35 USC §154(a)(2)) and 18-month publication (35 USC §122(b)) statutory changes.  There is no evidence in the PTO record that any significant number of abusive continuations has ever existed, much less that abusive continuations

NAPP Comments on Continuation Rules                                    Page 2

exist in sufficient quantities to justify restricting the vehicle generally. The PTO can handle any abuses in continuation filings through other means, including more targeted rules. *See* comment #46, below.

In sum, NAPP believes that continuation filings, more often than not, assist in protecting legitimate inventions through a procedural vehicle that does more good than harm. It is not a legitimate justification for this rule, therefore, that it would reduce inventors' ability to file continuations.

> *Comment #3.*    *The proposed rule fails to take into account that writing claims "up front" is not always possible or realistic.*

Explanation: The main practical impact of the proposed rule would be to allow the PTO to refuse to examine any claim presented by an applicant after a certain point in the application sequence. Under the proposed rule, in essence, an applicant would be entitled to present revised or new claims once in response to the examiner's first search and office action (FAOM) and once again in a single continuation, but not thereafter. The PTO should realize that it is impossible for diligent applicants and their practitioners, in every instance, to draft all possible claims by those points in the sequence.

The reality is that patent applications, and especially patent claims, "constitute one of the most difficult legal instruments to draw with accuracy." *Topliff v Topliff*, 145 U.S. 156, 171 (1892). Defining the proper scope of many inventions is not easy.

A PTO search done on a first draft of the claims presented with an original application filing (in combination with whatever searching applicant did privately) does not always uncover enough information about prior art to allow reliable drafting to all possible additional claims for the continuation filing. A PTO examiner's supplemental search on a single continuation might require adjustment of the continuation claims or lead to additional claim-drafting ideas that perhaps would be better dealt with in a second continuation than in the first.

Without seeming to denigrate PTO examiners, it is also the case that PTO searches are of widely varying quality. If a patent search fails to uncover a significant reference or set of references, then the patent applicant may believe that the invention can be claimed more broadly than appropriate. While later events might alter applicant's view, this may not occur in time to permit filing new claims before the time limit set by the proposed rule.

Additional ways to word claims to an invention can be triggered also by such events as receipt of interfering or nearly interfering applications, discovery of related products on the marketplace, feedback from accused infringers, or interviews with new experts or technical personnel in the ordinary course of business.

Reexamination or reissue of a patent once issued does not provide an adequate alternative to continuation filings, because those procedures generate intervening rights for

A02619

applicants relying on the wording of the claims as issued – a problem that does not exist for patents issuing from continuation applications.

In many instances, in sum, applicants acting in the best of faith, or their attorneys or agents, may not appreciate fully how to claim an invention as broadly as possible without "stepping on" prior art inventions with the limited quantity of feedback available before expiration of the time set by the PTO for filing all possible claims. In such cases, penalizing an inventor of a potentially major technological advance by disallowing them the right to secure adequate patent protection seems unduly harsh.

## B.    THE PROCEDURE IN PROPOSING THIS RULE SHOULD BE IMPROVED

NAPP believes that the procedure in issuing this notice of proposed rulemaking has been inadequate and requests the PTO to reconsider its procedure. NAPP presents the following comments on that general subject.

> _Comment #4._    _The PTO should solicit input through requests for comment on a "green paper" or issue a notice of intent, and hold hearings, to develop consensus on backlog-reduction and continuation strategies._

Explanation:  In soliciting comment on a similarly difficult problem, namely on the question of possible changes to restriction practice, the PTO issued a "Green Paper" with alternatives and requested comments from the public. Federal Register, Vol. 70, No. 107 (70 Fed. Reg. 32761) (June 6, 2005). Prior rules of equal significance have been implemented only after significant public hearings. Various PTO officials have traveled the country discussing the proposed "roadshow" events have given no significant opportunity for practitioners and members of the public to comment.

A process similar to the "Green Paper" should have been followed here, where the proposed rule solicits comments preparatory to a final rule without any consensus among PTO examiners, management, and interested stakeholders (to put it mildly). It is not too late to "return to the drawing board" and solicit input for creative ways to improve continuation practice or reduce backlog.

If the main goal of the proposed rule is to reduce backlog, then the PTO should not consider these changes – which many believe would significantly harm the ability of inventors to protect their inventions adequately, at least in some cases – without consideration of alternatives that might offer at least equal backlog reduction with less chance of damage.

> _Comment #5._    _The PTO should not pass this rule without a cost-benefit analysis._

Explanation:  Nothing in the proposed rulemaking reveals that the PTO has considered the cost-benefit of the proposed rule as a whole (as opposed to mere paperwork collection

A02620

costs). The proposed rule will have significant impact, pro and con, on the patent system, and (for reasons explained herein) will impose significant burden, not only in terms of the petition fees for exceptions but also in terms of increased attorney hours in writing claims at early times in applications that might never become patentable or important to the client. The PTO should not implement a rule of this magnitude without careful consideration or estimates of the costs to applicants compared to the level of proposed benefit.

> *Comment #6.* *The PTO should consider changes to continuing application practice only in coordination with its work on restriction requirements.*

**Explanation:** As noted in comment #4 above, the PTO has requested comments on possible changes to restriction practice because of serious concerns over the fragmentation of applications occurring under the current restriction system. Because of the close relationship between continuation and divisional applications, rules on restriction requirements can have a material impact on continuation practices, and vice versa. Accordingly, the PTO should defer the proposed rule until they can be coordinated with restriction rules.

> *Comment #7.* *The PTO should consider implementing changes to continuing application practice only after pilot program testing.*

**Explanation:** The notice includes a number of assumptions that could profitably be tested using pilot programs. For example, a select art unit or sample of applications could be drawn and the time spent examining second and subsequent continuations actually logged and compared with total examination time. Such an experiment would give some estimate of the maximum amount of time that could be gained if such applications were essentially barred as proposed by the rule.

For another example, the PTO could log time spent, for a sample of applications, examining or checking for potential double-patenting issues.

As one former high-ranking PTO official, Mr. Charles Van Horn, testified to Congress: "[B]efore [PTO] seeks to limit the number and availability of continuing applications, it should conduct a study of these applications, when, why and in what technologies they are being filed, to determine the most responsible way to reduce their numbers." House Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 58.
*See* http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

## C.    THE PROPOSED RULE WOULD BE INEFFECTIVE

NAPP believes that limiting continuation filings in the way specified in the proposed rule (as is or with any small modifications) will not achieve the purposes that the proposal was designed to achieve, especially with respect to purported reduction of

NAPP Comments on Continuation Rules

A02621

backlog or average pendency. NAPP presents the following comments on that general subject.

> Comment #8.    *The proposed rule will increase, rather than decrease, backlog because of the relatively small frequency of second or later continuations and the likely reactions of applicants to the proposed rule.*

Explanation:  The proposed rulemaking itself indicates that the quantity of second or subsequent applications under the rule approximates 4-5% of the total number of applications. 71 FR 57. The proposal further comments that value of examiner-applicant exchanges tend to decrease for later continuations. 71 FR 51. The time examiners spend on the average later continuations, accordingly, would seem likely to be smaller than the time spent on the average original applications. Also, the proposed rule permits second or subsequent continuations in some instances, such as a continuation of a division. For all of those reasons, it seems that the amount of examiner time that could possibly be saved by the proposed rule's central provision is less than the theoretic maximum of about 4% of all examiner time. NAPP estimates that the gross savings of examiner time would be a small fraction of the 4% maximum.

Moreover, the above-stated maximum savings would be offset by additional time required by the rule, if passed, for at least the following reasons:

> 1.    A likely outcome is increased frequency of filing extra original applications; accordingly examiner time savings will be offset by added applications in permitted categories.

> 2.    As indicated in a comment below, examiner time will be shifted from continuation examination to defending appeals.

> 3.    Examiner time savings will be consumed by examination of an increased number of claims in the original application and permitted continuations, because an applicant cannot count on pursuing additional claims in subsequent continuations.

> 4.    Examiner time savings will be consumed by issuing more first-action rejections instead of first-action allowances.

> 5.    Any PTO time savings will be offset by the need to decide petitions for permission to file "extra" continuations.

In all, NAPP believes that the net impact of the proposed rule would be to increase the backlog and waste examiner time compared to the present system. The main reason is the increased frequency of filing applications with more claims and the likelihood that applicants will take and continue to pursue more aggressive positions.

NAPP Comments on Continuation Rules                              Page 6

A02622

Presently, applicants can present issues of patentability to examiners using a selected set of claims, comfortable with the knowledge that, once the boundaries of patentability are decided and disputes resolved, using the original claim set, one or more continuations can be submitted to "flesh out" the scope of protection, without fear of loss of rights.

Applicants choose to submit such targeted claim sets for a variety of reasons. Sometimes, applicants file an abridged claim set to focus and resolve a dispute with the examiner. Other times, applicants are uncertain whether commercial realities will make a proposed patented invention marketable or capable of being funded. Still other times, applicants may choose to submit only narrow claims, to gain the benefit of the examiner's search before deciding how to broaden the claims.

In such instances, an applicant might decide later to pursue additional claims in a continuation, for example if the dispute is resolved in favor of patentability, or if the product appears marketable or is funded sufficient to justify spending more money on claim-drafting fees, or if the examiner's search does not find close prior art. On the other hand, in some instances, the applicant will elect not to file for additional claims.

The proposed rule would provide substantial incentive for applicants to present all claims at the earliest possible dates. Accordingly, applicants will respond by filing more claims in more cases, resulting in original and permitted continuations having larger numbers of claims.

