UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| **TRIANTAFYLLOS TAFAS,**<br><br>                                   **Plaintiff,**<br><br>        **v.**<br><br>**JON W. DUDAS,** in his official capacity as Under-<br>Secretary of Commerce for Intellectual Property<br>and Director of the United States Patent and<br>Trademark Office, and the **UNITED STATES<br>PATENT AND TRADEMARK OFFICE,**<br><br>                                   **Defendants.** | **CIVIL ACTION:  1:07cv846 (JCC/TRJ)**<br>and Consolidated Case (below) |
| **SMITHKLINE BEECHAM CORPORATION,**<br><br>                                   **Plaintiff,**<br><br>        **v.**<br><br>**JON W. DUDAS,** in his official capacity as Under-<br>Secretary of Commerce for Intellectual Property and<br>Director of the United States Patent and Trademark<br>Office, and the **UNITED STATES PATENT AND<br>TRADEMARK OFFICE,**<br><br>                                   **Defendants.** | |

## DECLARATION OF TRIANTAFYLLOS TAFAS
## IN SUPPORT OF SUMMARY JUDGMENT MOTION

STATE OF CONNECTICUT      )
                                              )    ss:  New Haven
COUNTY OF NEW HAVEN      )

**TRIANTAFYLLOS TAFAS**, being duly sworn, deposes and says:

1.       I am over the age of eighteen (18) years and I understand the obligations

of an oath.   I submit this Declaration in support of my Motion for Summary Judgment in the

above-referenced consolidated action.   The statements made in this Declaration are true and

correct and are made on the basis of my personal knowledge, unless indicated to be based upon

information and belief, in which case I believe them to be true.

Dockets.Justia.com

## BACKGROUND

2.    I presently reside in Rocky Hill, Connecticut. I am an inventor and entrepreneur. I am a named inventor on eight (8) issued United States patents and forty-one (41) United States patent applications.

3.    I am originally from Greece and was educated in Athens, receiving a Ph.D. in Biological Sciences from the University of Athens in 1991. I authored my first patent in that same year.

4.    Upon receiving my Ph.D., I took a teaching position at the University of Athens, teaching courses in Biology, emphasizing the use of Computers in the study of Biology.

5.    During my time at the University of Athens I developed an interest in automating microscopy. In the mid-1990's I began traveling between Greece and the United States seeking to raise venture capital for the development of diagnostic products using robotic microscopy. During that time, I also served as a Visiting Professor at the University of Connecticut.

6.    In 1999 I started with a colleague a company named Ikonisys, Inc. ("Ikonisys"), which is headquartered in New Haven, Connecticut. Ikonisys is in the business of inventing, designing and building cell-based diagnostic systems that use robotic microscopes.

7.    In 2000, I made the decision to leave Greece permanently and to move to the United States full-time in an effort to expand Ikonisys' business.

8.    When I began raising funds to start the business that was to become Ikonisys, I quickly became aware that I would need patent protection for my inventions in order to protect my intellectual property and to have any reasonable prospect chance of raising the outside venture capital needed to get Ikonisys off the ground.

9.     Like any technology company, the primary core value in Ikonisys in its earliest stages lies in its intellectual property.  In order to secure this value, I pursued patent protection on the robotic microscope that I invented.  I am a named inventor on thirty-four (34) patent applications relating to this robotic microscope, as well as on eight (8) U.S. issued patents assigned to Ikonisys.  I consider myself a regular and consistent filer of patent applications with the United States Patent and Trademark Office ("USPTO) and reasonably anticipate that I will continue to be so for many years into the future.

10.     As a result of my above referenced efforts, as well as the protections granted by the United States patent laws, Ikonisys is growing, employs approximately seventy (70) people, and is marketing a high throughput, robotic microscope that allows automated review of multiple microscope slides for medical diagnostics and other purposes.

11.     I believe that Ikonisys' automated robotic microscope will enable the diagnosis of serious medical conditions more rapidly than conventional microscopy.  More importantly, I am involved in research using such microscopy which I believe will enable much earlier diagnosis of cancer, through the detection of rare cancer cells, than is otherwise impossible using conventional manual microscopy.  Ikonisys' automated microscope could change the world of cancer research and therapies.

12.     I maintain a substantial pecuniary interest in Ikonisys.  I also act as Ikonisys' Chief Technology Officer, overseeing its product development and directing all of Ikonisys' patent prosecution efforts on its products.

