# EXHIBIT F

## Part 1 of 2

Case 1:07-cv-00846-JCC-TRJ    Document 143-10    Filed 12/21/2007    Page 2 of 8
http://www.nipra.org/ddpatents06.htn

# New Claims and Continuations Rules at the USPTO

## A quiz for patent professionals (rev. 0.6a, 9/29/2007)

A newer version of this quiz is available. Click here to be linked to the new location. There are 22 questions. Many of the questions are based on the new rules (hypotheticals start at question 11), and we are trying to figure them out just like you. Our answers do not constitute legal advice, and may be wrong. If you think they are, or if you have suggestions or ideas for other "interesting" questions, please e-mail us at comments27@nipra.org. Thank you.

Show questions one by one

1. Which of the following United States agencies is given a constitutional mandate to promote the progress of science and the useful arts?

   A. ? National Endowment for the Arts (NEA)

   B. ? National Science Foundation (NSF)

   C. ? United States Patent and Trademark Office (USPTO)

   D. ? Defense Advanced Research Projects Agency (DARPA)

2. In 1999, to address a shortcoming which became evident in the patent system, Congress amended 35 U.S.C. 3 to require that the following individuals have a "professional background and experience in patent or trademark law" before assuming their governmental positions:

   A. ? Patent Examiners

   B. ? Trademark Attorneys

   C. ? Federal Judges at the Court of Appeals for the Federal Circuit

   D. ? Director and Deputy Director of the United States Patent and Trademark Office

3. During the last 15 years, which Directors (or former Commissioners) of the United States Patent and Trademark Office have had a "professional background and experience in patent or trademark law" before coming to the USPTO, as is now

required by 35 USC 3?

A.  ?  Bruce Lehman (1993-1998), Clinton Administration

B.  ?  Q. Todd Dickinson (1998-2000), Clinton Administration

C.  ?  James E. Rogan (2001-2003), Bush Administration

D.  ?  Jon W. Dudas (2004-2007), Bush Administration

---

4.  What do you think having inexperienced and unqualified political appointees running the USPTO for 12 of the last 15 years has done to the operation of the agency?

A.  ?  The USPTO has been operating as a virtually headless organization, unable to constructively address the problems which face it and the nation.

B.  ?  I think it has actually helped the patent system. The morale at the USPTO is high, examiner retention is very good, the public thinks the USPTO is doing a great job, and the customers are happy. Moreover, I just read the USPTO's own 2006 Performance and Accountability Report which says the patent allowance error rate is even lower than the target error rate of 4%. Given all this, what more could one possibly ask for?

C.  ?  I actually don't think it has harmed operations at all, and the present distress of the agency as described by the OIG, the GAO, the media, and the Examiner's Union is only coincidental to the unqualified leadership. Moreover, I actually haven't heard any complaints about patent quality or problems with the patent system.

D.  ?  Who's inexperienced? Director Dudas has brought back more funds to Alexandria than Ted Stevens has to Alaska, and if the new rules are just a bridge to nowhere, then it will have been good money spent nonetheless.

---

5.  Currently Jon W. Dudas is the Director of the United States Patent and Trademark Office, and Margaret J. A. Peterlin is the Deputy Director. Between the two of them, how much "professional background and experience in patent or trademark law" do they have?

A.  ?  Well, Director Dudas has had several years of on the job training now, and Deputy Director Peterlin is getting her on the job training at this very moment.

B.    ?    Deputy Director Peterlin is a registered patent attorney

C.    ?    Director Dudas and Deputy Director Peterlin are both trademark attorneys.

D.    ?    Director Dudas and Deputy Director Peterlin both can recognize the trademarks belonging to McDonald's Corporation.

---

6.    How could it be that Director Dudas and Deputy Director Peterlin were both initially appointed to the Office contrary to law?

A.    ?    There was a misunderstanding at the Commerce Department about each one's professional background and experience.

B.    ?    We honestly don't know, especially since effective leadership is so vital for the effective and efficient operation of the USPTO.

C.    ?    No one in Washington was aware of the law, and therefore the appointments just fell through the cracks, so to speak.

