Tafas v. Dudas et al

Doc. 143 Att. 52

# EXHIBIT

14-a

Dockets.Justia.com

is that they need to protect, the scope of the claims and so forth. Some will say that because of the youth of our examiners that they're not getting to the real issues early enough and it's causing more continuations. That's a concern of some individuals.

COMMISSIONER DOLL: What's interesting, though, is that when we go out and talk to bar associations, we hear that it takes two, three, four continuations before the examiner understands the invention. When I come back and we have town halls with the examiners, the examiners say: it takes us three, four, five continuations to get the claims narrowed down to something that's reasonable that we can search and that we can actually give a good office action on. And both those statements are probably true, because we have a spectrum of problems, and we have a spectrum of quality. And I think both are true.

CHAIRMAN RIVETTE: Robert, are you

seeing the same thing? From your site?

MR. BUDENS: I think what John has said I would tend to agree with. And, also, the trunk of that is just prosecution in some of the tech centers; you know, 1,600 -- we have a lot of continuations just because prosecution continues on while the companies are looking for FDA approval, for example. They just keep the cases alive.

CHAIRMAN RIVETTE: Do we have any breakdown on this by TC?

MR. LOVE: Yes.

CHAIRMAN RIVETTE: Have we? Where are we finding the most continuations?

MR. LOVE: Well, the first continuations are relatively even across the TC's: it's 1600s that subsequent really stick out.

MS. NORTON: Do you think that's related significantly to the quality initiatives? That more rejections are going out because of quality review?

MR. LOVE: No, I don't think so. But I don't have the experience in 1600s, so I couldn't really say.

CHAIRMAN RIVETTE: Well, we were talking right over here.

MR. LOVE: Yes.

MR. BUDENS: I don't think -- I mean, the quality initiatives are playing a part in the last two years, but I think the other issue really is a case of the companies' taking time to overcome enablement rejections; for example, collecting the data they need in order to overcome the rejections that are being made. That would be my view from an examiner's point of view. We can get the industry point of view also, but -- but that's, I think, where we mostly would see them.

MS. RYAN: And I think it's a combination of things. I think that there's a great pressure in the pharmaceutical and biotech industry to file early, and there's

the weighing of do you have enough to file? Do you wait? And so there is that balance.

MR. BUDENS: In reply to that, too, I would also point out: this one also includes divisionals; 1600 does a lot of restrictions and stuff, and some of the electrical areas do. So by factoring in the divisionals in that statistic, you've also increased that somewhat.

CHAIRMAN RIVETTE: So let's just -- for the people that are just joining us -- one of the things we're trying to do is get rid of the acronyms, get rid of the priesthood jargon. Doug, are you familiar with what a "continuation" is, and what a "divisional" is?

MR. PATTON: Yes.

CHAIRMAN RIVETTE: Okay. Fine. Thanks.

MR. LOVE: Okay, moving on then to the next slide -- this, Jerry, shows some of the targets of the past year in terms of

quality goals. The goal for '06 was to be less than 4 percent with respect to our allowance error, and to be greater than 86 percent in the in-process compliance number. And that has to do with -- the difference is, allowance error has to be with allowed applications that are reviewed by our quality review examiners. The in- process review compliance number has to do with reviews of applications before they're allowed; in other words, first office actions, restriction requirements, final rejections -- that sort of thing. So that's the two different numbers and what they're looking. And in '06 you see -- and, by the way, one of the things we really want to do, and we'd like the board's input -- the PPAC -- go from characterizing it as an "allowance error" to a compliance factor for allowances also.

One goal is expressed in terms of "compliance," and the other is "error rate." So we'd like to be consistent and also

express it in terms of compliance with respect to the allowance error rate. But the overall is 3.5 percent for the corps for the allowance error rate, which is below the 4 percent, which means we surpassed our goal -- significantly. And the compliance rates for the in- process reviews were 90 percent, which is again exceeding the goal by a significant amount.

CHAIRMAN RIVETTE: Why don't you give us an idea of what the numbers are. 1600 is bio?

MR. LOVE: It's biotech-1700 is traditional chemistry; 21 is computer software, computer architecture; 26 is telecommunication -- any communication-type system; 28 is the traditional electrical areas; 3600 is -- they have business methods, they have civil engineering -- a lot of the traditional transportation arts; then 3700 has the other mechanical arts.

CHAIRMAN RIVETTE: So you get

software in 21 and 26?

MR. LOVE: Yes.

CHAIRMAN RIVETTE: 36?

MR. LOVE: 36 has the business methods area.

CHAIRMAN RIVETTE: So, as I look at this, in the high-tech area it looks like we're doing real well? Is that what I'm seeing? And the question then becomes: why is that different than 1600 and 1700? Is it we've got different people? Is it the problems are different? Are we attacking it differently?

MR. LOVE: Well, it's the same review process. There are different reviewers that specialize in certain technologies.

CHAIRMAN RIVETTE: Because you get a 2 percent differential.

MR. LOVE: Right.

CHAIRMAN RIVETTE: It seems like a lot -- especially when you're talking about

the high-tech stuff. I mean, I commend the office; 2.8 is great. I just wonder why the 4.8 -- why the difference of almost 50 percent. Any ideas?

MR. LOVE: Well -- in the complex arts, the people that file the applications really know what the state of the art is, and perhaps the examiners start from a better point in terms of what the state of the art is. And the other areas, where they don't get enough information that's good information up front, and it certainly may be a little bit more difficult to search and to find the art; whereas in the high tech, it's a narrow field, the scope of the art is really pretty well defined, and they might be in a better starting point than the other examiners.

COMMISSIONER DOLL: One of the things that I like to mention -- and this relates to the chemical and the biotech, is that the number one error that we have is

that quality review finds prior art that the examiners did not find. And they find prior art the examiner did not find because the examiner misinterpreted the scope of that claim; they didn't read the claim broadly enough. When you get into the extremely complex areas -- digital encryption, computer architecture -- things are much better defined. When you look at a Markush claim that contains, you know, 10 to the 6,000 species, it's hard to search the scope of that claim; it's hard to appreciate. We're working on -- and those are some of the things about, quality initiatives to help the examiners search, help them understand the scope of a claim -- and in the higher tech art areas, such as the satellite communications, things seem to be much better defined, which gives the examiner a much better opportunity to zero in on what they should search. Because they don't have a claim that reads "On the sun, the moon and

the stars," which is the typical pharma or biotech case.

MR. PATTON: I have a layman's question: are there Google-like search engines designed for each one of these areas by the Patent Office to do this? It would seem that with technology now -- is that something that exists? Or not?

COMMISSIONER DOLL: We have search engines. We usually use East or West, which is our primary search engines. We search databases such as Dialogue, Questell. I mean, we search every database that's possible. Mostly it's through Boolean logic. Again, one of the strategic initiatives that we're looking at is going out to universities, corporations, and art-specific areas to see: what are they using to search their particular art to see if we couldn't important that technology here to help in a particular area, or to see what's the best search engine for mechanical devices, or