# EXHIBIT 26

Dockets.Justia.com

STATEMENT OF

THE HONORABLE JON W. DUDAS

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY
AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE

SUBCOMMITTEE ON INTELLECTUAL PROPERTY
COMMITTEE ON THE JUDICIARY
United States Senate

"The Patent System: Today and Tomorrow"

APRIL 21, 2005

## Introduction

Chairman Hatch, Ranking Member Leahy, and Members of the Subcommittee:

Thank you very much for inviting me to testify today. I commend you for holding this hearing appropriately named the "Patent System: Today and Tomorrow." This is a particularly appropriate time to reflect upon the incredible success of innovation and of our patent system in the United States. It was 215 years ago this month that our young nation adopted its first patent statute. On April 5, 1790, your predecessors in the Senate passed the final version of the statute, and President George Washington signed it into law on April 10.

The benefits of our patent system have always been obvious to Americans. You are familiar with Article 1, Section 8, Clause 8 of the U.S. Constitution, granting Congress the power "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." James Madison wrote in one of the Federalist Papers, "The utility of this power will scarcely be questioned." He was right. That clause was adopted into the Constitution without a dissenting vote -- without even any recorded debate.

The need for a statutory system to examine and grant patents was just as obvious. President Washington signed the first patent statute 215 years ago -- before our nation even had its 13th state. History has repeatedly affirmed the wisdom of this decision of our Nation's founders. The tremendous ingenuity of American inventors, coupled with

1

We have an incredibly dedicated core of patent examiners and technical support staff. I have met with hundreds of examiners individually, collectively, in tech center meetings, at union meetings, at retirement parties, and just walking the halls. Those who stay and make a career at the USPTO are dedicated, engaged, and knowledgeable. They not only know their art, but also are keenly aware of the outside pressures on our office. Interestingly, the number-one challenge I hear from examiners is that of problems with incoming application quality! The comments from our examiners emphasize to me, possibly more than anything else, how much of a shared responsibility patent quality is and improvement to the patent system.

## The Impact of "Continuations" on the USPTO

Last year, more than 100,000 of the 355,000 applications filed with the USPTO were iterations of applications that had previously been reviewed by an examiner. That is, more than one-third of the applications received last year were not, strictly speaking, "new." Rather, they represented a form of re-work. This rework is a significant challenge for reaching new applications, because so-called continuations represent additional work on subject matter that has already been reviewed in examination and – in some instances – even issued as a patent. Continuations, or "re-work," can take a variety of forms. A "continuation," per se, is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented. A "divisional application" is a later-filed application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application. An "RCE" (request for continued examination) is available in an application where prosecution is closed, at the request of the applicant. Given the ever-increasing workloads we face, it is necessary and appropriate for all to consider whether some restrictions should be placed upon so-called "continuation" practices.

## Patent Applications and the Number of Claims

Patent applicants include, as part of their application, patent claims that ultimately define the legal metes and bounds of the protection when a patent is granted. Thanks to your efforts last year, the USPTO now receives additional funding to support our examination function through fees based upon the number of claims presented for examination. Tying increased fees to increased numbers of claims inserts the right monetary incentives in the system. What is not immediately evident is that even a relatively small number of applications containing a large number of claims present efficiency challenges. Complexity of analysis is directly related to the number of claims presented, and large numbers of claims immediately affect our examiners' ability to conduct the high-quality examination we all expect from our patent system. It is not solely a question of time. Large numbers of claims may involve numerous interactions with possibilities not envisioned by even the applicant. Accordingly, the burden imposed by such large-claim applications – even when received in relatively small numbers -- can impede our ability promptly to examine applications relating to other inventions. At the same time, we must certainly recognize the legitimate need for applicants to present large numbers of claims in some applications.