Tafas v. Dudas et al
Case 1:07-cv-00846-JCC-TRJ   Document 143-82   Filed 12/21/2007   Page 1 of 14
Doc. 143 Att. 81

# EXHIBIT 34

Dockets.Justia.com

# New Claims and Continuations Rules at the USPTO

## A quiz for patent professionals (rev. 0.6a, 9/29/2007)

A newer version of this quiz is available. Click here to be linked to the new location. There are 22 questions. Many of the questions are based on the new rules (hypotheticals start at question 11), and we are trying to figure them out just like you. Our answers do not constitute legal advice, and may be wrong. If you think they are, or if you have suggestions or ideas for other "interesting" questions, please e-mail us at comments27@nipra.org. Thank you.

Show questions one by one

1. Which of the following United States agencies is given a constitutional mandate to promote the progress of science and the useful arts?

   A. ? National Endowment for the Arts (NEA)

   B. ? National Science Foundation (NSF)

   C. ? United States Patent and Trademark Office (USPTO)

   D. ? Defense Advanced Research Projects Agency (DARPA)

2. In 1999, to address a shortcoming which became evident in the patent system, Congress amended 35 U.S.C. 3 to require that the following individuals have a "professional background and experience in patent or trademark law" before assuming their governmental positions:

   A. ? Patent Examiners

   B. ? Trademark Attorneys

   C. ? Federal Judges at the Court of Appeals for the Federal Circuit

   D. ? Director and Deputy Director of the United States Patent and Trademark Office

3. During the last 15 years, which Directors (or former Commissioners) of the United States Patent and Trademark Office have had a "professional background and experience in patent or trademark law" before coming to the USPTO, as is now

required by 35 USC 3?

- A. ? Bruce Lehman (1993-1998), Clinton Administration
- B. ? Q. Todd Dickinson (1998-2000), Clinton Administration
- C. ? James E. Rogan (2001-2003), Bush Administration
- D. ? Jon W. Dudas (2004-2007), Bush Administration

4. What do you think having inexperienced and unqualified political appointees running the USPTO for 12 of the last 15 years has done to the operation of the agency?

- A. ? The USPTO has been operating as a virtually headless organization, unable to constructively address the problems which face it and the nation.
- B. ? I think it has actually helped the patent system. The morale at the USPTO is high, examiner retention is very good, the public thinks the USPTO is doing a great job, and the customers are happy. Moreover, I just read the USPTO's own 2006 Performance and Accountability Report which says the patent allowance error rate is even lower than the target error rate of 4%. Given all this, what more could one possibly ask for?
- C. ? I actually don't think it has harmed operations at all, and the present distress of the agency as described by the OIG, the GAO, the media, and the Examiner's Union is only coincidental to the unqualified leadership. Moreover, I actually haven't heard any complaints about patent quality or problems with the patent system.
- D. ? Who's inexperienced? Director Dudas has brought back more funds to Alexandria than Ted Stevens has to Alaska, and if the new rules are just a bridge to nowhere, then it will have been good money spent nonetheless.

5. Currently Jon W. Dudas is the Director of the United States Patent and Trademark Office, and Margaret J. A. Peterlin is the Deputy Director. Between the two of them, how much "professional background and experience in patent or trademark law" do they have?

- A. ? Well, Director Dudas has had several years of on the job training now, and Deputy Director Peterlin is getting her on the job training at this very moment.

    B. ? Deputy Director Peterlin is a registered patent attorney

    C. ? Director Dudas and Deputy Director Peterlin are both trademark attorneys.

    D. ? Director Dudas and Deputy Director Peterlin both can recognize the trademarks belonging to McDonald's Corporation.

6. How could it be that Director Dudas and Deputy Director Peterlin were both initially appointed to the Office contrary to law?

    A. ? There was a misunderstanding at the Commerce Department about each one's professional background and experience.

    B. ? We honestly don't know, especially since effective leadership is so vital for the effective and efficient operation of the USPTO.

    C. ? No one in Washington was aware of the law, and therefore the appointments just fell through the cracks, so to speak.

