IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
_____
TRIANTAFYLLOS TAFAS                    )
                                       )
                Plaintiff,             )
                                       )
        v.                             )     Case No. 1:07cv846 (JCC/TRJ)
                                       )
JON W. DUDAS, et al.,                  )
                                       )
                Defendants.            )
_____)
```

CONSOLIDATED WITH

```
_____
SMITHKLINE BEECHAM                     )
CORPORATION, et al.,                   )
                                       )
                Plaintiffs,            )
                                       )
        v.                             )     Case No. 1:07cv1008 (JCC/TRJ)
                                       )
JON W. DUDAS, et al.,                  )
                                       )
                Defendants.            )
_____)
```

**MEMORANDUM OF *AMICUS CURIAE* INTELLECTUAL PROPERTY INSTITUTE OF
WILLIAM MITCHELL COLLEGE OF LAW IN SUPPORT OF
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

**STATEMENT OF INTEREST**

The Intellectual Property Institute is an entity within the William Mitchell College of

Law. The mission of the Institute is to foster and protect innovation through educational,

research, and service initiatives. Among its activities, the Institute advocates for the responsible

development and reform of intellectual property law, including the patent laws and the patent

Dockets.Justia.com

system of the United States.  A purpose of the Institute is to raise issues and arguments in light of the public interest and the best interests of the patent system as a whole.  The Institute has no financial interest in any of the parties to the current action.

## SUMMARY OF ARGUMENT

On August 21, 2007, the United States Patent and Trademark Office ("USPTO") announced a sweeping set of rules that govern the practice of continuing applications and the examination of claims.  Patent and Trademark Office, Changes to Practice for Continued Examination Filings, Patent Applications Containing Patentably Indistinct Inventions, and Examination of Claims in Patent Applications, 72 Fed. Reg. 46716 (Aug. 21, 2007) ("Final Rules").  If allowed to go into effect, the rules would change drastically aspects of United States patent practice that previously have been considered both fundamental and settled.

Most segments of the patent community view the changes in these new rules are unwise.  An even more basic point, however, is that the rules are beyond the USPTO's authority to make.  The USPTO has only a very limited role in the patent system overall, *see, e.g.,* Moy, *Judicial Deference to the USPTO's Interpretations of the Patent Law,* 74 J. Pat. Tm. Off. Soc'y. 406 (1992),  and its statutory authority to make rules is very narrow.  *See, e.g.,* 35 U.S.C. § 2(b)(2).  It has no authority to make legislative rules, and instead can make only rules that deal with procedural, as opposed to substantive aspects of patent law, *see, e.g.,* Merck & Co., Inc. v. Kessler, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996), or which faithfully interpret higher authorities that already exist.  It is expressly prohibited from making rules that are contrary to existing law.  35 U.S.C. § 2(b)(2).

This brief explains how two specific aspects of the Final Rules are contrary to existing law.   Rules 75 and 265, 37 C.F.R. §§ 1.75, 1.265, now include a requirement that the patent applicant supply, under some circumstances, an Examination Support Document ("ESD").  This requirement effectively assigns patent applicants – for the first time in history – the initial burden of proving that they are entitled to patent rights.  This requirement is contrary to statutory provisions, such as sections 102, 103, and 115 of the patent statute, 35 U.S.C. §§ 102, 103, 115, and a long line of decisions by the courts.  *See, e.g.,* In re Wagner, 28 F.Cas. 1327, 1329-30 (C.C.D.C. 1857); In re Warner, 379 F.2d 1011, 1016 (CCPA 1967); In re Piasecki, 745 F.2d 1468, 1472 (Fed. Cir. 1984); In re Oetiker, 977 F.2d 1443, 1444 (Fed. Cir. 1992).

Paragraph 706.07(b) of the USPTO's Manual of Patent Examination Practice permits the agency to designate its first rejection in a continuing application as final.  MPEP ¶ 706.07(b) (8th ed. Rev. 5 2006).  This "First-Action, Final-Rejection" ("FAFR") practice is directly contrary to section 132(a) of the patent statute.  35 U.S.C. § 132(a).  The USPTO nevertheless expressly decided to retain its FAFR practice, and paragraph 706.07(b), as part of its Final Rules.  *See, e.g.,* Final Rules, 72 Fed. Reg. 46716, 46722 (part (I)(D): "Retention of First Action Final Practice and Changes in Second Action Final Practice").

