# Exhibit 5

**Reply of Patent and Trademark Office to request 06-176 under Freedom of Information Act (June 6, 2005)**

Dockets.Justia.com

**Culver, Jennifer**

OFFICE OF THE
GENERAL COUNSEL

| | |
|---|---|
| **From:** | Boundy, David [dboundy@willkie.com] |
| **Sent:** | Saturday, April 01, 2006 6:11 PM |
| **To:** | EFOIA |
| **Subject:** | FOIA request |

06-176

2006 APR -3  AM 9: 29

U.S. PATENT
AND
TRADEMARK OFFICE

The following requests for documents are presented pursuant to the Freedom of Information Act.

**Request 1.** Attached is one of the slides from the PTO's recent Townhall presentations on the proposed rule changes, showing projected pendency.

<<From townhall slides - pendency projection.ppt>>
Kindly provide all documents that demonstrate (a) any data and assumptions on which the projections of this slide are based, and (b) the methodology or analysis used to generate the slide's projections from the data and assumptions.

In particular, please provide documents that support the projection that pendency will increase as projected for 2008-2011 (the red projection), and the projection that pendency will fall sharply if all rule proposals are enacted (the two purple declining projections).

The following documents are within the scope of this request. The relevant time period is at least the years 1996 to 2011 (the time period covered by the slide):

    - documents showing the number of applications actually filed, and projected to be filed
    - documents showing historical and projected examiner hours per application
    - documents comparing examiner hours per original application vs. examiner hours per continuation application or RCE

    - documents showing historic and projected examiner hiring and attrition
    - any spreadsheet or other calculations that correlate or generate the projected pendency numbers from the underlying data and assumptions

    - any documents that reflect applicants' likely response and adjustments to the proposed rules, and how that response/adjustment will affect pendency estimates.


**Request 2.** Please provide documents sufficient to identify the proportion of examiners, supervisory examiners, special program examiners, and Technology Center Directors that have law degrees.


**Request 3.** Please provide documents sufficient to identify the rate of disposition of "obviousness-type double patenting" issues during appeal conference and *ex parte* appeal to the Board of Patent Appeals and interferences for recent years.


Thank you.

Electronic documents, such as spreadsheets, may be emailed to DBoundy@Willkie.com  This would be the appropriate vehicle for providing spreadsheets, as the spreadsheets would contain the formulas that show the relationship between underlying data and conclusions.

Paper documents may be mailed to the address below.

David Boundy

4/3/06

P000008

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York NY 10021

(212) 728 8757
(212) 728 9757 (FAX)

4/3/06





## UNITED STATES PATENT AND TRADEMARK OFFICE

GENERAL COUNSEL

JUN - 5 2006

Mr. David Boundy
Willkie Farr & Gallagher, LLP
787 Seventh Ave.
New York, NY 10021

     Re: Freedom of Information Act (FOIA)/Privacy Act Request No. 06-176

Dear Mr. Boundy:

The Office of the General Counsel received your e-mail dated April 11, 2006, in which you requested, under the provisions of the Freedom of Information Act, 5 U.S.C. § 552, a copy of

"(1)    documents showing the number of applications actually filed, and projected to be filed;

(2)    documents showing historical and projected examiner hours per application;

(3)    documents comparing examiner hours per original application vs. examiner hours per continuation application or RCE;

(4)    documents showing historic and projected examiner hiring and attrition;

(5)    any spreadsheet or other calculation that correlate or generate the projected pendency numbers from the underlying data and assumptions;

(6)    any documents that reflect applicants' likely response and adjustments to the proposed rules, and how that response/adjustment will affect pendency estimates;

(7)    documents sufficient to identify the proportion of examiners, supervisory examiners, special program examiners, and Technology Center Directors that have law degrees;

(8)    documents sufficient to identify the rate of disposition of 'obviousness-type double patenting' issues during appeal conference and ex parte appeal to the Board of Appeals and Interferences for recent years."

2

The United States Patent and Trademark Office identified 74 pages of documents that are responsive to your request. A copy of this material is enclosed.

The processing fee was less than $20.00, and is hereby waived.

Sincerely,

Robert Fawcett
Program Manager



**United States Patent and Trademark Office**                                    ABOUT

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Reports > USPTO Annual Reports



## Performance and Accountability Report Fiscal Year 2005
### Other Accompanying Information

Table of Contents | Management | Financial | Supplementary | Auditor | IG | Other

| TABLE 2: PATENT APPLICATIONS FILED (FY 1985 - FY 2005) | | | | | |
|---|---|---|---|---|---|
| **Year** | **Utility** | **Design** | **Plant** | **Reissue** | **Total** |
| 1985 | 115,893 | 9,504 | 244 | 290 | 125,931 |
| 1986 | 120,988 | 9,792 | 291 | 332 | 131,403 |
| 1987 | 125,677 | 10,766 | 364 | 366 | 137,173 |
| 1988 | 136,253 | 11,114 | 377 | 439 | 148,183 |
| 1989 | 150,418 | 11,975 | 418 | 495 | 163,306 |
| 1990 | 162,708 | 11,140 | 395 | 468 | 174,711 |
| 1991 | 166,765 | 10,368 | 414 | 536 | 178,083 |
| 1992 | 171,623 | 12,907 | 335 | 581 | 185,446 |
| 1993 | 173,619 | 13,546 | 362 | 572 | 188,099 |
| 1994 | 185,087 | 15,431 | 430 | 606 | 201,554 |
| 1995 | 220,141 | 15,375 | 516 | 647 | 236,679 |
| 1996 | 189,922 | 15,160 | 557 | 637 | 206,276 |
| 1997 | 219,486 | 16,272 | 680 | 607 | 237,045 |
| 1998 | 238,850 | 16,576 | 658 | 582 | 256,666 |
| 1999 | 259,618 | 17,227 | 759 | 664 | 278,268 |
| 2000 | 291,653 | 18,563 | 786 | 805 | 311,807 |
| 2001 | 324,211 | 18,636 | 914 | 956 | 344,717 |
| 2002 | 331,580 | 19,706 | 1,134 | 974 | 353,394 |
| 2003 | 331,729 | 21,966 | 785 | 938 | 355,418 |
| 2004 [1] | 353,319 | 23,457 | 1,212 | 996 | 378,984 |
| **2005** | **381,797** | **25,304** | **1,288** | **1,143** | **409,532** |

**Notes:**
1: Revised to reflect final FY 2004 data. *(back to text)*

**< Previous Page | Next Page >**

*Is there a question about what the USPTO can or cannot do that you cannot find an answer for? Send questions about USPTO programs and services to the USPTO*



# 2007 BUDGET

## 2007 President's Budget

UNITED STATES PATENT AND TRADEMARK OFFICE

P000014

# UNITED STATES PATENT AND TRADEMARK OFFICE



## FISCAL YEAR 2007 PRESIDENT'S BUDGET

## February 6, 2006

P000015

# Table of Contents

1) USPTO Budget at a Glance ..................................................................................... 1

    Executive Summary ........................................................................................... 3

2) Section 1 – Fiscal Year 2007 Budget Request By Business Line ............................. 9

    Patents ............................................................................................................... 9

    Trademarks ...................................................................................................... 13

    Summary of Accomplishments and Future Challenges .................................. 17

    Management Priorities..................................................................................... 20

    Commitment to the President's Management Agenda ..................................... 21

    *The USPTO 21st Century Strategic Plan* ......................................................... 24

3) Section II – Fiscal Year 2007 Budget Request by Performance Goal ..................... 25

    Goal 1 –
    Improve the quality of patent products and services and optimize patent processing time ..................... 25

    Goal 2 –
    Improve quality of trademark products and services and optimize trademark processing time ............... 33

    Goal 3 –
    Create a more flexible organization through transitioning patent and trademark operations to an e-Government environment and advancing IP development worldwide........................................................ 36

4) Budget Exhibits.................................................................................................... 45

    Exhibit 3A – USPTO Resource Requirements by Performance Goal ......................... 45

    Exhibit 5 – Summary of Resource Requirements ................................................ 52

    Exhibit 6 – Summary of Reimbursable Obligations ........................................... 54

    Exhibit 7 – Summary of Financing ................................................................... 55

    Exhibit 8 – Adjustments to Base ...................................................................... 56

    Exhibit 9 – Justification of Adjustments to Base ............................................... 57

    Exhibit 16 – Summary of Requirements by Object Class ................................... 65

    Exhibit 17 – Detailed Requirements by Object Class ......................................... 67

Appendix

    Interim Adjustment Document

# USPTO Budget-at-a-Glance

## DEPARTMENT OF COMMERCE STRATEGIC GOAL 2

*"Foster science and technological leadership by protecting intellectual property..."*

| Dollars in '000s | Actuals[1] FY 2005 | Enacted FY 2006 | Budget FY 2007 | Outyear Estimates FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|---|---|
| **_USPTO Goal 1_: Improve quality of patent products and services and optimize patent processing time** | | | | | | | |
| Amount | $1,213,162 | $1,335,124 | $1,472,479 | $1,603,349 | $1,757,646 | $1,975,383 | $2,198,128 |
| Total UPR Production Units | 288,315 | 311,900 | 343,900 | 372,900 | 414,400 | 458,700 | 509,400 |
| Allowance Error Rate | 4.6% | 4.0%[2] | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| Average First Action Pendency/UPR (Months) | 21.1 | 22.0[3] | 23.0 | 23.7 | 23.9 | 23.8 | 23.5 |
| **_USPTO Goal 2_: Improve quality of trademark products and services and optimize trademark processing time** | | | | | | | |
| Amount | $141,605 | $142,776 | $148,264 | $153,742 | $158,910 | $163,518 | $169,697 |
| Total Units of Production[4] | 666,687 | 706,900 | 787,200 | 820,500 | 850,000 | 888,500 | 932,700 |
| First Action Deficiency Rate[5] | 4.7% | 6.5% | 6.0% | 5.5% | 5.0% | 4.5% | 4.0% |
| Final Action Deficiency Rate | 5.9% | 6.5% | 6.0% | 5.5% | 5.0% | 4.5% | 4.0% |
| First Action Pendency (Months) | 6.3 | 5.3 | 3.7 | 3.0 | 3.0 | 3.0 | 3.0 |
| **_USPTO Goal 3_: Create a more flexible organization through transitioning patent and trademark processing to an e-** | | | | | | | |
| Amount | $153,625 | $205,186 | $222,223 | $237,906 | $243,345 | $256,888 | $267,243 |
| Applications Managed Electronically: Patents | 96.7% | 99.0%[6] | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Applications Managed Electronically: Trademarks | 99.9% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| IP Technical Activities Completed | 59 | 82 | 84 | 84 | 84 | 84 | 84 |
| **USPTO Appropriation** | **$1,508,392** | **$1,683,086** | **$1,842,966** | **$1,994,997** | **$2,159,901** | **$2,395,789** | **$2,635,068** |

---

[1] The USPTO consolidated statement of financing, status of budgetary resources, reimbursable obligations incurred for year ending September 30, 2005.
[2] The quality goal target has been revised from the fiscal year 2006 President's Budget based on fiscal year 2005 performance results, resource requirements, and customer feedback.
[3] Fiscal year 2006 target revised and the long term pendency goal of 18 months will not be achieved in the near term because of (1) priority emphasis on quality initiatives, (2) actual application growth rates above those assumed for planning purposes and, (3) implementation delays and legislative requirements which had the effect of postponing competitive sourcing efforts.
[4] Total units of production were previously based on an "action point" standard. The standard was changed to "balanced disposals" with the implementation of a new performance appraisal plan in the second half of fiscal year 2005; units of production were revised based on the new standard. The production standard for examining attorneys has changed from action points to balanced disposals beginning in fiscal year 2006 with the implementation of a negotiated performance appraisal plan.
[5] The deficiency rate for assessing the quality of first and final office actions have been revised based on actual experience and expectations for improvement since the criteria for assessing the substantive decision making of examiner's action was first implemented in fiscal year 2004.
[6] This goal has been modified as it has been determined that a small percentage of documents, such as applications under security review, may not be managed electronically.

- 1 -

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

**This Page is Intentionally Left Blank**

P000018

# Fiscal Year 2007 Budget Request

## EXECUTIVE SUMMARY

The USPTO's fiscal year 2007 budget submission is for $1,843 million and represents a $160 million, or a 9.5 percent increase over the enacted fiscal year 2006 budget. This requirement will provide $1,641 million for completing over 349,100 first actions on patentability determinations and over 338,700 patent application disposals; and $202 million for completing 418,000 first actions on trademark applications and 326,100 office disposals. In addition, this budget submission applies funds towards the accomplishment of strategic and other initiatives associated with the performance goals contained in the USPTO *21st Century Strategic Plan* to transform the agency into a quality-focused, highly productive and responsive organization that supports a market-driven intellectual property system. Our strategic goals will enhance the agility, capability, and productivity of both primary business lines, as well as the expanded intellectual property protection and enforcement program. The corresponding fee income estimates for fiscal year 2007 are $1,641 million for Patents and $202 million for Trademarks and assume continuation of the fee levels based on the provisions of Title VIII in the Consolidated Appropriations Act, 2005 (P.L. 108-447).

The USPTO fiscal year 2007 budget request supports the Department of Commerce in its goal to foster science and technological leadership by protecting intellectual property. The growth proposed in this request is guided by the President's Management Agenda (PMA) strategy for improving the management and performance on five key Government-wide areas: strategic management of human capital, competitive sourcing, improved financial performance, expanded electronic government, and budget and performance integration.

## Mission Statement

The mission of the USPTO is to ensure that the intellectual property system contributes to a strong national and global economy, encourages investment in innovation, and fosters entrepreneurship. This mission is accomplished by the USPTO through its two distinct business lines, Patents and Trademarks, which embodies Intellectual Property inventions or creations and aims to:

- Promote the progress of science and the useful arts by securing, for limited times to inventors, the exclusive rights to their respective discoveries (Article 1, Section 8 of the United States Constitution).

- Provide businesses with enhanced protection of trademark rights and notices of the trademark rights claimed by others, as well as protect consumers against confusion and deception in the marketplace.

- Build the infrastructure for innovation and lead the way in creating a quality-focused, highly productive, responsive organization that supports a market-driven Intellectual Property system for the 21st Century.

## USPTO Strategic Plan

The USPTO is dedicated to the goal of *The 21st Century Strategic Plan* which is to transform the USPTO into a responsive and flexible agency capable of competing in a global, market-driven economy. The ambitious plan was first issued in June 2002. In response to stakeholder input, a revised plan was submitted as part of the USPTO's fiscal year 2004 budget request, including legislative changes to USPTO's patent and trademark fee schedules. The plan was internally adjusted in fiscal years 2003 and 2004 to revise planned accomplishments to align with enacted funded levels. In December 2004, with the passage of the Consolidated Appropriations Act, 2005 (P.L. 108-447), the proposed fee changes were enacted for two fiscal years and the USPTO received full access to its projected fee income for 2005, which allowed the USPTO to move forward with many of the initiatives contained in *The 21st Century*

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

*Strategic Plan.* Since it's conception, the USPTO has been anticipating an improvement in the economy and has been planning for increased workloads. Over the last two years, however, the overall direction of the U.S. economy and the global economy, in general, has been more positive than anticipated. The USPTO has experienced even higher than projected growth in patent and trademark applications in fiscal years 2004 and 2005. *The 21st Century Strategic Plan* has laid the foundation to facilitate improvements in Patent and Trademark quality and address increases in pendency due to the growing complexity of applications and increasing workloads. The USPTO will continue to explore all opportunities available to optimize Patent and Trademark quality and processing time, including working with our Intellectual Property (IP) partners on worksharing initiatives, expanding and training our examination staff and focusing them on the core examination functions, and working with our customers and stakeholders on changes to our processes which will aid the USPTO in meeting the workload challenges it faces. Additionally, the USPTO is focused on increasing the number of applications and communications received and processed electronically and other e-government initiatives. Strengthening worldwide protection and enforcement of intellectual property is also a priority of the USPTO and many initiatives address this effort. Achievement of the USPTO's outyear goals is dependent upon permanent authorization of the revised fee schedule that was set forth in the Consolidated Appropriations Act, 2005.

The continued challenges of forecasting economic change and volatility in demand for products and services present the USPTO with ambitious transformation opportunities to leverage innovative solutions that are geared toward making the organization a value-creating, customer-focused partner in business results.

## President's Management Agenda

The USPTO is committed to the objectives of the PMA. This is evidenced by the progress we have made in improving the strategic management of human capital, competitive sourcing, improved financial performance, expanded e-government, and budget and performance integration. One such notable progress is the competitive sourcing plan for searches done in cases filed pursuant to the Patent Cooperation Treaty (PCT). At the end of fiscal year 2005, the USPTO began to competitively source PCT searches. This will serve as a pilot for the competitive sourcing of U.S. application searches. Additionally, the USPTO continues to enhance our electronic business center which is available at the USPTO web site www.uspto.gov, and provides consumers with online services for fee payment, obtaining historical patent and trademark information, filing applications and correspondence for pending applications and maintaining patents and registered marks, viewing patent and trademark documents, and locating registered patent attorneys or agents. The USPTO's web site has received recognition for its design, content, services offered, help features, navigation, site legitimacy, and accessibility.

By design, our annual performance plan is linked to our fiscal year 2007 budget submission and reflects the priorities of the Under Secretary and goals contained in *The 21st Century Strategic Plan.* The annual budget request is a consequence of USPTO managers integrating their funding requirements to the plan, which contain measurable objectives and milestones for each business goal. The annual integrated budget/performance plan is the most effective and efficient way of establishing accountability by making sure that performance measures are consistent with the views of the Administration and the Congress. The USPTO utilizes the Program Assessment Rating Tool (PART), and other assessment evaluations and modeling techniques to effectively enhance delivery of services and achieve improved program results. The agency routinely monitors program performance targets to ensure achievement of actual results to performance goals. Organizational goals and crosscutting performance measures are also included in senior executive members' performance appraisal plans to ensure alignment with agency mission, goals, and strategic objectives.

P000020

## The Economy and USPTO Workloads

USPTO workloads are dependent upon many factors, including economic activity in the U.S. and around the world. In addition to the normal difficulties associated with determining business cycle turning points, the economic outlook over the last few years has been extremely uncertain because of worldwide security concerns. Today, while many of the national security uncertainties remain, the overall direction of the U.S. economy and the global economy, in general, is positive. With the world and especially the U.S. economy improving, the workload outlook for the USPTO is also positive. Based on this outlook, the projected demand for patents and trademarks is expected to continue to grow.

P000021

## Economic Assumptions

In projecting future workloads, the USPTO considers a number of factors, prominently including the overall condition of the global and U.S. economies and the state of research and development within the United States. Such projections are always uncertain, with national security concerns and record petroleum prices the Assumptions sources of uncertainty in the current projection.

### U.S. Economy

U.S. economic activity has continued to expand since the recession of 2001 and the general expectation is that the U.S. economy will continue to grow in 2006 and remain strong at least over the next one to two years. As compared to this time last year, forecasts of the U.S. economy from the Congressional Budget Office (CBO) have been revised downward slightly for near-term GDP growth and slightly upward for mid-term GDP growth.[7]  CBO is currently optimistic, envisioning recent rapid growth moderating only to a small extent through 2007.