The proposed rule would also provide a substantial incentive for applicants to take more aggressive positions regarding the breadth of possible claim coverage, and to fight rejections, because if dropped, it may not be possible to pursue such broader coverage in a continuation given the restrictions of the rule.

> ### Comment #9.    *The proposed rule will cause applicants to file more applications, thereby offsetting or eliminating any backlog reduction.*

Explanation:  Under the proposed rule, applicants will more likely file separate original applications for multiple aspects of an invention. Such a strategy would increase the number of "vehicles" for possible claims that might be developed or considered needed later. If an applicant files two applications with the same specification, he or she is entitled to two "first" continuations, whereas if the applicant files only one original application, he or she is entitled to only one "first" continuation.

Moreover, if one of the two applications is processed more slowly than the other, applicant has a "second" continuation available at a later time in the examination process. An applicant can virtually ensure such a result, for example, given current backlogs, by filing a copy of a typical application with "business method" patent claims, because that art unit has an extreme backlog. The applicant then will likely receive a first action on the main application at an average of 20 months after filing, giving a chance to file a continuation around the two-year mark, and the applicant will likely receive a first action

A02623

on the business method counterpart around 40 months after filing, giving a second chance to file a continuation around the four-year mark.

>    *Comment #10.*    *The proposed rule will cause applicants to file permitted continuing applications more frequently, thereby offsetting or eliminating any backlog reduction.*

**Explanation:** Under the proposed rule, applicants will more likely file "permitted" continuations. In particular, NAPP believes that, in cases where an original application has been restricted into several divisions and the original application is nearing the conclusion of prosecution, the proposed rule will urge applicants to file a continuing application as a precaution, as well as all divisional applications. The proposed rule will push applicants to adopt this strategy because, while the proposed rule permits a continuation of a divisional application filed before termination of proceedings on an original application, filing a precautionary continuation of the first application gives applicants an extra vehicle for securing claims, and the proposed rule prevents applicants from filing divisionals in series.

By contrast, under current practice, in many instances, applicants will adopt a "wait and see" posture, such as by, in the scenario discussed above, allowing a first divisional to proceed through examination before deciding on further continuations or additional divisional filings. Applicants often take that strategy for many reasons, including gaining more full development of the examiner's search and position on patentability, or simply waiting to see how the market develops and how successful the product will be.

In many instances, applicants never get around to filing deferred continuations or divisions, either because market realities make them unimportant or because art or examiner positions uncovered during earlier examinations make it clear that deferred filings will be futile.

Presently (FY2005), continuations (including CIPs) account for about 14% (44,500 of 317,000) of all applications, and divisions account for about 6% (18,500 of 317,000). 71 FR 50. Thus, only about 20% of all applications are continuing applications. If the new incentives in the proposed rule induces that figure to rise from 20% to 22% (meaning that it is just 10% more likely that an applicant will file a continuation or division), then any possible savings from the strict elimination of second and later continuations would be entirely offset.

>    *Comment #11.*    *The proposed rule will cause applicants to file more frequent appeals, thereby offsetting or eliminating any backlog reduction and increasing appeal backlogs.*

**Explanation:** The proposed rule strongly encourages applicants to file appeals more frequently. In one common scenario occurring under present law, an examiner rejects some but not all of the claims and applicant files a continuation to continue to advocate for allowance of the rejected claims. Another common scenario is for an applicant to try

A02624

to work out a mutually acceptable solution with the examiner by proposing an after-final amendment and, if the examiner appears agreeable, filing an RCE to gain allowance, even if the applicant believes that the examiner took an incorrect position with respect to the originally worded claims.

Under the proposed rule, by contrast, either an applicant cannot take the RCE or continuation approach at all, or doing so would use up applicant's "one free shot" at a continuation. Applicants plainly will react by filing appeals more frequently rather than trying to work things out with the examiner, especially after final.

The PTO just succeeded in reducing the backlog of appeals, after much work and effort. 71 FR 51. The PTO also instituted a pre-appeal-brief conference program, which has shown some success in avoiding unnecessary appeals. NAPP commends the PTO's efforts. It would be a great shame if the logical reactions to this rule reversed those gains. Yet that appears quite likely to occur.

> *Comment #12.    The proposed rule will cause some applicants to file original applications with at least one defect, to reduce the chance of receiving a first action allowance, thereby offsetting or eliminating any backlog reduction.*

Explanation:   Under the proposed rule, for an application in which no restriction requirement exists and that undergoes normal compact prosecution, an applicant may present new claims at the time of filing an original application, in response to the first office action, upon filing a first continuation, and in response to an office action in the first continuation. (Other times are possible, because of the possibilities of preliminary or supplemental amendments, but they are equivalent in terms of the information available to applicant.) The point of importance here is that the issuance of a first office action gives applicants an extra chance to submit claims, in anticipation of an expected allowance.

If the proposed rule takes effect, applicants will strongly prefer to preserve the opportunity to submit new claims after the first office action, either in an original application or a first continuation. In the case of a continuation, in particular, applicants will consider the opportunity to add new claims after the first office action as likely the final opportunity to introduce new claims into the chain of applications, because the proposed rule would prevent any second continuation, and existing rule preclude introducing new claims after final rejection or allowance.

Applicants will strongly prefer, therefore, to see the PTO issue a first office action that can be overcome instead of a first action notice of allowance. If the PTO allowed an application, the applicant would lose the chance to introduce further claims.

That applicant preference will encourage some applicants to take action to encourage the desired result. Applicants might submit applications with minor but curable defects to prevent or discourage the issuance of first-action allowances. For example, an applicant

A02625

might submit claims with minor errors (such as antecedent-basis problems) or submit a complete set of claims but include one deliberately overbroad claim as well, to induce the examiner to issue a first action rejecting the overbroad claim only.

One NAPP member has already reported a practice of intentionally submitting applications with minor defects to discourage first action allowances, merely to avoid the cost of filing a continuation to preserve the right to introduce new claims. That member commented that the new rule would cause him to expand that practice, because the ability to submit new claims after first office actions would become even more important.

If the PTO passes the harsh restrictions on claim presentation, it can feel confident that a certain portion of patent applicants and practitioners will look for creative ways to "fight back" by preserving the limited remaining opportunities to present new claims as much as possible.

NAPP predicts that some applicants will adopt this kind of approach, with the consequence that the proportion of applications being allowed on the first action will decrease. Any time savings resulting from examiners not having to examine second and subsequent continuations would be offset by the extra examiner time spent looking at some fraction of remaining applications twice instead of once.

> *Comment #13.    The proposed rule will create uncertainty from, and divert PTO resources to, litigation on the question of whether the PTO has the power to decline to examine applications permitted under Section 120.*

Explanation: It is apparent from the detailed discussion in the proposed rulemaking that the PTO anticipates a serious question of whether it has the power to decline to examine second and subsequent applications. Clearly also, the PTO believes that it has such power under Congressional grants of authority and that such would not be inconsistent with 35 USC §§120-121. Equally clearly, some commenting parties disagree with the PTO's position. *See, e.g., Racing Strollers, Inc. v. TRI Industries, Inc.,* 878 F.2d 1418, 1420-21 (Fed. Cir. 1989) *(en banc)* (35 USC §§ 120-121 are "entitlement provision[s]": "In our view, § 120 gives to any applicant for a patent *complying with its terms* the right to have the benefit of the filing date of an earlier application") (emphasis in original); *In re Bauman,* 683 F.2d 405, 407 (CCPA 1982) (declining to recognize "a nonstatutory exception to the clear language of section 120"); *In re Hogan,* 559 F.2d 595, 604 n.13, 605 n.15 (CCPA 1977) ("the law as set forth in 35 U.S.C. §§ 112 and 120 is the same for all applications, whether of long or short pendency" and "[i]t is immaterial under 35 U.S.C. 120 that the subject matter of [a] claim [in a continuing application] was not specifically claimed in the [parent] application"); *Martin v. Johnson,* 454 F.2d 746, 750, 172 USPQ 391, 394 (C.C.P.A. 1972) ("A patent applicant is *entitled* to the benefit of the filing date of a previously filed application when the requirements of 35 U.S.C. § 120 are satisfied") (emphasis added); *In re Henriksen,* 399 F.2d 253, 254 (CCPA 1968) ("there is no statutory basis for fixing an arbitrary limit to the *number* of prior applications through which a chain of copendency may be traced to obtain the benefit of the earliest of a chain of copending applications, provided applicant meets all the other conditions of the

A02626

statute"); *Technicon Instruments Corp. v. Coleman Instruments, Inc.*, 255 F. Supp. 630, 641 (N.D. Ill. 1966) ("There are no conditions other than those of Title 35 U.S.C. §120"), *aff'd*, 385 F.2d 391 (7th Cir. 1967).

NAPP believes that it would be futile to seek to convince the PTO that its legal position is incorrect. Plainly, key PTO management personnel have made up their minds on that issue. NAPP will leave the legal argument on this point to others.

However, NAPP hopes to persuade the PTO that it should not waste its limited resources litigating this nice legal question. If the PTO issues a final rule that someone challenges on legal grounds, the rule will be suspended while on appeal, and chaos and uncertainty in the patent system will result. To avoid the risk of the court approving the rule, prudent applicants and practitioners will check each pending application for possible continuation filings, and the PTO can expect a peak in such filings. (A similar peak occurred when Congress changed the patent term in June 1995.)

## D.    THE PETITION PROCESS IN THE PROPOSED RULE REQUIRES IMPROVEMENT

NAPP believes that the procedure for securing exceptions to the restrictions on continuation filings is entirely undefined and excessively restrictive. NAPP presents the following comments on that general subject.