13.     Before I file any patent application on an inventive concept, it is my standard practice to weigh the advantages, and possible disadvantages, of filing for a patent as compared to the alternative of simply maintaining the inventive concept as a trade secret.  In

addition to the significant cost involved, one of the downsides to filing for a U.S. patent is the

loss of trade secret rights with respect to the underlying disclosed invention.   In cases where I

have authorized a patent application to be filed, I ultimately have determined, in reasonable

reliance on the various benefits and protections afforded by Congress in the Patent Act (35

U.S.C. § 1 *et seq.*) to inventors such as myself, that the benefits of applying for a patent, and the

protections and benefits that flow from an issued patent, outweigh the substantial patent

application and prosecution costs and the benefits of keeping the inventive concept as a trade

secret.

       14.     One of the factors I have considered in connection with the type of cost-

benefit analysis described above with regard to any patent application which I have filed, or have

overseen the filing of, is that the United States patent laws enacted by Congress guarantee an

inventor, among other things, a limited period of exclusivity on patentable inventions, and also

allow for the filing of unlimited continuations should the initially disclosed research and

invention subsequently be found to include more than one (1) patentable invention during the

sometimes lengthy pendency of the patent application .

       15.     In addition to my interest in microscopy technology, I also developed an

interest in the automotive arts and, more particularly, utilizing technology to capture heat that

radiates from an automobile's manifold.  In November 2005, I submitted one (1) patent

application to the United States Patent and Trademark Office (USPTO) for this technology --

U.S. Patent Application Serial No. 11/266,948 (the "Energy Recovery Patent Application" or

"ERA Invention"), which is presently pending with the USPTO.   As is reflected in my patent

application, my ERA Invention starts with capturing waste heat.  Once that heat is captured, it

may be utilized in any number of ways to improve the automobile's performance.  The proposed

concept has the potential to improve fuel consumption by the automobile's engine with a significant positive improvement in miles-per-gallon performance. Additionally, acceptance of this concept by the automotive industry will reduce exhaust gas emissions. Of course, this will address growing concerns related to the rise of atmospheric carbon dioxide -- so-called "global warming."

16.    In August 2007, I requested that my patent law firm file a number of continuation filings with the USPTO seeking certain subject matter that was disclosed but not claimed in my original Energy Recovery Patent Application filed in November 2005. I also sought to add to the specification new ideas linked to the original disclosure. I understand that three (3) of these applications were filed with the USPTO on August 10, 2007, and a fourth was filed on September 7, 2007. In accordance with my attorneys' instructions, I have carefully guarded the confidentiality of each of my ERA Inventions until the date of the publication of the application.

### THE ADVERSE IMPACT OF THE USPTO'S NEW RULES

17.    When I filed my Energy Recovery Patent Application with the USPTO in November 2005, I reasonably assumed that I would be able to satisfy the statutory criteria for patent eligibility laid down by Congress; that the USPTO's procedural rules pertaining to the processing of my above referenced application imposed by the USPTO were within the scope of its Congressionally delegated authority; and, that I would be capable of complying with these USPTO rules at a cost that would not be unduly prohibitive.

18.    I never anticipated that the USPTO, which I understand is part of the Executive Branch, would later purport to unilaterally impose burdensome new *substantive* restrictions on my eligibility to obtain a patent – the so called "Revised Rules" (as referenced in

my Amended Complaint).   The USPTO's Revised Rules appear to fundamentally change the

pre-existing statutory ground rules set by Congress, among other ways, by imposing new

substantive limitations on the eligibility criteria to obtain a patent (*e.g.*, including by sharply and

seemingly arbitrarily limiting, in a "one size fits all manner," the ability of patent applicants to

file as many continuation applications or claims as they deem necessary or appropriate).

      19.    While I understand that the USPTO purports to justify the rules claiming

they are merely procedural in nature, the substantive nature of the USPTO's new rules package is

seemingly admitted by the USPTO's own Deputy General Counsel and Solicitor (now retired),

John Whealan, who acknowledged in a speech at Duke Law school on February 17, 2006 that the

USPTO is changing "policy" of the "patent system" through the promulgation of "rules," without

the need for the USPTO to turn to the courts or the legislature for permission:

> I went to the patent office to argue cases at the Federal Circuit, and
> after doing that for a while, you realize well, that's interesting, but
> its <u>hard to make policy</u> that way because you have to get a case up,
> win it, and get them to write it your way.
>
> What we have realized is that we are an agency, and we write
> rules, and we can actually <u>change policy</u> a lot quicker <u>by making
> some rules that might change the patent system</u>. That is what I am
> going to talk about.
>
> Brian did a nice job in referring to some <u>patent legislation up on
> the hill – that is stalled.  We don't have that problem.  We write
> rules</u>, and they issue,<u> and maybe they get overturned,</u> but we can
> actually try to move forward and I think it would be irresponsible
> not to do that. (emphasis added)

(Video Excerpt of Whealan Speech, Exhibit A – Video #1)(Emphasis Added).