D.    ?    Actually, Congress never intended for 35 USC 3 to be enforced. It's really just for political show.

---

7.    On August 21, 2007, the USPTO announced final rules relating to continuations, claims, and prior art disclosure and analysis. These rule changes are slated to become effective on November 1, 2007 and will:

A.    ?    have no significant economic impact on the United States as indicated by OMB's review and approval of the final rules.

B.    ?    have become effective after notice and public comment as required by the APA.

C.    ?    be instrumental in making the USPTO more efficient in its operations.

D.    ?    be retroactive as to all patent applications in which a "first action on the merits" (FAOM) has not been issued before November 1, 2007, even if those applications were filed before the final rules were made public.

---

8.    The final rules announced on August 21, 2007 have two major effects which the USPTO says are designed to help focus examination for those applications which

place an "extensive burden" on the Office. First, applications in which an Examination Support Document (ESD) has not been filed before the first Office action on the merits will be limited to five (5) independent claims and twenty-five (25) total claims. Secondly, all applications will be limited to two (2) continuations (including CIPs and voluntary divisionals) and one (1) request for continued examination (RCE).

The National Inventors Hall of Fame (http://www.invent.org) lists fifty-three U.S. Patents that have been issued to its inductees since 1970. Of those 53 patents, what percentage would run afoul of the new claims and continuations rules (if the patents were newly pending on November 1, 2007) and would therefore have been considered to place an "excessive burden" on the Office (considering the total number of continuations and the number of claims in the patent) by the present USPTO leadership?

A.   ☐   None, these patents represent America at its best, and the USPTO exists to process and issue patents like these. No one would ever consider them a "burden"!

B.   ☐   9%

C.   ☐   22%

D.   ☐   32%

9.   Considering again the situation with the National Inventors Hall of Fame patents, why do you think so many patents from as early as 1970 (the earliest year we analyzed) through the mid-1990s violated the new rules which the USPTO management has indicated are intended to produce "more effective and efficient examination for the typical applicant without any additional work on the part of most applicants" and to reduce the "extensive burden" of such applications on the agency?

A.   ☐   Because the USPTO management believes that anything more than a simple patent application is, in fact, an "extensive burden". It wants to encourage and receive only simple patent applications. It does not want to receive complex patent applications, especially those which might represent the best of the American inventive spirit.

B.   ☐   Because these Hall of Fame inventors from every major discipline and industry have been abusing the U.S. patent system (and the USPTO) for almost four decades now.

C.   ☐   Because the patent attorneys for these inventors have been abusing the patent system (and the USPTO) for almost four decades now.

D.   ☐   Because someone other than the USPTO has made a mistake or

done something wrong, or failed to do what they should have, or otherwise erred.... It's not the USPTO's fault!

---

10.  Let's leave the National Inventor Hall of Fame and turn our attention to the National Inventor of the Year Awards.

Every year since 1974, the IPO (Intellectual Property Owners Association) has nominated U.S. patentees for the National Inventor of the Year Award. Criteria used to judge the winning nomination include, among other things, the display by the inventor of the American traditions of technological leadership and Yankee ingenuity, as well as the societal benefits and commercial success of the invention.

Since 1975, there have been approximately 60 U.S. Patents which have been the bases for all the National Inventor of the Year Awards. Of these 60 patents, what percentage do you think would run afoul of the new claims and continuations rules and would have thus been considered to place an "extensive burden" on the Office (again, considering the total number of continuations and the number of claims in the patent) by the present USPTO leadership?

A.    ?    0%. The USPTO can recognize important patent applications before they issue and would never hinder the progress of the useful arts by issuing regulations which work against "good" patents. The USPTO management is merely trying to protect the public from the "bad" patents that it has heretofore issued.

B.    ?    15.8%

C.    ?    31.7%

D.    ?    63.5%

---

11.  Now we'll move on to a few hypotheticals regarding the new rules.

On November 5, 2007, you file an application on a tumor imaging system. The application includes four embodiments O, P, Q, and R, but only three (O, P, and Q) are claimed. On April 3, 2008, the Examiner, not seeing any significant difference between the embodiments O and P, makes a two-way restriction, requesting election between the embodiments O, P and the embodiments Q, R. On May 1, 2008, you elect O, P and at some point later (after the FAOM) the Examiner, now recognizing the burden of examining two embodiments, issues a second [delayed] restriction between the embodiments O and P, and you elect and prosecute O to allowance.