    D. ? Actually, Congress never intended for 35 USC 3 to be enforced. It's really just for political show.

7. On August 21, 2007, the USPTO announced final rules relating to continuations, claims, and prior art disclosure and analysis. These rule changes are slated to become effective on November 1, 2007 and will:

    A. ? have no significant economic impact on the United States as indicated by OMB's review and approval of the final rules.

    B. ? have become effective after notice and public comment as required by the APA.

    C. ? be instrumental in making the USPTO more efficient in its operations.

    D. ? be retroactive as to all patent applications in which a "first action on the merits" (FAOM) has not been issued before November 1, 2007, even if those applications were filed before the final rules were made public.

8. The final rules announced on August 21, 2007 have two major effects which the USPTO says are designed to help focus examination for those applications which

place an "extensive burden" on the Office. First, applications in which an Examination Support Document (ESD) has not been filed before the first Office action on the merits will be limited to five (5) independent claims and twenty-five (25) total claims. Secondly, all applications will be limited to two (2) continuations (including CIPs and voluntary divisionals) and one (1) request for continued examination (RCE).

The National Inventors Hall of Fame (http://www.invent.org) lists fifty-three U.S. Patents that have been issued to its inductees since 1970. Of those 53 patents, what percentage would run afoul of the new claims and continuations rules (if the patents were newly pending on November 1, 2007) and would therefore have been considered to place an "excessive burden" on the Office (considering the total number of continuations and the number of claims in the patent) by the present USPTO leadership?

A. ? None, these patents represent America at its best, and the USPTO exists to process and issue patents like these. No one would ever consider them a "burden"!

B. ? 9%

C. ? 22%

D. ? 32%

---

9. Considering again the situation with the National Inventors Hall of Fame patents, why do you think so many patents from as early as 1970 (the earliest year we analyzed) through the mid-1990s violated the new rules which the USPTO management has indicated are intended to produce "more effective and efficient examination for the typical applicant without any additional work on the part of most applicants" and to reduce the "extensive burden" of such applications on the agency?

A. ? Because the USPTO management believes that anything more than a simple patent application is, in fact, an "extensive burden". It wants to encourage and receive only simple patent applications. It does not want to receive complex patent applications, especially those which might represent the best of the American inventive spirit.

B. ? Because these Hall of Fame inventors from every major discipline and industry have been abusing the U.S. patent system (and the USPTO) for almost four decades now.

C. ? Because the patent attorneys for these inventors have been abusing the patent system (and the USPTO) for almost four decades now.

D. ? Because someone other than the USPTO has made a mistake or

done something wrong, or failed to do what they should have, or otherwise erred.... It's not the USPTO's fault!

10. Let's leave the National Inventor Hall of Fame and turn our attention to the National Inventor of the Year Awards.

    Every year since 1974, the IPO (Intellectual Property Owners Association) has nominated U.S. patentees for the National Inventor of the Year Award. Criteria used to judge the winning nomination include, among other things, the display by the inventor of the American traditions of technological leadership and Yankee ingenuity, as well as the societal benefits and commercial success of the invention.

    Since 1975, there have been approximately 60 U.S. Patents which have been the bases for all the National Inventor of the Year Awards. Of these 60 patents, what percentage do you think would run afoul of the new claims and continuations rules and would have thus been considered to place an "extensive burden" on the Office (again, considering the total number of continuations and the number of claims in the patent) by the present USPTO leadership?

    A. ___?___ 0%. The USPTO can recognize important patent applications before they issue and would never hinder the progress of the useful arts by issuing regulations which work against "good" patents. The USPTO management is merely trying to protect the public from the "bad" patents that it has heretofore issued.

    B. ___?___ 15.8%

    C. ___?___ 31.7%

    D. ___?___ 63.5%

11. Now we'll move on to a few hypotheticals regarding the new rules.

    On November 5, 2007, you file an application on a tumor imaging system. The application includes four embodiments O, P, Q, and R, but only three (O, P, and Q) are claimed. On April 3, 2008, the Examiner, not seeing any significant difference between the embodiments O and P, makes a two-way restriction, requesting election between the embodiments O, P and the embodiments Q, R. On May 1, 2008, you elect O, P and at some point later (after the FAOM) the Examiner, now recognizing the burden of examining two embodiments, issues a second [delayed] restriction between the embodiments O and P, and you elect and prosecute O to allowance.