**ARGUMENT**

**A.    The USPTO's Final Rules Are Invalid Where They Are Contrary to Existing Law.**

Authorities in administrative law distinguish between rules that are procedural, legislative, and interpretive.  *See, e.g.,* 5 U.S.C. § 553; 3 Stein, et al., Administrative Law §§ 13.02[1]-[2] (2007); 1 Pierce, Administrative Law Treatise § 6.1 (2002).  Procedural rules are

those that deal with non-substantive matters of internal agency practice.  *See, e.g.,* Pickus v. U.S. Parole Board, 507 F.2d 1107 (D.C. Cir. 1974); 1 Pierce, § 6.5.  Legislative rules are those that deal with substantive matters, under a grant of such rule making authority from Congress.[1]  *See, e.g.,* Christensen v. Harris County, 529 U.S. 576 (2000); 1 Pierce, §§ 6.2, 6.4.  Interpretive rules are those that set out the agency's view of the proper meaning of already existing laws.   *See, e.g.,* 3 Stein, et al., §§ 15.05[3]; 1 Pierce, § 6.4.

These categorizations are important in the present case because the USPTO has express, statutory authority to grant only procedural rules.  The main statutory provision, 35 U.S.C. § 2, gives the USPTO, on general matters, only the power to "establish regulations, not inconsistent with law, which . . . shall govern the conduct of proceedings in the Office . . . ."   35 U.S.C. § 2(b)(2)(A).  The legislative history of this provision, which stems from the Patent Act of 1870, indicates that the provision was specifically intended to confer the power to regulate only procedural matters, and not matters of substance.  *See* Congressional Globe, 41st Cong., 2nd Sess. 2855-56 (April 20, 1870) ("It is part of the recommendation of the committee . . . that the power that the Commissioner shall have and ought to have shall be that of regulating the manner in which the proceedings shall be conducted in his Office; the rules of court, so to speak, not the rules of decision but of Government.").  The language of section 2(b)(2)(A) is much narrower

---

[1]Although the relevant statutory provision uses the term "substantive" for this type of rule, 5 U.S.C. § 553(d), they are commonly referred to as "legislative," to make clear their relation to the agency's statutory grant of authority from Congress.  *See, e.g.,* 3 Stein, et al., §§ 15.05[2] n.22; 1 Pierce, § 6.1.

than the formulation that Congress typically uses when it gives an agency the authority to make legislative rules. *See, e.g.,* 21 U.S.C. 371(a) (granting rule making authority to FDA).

The contrary position advanced by the USPTO on this point is plainly incorrect. According to the agency, the general grant of rule making authority to it extends to substantive matters, provided that those matters "relate[] to application processing within the Office." Final Rules, 72 Fed. Reg. 46716, 46807. This position fails for several reasons. First, it proves too much. Since the USPTO, during patent examination, estimates whether a claimed invention is patentable, *see, e.g.,* 35 U.S.C. § 131, virtually every aspect of substantive patent law "relates" in some way to how a patent application is processed. Adopting the USPTO's position would therefore give the agency *carte blanche* permission to impose its own, independent, legislative views on, for example, the laws of statutory subject matter under section 101 of Title 35, U.S.C., anticipation under section 102, and non-obviousness under section 103. This would vastly expand the agency's rule making power beyond anything it has been understood to possess up to this point in history.

Second, the USPTO's assertion is contrary to express statements by the Federal Circuit regarding the agency's rule making power. In cases extending over nearly two decades the Federal Circuit has consistently refused to characterize the USPTO as having the authority to issue general legislative rules. *See, e.g.,* Animal Legal Defense Fund v. Quigg, 932 F.2d 920 (Fed. Cir. 1991); Merck & Co., Inc. v. Kessler, 80 F.3d 1543 (Fed. Cir. 1996). Instead, that court views Congress's relevant grant as simply procedural:

> As we have previously held, the broadest of the PTO's rulemaking powers – 35 U.S.C. § 6(a)[2] – authorizes the Commissioner to promulgate regulations directed only to "the conduct of proceedings in the [PTO]"; it does not grant the Commissioner the authority to issue substantive rules.

Merck v. Kessler, 80 F.3d at 1549-50 (quoting Animal Legal, 932 F.2d at 930, and collecting additional authorities).  As the Federal Circuit has stated succinctly, "Congress has not vested the Commissioner with any general substantive rulemaking power . . . ."  Merck v. Kessler, 80 F.3d at 1550 (Fed. Cir. 1996).

The cases offered by the USPTO to counter this are off-point.  Lacavera v. Dudas, 441 F.3d 1380, 1383 (Fed. Cir. 2006), for example, dealt not with patent application procedures, but with the processes and standards for determining when a practitioner should be registered to practice before the agency.  This type of activity is not governed by the provision at issue here, 35 U.S.C. § 2(b)(2)(A), but by a completely different provision, specific to the registration of attorneys and agents, which employs language that is much more extensive.  35 U.S.C. § 2(b)(2)(D).  As a result, the statements in *Lacavera* have no bearing on the present case.