Corporate profits and equity markets have recovered from the recent downturn and unemployment levels have improved, although employment gains have been below expectations to some extent. The prognosis for both consumer spending and business investment is good. Moreover, from the USPTO's prospective, it is important to note that continuing healthy economic growth over the next two years will be led by business investment spending, which will undoubtedly be further reflected in continued growth in patent and trademark filings.

For the remainder of fiscal year 2006, U.S. real GDP growth is expected to be near 3.4 percent. According to the CBO and private forecasters, such as those represented in the Blue Chip survey, fiscal years 2006 and 2007 growth is expected to be above 3.0 percent, absent significant external shocks resulting from terrorist activity in the U.S. or abroad, or from record high petroleum prices. Based on the probable overall economic growth path alone, the USPTO should experience steady demand for patents and trademark filings through fiscal year 2007. There is little evidence thus far, however, that points to a resumption of the extremely high rates of workload growth that the USPTO experienced in the late 1990s.

### Research and Development

Another key factor influencing the direction of USPTO workload is R&D expenditures, which is a useful leading indicator of patent application filings. The latest revised figures available from the National Science Foundation (NSF) show that total U.S. R&D expenditures increased by $7.4 billion to $283.8 billion in 2003. About two-thirds of this total was funded by private industry. When the figures are adjusted for inflation, U.S. R&D expenditures are estimated to have increased by only about one-tenth of a percent in 2003.

Annual growth rates of U.S. R&D expenditures are estimated to have improved since 2003. According to the Battelle-R&D Magazine annual funding forecast, U.S. R&D expenditures were estimated to have reached about $301.5 billion in 2004 or about 6.2 percent higher than the 2003 level. For 2005, R&D expenditure growth is expected to be about 3.5 percent higher than the 2004 level. Historically, the USPTO has found R&D expenditures impact its patent filings workload approximately one year later.

### Global Economy

Since intellectual property protection is a world-wide concern, the global economy is an important component of the USPTO's workload outlook. Approximately 45.0 percent of patent application filings and about 19.0 percent of trademark application filings originate in foreign countries.

---

[7] CBO develops a domestic forecast twice a year and presents it formally in testimony before Congress, making it both timely and authoritative. The current forecast is as of August 15, 2005. In particular, it can be viewed as an official update of the forecasts appearing in the Economic Report of the President.

P000022

Global economic growth has been strong in recent years, with world output increasing 4.0 percent in 2003 and 5.1 percent in 2004. For calendar year 2005, the current growth rate estimate is 4.3 percent. The outlook remains positive, but economic growth will likely decelerate in the future and return to a more sustainable rate of expansion that reflects higher oil prices. According to the International Monetary Fund, world output is expected to increase at a 4.3 percent rate in 2006. Continued global economic growth would suggest that patent and trademark filings from overseas are also likely to continue to increase through 2006 and 2007.

**Economic Outlook Summary**

Economic activity in the U.S. remains strong and many economists are expecting the outlook to remain positive in the near future. With the global economy, and especially with the U.S. economy continuing to expand, the workload outlook for the USPTO remains positive despite some risks, such as rising oil prices, which could negatively impact the future.

P000023

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

**This Page is Intentionally Left Blank**

P000024

# Fiscal Year 2007 Budget Request By Business Line

The USPTO operates as a performance-based organization based on two mission driven business operations — Patents and Trademarks. The budget presentation takes into account full program costs in order to illustrate a clear link to Patent and Trademark performance goals and targets. The performance plan (performance budget) is organized according to Federal Accounting Standards Advisory Board's (FASAB) managerial cost accounting standards Statement of Federal Financial Accounting Standards (SFFAS) No. 4. Under this cost accounting concept, the tables on pages 11 and 15 depict total budget estimates including (a) direct traceable costs, (b) assigned costs on a cause-and-effect basis and, (c) allocated costs on a consistent and reliable basis that help to establish key Patent and Trademark operational and policy requirements. Direct costs are shown as principle functions of the examination pipeline and indirect costs correspond with other contributing resources.

## PATENT BUSINESS

Patents — The core mission of the Patent Organization is to examine applications and grant valid patents in accordance with the law. This is accomplished by comparing the claimed subject matter of an inventor's application for a patent to a large body of existing technological information to determine whether or not the claimed invention is new, useful, and non-obvious to someone knowledgeable in that subject matter. In the course of examining patent applications, examiners make determinations on patentability, prepare answers to briefs in appeals contesting actions rejecting an application, make holdings of abandonments, recommend institution of interference proceedings to determine priority of invention, and act on other post-examination issues in accordance with the provisions of 35 U.S.C. and 37 C.F.R.

The examination of patent applications consists of several distinct, but interrelated functions, which are described below. Workloads, together with the strategic initiatives, drive all increases in budget estimates for fiscal year 2007.

- *Initial Examination — $34.000 million*: This function includes the administrative review of all applications filed (including those filed under the Patent Cooperation Treaty) before delivery to the Patent Examining Corps for examination. In this phase, the review is for compliance with requirements of form and content; determination of the adequacy and acceptability of statutory fees; conversion to the Image File Wrapper (IFW), except if filed electronically, for electronic processing of all documents and orders; assignment of the official filing date and application tracking number; and inputting of patent bibliographic data in the Patent Application Location Monitoring (PALM) system.

- *Examination — $758.724 million:* In this phase, examiners compare the application's subject matter to a large body of technological information to determine the patentability of a claimed invention, whether or not the invention is new, useful, non-obvious, adequately described or enabled, and claimed in clear and definite terms to individuals knowledgeable in that subject matter. The fiscal year 2007 cost of examination includes a net increase of 530 in examining staff over fiscal year 2006 staffing levels.

- *Scientific, Technical, and Classification Services — $45.418 million:* The patent scientific, technical and classification services are an integral part of the patent examination process. These functions are required to maintain a patent classification system by subject matter and to provide

P000025

electronic access to all U.S. and foreign patents and related technical literature used for searching. The current examiner search files contain more than 8.4 million U.S. patent documents and 23.0 million foreign patent documents. Examiners also have access to over one thousand commercial databases containing non-patent technical literature documents.

- *Pre-Grant Publication and Patent Issuance — $102.189 million:* Pre-grant publication is the process of publishing those applications that are subject to publication 18 months after the earliest effective filing date. The patent issuance function occurs after examiners have allowed applications and includes tasks associated with the preparation for issue and printing of patents and publication of a weekly edition of the electronic *Official Gazette* for dissemination to the public. Also included in the cost of this phase is the printing of reexamination certificates, Statutory Invention Registrations and new effort for searchable database for non-published applications.

- *Patent Appeals and Interferences — $16.418 million:* This phase includes post-examination hearing and deciding appeals from examiner adverse decisions concerning patent applications, and conducting interference proceedings to make final determinations as to questions of priority of invention.

- *Operations, Including Systems Maintenance and Automation Support — $75.911 million:* Outside of the above patent examination process components, direct support of patent operations includes costs related to patent executive and policy leadership, quality review and training functions. These estimates also include the costs of maintaining all automated information systems that directly support the patent process. As part of this function, patent automation personnel serve as business process experts in working with the Chief Information Officer (CIO) organization to implement information technology systems and to procure and deploy related hardware and software in support of the Patent Business.

- *Strategic Initiatives — $139.424 million:* The strategic initiatives supporting the Patent Business include all of the initiatives discussed under Goal 1 — Improve quality of patent products and services and optimize patent processing time. Additionally, the initiatives discussed under Goal 3 that directly support the Patent Business are also captured here.

- *Other Contributing Resources* (assigned in direct costs of support functions and miscellaneous general expenses) — *$468.337 million:* These costs represent the patent share of agency-wide strategic initiatives such as the share of IT Security and other indirect costs such as rent, utilities, program administration, internal operations and infrastructure that support the entire Agency. The USPTO utilizes an activity-based costing methodology that provides greater transparency to the program's operational performance in identifying various factors that drive program costs.

P000026

*Dollars in Thousands*

| Patents | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Operations— Resource Requirements are Driven by Incoming Workloads and Targeted Outputs | *Actual* | *Enacted* | *Budget* |
| • Initial Examination | $30,674 | $31,269 | $34,000 |
| • Examination | $569,497 | $651,849 | $758,724 |
| • Scientific, Technical and Classification Services | $41,908 | $43,432 | $45,418 |
| • Pre-Grant Publication and Patent Issuance | $98,434 | $101,062 | $102,189 |
| • Patent Appeals and Interferences | $13,683 | $15,389 | $16,418 |
| Operations, Including Systems Maintenance and Automation Support | $71,724 | $71,289 | $75,911 |
| Strategic Initiatives | $65,715 | $136,345 | $139,424 |
| **TOTAL DIRECT** | **$891,635** | **$1,050,635** | **$1,172,084** |
| Other Contributing Resources (Indirect Costs for Support Functions) | $427,381 | $443.039 | $468,337 |
| **GRAND TOTAL** | **$1,319,016** | **$1,493,674** | **$1,640,421** |
| FTEs | 6,020 | 6,996 | 7,582 |
| **KEY PERFORMANCE RESULTS** | | | |
| Efficiency | $3,877 | $4,214 | $4,196 |
| Examiners On-Board at End-of-Year | 4,177 | 4,705 | 5,235 |
| Utility, Plant, and Reissue (UPR) Disposals | 279,345 | 307,200 | 338,700 |
| UPR First Actions | 297,287 | 316,600 | 349,100 |
| Pendency to First Action (Months) | 21.1 | 22.0 | 23.0 |
| Total Pendency (Months) | 29.1 | 31.3 | 32.0 |

P000027

## Planned Performance Results

In fiscal year 2007 the Patent business will:

- Receive 444,000 new UPR applications;

- Complete 349,100 first actions on the merits to achieve a first action pendency of 23.0 months; this production target is 10.3 percent more than the 316,600 first actions planned for fiscal year 2006; and

- Dispose of over 338,700 cases to achieve a total pendency of 32.0 months; and issue and print over 181,200 patents; this target is 13.3 percent more than the 160,000 projected for fiscal year 2006.

## Critical Events

- Increase the capacity of the patent examining corps by hiring 1,000 new patent examiners. To support the training and inclusion of this large number of new hires, Patents will establish a new training program, the USPTO Patent Training Academy, and will graduate new hire examiners with the ability to work with reduced oversight thereby reducing the training burden faced by the Supervisory Patent Examiners (SPE). New examiners will be hired in incoming classes of approximately 128 new hires who will remain in the training environment for approximately 8 months. Courses will be a combination of large lectures and small "labs" with groups of approximately 16 who will work in a similar (or same) technology environment.

- Implement retention incentives to retain a highly qualified and productive workforce and continue an enhanced performance-based award package for SPEs and managers. Efforts are underway to ensure that all internal and external factors that influence the retention of examiners are identified and assessed. Programs will be established to reward examiners throughout their career and additionally ensure that the best-qualified examiners seek supervisory positions by providing the potential to be rewarded at the same level as examiners.

- Increase participation in telework by implementing a patent hoteling program that will also allow for the expansion of the patent examining corps without incurring additional office space costs.

- Continue an enhanced performance-based award package for SPEs and managers.

- Collaborate with other Intellectual Property partners to maximize work-sharing opportunities and competitively source the search function, to allow the USPTO to generate gains in examiner resources by focusing examiners on making patentability determinations rather than spending substantial amounts of time on searching.

- Continue the deployment of the Patent File Wrapper (PFW) functionality including the new text and image file repository, the new automated workflow, redesigned scanning operations, and expanded electronic filing and correspondence providing a more comprehensive and productive set of integrated information technology (IT) tools to accomplish end-to-end electronic application processing.

P000028

# TRADEMARKS

Trademarks — The core mission of the Trademark Organization is to register marks that meet the requirements of the Trademark Act of 1946, as amended, and provide notice to the public and businesses of the trademark rights claimed in the pending applications and existing registrations of others. With such notice, readily available at www.uspto.gov, a business can make an informed decision when it wishes to adopt a new mark or expand the goods or services marketed under an existing mark. Federal registration provides enhanced protection for the owner's investment in the mark and in the goods and services sold under the registered mark.

The core process within the Trademark Organization is the examination of applications for trademark registration. As part of that examination, examining attorneys must make determinations of registrability under the provisions of the Trademark Act of 1946, as amended, including searching the electronic databases for any pending or registered marks that are confusingly similar to the mark in a subject application, preparing letters informing applicants of the attorney's findings, approving applications to be published for opposition, and examining Statements of Use in applications filed under the Intent-to-Use provisions of the Trademark Act.

The examination of trademark applications consists of several distinct functions, which are:

- *Initial Examination — $6.697 million:* When an application for trademark registration is received it is reviewed for adherence to filing requirements. If basic filing requirements are met, the application is classified and data is transferred into trademark automated systems. Trademark automated systems are the source for application data that is used in the processing and examination of trademarks. The automated system also provides information available to the public through the USPTO web site. Initial examination also encompasses the processing of applications filed under the Madrid Protocol.

- *Examination — $61.769 million:* In this phase of the process, examining attorneys determine if the mark in the application is entitled to registration under the provisions of the Trademark Act of 1946, as amended. As part of the examination process, examining attorneys evaluate many types of marks, such as trademarks, service marks, certification marks, collective marks, and membership marks. Examining attorneys must search a database of about 1,200,000 registered marks and more than 500,000 pending marks in order to determine if a mark in the subject application is confusingly similar to an existing mark.

- *Publication and Registration — $3.719 million:* This phase includes the publication of applications for opposition or notice that the mark has been approved, the registration of allowed applications that have demonstrated use, and the processing of allowed intent-to-use applications awaiting statements of use.

- *Post Registration — $3.338 million:* Between the fifth and the sixth year after registration and at ten year intervals after registration or renewal, the registrant must file an affidavit and proof that the mark shown in the registration is being used in commerce, or that grounds for excusable non-use exists. Failure to file the required affidavit and proof of use results in cancellation of the registration. These requirements serve to remove trademarks from the register when the mark is no longer in use.

- *Appeals and Inter Partes Proceedings — $9.908 million:* This phase includes review, at applicant request, of adverse registrability determinations, opposition hearings where an existing trademark holder believes that an allowed application may be confusingly similar, and other proceedings involving registrations where a third party wishes to challenge the validity of a registration.

P000029

- *Operations, Including Systems and Automation Support — $19.944 million:*  Outside of the above trademark examination process components, direct support of trademark operations includes costs related to trademark executive and policy leadership, customer assistance, quality review and training functions.  These estimates also include the costs of maintaining all automated information systems that directly support the trademark process.  Dedicated trademark support personnel serve as business process experts in working with the CIO organization to implement information technology systems and to procure and deploy related hardware and software in support of trademark operations.

- *Strategic Initiatives — $9.864 million:*  These are the costs of those strategic initiatives that are discussed under Goal 3, that directly support the Trademark Business.

- *Other Contributing Resources* (indirect costs for support functions that are reasonably allocated to programs and activities on a prorated basis using a consistent cost allocation methodology) — *$87.306 million:*  These costs represent the trademark share of agency-wide strategic initiatives such as the share of IT Security and other indirect costs such as rent, utilities, program administration, internal operations and infrastructure that support the entire Agency.  The USPTO utilizes an activity-based costing methodology that provides greater transparency to the program's operational performance in identifying various factors that drive program costs.

*Dollars in Thousands*

| Trademarks | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|
| Operations — Resource Requirements are Driven by Incoming Workloads and Targeted Outputs | *Actual* | *Enacted* | *Budget* |
| ● Initial Examination | $10,734 | $7,520 | $6,697 |
| ● Examination | $57,993 | $57,657 | $61,769 |
| ● Publication and Registration | $2,217 | $2,889 | $3,719 |
| ● Post Registration | $2,399 | $3,163 | $3,338 |
| ● Appeals and Inter Partes Proceedings | $8,408 | $8,835 | $9,908 |
| Operations, Including Systems and Automation Support | $20,777 | $20,872 | $19,944 |
| Strategic Initiatives | $9,484 | $10,101 | $9,864 |
| **TOTAL DIRECT** | **$112,012** | **$111,037** | **$115,239** |
| Other Contributing Resources (Indirect Costs for Support Functions) | $77,364 | $78,375 | $87,306 |
| **GRAND TOTAL** | **$189,376** | **$189,412** | **$202,545** |
| **FTEs** | **805** | **879** | **975** |
| **KEY PERFORMANCE RESULTS** | | | |
| Efficiency | $677 | $635 | $621 |
| Examining Attorney FTE on production at End-of-Year | 357 | 359 | 414 |
| Total Office Disposals | 252,275 | 298,100 | 326,100 |
| Total First Actions | 317,757 | 371,600 | 418,000 |
| **Pendency to First Action (Months)** | **6.3** | **5.3** | **3.7** |
| **Total Pendency (Months)** | **19.6** | **18.8** | **17.3** |

P000031

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

## Planned Performance Results

In fiscal year 2007 the Trademark business will:

- Receive 376,000 new applications for registration;

- Complete 418,000 first actions to achieve a first action pendency of 3.7 months; this production target is about 12.5 percent more than the 371,600 first actions planned for fiscal year 2006;

- Complete 787,200 balanced disposals[8]; this production target is 11.4 percent more than the 706,900 balanced disposals planned for fiscal year 2006; and

- Complete 326,100 office disposals to achieve a total pendency of 17.3 months; this production target is 9.4 percent more than the 298,100 disposals planned for fiscal year 2006.

## Critical Events

- Expand the Trademark Work-at-Home program to 280 participants;

- Continue to complete the transition to a fully electronic workflow, and;

- Implement *The 21st Century Strategic Plan* initiative for non-attorney examination of statements of use.

---

[8] All of the following count as one balanced disposal per class: First action, Approval for publication and allowance on the Principal or Supplemental Register, and Abandonment (initial examination). Examiners have the potential to earn up to 2 balanced disposals per class. The production standard was changed from action points to balanced disposals with the implementation of a negotiated performance appraisal plan in 2005.

P000032

## SUMMARY OF ACCOMPLISHMENTS AND FUTURE CHALLENGES

### Strengthening Intellectual Property Protection Worldwide

During the course of fiscal year 2005, strengthening intellectual property protection and enforcement continued to be one of the main themes of USPTO efforts worldwide. Officials from the USPTO continue to discuss ways of enhancing protection for copyrights, geographical indications, patents, trademarks, trade secrets and other forms of intellectual property in China, Brazil, Paraguay, Mexico, Eastern Europe, the Republic of Korea, the Philippines, and many other countries, and for the countries in which the United States is negotiating or has negotiated Free Trade Agreements (Morocco, Bahrain, the Central American countries, Australia, Panama, the Andean countries, Thailand, the Southern Africa Customs Union, Chile, Jordan, and Singapore).

In fiscal year 2005, the USPTO expanded its intellectual property protection and enforcement program based on the provisions in the Consolidated Appropriations Act, 2005 (P.L. 108-447) to include training assistance programs, special work assignments aimed at enhancing technical assistance, a public awareness campaign, and studies on key intellectual property issues.