> *Comment #14.    The proposed rule should specify what standards will be applied in allowing exceptions through petitions.*

<u>Explanation:</u>  The proposed rule purports to allow applicants to file a petition with fee (presently $400) to seek an exception, allowing for a second or subsequent continuation. However, the rule does not specify any standard or basis for allowing such continuations. Presentations from PTO officials accompanying the roll-out of the rule package have failed to identify any types of circumstances in which the PTO would allow such a continuation; to the contrary, presenters have <u>suggested</u> (although not come right out and said so directly) that the PTO might well reject such petitions in all or nearly all instances. The rule itself certainly contains no standard for reviewing such petitions.

Such an approach is fraught with difficulty. The grant or denial of petitions without any standards would place applicants at the mercy of unfettered discretion by the PTO's deciding official. NAPP strongly urges the PTO to define with specificity the types of circumstances in which petitions would be granted, as well as to establish a workable standard for deciding when to grant petitions in less usual circumstances.

In the comments that follow, NAPP offers some real-world examples and comments on the proper standard.

A02627

> *Comment #15.*    *The proposed rule's "could it have been filed earlier" test*
> *is inappropriate because it is essentially impossible to meet and*
> *undefined.*

<u>Explanation:</u>  The closest thing to a standard is a statement repeated a number of times in the rule package that the rule would prevent second and subsequent applications from introducing claims that "could have been filed earlier."  This is an inappropriately difficult standard, because – by definition – all claims supported by a continuation application, at least in theory, <u>could</u> have been filed earlier, namely in the original application.

Even if a restriction requirement had been entered in the parent, it is possible to argue that applicant could have filed the claim with the original application, before the restriction requirement was entered.  Even if the second continuation is a CIP, and the claim requires the "new matter" for support, it is possible to argue that the CIP could have been filed earlier.  And, this situation would not likely justify a petition to file a second continuing application anyway, because applicant could simply file the application with the "new matter" as an original application and avoid the need for a petition at all.

The PTO's comment about "could have been filed earlier," in any event, fails to articulate a workable and definite standard.  Some examples will illustrate the lack of definiteness:

> 1.    Suppose an applicant were disabled for a lengthy time during application pendency, for health or other reasons (imagine, for an extreme case, a coma) – would the PTO agree that claims could not have been presented earlier?  Or would the PTO take the position that a co-inventor, practitioner, or assignee could have acted for the inventor to present claims earlier?

> 2.    Suppose a practitioner failed to present extra claims desired by a client for excusable neglect (of the sort accepted in petitions to revive abandoned applications for unavoidable delay) – would the PTO agree that claims could not have been presented earlier?  Or would the PTO take the position that the claims "could have" been presented earlier despite the excusable neglect?

> 3.    Suppose new claims come to the applicant's or practitioner's mind as the result of events occurring during prosecution, such as new prior art being uncovered, or an applicant learning of a competing product that implements the central concept of the invention but does not meet some minor and unnecessary claim limitation – in such situations, would the PTO agree that the claims could not have been presented earlier – because the applicant and practitioner never thought of the new claim?  Or would the PTO take the position that the inventor could have presented them earlier by having more perfect foresight?

The rulemaking notice fails entirely to answer, or even suggest answers, to the above sorts of questions.  A proposed rule should not be adopted or finalized if it does not

A02628

specify, quite clearly, the circumstances under which the PTO will accept petitions for further continuing applications.

Subsequent comments present specific suggested standards for the PTO to include should it decide to proceed with a rule.

> *Comment #16.* *The proposed rule should allow for additional continuations if reasonably necessitated by health or disability of at least one co-inventor who applicant considers necessary to prepare claims.*

Explanation: NAPP believes that the suggestion makes sense and is largely self-explanatory. The PTO should allow showings of necessity because of health or disability reasons. It is no answer that a practitioner can file a claim, because practitioners require client input, information, and approval.

> *Comment #17.* *The proposed rule should allow for additional continuations if the delay in filing the claims arose from excusable neglect.*

Explanation: Again, NAPP believes that the suggestion makes sense and is largely self-explanatory. The PTO should allow additional continuations upon a showing roughly equivalent to the standards for petitions for revival on account of unavoidable abandonment.

> *Comment #18.* *The proposed rule should allow for additional continuations if the delay in filing the claims arose from practitioner error or inaction or other reasons not the fault of the applicant or assignee.*

Explanation: The PTO allows applicants to revive patent applications merely with a showing that the applicant did not intend the application to go abandoned. A parallel circumstance should apply for filing additional claims. In circumstances where an applicant in good faith intends to introduce new claims but does not accomplish the result in time, the applicant should have recourse through petition.

For example, in many instances, a practitioner may have a backlog of matters to handle and not have the time to draft a claim set requested by a particular applicant before the PTO allows the application. In some instances, the PTO examiner may allow a first continuation application earlier than would be expected based on average pendency statistics, for example.

Practitioner error or backlogs that are not the fault of the applicant should not be allowed to cause prejudice to an applicant's substantive patent rights. Just as the PTO (or Congress) has established procedures to excuse missed deadlines in nearly all contexts, it should similarly do so here.

A02629

Indeed, this situation justifies an opportunity for a "second chance" even more so than the existing situations. Here, it is not possible for applicants to know for sure when an examiner will pick up and allow an application. Under the proposed rule, if the application is a continuation, doing so will cut off applicant's right to submit new claims. Because this can happen suddenly and at any time, the PTO should allow some way for applicants to submit claims that they intended to submit before the PTO action cut off their chance.

> *Comment #19.    The proposed rule should allow for additional continuations if new claims are deemed appropriate to address newly located prior art references, whether brought to applicant's attention by the examiner, by a third party, by chance, or through a search.*

Explanation: In many instances, new art comes to a practitioner's or applicant's attention that would justify presentation of a modified claim set. For example, an applicant may submit a claim set that he or she believes is perfectly patentable only to change that claim set when the examiner cites prior art. New prior art also can come to an applicant's attention through new searches, commissioned for either the application in question or a different application by the same inventor or assignee. New prior art also can be located through the course of business, and recall that prior art can include commercial activities, not just patents and publications, which might come to an applicant's attention. Finally, if an applicant has an issued patent from an original application, that patentee might have presented the patent to an accused infringer or a potential licensee, who might have responded by citing items of prior art not previously considered.

While it has been observed many times that good patent practitioners aspire to present claims offering protection from broad to narrow, this observation does not cure the problem. It is not always possible for practitioners to anticipate how a claim might be required to be narrowed in response to unanticipated prior art. The scope of protection of an invention presents a multi-dimensional problem. Claims can be narrowed in many different ways from any initial starting point.

Especially given the PTO's efforts to reduce the number of claims filed through fee increases, in many cases one would expect that an existing claim set will not contain any claim that adequately evades a newly located piece of prior art, yet the specification would support a claim narrowed in a different way to define a patentably distinct invention.

If a new piece of prior art arises at a time when applicant has "used up" the chance to file a further continuation – and it is not possible for applicant to present new claims in the pending application – then the PTO should permit the filing of a second continuation upon applicant's certification that the second continuation addresses a piece of prior art recently found for the first time.

For example, take a situation where an applicant gains a patent on an original application, files the one permitted continuation with a second claim set, receives a first office action

·A02630

rejecting the claims (for whatever reason), and responds with an amendment that should put the application in condition for allowance. A new piece of material prior art comes to applicant's attention after the response, either before or after the examiner acts to allow the amended claim set. Under current rule, applicant presumably must cite the reference but does not have the unrestricted right to file an amendment to present new claims. 37 CFR §§ 1.111(a), 1.312; MPEP 714.03(a), 714.16. If applicant believes that additional claims are desired to sharpen the distinction over the reference but the examiner has already or remains willing to allow the original claim set and an amendment could not or would not be accepted, then the PTO should permit the filing of a second continuation.

To do otherwise would be tantamount to imposing an unacceptable requirement that applicants conduct their own searches. Even with adequate searching, no search can ensure that all material prior art is located.

> *Comment #20.    The proposed rule should allow for additional continuations if applicant learns of an interfering patent or application and wishes to copy the claims.*

Explanation:  If, during pendency of an application (original or continuation), an applicant learns of claims that he or she wishes to copy for purposes of provoking an interference, it is prudent and efficient to file a separate continuation to address the copied claims. Such a continuation ought not to count as applicant's one continuation as of right. Otherwise, the PTO will encourage applicants to mix, in a single application, some copied claims and some non-interfering claims.    Such a procedure would complicate interferences and significantly delay issuance of the non-interfering claims.

> *Comment #21.    The proposed rule should allow for additional continuations if an applicant switches practitioners in good faith and certifies that he or she was dissatisfied with the original practitioner's claim drafting for the application.*

Explanation:  Patent practitioners have a wide variety of skills in claim drafting.  As indicated above, claims that adequately protect inventions are difficult to draft, and there are skillful and not skillful practitioners. Patent applicants sometimes switch practitioners for valid reasons, and new counsel presents a different strategy for drafting claims to protect the invention adequately.

Under the proposed rule, an applicant who comes to realize that an original practitioner did not present adequate claims might have no recourse to allow new counsel to present a better claim set adequately protecting the invention.  The PTO ought not to penalize applicants who do not receive good prosecution services, when the problem is caught within the time permitted for filing continuations under the Patent Act, 35 USC § 120.

NAPP recognizes that if the PTO passes the proposed rule, it would likely not wish to include an exception that would allow applicants to evade the limit on continuations merely by switching practitioners. Accordingly, the proposed rule should allow for such

A02631

an exception only if the applicant certifies that the switch of counsel occurred for valid reasons, specifically not to evade the rule.