      20.    Since I first heard about the proposed new rules after they were first

proposed by the USPTO in January 2006, I have been in repeated contact with my counsel to

discuss their implications.  These discussions included how, if ultimately promulgated, the

Revised Rules might effect my Energy Recovery Patent Application estate, as well as Ikonisys'

patent application estate.   As a result of these discussions, and numerous similar conversations I

understand that my counsel had with other clients who similarly believed they would also be

adversely affected if the newly proposed USPTO rules went into effect, my attorney agreed to

submit comments to the USPTO concerning the proposed rules on behalf of myself and his entire

effected client base (including myself and Ikonisys.).

21.    On or about August 21, 2007, the USPTO enacted a substantially modified

version of the rules originally proposed  (again referred to collectively in my Amended

Complaint as the "Revised Rules").   As set forth below, I filed the present action to challenge

the validity of the Revised Rules because I believe I have been seriously injured as a present and

future patent applicant by the USPTO's enactment of these oppressive new substantive rules, as

well as the U.S. economy.

22.    I understand that the Revised Rules will operate so as to substantially

circumscribe the existing protections afforded to myself and other patent applicants by Congress

with a resulting loss of value to patent estates.  I am also greatly concerned that the Revised

Rules will imposing a chilling effect on the ability of small companies, emerging companies

(such as Ikonisys), research-intensive companies, and small and independent inventors (such as

myself) to successfully prosecute their pending applications and to file and prosecute future

patent applications.

### THE TYPES OF HARM SET FORTH IN MY AMENDED
### COMPLAINT ARE NOT HYPOTHETICAL OR SPECULATIVE

23.    In the past, I have frequently requested the filing of continuation applications numerous times. In fact, in a number of instances I have requested multiple continuation filings. With respect to applications on which I am a named inventor and which are assigned to Ikonisys, I have authorized filings of more than two (2) continuation filings in at least two (2) cases. With respect to my Energy Recovery Patent Applications, four (4) of my five (5) applications comprise continuing applications.

24.    Furthermore, I have been in conversations with my law firm about possibly filing yet another continuation-in-part application for my Energy Recovery patent application estate. I was notified that as a result of the new Revised Rules my original Energy Recovery Patent Application will become prior art against any continuing application filing that I may file after May 10, 2008.

25.    The USPTO has previously asserted that I may not raise the *ultra vires* effect of the Revised Rules to prevent me from authorizing after November 1, 2007 the filing of a continuation-in-part application from a divisional application simply because to date I have not done so in my Energy Recovery patent estate. However, it is clear from my actions at Ikonisys, wherein I authorized such filings with respect to applications naming me as an inventor, that this assertion is not a "speculative" possibility. I would authorize such a filing in respect of my Energy Recovery patent estate if I felt the need to do so. This was not even a "worry" before the promulgation of the Revised Rules in that I understood there were no substantive restrictions, either under the Patent Act or the USPTO's Rule of Practice, preventing unlimited filings in the divisional application process.

8

26.    I also understand that the USPTO has previously asserted that inventors such as myself do not have the right to raise the issue of the effect of these rules on the early commercialization of inventions by entities receiving federally supported research grants pursuant to the Bayh-Dole Act. Again, I disagree. In fact, in the past I have been instrumental in obtaining federal funding for a research project conducted by Ikonisys, and would pursue federal funding with respect to my Energy Recovery inventions if I could obtain the same.

27.    The USPTO has also argued in the past that I have no standing to raise the issue of the USPTO's violation of my rights under the applicable statute to utilize the Request for Continued Application ("RCE") process because my patent application filings for my Energy Recovery inventions are so new and have not yet been examined by the USPTO. I have used the RCE process several times in connection with my past activities in the patent field. With respect to applications naming me as an inventor, I understand that I have used the RCE process at least three (3) times after the issuance of a final office action.

28.    Paragraph 56(h) of my Amended Complaint reflects my concern that the identification of patentably indistinct claims in an Examiner's Office Action would impermissibly disclose, before publication, subject matter that the USPTO is held by statute to keep confidential. I understand that the USPTO has argued that this problem does not exist with respect to any application in my Energy Recovery Patent Application estate as I have not filed a non-publication request with respect to any of these applications. Respectfully, this makes little sense. Since I understand that a USPTO Examiner may take one of these applications for examination before it is published, I am confused as to why the USPTO believes that this problem would only exists if a patent applicant files a non-publication request when filing an application.