After allowance, you file separate continuing applications on P, Q, and R. According to new Rule 78, which of the new continuing applications are divisionals?

A.    ?    the application directed to P.

B.    ?    the application directed to Q.

C.    ?    the application directed to R.

D.    ?    the applications directed to P and Q

E.    ?    all of them are!

12.    New 37 CFR 1.75(b)(2) states:

"A claim that refers to another claim but does not incorporate by reference all of the limitations of the claim to which such claim refers will be treated as an independent claim for fee calculation purposes under § 1.16 (or § 1.492) and for purposes of paragraph (b) of this section."

In the "Response to Comments" section, the FR notice further indicates this (at 46794):

"A claim that merely refers to another claim is not a dependent claim in compliance with 35 U.S.C. 112, ¶ 4."

An example of a claim that "merely refers" to another claim but does NOT incorporate by reference all the limitations of the claim to which it refers would be:

A.    ?    4. An air filter made according to the process of claim 3.

B.    ?    6. An air filter as recited in claim 5, wherein the filter media includes pleated layers.

C.    ?    7. An air filter as recited in claim 5 but not claim 6, wherein the filter media is matted.

D.    ?    8. An air filter as recited in claim 5 which incorporates by reference all the limitations of claim 5, wherein the filter media includes a final HEPA stage.

E.    ?    9. An air filter as recited in claims 1 or 5, wherein the filter media is charcoal activated.

13.    The new rules came as such a surprise, didn't they? Good thing you have a chance to file that "one more" continuing application (FR 46736, 46737) for any of those difficult cases that have been hanging around for a while, even though they're

Claims and Continuations Under the New USPTO Rules http://www.mpra.org/ddpatents

beyond the continuation/RCE limits, eh?

On January 3, 2002, you filed a patent application for Acme Corp. on a batteryless smoke detector and method of operation, claiming priority under 35 USC 119 to an application filed in Japan on January 4, 2001. Initial examination at the USPTO was contentious, and after filing an RCE, you strategized and filed two voluntary divisionals on July 7, 2005, one with twelve claims to cover the smoke detector and one with ten claims to cover the method, abandoning the original application. On December 5, 2005, your strategy paid off and the Examiner allowed the application covering the method, and the patent to the method subsequently issued on April 18, 2006.

On November 27, 2007, under final rejection in the smoke detector application, you file a continuation application and abandon the parent. Thereafter, you file a preliminary amendment adding limitation Z to your broadest claims and in a telephone interview, the Examiner indicates that an agreement has been reached and the continuation is now in condition for allowance. Subsequently, on January 29, 2008, you see on Public PAIR that the Examiner has issued a notice of allowability with reasons for allowance that mentions, among other things, the limitation Z. Wow, this is a good day!

You receive the notice of allowance and issue fee due shortly thereafter, and proceed through your final checklists, making sure to cross every "t" and dot every "i" with respect to the reasons for allowance, related applications, declaration sufficiency, duty-to-disclose from foreign counterparts, etc. Everything's a "go", so you pay the issue fee on April 11, 2008.

On April 18, 2008, you receive a manilla envelope from Big Corp. via certified mail. Inside the envelope, a letter from in-house counsel congratulates you on the allowance of your application (which he also saw on Public PAIR on January 29, 2008), and (strangely, it seems) on your payment of the issue fee. Clipped to the letter is a copy of a Japanese Utility Model from 1992 which clearly shows on its cover page the limitation Z, but apparently does not show several other features of your broadest claims.

At this point you should:

A.   ?   withdraw the smoke detector application from issue, file a continuation with the IDS, and expressly abandon the withdrawn application.

B.   ?   withdraw the smoke detector application from issue, file the IDS with an RCE, and expressly abandon the withdrawn application.

C.   ?   withdraw the smoke detector application from issue, file a continuation with the IDS, deleting the priority reference to the January 3, 2002 application in the continuation, and expressly abandon the withdrawn application.

D.   ?   withdraw the smoke detector application from issue, file a continuation with a petition and showing under 37 CFR 1.78(d)(1)(vi), and expressly abandon the withdrawn application.