    After allowance, you file separate continuing applications on P, Q, and R. According to new Rule 78, which of the new continuing applications are divisionals?

A. [ ? ] the application directed to P.

B. [ ? ] the application directed to Q.

C. [ ? ] the application directed to R.

D. [ ? ] the applications directed to P and Q

E. [ ? ] all of them are!

---

12. New 37 CFR 1.75(b)(2) states:

    "A claim that refers to another claim but does not incorporate by reference all of the limitations of the claim to which such claim refers will be treated as an independent claim for fee calculation purposes under § 1.16 (or § 1.492) and for purposes of paragraph (b) of this section."

    In the "Response to Comments" section, the FR notice further indicates this (at 46794):

    "A claim that merely refers to another claim is not a dependent claim in compliance with 35 U.S.C. 112, ¶ 4."

    An example of a claim that "merely refers" to another claim but does NOT incorporate by reference all the limitations of the claim to which it refers would be:

    A. [ ? ] 4. An air filter made according to the process of claim 3.

    B. [ ? ] 6. An air filter as recited in claim 5, wherein the filter media includes pleated layers.

    C. [ ? ] 7. An air filter as recited in claim 5 but not claim 6, wherein the filter media is matted.

    D. [ ? ] 8. An air filter as recited in claim 5 which incorporates by reference all the limitations of claim 5, wherein the filter media includes a final HEPA stage.

    E. [ ? ] 9. An air filter as recited in claims 1 or 5, wherein the filter media is charcoal activated.

---

13. The new rules came as such a surprise, didn't they? Good thing you have a chance to file that "one more" continuing application (FR 46736, 46737) for any of those difficult cases that have been hanging around for a while, even though they're

beyond the continuation/RCE limits, eh?

On January 3, 2002, you filed a patent application for Acme Corp. on a batteryless smoke detector and method of operation, claiming priority under 35 USC 119 to an application filed in Japan on January 4, 2001. Initial examination at the USPTO was contentious, and after filing an RCE, you strategized and filed two voluntary divisionals on July 7, 2005, one with twelve claims to cover the smoke detector and one with ten claims to cover the method, abandoning the original application. On December 5, 2005, your strategy paid off and the Examiner allowed the application covering the method, and the patent to the method subsequently issued on April 18, 2006.

On November 27, 2007, under final rejection in the smoke detector application, you file a continuation application and abandon the parent. Thereafter, you file a preliminary amendment adding limitation Z to your broadest claims and in a telephone interview, the Examiner indicates that an agreement has been reached and the continuation is now in condition for allowance. Subsequently, on January 29, 2008, you see on Public PAIR that the Examiner has issued a notice of allowability with reasons for allowance that mentions, among other things, the limitation Z. Wow, this is a good day!

You receive the notice of allowance and issue fee due shortly thereafter, and proceed through your final checklists, making sure to cross every "t" and dot every "i" with respect to the reasons for allowance, related applications, declaration sufficiency, duty-to-disclose from foreign counterparts, etc. Everything's a "go", so you pay the issue fee on April 11, 2008.

On April 18, 2008, you receive a manilla envelope from Big Corp. via certified mail. Inside the envelope, a letter from in-house counsel congratulates you on the allowance of your application (which he also saw on Public PAIR on January 29, 2008), and (strangely, it seems) on your payment of the issue fee. Clipped to the letter is a copy of a Japanese Utility Model from 1992 which clearly shows on its cover page the limitation Z, but apparently does not show several other features of your broadest claims.

At this point you should:

A. ? withdraw the smoke detector application from issue, file a continuation with the IDS, and expressly abandon the withdrawn application.