Stevens v. Tamai, 366 F.3d 1325 (Fed. Cir. 2004), dealt with whether a non-US party to an interference could be required to submit a translation as part of the interference proceeding.  This is was a purely procedural question, and thus could not present the question of whether the USPTO's authority was legislative.  Accordingly, the Federal Circuit's statement that the USPTO has "plenary authority over PTO practice," Stevens v. Tamai, 366 F.3d at 1333, is

---

[2]The relevant statutory language was repositioned, from section 6 of Title 35, U.S.C., to section 2, in 1999.  *See*, Pub.L. No. 106-113, Div. B, § 1000(a)(9) [Title IV, § 4712], 113 Stat. 1536, 1501A-572 (1999).

perfectly understandable, and in no way supports the agency's current position.  In fact, the

Federal Circuit in *Stevens* cited directly to *Merck v. Kessler*'s description of the USPTO's rule

making authority, with approval.  Stevens v. Tamai, 366 F.3d at 1333-34 ("In view of the

reasonableness of the Office's rules governing the procedure in patent interferences, and the

substantial deference we accord such rules, *see* Merck & Co., 80 F.3d at 1549, we cannot agree

with Tamai . . . .").

The necessary consequence of all this is that the USPTO actually has no power to make

legislative rules that deal with the substance of patent law.   The impact of this limitation is

profound.  It is now settled, for example, that the elevated deference to agency determinations

that is set out in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837

(1984), applies only where the agency rules are legislative.  Christensen v. Harris County, 529

U.S. 576 (2000).  Thus, apart from very specialized topics that are not relevant to the present

dispute, the rules of the USPTO can never receive *Chevron* deference.

In addition, the definition of what constitutes a procedural rule is narrow.  According to

one classic formulation, procedural rules "should not be deemed to include any action which

goes beyond formality and substantially affects the rights of those over whom the agency

exercises authority."  Pickus v. U.S. Parole Board, 507 F.2d 1107 (D.C. Cir. 1974).  *See also,*

*e.g.,* Chamber of Commerce of U.S. v. U.S. Dept. of Labor, 174 F.3d 206 (D.C. Cir. 1999).  The

determination of whether a rule is procedural or not is determined by a balancing test, which

weighs the agency's need to regulate its internal affairs against other interests that are at stake.

*See, e.g.,* Chamber of Commerce v. Dept. of Labor, 174 F.3d 206 (interest of public in

participation via notice-and-comment proceedings); James V. Hurson Associates, Inc. v.

Glickman, 229 F.3d 277 (D.C. Cir. 2000) (same). Here, the opposing interest is particularly important: Congress has decided that the USPTO should not have the power to create new law in the area of patents, and that the power should remain instead in the hands of Congress and the courts. Accordingly, efforts by the USPTO to create such new law via regulation are illegitimate, and need to be turned back.

The correct view, then, is that the USPTO can address matters of substantive patent law only through its inherent power to make rules that are interpretive. Interpretive rules, however, are subject to very important limits as well. As stated, they are not deferred to under *Chevron*; instead, they are accepted only to the degree they are persuasive, under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). Christensen v. Harris County, 529 U.S. 576. In addition, since interpretive rules, by definition, merely set out the agency's view of what has been set out in higher authorities, it is axiomatic that they are invalid to the extent that those higher authorities are to the contrary. *See, e.g.,* 1 Pierce, §§ 6.4 ("[A]n interpretive rule cannot impose obligations on citizens that exceed those fairly attributable to Congress through the process of interpretation."). *Accord* 35 U.S.C. § 2(b)(2)(A) (USPTO rule authorized only where consistent with existing laws). In the UPSTO's case, it is clear that these higher authorities include both Federal statutes and case holdings of the Federal Judiciary. *See, e.g.,* In re Gibbs, 437 F.2d 486, 491 (CCPA 1971); Eugene W. Geniesse, The Examination System in the U.S. Patent Office, Study no. 29 of the Subcommittee on Patents, Trademarks, and Copyright of the Committee of the Judiciary of the United States Senate, 85th Cong., 2nd Sess. (1961) ("[D]ecisions of the Court of Customs and Patent Appeals . . . generally are controlling with respect to the Office.").

**B.**  **Certain Features of The USPTO's Final Rules Are Contrary to Existing Law.**

   **1.**  **The Rules Requiring Submission of an Examination Support Document Are Contrary to Existing Law.**

Under the USPTO's new version of Rule 75, 37 C.F.R. § 1.75, a patent applicant who files an application with more than twenty-five total claims, or more than five independent claims, is required to supply an Examination Support Document. 37 C.F.R. § 1.75(b)(1). This ESD must be submitted before the USPTO acts on the application; if it is omitted, or if it is deemed insufficient, the agency will treat the application as abandoned. 37 C.F.R. §§ 1.75(b)(1), (3).