### Electronic Government

The USPTO has made significant progress in maximizing electronic tools to make the patent and trademark examination process fully transparent and accessible to the public. Anyone with Internet access anywhere in the world can use the USPTO web site to track the status of, and review documents in, published patent applications through Public Patent Application and Information Retrieval (PAIR), and the full contents of all pending trademark application files through the Trademark Document Retrieval (TDR) system, including all decisions made by the examiners and their reasons for making them.

Patent applications become eligible for publication 18 months after the earliest effective filing date and trademark applications are added as they are filed. The USPTO projects that about 343,900 new published patent application files and 376,000 trademark applications will become available to the public in 2007. The E-Patent Reference system is available to applicants to access U.S. references referred to in examiners' office actions for patent documents that are not yet available to the public, eliminating the need for mailing paper copies of U.S. patents and published application references to applicants.

The Patent Organization has eliminated the movement of paper patent applications by creating an electronic image of patent applications filed since June 30, 2003, and pending applications filed before that date. The IFW system is used by all patent examiners, technical support staff, and other adjunct users. Full implementation of the USPTO's "Electronic Patent Processing Pipeline" is based on a two-phased approach. The first phase was an image-based solution, achieved through the IFW system. The second phase is a text-based process that will allow the USPTO to provide more automation of manual processes and will improve accuracy and reliability. In order to increase the number of electronically filed patent applications, the USPTO will move to PDF as an alternative to the earlier XML solution. Development of the second phase began in fiscal year 2006.

The USPTO established more options for filing for trademark registration, consistent with *The 21st Century Strategic Plan*, to create financial and market-based incentives and encourage greater participation in the U.S. trademark system. Trademark owners can now select the option that best meets their needs – with higher fees for filing on paper, and lower fees for filing electronically. Changes in the fee structure and system improvements have lead to an increase in the number of applications that are filed through the award-winning Trademark Electronic Application System (TEAS). More than 90.0 percent of applications for registration are now filed electronically, making it easier than ever to file for Federal registration. Electronic communications make it possible to conduct a preliminary search prior to filing an application, determine the status of pending and registered trademarks, respond to office actions, access general

P000033

information on marks published, registered and renewed, file initial applications and maintain a registered mark through the USPTO website. The USPTO has continued to enhance the system and expand the number and type of transactions that can be completed on-line. 26 TEAS forms are available and provide the means to handle most trademark transactions electronically.

The award-winning Trademark Work-at-Home program was expanded to include 69.0 percent of eligible examiners by the end of fiscal year 2005. In all, 220 employees are working nearly exclusively from home due to the success of this program with the number projected to increase to 280 by fiscal year 2007. The program has demonstrated a number of benefits including retention of experienced employees and has allowed the USPTO to expand its examining corps to address filing increases without incurring additional costs for office space.

The USPTO has made significant progress in achieving its long-term goal to create an e-government operation and now relies exclusively on trademark data and images submitted through electronic forms or captured from paper documents to support examination, publish documents, and issue trademark registrations. All trademark examination is conducted directly from electronic records. Examiners access applications for examination, take subsequent actions and transactions, and manage their individual case dockets from electronic records and systems. A complete electronic records database covering all trademark applications, including on-going correspondence, has been created by capturing the text and image of approximately 500,000 pending paper files and documents. The USPTO is well on its way to completing the integration of existing automated systems with an electronic file management system that will eliminate manual paper based processes altogether.

The Trademark Trial and Appeal Board (TTAB) now operates with a completely electronic workflow system, permits electronic filing of all documents, and makes available on the USPTO web site image copies of all its proceeding files.

As a result of the tremendous efforts made by the USPTO in e-government, the Winter Corporation recognized our Oracle database for electronic patent processing as one of the largest transactional databases in the world. The database consists of patent records and images that support the electronic processing of patent applications. The database is growing at the rate of over one terabyte every two months and is approaching 20 terabytes in size. This database automatically replicates every transaction for backup and protection.

## Quality Enhancements

The USPTO is committed to improving the quality of its products and services by continuing to implement the initiatives set forth in *The 21st Century Strategic Plan*. In the patent examining corps, an enhanced Quality Assurance Program has been implemented that includes end product reviews, in-process reviews and enhanced "second pair of eyes" reviews. The feedback from these reviews is used to identify and develop training modules and other quality enhancements. Additionally, to ensure that primary patent examiners maintain the knowledge, skills, and abilities (KSAs) necessary to perform a high quality examination, primary examiners are evaluated and re-certified every three years. This program includes mandatory continuing education courses with quizzes and expanded work product reviews. Also, a certification program was implemented to ensure that junior examiners have the required KSAs prior to promotion to the level where they are given legal and negotiation authority. This program includes a "Patent Law and Evidence" course and requires passing a certification examination before promotion to the GS-13 level. Programs that aim to monitor and improve the quality of work performed by the technical support staff and the quality of the examination of international applications filed under the Patent Cooperation Treaty (PCT) have also been developed.

The USPTO has instituted new measures and criteria to create a more comprehensive and meaningful review of what constitutes quality of trademark examination. The results of an examiner's first and final

P000034

office action are reviewed for the quality of the substantive basis for decision making, search strategy, evidence, and writing. Based on the data collected from those reviews, the Office has targeted both electronic and traditional training initiatives addressing specific problem areas. In addition, this program provides prompt feedback to examining attorneys when their work products are reviewed. Specific comments on any work product, which is either "excellent" or "deficient," are sent to the appropriate examining attorney and supervisor. As a result, training takes place both on the micro level, with specific feedback, as well as on the macro level, with training modules that address trends, targeting topics that warrant improvement. Examiners are required to take a series of self-paced e-learning tutorials, as part of the USPTO's commitment to improve quality of examination and ensure that all examiners possess the KSAs necessary to perform their jobs. The Office has developed a schedule to implement new e-learning modules throughout the year based on topics that are identified through quality review evaluations.

## Growth in Application Filings

The number of patent and trademark applications that were filed increased during fiscal year 2005 from the previous year at an average growth rate of 8.0 percent each. In the near future, patent and trademark applications are expected to continue to increase at this growth rate, with a slight decrease in the outyears The continued growth in patent application filings has been further magnified by an overall increase in the technological complexity of patent applications, which together make pendency improvements challenging and complicated. More applications, both in numbers and as a percentage of overall filings, seek patent protection in technology areas that are more complex, and the time spent on complex technology applications is almost double that required for traditional applications.

P000035

# MANAGEMENT PRIORITIES

- *Shift in Complexity of Filings /Growing Backlog of Applications / Sustained Emphasis on Quality*— Technology has become increasingly complex, and demands from the public for higher quality products and services have grown in importance. In order to meet customer needs, USPTO is continuing to address the challenges of rising workloads and the shift of applications from traditional arts to more complex technologies by hiring additional examiners and exploring process changes to reduce the amount of examination resources required. Quality is the most important component of *The 21st Century Strategic Plan*. The USPTO has in place several quality initiatives including an enhanced Quality Assurance Program for end product reviews, in-process reviews, and enhanced "second pair of eyes" reviews. Additionally, to ensure that our primary patent examiners maintain the KSAs necessary to perform a high quality examination, the USPTO implemented a recertification program, with primary examiners being recertified once every three years. Quality will be assured throughout the process by striving to identify the people most likely to become the best patent examiners, certifying their knowledge and competencies throughout their careers, and focusing on quality throughout the patent examination process.

- *Sustained Funding Stream*— Permanent enactment of the fee changes made with the Consolidated Appropriations Act, 2005 is necessary to provide a stable and predictable funding stream for the agency. In the U.S., demands for products and services have created substantial workload challenges in the processing of patents. The Congress, the owners of intellectual property, the patent bar, and the public-at-large have all told the Department of Commerce that it must address these challenges aggressively and promptly. Permanent enactment of these fee changes and continued implementation of *The 21st Century Strategic Plan* initiatives and timeframes will address many of the challenges.

- *Electronic Workplace* — The USPTO's Patent and Trademark operations are rapidly moving to eliminate paper documents from their processes. Electronic communications will continue to be improved, encouraging more applicants to do business electronically with the delivery of web-based text and image systems. Patent and Trademark operations have made significant progress in achieving the long-term goal to create an e-government operation, and Trademarks now relies exclusively on trademark data submitted or captured electronically to support examination, publish documents, and print registrations.

- *Multilateral and Bilateral Agreements* — Under *The 21st Century Strategic Plan*, the USPTO continues to work with its intellectual property (IP) partners to improve the efficiency of our processing systems. To streamline the IP system and protections, the USPTO must consult with, and receive the support of, other IP offices in structuring new bilateral and multilateral initiatives and agreements. Reaching bilateral and multilateral agreements will require all sides to openly communicate and strive toward a more global convergence of patent and trademark standards.

P000036

# COMMITMENT TO THE PRESIDENT'S MANAGEMENT AGENDA

The USPTO is committed to the implementation of the PMA. This is evidenced by the progress made in improving the strategic management of human capital, competitive sourcing, improved financial performance, expanded electronic government, and budget and performance integration.

- ***Strategic Management of Human Capital:*** *The 21st Century Strategic Plan*, together with the *USPTO Strategic Workforce/Restructuring Plan* lay out an explicit workforce planning strategy that is linked to the Agency's strategic and program planning efforts. The Agency has projected its current and future human capital needs, including the size of the workforce and its deployment across the organization, and has identified key competencies needed to fulfill the agency's mission and strategic goals. *The 21st Century Strategic Plan* and the *USPTO Strategic Workforce/Restructuring Plan* demonstrate that the USPTO is focused on building competencies in response to customer demands for enhanced quality. The USPTO also is leveraging competitive sourcing and e-government to better manage time devoted to examination of patent and trademark applications. The Office has become a recognized leader in Federal Government telework programs, and was the recipient of the 2004 Telework in the Federal Government Leadership Award for leadership in enterprise-wide telework programs. As a consequence of this recognized success, other Federal agencies have sought our assistance in establishing their own telework programs. *The 21st Century Strategic Plan* also views workforce planning from an international perspective, and incorporates how work sharing among IP offices can have an impact on USPTO's human capital planning and management. In addition, the USPTO's current organizational structure supports decision-making at the lowest appropriate level.

- ***Competitive Sourcing:*** The USPTO is committed to achieving performance enhancements and cost-savings through competitive sourcing. In recent years, we have competitively sourced many functions, such as payroll, mail processing/handling, clerical support, data transcription, systems maintenance and development, help desk support, etc. In particular, service contracts have presented an excellent opportunity to help us deal with fluctuating workloads and to minimize the impact on our employees as the Office transitions to a fully electronic workplace. Currently, approximately 35.0 percent of the USPTO's total workforce consists of contract personnel working either onsite or offsite at contractor facilities. *The 21st Century Strategic Plan* offers new approaches for performing work that is currently accomplished by Federal employees. While preserving the inherently governmental responsibility for examination, the USPTO is committed to increasing total patent examiner output by competitively sourcing prior art searches. At the end of fiscal year 2005, the USPTO began to competitively source Patent Cooperation Treaty searches. This will serve as a pilot for the competitive sourcing of U.S. patent application searches. In fiscal year 2006, a Request for Proposal was issued for reclassification functions. Reclassification of existing classification schemes serves to improve quality of examination by updating the existing schedules to reflect emerging technology and growth, as well as harmonizing with international systems. Additionally, the USPTO has completed two competitions for commercial activities in accordance with OMB Circular A-76, Performance of Commercial Activities. A streamlined A-76 competition for the Pre-Grant Publication Classification requirements resulted in a private sector performance decision. Based on that decision, a Request For Proposal for the private sector competition was released in the first quarter of fiscal year 2006.

   The USPTO also made strides in performance-based services acquisition and, as a result, was awarded the government-wide FY 2004 Excellence in Performance-Based Services Acquisition Award sponsored by the General Services Administration and the Performance Institute.

- ***Improved Financial Performance:*** The USPTO is in compliance with all Federal accounting principles and standards and has encountered no instances of material weaknesses in internal controls

or non-compliance with Federal accounting regulations. We will continue to maintain and strengthen our internal controls and improve the timeliness and usefulness of our financial management information. For fiscal year 2005, the USPTO met all quarterly financial reporting requirements instituted by OMB and the Treasury and accelerated the fiscal year 2004 annual reporting requirement. Again, the USPTO sustained its clean audit opinion with fiscal year 2005 marking the thirteenth consecutive unqualified audit opinion and the ninth consecutive year with no material weaknesses. The USPTO has a certified and accredited, fully integrated financial management system that routinely produces timely information and uses a data warehouse to accommodate both financial and operational data. The data warehouse is used by managers for analyzing financial results and performance and by SPEs for managing patent processing timeframes. The USPTO also operates a mature Activity Based Cost (ABC) Accounting system that captures costs of core mission activities and both direct and indirect costs for the entire agency. Managers use data from the ABC system to analyze the cost of operations when making decisions regarding improving processes, setting fees, or allocating budgetary resources. Additionally, the USPTO met its fiscal year 2004 financial performance measurement goals. Finally, for the third year in a row, the Association of Government Accountants awarded USPTO the prestigious Certificate of Excellence in Accountability Reporting for the agency's fiscal year 2004 Performance and Accountability Report.

- *Expanded E-Government:* USPTO is accelerating deployment of critical automated information systems, particularly the electronic end-to-end processing of patent and trademark applications. In addition, the USPTO is currently working on ways to improve delivery schedules, reliability, performance, security and monitoring the cost of its automated information systems. USPTO continues to work towards the completion of the Trademark Information System (TIS), the file management system that will create a fully electronic workflow system to manage all transactions throughout the examination, petition and post registration process.

  USPTO met its target to deliver an electronic operating process for patent applications by completing the image-based IFW system, which was developed in conjunction with the EPO's image-based system. This collaboration will help to achieve common goals and share systems already in use or in development. The system implemented in 2004 creates an image-based patent file wrapper system that includes an electronic image of all incoming and outgoing paper documents. The next phase of the patent e-government strategy will be to shift to a text-based system.

  USPTO seeks to choose IT projects that best support its mission and comply with its enterprise architecture. Individual projects are evaluated in the broader context of technical alignment with other IT systems as well as the investment's impact on the USPTO IT portfolio's performance, as measured by cost, benefit, and risk. As part of the Capital Planning and Investment Control (CPIC) process, USPTO prioritizes each investment and decides which projects will be funded in subsequent fiscal years. Once selected, each project is managed and monitored consistently throughout its life cycle. At key milestone dates, progress reviews are conducted to compare the project's status to planned benefit, cost, schedule, and technical efficiency and effectiveness measures. All major IT system investments are included in the fiscal year 2007 Exhibit 53.

- *Budget and Performance Integration:* Since 1999, the USPTO has developed an annual corporate plan that links the annual performance plan and budget request such that resource requirements for continuing programs and new initiatives are aligned with outputs and performance goals. Subsequently, in June 2002, the USPTO introduced *The 21st Century Strategic Plan* and an updated version of the plan in February 2003 in order to address issues raised by intellectual property stakeholders. *The 21st Century Strategic Plan* is a multi-year plan that identifies critical tasks designed to provide the USPTO and external stakeholders with a long-term vision of agency goals, potential funding levels, and planned outcomes. Following development of the Plan, USPTO has refined its

budget formulation process for better integration of budgetary resources with both enterprise-wide strategic goals and individual unit performance targets.

The USPTO made interim adjustments to *The 21st Century Strategic Plan* originally issued June 2002. These interim adjustments are provided as an addendum to the fiscal year 2007 Budget Request. Additionally, the USPTO will formally update *The 21st Century Strategic Plan* during fiscal year 2006 in concert with the development of the fiscal year 2008 budget cycle.

P000039

# THE USPTO 21ST CENTURY STRATEGIC PLAN

This budget request provides an inclusive perspective by deciding on and identifying critical Patent and Trademark requirements, challenges, approaches and initiatives along with corresponding proposed legislation necessary for successful multi-year implementation of *The 21st Century Strategic Plan.* All of our business line requirements center on three broad strategic themes:

- *Agility:* Address the 21st century economy by Becoming a More Agile Organization— We will create a flexible organization and work processes that can handle the increasing expectations of our markets, the growing complexity and volume of our work, and the globalization that characterize the 21st century economy. We will work, both bilaterally and multilaterally, with our partners to create a stronger, better-coordinated and more streamlined framework for protecting intellectual property around the world. We will transform the USPTO workplace by radically reducing labor-intensive paper processing.

- *Capability:* Enhance Quality through Workforce and Process Improvements— We will make patent and trademark quality our highest priority by emphasizing quality in every component of *The 21st Century Strategic Plan.* Through the timely issuance of high-quality patent and trademark registrations, we will respond to market forces by promoting advances in technology, expanding business opportunities and creating jobs.

- *Productivity:* Accelerate Processing Times Through Focused Examination— We will control patent and trademark pendency, reduce time to first Office action, and recover our investments in people, processes and technology.

The USPTO has three supporting performance goals with measures. Two of the strategic themes— *Agility* and *Productivity* — have a direct relationships with the three USPTO performance goals, while one crosscutting strategic theme— *Capability*— spans all three performance goals.

The *Agility* theme is linked to the third performance goal and incorporates ongoing initiatives in e-government and collaboration with our IP partners worldwide. As a first priority, the USPTO has made electronic end-to-end processing of both patents and trademarks the centerpiece of its business model by deploying critical automated information systems. In addition, the USPTO is currently working on ways to improve delivery schedules, reliability, performance, security and cost control of all our automated information systems. Further, the USPTO is enhancing existing, and establishing new alliances with our friends in other national and international IP organizations to strengthen intellectual property rights around the world.

The *Productivity* theme is linked to Performance Goals 1 and 2 and addresses the planned longer-term reduction in patent and trademark pendency as measured by the average first action pendency and the average total pendency. Costs related to pendency reduction initiatives are depicted in examination.

The *Capability* theme crosses all performance goals, emphasizes the quality and process improvement element in the USPTO, and permeates throughout all our activities and operations. Quality will be assured throughout the process by hiring the people who make the best patent and trademark examiners, certifying their knowledge and competencies throughout their careers at the USPTO, and focusing on quality throughout the examination of patent and trademark applications.

The budget request for fiscal year 2007 follows and is presented by each of USPTO's three performance goals.

# Fiscal Year 2007 Budget Request by Performance Goal

## GOAL 1 — BUDGET AND PERFORMANCE

### *Improve quality of patent products and services and optimize patent processing time*

The core process under Goal 1 is the examination of an inventor's application for a patent by comparing the claimed subject matter of the application to a large body of technological information to determine whether the claimed invention is new, useful, and non-obvious to someone knowledgeable in that subject matter. A quality review of the examination requirements and practice includes reviewing a random sample of both in process and allowed applications for quality. The patent examination process also includes deciding appeals regarding issues of patentability and preparing interference proceedings.