Failure to provide relief of this sort can be expected to increase the frequency of malpractice actions and complaints to the PTO's disciplinary arm (OED) arising from charges that an original practitioner drafted an inadequate set of claims, or did not draft such a claim set within the time allowed by the proposed rule.

> *Comment #22.    The proposed rule should allow for additional continuations if, at any time, an applicant wishes to issue a subset of the claims that the PTO has allowed and pursue the remainder in a continuation.*

Explanation:  As indicated above in the comment on appeals, in many instances an office action allows some claims and rejects others.  It is clearly in the interest of the public, the applicant (usually), and the PTO to have those claims that have been allowed issue.

Yet, under the proposed rule, if such a situation occurs in a continuation, applicant cannot permit such claims to issue without forgoing pursuit of the rejected claims because the rule bars applicant from filing another continuation application.  If such a situation occurs in an original application, applicant cannot permit such claims to issue and pursue the rest without "using up" the one permitted continuation.

While the notice of rulemaking says that an applicant could permit allowed claims to issue, 71 FR 51 (middle column, middle paragraph), the statement also makes an exception if this situation occurs in a continuation ("...other than a continuing application..."), and the statement refers to a portion of the proposed rule that makes it clear that the applicant would "use up" the one permitted continuation for this purpose.

The proposed rule should be amended to permit continuations for this circumstance.

> *Comment #23.    The proposed rule should allow for additional continuations if an applicant wishes to have a terminal disclaimer apply to some but not all claims; alternatively, the PTO ought to amend its rules on terminal disclaimers to allow the disclaimer to apply to less than all of the claims.*

Explanation:  Under present practice, if the PTO concludes that some claims of an application are patentably indistinct from a prior patent, then the PTO will enter an obviousness-type double-patenting rejection, applicable only to the subset of claims.  In response, the applicant may file a terminal disclaimer to overcome the rejection, and the application will be allowed.  However, the PTO does not permit a terminal disclaimer to apply to only the rejected claims.  Accordingly, in present practice, applicants typically file a continuation to separate the claims to which the double-patenting rejection applied from the non-obvious claims (the ones not rejected for this reason) and file the disclaimer only in the application containing the rejected claims.

NAPP Comments on Continuation Rules                                     Page 16

Under the proposed rule, an applicant could not follow the accepted procedure, if the situation occurred in a continuation, or would be forced to "use up" the one permitted continuation for this purpose, if the situation occurred in the original application. This should not be the case.

There are two ways the PTO can cure this problem. First, it can amend the proposed rule to permit an additional continuation if this circumstance occurs. Second, it can amend the rule on terminal disclaimers to allow the disclaimer to apply to less than all of the claims. With the 20-year term, the role of terminal disclaimers has been sharply reduced anyway, and it is not clear to NAPP why the PTO's rule requiring disclaimers to apply to a whole patent has any continuing importance (if it ever did). Given the power of computers, the PTO has the ability to identify the expiration dates of various claims on the face of the patent, without excess effort.

> **Comment #24.** *The proposed rule should allow for additional continuations if filed within a "safe harbor" period after the first non-provisional filing date, say three or five years.*

Explanation: In some instances, the PTO will examine certain applications unusually quickly. In some cases, the course of examination will result in the applicant filing the one permitted continuation. Now suppose the applicant notices a new product that copies the core concept of the invention but realizes that the earlier-filed claims contain an unnecessary limitation that precludes infringement. Further suppose that this happens within a short time after the original non-provisional application.

If the PTO had not acted so quickly, then the applicant would not have already filed the continuation, and he or she could have presented new claims in a later-filed continuation to address the potential infringing product. But, because the PTO happened to examine the application more quickly, the proposed rule would cut off the applicant's right to present further claims.

This illustrates an inequity – applicants should not be treated differently depending on the PTO's backlog. In practice today, applicants in the computer and internet areas, where backlogs are long, will have a longer time to file continuations than applicants in chemical or mechanical areas, where backlogs are shorter. There is no reason for happenstance factors to govern the time to present claims.

At least a partial solution can be achieved by allowing applicants the right to file continuations in any number during a fixed period after the first non-provisional filing date. NAPP suggests three years, which matches the standard under the "term guarantee" provision of the AIPA, or five years, to match MPEP 707.02. For most cases, this would even the time to file continuations somewhat by establishing a fixed period for applicants to conclude claim presentation.

A02633

While this would allow some additional continuations, by count, NAPP believes that the PTO could address the problem to avoid substantial additional "rework" from the "extra" allowed continuations. Because such "quickly-filed" continuations would certainly be co-pending with the original or permitted first continuation, the PTO could establish procedures to allow, or require, examiners to examine all co-pending continuations simultaneously, and such would require little added work.

This suggestion remains desirable even though applicants could, in some instances, file new claims during the "safe harbor" period in the original or permitted continuation. First, it is not always true that the applicant retains the right to file new claims in the other applications. Second, even if that could be done, in some instances it is sensible to file new claims in an entirely separate application.

> *Comment #25.*    *The rule should provide an exception for RCEs designed to further prosecution, not treat them the same way as voluntary continuations adding a brand new claim set.*

Explanation:  Under the proposed rule, an applicant can file only one continuation, and an RCE (request for continued examination) in essence counts as that one permitted continuation. This derives from the fact that the rule allows the filing of a continuation or an RCE only if no prior continuation or RCE has been filed before.

There are a variety of possible reasons for RCE filings. One, an applicant may file an RCE simply to cite prior art that has been discovered after allowance of an application. Two, an applicant may file an RCE to further prosecution of an application under final rejection, to allow entry of an amendment to an existing claim set that applicant hopes will place the claims in condition for allowance, which could not be entered after final. Three, an applicant may file an RCE to further prosecution of an application under final rejection, to submit additional evidence that applicant hopes will allow reconsideration.[1] Four, an applicant may file an RCE to pursue a brand new set of claims, in other words, in place of a continuation application.

NAPP understands that, if the rule barring second or subsequent continuations is to work, "Type Four" RCEs, *i.e.*, RCEs that simply substitute for a continuation, ought to be treated the same as a continuation filing. However, there is no good cause to treat the other sorts of RCEs the same as continuations.

The solution, NAPP believes, is to craft appropriate exceptions to the proposed rule's treatment of RCEs. At a bare minimum, "Type One" RCEs, filed to submit art references

---

[1]    For example, after a final rejection based on obviousness, an applicant may decide, rather than appealing, it is more expedient to submit convincing evidence of commercial success.  For another example, an applicant may argue against an anticipation rejection under 35 USC §102(e), and if the examiner disagrees and makes the rejection final, the applicant may decide, rather than appealing, it is more expedient to submit convincing evidence of prior invention under 37 CFR 1.131.

A02634

after final, without claim amendments, should be considered an exception and not counted as an applicant's one permitted continuation.

NAPP suggests that the exception also should cover all RCEs that applicants submit that appear to be a *bona fide* attempt to respond to the final rejection of the claim set of the parent application. The examining corps presently evaluates defective amendments under a similar standard – if an amendment appears to be a *bona fide* attempt to respond to a rejection, the PTO gives applicant a one-month period to correct technical errors.

The NAPP-suggested standard would not treat "Type Two" or "Type Three" RCEs the same as continuations. If an applicant files an RCE for the purpose of submitting evidence or claim amendment designed to overcome a final rejection, this presents a wholly different scenario from continuations intended to submit whole new claim sets that require examiner "rework" on different subject matter.

The proposed rule acknowledges the possibility of "Type Three" RCEs but contends that the applicant has had ample opportunity to submit evidence in the original filing, making the RCE unnecessary in many instances. 71 FR 54. That argument ignores the realities of patent prosecution, particularly the risks associated with submitting evidence, as opposed to argument. In litigation, it is common to attack a patent for invalidity and inequitable conduct arising from statements made (or not made) in evidentiary submissions. For this well-known reason, practitioners will vastly prefer to convince an examiner of a distinction from the prior art, mooting the need to present evidence. On the other hand, if that attempt fails, the practitioner will submit the evidence "late," to secure a patent, on the theory that a patent against which charges (probably unfair ones) can be leveled is better than no patent at all. The proposed rule, in short, inappropriately assumes that the failure to submit evidence before needing to file an RCE is unjustified by anything other than lack of diligence or intent to delay.

> *Comment #26.*    *For common fact patterns justifying an exception, the applicant should not have to file a petition to gain the extra continuation.*

Explanation: The PTO can anticipate in advance of finalizing a rule several commonly occurring situations that justify exceptions to the rule. NAPP has proposed that the PTO allow exceptions for a number of possible circumstances that NAPP deems likely to occur, in comments #16-25 above. The PTO, on its own or through other's comments, may foresee other types of fact patterns that would also justify an exception.

The PTO should amend the rule to provide express exceptions for all fact patterns that the PTO can envision and deems appropriate to justify an exception. In such circumstances, the PTO should not require applicants to file petitions for permission to file the continuation in question. Processing and granting routine petitions of this sort adds paperwork and burdens the PTO, as well as undue expense to blameless applicants, and will delay processing of applications.

A02635

Instead, the PTO should simply set forth in the rule a list of circumstances that are considered to justify an exception and reserve the petition process for unusual fact patterns that would justify an exception but are not so easily envisioned.

> _Comment #27._  _If circumstances justifying an exception exist, the applicant should be allowed to file an extra continuation, no matter when, and in which application, such circumstances occurred._

Explanation:  The proposed rule grants applicants the right to petition to file a second or subsequent continuation by presenting circumstances considered justifying an exception.[2] The rule improperly treats circumstances differently depending on whether they occur in the first or second continuation.

The rule properly addresses the situation where there are circumstances arising in the first continuation that require applicant to file a second continuation.  In that case, the rule allows the applicant to show through petition that the second continuation is justified.