29.    I further understand that the USPTO has asserted in the past that I have no multiple dependent claims pending in my Energy Recovery Patent Application and, as such, this somehow precludes me from raising the issue that the USPTO has impermissibly changed the cost of such making claims under the Revised Rules.  In this regard, I note that one of my continuation filings does presently contain a multiple dependent claim.  I do not presently have claim sets pending in my Energy Recovery applications, nor to my knowledge in the Ikonisys' estate that assert different statutory classes that might eventuate in having me or my company pay a greater fee for a claim than mandated by statute.  Nonetheless, I assert that as a regular applicant to the USPTO, that I certainly will run into such situation in the future and thus face immediate prospective harm from the Revised Rules.

30.    Thus far, I have not previously authorized the filing of a reissue application from which a divisional application might ultimately spring.  However, given the many patent filings that I have filed in the past, and those at Ikonisys which I am responsible for, it is my opinion that such an issue certainly is likely to arise in the future as a result of the Revised Rules.

### ADDITIONAL REPRESENTATIVE HARM TO ME FLOWING FROM THE REVISED RULES

**I am Forced to Chose Between Obtaining the Claim Coverage I have Determined in The Past to Adequately Cover Inventions, or Risk Filing an Examination Support Document, the Requirements of Which Are Vague and Indeterminate**

31.    The Revised Rules published on August 21, 2007 differed significantly from the Proposed Rules.  Of particular applicability to my continuation-in-part filings was the change by the USPTO to require an Examination Support Document (ESD) if the claims in an application exceeded either five (5) independent claims, or twenty-five (25) claims in total.  All of my Energy Recovery patent continuation-in-part application filings filed before August 21,

2007 contain either more than five (5) independent, or twenty-five (25) total claims, making each susceptible to the ESD requirement after November 1, 2007.

32.     When I filed three (3) of my Energy Recovery continuation-in-part applications, which occurred prior to the publication date of the Revised Rules, *viz.*, August 21, 2007, such filings were made with the Proposed Rules in mind.  The Proposed Rules allowed an applicant to file as many claims as desired, while permitting the applicant to only designate ten (10) claims for examination, unless the applicant supplied a pre-examination search.  The proposed rules did not inform me, or any other patent applicant or attorney, that the USPTO was about to issue Revised Rules limiting the number of independent claims in any application to five (5), and total claims to twenty-five (25), unless an ESD is filed.  The Proposed Rules also did not indicate that any pre-examination search requirement would encompass a need to search all of the limitations for all of the claims (whether in independent or dependent form).

33.     Under the Revised Rules, I understand that all non-provisional applications (including my continuation-in-part applications) which were filed before November 1, 2007, and in which a first Office Action on the merits was <u>not</u> mailed before November 1, 2007, would be subject to the 5/25 rule with respect to claims and thus necessitate the filing of ESDs.  I understand that I am now left the choice of either reducing the coverage I am seeking to protect the inventions asserted in each application or subjecting myself to the onerous burden and uncertainties of filing of an ESD.

34.     Under §1.75(b)(1) of the Revised Rules, if an application contains, or is amended to contain, more than five independent claims or more than twenty-five total claims (the "5/25" threshold), an applicant must file an ESD in compliance with § 1.265 that covers each claim (whether in independent or dependent form) before the issuance of a first Office

action on the merits of the application.   The USPTO has repeatedly reassured applicants of the

fact that the ESD places no effective limits on the number of claims applicants can file:

> The applicant is free to file as many claims as necessary to
> adequately protect the invention.

72 Fed. Reg. 46791, col. 1, ¶ 5.  (Exhibit B).

> Section 1.75 does not limit the number of claims that [an] applicant
> can present in one application.

72 Fed. Reg. 46790. col. 1, paragraph 2; Cf., 72 Fed. Reg. 46791, col. 1., ¶ 4.  (Exhibit
C).

> Plaintiffs misconstrue the ESD requirement to suggest there is a
> limit, that its only 5/25.

Transcript of Preliminary Injunction Hearing at pp. 56 lines 14-15.  (Excerpts at Exhibit
D).

35.    In attempting to determine if an ESD is truly a viable option or safety-

valve, I asked my counsel to obtain a quote for such search from a reputable search firm, as well

as to estimate the cost for reviewing any uncovered prior art, and performing any other actions

required by the Revised Rules.  I received an estimate of about $25,000 based on a "bare bones"

search of only the elements which were not known to be clearly in the prior art.  Thus, if I was to

require an ESD for each of the four (4) applications exceeding the 5/25 limitation, I estimate that

I would have to spend initially approximately $100,000.  I also understand from my attorneys,

that the Revised Rules require a supplemental ESD each time I amend my claims, which should

also be factored into the cost of filing an ESD.