B. ? withdraw the smoke detector application from issue, file the IDS with an RCE, and expressly abandon the withdrawn application.

C. ? withdraw the smoke detector application from issue, file a continuation with the IDS, deleting the priority reference to the January 3, 2002 application in the continuation, and expressly abandon the withdrawn application.

D. ? withdraw the smoke detector application from issue, file a continuation with a petition and showing under 37 CFR 1.78(d)(1)(vi), and expressly abandon the withdrawn application.

E.  [ ? ]  withdraw the smoke detector application from issue and submit the IDS with arguments as to why the claims are still patentable.

F.  [ ? ]  let the smoke detector application issue without having the Examiner consider the Japanese reference.

G.  [ ? ]  let the smoke detector application issue, filing the IDS knowing it may not be considered by the Examiner for non-compliance with 37 CFR 1.97.

H.  [ ? ]  none of the above.

14. On October 14, 2005, you filed a patent application on a digitally-activated virtual window for use in urban environments and a method of activating the same. On August 9, 2006, the examiner makes a telephonic restriction requirement and you elect without traverse to prosecute the virtual window. On October 1, 2007, you file a divisional application on the activating method, with the same disclosure as the original application and the same claims that were withdrawn after election (and you do this while the original application is under a non-final rejection).

Under 37 CFR 1.78(f)(2), there will be a rebuttable presumption that a nonprovisional application contains at least one claim that is not patentably distinct from at least one of the claims in another pending application if: A) the two applications have the same filing dates, taking into account their priority dates; B) the two applications have at least one inventor in common; C) the two applications are owned by or obligated to the same entity; and D) the two applications have overlap in disclosure such that one application could support a claim in the other under 35 USC 112.

True or False: There will be a rebuttable presumption that the claims in the divisional application are not patentably distinct from the claims in the original application.

A.  [ ? ]  True

B.  [ ? ]  False

15. Considering again the case of the "not patentably distinct" claims presumed by literal wording of 37 CFR 1.78(f)(2)(i):

On October 17, 2005, you filed a patent application on three new species J, K, L of perfluoropolyethers. On February 26, 2007, the Examiner issued a restriction requirement, and you elected to prosecute the species J (without traverse). On September 28, 2007, you two file divisional applications, with the original disclosure of the parent application and the original claims directed towards the respective species K and L.

Within 4 months of the filing date of the divisional applications (or, for applications filed prior to November 1, 2007, by February 1, 2008), the applicant must rebut the presumption, as specified in 1.78(f)(ii) and 1.78(f)(iii).

By or before February 1, 2008, you should:

A. [ ? ] file a paper explaining how the divisional applications for the species K and L contain only claims that are patentably distinct.

B. [ ? ] file a terminal disclaimer pursuant to 1.78(f)(ii)(B).

C. [ ? ] invoke 35 USC 121.

D. [ ? ] fight the new rules in a court of law.

E. [ ? ] abandon both divisional applications.

16. On January 5, 2006, you filed a continuation-in-part of an original patent application on a sea water desalinator, abandoning the parent case. The CIP application included four embodiments, A, B, and C from the parent case as well as new embodiment D. The four embodiments are covered by independent Claim 1 (which is generic and links all four embodiments) and by ten dependent claims each, for 41 claims total. In response to an initial restriction requirement dated July 2, 2007, you elected to prosecute the eleven claims directed toward the embodiment A. On November 27, 2007, you receive a first Office action allowance, without having filed an ESD. Congratulations!

Now, how do you proceed to fully protect the embodiments B, C, and D, in addition to the embodiment A, understanding that independent Claim 1 may at some point be found to be invalid? (More than one answer may be correct.)

A. [ ? ] After allowance, ask the Examiner to rejoin the thirty non-elected claims (directed to the embodiments B, C, and D) to the allowed linking claim and issue the patent with 41 claims.

B. [ ? ] Let the first application issue with claims directed only to embodiment A, and file three divisionals each having the same independent claim that was allowed in the first application and the dependent claims for the respective embodiment B, C, or D.