The content that the applicant must supply in the ESD is extraordinarily burdensome. Not only must the ESD contain the results of a search that corresponds generally to what the USPTO would do during examination, 37 C.F.R. § 1.265(a)(1)-(2); it must also set out, for each reference that the ESD cites, "an identification of all the limitations of each of the claims (whether in independent or dependent form) that are disclosed in the reference," 37 C.F.R. § 1.265(a)(3), and "[a] detailed explanation particularly pointing out how each of the independent claims is patentable over the cited references." 37 C.F.R. § 1.265(a)(4).

In fact, these aspects of the USPTO's new rules are so onerous that they effectively require the patent applicant to bear the initial burden of proving that claimed invention is patentable. The USPTO's Federal Register notice that accompanied the new rules makes clear that section 1.265(a)(4), in particular, involves the patent applicant essentially establishing, in advance, that the claims of the application avoid the art, under both the anticipation standard of section 102, Title 35, U.S.C., and the non-obviousness standard of section 103:

A general statement that all of the claim limitations are not described in a single reference does not satisfy the requirements of § 1.265(a)(4).  Section 1.265(a)(4) requires that the examination support document set out with particularity, by reference to one ore more specific claim limitations, why the claimed subject matter is not described in the references, taken as a whole.  The applicant must explain why a person of ordinary skill in the art would not have combined the features disclosed in one reference with the features disclosed in another reference to arrive at claimed subject matter.  The applicant must also explain why the claim limitations referenced render the claimed subject matter novel and non-obvious over the cited prior art.

Final Rules, 72 Fed. Reg. at 46742.

Changing the patent system so that the patent applicants must prove they are entitled to a patent is a fundamental, sharp break with the previously accepted practice, in which the initial burden has been on the USPTO, to prove that the applicants' inventions are unpatentable. Reference to this current practice is found in various recent decisions of the Federal Circuit and its predecessor tribunal, the Court of Customs and Patent Appeals.  *See, e.g.,* In re Warner, 379 F.2d 1011, 1016 (CCPA 1967) (collecting and analyzing authorities); In re Piasecki, 745 F.2d 1468, 1472 (Fed. Cir. 1984); In re Oetiker, 977 F.2d 1443, 1444 (Fed. Cir. 1992) ("[T]he examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability.  If that burden is met, the burden of coming forward with evidence or argument shifts to the applicant.").

The cases have noted that this burden can discerned from the preamble of section 102 of the patent statute, 35 U.S.C. § 102, which lists various scenarios as exceptions to the default conclusion, that a patent should issue.  *See, e.g.,* In re Warner, 379 F.2d at 1016 ("We think the precise language of 35 U.S.C. § 102 that '(a) person shall be entitled to a patent unless,' concerning novelty and unobviousness, clearly places a burden of proof on the Patent Office

which requires it to produce the factual basis for its rejection of an application under sections 102 and 103 . . . .").

This reading of the statute is consistent with basic principles of pleading and the allocation of proof: the contrary position, of placing the initial burden on the patent applicant, essentially requires the patent applicant to establish an exhaustive series of negatives. Such a contrary position is both illogical and impractical, and one can assume that Congress did not intend it when the statute was enacted.

The USPTO's proposed rules requiring the submission of ESDs are therefore contrary to sections 102 and 103 of the patent statute. As a result, they are unauthorized, and should be held void.

This conclusion, that the patent statutes assign the initial burden of proof to the Patent Office, finds support not only in modern case law, but also in decisions that date back to the Patent Office's earliest years. Explicit reference to it can be found in a reported decision from 1857, In re Wagner, 1 MacArthur's Patent Cases 510, 517 (C.C.D.C. 1857), and there are suggestions there that the practice was already old at that time. *See* In re Wagner, 28 F.Cas. 1327, 1329-30 (C.C.D.C. 1857) (referencing Patent Office behavior after Heath v. Hildreth, 11 F. Cas. 1003, No. 6309 (C.C.D.C. 1841)). Stated bluntly, the practice that the USPTO seeks to overturn is essentially as old as the Patent Office itself, and the basic function of patent examination. *Compare* Patent Act of 1836, 5 Stat. 117 (1836) (reforming patent system to create Patent Office, and instituting system of patent examination).

These early decisions held that the burden of proof was allocated to the Patent Office through the statutory requirement that the patent applicants supply an oath, asserting that their

inventions were believed to be patentable.  *See, e.g.,* In re Wagner, 28 F.Cas. at 1329-30 ("[T]he

oath of the party [i.e., the patent applicant] is to be considered in the character of *prima facie*

evidence of the novelty of the invention. [Citation omitted] According to this admitted

construction, it may be properly insisted that it is the Commissioner's duty and power to resort to

any circumstances legitimately in his possession for the purpose of repelling the presumption . . .