Other phases of the patent process include the initial administrative review of applications filed before examination and the publication of applications 18 months from the earliest effective filing date and upon issuance for dissemination to the public. Additionally, the Patent Organization is responsible for managing automation requirements for implementing and maintaining classification schemes for organizing and retrieving technical information contained in patents and other documents in the search files, and for acquiring, maintaining, and providing access to scientific and technical literature in support of the examination process.

Although the long term patent pendency goal remains 18 months, this goal will not be achieved in the near term because of (1) prior constraints on funding for new hires, which resulted in priority through fiscal year 2004 being placed on quality initiatives, (2) actual application growth rates for fiscal year 2005 above those assumed for planning purposes (with a growth rate of 8.0 percent), and (3) implementation delays and legislative requirements which have had the effect of postponing the realization of the competitive sourcing efforts. Additionally, of the applications filed, a higher percentage are being filed in the very high complexity art areas such as data processing, telecommunications, and biotechnology. These applications require more hours to examine than applications in the relatively less complex areas such as general mechanical and traditional chemical technologies. The time spent by an examiner on complex technology applications is almost double that of traditional applications. The USPTO is committed to an 18 month patent first action pendency goal. In fiscal years 2006 and 2007 the USPTO will be addressing pendency by hiring additional examiners, continuing competitive sourcing and worksharing opportunities and exploring other potential options with our customers and stakeholders.

As stated above, the USPTO began implementing several quality initiatives, including an enhanced Quality Assurance Program that includes end product reviews, in-process reviews, and enhanced "second pair of eyes" reviews. The feedback from these reviews is used to identify and develop training modules and other quality enhancements. In fiscal years 2006 and 2007, we will continue the quality efforts currently implemented. Additionally, we will continue to enhance the pre-employment assessment of patent examiner applicants to make sure they have the needed competencies. We will review work products throughout prosecution to ensure compliance with examination practice and procedures standards.

Additionally, in fiscal year 2007, we will continue to focus on the enhancement of the skill sets of the examination staff via the examiner certification program. The certification program, which includes the development and delivery of a patent law and evidence course, is now mandatory for examiners before promotion to a GS-13. In addition to this certification program for junior examiners, the Patent Organization also initiated a re-certification course for all primary examiners. This re-certification, which

will take place every three years, ensures that primary examiners are maintaining the necessary KSAs in current patent law, practice, and procedure. In fiscal years 2006 and 2007, we will continue both the certification and re-certification programs requiring the examiners to pass a comprehensive test that attests to their understanding of the content of the completed training. In combination, all of these quality initiatives will provide improved patent quality by providing review of work product, feedback to examiners on areas for improvement, targeted training, and safeguards to ensure competencies.

Focus on employee skill sets to improve overall patent quality has also been implemented at the technical support staff level. A comprehensive quality review program began in the second half of fiscal year 2004 and covers technical support staff work related to the processing of new applications, amendments, and issued patents. Employee-level assessments are generated and have been included as part of their annual performance plans. In fiscal years 2006 and 2007, we will continue to monitor quality at key training and certification points to ensure that implemented actions translate into improved work products of the technical support staff.

P000042

| Goal 1: Resource requirements for improving quality of patent products and services and optimizing patent processing time | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dollars in thousands | 2005 Actual | 2006 Enacted | 2007 Budget | 2008 Est | 2009 Est | 2010 Est | 2011 Est |
| Initial Examination | $30,674 | $31,269 | $34,000 | $35,246 | $37,259 | $39,665 | $40,742 |
| Examination | $569,497 | $651,849 | $758,724 | $881,602 | $983,911 | $1,076,924 | $1,155,242 |
| Scientific, Technical and Classification Services | $41,908 | $43,432 | $45,418 | $49,025 | $52,325 | $56,186 | $59,474 |
| Pre-Grant Publication and Patent Issuance | $98,434 | $101,062 | $102,189 | $101,178 | $109,276 | $121,179 | $133,948 |
| Appeals and Interferences | $13,683 | $15,389 | $16,418 | $16,721 | $17,033 | $17,883 | $18,235 |
| **SUBTOTAL EXAMINATION** | **$754,196** | **$843,001** | **$956,749** | **$1,083,772** | **$1,199,804** | **$1,311,837** | **$1,407,641** |
| Management, Policy and Administrative Support | $32,241 | $31,583 | $35,577 | $38,115 | $39,827 | $41,458 | $43,572 |
| Automation Support | $39,483 | $39,706 | $40,334 | $39,620 | $38,141 | $38,395 | $38,727 |
| Strategic Initiatives | $8,186 | $36,897 | $46,245 | $55,581 | $90,103 | $185,963 | $302,032 |
| **SUBTOTAL DIRECT SUPPORT** | **$79,910** | **$108,186** | **$122,156** | **$133,316** | **$168,071** | **$265,816** | **$384,331** |
| Other Contributing Resources (Indirect Costs for Support Functions) | $379,056 | $383,937 | $393,574 | $386,261 | $389,771 | $397,730 | $406,156 |
| **TOTAL FOR GOAL 1** | **$1,213,162** | **$1,335,124** | **$1,472,479** | **$1,603,349** | **$1,757,646** | **$1,975,383** | **$2,198,128** |
| Allowance Error Rate | 4.6% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| In-Process Examination Compliance Rate | 86.2% | 86.0% | 88.0% | 89.0% | 90.0% | 91.0% | 92.0% |
| UPR Applications Filed | 384,228 | 414,900 | 444,000 | 475,100 | 508,400 | 543,900 | 582,000 |
| UPR Applications Filed Percent Change Over Previous Fiscal Year | 8.1% | 8.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| UPR Units of Production | 288,315 | 311,900 | 343,900 | 372,900 | 414,400 | 458,700 | 509,400 |
| Average First Action Pendency (Months) | 21.1 | 22.0 | 23.0 | 23.7 | 23.9 | 23.8 | 23.5 |
| Average Total Pendency (Months) | 29.1 | 31.3 | 32.0 | 33.0 | 33.7 | 33.9 | 33.8 |

P000043

## Strategic Initiatives Under Goal 1

### Agility/ Flexibility 1 — Initial and Pre-Grant Classification of Newly Received Applications

Newly received patent applications are classified for routing to the correct Technology Center and examining unit and those applications that are published at 18 months from filing are subject to Pre-Grant classification. Currently, classifiers in pre-examination, patent examiners, and SPEs perform this function. The USPTO expects to begin the process of relying on commercial entities for these classification functions during fiscal year 2006, and will gradually expand to full implementation by the end of fiscal year 2007. This initiative will redirect the time patent examiners now spend on classification to core examination activities. Similarly, SPEs' time will be redirected to focusing on the quality of examiner work products and on training and mentoring examiners.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $14,000 | $14,100 | $14,500 | $15,300 | $16,100 |

### Agility/ Flexibility 2 — Support for Patent Cooperation Treaty (PCT) Search Activity

The USPTO receives international applications that require the performance of an international search to discover relevant prior art in Chapter I applications. As an International Searching Authority under the PCT, the USPTO is obligated to perform this search function. The USPTO plans to competitively source this search function, which will allow the USPTO to redirect patent examiner resources back to the examination of U.S. applications. Pursuant to the funding provisions of the Consolidated Appropriations Act, 2005 (P.L.108-447), the planning process began in fiscal year 2005 and resulted in a contract award during the fourth quarter of fiscal year 2005 to initiate a pilot program. During fiscal year 2006 the USPTO will conduct evaluations to assess whether the pilot should continue. The USPTO will evaluate the results of the pilot and report to the Congress. Assuming a successful pilot, the Competitive Sourcing of Search Function initiative would begin to be implemented (see below). Also, during fiscal year 2006 the USPTO entered into a Memorandum of Understanding with IP Australia to perform search and examination work on PCT applications. Additionally, future options may include enlisting support from other IP offices to enhance capacity for completing PCT search functions. The funding identified below will be used for system modifications, to explore alternative options with other IP offices, and to competitively source the PCT Chapter I search activity.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $14,487 | $17,163 | $29,144 | $30,330 | $31,586 |

### Agility/ Competitive Sourcing of Search Function

The Support for PCT Search Activity initiative will serve as the pilot for competitively sourcing the search of national cases. Given the large numbers of patent applications in or awaiting examination, the USPTO plans to competitively source the searches of prior art. This will generate substantial gains in examiner resources by focusing examiners on making patentability determinations rather than spending substantial amounts of time on searching. The USPTO will pilot sourcing the search function through the PCT Search Activity above. The UPSPTO will conduct an evaluation of pilot competitive search results before full implementation of the concept throughout the patent corps. The USPTO will monitor contractor performance to ensure that these searches (of available prior art relating to the subject matter of inventions claimed in patent applications) meet or exceed established search standards for patentability determinations.

The funding requested below is based on beginning full implementation of the competitive sourcing of search in fiscal year 2009. Based on the provisions of the Consolidated Appropriations Act, 2005 (P.L.108-447), the USPTO began a search pilot in late fiscal year 2005 (see Agility/Flexibility 2 above).

P000044

The USPTO plans to conduct an evaluation of the pilot and report its findings, and begin full implementation in fiscal year 2009.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $0 | $0 | $20,172 | $112,897 | $225,831 |

### Agility/Flexibility 3 — Competitive Sourcing of Reclassification Functions and Transition to International Patent Classification System

Over time, the file of issued patents and non-patent literature that patent examiners must search expands significantly. As the numbers of patent documents in each class and sub-class increases, and as new technologies come to the forefront, the classification mechanisms become less focused and new classification schemes must be established. Currently, Federal staff is devoted to carrying out these activities. By second quarter fiscal year 2006, a Request for Proposal will be issued for reclassification functions. Additionally, the USPTO will consider entering into agreements with other IP office to increase the capacity to perform reclassification functions. Reclassification of existing classification schemes serve to improve quality of examination by updating the existing schedules to reflect emerging technology and growth, as well as harmonize with the international system. The funding identified below will be used to continue the process of competitive sourcing of reclassification functions in fiscal year 2007 along with exploring alternative options with other IP offices.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $3,000 | $4,000 | $4,500 | $5,000 | $5,500 |

### Capability/Transformation 2 — Competitive Compensation Packages for Supervisory Patent Examiners and Managers

The USPTO will create a competitive compensation package for SPEs and other managers to encourage the best candidates to seek supervisory positions and simultaneously reward high-performing incumbent SPEs. The ability of SPEs to train and mentor employees, while demonstrating excellent interpersonal skills and competent knowledge of their art, patent laws and procedures, is fundamental to achieving the desired level of quality and productivity in the examining corps. The funding identified below will be used to implement a performance-based awards package of up to 10 percent for SPEs and other managers providing them the potential to be rewarded at the same levels as examiners.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 20010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $3,472 | $4,477 | $4,824 | $5,163 | $5,447 |

### Capability/Transformation 7 — Implementation of Pre-Employment Testing for Patent Examiners

One of the most essential competencies of a successful patent examiner is the ability to communicate effectively, both orally and in writing. In the past the USPTO has received negative feedback from our customers regarding the communication skills of some of its examiners. In response, in fiscal year 2002, the USPTO launched an interim program for pre-employment testing of oral and written communication skills of applicants for patent examiner positions to ensure that selected candidates possess the requisite language skills to perform their job. In fiscal year 2005 the USPTO partnered with OPM to develop an automated competency assessment tool and explore suitability testing tools. This development will include enhancements to the Job Application Rating System (JARS) to provide pre-employment testing information to SPEs and the Office of Human Resources; full development and deployment will be completed in fiscal year 2006 and the funding identified below will be used to maintain and enhance the tools.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $250 | $300 | $51 | $52 | $53 |

P000045

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

### Capability/Transformation 9 — Re-Certification of Primary Patent Examiners

Primary patent examiners are authorized to issue patents with their own signature, generally without further review by a SPE. It takes approximately 5-6 years to reach this level of expertise, during which time individuals are certified only once. However, because of periodic changes in patent law, policy and practice, the USPTO recognizes the advantages of periodic re-certification of primary examiners to ensure that they possess the required up-to-date KSAs for making sound patentability determinations. The USPTO implemented a re-certification program in the form of continuing legal education (CLE), in parallel with expanded review of primary examiner work products to ensure that current patent law, practice, and procedures are followed in all completed Office actions. In fiscal year 2003, the USPTO delivered three CLE programs and initiated the In-Process Review program in all Technology Centers, which increased the number of primary examiner work product reviews completed. In fiscal year 2004, Patents conducted re-certification of one third of primary examiners and in fiscal year 2005 another third of the primary examiners went through the re-certification process. The funding identified below will be used for completing the establishment of automated CLE training courses and continuing re-certification of all primary examiners on a three-year cycle.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $435 | $305 | $310 | $314 | $318 |

### Capability/Quality 5 — Expand Patent Reviews

In fiscal year 2003, Patents expanded the "second pair of eyes" review that was originally piloted on a limited basis in the art units dealing with business method patents. The purpose of this review was for the reviewer to quickly flag issues that needed further consideration by the examiner and/or examiner's supervisor. This program has been expanded to other areas identified as having high rates of errors. The funding identified below covers salaries for the staff dedicated to perform this function.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $211 | $215 | $219 | $223 | $227 |

### Capability/Legislation/Rules 1c — Monitor Practitioner Adherence to Rules of Practice

The USPTO has identified a number of changes to current processes and procedures to improve legal practice before the agency and thereby help improve the quality of patent examination. With significant input from the public, disciplinary rules are in the process of being modernized, including clarification of rules on frivolous filings. A program was announced that provides registered practitioners with options to satisfy a continuing legal education obligation, including the agency's provision of online education and certification of CLE providers. The funding identified below will be used to support contractor resources for the practitioner continuing legal education and patent examiner re-certification programs. The funding also covers salaries of the specialized staff to support these programs.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $1,462 | $1,469 | $1,498 | $1,525 | $1,553 |

### Capability/Worksharing 1 — Mutual Reliance on Searches

The USPTO supports the reciprocal reliance on prior art search results. This program focuses on utilizing Office of First Filing (OFF) completed search reports or Office actions, as appropriate, for use by the Office of Second Filing (OSF). As a strategic plan goal, the USPTO will rely on prior art searches performed by another IP office to the maximum extent practicable on a reciprocal basis so as to reduce duplication of efforts, decrease workload, and accelerate processing times. In this initiative, the USPTO will implement mutual reliance on search results with our trilateral partners, the EPO and JPO, to the extent practicable. Based on agreements with EPO and JPO, the USPTO began exchanging search results with them on a pilot basis in fiscal year 2003 for evaluation purposes. In fiscal year 2004, the USPTO

- 30 -

undertook an initial assessment of the Search Exchange pilot to review the applicability and quality of the search reports received from the EPO and JPO. The USPTO also evaluated the feedback received from EPO and JPO on the search reports generated by the USPTO and provided to the other IP offices. This feedback focused on the reasons why the other IP offices did or did not rely solely on the search report provided by the USPTO. These search report "gaps" are currently being analyzed to strengthen USPTO prior art search strategies. Fiscal year 2004 activities also addressed the scope of the next phase of the pilot; that is, if and to what extent these OFF searches are available and could be relied upon. The USPTO also pursued bilateral agreements with non-trilateral offices to benefit from searches performed by certain other IP offices, such as the United Kingdom and Australia. In all cases where the USPTO uses a search report provided by another IP office, the patentability determination will still reside with the USPTO and our examiners will have the opportunity to perform additional searches, as needed. No further funding is necessary for implementation of this initiative.

## Productivity/Pendency 2 — Multi-Track Examination

In an effort to dramatically change current business practices, the USPTO will move from a "one-size-fits-all" patent examination process to a Multi-Track Examination Process in order to eliminate duplication of effort, improve the quality of patents, and decrease processing time. While the current process has served the USPTO well, there are numerous shortcomings that, if unchanged, will not deliver quality patents in a timely manner; therefore, changes are needed to promote expansion of business opportunities, stimulate research and development, and expand U.S. businesses globally. Under the Multi-Track Examination Process, the USPTO will provide applicants with an incentive to: (1) expressly abandon an application if the applicant loses interest in the application before it is taken up for examination by the USPTO; or (2) have the application searched by an IP office with which the USPTO has a bilateral search exchange agreement. These changes will also permit the USPTO to examine applications in Technology Centers having the largest backlogs by using search reports from qualified search authorities rather than conducting complete in-house searches. The Multi-Track Examination Process will provide pendency and quality benefits by eliminating the need for the USPTO to spend resources to examine an application that the applicant decides he/she no longer wishes to pursue before it is taken up for examination, and allows the USPTO to exploit search reports prepared by other IP offices or qualified search contractors.

To implement the Multi-Track Examination Process, the USPTO plans to: (1) refund a portion of the search fee if the applicant expressly abandons the application before it is taken up for examination by the UPSTO; and (2) refund a portion of the search fee if an IP office provides the USPTO with a search report for the application.

No further funding is necessary for implementation of this initiative.

P000047

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

### Productivity/ Pendency 3 — New Hire Recruitment Costs

In support of the Patent Examining Corps' building a competent and diverse patent examiner workforce, as presented in this budget request, the USPTO has developed an outreach recruitment strategy that identifies the agency as an employer of choice and promotes the patent examiner career in the Federal government. Our outreach plan includes recruitment branding, a marketing campaign, college recruiting, and a university partnership program with ten target schools. The funding identified below will be used to implement the branding initiative through media advertisements, job fairs and career conferences, partnered events at target universities, and Internet recruiting.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $751 | $752 | $762 | $782 | $782 |

### Productivity/ Shared Responsibility 2 — Post-Grant Patent Review of Claims and Continuation Reform

This initiative reflects support for a new proceeding to allow parties, through litigation at the Patent Board, to obtain post-grant patent review of patent claims. This proposal, contained in *The 21st Century Strategic Plan*, has been endorsed in subsequent reports by the National Academies of Sciences and the Federal Trade Commission and has been the subject of hearings by the House Judiciary Committee. The projected workload after implementation of the expected legislation is around 1,000 requests annually (compared to roughly 2,500 district court patent cases filed a year). Legislation for this requirement will be submitted in early 2006. In fiscal year 2007, it is estimated that the filing of post-grant proceedings will require an additional 25 Administrative Patent Judges (APJs) and an additional 12 paralegals and administrative staff to ensure timely handling of these post-grant proceedings. Current estimates are modest, as the private bar is estimating a higher usage rate of post-grant review, and lower early disposition rates may be possible. The USPTO will refine these estimates as the final design of a proceeding becomes clearer in the legislative process. Additionally during fiscal year 2007, the Board of Patent Appeals and Interferences (BPAI) anticipates it will begin to receive an increased level of appeals following continuation rulemaking to bring greater finality to patent application prosecution. Based on existing assumptions, the office anticipates BPAI's appeal workload to increase by approximately one-third. Therefore, in order to maintain a level of timeliness in appeal processing while initializing post-grant review, the office estimates an increase of 10 APJs, or other legal professionals, and seven paralegals to support continuation reform. Thus, a total of 35 APJs or other legal professionals, and 19 support personnel, are needed to support this overall initiative.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $8,179 | $12,800 | $14,124 | $14,378 | $14,635 |

### Productivity/Accelerated Examination 1 — Accelerated Examination

The USPTO has heard the concerns expressed about the length of time it takes to process applications in certain technology areas and the fact that these processing timeframes do not always lend themselves to the customer's business requirements. Currently, new patent applications are normally taken up for examination in the order of their effective U.S. filing date. In order to respond to these concerns, the USPTO is considering an accelerated examination option. Applicants choosing the accelerated examination option must reduce the effort needed to examine the application by conducting a preexamination search covering the claimed invention and providing the USPTO with an information disclosure statement containing the referenced deemed most closely related to the subject matter of the claimed invention. In return, the applicant will be guaranteed 12-month pendency from the date of filing to patent issuance, rejection or abandonment. Current funding is used for contractor resources to modify and maintain the electronic filing and office action and correspondence systems to allow for multiple prosecution paths. No further funding is necessary for implementation of this initiative.