The rule improperly ignores the situation where the same circumstances arise in the original application and require applicant to file a first continuation.  In that case, the proposed rule is worded such that the exceptional circumstances will require applicants to "use up" the one permitted continuation, without any relief.  If an applicant sought to petition to file a second continuation, the proposed rule's test would be whether the claims of the second continuation could have been presented earlier (however that is interpreted), with no accommodation given for the fact that the first continuation was forced, not voluntary.

For example, suppose the PTO set a standard (as it should, _see_ comment #22 above) establishing that it would grant petitions for second continuations to allow applicants to issue allowed claims and file a continuation to continue to prosecute rejected claims.  If an examiner in a first continuation rejected some claims and allowed others, then an applicant could file, or petition to file, a second continuation to address the rejected claims.  But what if the same situation occurred in the original application?  The applicant would be free to file the rejected claims in the first continuation, but that would "use up" the one permitted continuation.  Then, if applicant sought to file a second continuation, the language of the rule would prevent granting the petition because the excusing circumstance did not force or justify the second continuation.

The problem derives from the rule's wording, which focuses on the justification for filing the second continuation.  Instead, the rule should be modified to provide a system of counting continuation.  A properly and fairly drafted rule would, first, establish a definition of a "voluntary continuation."  Under this proposal, the definition would list

---

[2]    Comments #14-25 above have addressed the issue of the vagueness of the standard for such petitions and offered concrete suggestions for types of circumstances that ought to justify an exception.  For purposes of this comment, it does not matter what types of circumstances the PTO considers to justify an exception.

NAPP Comments on Continuation Rules                                    Page 20

various circumstances where the continuation is considered forced or otherwise justified, and a "voluntary continuation" would be one in which none of the excusing circumstances applied. Such a properly drafted rule would, second, express a ban on second and subsequent <u>voluntary</u> continuations in a line of applications.

Such a properly drafted rule would treat excusing circumstances the same regardless of when, and in which application, they occurred. If, for example, an examiner in an original application allowed some claims and rejected others, and the applicant chose to pursue the rejected claims in a first continuation to permit faster issuance of the allowed claims, the filing of that first continuation would be permitted and would not count as the first "voluntary continuation." Accordingly, applicant would not use up the one permitted voluntary continuation, and he or she could use the voluntary continuation as a second continuation.

## E.    OTHER    ASPECTS    OF    THE    PROPOSED    RULE    REQUIRE IMPROVEMENT

NAPP believes that, aside from the petitions process, the proposed rule contains a variety of other defects that require change. NAPP presents the following comments on that general subject.

> *Comment #28.    Transitional rules should be created, not counting continuation applications filed before 2006, to mitigate unfairness for pending applications and to avoid a "bump" in continuation filings.*

<u>Explanation:</u> The proposed rule applies to all pending applications as well as newly filed applications. However, in many applications having parents predating January 3, 2006, the date of the proposed rule, applicants filed continuation applications before that date without any awareness that the PTO might propose a rule of this nature. Nevertheless, under the proposed rule, an applicant would still be barred from filing a second or subsequent continuation (absent an exception). In some instances, had applicant foreseen the rule, he or she might not have "used up" the one permitted continuation filing by filing the pre-2006 continuation. But applicants cannot be expected to have foreseen this rule proposal.

To address the unfairness, the PTO should create a transitional rule for application chains pending on the date the rule is promulgated. Under the transitional rule, for such chains, continuations filed before the promulgation date should not count, and the rule against second and subsequent applications should apply only to second filings post-dating the rule's adoption.

In addition, the PTO should announce, as soon as possible after today, that it intends to implement a transitional rule of this sort. Many NAPP members have announced their intention to review all of their clients' applications for possible continuations, to try to file all possible continuations before the date the PTO adopts a final rule. Just as the change in patent term in June 1995 created a pulse in application filings, including

A02637

continuations and divisions, so too the mere threat to pass this rule will create a pulse in filing continuing applications, because the proposed rule contains no transitional provisions.

The present situation is worse than the situation that happened a decade ago, because applicants and practitioners the last time had about a seven-month advance notice of the June 1995 change in patent term, affording a fair chance to file before the change. This time, the PTO can promulgate a final rule at any time, without any advance notice. Without a transitional provision, such sudden PTO action can change applicants' rights, to their detriment, without warning.

It would pervert the main intention of the rule – to reduce the backlog in the near term – if the perfectly predictable pulse in filings of continuing applications were to cause a short-term increase in the backlog, precisely at a time when the PTO is frantically hiring a large quantity of new examiners to try to make up for the funding shortages of past years. The only way for the PTO to avoid this problem is to create a transitional rule AND to announce, publicly and immediately, the PTO's intent to include transitional provisions, thereby assuring practitioners that they will have a fair chance to file continuations of existing applications before the rule (suddenly and without warning) takes effect.

> *Comment #29.    If the number of sequential applications must be limited to a specified number, the number should be three, not two.*

Explanation:  As indicated above, NAPP believes that there is no good cause to limit the number of continuing applications in a sequence. If the PTO decides to maintain this rule, however, it would benefit the inventor community far more to allow two continuations of an original application, not only one. This is particularly the case if the PTO refuses to exclude the sorts of required or reasonable continuations discussed in several of the comments above.

NAPP believes that a second continuation is in many cases justified. By the time an applicant files a first continuation, it is quite often the case that (1) the PTO has not examined all divisional applications, (2) foreign patent offices with longer backlogs have not examined counterpart applications or even conducted searches in many instances, (3) the product protected by the patent claims has not reached the commercial marketplace, or (4) any disputes about a patent issued from the original application have not matured. Factors of those sorts are quite common reasons for presentation of additional claims through the use of continuations.

Under the proposed rule, NAPP expects that PTO will discover that applicants will petition to seek, in some instances, exceptions to the rule because of the occurrence, after the first permitted continuation, of events of the sorts listed above. If the PTO were to revise the rule to permit a second continuation, in accordance with this suggestion, however, NAPP believes that the frequency of petitions would drop off sharply and the

number of cases where the rule unfairly prevented an applicant from securing adequate protection for an honest invention would be sharply reduced.

By the time an applicant filed a second continuation, uncertainties of the sorts listed above are much less likely to exist, and it is far more reasonable to expect that applicants would have had a reasonable opportunity to file all possible claims.

> *Comment #30.    A continuation should be permitted even if an RCE has been filed in the parent application.*

Explanation:  Under the proposed rule, an applicant can file a continuation application only if there has been no RCE filed in the parent application. Put another way, once an applicant chooses to file an RCE, this will eliminate the chance to file a continuation later. Put yet a third way, an applicant planning to file an RCE may file a continuation only by making such a filing before the RCE filing. That treatment of RCE filings in the proposed rule makes little sense and will lead to odd results.

The main purpose of RCE filings is to allow an applicant to conclude prosecution on an invention claimed in an initial application, by resolving disputes between applicant and examiner. RCEs allow an applicant to present new evidence, make claim amendments not permitted after final rejection, or shift the claims to overcome prior art cited by the examiner. RCEs benefit the PTO and applicants by allowing resolution of disputes without the need to file appeals.

Under the incentives set up by the proposed rule, if an applicant wishes to pursue claims directed to a second invention through a continuation, he or she must file that continuation before the RCE; in other words, before examiner and applicant have concluded efforts to resolve disputes over the original application.

The proposed rule will cause applicants to react in the following ways: (1) appeal more original applications, to avoid cutting off the option of filing a continuation; (2) file more continuation applications just before filing an RCE, as a precaution in case they are needed later; and (3) file more continuations instead of RCEs, because a continuation can include both rejected claims from the original application (with whatever amendments or evidence is desired) as well as claims that the applicant would have put in a continuation. Because the PTO typically takes more time to process continuations than RCEs, the applicant will preserve the right to add continuing claims longer by avoiding the RCE route.  In short, the proposed rule will provide substantial disincentive to use RCE process, which is not helpful to the PTO.

If the PTO remains insistent on trying to restrict the number of continuing applications, it should nonetheless amend the rule to permit applicants to file their permitted continuations at any time during pendency of the parent application, and not restrict the filing to the period before an RCE request.

A02639

*Comment #31.    The PTO should rethink the rules on "patentably indistinct claims" and review double-patenting rejections in their entirety.*

<u>Explanation</u>:  The PTO seems motivated to avoid the situation where an applicant files more than one *original* application with patentably indistinct claims and gain assistance from applicants in formulating double-patenting rejections.  However, unlike the rather draconian rules against continuations, the proposed rule does not seem to try to bar multiple indistinct applications.  Rather, the proposed rule merely would require applicants to identify applications having overlapping inventors and specifications and filing dates that are no more than two months different and to explain the intended demarcations between the patentable subject matter.  Absent such an explanation, the PTO would presume an obviousness-type double-patenting situation exists.

NAPP respectfully submits that this proposed rule has not been carefully considered, as questions arise on many fronts, and the motivations for the rule do not match the PTO's comments in the rule package.

First, applicants already have the duty to disclose copending applications with related claims.  *See* 37 CFR §1.56 and extensive case law relating to "inequitable conduct."  Presumably the PTO does not intend to remove the requirement for applicants to disclose related applications that do not meet the standards of the proposed rule – *e.g.*, applications filed more than two months apart or commonly assigned by having non-overlapping applicants.  Yet the rule leaves applicants' duties unclear.  Given the ease with which allegations of inequitable conduct can be leveled, the PTO should be clear.

Second, the PTO has no cause to <u>presume</u> any kind of rejection applies, and the notice of proposed rulemaking does not cite any authority allowing the PTO to evade its statutory duty to <u>examine</u> applications, 35 USC §131, and state <u>reasons</u> for rejections, 35 USC §132(a).