36.    I also understand that the search firm contacted by my attorneys refused to

provide a certification that their search would be ESD compliant.  Of course, this suggests that

they deemed the ESD requirements set forth in the new Revised Rules to be unclear.  Along

those lines, the Revised Rules do not appear to specify:  (i) whether both a manual and electronic

search need to be performed; (ii) the extent of the search that must be performed with respect to

all of the documents available on the faced of the Earth; and, (iii) what it meant by the language directing the search to encompass "all of the limitations of all of the claims."

37.    Thus, due to the retroactive application of the Revised Rules to applications filed and which have not received a first Office Action before November 1, 2007 if the preliminary injunction is withdrawn, I would be faced with a Hobson's choice. I must either accept less than I am entitled to in terms of patent coverage (by reducing the number of claims in my applications) or, alternatively, file an ESD with its attendant substantial costs and uncertainties with respect to compliance. Given the enormous cost and burden that would be attendant to preparing and filing an ESD, it is very questionable whether it is even reasonable to list an ESD filing as a truly plausible alternative.

38.    In any event, in determining whether my applications were an aberration in respect to the number of claims filed, I instructed my attorneys to uncover art pertaining to the filing pattern of persons and entities well known in the art. Such data supports my belief that the claim numbers residing in my patent applications are not outside of the norm. Many of the most prolific inventors of our time have filed numerous applications with more than 5/25 claims.

39.    For example, I have learned that it has been reported, based solely on the claims that issued in his patents, Thomas Edison would have violated the 5/25 threshold on a minimum of 394 occasions had the Revised Rules been in effect during his era. (See Exhibit E - http://www.legalmetric. com/ presentations /edison patent output.xls). Likewise, based solely on the claims in their patents, I understand that seventeen (17) of the fifty-three (53) inventors honored by the USPTO in its National Inventors' Hall of Fame also would have violated such a restriction (See Exhibit F - http://www.nipra.org/ddpatents06.htm).

40.    Furthermore, I have seen data suggesting that the USPTO's 5/25 claims limitation will have a detrimental effect on the Bayh-Dole Act's goal "to use the patent system to promote the utilization of inventions arising from federally supported research or development … [and] to promote the commercialization and public availability of inventions made in the United States …" 35 U.S.C. § 200.  For example, based on issued patents alone, 870 out of 2531 applications (34.4%) from federally funded research at MIT and California Universities since 2000 would run afoul of the new 5/25 threshold limitation.  (See Exhibit G).  Most interestingly since 2000, 26% percent of all patents that issued to the Department of Commerce have more than 5/25 claims, and 23% percent of all patents issued to the Department of Commerce after 1990 have more than 5/25 claims.  (See Exhibit H).

41.    My attorneys have also advised me that another factor arguing against the filing of an ESD is that it may open me (and my attorneys) to possible allegations by the USPTO of inequitable conduct.  For example, I understand that the USPTO could take the position in connection with any such filing that we failed to perform an adequate search, failed to take into account certain references noted by the search but not adequately reviewed, or failed to bring certain passages in the references uncovered by the applicant to the Examiner's attention.  This risk of being unfairly targeted by an inequitable conduct charge was further brought home by a short video clip shown to me from a presentation given at Duke Law School in February 2006, by the USPTO's former Deputy General Counsel for Intellectual Property and Solicitor, John M. Whealan (while he was still the Deputy General Counsel and Solicitor for the USPTO) concerning the Proposed Rules.  During this presentation, Mr. Whealan admitted that attorneys most likely would not file ESD's due to a fear of inequitable conduct charges that could be raised:

> If you want your claims examined up front, you can have it done –
> but it is going to cost you.  Your are going to have to do some
> work, which in the current law of inequitable conduct, <u>nobody is
> going to want to do.</u> (emphasis added)

(Excerpt of Speech, Exhibit A – Video 2 - Duke University School of Law, 5th Annual

Symposium, http://realserver. law.**duke**.edu /ramgen/spring06/students/02172006b.rm).   Mr.

Whealan's quip is certainly hammers home the fact that even the USPTO does not believe its

own purported justification that the ability to file an ESD is a truly practical alternative for most

inventors.  Id.

        42.    I have also reviewed non-confidential documents portions of the

administrative record provided by the USPTO in this case, which imply that the USPTO has

raised the ESD bar to such a level that it recognizes this option as a phantom right.  For example,

while I reviewed an email dated March 22, 2007, wherein a Robert Bahr of the USPTO reports

to Gregory Morse of the USPTO that as of February 28, 2007, of the 708,321 applications in the

backlog, of all the 5/25 non-compliant applications identified, 29% were large entity cases, and

30% small entity cases.  (See A.05028; Exhibit I).  I also reviewed a presentation slide by Robert

J. Spar, the Former Director of the Office of Patent Legal Administration and Deputy

Commissioner for Patent Examination Policy, who was the Certifying Officer of the USPTO's

information collection request to the OMB in 2005 and 2006, shown at an SDIPLA Meeting,

October 11, 2007 (after his retirement):

> An ESD will be required to aid in the examination,  <u>but it is
> expected that most applicants will not file an ESD</u>

Slide 15 SDIPLA Meeting October 11, 2007 - Exhibit J.