C. [ ? ] Let the first application issue with claims directed only to embodiment A, and file three divisionals each having a somewhat-unique independent claim (so as to avoid statutory double patenting) and the dependent claims for the respective embodiments B, C, or D.

D. [ ? ] Cancel at least 16 claims, ask for rejoinder, check your malpractice

insurance, and hope your client wouldn't have relied on those canceled claims for validity.

E. ? | Cancel the claims to two embodiments, ask for rejoinder of the other 10 claims, and then file two "divisionals" covering to the extent possible the features of the cancelled claims.

F. ? | Fight the new rules in a court of law.

17. On January 6, 2006, you filed an application on a micromachined gyroscope. The application included three embodiments X, Y, Z, each being covered by two non-generic independent claims and no dependent claims, for 6 independent claims total. On August 23, 2007, you filed a suggested requirement for restriction (SRR), electing embodiment X without traverse, in an attempt to minimize the impact of the new rules for your client. On December 18, 2007, the Examiner picks up your case to work on. The holidays are coming, and he's a little behind on his counts for the quarter. He's also overworked, under appreciated, exasperated at management, and tired. What should the Examiner do, from an efficiency and a career standpoint, under the new rules? (Please choose from an Examiner's point-of-view, noting that more than one answer may be correct.)

A. ? | Restrict you, and the search one embodiment and examine two claims, doing normal examination work.

B. ? | Not restrict you, give you the two-month time period of 1.75(b)(3), and wait for you to abandon and refile the continuation (because of the ESD requirements and short time limit), thereby receiving two counts.

C. ? | Not restrict you immediately, have you file the ESD which analyzes the prior art and six claims for him, and then restrict you in a subsequent Office action (e.g. before or after FAOM). That way he can use your ESD work in his office action on the single embodiment that you elect (e.g. X), and also have your additional work (on the embodiments Y and Z) held "in reserve" should you later file applications on the other non-elected embodiments.

D. ? | Not restrict, have you file the ESD which analyzes the prior art and six claims for him, and then examine all three embodiments (X, Y, and Z) using your ESD work in his Office action.

18. On January 4, 2004, you filed a patent application on an ultra-pasteurization process with 32 claims. After a final rejection on November 6, 2006, you filed a request for continued examination (RCE). Then in a subsequent final rejection dated August 22, 2007, the Examiner rejected your two broadest claims but he allowed or objected to the other 30 claims.

In your response to the August 22, 2007 final rejection, you present on September

28, 2007 supplemental evidence regarding secondary considerations of non-obviousness, but the Examiner advises you on October 29, 2007 that the supplemental evidence raises new issues and will not be considered. With his advisory action, he also advises you of the new rules limiting RCEs, continuations, and claims, and provides you with the USPTO FAQs and the Federal Register notice regarding the rules, which you study diligently.

Cognizant of the new rules, you deliberately file a continuation on November 16, 2007 with the same 32 claims and the same supplemental evidence regarding secondary considerations of non-obviousness. In calculated remarks filed with your continuation, you argue strenuously that an ESD under new 1.265 is not required since the effective filing date of your application, as well as all evidence in the record, predates the effective date of the new rules.

Your next communication from the Office will likely be:

A.   ?   an action on the merits of the continuation case by the Examiner.

B.   ?   a notice under 37 CFR 1.75(b)(3) setting a two-month non-extendable time period to either cancel claims or file an ESD in the continuation case.

C.   ?   a notice that the application has been abandoned without setting the two-month time period.

D.   ?   None of the above, or we don't know, or a disciplinary notice under 37 CFR 10.18(b)(2)(i) with associated penalties.

---

19. On January 4, 2006, you filed a patent application on a radiation detector with 40 claims. You researched the prior art before filing, and meticulously complied with all applicable statutes including 35 U.S.C. 101, 102, 103, and 112, as well as with the regulations which were in effect at the time of filing. It would therefore appear that, having satisfied all statutory requirements, you are entitled to a patent under the law (35 USC 151). And so you were expecting to receive a first Office action allowance in the summer of 2008.