."). This understanding, that the initial burden was allocated to the Patent Office via the statutory

requirement for an oath, proved stable and persistent.  *See, e.g.,* 2 William C. Robinson, The Law

of Patents for Useful Inventions § 559 (1890) (describing the process of rejecting an application

after examination: "If the ground of the rejection be that the applicant is not the first and true

inventor of the art or instrument described, the examiner must cite references establishing his

assertion, or himself make oath to it, to overcome the presumption arising from the oath of the

alleged inventor.").

     The requirement that inventors supply an oath with the patent application has been

carried forward in the patent statute to this day.  35 U.S.C. § 115.  As in previous versions of the

statute, the provision relating to the oath continues to insist that inventors swear that they believe

they are the first and true inventor of the subject matter for which patent rights are being sought.

Accordingly, the text of section 115 of the patent statute, as interpreted by the judiciary, supplies

another ground on which to conclude that the USPTO's proposed rules requiring the submission

of ESDs are contrary to law, and thus invalid.

2.     **The Rules That Permit First-Action Final Practice in Continuing**
       **Applications Are Contrary to Existing Law.**

The USPTO's practice of permitting first actions to be designated final in continuing applications is set out in paragraph 706.07(b) of the agency's Manual of Patent Examination Procedure.  MPEP ¶ 706.07(b) (8th ed. Rev. 5 2006).  While that practice has existed for some time, its existence has until now been innocuous, as the harm that patent applicants suffered under it could be solved by simply filing yet another continuing application.  *See, e.g.,*  In re Bogese, 22 USPQ2d 1821 (Comm'r. Pat. & Trademarks 1991) ("The only possible harm was the price of a new filing fee.").  Now, the new Final Rules of the USPTO place severe limits on the ability of patent applicants to file continuing applications, limiting the number of such applications, in most cases, to two.  *See e.g.,* Final Rules, 72 Fed. Reg. at 46728-37 (discussing amendments to 37 C.F.R. § 1.78).  These Final Rules have transformed the USPTO's practice of issuing first-action final rejections into a significant burden on patent applicants.  In its Final Rules, in fact, the USPTO discussed its FAFR practice at length, noting that it was reversing its initial position, that the practice should be abandoned.  *See, e.g.,* Final Rules, 72 Fed. Reg. at 46722 (part (I)(D): "Retention of First Action Final Practice and Changes in Second Action Final Practice").

In fact, the USPTO's FAFR practice, as set out in paragraph 706.07(b) of the MPEP, is directly contrary to Congress's statutory commands about how the prosecution of a patent application should be structured.  Section 132(a) of the statute requires that the USPTO give a patent application least two substantive examinations.  *See* 35 U.S.C. § 132(a) ("[I]f . . . the applicant persists in his claim for a patent, with or without amendment, the application shall be

reexamined.").  This means that the USPTO cannot impose a final rejection in the first action on the merits, and instead must wait until at least the second action.

To this point, the USPTO has defended the legality of its FAFR practice on two grounds. First, it has asserted that the statutory language can be read in a way that allows reference to activities that took place in the immediately prior application, from which the continuing application is claiming the benefit under section 120.  *See, e.g.,* In re Bogese, 22 USPQ2d 1821, 1824 (Comm'r. Pat. & Trademarks 1991).  Second, it has noted that its FAFR practice was in place when Congress passed the Patent Act of 1952.  In re Bogese, 22 USPQ2d at 1827.

When scrutinized, however, neither of these justifications is persuasive.  The best reading of the statutory language, for example, is that it reflects Congress's decision to limit final-rejection practice, by forcing the USPTO to provide an least a minimum of prosecution in each patent application.

This can be seen by considering the circumstances under which the statutory language arose.  Since its inception in the early 1800's, the process of prosecuting a patent application has taken the form, generally speaking, of a series of alternating statements by the patent applicant and the Patent Office, about the merits of the patent application.  *See generally, e.g.,* 1 Moy, Walker on Patents § 3:42 (2007).  The first statement is the initial presentation of the inventor's patent application.  The second is the Patent Office's decision, after examining the application, of whether the application should be allowed to issue as a patent.  *See, e.g.,* 35 U.S.C. § 131. Where the Patent Office concludes that the application is in some way defective, this decision takes the form of a rejection, notice of which is given to the patent applicant.  *See, e.g.,* 35 U.S.C. § 132(a).  Thereafter, the patent applicant can persist in trying to obtain the patent, by responding

to the rejection with a combination of either arguments or amendments to the patent application. *See, e.g.,* 35 U.S.C. § 132(a). This, in turn, provokes the Patent Office into examining the application again, potentially resulting in another rejection. 35 U.S.C. § 132(a).