P000048

# GOAL 2 —BUDGET AND PERFORMANCE

## *Improve quality of trademark products and services and optimize trademark processing time*

The core process under Goal 2 is the examination of applications for trademark registration. As part of that examination, examining attorneys make determinations of registrability under the provisions of the Trademark Act of 1946, as amended, including searching the electronic databases for any pending or registered marks to determine if a mark in the subject application is confusingly similar to an existing mark, prepare letters informing applicants of the attorney's findings, approve applications to be published for opposition, and examine Statements of Use in applications filed under the Intent to Use provisions of the Trademark Act. At the requested application filing and funding level in fiscal year 2007, Trademarks will be able to hire sufficient numbers of additional examining attorneys to achieve a trademark first action pendency of 3.7 months and a total pendency of 17.3 months.

Activities under this goal also include initiatives aimed at improving the quality of trademark products and services. The Trademark Organization has implemented several of the quality initiatives of *The 21st Century Strategic Plan*. Trademark quality initiatives have focused on the development and implementation of training modules to address practice and procedural deficiencies identified through the quality review program. A key component of the approach was the implementation of an extensive quality review program geared towards in-process applications. The "in-process" review program has been designed to determine the quality of examiner's first and final office actions as "excellent" and "deficient" to better reflect more meaningful and rigorous standards of quality. Information from these reviews has been used to identify and focus training to enhance overall product quality and to improve the consistency of examination. A number of training modules, related to specific topics and sections of the Trademark Act have been developed in an e-learning environment to ensure content is timely, consistent, and available when needed by an employee. Other initiatives put in place to improve quality of the work product include the development of Policy Papers to reinforce proper practice in a wide range of examination activities and the expansion of the review program to assess the quality of work performed by paralegals and other non-attorney personnel. Continuing these programs through fiscal year 2007 will focus improvements in quality by setting an in-process review for first and final action deficiency rate of 6.0 percent.

The Trademark Organization is optimizing processing time by taking greater advantage of its success in implementing electronic processing and systems. In fiscal year 2005, enhancements were added to number of TEAS forms that automated transactions for filing petitions and extension requests, and a new filing option was introduced to applicants. The TEAS Plus electronic filing application offers a reduced fee to applicants that adhere to the TEAS Plus electronic filing requirements. Electronic processing will be used more extensively in the future to completely automate all transactions that will eliminate manual processing and directly route applications for processing. Electronic processing reduces the time and costs associated with the examination and registration of marks. TEAS was recognized in fiscal year 2005 as one of five winners at the Excellence.Gov Awards ceremony in Washington, D.C. as an example of a best practice in federal e-Government implementation.

P000049

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

## Goal 2: Improve quality of trademark products and services and optimize trademark processing time

| Dollars in thousands | FY 2005 Actual | FY 2006 Enacted | FY 2007 Budget | FY 2008 Est | FY 2009 Est | FY 2010 Est | FY 2011 Est |
|---|---|---|---|---|---|---|---|
| Initial Examination | $10,734 | $7,520 | $6,697 | $6,692 | $6,897 | $7,294 | $7,429 |
| Examination | $57,993 | $57,657 | $61,769 | $65,917 | $69,649 | $74,445 | $78,853 |
| Publication and Registration | $2,217 | $2,889 | $3,719 | $4,091 | $4,299 | $4,056 | $4,416 |
| Post Registration | $2,399 | $3,163 | $3,338 | $3,418 | $3,498 | $3,580 | $3,663 |
| Appeals and Inter Partes Proceedings | $8,408 | $8,835 | $9,908 | $10,324 | $10,513 | $10,708 | $10,908 |
| **SUBTOTAL EXAMINATION** | **$81,751** | **$80,064** | **$85,431** | **$90,442** | **$94,856** | **$100,083** | **$105,269** |
| Management, Policy and Administrative Support | $10,096 | $9,734 | $10,219 | $10,274 | $10,521 | $10,734 | $10,980 |
| Automation Support | $11,849 | $11,139 | $9,725 | $10,933 | $11,057 | $9,359 | $9,188 |
| **SUBTOTAL DIRECT SUPPORT** | **$21,945** | **$20,873** | **$19,944** | **$21,207** | **$21,578** | **$20,093** | **$20,168** |
| Other Contributing Resources (Indirect Costs-for Support Functions) | $37,909 | $41,839 | $42,889 | $42,093 | $42,476 | $43,342 | $44,260 |
| **TOTAL FOR GOAL 2** | **$141,605** | **$142,776** | **$148,264** | **$153,742** | **$158,910** | **$163,518** | **$169,697** |
| First Action Deficiency Rate | 4.7% | 6.5% | 6.0% | 5.5% | 5.0% | 4.5% | 4.0% |
| Final Action Deficiency Rate | 5.9% | 6.5% | 6.0% | 5.5% | 5.0% | 4.5% | 4.0% |
| Applications Filed - Classes | 323,501 | 348,000 | 376,000 | 399,000 | 423,000 | 448,000 | 475,000 |
| Applications Filed Percent Change Over Previous FY | 8.4% | 8.0% | 8.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| Total Units of Production (Examiner Action Points thru 2005/Balanced Disposals 2006 - 2011) | 666,687 | 706,900 | 787,200 | 820,500 | 850,000 | 888,500 | 932,700 |
| Average First Action Pendency (Months) | 6.3 | 5.3 | 3.7 | 3.0 | 3.0 | 3.0 | 3.0 |
| Average Total Pendency (Months) | 19.6 | 18.8 | 17.3 | 16.6 | 15.9 | 15.3 | 14.6 |

P000050

## Strategic Initiatives Under Goal 2

The Trademark Organization completed initial implementation of quality programs described as initiatives of *The 21st Century Strategic Plan* in fiscal year 2004. The costs associated with the continuation of the established quality programs in fiscal year 2007 and outyears are included in the cost of operations above.

Following successful results of a multi-year pilot program, the Trademark Organization plans to adopt *The 21st Century Strategic Plan* initiative to have non-attorney examiners handle subsequent examination to approve marks for registration once use has been demonstrated. This request includes funding to hire fifteen paralegals to conduct examination of statements of use, work that currently is handled by examining attorneys.

P000051

# GOAL 3 — BUDGET AND PERFORMANCE

## *Create a more flexible organization through transitioning patent and trademark operations to an e-Government environment and advancing IP development worldwide*

The USPTO has made significant strides toward achieving the milestones and goals of the e-government initiatives of *The 21st Century Strategic Plan*. The completion of the IFW phase of e-government -- an image-based electronic version of the former paper patent application file wrapper -- provides instant and concurrent access to a patent application, eliminates examiner interruption for paper entry, and eliminates the loss or damage experienced with paper files. In fiscal year 2005 Patents began an initiative, Trilateral Document Access (TDA) to facilitate access by patent examiners to the content of patent applications stored in participating foreign intellectual property offices' application document image systems. The continued implementation of e-government initiatives will result in additional functionalities that are described under corresponding e-government initiatives below.

Additionally, this goal includes multilateral and bilateral agreements, which form an integral part of USPTO's goal of advancing IP development worldwide. The USPTO continues to work with other IP offices in structuring new agreements in order to streamline IP protection and enforcement systems. This includes PCT reform efforts, focusing on the USPTO's proposal for simplified processing; developing a universal electronic patent application by leveraging USPTO's experience in trademarks and the EPO's experience with patent filings; and promoting IP law harmonization to strengthen the rights of American IP holders, making it easier for them to obtain international protection for their inventions and creations.

P000052

| Goal 3: Create a more flexible organization through transitioning patent and trademark applications to e-government operations and advancing IP development worldwide | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dollars in thousands | 2005 Actual | 2006 Enacted | 2007 Budget | 2008 Est | 2009 Est | 2010 Est | 2011 Est |
| E-Government Initiatives | $67,013 | $110,292 | $120,231 | $133,787 | $135,460 | $144,067 | $149,757 |
| IP Development and Enforcement - Operations | $17,529 | $8,478 | $11,181 | $11,257 | $11,763 | $11,672 | $11,888 |
| IP Development and Enforcement – Strategic Initiatives | $0 | $16,063 | $18,790 | $22,488 | $25,333 | $28,879 | $31,986 |
| SUBTOTAL E-GOVERNMENT AND IP ADVANCEMENT | $84,542 | $134,833 | $150,202 | $167,532 | $172,556 | $184,618 | $193,631 |
| Automation Support | $2,200 | $3,902 | $3,902 | $3,521 | $3,329 | $3,432 | $3,315 |
| Other Contributing Resources (Indirect Costs for Support Functions) | $66,883 | $66,451 | $68,119 | $66,853 | $67,460 | $68,838 | $70,297 |
| TOTAL FOR GOAL 3 | $153,625 | $205,186 | $222,223 | $237,906 | $243,345 | $256,888 | $267,243 |
| Patents Applications Filed Electronically | 2.2% | 10.0% | 20.0% | 30.0% | 40.0% | 50.0% | 60.0% |
| Patents Applications Managed Electronically | 96.7% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Trademark Applications Filed Electronically | 88.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| Trademark Applications Managed Electronically | 99.9% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Technical Assistance Activities Completed (Activities/Countries) | 59/142 | 82/77 | 84/79 | 84/79 | 84/79 | 84/79 | 84/79 |

P000053

## Strategic Initiatives Under Goal 3

### Agility/E-Government 1 — Trademark E-Government

In fiscal year 2005, the full contents of the trademark pending application file inventory became available to the public as electronic file records through the TDR system, which contain the complete contents of all pending trademark files including the initial application, subsequent correspondence, and office actions that examiners use to conduct examination.

Subsequently, over a multi-year period, the Office will include the file contents for all active U.S. registrations through TDR. The USPTO intends to deploy the Trademark Information System (TIS) and complete its transition to full electronic workflow and examination in fiscal year 2008.

In fiscal year 2006, the USPTO will enhance the TEAS system to support the use of PDF and additional forms for improved electronic communications with customers. Simultaneously, the Madrid Forms submission system will be expanded to support additional forms. We will deploy a Trademark status web service that will enable customers to view and print the content and status of a registration certificate. As electronic communications with our customers increase, it becomes critical to enhance electronic workflow systems for managing applications. This includes enhancement of our electronic records management system and Trademark Image Capture and Retrieval System (TICRS) to support higher volumes of electronic applications, improved search capability, and enhanced color images.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $7,716 | $7,365 | $7,544 | $7,729 | $7,918 |

### Agility/E-Government 2 — Patent E-Government

In fiscal year 2006, the USPTO began development of the initial stage of full text-based processing aimed at providing examiners access to text generated from IFW images in the Patent examination pipeline. Concurrent enhancement of the PAIR system will provide the applicants with secure private access to their unpublished application documents via the Internet as soon as the application is internally processed. The first phase of integration of workflow tools with IFW will provide examiners with enhanced access to IFW information and prosecution support, facilitating more efficient patent examination. In order to increase the number of applications filed electronically and gain greater user acceptance of electronic filing, the USPTO is implementing a web-based e-Filing initiative. This solution is a hardware/software-independent e-Filing system for patent applications and documents to incorporate the use of PDF files. Deployment occurred in December 2005 with a full production target of March 2006. The Electronic Filing System-Web (EFS-WEB) incorporates the electronic submission of new applications and follow-on papers (such as amendments) in conjunction with the means for transmitting outgoing USPTO generated correspondence to applicants.

Completion of the operational system for processing patent applications electronically has facilitated applications processing and reduced costs of handling paper application file wrappers. When complete, the text-based system will allow for full-text searching of application file technical content and supporting documents, automation of amendment processing, and content validation (formalities checking) of applications in the pre-examination process. Additionally, text-based processing will better support Federal electronic records management and paper elimination requirements and meet USPTO international agreements with the other trilateral offices (EPO and JPO) and WIPO in supporting the "author once, file many" concept. In fiscal year 2007, the USPTO plans to begin integrating dissemination and other processes into a text-based pipeline.

In fiscal year 2006, the USPTO set in motion the second phase of development for the Patents system text-based process to allow the Office to deliver more automation of manual processes and improve

P000054

accuracy and reliability of information. In order to increase the number of electronically filed applications, the USPTO will use a PDF format as an alternative to the earlier XML solution. PDF as the format for electronic filing has multiple benefits, which can be converted to the current paper scanning process. In this phase, the USPTO plans to accomplish a major reengineering of the IFW system components into PFW in fiscal years 2006 and 2007 to provide the functionality to capture and process application text data as well as image data; reduce the manual steps required to index and scan application papers; provide the functionality to capture color and grayscale images; consolidate the data capture and interaction with the publications contractor to reduce cost and redundant efforts; migrate to a more robust storage architecture for a combined text and image file structure using PDF technology; migrate to evolutionary, stable retrieval architecture to support increased examiner staffing and application volumes; strengthen the user access and authentication controls to sensitive application content; and increase the integration of the business process support Automated Information Systems (AIS)s to improve efficiency and eliminate manual processing wherever possible. Electronic PDF Text and scanned PDF image plus text is expected to provide examiners with use of text in office actions, search capabilities within applications, as well as interference searching.

The USPTO will ultimately complete implementation of an e-government strategy that includes electronic receipt, processing, reporting and publication through the entire application process lifecycle. The funding will be used for systems development, integration, enhancement as well as the scanning of incoming, outgoing paper documents and new applications filed. The critical milestones in fiscal year 2007 include; (a) reengineering of application storage to create a PDF repository and application text, (b) integration of color and grayscale image capture and storage into the patent process, and (c) implementation of automated workflow integration with the patent process. Phase two of the workflow applications integration process will further enhance workflow tools and products through fiscal year 2010.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $71,073 | $79,217 | $79,923 | $85,316 | $88,017 |

## Agility/E-Government 3 — Post-Grant Patent Review E-Processing (See Shared Responsibility 2 — Post-Grant Review of Patent Claims)

In support of legislation that will be submitted in early 2006 for post-grant patent review of claims, the USPTO will develop an automated information system that will provide an electronic file from which APJs can retrieve documents in connection with contested patent review proceedings. The new system, which would also support existing inter partes proceedings, will enable APJs to receive, store, search, and process records electronically, and is an extension of the USPTO's move to a fully electronic work environment for all phases of the patent process. This system will also increase operational efficiency and accuracy, as well as enhance system security through the availability of application data and support documentation electronically. The funding identified below will be used for systems development, integration, and maintenance.

Development of the system in support of this strategic initiative began late in fiscal year 2005. The funding identified below will be used to define user requirements for system development, acquisition of hardware and software for the system, and implementation of electronic processing for existing procedures in fiscal year 2007. That deployment will include processing for Post-Grant review if legislation is enacted and corresponding rule changes are adopted or permit rapid expansion once Post-Grant review is enacted.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $1,851 | $2,291 | $2,370 | $2,394 | $2,364 |

P000055

### Agility/E-Government 4 — Information Technology Security Program

As guardians of U.S. intellectual property, USPTO information security is of critical importance to inventor confidence. The growth of Internet based vulnerabilities requires a commensurate response in technical controls and counter-measures. As the USPTO implements e-government, its AIS are increasingly exposed to external systems. Consequently, security risk factors increase geometrically as a result of operating system security flaws and a growing community of sophisticated hackers. The IT Security Program provides the infrastructure security systems and standards that protect the USPTO systems and safeguard public trust.

The funding requested below will support the development of an infrastructure of technologies and methodology to address security issues across all systems, both those planned and in use. This will facilitate efficiency in maintaining full accreditation status for all USPTO AISs, as mandated by Clinger-Cohen and the Financial Information System Management Act (FISMA).

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $4,255 | $6,148 | $5,813 | $4,741 | $3,588 |

### Agility/E-Government 5 — Data Replication for High Availability and Disaster Recovery

The USPTO Business Continuity Program is committed to ensuring protection of USPTO data from damage in the event of a disaster. The goal of this investment is to guarantee the availability of patent and trademark data to patent examiners, trademark examining attorneys, the general public, and foreign patent and trademark offices in the event of a disaster resulting in the complete or partial destruction of the USPTO's single data center. The USPTO is operating both the patent and trademark production pipelines in a predominantly electronic environment and is dependent on automated systems to support the end-to-end processing of patent and trademark applications. As such, the continuing operations of the USPTO are at an increased risk should catastrophe strike the single data center prior to the full deployment of disaster recovery services. The USPTO is proposing a phased implementation for deploying dual, load-balanced data centers that would enable the USPTO to start protecting its mission critical patent and trademark data. Through an evolutionary process, this phased implementation will provide recovery capabilities in the event of a disaster at the USPTO primary data center.

The USPTO's Business Continuity Program completion timeline will occur in seven major phases between fiscal years 2003 and 2010. In Phase One (fiscal years 2003-2004), critical services and the associated applications were identified and assessed for criticality, sensitivity, and support to core business functions. In fiscal year 2006 disaster recovery capabilities for five of the twenty mission critical applications will be implemented during Phase Two by establishing network connectivity from a recovery location to the USPTO. In fiscal year 2007 Phase Three will provide recovery capabilities for an additional ten mission critical applications. Phases Four through Seven will provide recovery capabilities for the remaining mission critical applications and to essential business applications, will focus on server load balancing for mission critical and business essential applications, and will fine-tune load balancing to maximize availability to users.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $12,143 | $12,145 | $12,147 | $12,150 | $12,152 |

P000056

**Agility/ Other E-Government Initiatives — Customer Deposit Accounts and Increased Use of Electronic Payments**

The USPTO currently maintains an Internet accessible system that applicants and USPTO employees use to record electronic payments for a variety of patent and trademark fees. The system accommodates credit card transactions; electronic funds transfer from an applicant's bank account; and replenishment and debit of funds from customer deposit accounts, which the USPTO maintains on behalf of its customers. The USPTO currently processes approximately 3.5 million payments each year, 30.0 percent are received electronically. The USPTO's commitment to implementing e-government and the public's growing acceptance of this venue for conducting business will create demands the existing system is unable to support. One aspect of the e-government automation plan is modernization of our current fee collection system to accommodate increased demand for electronic fee collection no later than September 30, 2008.