Third, if the PTO desires to reduce the backlog by reducing the burden of double-patenting rejections, then it should consider alternative ways to do so that might alleviate far more burden than this proposed rule, without imposing added cost on applicants, as this proposal does.  The following observations may assist the PTO in thinking about alternatives more creatively.

Observation 1:  Only same-claim double-patenting rejections are required under the statute.  35 USC §101 ("*a* patent").  The PTO is not required under the statute to examine applications for compliance with the judicially created doctrine of obviousness-type double-patenting.

Observation 2:  The change to 20-year-from-filing patent terms means that, in cases of related applications (continuing applications), issuance of two patentably indistinct

A02640

patents ought to have the same or similar expiration dates.[3] Real problems from split in ownership of two related patents seem apocryphal.

Observation 3: If an assignee files two unrelated but indistinct applications within a two-month window, then, likewise, under the 20-year-from-filing patent term, patents issuing from the two applications will expire nearly coincidently. Thus, the proposed rule's focus on this type of application seems erroneous.

Observation 4: If an assignee files two unrelated (*i.e.*, non-continuing) but indistinct applications, one a <u>long</u> time after the other, then the later application is likely subject to rejection for reasons other than obviousness-type double-patenting, such as 35 USC §102(b) or (e) (*but see* 35 USC §103(c)). However, this kind of application pairing would seem unusual.

Observation 5: The courts, having created the doctrine of obviousness-type double-patenting, are best positioned to determine its scope and degree of viability post-20-year-term. Applicants can cure obviousness-type double-patenting issues during court proceedings, at least up to any time before trial, and the PTO records disclaimers at any time; it is not the sort of defect that must be fixed before patent issuance on pain of an invalid patent. *See, e.g.*, J. Lewis, "Curing Double Patenting During Prosecution and After Issuance," 21 AIPLA Q.J. 34, 48-51 (1993) ("there is a great deal of latitude as to when a terminal disclaimer may be filed"); *Mr. Hanger, Inc. v. Cut Rate Plastic Hangers, Inc.*, 372 F. Supp. 88, 93-93 (E.D.N.Y. 1974) (holding a terminal disclaimer effective even though filed just before trial); *Technicon Instruments Corp. v. Coleman Instruments, Inc.*, 255 F. Supp. 630, 636 (N.D. Ill. 1966) (holding a terminal disclaimer effective even though filed after the trial began), *aff'd*, 385 F.2d 391 (7th Cir. 1967).

Observation 6: The PTO has had substantial difficulty with administering restriction requirements, as indicated by its issuance and consideration of the "Green Paper" mentioned above. Under the 20-year patent term, divisional applications do not usually extend beyond a patent issuing from their parent application anyway. Accordingly, restriction requirements mainly impact only PTO fees and examiner production counts.

In sum, NAPP believes that the PTO should reconsider and withdraw the proposed rule concerning unrelated and patentably indistinct applications in favor of a comprehensive reconsideration of the PTO's duties and policies re: double-patenting rejections.

## F.    THE PROPOSED RULE WILL IMPOSE MORE COST THAN PLANNED

Overall, NAPP believes that the calculation of the cost of the rule in the PTO's notice of proposed rulemaking disingenuously ignores major categories of cost that the rule would

---

[3]    The only difference can arise from differing term extensions under the term guarantee act or term extension statute, and cases of a patent issuing from a continuing application expiring substantially after a patent issuing from its parent must be rare to non-existent.

A02641

impose on the public, through excessive focus on the cost of the petitions that would occur when people considered it necessary to seek an exception to the rule. NAPP presents the following comments on that general subject.

> *Comment #32.    The rule will require searches, as a practical matter, which will increase cost significantly.*

Explanation:    The proposed rule very clearly implies that the PTO believes that applicants are in a position to define their inventions, through the presentation of all possible claims, at the earliest possible moment. The rule sets up a regime where an applicant has no (or few) excuses for failing to present all possible claims by the time of a first continuation filing.

However, to draft claims, as explained above, an applicant needs good working knowledge of the prior art. Also as explained above, if new references come to the attention of the applicant, it is often the case that the references will require redrafting the claims to distinguish the patented invention from the new prior art.

For those reasons, patent applicants and practitioners are much more likely to consider patent searches a requirement, either before first application filing or, at worst, before examination of the continuation application, or both. It is perfectly predictable, therefore, that the passage of this rule will motivate more applicants to perform patent searches or supplemental patent searches.

The PTO's analysis of the cost of the rule completely ignores this predictable effect. The cost of additional patent searches can be quite high.

Although NAPP members typically support performing patent searches and believe that they benefit patent prosecution, the timing and extent of searching ought to be decided by the applicants. For example, the importance of a particular patent application can change over time – if a product becomes popular unexpectedly, a routine patent application may become much more significant; if a product fails, a patent application may become unimportant. Passing a rule that would strongly encourage extra precautionary patent searching, even for applications that are considered less important (because, who knows, they might turn out to be significant later) or for applications that are later abandoned (because the product failed), imposes additional, unnecessary cost that could be avoided in many instances.

> Comment #33.    *The rule will require higher attorney/agent fees for claim drafting, making applications and responses to office actions more expensive.*

Explanation:    The proposed rule would require that registered practitioners draft claim sets for applications that are as complete as possible, because there is no assurance that additional claims can be presented through continuing applications or such applications are impossible entirely. Such claim drafting must be done before the examiner reviews

A02642

the application, of course. Accordingly, the fees that practitioners must charge their clients for preparing claims sets is expected to increase significantly.

To illustrate: Assuming that each application requires an extra five hours of practitioner time for drafting all possible claims, at an average of $150/hr., the added cost would be $750 per application. If done in 317,000 applications, the added cost exceeds $200 million. NAPP believes that this estimate is conservative because some fraction of applications (including especially the 30% of applications that are continuing ones) will require far more extra time for claim drafting than presently allocated.

Because many applications never result in any patent, and other applications result in patents that never have any commercial value, most of this extra cost for claim drafting will go wasted.

> *Comment #34.*    The rule will require filing of all divisional applications at once.

Explanation:  In cases where an examiner enters a three-way or higher restriction requirement, the proposed rule encourages applicants to file all divisional applications at once, before the termination of proceedings on the application in which the restriction requirement is entered, because otherwise, applicants will lose the right to file additional divisional applications. Accordingly, applicants will file them as a precaution, imposing additional cost compared to current practice, where applicants often defer filing such second divisionals and sometimes end up never filing them at all based on commercial realities or what happened in the course of prosecuting the filed divisional.

> *Comment #35.*    The rule will cause an increase in malpractice litigation for failing to draft claims soon enough.

Explanation:  The proposed rule disallows any continuing application after a first one. Accordingly, if a practitioner does not think of valuable claims until it is too late, the client has no protection against a competitor that appropriates the core of the invention while designing around the claims that the practitioner filed and got allowed. If such a competitor would have been unable to avoid a claim that the practitioner did not envision, then the client has suffered significant harm from the practitioner's lack of perfect foresight. Under current practice rules, in many instances, a practitioner may cure the problem by filing a continuation to secure the additional claims, but that opportunity would be barred in many instances by the proposed rule.

One result of this situation will likely include an increase in the frequency of charges of practitioner malpractice. In some instances, these will be justified, but damage to the client could have been cured in the absence of the rule. In other instances, the claims will be unjustified, because the practitioner will be able to explain, at great expense and risk, that it was not possible for a reasonable person to have foreseen the omitted claim. Whether justified or not, the economic cost of such charges will be high.

A02643

> ### Comment #36.    The rule will impose costs for reviewing all presently pending applications.

<u>Explanation:</u>  As indicated, NAPP members have suggested that they will respond to the rule by reviewing all applications to see if continuation filings can be made. This will impose significant cost to clients from the threatened adoption of the rule. (Again, if the PTO announces its intent to include a transitional exception, the cost from this item can be deferred or mitigated.)  An average of two hours per application pending, times approximately 600,000 pending applications, at $150/hr., will impose $180 million in extra review cost.

> ### Comment #37.    The rule will disproportionately impact important inventions or inventions that are difficult to claim.

<u>Explanation:</u>  The PTO rulemaking suggests that the proposal will not create significant mischief because a relatively small percentage of applications are second or subsequent continuations.  (On the other hand, this also goes to show that the benefit to backlog reduction is correspondingly small.)  But this argument ignores the fact that the applications that result in multiple continuations are expected to be disproportionately likely to fall into one of two categories:  (a) the most significant, groundbreaking, far-ranging, and pioneering inventions; and (b) inventions that are the most difficult to claim or define properly, because of complex technology or limitations on the precision of English words and phrases.  Thus, even if the percentage is small, the damage from the rule can be much more significant, because it targets the very inventions that need careful patent protection the most.  Thus, the economic harm from the rule will be quite high.

## G.    THE    PROPOSED    RULE    WILL    HARM    SMALL    BUSINESS SIGNIFICANTLY

NAPP believes that the rule will cause significant harm to a significant number of small business entities. NAPP presents the following comments on that general subject.

> ### Comment #38.    The statistics show that second and subsequent continuations, essentially banned by the proposed rule, are disproportionately filed by individuals and small businesses.

<u>Explanation:</u>  The notice itself reveals statistics showing that small entities file second and subsequent continuations in disproportionate numbers, contrary to the certification that this rule will not disproportionately impact small entities. 71 FR 57. For small entities, during FY2005, there were 4470 second or subsequent continuations filed out of 93000 total applications, or 4.8%. For large entities during the same fiscal year, there were 7320 second or subsequent continuations filed out of 224000 total applications, or 3.3%. *Id.* That shows that small entities are nearly 50% more likely than large entities to file the type of application being essentially banned by the proposed rule.