        43.    In yet another document which I reviewed from the OMB, the USPTO

certifies to the Office of Management and Budget as part of an attempt to paint a misleading

picture that the Revised Rule's ESD requirement will have only a very minimal impact on the

15

information collection burden of the public, that it anticipated no (0) small entities would file an ESD. (See Exhibit K). I understand the information provided in the OMB is provided pursuant to statute under the Paper Reduction Act, 35 U.S.C. 3501 *et seq*. I have been advised and otherwise understand that, under the Paper Reduction Act, the head of the particular agency supplying information to the OMB (which with respect to the USPTO, I understand to be Director Jon W. Dudas) is responsible for complying with all requirements of the Act, including certifying to the OMB's Director that the record supporting the collection of information supplied to OMB is based on "effective and efficient statistical survey methodology appropriate to the purpose for which the information is collected."

44.    Moreover, the USPTO in its own "Certification Analysis Under the Regulatory Flexibility Act," dated June 29, 2007, has adopted an average value of the market value of a patent application to be at least $220,000 (based on data from 1976 – 1992) indicating substantial harm in limiting the ability of an applicant to file a patent application. (See Exhibit L).

**I Must Overcome A Rebuttable Presumption That Exists in Respect To Three (3) of My Continuation Application Filings Simply Because these Filings Were Made on the Same Day, And Even After Rebuttal of Such Presumption, the A Non-Distinct Claim Objection May be Raised Continually Every Time I Amend Any of the Claims of Such Continuation Applications in Prosecution**

45.    I understand that three (3) of my continuation-in-part Energy Recovery Patent Applications invoke a rebuttable presumption under the Revised Rules that patentably non-indistinct claims exist between applications simply because these applications were filed on the same day. This rebuttable presumption seemingly applies even though the patent laws in effect when I filed my patent applications did not specify such a presumption.

46.    I have reviewed certain portions of the Manual of Patent Examining Procedure ("MPEP"), the USPTO's manual for its Examiners. MPEP 802.1 instructs that claims are "patentably distinct" where "the inventions *as claimed* are not connected in at least one of design, operation, or effect (*e.g.*, can be made by, or used in, a materially different process) AND wherein at least one invention is PATENTABLE (novel and non-obvious) OVER THE OTHER (though they may each be unpatentable over the prior art)." I understand from such definitions that the USPTO may raise the issue of indistinct claims again, every time I amend the claims, or new prior art is uncovered, concerning the three (3) applications I filed on the same day even if I overcome the presumption once.

47.    I also understand that the USPTO's implementation of this presumption under the Revised Rules is likely to have a draconian effect concerning how the USPTO will treat my pending patent applications. Under the Revised Rules, the USPTO will treat each application that it presumes or determines to have patentably indistinct claims as having the total number of claims present in all the applications for determining whether each application exceeds the 5/25 claim threshold. Consequently, I may be repeatedly subject to an ESD requirement and/or cancellation of claims, so long as one or more amendments are made to the claims or new references surface that call into question the patentability of previous discerned distinct patentable elements.

**I Also Face Expensive Requirements With Respect to All of My
Continuation-In-Part Applications**

48.    I am required under the Revised Rules with respect to four (4) of my continuation-in-part applications to identify "the claim or claims in a continuation-in-part application for which the subject matter is disclosed in the manner provided by the first paragraph of 35 U.S.C. 112 in the prior-filed application." This is so even though no similar rule

existed prior to the Revised Rules when I first filed my applications.    I understand that the

USPTO has waived this requirement for any continuation-in-part application in which a first

Office action on the merits has been mailed before November 1, 2007 in a USPTO publication

entitled "Clarification" of its Transitional provisions issued October 11, 2007".    None of my

Energy Recovery Application continuation-in-part applications, however, seemingly fits within

this "clarification" waiver.