On November 5, 2007, you receive a Rule 75(b) notice from the USPTO indicating that your application will be abandoned within two months (extendable to 6 months under 37 CFR 1.136(a) for applications filed before November 1, 2007; FR 46728) unless you either 1) cancel claims, or b) submit an Examination Support Document within two months of the notice date.

On January 4, 2008, you respond to the Rule 75(b) notice, contesting the Director's authority to make such requirements retroactive to previously filed applications, requesting reconsideration, examination on the merits, and allowance of the application. On May 12, 2008, you receive a notice of abandonment for non-compliance with Rule 75(b).

New Rule 75(b) is:

- A. [ ? ] consistent with law.

- B. [ ? ] inconsistent with law, but permitted under 35 USC 2.

- C. [ ? ] inconsistent with law and proscribed by 35 USC 2

- D. [ ? ] effective in causing the applicant to help focus examination by providing additional information to the Office because this application places an "extensive burden on the Office."

20. Regarding the reduction of the Patent Term Adjustment (PTA) period in 37 CFR 1.704:

Rule 704(c)(11) indicates that, for applications with more than 5/25 claims, the period of adjustment set forth in 1.703 shall be reduced by the number of days that pass between 1) the later of the date that an amendment rendering the application in violation of the 5/25 limitation of Rule 75(b) is filed and four months after the application filing date, and 2) the earliest date that a) the application is brought into compliance with Rule 75(b) by i) filing an ESD in compliance with 1.265, ii) making an election in response to an Examiner's restriction requirement to withdraw from consideration the excess claims, or iii) cancelling the excess claims, or b) a suggested restriction requirement (SRR) in compliance with 1.142(c) is filed.

It would appear then, that if you inadvertently file an application with a non-compliant ESD and 6/30 claims, and the USPTO fails to pick up your application for a first action for 52 months, that you will risk losing 48 months of any patent term adjustment period unless you:

- A. [ ? ] submit a corrected ESD within two months of receiving the notice of non-compliance under 1.265(e)

- B. [ ? ] filed an SRR in compliance with 1.142(c) when you filed the case.

- C. [ ? ] cancel 1/5 claims within two months of receiving the notice of non-compliance under 1.265(e)

- D. [ ? ] file a continuation of the application that was inadvertently filed with the non-compliant ESD and the 6/30 claims, together with an SRR or a corrected ESD.

21. Regarding applications filed before November 1, 2007 and naming at least one inventor in common, new Rule 1.78(f)(1) requires that the applicant *must* either a) rebut a presumption that the claims in the applications are not patentably distinct or b) file a terminal disclaimer explaining why two applications contain patentably

indistinct claims by the "compliance date" (FR, 46717) if the following four conditions exist: 1) the filing dates of the applications are the same, 2) the applications name a common inventor, 3) they are owned by the same person or subject to common obligation of assignment, and 4) they contain substantial overlapping disclosure (such that one specification could support a claim in the other application under 35 USC 112).

It is possible that the USPTO will not be sending out notices for applications in which compliance under 1.78(f)(1) is required.

If the applicant fails to rebut the presumption or file the terminal disclaimer by the compliance date, the penalty under the new rule is:

A. ? both applications will become abandoned.

B. ? the application with the claim that was supported by the specification of the other application will become abandoned.

C. ? all claims presumed to be not distinct will be eliminated by the Office in both applications.

D. ? all claims presumed to be not distinct will be eliminated by the Office in the later filed application.

E. ? apparently not specified in the Rules or the Federal Register notice.

---

22. If a PCT application designating the U.S. has more than one invention, and the applicant files a Demand and pays the additional examination fees and all of the inventions are examined in the international application, and subsequently in the National Phase a U.S. Examiner issues a restriction requirement and claims directed to one of the inventions are elected by the applicant, can the applicant then file a divisional application to cover the non-elected claims under new Rule 78?

A. ? Yes, of course, since the U.S. Examiner has issued the restriction requirement.

B. ? No, because the non-elected invention was examined within the meaning of 37 CFR 1.78(d)(1)(ii) in the international application designating the U.S.