This back-and-forth sequence of communications is potentially without end. Since at least 1869, therefore, the USPTO has made a practice of designating some rejections as "final." *See, e.g.,* Ex parte Appleton, 1869 C.D. 8 (Comm'r. Pat. 1869); 37 C.F.R. § 1.113 (2006) ("Final rejection or action."). *See also* 1 Moy, § 3:42 (discussing historical origin of final rejection practice). Designating a rejection as final results in prosecution of the particular application being closed; thereafter, the applicant cannot further argue or amend the application as a matter of right, and must either acquiesce in the Patent Office's position or take some other action, such as an appeal. 37 C.F.R. § 1.113.

This is the situation that confronted Congress in 1870, as it considered and passed the Patent Act of 1870, 16 Stat. 198 (1870). In that act, Congress specifically addressed the steps that were required of the Patent Office during prosecution. In particular, section 41 of that act expressly required, where a claim in an application was rejected, that the Commissioner notify the applicant in writing. Section 41, Patent Act of 1870, 16 Stat. 198. In addition, the statute required that "if, after receiving such notice, the applicant shall persist in his claim for a patent, with or without altering his specifications, the commissioner shall order a reexamination of the case." Section 41, Patent Act of 1870, 16 Stat. 198.

The most natural reading of this series of events is that Congress enacted section 41 of the Patent Act of 1870 to limit the Patent Office's power to designate a rejection as final. Because of the statutory language, the Patent Office had to wait until a second action before

designating a rejection as final. Stated another way, the applicant was guaranteed to receive at least two examinations on the merits.

Section 41 of the Patent Act of 1870 was carried forward into section 4903 of the Revised Statutes in 1874. Section 4903 of the Revised Statutes was reenacted, nearly verbatim, into section 132 of the Patent Act of 1952, Pub. L. No. 82-593, ch. 950, 82nd Cong., 2nd Sess., 66 Stat. 792 (July 19, 1952), and now appears as paragraph (a) of section 132. 35 U.S.C. § 132(a).

The original development of the USPTO's FAFR practice, in contrast, is much more recent. Evidence of the practice can be traced back only as far as 1923, when a related practice, dealing with renewal applications,[3] is mentioned in a decision of the Commissioner. Ex parte Ball, 1924 C.D. 123, 124 (Comm'r. Pat. 1923). *See* In re Bogese, 22 USPQ2d 1821 (collecting authorities). Yet continuing applications had become commonplace in United States patent practice many years earlier, by at least the 1860's. *See, e.g.,* Godfrey v. Eames, 68 U.S. 317 (1863). *See generally* 1 Moy, § 3:44 (2007) (discussing historical development of continuation practice). Taken together, this shows that the original understanding of the statutory language, as it applied to continuing applications, did not include the USPTO's FAFR practice. Instead, it is logical to assume that final rejections were imposed in continuing applications, for decades, no earlier than the second action.

History also severely undercuts the USPTO's contention that its practice somehow benefits from Congress's passage of the Patent Act of 1952. That argument by the agency is

---

[3]Renewal applications were removed from the patent statute in 1939. *See generally, e.g.,* In re Bogese, 22 USPQ2d 1821; 1 Moy, § 3:44 n.4 (2007).

essentially an assertion of legislative reenactment, which argues that Congress implicitly adopts agency interpretations when it reenacts statutory language without change. *See generally, e.g.,* 1 Pierce, § 6.4, at 336-38. As a general matter, however, the persuasive force of that doctrine is fairly weak. *Compare, e.g.,* Massachusetts Trustees of Eastern Gas and Fuel Associates v. U.S., 377 U.S. 235, 241 (1964) (legislative reenactment "certainly not controlling"); Demarest v. Manspeaker, 498 U.S. 184, 190 (1991) ("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction."). For example, the doctrine is balanced against statements, in other decisions, that an illegitimate regulation does not become otherwise, simply because it is old. *See, e.g.,* Brown v. Gardner, 513 U.S. 115, 122 (1994) ("[W]e dispose of the Government's argument that the VA's regulatory interpretation of §1151 deserves judicial deference due to its undisturbed endurance for 60 years. A regulation's age is no antidote to clear inconsistency with a statute, and the fact, again, that § 3.358(c)(3) flies against the plain language of the statutory text exempts courts from any obligation to defer to it.") (collecting authorities). In addition, the weight given to the argument appears to depend significantly on whether there is evidence in the legislative history that Congress actually knew of the agency interpretation in question. *See, e.g.,* Brown v. Gardner, 513 U.S. at 122 ("[T]he record of congressional discussion preceding reenactment makes no reference to the VA regulation, and there is no other evidence to suggest that Congress was even aware of the VA's interpretive position. 'In such circumstances we consider the . . . re-enactment to be without significance.'") (quoting United States v. Calamaro, 354 U.S. 351, 359 (1957)).