The funding identified below will be used for contractor resources to automate a wider range of patent and trademark fee payments so that they can be made electronically, as well as increase marketing of this functionality. In fiscal year 2006, the USPTO will complete identification of expanded electronic fee collection requirements and begin development of the modernized system in fiscal year 2007. It is estimated that the new system will be deployed in fiscal year 2008.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $3,241 | $3,461 | $482 | $8 | $8 |

**Agility/ Work-at-Home — Trademark Work-at-Home**

The Trademark Work-at-Home program is a nationally recognized telecommuting program. It began as a pilot in March of 1997 and expanded to include 220 total positions in fiscal year 2005. Initially, each examining attorney in the program worked at home three days per week and shared an office at the USPTO work site with another attorney who also participated in the Work-at-Home program. A "hoteling" program has been implemented to provide even greater telecommuting opportunities while making the program more efficient and effective. Under this program, Work-at-Home participants spend nearly all of their workweek at home and are at the USPTO work site less than two to four hours per week. Hoteling participants are not assigned a personal office, but reserve an office to use when they must come in the work site. As a result, the Trademark organization has been able to reduce its total space requirements and expand examiner staffing without increasing office space requirements. The funds requested below will provide hardware and software to accommodate an additional 40 users in fiscal year 2006 and 20 users in fiscal year 2007.

Also, USPTO currently has a number of TTAB users in the TTAB Work-at-Home program accessing the Trademark Trial and Appeal Board Information System (TTABIS) and PTOnet e-mail from home using laptops. The project is migrating current users to Citrix servers with a planning strategy to expand the program to add new users. Funding is required for contractor support for configuration and development of Citrix servers and for the maintenance of the TTAB Work-at-Home program.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $2,149 | $1,318 | $1,343 | $1,230 | $1,291 |

- 41 -

P000057

## Agility/ Telecommuting — Patents Hoteling Program

In fiscal year 2005, Patents launched a hoteling program pilot providing participants the ability to work at home fully supported with complete access to on-line USPTO provided resources for conducting their assigned duties. The pilot program incorporates the concept of hoteling where telecommuting participants reserve time in designated shared hotel offices at the Alexandria Campus to conduct activities such as personal interviews with applicants and attending meetings or training classes. Pilot participants received special training to enable them to work as effectively at home as in the office. The Patents Hoteling Program is designed to comply with Congressional direction and build upon the lessons learned from the very successful Trademark Work-at-Home program. The Patents Hoteling Program provides patent examiners the ability to work from home with complete on-line access to USPTO resources. This concept allows participants to reserve time in designated shared "hotel" offices at the Carlyle Campus in Alexandria, Virginia. 'Hoteling' allows telecommuting participants to conduct on-campus activities such as personal interviews, training requirements, meetings and access to other on-sites resources. A critical component of the Patents Hoteling Program is the use of IT to provide necessary remote access for collaboration capabilities. This program is designed to ensure participants have the ability to perform their jobs when either at or away from the main Carlyle campus. Feedback from pilot participants and reviews of the technologies were used to finalize designs for a vastly expanded telework program that could potentially allow virtually any USPTO employee to participate. Implementation started in fiscal year 2006.

The long term goal is to have a substantial number of patent examiners working at home consistent with the law, and at the same time achieving productivity and quality performance targets, at a reasonable cost. If successfully implemented, this program also has the potential to assist in the recruitment, hiring, and retention of examiners. The funds requested below will be used for the continued implementation of a hoteling program which began in fiscal year 2006.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $17,802 | $21,841 | $25,837 | $30,500 | $34,420 |

## Agility/ Global Development 1 — Pursuit of Substantive Patent Law Harmonization

The USPTO is currently engaged in Substantive Patent Law Treaty discussions with the Standing Committee on the Law of Patents (SCP) at the WIPO. There are a number of major issues in discussion that have significant implications for the USPTO and the U.S. intellectual property community, such as global prior art definition and methodologies for determining novelty and non-obviousness. The funding identified below covers the salaries of specialized staff devoted to holding discussions and pursuing substantive Patent Law Harmonization both within and outside of the SCP in support of the *21st Century Strategic Plan* goals and objectives.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $398 | $405 | $412 | $418 | $423 |

## Agility/ Global Development 2 — Other Bilateral/Multilateral Agreements

The USPTO will pursue bilateral and/or multilateral arrangements to share search and examination results among offices. This is critical to assisting the USPTO in managing projected significant workload increases (considering the fact that approximately 45.0 percent of new applications come from foreign countries) and implementing the changes to the patent processes identified in *The 21st Century Strategic Plan*. Agreements are currently being negotiated based on the results of the trilateral pilot projects that started in fiscal year 2003. The funding identified below covers specialized staff devoted to continuing multilateral discussions leading to agreements on behalf of the U.S.

P000058

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $1,003 | $1,019 | $1,053 | $1,069 | $1,083 |

### Agility/ Global Development 3 — Patent Cooperation Treaty Reform

The U.S. has been at the forefront of PCT reform efforts since 1999. While some important changes have taken place, further streamlining and simplification are required. In fiscal year 2003, first stage reforms were completed and the revised guidelines for PCT search and examination were adopted effective January 1, 2004. Continued reform to PCT provisions will have a number of benefits for the USPTO, including improved international patent application filings, integration of national and international processing in the USPTO, and enhanced reliance on PCT work products by other authorities and offices. The funding identified below covers the salaries of specialized staff devoted to continuing negotiations for PCT reform, as well as contractor resources to complete systems modifications needed to implement the resulting business process and rule changes.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $511 | $473 | $487 | $498 | $507 |

### Agility/ Intellectual Development and Intellectual Property Enforcement (Operations and Strategic Initiatives)

With increased demands for countries to implement effective systems for IPR enforcement to meet their WTO TRIPs obligations and to comply with existing and new bilateral/multilateral trade agreement commitments, the Office of Enforcement is focused on providing practical technical training and capacity-building programs in the areas of IPR enforcement, judicial and prosecutorial education, public education and awareness efforts, and capacity-building programs that meet the needs of developing and least developed countries. While the USPTO has long provided such assistance and training, the Office of Enforcement has developed a flexible team approach to meet the challenges of IPR enforcement in today's global economy. This is done by carrying out existing obligations to assist nations in implementing accessible and effective IPR enforcement systems; partnering with others to provide useful programs and training; and working to increase the accessibility, efficiency, and effectiveness of civil, administrative, and criminal enforcement mechanisms in global trade, foreign markets, and electronic commerce.

The New Enforcement Initiative (NEI) is designed to allow the USPTO to address Inspector General recommendations to strengthen efforts to protect U.S. intellectual property rights overseas and to improve the effectiveness of U.S. Government-sponsored IP technical assistance and training. The NEI would allow the Office of Enforcement to hire expert attorney-advisors, which will contribute to the Office's ability and capacity to organize, conduct, and coordinate additional IPR enforcement training and technical assistance activities and capacity-building programs internationally. Such additional legal staff will permit expanded technical assistance and training programs in countries identified as critical to U.S. commercial, economic, and political interests.

A full-time, permanent Global IPR Academy program has been established. The academy expands existing training, provides technical assistance and capacity-building programs, and activities carried out by the Office of Enforcement and Office of International Relations. This newly established training academy provides the capacity to train more than four times the number of individuals that are currently able to be involved in existing training programs.

| Dollars in thousands | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Amount | $28,059 | $31,849 | $35,144 | $38,566 | $41,861 |

P000059

USPTO President's for Fiscal Year 2007

**This Page is Intentionally Left Blank**

P000060

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

EXHIBIT 3A

U.S. Patent and Trademark Office
## USPTO TOTAL RESOURCE REQUIREMENTS

| *Dollars in thousands* USPTO TOTAL | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/ (Decrease) | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL FUNDING | $1,513,930 | $1,688,286 | $1,758,512 | $88,954 | $1,847,466 | $1,999,497 | $2,164,401 | $2,400,349 | $2,639,568 |
| ↳ Direct Obligations | $1,508,392 | $1,683,086 | $1,753,312 | $89,654 | $1,842,966 | $1,994,997 | $2,159,901 | $2,395,849 | $2,635,068 |
| ↳ Reimbursable | $5,538 | $5,200 | $5,200 | $(700) | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 |
| IT FUNDING (included above) | $312,951 | $311,378 | $315,900 | $(21,671) | $294,229 | $312,591 | $301,338 | $299,304 | $302,740 |
| FULL-TIME EQUIVALENT (FTE) TOTALS | 6,825 | 7,875 | 8,157 | 400 | 8,557 | 9,191 | 9,801 | 10,414 | 10,972 |

This Exhibit represents a summary of USPTO's total obligations by performance goal. USPTO Information Technology (IT) funding and FTE resources shown in the above table are also reported using the Agency IT Investment Portfolio (FY 2007 Budget Exhibit 53) reporting format.

45

P000061

USPTO PRESIDENT'S BUDGET FOR FISCAL YEAR 2007

## RESOURCE REQUIREMENTS, TARGETS AND PERFORMANCE SUMMARY
### GOAL ONE: Improve the quality of patent products and services and optimize patent processing time

| Dollars in thousands USPTO GOAL 1 | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/Decrease | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL FUNDING | $1,218,046 | $1,339,710 | $1,393,950 | $82,498 | $1,476,448 | $1,607,318 | $1,761,615 | $1,979,352 | $2,202,097 |
| ↳ Direct Obligations | $1,213,162 | $1,335,124 | $1,389,364 | $83,115 | $1,472,479 | $1,603,349 | $1,757,646 | $1,975,383 | $2,198,128 |
| ↳ Reimbursable | $4,884 | $4,586 | $4,586 | $617 | $3,969 | $3,969 | $3,969 | $3,969 | $3,969 |
| IT FUNDING (included above) | $244,978 | $243,747 | $247,290 | ($16,967) | $230,323 | $244,696 | $235,887 | $234,295 | $236985 |
| FULL-TIME EQUIVALENT (FTE) TOTALS | 6,202 | 6,954 | 7,184 | 365 | 7,549 | 8,197 | 8,809 | 9,408 | 9,942 |

| | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/Decrease | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| Allowance Error Rate | 4.6% | 4.0% | — | — | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| In-Process Examination Compliance Rate | 84.0% | 86.0% | — | — | 88.0% | 89.0% | 90.0% | 91.0% | 92.0% |
| Average First Action Pendency (months) | 21.1 | 22.0 | — | — | 23.0 | 23.7 | 23.9 | 23.8 | 23.5 |
| Average Total Pendency (months) | 29.1 | 31.3 | — | — | 32.0 | 33.0 | 33.7 | 33.9 | 33.8 |

46

P000062

Rationale of Performance Goal: This performance goal was established as a result of USPTO's strategic planning process. The *21st Century Strategic Plan* recognized quality and processing time (pendency) as the two measures most significant for our patent user community and other external stakeholders. In particular, the inability to hire new personnel at a rate necessary to keep up with growth in electronic technologies has meant increased pendency in those technologies for which the value of patents depends most on prompt issuance. Additionally, improving the quality of patents through implementation of the quality initiatives in the *21st Century Strategic Plan* are paramount to achieving the targets set forth under this goal.

External Factors and Mitigation Strategies: The key variables impacting performance under this goal are incoming workloads and requested resources to improving quality and reducing pendency. The patent incoming workloads are dependent upon many factors, including economic activity around the world, and especially in the United States. Growth of science and technology has had considerable impact on intellectual property protection in the United States. For the USPTO, this growth has meant increases in application filings, and receipt of significantly more complex patent applications supporting the latest technologies. Achievement of the outyear (fiscal years 2008 to 2011) performance targets set forth in this exhibit assume permanent authorization of the revised fee schedule that was set forth in the Consolidated Appropriations Act, 2005 (P.L. 108-447). Funding at the fiscal year 2007 budget level will allow the USPTO to continue implementation of it's strategic planning initiatives and ultimately result in enhanced quality throughout the Patent examination process.

Program Increases for Performance Goal One: + 365 FTE and + $83.1 million: The increases requested for fiscal year 2007 are for hiring patent examiners to implement the strategic initiatives that contribute to achieving the quality and pendency targets shown above

Performance Monitoring and Program Evaluations: The patent examination program is evaluated for quality of examination decisions through in-process and allowance reviews. The focus of the review for patent applications is threefold: (1) to identify patentability errors; (2) to assess adequacy of the field of search and proper classification; and (3) to assess proper examination practice and procedures. The information gathered from the review of these examination program activities help business units identify necessary training with the goal of enhancing overall product quality and improving the consistency of examination. The results of the reviews provide analysis in the form of reports to Patent management. In addition to reporting specific errors, the analysis provides information on recurring problems and trends that may warrant changes in the examination program.

The patent examination program is also monitored for production through tracking and analysis of production counts recorded in the Patent Application Locator Monitoring (PALM) system. Production reports, containing detailed information on time spent examining and actions performed by each patent examiner, are provided to Patent management on a biweekly basis. Like the quality review tools, production monitoring identifies recurring problems and trends that may warrant changes in the examination program.

Crosscutting Activities: None other than intra-USPTO.

USPTO President's Budget for Fiscal Year 2007

## RESOURCE REQUIREMENTS, TARGETS AND PERFORMANCE SUMMARY

GOAL 2: Improve the quality of trademark products and services and optimize trademark processing time

| Dollars in thousands USPTO GOAL 2 | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/ (Decrease) | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL FUNDING | $142,259 | $143,390 | $144,575 | $4,220 | $148,795 | $154,273 | $159,441 | $164,049 | $170,228 |
| ↳ Direct Obligations | $141,605 | $142,776 | $143,961 | $4,303 | $148,264 | $153,742 | $158,910 | $163,518 | $169,697 |
| ↳ Reimbursable | $654 | $614 | $614 | $-83 | $531 | $531 | $531 | $531 | $531 |
| IT FUNDING (included above) | $25,881 | $25,751 | $26,120 | ($1,787) | $24,333 | $25,851 | $24,921 | $24,752 | $25,037 |
| FULL-TIME EQUIVALENT (FTE) TOTALS | 737 | 844 | 896 | 19 | 915 | 898 | 896 | 910 | 934 |

| | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/ (Decrease) | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| Final Action Deficiency Rate | 5.9% | 6.5% | — | — | 6.0% | 5.5% | 5.0% | 4.5% | 4.0% |
| First Action Deficiency Rate | 4.7% | 6.5% | — | — | 6.0% | 5.5% | 5.0% | 4.5% | 4.0% |
| Average First Action Pendency (months) | 6.3 | 5.3 | — | — | 3.7 | 3.0 | 3.0 | 3.0 | 3.0 |
| Average Total Pendency (months) | 19.6 | 18.8 | — | — | 17.3 | 16.6 | 15.9 | 15.3 | 14.6 |

48

P000064

Rationale of Performance Goal: As in Goal One, this performance goal was also established as a result of USPTO's strategic planning process. The *21st Century Strategic Plan* recognized quality and processing time (pendency) as the two measures most significant for our trademark user community and other external stakeholders. In particular, the inability to hire new personnel at a rate necessary to keep up with growth in filings has meant increased pendency. Additionally, improving the quality of trademark products and services through continuation of the quality initiatives in the *21st Century Strategic Plan* are paramount to achieving the targets set forth under this goal.

External Factors and Mitigation Strategies: The key variables impacting performance under this goal are incoming workloads and resources allotted to improving quality and reducing pendency. The trademark incoming workloads are dependent upon many factors, including economic growth in the United States.

Program Increases for Performance Goal Two: + 19 FTE and + $4.3 million: The increases requested for fiscal year 2007 are for hiring trademark examining attorneys for implementing the strategic initiatives that contribute to achieving the quality and pendency targets shown above.

Performance Monitoring and Program Evaluations: The trademark examination program is evaluated for quality of examination decisions through in-process and final action reviews. The focus of the trademark review program is to identify practice and procedural deficiencies and develop training modules to address those deficiencies. The review of trademark applications is centered on addressing the appropriateness or omission of substantive refusals outlined in Section 2 of the Trademark Act. Section 2 of the Trademark Act provides the statutory bases for which the Office refuses marks for registration. The results of the reviews provide analysis in the form of reports to Trademark management. In addition to reporting specific types of errors, the analysis provides information on recurring problems and trends that may warrant changes in the examination program. The information gathered from the review of these examination program activities are also used to develop and implement quality-driven training modules as well as Policy Papers aimed at reinforcing the proper practice in a wide range of examination activities.

The trademark examination program is also monitored for production through tracking and analysis of production counts recorded in the Trademark Reporting and Monitoring (TRAM) system. Production reports, containing detailed information on time spent examining and actions performed by each examining attorneys, are provided to Trademark management on a biweekly basis. Like the quality review tools, production monitoring identifies recurring problems and trends that may warrant changes in the examination program.

Crosscutting Activities: None other than intra-USPTO.

49

## RESOURCE REQUIREMENTS, TARGETS AND PERFORMANCE SUMMARY

**GOAL 3:** Create a more flexible organization through transitioning patent and trademark applications to e-Government operations and participating in IP development worldwide

| Dollars in thousands USPTO GOAL 3 | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/(Decrease) | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL FUNDING | $153,625 | $205,186 | $219,987 | $2,236 | $222,223 | $237,906 | $243,345 | $256,888 | $267,243 |
| ↳ Direct Obligations | $153,625 | $205,186 | $219,987 | $2,236 | $222,223 | $237,906 | $243,345 | $256,888 | $267,243 |
| ↳ Reimbursable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| IT FUNDING (included above) | $42,092 | $41,880 | $42,490 | ($2,916) | $39,574 | $42,044 | $40,530 | $40,256 | $40,719 |
| FULL-TIME EQUIVALENT (FTE) TOTALS | 68 | 77 | 77 | 16 | 93 | 96 | 96 | 96 | 96 |

| | FY 2005 Actual | FY 2006 Enacted | FY 2007 Base | Increase/(Decrease) | FY 2007 President's Budget | FY 2008 Estimate | FY 2009 Estimate | FY 2010 Estimate | FY 2011 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| Patent Applications filed electronically | 2.2% | 10.0% | — | — | 20.0% | 30.0% | 40.0% | 50.0% | 60.0% |
| Patent applications managed electronically | 96.7% | 99.0% | — | — | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Trademark Applications filed electronically | 88.0% | 80.0% | — | — | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| Trademark applications managed electronically | 99.9% | 99.0% | — | — | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Technical assistance activities completed (activities/countries) | 59/142 | 82/77 | — | — | 84/79 | 84/79 | 84/79 | 84/79 | 84/79 |

Rationale of Performance Goal: The goal of creating a flexible organization through e-government incorporates initiatives that enhance and maintain electronic end-to-end processing of patent and trademark applications. This performance goal was established as a result of USPTO's strategic planning process and for the targeted implementation of the President's Management Agenda initiatives. The second part of this performance goal also is an integral part of the *21st Century Strategic Plan* and is achieved through worldwide technical assistance programs designed to address civil, criminal and border enforcement of intellectual property rights. Under this goal, the USPTO provides

foreign governments with the tools to encourage economic development through robust protection of intellectual property rights, combat health and safety risks associated with counterfeit and pirated products, and combat growing criminal activity involving intellectual property theft. To maximize resources, these programs are developed and implemented in coordination with national and international intellectual property organizations, Federal agencies and rights owners.

External Factors and Mitigation Strategies: The key variables impacting performance under this goal are passage of the fee legislation and funding at the fiscal year 2007 budget level.