A02644

*Comment #39.    The cost from searching and higher claim-drafting fees will fall disproportionately on individuals and small businesses.*

<u>Explanation:</u> Large companies perhaps can readily react to the proposed rule simply by filing more applications, each one addressing a particular aspect of an invention. Such a strategy will make continuations less likely to be needed. Already, many of the largest companies file large numbers of applications, each addressing very narrow inventions, and many such applications often arise from a common commercial product or project. For application filing strategies of this sort, continuing applications are less needed.

Individuals and small businesses, on the other hand, often for cost considerations, more typically file one original application per product, with the application discussing a variety of improvements or aspects of an improvement to the product. Accordingly, it is more likely that subsequent prosecution will result in a need to rely on continuation filings for adequate protection.

## H.    ALTERNATIVES TO THE PROPOSED RULE CAN MORE LIKELY ACHIEVE BACKLOG REDUCTION

NAPP believes that backlog reduction and pendency shortening, which is presented as the main purpose of the proposed rule, can be achieved far more effectively, at lower cost and adverse impact, through a variety of alternative strategies. NAPP presents the following comments on that general subject.

*Comment #40.    To reduce backlog, the government should fully fund the PTO and subsidize, not tax, its operations*

<u>Explanation:</u> One option for reducing backlog is to fund the PTO fully. At a minimum, Congress should allow the PTO to keep all of its revenue; to do otherwise represents a tax on invention, which is damaging to the economy. NAPP recognizes that the PTO has sought to keep its revenue. However, NAPP suggests that the PTO should begin lobbying Congress to grant the PTO even *more* revenue than it collects, to offset the losses from past years.

Between fiscal year 1992 and 2004, the PTO lost access to $741 million of the fees it collected. House Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 11.
*See* http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

The backlog and increasing pendency of patent applications derives in large part from past under-funding. For example, a report by the GAO concluded that the PTO has fully or partially implemented only 8 of 15 initiatives aimed a reducing pendency of applications. "USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain," U.S. Government Accountability Office Report No. GAO-05-720

A02645

(June 2005). *See* http://www.gao.gov/new.items/d05720.pdf   The PTO cited lack of funding as the primary reason for not accomplishing all initiatives. *Id.*[4]

The PTO should seek necessary funding now to implement backlog-reduction programs.

> *Comment #41.*   To help reduce backlog, the PTO should continue to expand its hiring and training programs.

Explanation:   NAPP is aware that, in connection with this proposed rule, PTO management has repeated the refrain that it cannot "hire its way out of the backlog." Yet, this statement does not appear entirely accurate. For example, an August 2005 report by the National Academy of Public Administration entitled, "U.S. Patent and Trademark Office: Transforming to Meet the Challenges of the 21st Century" contains a ten-page discussion (pp. 40-49) entitled, "Consistent Hiring is the Key to Reducing Pendency and Maintaining Desirable Pendency." *See* http://www.napawash.org/Pubs/PTO-8-25-05.htm

In testimony before the House last year, PTO Director Jon Dudas stated, "If we go to a situation where we are, instead of hiring 860 to 750 a year, if we hire 1,000 new examiners per year, and work on reducing attrition, we can ... turn the pendency corner. This is without competitive sourcing, but with dramatically increased hiring." House Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 19.
*See* http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

NAPP agrees with NAPA and Director Dudas. NAPP believes that the PTO can do far more to help reduce backlog by continuing to expand its hiring and training programs than it can ever hope to achieve through difficult and painful rule adjustments directed to the modest subject of continuations.

Funding can help the PTO to attract more qualified examiner candidates, through pay or hiring incentives and funding more frequent exposure to the PTO as a valid career. Funding can help the PTO integrate new examiners into the corps as well.

> *Comment #42.*   To help reduce backlog, the PTO should reconsider its "count system."

Explanation:   A number of reports have commented on the difficulties arising from the PTO's antique "count system" for evaluating and compensating examiners. "USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain," U.S. Government Accountability Office Report No. GAO-05-720 (June 2005), p. 5. *See* http://www.gao.gov/new.items/d05720.pdf ("Patent examiners' awards are based largely on the number of applications they process, but the assumptions underlying their application processing quotas have not been updated since 1976"); "USPTO should Reassess How Examiner Goals, Performance Appraisal Plans, and The Award System

---

[4]    While NAPP does not intend here to endorse all of those initiatives, the point remains that adequate funding is required to reduce pendency.

A02646

Stimulate and Reward Examiner Production," U.S. Dept. of Commerce Office of Inspector General Final Inspection Report No. IPE-15722 (September 2004). *See* http://www.oig.doc.gov/oig/reports/2004/USPTO-IPE-15722-09-04.pdf  NAPP members have frequently reported and discussed on NAPP's practice mail-list instances in which understandable examiner action driven by the hunt for "counts" has warped and delayed prosecution.

Revamping and updating the examiner compensation and evaluation system to reflect modern realities could produce far bigger benefits for backlog reduction than difficult and painful rule adjustments directed to the modest subject of continuations.

> *Comment #43.*    *To help reduce backlog, the PTO should continue to explore remote-location hiring and off-premises work.*

Explanation: Hiring and recruitment is made more difficult by the fact that the PTO can hire examiners only at its Virginia location. Establishing remote locations for examiners, in desirable areas of the country, could do far more to permit much faster action on applications than difficult and painful rule adjustments directed to the modest subject of continuations.

NAPP applauds the PTO for taking partial steps toward loosening the location issue, by implementing and expanding work-at-home or flex-time programs, but suggests that it devote management time to more fundamental change.

> *Comment #44.*    *To help reduce backlog, the PTO should look for ways to reverse the trend towards increased attrition.*

Explanation: As Cong. Berman noted, "[A]ttrition remains a serious problem. Only 45 percent of the Patent Office workforce has 5 or more years of service, and in an agency where it takes roughly 5 or 6 years before an employee becomes fully productive, this is a troubling statistic." House Jud. Comm., Report No. 109-48 (8/8/05), 2005 Review of PTO Operations before IP subcommittee (109 Cong., 1st Sess.), p. 12. *See* http://commdocs.house.gov/committees/judiciary/hju23324.000/hju23324_0.HTM

The PTO should take seriously the reasons for such attrition. The GAO referred to several "challenges to retention," including "the lack of an effective strategy to communicate and collaborate with examiners"; "According to patent examiners, the lack of communication and a collaborative work environment has resulted in low morale and an atmosphere of distrust that is exacerbated by the contentious relation ship between management and union officials," and "examiners told [GAO] they have to contend with a highly stressful work environment and work voluntary overtime to meet their assigned quotas." "USPTO Has Made Progress in Hiring Examiners, but Challenges to Retention Remain," U.S. Government Accountability Office Report No. GAO-05-720 (June 2005). *See* http://www.gao.gov/new.items/d05720.pdf

A02647

Those words should motivate the PTO to focus immediately and seriously on this issue, in collaboration with examiners and the POPA union. Such efforts would seems to have potential to cure, far more promptly and effectively, the productivity and backlog problems than difficult and painful rule adjustments directed to the modest subject of continuations.

> *Comment #45.    To help reduce long-pending series of continuations, the PTO should follow the MPEP's stated standard of examining applications by effective filing date.*

Explanation: According to MPEP 708 (order of examination):

> "Each examiner will give priority to that application in his or her docket, whether amended or new, which has the *oldest effective U.S. filing date.* Except as rare circumstances may justify Technology Center Directors in granting individual exceptions, this basic policy applies to all applications." [Emphasis in original]

*See also* MPEP 707.02 & 708.01(I) ("special" cases advanced out of order and having special procedures include cases still pending more than five years after the effective filing date).

Nevertheless, the PTO's computer system (eDAN) apparently prints lists for examiners ordered by application filing date, even for continuations or applications claiming priority to an earlier provisional. Although examiners have some ability to customize eDAN, they apparently cannot retrieve effective filing date for their reports. Indeed, examiners report that, their lists of applications formerly reported, but no longer report, effective filing date (although the applications were never ordered according to that information).

Although the MPEP has not been changed for many years, examiners simply do not follow the MPEP approach to order of examination.

The PTO should require its examiners to follow the MPEP procedure and make it possible for examiners to do so. The PTO should update its computer system to accommodate that practice.

The MPEP procedure is appropriate. If the PTO examined the oldest chains of applications first, it would very quickly dispose of the oldest "lines" and reduce the odds that, with the passage of time, an applicant or practitioner will think of additional claims that should be added. Under present practices, by contrast, continuations take up to several years to work their way through examiner backlogs, allowing additional opportunities for new claims or complications to develop.

In addition, if examiners picked up continuations as fast as they examine RCEs or amendments, there is far less chance of significant "rework." If an examiner who reviewed an original application examined a continuation only a few months later, the odds are that he or she will recall most of the pertinent information, and the examination will likely proceed promptly. Under current practice, by contrast, examiners who pick up

A02648

continuation applications many years after first examination will likely have forgotten about the application. Worse, the original examiner may have left the PTO, been promoted, or moved to a different position, and a new examiner must study and learn about the application (including both the parent and continuation) from scratch.

In short, strict adherence to the MPEP's procedure on examination order would be expected to decrease the number of second and subsequent continuations and reduce the time examiners take to handle continuing applications.

NAPP believes that this change alone would do far more to reduce the burden on the examining corps than the proposed rule, and it would have far fewer negative implications or chances for offsets to the time gains.