### The Revised Rules Are Affecting the Valuation of My Patent Application Estate and Make the Processing of My Patent Applications Far More Expensive and Burdensome

49.    Due to the Revised Rules, I now face the prospect of filing far more

applications at considerable expense, each of which will undoubtedly assert and disclose far less

subject matter.    The claims' limitations and continuation limitations imposed by the Revised

Rules will force me to seek each invention in a separate application.    Otherwise, I will run the

risk that I might not be able to seek protection on such invention simply because I have no

continuation application opportunities to turn to or, that the Examiner will not give me a

restriction requirement (which is needed in order to file a divisional application).    Thus instead of

paying one filing fee, examination fee, and publication fee, as a result of the Revised Rules I will

be forced in the future to face a multiplicity of USPTO fees and attorney fees, as I attempt to

protect my inventions with far fewer claims, and fewer continuing applications off of one initial

application.

50.    Furthermore, due to the continuations limitation imposed by the Revised

Rules, I will assuredly have to file many more expensive appeal briefs.    Under  the Revised

Rules,  it would make little sense to file all of my continuations before appealing a "Final Office

Action."  By maintaining a continuation application opportunity after appeal, an applicant

preserves the opportunity to make one more filing before the Examiner after receiving input from the Patent Board of Appeals and Interferences.

51.     The Revised Rules have already affected the valuation of my Energy Recovery patent estate. First, the mere fact that I will be allowed only a small number of attempts as of right to get these patent applications issued adversely affects the valuation of my patent estate. As any baseball player knows, it is far more valuable to swing at the ball three times rather than just once. The same is true of patent applications. With less chances "at bat," I will be pushed to accept far less protection for my inventions than I would before the USPTO's enactment of the Revised Rules. I will also need to immediately (along with my attorneys) factor and adapt to the potential impacts of the Revised Rules in devising day-to-day tactical strategy for my ongoing patent prosecution efforts. In my experience, potential investors attempting to evaluate patent portfolios have always taken keen a interest in determining the available mechanisms to protect a patent portfolio, scope of possible protection and the odds of obtaining that protection.

52.     In conjunction with the Revised Rules, the USPTO has also proposed a number of rules with respect to the appeal process from an Examiner's final rejection (72 Fed. Reg. 41472 *et seq.*). I understand that these rules restrict my right to appeal from an adverse determination by an Examiner and, in determining whether the Revised Rules would have a substantial economic effect on small entities, the combined impact of these rules were not considered.

53.     As a practical matter, the restriction of my right to appeal a final rejection from an Examiner by any means, in conjunction with the new restrictions arbitrarily limiting number of times I may take up my case in front of the USPTO's examiners, significantly

decreases the valuation of my patent filings and my ability to attract investment capital. Without capital investment, it is very unlikely that I will bring my ERA invention, or other of my other inventions, to ultimate fruition and widespread commercial application.

### Under the Revised Rules, I May Not File and Maintain Another Continuation Application After November 1, 2007 Due to My Continuation-in-Part Filing Made After August 22, 2007

54.     One continuation-in-part application which I authorized to be filed with respect to my Energy Recovery inventions was not filed until September 7, 2007 after publication of the Revised Rules.

55.     On or about October 19, 2007, I was notified that the publication of my parent application would likely act as prior art against any continuation filing I might make after May 10, 2008. After discussing what subject matter was not already disclosed in my other continuation filings, I indicated that I would likely be filing such an application before May 10, 2008. Presently I am contemplating the filing of an application that both includes subject matter disclosed, but not claimed, in the parent application (nor for that matter in any of its continuing application progeny), as well as considering adding some new subject matter that may or may not be obvious in light of my parent application disclosure.

56.     I understand that the Revised Rules allows the USPTO to "delete if present, any specific reference to a prior-filed application" that does not meet certain requirements. I further understand that the USPTO has waived this requirement with respect to a certain category of applications into which my applications do not fit.

57.     I understand that if the preliminary injunction should be lifted and the Revised Rules are implemented, the only mechanism for me to file a new continuation-in-part application under the Revised Rules without loosing my priority date is to file a petition as specified under the Revised Rules.

58.    My attorneys have explained to me that a petition to support a continuing application may be filed under the Revised Rules only if I am able to make a showing that the application was "filed to obtain consideration of an amendment, argument or evidence that could not have been submitted during the prosecution of the prior-filed application."

59.    As I am seeking to claim material that was fully disclosed in my parent ERA Patent Application, my attorneys have told me that such a petition would not be grantable and have pointed me to 72 Fed. Reg. at 46768 ("The submission of an amendment to the claims or new claims to different subject matter alone will not be sufficient to meeting the showing requirement").

60.    I have also been advised that the filing of such a petition would risk violation of the PTO's rules of conduct (37 CFR § 10.85) (35 USC 32). This interpretation appears to be supported by reports supplied to me (I/P Updates, William Heinze, BillHeinze@yahoo.com, October 2007; PatentlyO, Dennis Crouch, www.patentlyo.com, October 15, 2007) that indicate that the Director of the UPSTO's Office of Enrollment and Discipline, in a September 11, 2007 presentation, has stated: "Patent attorneys and agents are subject to discipline for not complying with adopted regulations."  (See Exhibit M).