This last point is particularly destructive to the USPTO's argument. The legislative history of the Patent Act of 1952 apparently contains no indication that Congress was aware of

the Patent Office's FAFR practice at the time.  The circumstances that the USPTO has offered to establish that FAFR practice has been legislatively reenacted are therefore the barest possible. Under that same reasoning, one would have to conclude that Congress also adopted – and thus removed from further modification by even the USPTO itself – many, many other interpretations that the Patent Office had at the time.  The position is plainly too extreme to be acceptable, even to the USPTO.

Instead, the much better view is that the 1952 Act simply left the potential legitimacy of the Patent Office's FAFR practice undisturbed, and open to further review.  Historically, in fact, commentators questioned the legality of the FAFR practice almost as soon as it arose.  Emerson Stringham, for example, suggested in 1934 that the practice might be subject to mandamus: "A renewal is, in at least some aspects, a new application [citing authorities]; Rev. Stat. § 4903 gives applicants the right to a reexamination after the first rejection. Therefore the court might mandamus the commissioner to give the second action . . . ."  Emerson Stringham, Patent Soliciting and Examining § 172 (1934).

Even the Patent Office itself was unsure whether FAFR practice was legal.  The first edition of the agency's Manual of Patent Examining Procedure, for example, published in 1949, contained an express defense of the practice, asserting that it was "quite consistent" the agency's Rule 113.  That latter rule repeated the substance of Rev. Stat. § 4903.  Patent Office, Manual of Patent Examining Procedure ¶ 706.07(b) (1949).  The Patent Office's uncertainty over the practice continued even after 1952: the language in paragraph 706.07(b) defending the practice remained, through several new editions and revisions of the manual, until it was finally deleted in 1969.  *See* 861 O.G. 1011 (April 22, 1969).  *See generally* In re Bogese, 22 USPQ2d at 1826.

Certainly, the USPTO at the time did not believe that its interpretation of Rule 113 – and thus by implication section 132(b) – had been adopted by Congress.

## CONCLUSION

For the reasons discussed above, the Institute respectfully submits that the USPTO lacks the authority to make rules that are contrary to law.  As a consequence, the portions of the USPTO's Final Rules that pertain to Examination Support Documents, 37 C.F.R. §§ 1.75(d) and 1.265, as well as that part of its final rule-making action that pertains to FAFR practice in

continuing applications, MPEP ¶ 706.07(b), are outside the agency's regulatory authority, and

should be held void.

Respectfully submitted,
Birch, Stewart, Kolasch and Birch, LLP

Date: December 26, 2007                By:___/s/_____
Charles Gorenstein (Va. Bar No. 28,606)
Michael K. Mutter (Va. Bar No. 21,172)
8110 Gatehouse Rd
Suite 100 East
Falls Church, Virginia 22042
Ph. (703) 205-8000
Fax (703) 205-8050

*Counsel for* amicus curiae
Intellectual Property Institute of the
William Mitchell College of Law

*Counsel*
R. Carl Moy
Jay Erstling
Intellectual Property Institute of the
William Mitchell College of Law[4]
875 Summit Avenue
St. Paul, Minnesota 55105
Ph. (651) 227-9171
Fax (651) 290-6406

*Of-Counsel*:
Niels Schaumann
Ken Port
Intellectual Property Institute of the
William Mitchell College of Law
875 Summit Avenue
St. Paul, Minnesota 55105
Ph. (651) 227-9171
Fax (651) 290-6406

---

[4]This brief was prepared with the research assistance of the following students: Nathan Ellefson, Martha Engel, Nicholas Hergott, Michael McKeen, Marsha Pernat, Tyler Torgrimson, and Aditya Tyagi.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of December 2007, I caused a copy of the foregoing Memorandum of Amicus Curiae Intellectual Property Institute of William Mitchell College of Law in Support of Plaintiffs' Motions for Summary Judgment was electronically filed with the clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following:

Elizabeth M. Locke
Daniel Sean Trainor
Kirkland & Ellis LLP
655 15th Street, NW  Suite 1200
Washington, DC  20005
Email: elocke@kirkland.com

and

Craig C. Reilly
Richard McGettigan Reilly & West PC
1725 Duke Street Suite 600
Alexandria, VA  22314
Email: craig.reilly@rmrwlaw.com

*Counsel for GSK Plaintiffs*

Joseph Dale Wilson, III
Kelley Drte & Warren LLP
Washington Harbour
3050 K Street NW Siote 400
Washington, DC  20007
Email: jwilson@jekketdrye.com

*Counsel for Plaintiff Tafas*