Program Increases for Performance Goal Three: + 16 FTE and - $2.2 million: The funding increase reflected above assumes that implementation of e-government strategic initiatives will peak in fiscal year 2006 and will gradually move into maintenance mode at a relatively lower cost. The USPTO will see some increases in the later years as Patent E-Government Phase two of the workflow applications integration process will further enhance workflow tools and products through fiscal year 2010.

Program Evaluations: Evaluations or proofs of concept have been incorporated into the implementation plans of many strategic initiatives. Completed pilot projects or new ones to be initiated will be tested, as necessary. Evaluations will assess the consistency of pilot program components with the intent of the *United States Patent and Trademark Fee Modernization Act of 2004*, where appropriate, and will incorporate analyses of pilot results against baseline data, critical success factors, and recommendations for full implementation.

Crosscutting Activities: Within the Department of Commerce, the USPTO provides support to the International Trade Administration (ITA) at international negotiations on intellectual property rights and advises ITA on patent and trademark issues. The USPTO also works with the Department of State and U.S. Missions abroad in the implementation of IP-focused programs.

51

Exhibit 5

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
SUMMARY OF RESOURCE REQUIREMENTS
(Dollar amounts in thousands)

| 2006 Enacted | Full-Time Permanent Positions | FTE | Direct Obligations |
|---|---|---|---|
| Total Obligations.................... | 8,198 | 7,875 | $1,688,286 |
| Less: Reimbursable Obligations........... | 0 | 0 | (5,200) |
| 2006 Enacted Direct Obligations........... | 8,198 | 7,875 | $1,683,086 |
| Plus: 2007 Adjustments to base............ | 0 | 282 | 70,226 |
| 2007 Base Request.................... | 8,198 | 8,157 | $1,753,312 |
| Less or plus: 2007 Program Changes........... | 799 | 400 | 89,654 |
| 2007 Presidents Budget.................. | 8,997 | 8,557 | $1,842,966 |

52

P000068

Exhibit 5

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**SUMMARY OF REQUIREMENTS BY BUSINESS AREAS**
(Dollar amounts in thousands)

| Business Areas | | 2005 Actuals Personnel | 2005 Actuals Amount | 2006 Enacted Personnel | 2006 Enacted Amount | 2007 Base Personnel | 2007 Base Amount | 2007 President's Budget Personnel | 2007 President's Budget Amount | Increase/(Decrease) From 2007 Base Personnel | Increase/(Decrease) From 2007 Base Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patents | Pos/BA | 6,501 | $1,324,025 | 7,273 | $1,493,674 | 7,273 | $1,556,393 | 7,982 | $1,640,421 | 709 | $84,028 |
| | FTE/Obl | 6,020 | 1,319,017 | 6,996 | 1,510,699 | 7,207 | | 7,582 | | 375 | |
| Trademarks | Pos/BA | 870 | 190,095 | 925 | 188,412 | 925 | 196,919 | 1,015 | 202,545 | 90 | 5,626 |
| | FTE/Obl | 805 | 189,375 | 879 | 190,315 | 950 | | 975 | | 25 | |
| Total United States Patent and Trademark Office | Pos/BA | 7,371 | $1,514,120 | 8,198 | $1,683,086 | 8,198 | $1,753,312 | 8,997 | $1,842,966 | 799 | $89,654 |
| | FTE/Obl | 6,825 | 1,508,392 | 7,875 | 1,701,014 | 8,157 | | 8,557 | | 400 | |
| Less: Financing from Offsetting Collections | BA | | 1,514,120 | | 1,683,086 | | 1,753,312 | | 1,842,966 | | 89,654 |
| | Obl. | | 1,508,392 | | 1,701,014 | | 0 | | 0 | | 0 |
| Less: Rescission of Unobligated Balances | BA | | 0 | | 0 | | 0 | | 0 | | 0 |
| | Obl. | | 0 | | 0 | | 0 | | 0 | | 0 |
| Less: Portion not Available for Obligation CY (limitation on obligations) | BA | | 0 | | 0 | | 0 | | 0 | | 0 |
| | Obl. | | 0 | | 0 | | 0 | | 0 | | 0 |
| Less: Prior Year Unobligated Balance Brought Forward | BA | | | | | | 0 | | 0 | | 0 |
| | Obl. | | 2,363 | | 5,728 | | 0 | | 0 | | 0 |
| Less: Estimated Recoveries of Prior Year Obligations | BA | | | | | | 0 | | 0 | | 0 |
| | Obl. | | 0 | | 0 | | 0 | | 0 | | 0 |
| Less: Financing from Direct Appropriated Funds | BA | | 7,543 | | 12,200 | | 0 | | 0 | | 0 |
| | Obl. | | 0 | | 0 | | 0 | | 0 | | 0 |
| Total Appropriation | BA | | 0 | | 0 | | 0 | | 0 | | 0 |
| | Obl. | | 0 | | 0 | | 0 | | 0 | | 0 |
| Plus/Less: Change in Offsetting Collections (unavailable balances) | BA | | 0 | | 0 | | 0 | | 0 | | 0 |
| | Obl. | | 0 | | 0 | | 0 | | 0 | | 0 |
| Total Budget Authority | BA | | $0 | | $0 | | $0 | | $0 | | $0 |

53

P000069

Exhibit 6

**DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office
Salaries and Expenses
**SUMMARY OF REIMBURSABLE OBLIGATIONS**
(Dollar amounts in thousands)

| Business Areas: | | 2005 Actuals | | 2006 Enacted | | 2007 Base | | 2007 President's Budget | | Increase / (Decrease) From 2007 Base | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FTE | Amount | FTE | Amount | FTE | Amount | FTE | Amount | FTE | Amount |
| Patents | BA | 0 | $4,884 | 0 | $4,586 | 0 | $4,586 | 0 | $3,969 | 0 | (617) |
| | Obl. | 0 | 0 | 0 | | 0 | | 0 | | | |
| Trademarks | BA | 0 | $654 | 0 | $614 | 0 | $614 | 0 | $531 | 0 | (83) |
| | Obl. | 0 | 0 | 0 | | 0 | | 0 | | | |
| Total United States Patent and Trademark Office | BA | 0 | $5,538 | 0 | $5,200 | 0 | $5,200 | 0 | $4,500 | 0 | (700) |
| | Obl. | 0 | 0 | 0 | | 0 | | 0 | | | |

54

Exhibit 7

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**SUMMARY OF FINANCING**
(Dollar amounts in thousands)

| | 2005 Actuals | 2006 Enacted | 2007 Base Amount | 2007 Presidents Budget | Increase/ (Decrease) From 2007 Base |
|---|---|---|---|---|---|
| **Obligations:** | | | | | |
| Total direct obligations................ | $1,508,392 | $1,683,086 | $1,753,312 | $1,842,966 | $89,654 |
| Total reimbursable obligations........ | 5,538 | 5,200 | 5,200 | 4,500 | (700) |
| Total obligations................ | $1,513,930 | $1,688,286 | $1,758,512 | $1,847,466 | $88,954 |
| **Financing:** | | | | | |
| Offsetting collections from: | | | | | |
| Reimbursable obligations................ | (5,538) | (5,200) | (5,200) | (4,500) | 700 |
| Non-Federal sources/User fee collections.... | (1,514,120) | (1,683,086) | (1,753,312) | (1,842,966) | (89,654) |
| Subtotal | ($1,519,658) | ($1,688,286) | ($1,758,512) | ($1,847,466) | ($88,954) |
| Recoveries: | | | | | |
| Prior year obligations................ | (7,543) | 0 | 0 | 0 | 0 |
| Unobligated balance, start of year........ | (2,363) | 0 | 0 | 0 | 0 |
| Unobligated balance, end of year.......... | 2,764 | 0 | 0 | 0 | 0 |
| Unavailable offsetting collections (limitations on obligations)...... | 2,965 | 0 | 0 | 0 | 0 |
| Net change............ | ($4,177) | 0 | 0 | 0 | 0 |
| Financing from direct appropriated funds........ | ($9,905) | $0 | 0 | 0 | 0 |
| Total net appropriation.......... | ($9,905) | $0 | 0 | 0 | 0 |

55

P000071

Exhibit 8

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**ADJUSTMENTS TO BASE**
(Dollar amounts in thousands)

| | FTE | Amount |
|---|---|---|
| **OTHER COST CHANGES** | | |
| 2006 Pay Raise | | 5,611 |
| 2007 Pay Raise | | 13,517 |
| Full-year cost in 2007 for positions financed for part-year in 2006 | 282 | 20,731 |
| Within-grade step increases | | 8,646 |
| Civil Service Retirement System (CSRS) | | (822) |
| Federal Employees Retirement System (FERS) | | 4,192 |
| Thrift Savings Plan | | 235 |
| Federal Insurance Contribution Act (FICA) - OASDI | | 1,311 |
| Health insurance | | 3,547 |
| Travel | | 1 |
| Rental payments to GSA | | 1,561 |
| Printing and reproduction | | 1,679 |
| General Pricing Level Adjustment | | 10,017 |
| **TOTAL ADJUSTMENTS TO BASE** | 282 | 70,226 |

56

P000072

Exhibit 9

## DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office
### Salaries and Expenses
### JUSTIFICATION OF ADJUSTMENTS TO BASE
(Dollars in thousands)

| | FTE | Amount |
|---|---|---|
| **2006 Pay Raise** | | |
| Full Year of 2006 pay increase and related costs | | 5,611 |
| A pay raise of 3.44% is to be effective January 1, 2006. | | |
| Total cost in 2006 of 2006 pay increase...................... | 22,442,560 | |
| Less amount funded in 2006...................... | -16,831,920 | |
| Less amount absorbed...................... | 0 | |
| Amount requested in 2007 to provide full-year cost of 2006 pay increase...................... | 5,610,640 | |
| Total cost of Working Capital Find increase...................... | 0 | |
| Less amount funded in 2006...................... | 0 | |
| Total, adjustment for 2006 pay increase...................... | 5,610,640 | |
| **2007 Pay Raise** | | |
| A general pay raise of 2.3% is assumed to be effective January 1, 2007. | | 13,517 |
| Total cost in 2007 of pay increase...................... | 13,517,000 | |
| Less amount absorbed in FY 2006...................... | 0 | |
| Amount requested for 2007 pay increase...................... | 13,517,000 | |
| Payment to Working Capital Fund...................... | 0 | |
| Total, adjustment for 2007 pay increase...................... | 13,517,000 | |

57

P000073

Exhibit 9

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

Full-year cost in 2007 of positions financed for part-year in 2006

An increase of $20,730,860 is required to fund the full-year cost in
2007 of positions financed for part-year in 2006. The computation
follows:

|  | FTE | Amount |
|---|---|---|
|  | 282 | 20,731 |
| Annual salary of new positions in 2006.................... | 588 | 33,015,330 |
| 2006 Pay Raise.................... | 0 | 1,135,727 |
| Less 5 percent lapse.................... | -29 | -1,688,734 |
| Full-year cost of personnel compensation.................... | 559 | 32,462,323 |
| Less personnel compensation in 2006.................... | -277 | -16,122,741 |
| Cost of personnel compensation in 2007.................... | 282 | 16,339,582 |
| Adjustment for 2006 pay raise (3.44% x .75 x $15,963,207).................... | 0 | 411,851 |
| Amount required for personnel compensation.................... | 0 | 16,751,433 |
| Benefits.................... | 0 | 3,979,427 |
| Total adjustment-to-base.................... | 282 | 20,730,860 |

58

P000074

Exhibit 9

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

|  | Amount |
|---|---|
|  | 8,646 |

**Within-grade step increases**

An increase of $8,646,350 is required to cover the cost of within-grade step increases. This estimate reflects the net cost of step increases including merit pay increases which will be earned in 2007.

| | FTE | Amount |
|---|---|---|
| Estimated number of within-grade step increases.......................... | | 3,610 |
| Step increases not earned due to turnover (6.7% x 3,610)............... | | 242 |
| Average step above step 1 per separation..................................... | | 3 |
| Average cost per within-grade step increase.................................. | | 2,507 |
| Gross cost of scheduled step increase (3,610 x $2,507)................ | | 9,050,270 |
| Less savings due to separations ($2,507 x 242 x 3)...................... | | -1,820,082 |
| Subtotal, personnel compensation.................................................. | | 7,230,188 |
| Benefits......................................................................................... | | 1,416,162 |
| Total adjustment-to-base.............................................................. | | 8,646,350 |

P000075

Exhibit 9

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

|  | FTE | Amount (822) |
|---|---|---|

Civil Service Retirement System (CSRS)

The number of employees covered by the Civil Service Retirement
System (CSRS) continues to drop as positions become vacant and are
filled by employees who are covered by the Federal Employees
Retirement System (FERS). The estimated percentage of payroll for
employees covered by CSRS will drop from 11.80% in 2006 to 10.00%
in 2007 for regular employees. The contribution rate of 7.0% will remain
the same from FY 2006 to FY 2007 for regular employees.

Regular:
2007  $652,400,000 x .100 x .070................................................    4,566,800
2006  $652,400,000 x .118 x .070................................................   -5,388,824
Total adjustment-to-base........................................................     -822,024

60

P000076

**Exhibit 9**

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

| | FTE | Amount |
|---|---|---|

**Federal Employees Retirement System (FERS)**

The number of employees covered by FERS continues to rise as employees covered by CSRS leave and are replaced by employees covered by FERS. The estimated percentage of payroll for employees covered by FERS will rise from 88.20% in 2006 to 90.00% in 2007 for regular employees. The contribution rate will rise from 10.7% in 2006 to 11.20% in 2007 for regular employees.

| | | |
|---|---|---|
| Regular: | | |
| 2007  $652,400,000 x 900 x .112............... | 65,761,920 | |
| 2006  $652,400,000 x 882 x .107............... | -61,569,598 | |
| Total adjustment-to-base............... | 4,192,322 | 4,192 |

**Thrift Savings Plan (TSP)**

The cost of agency contributions to the Thrift Savings Plan will also rise as FERS participation increases. The contribution rate is expected to remain at 2.0% from 2006 to 2007.

| | | |
|---|---|---|
| Regular: | | |
| 2007  $652,400,000 x 900 x .02............... | 11,743,200 | |
| 2006  $652,400,000 x 882 x .02............... | -11,508,336 | |
| Total adjustment-to-base............... | 234,864 | 235 |

61

P000077

Exhibit 9

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

| | FTE | Amount |
|---|---|---|
| Federal Insurance Contribution Act (FICA) | | 1,311 |

As the percentage of payroll covered by FERS rises, the cost of OASDI contributions will increase. In addition, the maximum salary subject to OASDI will be raised from $92,175 in 2006 to $96,150 in 2007. The OASDI tax rate will remain 6.2% in 2007.

Regular:

| | | |
|---|---|---|
| 2007 $652,400,000 x .900 x .962 x .062 | | 34,947,763 |
| 2006 $652,400,000 x .882 x .946 x .062 | | -33,749,346 |
| Subtotal | | 1,198,417 |

Other:

| | | |
|---|---|---|
| 2007 $61,257,000 x .900 x .962 x .062 | | 3,281,415 |
| 2006 $61,257,000 x .882 x .946 x .062 | | -3,168,890 |
| Subtotal | | 112,525 |

| | | |
|---|---|---|
| Total adjustment-to-base | | 1,310,942 |

| | | |
|---|---|---|
| Health Insurance | | 3,547 |

Effective January 2005, PTO's contribution to Federal employees' health insurance premiums increased by 9.0%. Applied against the 2006 estimate of $39,416,000 the amount of increase is $3,547,440.

62

P000078

Exhibit 9

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

| | FTE | Amount |
|---|---|---|
| **Travel** | | 1 |
| Effective February 4, 2005, changes to the federal travel regulations increased the reimbursement rate for privately owned vehicles from 37.5 cents to 40.5 cents. This percentage increase of 8% was applied to the 2006 estimate of $12,000 to arrive at an increase of $960. | | |
| **Rental Payments to GSA** | | 1,561 |
| GSA rates are projected to increase 1.5% in 2007. This percentage was applied to the 2006 estimate of $104,057,000 to arrive at an increase of $1,560,855. | | |
| **GPO Printing** | | 1,679 |
| GPO has provided an estimated rate increase of 1.80%. This percentage was applied as follows. | | |
| Other GPO Printing:  The percentage was applied to the 2006 estimate of $812,000 to arrive at an increase of $14,616............................... | | 14,616 |
| Trademark GPO Printing:  The percentage was applied to the 2006 estimate of $1,170,000 to arrive at an increase of $21,060.......................... | | 21,060 |
| Patent GPO Printing:  The percentage was applied to the 2006 estimate of $91,316,000 to arrive at an increase of $1,643,688........................ | | 1,643,688 |
| Total  GPO Printing adjustments-to-base............................ | | 1,679,364 |

63

Exhibit 9

**DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Salaries and Expenses
**JUSTIFICATION OF ADJUSTMENTS TO BASE**
(Dollars in thousands)

| | FTE | Amount |
|---|---|---|
| General Pricing Level Adjustment | | 10,017 |

This request applies to OMB economic assumptions for 2007 to sub-object classes where the prices that the Government pays are established through the market system. Factors are applied to transportation of things ($14,922) rental paymemnts to others ($131,274); communications, utilities, miscellaneous charges (excluding postage) ($506,268); other services (excluding NARA) ($7,674,030); supplies and materials ($300,546); and equipment ($1,389,492).

| | FTE | Amount |
|---|---|---|
| Total, adjustments-to-base | 282 | 70,226 |

64

Exhibit 16

| Object Class Title: | FY 2006 Approp Budget | FY 2006 Enacted Budget | FY 2007 Adjust. To Base | FY 2007 Base | FY 2007 Program Changes | FY 2007 Budget Estimate | FY 2007 Increase (Decrease) |
|---|---|---|---|---|---|---|---|
| **Full-Time Equivalent Employment:** | | | | | | | |
| Full-Time Permanent............................ | 7,777 | 7,777 | 282 | 8,059 | 400 | 8,459 | 400 |
| Other Than Full-Time Permanent........" | 98 | 98 | 0 | 98 | 0 | 98 | 0 |
| Total Full-Time Equivalent Employment. | 7,875 | 7,875 | 282 | 8,157 | 400 | 8,557 | 400 |
| | | | | | | | |
| **Authorized Positions:** | | | | | | | |
| Full-Time Permanent............................ | 8,038 | 8,038 | 0 | 8,038 | 799 | 8,837 | 799 |
| Other Than Full-Time Permanent........." | 160 | 160 | 0 | 160 | 0 | 160 | 0 |
| Total Authorized Positions.................. | 8,198 | 8,198 | 0 | 8,198 | 799 | 8,997 | 799 |