> *Comment #46.    The PTO should consider rules disallowing continuations filed without substantive prosecution (Bogese-type) or where intentional applicant stalling seems present.*

Explanation: The proposed rule makes clear that the PTO does not intend to establish rules to address continuation abuse, of the sort criticized by the Federal Circuit in the case of *In re Bogese*, 303 F.3d 1362 (Fed. Cir. 2002). 71 FR 50 ("The proposed rules are not an attempt to codify *Bogese II* or to simply combat such extreme cases of prosecution laches"). NAPP wonders, why not?

NAPP believes that the PTO should work on rules designed to disallow continuation filings without substantive prosecution (the practice apparently followed in *Bogese*) or continuation (or other practices) which seem to evidence applicant stalling or significant intentional delay. Rules against continuation <u>abuse</u> would seem to benefit the public and avoid <u>undue</u> burden on the examining corps, whereas rules designed to curb all continuations, abusive or legitimate, present significant risks and obstacles to the adequate protection of inventions deserving of protection.

> *Comment #47.    The PTO should consider rules allowing continuations-IN-PART only in exceptional cases.*

Explanation: One way to reduce the backlog would be to remove the burden on examiners to evaluate the effective priority date of claimed inventions. Under the current system, the main case where priority date analysis is required arises from continuation-in-part ("CIP") applications that add new text or drawings.

Such continuations-in-part provide little value to applicants under modern patent law. If an applicant wishes to claim an invention that relies on "new matter" added upon filing a CIP, using the CIP vehicle simply truncates the patent term under the 20-year-from-filing statute, without providing any earlier effective filing date. In that case, the applicant might as well file a new application with the old and new matter together as an original application, without claiming priority to any parent (which does not disclose the claimed invention).

NAPP Comments on Continuation Rules                                    Page 33

A02649

On the other hand, if applicant wishes to claim an invention that does not rely on "new matter" added upon filing a CIP, using the CIP vehicle simply "muddies the waters" by including distracting and unnecessary "new matter," which affords infringers a chance to advocate for the CIP date as the effective filing date. In that case, the applicant might as well file a straight continuation, without including new matter.

The routine filing of CIP applications disproportionately burdens the examining corps (and/or the public and courts). In many cases, the examiner must undertake to analyze the effective priority date issue, either initially or by issuing a rejection based on an intervening reference and seeing whether the applicant can backdate it. That leads to wasted hours and, in some cases, wasted office actions and delay in overall pendency. In other cases, the examiner can leave the priority date ambiguous, where no intervening art is found, and the burden simply shifts to the courts or potential infringement targets or licensees of the resulting patent to conclude the analysis.

The PTO could assist its examiners and shorten the time for examination by abolishing or restricting CIP applications, perhaps with an exception for unusual situations where applicants can show that the CIP vehicle is needed or helpful for some reason. Because applicants, in all or nearly all situations, can replace a CIP filing with a new application, a "straight" continuation, or both, such a rule would seem to provide assistance in reducing the backlog without significantly damaging applicants' understandable desire to receive robust protection for their inventions.

One situation in which a CIP can be a useful vehicle for an applicant is when a first application is followed quickly (within a year) by a second, improvement application, and the applicant would prefer to pursue the latter but also wishes to save costs by including some claims to the core idea disclosed in the first application. Complete abolition of CIP practice would preclude this cost-savings technique. A CIP rule could accommodate this situation by allowing applicants to convert the first application to a provisional application (even retroactively) and permitting benefit claims to provisional applications even if they did not contain the same specification as the regular application.[5]

> *Comment #48.*    *The PTO should consider rules requiring applicants to*
> *specify the text or drawings added to provisional or foreign applications*
> *in non-provisional U.S. applications.*

Explanation: Another way to assist examiners to determine the effective priority date of claimed inventions would be to require applicants to identify whether, and if so how, they have changed a provisional or foreign application referenced in a regular application

---

[5]    CIPs are also sometimes filed (1) to delete some embodiments of an original application, or (2) to correct an informal application. A CIP rule should allow the former practice, although the PTO might consider different labeling. A CIP rule should allow the latter practice only either by filing a continuation, which is examined to ensure the absence of "new matter," or by converting the informal application into a provisional.

A02650

filing under 35 USC §119 ("119 benefit application"). In some instances, a regular application simply repeats the contents of the 119 benefit application without change (except for translation, typographic corrections, addition of the claim to benefit, or other minor changes); in other instances, the regular application is, in essence, a more formalized version of the 119 benefit application; and in still other instances, the regular application expands upon the 119 benefit application considerably.

The PTO does not require applicants to state whether a regular application introduces additional material to the 119 benefit application – there is only a claim of benefit, unlike the distinction between continuations and CIPs under 35 USC §120. As an initial matter, NAPP does not see why the PTO requires applicants to identify whether there has been added matter through use of CON/CIP labels for benefit applications under Section 120 but not require the same for benefit applications under Section 119. At a minimum, the PTO should consider a rule change to require parallel labels.

NAPP suggests, further, that the PTO consider rules requiring applicants to specify <u>how</u> the regular application compares to the 119 benefit application. Document "redlining" technology exists and can point out differences efficiently. In those instances in which intervening art exists, the comparison would assist examiners and the public in determining the priority date of a claimed invention.

> *Comment #49.    The PTO should impose extra fees on later continuations instead of abolishing them.*

<u>Explanation:</u>    A less-restrictive alternative to simply precluding all second and subsequent continuations would be to charge an extra fee for their examination. Such an approach would not cause the same sorts of practice adjustments and so would not suffer from the same sorts of offsets to backlog reduction discussed in other comments. But, a charge would likely discourage, and reduce the number of, such later continuations. An appropriately set fee would seem to provide as much, or nearly as much, benefit in terms of backlog-reduction as a complete ban, without the difficulties to invention protection.

NAPP believes that applicants most likely file second and subsequent continuations in cases of the most significant or "complicated to claim" inventions. In those cases, where repeated continuations are justified, applicants can likely afford to pay an extra fee.

Such a fee would also provide added revenue to the PTO (at least assuming that Congress allowed the PTO to keep it), providing some funds that could be put to use reducing the backlog more.

> *Comment #50.    The PTO should carefully analyze the option of generating significant backlog reduction by allowing applicants to defer requests for examination.*

<u>Explanation:</u>    Presently, in general, applicants must request examination (and pay an examination fee) upon filing an application. In actuality, this is not true, because an

NAPP Comments on Continuation Rules                                        Page 35

A02651

applicant has two ways to defer examination voluntarily, without penalty: (1) applicant can file the application as a provisional application, which is not examined, and claim benefit of the provisional in a regular application filed up to one year after the provisional filing date; and (2) applicant can file a regular application without a fee, which will cause the PTO to generate a "notice of missing parts," to which applicant must respond. A response to a notice of missing parts can be deferred for up to two months, with a penalty in the amount of the "surcharge" for missing parts, which is quite small, or it can be deferred for up to an additional four months by paying extension fees, which increase month by month. In all, under current law, applicants can defer requesting examination by approximately 20 months from the effective filing date. Also, applicants can request suspension or deferral of examination under certain circumstances listed in 37 CFR §1.103(a)-(d).

The current system, however, (1) imposes costs on the applicant who follows the deferral technique above, especially for the final several months of extension fees; (2) constrains the type and length of deferral requests; and (3) does not necessarily put the application further back in the examiner's application queue. Examiner dockets place applications in order by filing date, not by request for examination date, so a provisional-regular conversion or a notice of missing parts does not necessarily cause the examiner to pick up the application for examination any later than he or she would otherwise.

Yet, applicants sometimes have valid reasons for wishing, in certain circumstances, to defer examination. First, applicants may wish to see whether a product does well on the marketplace, or whether a company gets additional funding, before spending money on patent prosecution, including responses to office actions or continuing practice. Second, applicants may wish to keep an invention as a trade secret (in U.S.-only cases where such remains possible under the 18-month publication statute) until a product is ready and allow the patent issuance to coincide with the product release.

Under current law and rules, examiners must examine all applications when they reach the front of the docket, even those that applicants would prefer to defer, and even those where the applicant has gone bankrupt or failed to develop any commercial product and no longer cares about the application (but has not abandoned it expressly). While examining such uncared-for applications, the examining corps must defer other applications that applicants would prefer to issue as soon as possible.

In other words, the backlog is worsened by large numbers of applications for which examination could be deferred. Significant backlog reduction could be achieved by loosening the rules on deferral of examination. Many foreign countries, by the way, have systems where applicants may request examination at any time up to years after the original filing date.

The PTO should seriously consider allowing applicants to request examination (and pay the corresponding examination fee) for a period of time of up to several years after the effective filing date.

A02652

Also, the PTO should establish a system of ensuring that, when a significant time has passed since the original filing date or the last word from the applicant, the examiner must contact the applicant's representative to ensure that the applicant still wishes the examination to proceed – before spending time on the application. In that way, examiner time will not be wasted issuing first office actions or other papers in applications that the applicant no longer considers valuable anyway, or where something has happened to the applicant or assignee (like bankruptcy or death) that has made the application unimportant.

NAPP believes that this change alone would do far more to reduce the burden on the examining corps and the backlog than would difficult and painful rule adjustments directed to the modest subject of continuations.

### Conclusion

NAPP appreciates the PTO's concern about increasing pendency and backlog and thanks the PTO for the opportunity to provide comments. However, for the reasons stated above, NAPP urges that the PTO reconsider its presently proposed approach. NAPP remains willing to work with the PTO to explore methods for improving the current system and facilitating implementation of such improvements.

Respectfully submitted,

Ron Reardon, President
Louis J. Hoffman, Government Affairs Liaison
NATIONAL ASSOCIATION OF PATENT PRACTITIONERS
napp@napp.org
May 3, 2006

A02653