61.    Documents provided to me in this case further indicate to me that the USPTO understood the overwhelming difficulties attendant to filing a petition, particularly for a small entity.  As such, the USPTO's repeated statements that Revised Rules do NOT restrict continuation practice is simply untenable.  In particular, I note an email dated March 15, 2007 from Gregory Morse to John Doll, the Commissioner of Patents, which indicates that small entities comprised thirty (30) percent of all filers in fiscal year 2006 with patent application

families having three (3) or more continuations (3,320 small entity filers to 8,006 large entity

filers). (See A.08227; Exhibit N),

### The Revised Rules Impose Stringent and Requirements That Are Sowing Confusion

62.    I also suffer, and will continue to suffer, from the reporting requirements

that may be imposed retroactively if the Court's preliminary injunction order is removed.  Many

of these are required to be met before February 1, 2008.  For example:

    a.    I must identify all applications having a common owner and at least one common inventor which were filed within a two (2) month window before and after the filing date, or any priority date asserted in the application. The Revised Rules as promulgated applied to all applications, although on October 11, 2007 the USPTO in a "clarification" waived the "or within two months of" provision with respect to applications filed before November 1, 2007.

    b.    I must rebut a presumption of indistinct claims with respect to applications having: (a) a filing/priority date that is the same as the filing/priority date of another pending application or patent; (b) at least one inventor in common with another pending application or patent; (c) the same assignee (or subject to an assignment to the same entity); and (d) having written description support of at least one claim in the application.  Or in the alternative, I may file a terminal disclaimer and "explain why there are two or more pending … applications naming at least one inventor in common and owned by the same person, or subject to an obligation of assignment to the same person, which contain patentably indistinct claims."

63.    Confusion seems to be rampant with respect to the Revised Rules and has

already resulted in significant costs to myself and other patent applicants.  For example,  I

understand the USPTO issued a manual entitled "Claims and Continuations Final Rule," on

September 26, 2007 in which it maintained at (C11) that "if applicant filed a Demand and paid

the additional examination fees and all of the inventions were examined in the international

application, the applicant may not file a divisional application," under the Revised Rules.

64. I understand that the issuance of this manual rapidly led to many patent attorneys, including my own, reviewing each of their clients files to determine whether a demand had been filed in the international application, and a restriction requirement in the corresponding U.S. patent. I understand that my own attorneys and other patent practitioners proceeded to undertake efforts to prepare divisional applications in such cases before November 1, 2007 (when this certain provision of the Revised Rules was to go into effect).

65. On October 11, 2007, the USPTO, however, sent out yet another "clarification" of the Revised Rules indicating that the term "examined" as used in this provision did not include international phase examination under PCT Article 31. Of course, myself and other patent applicants were burdened with attorneys' fees and other costs in connection with these efforts.

## CONCLUSION

66. In view of the foregoing, it is my opinion that I have suffered, and continue to suffer significant, tangible, and irreparable harm from the retroactive and prospective actions of the Revised Rules if they are not declared invalid and permanently enjoined.

67. The Revised Rules diminish my rights to obtain the scope of protection I am entitled to under Congressional statutes, both by restricting my ability to file continuing applications without the filing of a petition (which seemingly few chances of being granted), and by effectively limiting the number of claims that I may pursue without the need to file an indeterminate ESD (which, again, the USPTO's own Deputy General Counsel and Solicitor (retired) has acknowledged may open me and my attorneys up to charges of inequitable conduct in the future). I am further harmed in having to comply with provisions in the Revised Rules that do not specifically set forth the metes and bounds of their requirements, and that are so

confusing, even the United States Patent and Trademark Office has felt the need to "clarify" away their prior interpretation of provisions of the Revised Rules.

68.    The Revised Rules devalue my Energy Recovery patent estate in reducing my ability to contest patentability determinations before the Examiner, and in working in conjunction with other rules proposed by the USPTO to restrict the appeal of such determinations to the Patent Board of Appeals and Interferences.  It also makes the patent estate of the automated microscopy company in which I have invested so much of my life, and which I have a proprietary interest, subject to devaluation.  Devaluation of the worth of either patent portfolio, makes it significantly more difficult to raise funds needed to develop my inventions, and puts my prior investment at jeopardy.

**VERIFICATION**

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the

United States of America that the foregoing is true and correct.


Executed this 20th day of December, 2007, in New Haven, Connecticut.


_____

TRIANTAFYLLOS TAFAS