Lauren A. Wetzler
U.S. Attorney's Office
 2100 Jamison Ave.
Alexandria, VA  22314
Email: Lauren.wetzler@usdoj.gov

*Counsel for the Defendants*

-21-

Thomas J. O'Brien
Morgan, Lewis & Bockius
1111 Pennsylvania Ave., NW
Washington, DC 20004
Email: to'brien@morganlewis.com

*Counsel for Putative Amicus American Intellectual Property Lawyers Association*

Dawn-Marie Bey
Kilpatrick Stockton, LLP
700 13th Street, NW
Suite 800
Washington, DC 20005

*Counsel for Putative Amicus Hexas, LLC, The Roskamp Institute, Tikvah Therapeutics, Inc.*

James Murphy Dowd
Wilmer Cutler Pickering Hale & Dorr LLP
1455 Pennsylvania Ave., NW
Washington, DC 20004

*Counsel for Putative Amicus Pharmaceutical Research and Manufactures of America*

Rebecca Malkin Carr
Scott Jeffrey Pivnick
Pillsbury Winthrop Shaw Pittman LLP
2300 N St NW
Washington, DC 20037

and

Scott Jeffrey Pivnick
Pillsbury Winthrop Shaw Pittman LLP
1650 Tysons Blvd
Suite 400
McLean, VA 22102

*Counsel for Putative Amicus Elan Pharmaceuticals, Inc.*

Randall Karl Miller
Arnold & Porter LLP
1600 Tysons Blvd.
Suite 900
McLean, VA 22102

*Counsel for Putative Amicus Monsanto Company*

Robert Emmett Scully, Jr.
Stites & Harbison, PLLC
1199 North Fairfax St.
Suite 900
Alexandria, VA 22314
(703) 739- 4900
Fax: (703) 739- 9577
Email: rscully@stites.com

*Counsel for Human Genome Sciences, Inc.*

Craig James Franco
Odin Feldman & Pittleman PC
9302 Lee Highway
Suite 1100
Fairfax, VA 22031
(703) 218-2100
Email: craig.franco@ofplaw.com

*Counsel for Polestar Capital Associates, LLC and Norseman Group, LLC*

Matthew Christian Schruers
Computer & Communications Industry Association
900 17th St NW
Suite 1100
Washington, DC 20006
(202) 470-3620
Email: MSchruers@ccianet.org

*Counsel for Public Patent Foundation, Computer and Communications Industry Association,*
*AARP, Consumer Federation of America, Essential Action, Foundation for Taxpayer and*
*Consumer Rights, Initiative for Medicines Access and Knowledge, Knowledge Ecology*

*International, Prescription Access Litigation, Public Knowledge, Research on Innovation, and Software Freedom Law Center*

Jonathan Dyste Link
McGuireWoods LLP
1750 Tysons Blvd
Suite 1800
McLean, VA 22102-4215
703-712-5000
Fax: 703-712-5279
Email: jlink@townsend.com

*Counsel for CFPH, LLC*

John C. Maginnis, III
1350 Connecticut Avenue, N.W.
Suite 301
Washington, DC 20036
(202) 659-44220
Email: maginnislaw2@verizon.net

*Counsel for CropLife America*

Maurice Francis Mullins
Spotts Fain PC
411 E Franklin St
Suite 600
PO Box 1555
Richmond, VA 23218-1555
(804) 697-2069
Fax: (804) 697-2169
Email: cmullins@spottsfain.com

*Counsel for Micron Technology, Inc.*

Jackson David Toof
Robins Kaplan Miller & Ciresi LLP
1875 Eye St NW
Suite 300
Washington, DC 20006-1307
202-857-6130
Fax: 202-223-8604
Email: toof.jackson@arentfox.com

*Counsel for Fdration Internationale Des Counseils En Proprit Industrielle and Valspar Corporation*

Robert C. Gill
Saul Ewing LLP
2600 Virginia Ave NW
Suite 1000
Washington, DC 20037
202-295-6605
Fax: 202-295-6705
Email: rgill@saul.com

*Counsel for PA Bioadvance, Life Sciences Greenhouse of Central Pennsylvania, and Pittsburgh Life Sciences Greenhouse*

Kenneth Carrington Bass, III
Sterne, Kessler, Goldstein & Fox
1100 New York Ave NW
Suite 600
Washington, DC 20005

*Counsel for AmberWave Systems Corporation, Fallbrook Technologies, Inc., InterDigital Communications LLC., Nano-Terra Inc., Tessear, Inc.*

Kevin Michael Henry
Sidley Austin Brown & Wood LLP
1501 K St NW
Washington, DC 20005
(202) 736-8000
Email: khenry@sidley.com

*Counsel for Washington Legal Foundation*

By:_____/s/_____
           Charles Gorenstein (Va. Bar No. 28,606)
           Michael K. Mutter (Va. Bar No. 21,172)
           8110 Gatehouse Rd
           Suite 100 East
           Falls Church, Virginia 22042
           Ph. (703) 205-8000/Fax (703) 205-8050
           cg@bskb.com

*Counsel for* amicus curiae
Intellectual Property Institute of the
William Mitchell College of Law