65

Exhibit 16

| Object Class | Object Class Title | FY 2005 Actual | FY 2006 Enacted Budget | FY 2007 Adjust. To Base | FY 2007 Base | FY 2007 Program Changes | FY 2007 Budget Estimate | FY 2007 Increase (Decrease) |
|---|---|---|---|---|---|---|---|---|
| | **Personnel Compensation:** | | | | | | | |
| 11.1 | Full-Time Permanent Compensation................. | 559,947 | 626,043 | 39,474 | 668,517 | 44,821 | 713,338 | 44,821 |
| 11.3 | Other Than Full-Time Permanent Compensation...... | 6,416 | 6,286 | 216 | 6,502 | | 6,502 | |
| 11.5 | Other Personnel Compensation................. | 41,416 | 58,462 | 0 | 58,462 | 7,318 | 65,780 | 7,318 |
| 12.0 | Total Personnel Compensation................. | 607,779 | 690,791 | 39,690 | 733,481 | 52,139 | 785,620 | 52,139 |
| | Personnel Benefits................. | 192,798 | 211,055 | 17,278 | 228,333 | 12,191 | 240,524 | 12,191 |
| 13.0 | Benefits for Former Personnel................. | | 1,000 | | 1,000 | (1,000) | 0 | (1,000) |
| 14.0 | Salary Payments from Imprest................. | 165 | | | | | 0 | |
| 21.0 | Travel and Transportation of Persons................. | 6,922 | 11,268 | 1 | 11,269 | 1,262 | 12,531 | 1,262 |
| 22.0 | Transportation of Things................. | 620 | 829 | 15 | 844 | (49) | 795 | (49) |
| 23.1 | Rental Payments to GSA................. | 95,647 | 104,057 | 1,561 | 105,618 | (6,001) | 99,537 | (6,001) |
| 23.2 | Rental Payments to Others................. | 8,600 | 7,293 | 131 | 7,424 | | 7,424 | |
| 23.3 | Communications, Utilities, and Misc. Charges......... | 29,479 | 40,069 | 506 | 40,575 | (9,721) | 30,854 | (9,721) |
| 24.0 | Printing and Reproduction................. | 73,390 | 93,298 | 1,679 | 94,977 | (21,331) | 73,646 | (21,331) |
| 25.1 | Advisory and Assistance Services................. | 13,253 | 11,192 | 201 | 11,393 | | 11,393 | 0 |
| 25.2 | Other Services................. | 362,768 | 409,501 | 7,452 | 416,953 | 64,201 | 481,154 | 64,201 |
| 25.3 | Purchase of Goods and Services from Gov't Accounts... | 24,569 | 5,842 | 21 | 5,863 | 1,883 | 7,746 | 1,883 |
| 26.0 | Supplies and Materials................. | 11,475 | 16,697 | 301 | 16,998 | (2,529) | 14,469 | (2,529) |
| 31.0 | Equipment................. | 60,932 | 77,194 | 1,390 | 78,584 | (1,311) | 77,273 | (1,311) |
| 32.0 | Lands and Structures................. | | | | | | 0 | 0 |
| 42.0 | Insurance Claims and Indemnities................. | | | | | | 0 | 0 |
| 43.0 | Interest and Dividends................. | | | | | | 0 | 0 |
| | **Total Direct Obligations................** | 1,508,392 | 1,683,086 | 70,226 | 1,753,312 | 89,654 | 1,842,966 | 89,654 |
| | Less: Financing from Offsetting Collections................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Less: Portion not Available for Obligation (limitation on obligations)... | 7 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Less: Unobligated balance, EOY................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Less: Prior Year Unobligated Balance Brought Forward................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Less: Recoveries of Prior Year Obligations/Parking Fee Reimb....... | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Financing/(Rescission) from Direct Appropriated Funds..........** | 1,508,392 | 1,683,096 | 0 | 0 | 89,654 | 89,654 | 89,654 |
| | **Total Appropriation................** | 1,508,392 | 1,683,096 | 0 | 0 | 89,654 | 89,654 | 89,654 |
| | **Total Budget Authority................** | 1,508,392 | 1,683,096 | 0 | 0 | 89,654 | 89,654 | 89,654 |

66

P000082

Exhibit 17

| Object Class | Object Class Title | FY 2006 Approp Budget | FY 2006 Enacted Budget | FY 2007 Adjust. To Base | FY 2007 Base | FY 2007 Program Changes | FY 2007 Budget Estimate | FY 2007 Increase (Decrease) |
|---|---|---|---|---|---|---|---|---|
| 11 | Personnel Compensation: | | | | | | | |
| 11.1 | Full-Time Permanent Positions: | | | | | | | |
| | Executive Level | 152 | 152 | 7 | 159 | 0 | 159 | 0 |
| | Senior Executive Service | 7,664 | 7,664 | 396 | 8,060 | 0 | 8,060 | 0 |
| | General Schedule | 627,577 | 607,363 | 38,491 | 645,854 | 44,187 | 690,041 | 44,187 |
| | Wage Board | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Patent Appeals Examiners (P.L. 82-593) | 11,387 | 11,387 | 476 | 11,863 | 532 | 12,395 | 532 |
| | Trademark Appeals Examiners (P.L. 98-622) | 2,477 | 2,477 | 104 | 2,581 | 102 | 2,683 | 102 |
| | Total, Full-Time Permanent Positions | 649,257 | 629,043 | 39,474 | 668,517 | 44,821 | 713,338 | 44,821 |
| 11.3 | Positions Other Than Full-Time Permanent: | | | | | | | |
| | General Schedule | 5,980 | 5,980 | 205 | 6,185 | 0 | 6,185 | 0 |
| | Wage Board | 256 | 256 | 9 | 265 | 0 | 265 | 0 |
| | Intermittent | 50 | 50 | 2 | 52 | 0 | 52 | 0 |
| | Total, Positions Other Than FT Permanent | 6,286 | 6,286 | 216 | 6,502 | 0 | 6,502 | 0 |
| 11.5 | Other Personnel Compensation: | | | | | | | |
| | Overtime | 24,778 | 24,778 | 0 | 24,778 | 4,153 | 28,931 | 4,153 |
| | Night Differential - Premium Pay | 15 | 15 | 0 | 15 | 0 | 15 | 0 |
| | Awards | 33,669 | 33,669 | 0 | 33,669 | 3,165 | 36,834 | 3,165 |
| | Total, Other Personnel Compensation | 58,462 | 58,462 | 0 | 58,462 | 7,318 | 65,780 | 7,318 |
| 11.9 | Total Personnel Compensation | 714,005 | 693,791 | 39,690 | 733,481 | 52,139 | 785,620 | 52,139 |
| 12.0 | Civilian Personnel Benefits: | | | | | | | |
| | Civil Service Retirement | 8,052 | 8,052 | (665) | 7,387 | 0 | 7,387 | 0 |
| | Federal Employee Retirement System (FERS) | 56,086 | 56,086 | 8,189 | 64,275 | 4,313 | 68,588 | 4,313 |
| | Thrift Plan Contributions | 21,738 | 21,738 | 985 | 22,703 | 1,524 | 24,227 | 1,524 |
| | Federal Insurance Contributions Act (FICA) | 31,092 | 31,092 | 3,413 | 34,505 | 2,316 | 36,821 | 2,316 |
| | Medicare | 10,395 | 10,395 | 538 | 10,933 | 734 | 11,667 | 734 |
| | Health Insurance | 39,416 | 39,416 | 4,752 | 44,168 | 2,964 | 47,132 | 2,964 |
| | Life Insurance | 1,303 | 1,303 | 73 | 1,376 | 92 | 1,468 | 92 |
| | Post-retirement life and health benefits | 39,000 | 39,000 | 0 | 39,000 | 0 | 39,000 | 0 |
| | OWCP Payments | (77) | (77) | 0 | (77) | 0 | (77) | 0 |
| | Flexible Spending Account | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Prof Liability Insurance | 3 | 3 | 0 | 3 | 0 | 3 | 0 |
| | Prompt Payment Act Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Transportation Subsidy | 3,695 | 3,695 | 12 | 3,707 | 248 | 3,955 | 248 |
| | Recruitment Allowance | 341 | 341 | 1 | 342 | 0 | 342 | 0 |
| | Retention Allowance | 11 | 11 | 0 | 11 | 0 | 11 | 0 |
| | Total, Civilian Personnel Benefits | 211,055 | 211,055 | 17,278 | 228,333 | 12,191 | 240,524 | 12,191 |
| 13.0 | Benefits for Former Personnel | 1,000 | 1,000 | 0 | 1,000 | (1,000) | 0 | (1,000) |

67

P000083

Exhibit 17

| Object Class | Object Class Title: | FY 2006 Approp Budget | FY 2006 Enacted Budget | FY 2007 Adjust. To Base | FY 2007 Base | FY 2007 Program Changes | FY 2007 Budget Estimate | FY 2007 Increase (Decrease) |
|---|---|---|---|---|---|---|---|---|
| 21.0 | Travel and Transportation of Persons: | | | | | | | |
| | Transportation - Domestic | 1,257 | 1,257 | 0 | 1,257 | 0 | 1,257 | 0 |
| | Transportation - International | 3,219 | 3,219 | 0 | 3,219 | 0 | 4,481 | 1,262 |
| | Local Travel | 6,309 | 6,309 | 0 | 6,309 | 0 | 6,309 | 0 |
| | Relocation Travel | 288 | 288 | 0 | 288 | 0 | 288 | 0 |
| | Per Diem Allowances | | | 0 | 0 | 0 | 0 | 0 |
| | Examiner Education - Domestic | 12 | 12 | 0 | 12 | 0 | 12 | 0 |
| | Examiner Education - International | | 6 | 0 | 6 | 0 | 6 | 0 |
| | Rental Car Expenses | 43 | 43 | 0 | 43 | 0 | 43 | 0 |
| | Privately-Owned Automobiles | 12 | 12 | 1 | 13 | 0 | 13 | 0 |
| | Rental of GSA Vehicles | 122 | 122 | 0 | 122 | 0 | 122 | 0 |
| | Total, Travel and Transportation of Persons | 11,268 | 11,268 | 1 | 11,269 | 1,262 | 12,531 | 1,262 |
| 22.0 | Transportation of Things: | | | | | | | |
| | Freight Charges | 51 | 51 | 1 | 52 | (22) | 30 | (22) |
| | Transportation of Household Goods | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Parcel Post | 751 | 751 | 14 | 765 | 0 | 765 | 0 |
| | Other | 27 | 27 | 0 | 27 | (27) | 0 | (27) |
| | Total, Transportation of Things | 829 | 829 | 15 | 844 | (49) | 795 | (49) |
| 23.1 | Rental Payments to GSA | 104,057 | 104,057 | 1,561 | 105,618 | (6,081) | 99,537 | (6,081) |
| 23.2 | Rental Payments to Others | 7,293 | 7,293 | 131 | 7,424 | 0 | 7,424 | 0 |
| 23.3 | Communications, Utilities, and Misc. Charges: | | | | | | | |
| | Rental of IT Equipment | 18,813 | 18,813 | 339 | 19,152 | (4,816) | 14,336 | (4,816) |
| | Rental of Office Copying Equipment | 136 | 136 | 1 | 137 | (75) | 62 | (75) |
| | Other Equipment Rental | 84 | 84 | 2 | 86 | (47) | 39 | (47) |
| | Federal Telecommunications Systems | 2,722 | 2,722 | 0 | 2,722 | (2,572) | 150 | (2,572) |
| | Telecommunications Systems | 6,343 | 6,343 | 114 | 6,457 | (2,845) | 3,612 | (2,845) |
| | Postal Services by USPS | 9,221 | 9,221 | 0 | 9,221 | (2,900) | 6,321 | (2,900) |
| | Utilities Services | 2,750 | 2,750 | 50 | 2,800 | 3,534 | 6,334 | 3,534 |
| | Total, Comm, Utilities, and Misc. Charges | 40,069 | 40,069 | 506 | 40,575 | (9,721) | 30,854 | (9,721) |

68

P000084

Exhibit 17

| Object Class | Object Class Title: | FY 2006 Approp Budget | FY 2006 Enacted Budget | FY 2007 Adjust. To Base | FY 2007 Base | FY 2007 Program Changes | FY 2007 Budget Estimate | FY 2007 Increase (Decrease) |
|---|---|---|---|---|---|---|---|---|
| 24.0 | Printing and Reproduction: | | | | | | | |
| | Patent Printing | 91,316 | 91,316 | 1,644 | 92,960 | (21,331) | 71,629 | (21,331) |
| | Trademark Printing | 1,170 | 1,170 | 21 | 1,191 | 0 | 1,191 | 0 |
| | General Printing | 413 | 413 | | 413 | 0 | 413 | 0 |
| | Publications | 78 | 78 | | 78 | 0 | 78 | 0 |
| | Binding-OPS | 71 | 71 | | 71 | 0 | 71 | 0 |
| | Other Printing | 250 | 250 | 14 | 264 | 0 | 264 | 0 |
| | Total, Printing and Reproduction | 93,298 | 93,298 | 1,679 | 94,977 | (21,331) | 73,646 | (21,331) |
| 25.1 | Advisory and Assistance Services: | | | | | | | |
| | Management & Professional Support Services | 11,192 | 11,192 | 201 | 11,383 | 0 | 11,383 | 0 |
| | Studies, Analyses, & Evaluation | 0 | | | 0 | 0 | 0 | 0 |
| | Engineering & Technical Services | 0 | | | 0 | 0 | 0 | 0 |
| | Subtotal | 11,192 | 11,192 | 201 | 11,383 | 0 | 11,383 | 0 |
| 25.2 | Other Services: | | | | | | | |
| | Training: | | | | | | | |
| | University | 4,240 | 4,240 | 76 | 4,316 | 1,073 | 5,389 | 1,073 |
| | Other | 9,736 | 9,736 | 175 | 9,911 | 2,465 | 12,376 | 2,465 |
| | Exhibits and Displays | 0 | 0 | | 0 | 0 | 0 | 0 |
| | Install/Reconfigure Existing Systems | 2,169 | 2,169 | 39 | 2,208 | 549 | 2,757 | 549 |
| | Non-IT Maintenance and Repair Services | 2,892 | 2,892 | 52 | 2,944 | 732 | 3,676 | 732 |
| | Operation and Maintenance of Facilities | 1,356 | 1,356 | 25 | 1,381 | 346 | 1,737 | 346 |
| | IT Maintenance and Repair Services | 11,947 | 11,947 | 215 | 12,162 | 3,025 | 15,187 | 3,025 |
| | Building Repairs & Alterations - NonCapitalized | 1,204 | 1,204 | 22 | 1,226 | 305 | 1,531 | 305 |
| | IT Operation Support Services | 109,094 | 109,094 | 1,964 | 111,058 | 17,620 | 128,678 | 17,620 |
| | IT Timesharing Services | 29,117 | 29,117 | 524 | 29,641 | 5,472 | 35,113 | 5,472 |
| | Other Contractual Services | 1,462 | 1,462 | 26 | 1,488 | 370 | 1,858 | 370 |
| | Miscellaneous Goods and Services Non-IT | 17,679 | 17,679 | 318 | 17,997 | 2,476 | 20,473 | 2,476 |
| | Non-IT Operation Support Services | 216,595 | 216,595 | 4,016 | 222,611 | 29,768 | 252,379 | 29,768 |
| | Subtotal | 409,501 | 409,501 | 7,452 | 416,953 | 64,201 | 481,154 | 64,201 |

P000085

Exhibit 17

| Object Class | Object Class Title | FY 2006 Approp Budget | FY 2006 Enacted Budget | FY 2007 Adjust. To Base | FY 2007 Base | FY 2007 Program Changes | FY 2007 Budget Estimate | FY 2007 Increase (Decrease) |
|---|---|---|---|---|---|---|---|---|
| 25.3 | Purchase of Goods and Services from Gov't Accounts: | | | | | | | |
| | Office of Personnel Management Training | 54 | 54 | 1 | 55 | 0 | 55 | 0 |
| | Government Services | 834 | 834 | 15 | 849 | 1,883 | 2,732 | 1,883 |
| | Executive Development and Leadership Training | 254 | 254 | 5 | 259 | 0 | 259 | 0 |
| | National Archives and Records Administration (NARA) | 400 | 400 | 0 | 400 | 0 | 400 | 0 |
| | Payment to GA, WCF | 4,300 | 4,300 | 0 | 4,300 | 0 | 4,300 | 0 |
| | Subtotal | 5,842 | 5,842 | 21 | 5,863 | 1,883 | 7,746 | 1,883 |
| 26.0 | Supplies and Materials: | | | | | | | |
| | Office Supplies | 253 | 253 | 5 | 258 | (38) | 220 | (38) |
| | GSA Supplies | 764 | 764 | 14 | 778 | (116) | 662 | (116) |
| | IT Supplies | 905 | 905 | 16 | 921 | (137) | 784 | (137) |
| | Toner Supplies | 2,226 | 2,226 | 40 | 2,266 | (337) | 1,929 | (337) |
| | Other Supplies | 4,107 | 4,107 | 74 | 4,181 | (622) | 3,559 | (622) |
| | Books and Periodicals | 5,878 | 5,878 | 106 | 5,984 | (890) | 5,094 | (890) |
| | Copier Paper | 2,564 | 2,564 | 46 | 2,610 | (389) | 2,221 | (389) |
| | Total, Supplies and Materials | 16,697 | 16,697 | 301 | 16,998 | (2,529) | 14,469 | (2,529) |
| 31.0 | Equipment: | | | | | | | |
| | Capital Leases | 2,357 | 2,357 | 42 | 2,399 | (40) | 2,359 | (40) |
| | Internal Use Software In Progress (Capitalized) | 5,817 | 5,817 | 105 | 5,922 | (100) | 5,822 | (100) |
| | Hardware for Internal Use Software in Progress (Non-Capitalized) | 13,137 | 13,137 | 236 | 13,373 | (223) | 13,150 | (223) |
| | IT Equipment (Capitalized) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | IT Equipment (Non-Capitalized) | 26,617 | 26,617 | 479 | 27,096 | (452) | 26,644 | (452) |
| | Internal Use Software (Capitalized) | 1,680 | 1,680 | 30 | 1,710 | (29) | 1,681 | (29) |
| | IT Software (Non-Capitalized) | 17,751 | 17,751 | 320 | 18,071 | (301) | 17,770 | (301) |
| | IT Software (Expensed) | 104 | 104 | 2 | 106 | (2) | 104 | (2) |
| | Furniture and Fixtures (Capitalized) | 6,442 | 6,442 | 116 | 6,558 | (109) | 6,449 | (109) |
| | Furniture and Fixtures (Non-Capitalized) | 1,439 | 1,439 | 26 | 1,465 | (24) | 1,441 | (24) |
| | Office Equipment/Telecommunications (Capitalized) | 654 | 654 | 12 | 666 | (11) | 655 | (11) |
| | Office Equipment/Telecommunications (Non-Capitalized) | 1,196 | 1,196 | 22 | 1,218 | (20) | 1,198 | (20) |
| | Total, Equipment | 77,194 | 77,194 | 1,390 | 78,584 | (1,311) | 77,273 | (1,311) |
| 32.0 | Leasehold Improvements Capitalized | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 42.0 | Insurance Claims and Indemnities | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 43.0 | Interest and Dividends | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Direct Obligations | 1,703,300 | 1,683,086 | 70,226 | 1,753,312 | 89,654 | 1,842,966 | 89,654 |

70

P000086