# Exhibit 9

**Presentation to Office of Management and Budget by parties including Polestar
(June 15, 2007)**

**Part 2: Attachments D-M (P000265-338)**

Dockets.Justia.com

# Attachment D

# USPTO's Written Rationale for Regulation is Insufficient

USPTO is required to show that these draft final rules are needed and give an informative written explanation for that need:

> Each agency shall identify in writing the specific market failure (such as externalities, market power, lack of information) or other specific problem that it intends to address (including, where applicable, the failures of public institutions) that warrant new agency action, as well as assess the significance of that problem, to enable assessment of whether any new regulation is warranted (Sec. 1(b)(1), as amended).

USPTO's rationale for each of these rules is seriously flawed.

## I.    Limits on Claims Rule

The rationale for this draft rule is that initially examining more than 10 claims in a patent application is burdensome to USPTO, and limiting to 10 the number of claims that can be initially examined would reduce this burden:

> The changes proposed in this notice will allow the Office to do a better, more thorough and reliable examination since the number of claims receiving initial examination will be at a level which can be more effectively and efficiently evaluated by an examiner.[28]

This rationale does not take into account the reasons why applications might legitimately have more than 10 claims deserving of initial examination. Easing USPTO's workload, without regard for its social costs and social benefits, is not a valid rationale for regulation. It is an especially egregious rationale when examination of those claims is an essential agency service that is funded directly by user fees that are set at a cost-recovery level that was requested by the agency itself.[29]

USPTO has a history of antipathy toward applications with many claims. In 1998, in response to the National Performance Review, the Office proposed similar (but less restrictive) limits on the number of claims it would review. In 1999, it abandoned the proposal in the face of widespread opposition. In the Appendix to this attachment, we reprint the relevant sections of the

---

[28] 71 Fed. Reg. 61.

[29] 35 U.S.C. § 41(a) (fees for claims over a set threshold vary from $25 to $200 each); USPTO Strategic Plan, Fee Purpose, http://web.archive.org/web/20030407093355/www.uspto.gov/web/offices/com/strat21/feepurpose.htm ("This legislative proposal [establishes] a new schedule of patent fees … realigning fees so they better reflect the needs of customers and better correlate fees with the extra effort required to meet the demands of certain kinds of patent requests. This proposal would generate the levels of patent and trademark fee income needed to implement the goals and objectives of the strategic plan.")

P000265

preamble of both the 1998 Advance Notice of Proposed Rulemaking (ANPRM) and the 1999 notice in which the Office withdrew the proposal.

### 1. How the Current Process Works

Applicants decide how many claims to file in an application based on their knowledge of the invention and the prior art, as well as various uncertainties, such as how a court might interpret claims or interpret the changes (or amendments) made to claims during examination, and the applicant's general level of confidence in the thoroughness of the prior art searches during examination. There is no question that this is a complicated decision, and especially so for the most complex and commercially valuable patents. Significant technical and legal knowledge must be combined with experience dealing with USPTO policies, practices and procedures. Errors and oversights that may seem trivial early in the process can turn out to be crucial and devastating for the protection of intellectual property.[30]

For decades, USPTO has said that examination proceeds most efficiently when an applicant provides claims for initial examination "ranging from the broadest claim patent owner considers to be patentable over the prior art to the narrowest claim patent owner is willing to accept."[31] This puts all negotiating positions on the table early to give all parties an opportunity to consider all options that might result in agreement. If there is no agreement, USPTO has long recognized that the examiner's view on a full range of claims is essential if appeal is to be

---

[30] The *Festo* decisions of the Supreme Court and Court of Appeals for the Federal Circuit in 2002 and 2003 sharply limited the "doctrine of equivalents," and placed a burden on applicants to present as many claims as required to precisely and fully describe the entire scope of all patentable subject matter – subject matter that was formerly covered by inferences drawn from fewer claims now has to be covered expressly, or not at all. *Fest Corp. v. Sheets Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 122 Sect. 1831, 62 USPQ2d 1705 (2002) (*Festo VIII*) and *Festo IX*, 344 F.3d 1359, 1366, 68 USPQ2d 1321, 1326-27 (Fed. Cir. 2003).

This change in the way claims are interpreted by courts prompted applicants to consider adopting various strategies, such as filing more claims, including more independent claims, in an attempt to preclude the need for amending claims during examination. See, e.g., John M. Benassi and Christopher K. Eppich, "Litigation and Prosecution after *Festo* III," on-line at http://www.buildingipvalue.com/n_us/182_186.htm ("One approach involves the filing of a number of different independent claims. The independent claims should encompass a scope that ranges from a very broad claim to a claim that is allowable as written."). Anecdotal evidence suggests that applicants have, in fact, adopted such strategies. USPTO could utilize its vast database to determine if, in fact, there has been an upward trend in the number of independent claims since the *Festo* decisions."

[31] Rules to Implement Optional Inter Partes Reexamination Proceedings, 65 Fed. Reg. 76755, 76767 col. 2-3 (Dec. 7 2000); John Love (now Deputy Comm'r for Patent Examination Policy) and Wynn Coggins, Successfully Preparing and Prosecuting a Business Method Patent Application, www.uspto.gov/web/menu/pbmethod/aiplapaper.rtf, presented at 2001 AIPLA meeting, at page 9.

P000266

meaningful: "[P]rior to the close of prosecution, the issues are well developed, patent owner is aware of the issues and positions of the … examiner, and patent owner has the right to present evidence and argument in light of the … examiner's rejections and to present amended claims."[32]

USPTO now says this practice is less efficient than it could be because it requires an initial patentability examination of every claim in an application, an effort that is wasted when the patentability of the dependent claims stand or fall together with the independent claim from which they directly or indirectly depend.[33] The Office proposes to reduce its burden by limiting to 10 the number of claims that will be initially examined. USPTO makes no argument, and certainly offers no evidence, supporting the proposition that all inventions disclosed in each and every patent application can be adequately claimed by 10 or fewer claims deserving of initial examination. Rather, the problem USPTO seeks to solve is that applications with more than 10 claims deserving of initial examination are more complex and entail more work for patent examiners, but examiners are not rewarded for doing more work on any given patent application.

Any savings to be obtained by the Limits on Claims Rule is not apparent, however. Under the proposed rule, when an independent claim is allowed, all dependent claims are examined to ensure they are in the proper form. This proposed examination practice is the same as current examination practice, and thus, under this scenario, the Limits on Claims Rule achieves no savings. However, when an independent claim is rejected, then patentability – and an efficiently-obtained agreement between examiner and applicant – lies in the dependent claims that the USPTO proposes, under the proposed rule, <u>not</u> to examine. If there is an efficiency to be gained by not looking for an agreement where it is most likely to be found, a well-considered regulatory analysis should explain it.

### 2.  Applicants give USPTO clear and robust signals of patent value

The filing fee for a "base level" application is $1,000. The Office charges extra filing fees for extra complexity – more than a base number of claims, more than 100 pages of disclosure, prior art references provided to USPTO after a certain time period, and the like. These "complexity fees" can easily double the filing fee cost, or more. In addition, there is an issue fee of $1,300, and "maintenance fees" of $900 due 3½ years after issue, $2,300 due 7½ years after issue, and $3,800 due 11½ years after issue. These issue and maintenance fees are a significant source of revenue for USPTO.[34]

---

[32] *Id.*

[33] 71 Fed. Reg. at 62.

[34] "The examination fees for patent applications are set at amounts that do not recover the USPTO's costs of examining patent applications. The USPTO's costs of examining applications are subsidized by issue and maintenance fees under §§ 41(a)(4) and 41(b))."  Rationale for 2003 Fee Statute, http://web.archive.org/web/20030407092837/ www.uspto.gov/web/offices/com/strat21/feeanalysis.htm.

P000267

Crucially, these fees give robust signals to USPTO of the relative value placed on the application by the applicant: the applicant pays USPTO one or more of these "complexity fees" and also pays several times that amount in attorney fees for preparing the corresponding submission. Applicants do not bear these substantial costs unless they perceive significant value.

A recent empirical study[35] confirmed what one would intuit,[36] that the costs borne up front for patent filing are strongly indicative of the value that the patent owner will later place on the patent, as signaled by continued payment of maintenance fees. The most valuable patents are the ones that had the following characteristics, listed in the author's order:

1. Patents with more claims are more valuable than patents with fewer claims.

2. Patents in which the applicant and examiner had cited more prior art references are more valuable than patents with fewer prior art references considered.

3. Patents cited as prior art by subsequent patents are more valuable

4. Patents with more inventors tend to be more valuable than patents with fewer inventors

5. Patents with more related applications, that is, that are part of a larger family of continuations, are more valuable than patents with smaller families.

This suggests a number of ironies. First, the applications that are directly targeted by the two proposed rules[37] are the applications that patent owners on average believe to be most valuable. Second, at least three of the five characteristics that predict patent value are usually signaled by the time of first examination.[38] As we discuss in more detail in Attachment F, section I, this information could be used by USPTO in its examination resource allocation decisions, thereby reducing the harm to the most valuable patents arising from the backlog, but it is not. Third, the applications that USPTO most wants to discourage are precisely the ones that are more likely to generate the issue and maintenance fees that subsidize examination.

---

[35] Kimberley A. Moore, Worthless Patents, Berkeley Technology Law Journal vol. 20 no. 4, pp. 1521-52 (Fall 2005). The results are summarized at pp. 1530-31.

[36] Applicants are more likely to invest more money in the filing and examination of commercially important patent applications, either through the added expense of filing numerous claims of varying scope, through the added expense of filing further continuations in order to obtain claims covering the entire scope of applicant's invention, and by performing a thorough prior art search and providing the examiner with the results of that search. *See* Worthless Patents at 1531.

[37] And a third proposed rule not yet submitted to OMB for review as a draft final rule: RIN 0651-AB95, "Changes to Information Disclosure Statement Requirements and Other Related Matters," 71 Fed. Reg. 38808 (July 10, 2006) (the "IDS Rule").

[38] Item 3 (the number of subsequent citations as prior art), cannot be ascertained during pendency. Item 5 (relationship to other applications in the same family) is sometimes discernable.

P000268

To better understand the impact of these rules, both on applicants and on future USPTO revenues, we believe the Office should do a proper Regulatory Impact Analysis. It has a vast storehouse of data from which it could develop credible proxy measures for patent value. This would enable the Office to discern ways to reduce patent pendency while imposing the least cost on innovators, and possibly generating additional social benefits.

### 3. USPTO Does Not Explain its Reversal of Course

It is also striking that USPTO would now seek to return to a "piecemeal examination" scheme similar to what it abandoned in the early 1960s, but without the procedural flexibility that protected applicants under the old system. Back then, USPTO used a procedure somewhat similar to the procedure still used in Europe and Japan today, under which the examiner need not examine for every issue in the first Office Action, and dialog between the applicant and the examiner continues for as long as the parties perceive progress. "Final Rejection" was not imposed until a genuine impasse was identified.

In the early 1960's, USPTO concluded that this was not efficient, and changed to a "compact prosecution" regime, where the examiner was required to fully consider every issue in the first Office Action, and "Final Rejection" was used as the incentive for applicants not to press unreasonable positions.

USPTO now seeks to impose a structure that seeks to marry the applicant-adverse aspects of modern "Final Rejection" practice and old "piecemeal examination" practice. The Office does not explain how this combination provides incentives for examiners to be complete and efficient, or how it provides opportunities to reach agreement when the Office refuses to consider any more than opening negotiating positions.

### 4. The Limited Data Presented by USPTO Does Not Help Predict the Impact of the Rule

The Limits on Claims Rule caps at 10 the number of independent claims that USPTO will initially examine without submission of an Examination Support Document (ESD). In the preamble, USPTO said 1.2% of patent applications would be affected by the rule. This figure understates the true proportion of applications affected because the proposed rule changes the measurement base.[39] The public has neither a valid baseline nor any way to consider the rule's effects – only USPTO's assurances that it will reduce the Office's workload and therefore reduce patent pendency.

---

[39] See Attachment H, Sec. II.2.

## II.     Continuations Rule

USPTO's rationale is that the Office has a serious problem with backlog (*i.e.*, "patent pendency"); continued examinations are the cause of this backlog; and restricting applicants to a single continued examination will solve it:

> [E]ach continued examination filing, whether a continuing application or request for continued examination, requires the United States Patent and Trademark Office (Office) to delay taking up a new application and thus contributes to the backlog of unexamined applications before the Office. In addition, current practice allows an applicant to generate an unlimited string of continued examination filings from an initial application.[40]

According to the rationale set forth in the NPRM, continued examinations are inherently undesirable and ought to be reduced or eradicated because they do not contribute significant social value:

> In such a string of continued examination filings, the exchange between examiners and applicants becomes less beneficial and suffers from diminishing returns as each of the second and subsequent continuing applications or requests for continued examination in a series is filed. Moreover, the possible issuance of multiple patents arising from such a process tends to defeat the public notice function of patent claims in the initial application.[41]

In public presentations, USPTO officials framed continued examination pejoratively as "rework,"[42] implying that they involve applicants asking USPTO to re-examine claims that have already been fully examined.  While such "rework" may occur in limited situations where applicants abuse the continuation process, it simply doesn't occur in most continued examinations.

For example, continuation-in-part applications (CIPs), by definition, include new subject matter and the claims of these applications are usually directed to this new subject matter.  Thus, examinations of CIPs are likely examinations of new claims that have not previously been examined by USPTO, and therefore cannot be "rework." As another example, when filing a Request for Continued Examination (RCE), applicants are specifically required to advance the examination of an application.  The examiner is provided with new information to consider (e.g., changes to the claim, new arguments, or new references).  Action by an examiner on an RCE is thus, by definition, not "rework." Finally, continuation applications can be filed that are directed

---

[40] 71 Fed. Reg. 48.

[41] Id.

[42] See Attachment N, slide 18 of the Chicago Town Hall slides.

to subject matter that is fully disclosed but has never been claimed by applicant. Such new claims have never been considered by USPTO and also are not "rework."

USPTO's pejorative characterization of continuations as "rework" hints at a policy rationale that may explain the purpose of the draft rule.[43] For example, senior officials may believe that inventors should not be allowed to pursue claims to additional aspects of an invention, even if those aspects are fully disclosed in an application as originally filed. Reasonable people may disagree about what the policy should be.[44] But that policy balancing was done by Congress, which determined that both "continuing application" and "request for continued examination" should be available as a matter of right.[45] As we discuss in more detail in Attachment E, USPTO does not have the authority to take these rights away. For that reason, senior officials expect to be sued if this rule is finalized and are not confident that they will prevail.[46]

## III.     Backlog ("Patent Pendency")

USPTO says the problem it is trying to solve is a rise in its backlog, the number of patent applications in examination. But patent pendency is not a uniformly serious problem across all

---

[43] In 1998, USPTO floated a similar proposal similar to the Limits on Claims Rule. In response to extensive opposition, the Office abandoned that effort in 1999. See the Appendix to this Attachment D for more information.

[44] Under current law, an inventor's duty to disclose an invention does not undermine his ability to claim its full economic benefits. If inventors no longer had these protections, fulfilling this duty would invite those who made no contribution to the invention to reap its economic value. The patent law must balance these competing interests, and that is the purview of Congress and not USPTO, whose function is to administer the policy tradeoffs that Congress enacts.

[45] A "continuation application" is a later-filed application that claims the benefit of the filing date of an earlier application. Continuations as a matter of right have long been provided by statute, 35 U.S.C. § 120 (1952), 5 Stat. 353 (1839). Though the form and degree vary country-to-country, rights analogous to U.S. continuation practice, including an inventor's right to add claims directed to additional inventions as those inventions are recognized, exist under the laws of all major patent systems, including at least Europe, Japan and Canada.

[46] Eric Yeager, "USPTO Commissioner Doll Says That Limiting Continuations Will Improve Patent Landscape," 72 Patent, Trademark & Copyright Law 1791 (704) ("John J. Doll, commissioner for patents at the Patent and Trademark Office, Oct. 19 argued at the American Intellectual Property Law Association's annual meeting in Washington, D.C.… When questioned on whether the agency had the statutory authority to make the rules changes, Doll said a lawsuit is highly likely and the agency has 'better than a 50/50 chance of prevailing.'"); USPTO Solicitor John Whealan, Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, February 17, 2006, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm, at time mark 52:10 ("We can write rules, and they issue, and maybe they get overturned.").

---

P-000271

technology sectors. For example, the American Inventors Protection Act of 1999 enabled applicants to regain patent term lost due to excessive pendency. So for patentees whose inventions do not reach the market for many years (*e.g.*, pharmaceuticals), current delays do not appear to pose a serious problem. But for patentees in industries where the pace of technological change is very rapid, delays may adversely affect their ability to use the patent system to protect their intellectual property. The economic value of their patents may be realized very early in the 20-year patent term, with little or none of this value accruing, say, 10 or more years out.[47]

USPTO has recognized this market need and recently instituted an Accelerated Examination Procedure that gives applicants the opportunity to supply additional information with their patent filing in exchange for moving their application to the front of the queue.  Under this program, USPTO guarantees to issue a patent in 12 months.

Significant differences in the value of reduced patent pendency across technology sectors highlights the need for proper regulatory analysis. This includes identifying reasonably available alternatives and avoiding the temptation to impose one-size-fits-all solutions that address the legitimate needs of only a small subset of patent applicants. A complete regulatory analysis that includes, for example, an examination of the tendency of applicants from different technology areas to pay maintenance fees, may provide USPTO with additional information regarding the Technology Centers in which accelerated examination is most important. Armed with this information, the Office could alter its external and internal incentives and reallocate resources in a way that maximizes net benefits to all rather than just a narrowly defined few.

In support of the Continuations Rule, USPTO cites two scholarly authorities for the proposition that continued examinations are the cause of its backlog problem.

### 1. President's Commission on the Patent System (1966)

This report has been in circulation for over 40 years. The changes it recommended required legislative action. Congress was well aware of it when it enacted major revisions of the Patent Act relating to continuation practice in 1994 and 1999.  For example, in 1994, Congress redefined patent term from the old 17-years-from-issue patent term, to a 20-years-from-filing patent term.  This put a practical but indirect cap on continuations,[48] but did not eliminate them. In the American Inventors Protection Act of 1999, Congress then <u>expanded</u> continuation

---

[47] This difference in the timing of how economic value from innovation is realized may explain why a small number of very large firms, all in the electronics industry, supported one or both proposed rules. See, *e.g.*, the public comments to USPTO by Apple Computer, Cisco Systems, eBay, Intel, Micron Technology, Microsoft, and Oracle on the Continuations Rule (http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/continuation_comments.html) and the Limits on Claims Rule (http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_claims/claims_comments.html).

[48] Before this change, one could theoretically have a continuation pending from an initial disclosure that was filed 30, 40, or more years earlier.

practice, by creating the new procedure for Requests for Continued Examination (RCE) that USPTO now finds objectionable. We believe the RCE procedures have considerable merit because they enhance the ability of inventors to maximize the protection they obtain for their intellectual property. In any case, their merits are not matters of policy discretion open to USPTO. Congress has spoken, and USPTO lacks the statutory authority to restrict rights established by law (see Attachment E).

### 2. Lemley & Moore (2004) [49]

USPTO justifies its claim that continued examinations are the cause of its backlog by reference to a single law review article written by a pair of distinguished legal analysts:

> Commentators have noted that the current unrestricted continuing application and request for continued examination practices preclude the Office from ever finally rejecting an application or even from ever finally allowing an application. [50]

USPTO's reliance on Lemley & Moore is problematic for at least three reasons.

First, Lemley & Moore do not address the problem of USPTO's backlog. While they are critical of continued examination practice, their criticisms are based on unrelated issues. It is inappropriate to invoke Lemley & Moore in defense of a regulatory change motivated by concerns about which they were silent.

Second, as Lemley & Moore themselves concede, the abuses that were the subject of their analysis have been almost entirely eradicated by action of Congress, the courts, and USPTO. [51] Moreover, the major reforms occurred in 1995 and 1999 – long before Lemley & Moore was published – and they have virtually eliminated the phenomenon of "submarine" patents.

What is a "submarine" patent? This is the erstwhile and infamous practice of keeping a patent application hidden from public disclosure for years or even decades, using continued examination practice to illicitly incorporate the inventions of others observed in the marketplace, then surfacing them unexpectedly to sabotage a mature industry with infringement claims. The

---

[49] Mark A. Lemley and Kimberly A. Moore, Ending Abuse of Patent Continuations, Boston University Law Review, vol. 84 (63-123) (2004) (hereinafter Lemley & Moore).

[50] 71 Fed. Reg. 49.

[51] Congress acted through several statutes mentioned in the Lemley & Moore article, including a 1995 statute that capped patent term at 20 years from filing and provided for publication of most patent applications. The courts acted in a series of cases cited in the "Continuations" NPRM: *In re Bogese*, 22 USPQ2d 1821, 1824 (Comm'r Pats. 1991) (*Bogese I*), and *In re Bogese*, 303 F.3d 1362, 64 USPQ2d 1448 (Fed. Cir. 2002) (*Bogese II*). In addition, the USPTO now provides web access, on a near real-time basis to most applications, and essentially all continuation applications that are related to issued patents, as they are prosecuted.

ATTACHMENT D: USPTO'S WRITTEN RATIONALE FOR REGULATION IS INSUFFICIENT                                                                              PAGE D-9

most famous "submarine" patents were those of Jerome Lemelson, who probably was responsible for Congress taking the action it did in 1994.

At one time, Jerome H. Lemelson was the patentee of over 185 unexpired patents and many pending patent applications. In 1998, users of bar code scanners began to receive letters from stating that their use infringed various Lemelson patents. One such patent, U.S. Patent No. 4,338,626, issued in 1982 on an application that claimed priority to 1954, almost 30 years earlier. Under U.S. patent law at the time, patents were entitled to a 17-year term from the date of issuance. Thus, Lemelson alleged that he "invented" the bar code scanner as early as 1954 and was entitled to a patent that would not expire until 45 years later. Many of Lemelson's nearly 200 issued patents were similarly obtained by such egregious abuse of the patent system, and they were used to extract hundreds of millions of dollars in royalties.

Fortunately, this kind of abuse of patent continuation practice is no longer possible.[52] A 1994 statute and the AIPA deny applicants the ability to avoid public disclosure unless the patent application is filed solely in the U.S. and has no related applications issued as patents, and determines patent lifetime from the date of application rather than the date of issuance. Further, the USPTO now makes available on its web site the files for very nearly <u>all</u> continuation applications – competitors now have "real time" insight into the scope of claims that are being sought. Thus, the majority of patent claims can no longer be hidden, and delaying final decision cannot increase patent value.[53]

Indeed, the so-called *Lemelson* cases are famous because they were rare. Lemley & Moore also acknowledge that abuses of this sort have never been common[54] and that various changes in the law have taken care of <u>every</u> type of "abuse" that they identify.[55] In any case,

---

[52] Though the NPRM does not cite it, USPTO officials have claimed in public forums that the Continuations Rule is needed to prevent submarine patents. Thus far, however, they have not supported these claims with evidence documenting the extent to which submarine patents still exist after courts decided the *Lemelson* and *Bogese* cases of 2002 and Congress enacted legislative reforms in 1995 and 1999.

[53] USPTO may assert that a published application can still be considered a "submarine" patent because one does not know what claims may ultimately be drafted from the published disclosure. However, web access to the file enables the public to gain enough knowledge to successfully manage this issue.

[54] "[T]he abuse of continuation practice is not as pervasive as some might think," Lemley & Moore, 84 B.U.L.R. at 118

[55] Lemley & Moore, 84 B.U.L.R. at 79, 83-85, 88-89, and 91-93: almost every section describing some form of past abuse concludes by identifying the change in the law that shut down the abuse, including 1995, 1999 and 2003 statutory changes; common law changes that confine patents to only that which the inventor invented and disclosed, and render "abusive" patents unenforceable, and give USPTO authority to strike abusive applications. Lemley & Moore omit mention of USPTO's practice, just new at

---

ATTACHMENT D: USPTO'S WRITTEN RATIONALE FOR REGULATION IS INSUFFICIENT

PAGE D-10

P000274

USPTO expressly states that this rule is <u>not</u> intended as a remedy for abuse,[56] and it cites no evidence suggesting that abuse remains a significant problem. So, even if some level of abuse might remain in the system, the Continuations Rule is not needed to fix it. The Office has all the authority it needs to police instances of abuse as they arise on a case-by-case basis.

Third, as a source of influential information, Lemley & Moore suffers from serious problems that foreclose any use by USPTO for regulatory decision-making, even to address the problem of patent "abuse." For example, Lemley & Moore do not clearly define the term "abuse." There is probably a consensus that several of the phenomena they discuss – delay, submarine patenting, changing claims, "evergreening" – were indeed abusive. But they come perilously close to asserting that all patent continuations are per se abusive without regard for any social value they might contain. That they do not truly believe this becomes clear, however, when they discuss proposed remedies. For example, they reject the notion that continuation applications should be prohibited and finally settle on (coincidentally) the same alternative that USPTO proposed in the Continuations Rule: a single continuation by right. Whereas USPTO proposes this as a remedy to solve its backlog problem, however, Lemley & Moore propose it as a political compromise between competing interests.[57] Unlike USPTO, Lemley & Moore acknowledge that USPTO lacks the statutory authority to make such a policy change.[58]

Two other features of Lemley & Moore are worthy of additional comment. First, this paper is based on analysis of a substantial data set. They collected data on over 2 million patents issued from 1976-2000, which suggests that a host of hypotheses could have been rigorously tested. Unfortunately, the only data analyses they report are descriptive – distributions of prosecution times (Figures 1 and 3) and pendency (Figure 4); the length of time under examination at USPTO (Figure 2); the proportion of patents with continuations by technology sector (Table 2); and total prosecution time by year (Table 1). Descriptions of data can be useful and revealing, but they are not amenable for determining causality or drawing interesting or policy-relevant inferences.

---

their publication date, of providing web access to pending applications. Lemley & Moore note that courts have long held that "there is nothing improper, illegal or inequitable" in continuations not addressed by these laws, which appear to cover essentially the entire remainder. Lemley & Moore, 84 B.U.L.R. at 77.

[56] 71 Fed. Reg. 50 ("The proposed rules are not an attempt to codify *Bogese II* or to simply combat such extreme cases of prosecution laches.")

[57] Lemley & Moore at 106-107 ("Even if policymakers conclude that there are good reasons to permit patentees to file continuation applications … those reasons don't justify an unlimited number of continuation applications. A compromise proposal might, therefore, limit each applicant to no more than one continuation application… Allowing even one continuing application will give the applicant five or six bites at the apple. Surely that is enough.").

[58] Lemley & Moore at 105 ("Abolishing patent continuations would require legislative action") and 107 ("Limiting the number of continuation applications may require an act of Congress").

P000275

Second, virtually the entire data set predates both the *Lemelson* and *Bogese* cases that were decided in 2002 and the reforms made by Congress in 1995 and 1999.[59]  Their data could be compared with a new data set consisting of patents applied for since these reforms were instituted, and such a comparison might yield useful estimates of the effects of these judicial and legislative reforms. But it is analytically inappropriate to use data that are known to characterize an outdated system to describe the current system, much less use them to diagnose current problems or propose remedies.

### 3.  Applying Federal Information Quality Guidelines to Lemley & Moore

The federal Information Quality Act,[60] as interpreted by OMB in its government-wide Information Quality Guidelines, requires that influential information disseminated by federal agencies be objective both in substance and in presentation.[61]  USPTO's dissemination of Lemley & Moore does not meet the <u>presentational</u> objectivity standard even if the data and analyses therein are guaranteed to be <u>substantively</u> objective.

First, Lemley & Moore deals with the ambiguously defined problem of patent "abuse" but USPTO's stated objective is to reduce examination backlog. Abuse, however defined, contributes to backlog but it is not the only cause. For example, backlog would be expected if USPTO staffing did not keep up with growth in innovation. Thus, a vibrant economy may be one explanation for USPTO's backlog. The number of patent applications nearly doubled in the 9 years from FY 1996-2005, but USPTO examiner staffing has not kept pace.

Lemley & Moore can't be considered authoritative about backlog because they discuss it only in passing. Moreover, none of their analyses suggest that continued applications are the culprit.  It is a clear violation of the <u>presentational</u> objectivity standard to utilize and treat as "influential" scientific, technical, economic or statistical information that was created for and relates to unrelated phenomena, even if that information is assured to be <u>substantively</u> objective.

Second, USPTO expressly disclaims any intent to solve the problem of "abuse" through this rulemaking.[62] That means Lemley & Moore is simply an inappropriate scholarly reference

---

[59] Lemley & Moore's data window, which closes with 2000, includes only the simpler applications filed after the June 1995 statutory amendment, but few complex applications filed after this amendment.  Similarly, essentially all applications subject to the 1999 statutory amendment are excluded.

[60] Sec. 515, Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554), codified at 44 U.S.C. § 3516 note).

[61] Office of Management and Budget, "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Notice; Republication," 67 Fed. Reg. 8452.

[62] See 71 Fed. Reg. 50 ("The proposed rules are not an attempt to codify *Bogese II* or to simply combat such extreme cases of prosecutions laches.")

unless it is accompanied by transparent acknowledgement that the article concerns unrelated issues.

Of course, that would beg the question why USPTO cites it. Clearly, the Office intends that the public infer that its proposed limitation on continuation practice is supported by the data and analysis in Lemley & Moore.[63] In that regard, USPTO is adopting the inferences of Lemley & Moore as an objective characterization of its own, and under applicable information quality guidelines, it is thus responsible for their objectivity.

---

[63] Whether Professor Lemley and/or Judge Moore personally support or oppose USPTO's draft rule is immaterial. Only the portion of their joint research contained in this 2004 law review article is relevant.

# Attachment D, Appendix 1

## USPTO's 1998 Proposal to Limit Applicants to 40 Claims, and its 1999 Abandonment of that Proposal

USPTO has previously proposed limits on claims. In a 1998 Advanced Notice of Proposed Rulemaking, the agency identified claims limits as one way to help implement its "business goals" "to increase the level of service to the public." Vice President Gore's National Performance Review prompted this initiative. The agency asserted that it had statutory authority to make these changes in patent practice.

In 1999, USPTO abandoned this initiative in response to widespread criticism. The agency lists seven broad objections raised by public comments (including a direct challenge to its claim of statutory authority). The Comments offered seven alternative approaches for USPTO to consider instead.

The record for the Limits on Claims Rule currently under consideration by OMB contains no analysis of any of these alternatives, and fails to address or avoid the specific objections that were raised.

**Federal Register** / Vol. 63, No. 192 / Monday, October 5, 1998 / Proposed Rules

53498-53530

**DEPARTMENT OF COMMERCE**

**Patent and Trademark Office**

**37 CFR Part 1**

**[Docket No.: 980826226–8226–01]**

**RIN 0651–AA98**

**Changes To Implement the Patent Business Goals**

**AGENCY:** Patent and Trademark Office, Commerce.

**ACTION:** Advance notice of proposed rulemaking.

**SUMMARY:** The Patent and Trademark Office (PTO) has established business goals for the organizations reporting to the Assistant Commissioner for Patents (Patent Business

Goals). The Patent Business Goals have been established in response to the Vice-President's designation of the PTO as an agency that has a high impact on the public, and they are designed to make the PTO a more business-like agency. The focus of the Patent Business Goals is to increase the level of service to the public by raising the efficiency and effectiveness of the PTO's business processes. The PTO is considering a number of changes to the rules of practice and procedure to support the Patent Business Goals. The PTO is publishing this Advance Notice of Proposed Rulemaking to allow for public input at an early stage in the rule making process. The PTO is soliciting comments on these specific changes to the rules of practice or procedures.

…

Topic #4. Limiting the number of claims in an application (37 CFR 1.75)

*Summary:* The PTO is considering a change to 37 CFR 1.75 to limit the number of total and

P000278

independent claims that will be examined (at one time) in an application. The PTO is considering a change to the rules of practice to: (1) limit the number of total claims that will be examined (at one time) in an application to forty; and (2) limit the number of independent claims that will be examined (at one time) in an application to six. In the event that an applicant presented more than forty total claims or six independent claims for examination at one time, the PTO would withdraw the excess claims from consideration, and require the applicant to cancel the excess claims. This change would apply to all non-reissue utility applications filed on or after the effective date of the rule change, to all reissue utility applications in which the application for the original patent was subject to this change, and to national applications filed under 35 U.S.C. 111(a), as well as national applications that resulted from a PCT international application.

*Discussion:* Applications containing an excessive number of claims present a specific and significant obstacle to the PTO's meeting its business goals of reducing PTO processing time to twelve months or less for all inventions. While the applications that contain an excessive number of claims are relatively few in percentage (less than 5%), these applications impose a severe burden on PTO clerical and examining resources, as they are extremely difficult to properly process and examine. The extra time and effort spent on these applications has a negative ripple effect, resulting in delays in the processing and examination of all applications, which, in turn, results in an increase in pendency for all applications. In view of the patent term provisions of 35 U.S.C. 154, as amended by the Uruguay Round Agreements Act (URAA), Pub. L. 103–465, 108 Stat. 4809 (1994), PTO processing time and pendency are concerns to the PTO and all applicants. Thus, the PTO considers it inappropriate to continue to permit the proclivity of a relatively low number of applicants (less than 5%) for excessive claim presentation to result in delays in examination and unnecessary pendency for the vast majority of applicants.

Approximately 215,000 utility applications were filed in the PTO in Fiscal Year 1997. PTO computer records indicate that the approximate number and percentage of applications filed in Fiscal Year 1997 containing the following ranges of independent and total claims breaks down as follows:

| Applications filed in FY 1997 containing | Number | Percentage FY 1997 filings |
|---|---|---|
| Over 50 independent claims | 11 | 00. |
| Between 41 and 50 independent claims | 23 | 00. |
| Between 31 and 40 independent claims | 77 | 00. |
| Between 21 and 30 independent claims | 275 | 00. |
| Between 16 and 20 independent claims | 536 | 00. |
| Between 11 and 15 independent claims | 1,887 | 00. |
| Between 7 and 10 independent claims | 7,024 | 03. |
| Between 4 and 6 independent claims | 27,147 | 12. |
| Over 6 independent claims | 9,833 | 4. |
| Over 500 total claims | 5 | 00. |
| Between 201 and 500 total claims | 88 | 00. |
| Between 101 and 200 total claims | 652 | 00. |
| Between 61 and 100 total claims | 2,514 | 01. |
| Between 51 and 60 total claims | 2,143 | 00. |
| Between 41 and 50 total claims | 4,056 | 01. |
| Between 31 and 40 total claims | 8,631 | 04. |
| Between 21 and 30 total claims | 23,323 | 10. |
| Over 40 total claims | 9,458 | 4. |

ATTACHMENT D: USPTO'S WRITTEN RATIONALE FOR REGULATION IS INSUFFICIENT

PAGE D-15

These numbers indicate that over 95% of all applications filed in Fiscal Year 1997 contained fewer than forty total claims and over 95% of all applications filed in Fiscal Year 1997 contained fewer than six independent claims. Thus, the rule change under consideration should not prevent the overwhelming majority of applicants from presenting the desired number of total and independent claims for examination. In addition, the rule change under consideration will benefit the overwhelming majority of applicants, since it will stop a relatively small number of applicants from occupying an inordinate amount of PTO resources.

While the problem with applications containing an excessive number of claims is now reaching a critical stage, this problem has long confronted the PTO…

For these reasons, it is now time for the PTO to act to limit the use of excessive numbers of claims in an application. The PTO is specifically proposing to deal with this problem now on a systemic basis by limiting, via rulemaking, the number of claims that will be examined in an application. This proposal supports the PTO business goals of reducing PTO processing time to twelve months or less for all inventions, and aligning fees to be commensurate with resource utilization and customer efficiency.

A rule limiting the number of claims in an application is within the PTO's rulemaking authority under 35 U.S.C. 6(a) if it ''is within the [PTO's] statutory authority and is reasonably related to the purposes of the enabling legislation * * * and does no violence to due process.'' See Patlex Corp. v. Mossinghoff, 758 F.2d 594, 606, 225 USPQ 543, 252 (Fed. Cir. 1985) (citations omitted).

**Federal Register** / Vol. 64, No. 191 /

Monday, October 4, 1999 / Proposed Rules

53772-53845

DEPARTMENT OF COMMERCE

Patent and Trademark Office

37 CFR Parts 1, 3, 5, and 10

[Docket No.: 980826226–9185–02]

RIN 0651−AA98

Changes To Implement the Patent Business Goals

AGENCY: Patent and Trademark Office, Commerce.

ACTION: Notice of proposed rulemaking

*Limiting the Number of Claims in an Application (Topic 4)*

The Office indicated in the Advance Notice that it was considering a change to § 1.75 to limit the number of total and independent claims that will be examined (at one time) in an application. The Office was specifically considering a change to the rules of practice to: (1) Limit the number of total claims that will be examined (at one time) in an application to forty; and (2) limit the number of independent claims that will be examined (at one time) in an application to six. In the event that an applicant presented more than forty total claims or six independent claims for examination at one time, the Office would withdraw the excess claims from consideration, and require the applicant to cancel the excess claims.

While the comments included sporadic support for this proposed change, the vast majority of comments included strong opposition to placing limits on the number of claims in an application. The reasons given for opposition to the proposed change included arguments that: (1) Decisions by the Court of

P000280

Appeals for the Federal Circuit (Federal Circuit) leave such uncertainty as to how claims will be interpreted that additional claims are necessary to adequately protect the invention; (2) the applicant (and not the Office) should be permitted to decide how many claims are necessary to adequately protect the invention; (3) there are situations in which an applicant justifiably needs more than six independent and forty total claims to adequately protect an invention; (4) the proposed change exceeds the Commissioner's rule making authority; (5) the change will simply result in more continuing applications and is just a fee raising scheme; (6) the Office currently abuses restriction practice and this change will further that abuse; and (7) since only five percent of all applicants exceed the proposed claim ceiling, there is no problem. Several comments which opposed the proposed change offered the following alternatives: (1) Charge higher fees (or a surcharge) for applications containing an excessive number of claims; (2) charge fees for an application based upon what it costs (*e.g.,* number of claims, pages of specification, technology, IDS citations) to examine the application; and (3) credit examiners based upon the number of claims in the application. Several comments which indicated that the proposed change would be acceptable, placed the following conditions on that indication: (1) That a multiple dependent claim be treated as a single claim for counting against the cap; (2) that a multiple dependent claim be permitted to depend upon a multiple dependent claim; (3) that a Markush claim be treated as a single claim for counting applications are taken up by the same examiner in the same time frame; (5) that allowed dependent claims rewritten in independent form do not count against the independent claim limit; (6) that the Office permit rejoinder of dependent claims upon allowance; and (7) that higher claim limits are used.

*Response:* This notice does not propose changing § 1.75 to place a limit on the number of claims that will be examined in a single application.

# Attachment E

# The Rules Exceed the Authority Delegated to USPTO under the Administrative Procedure Act and Patent Act

As noted in many of the comments submitted in response to the two NPRMs, USPTO likely does not have the legal authority to promulgate either the Continuations Rule or the Limit on Claims Rule. While we understand that it is not OMB's role to supplant the judgment of agency officials with regard to their statutory authority, some statutory matters are more clear cut than others. We believe that it is important to avoid a predictable (and likely unfavorable to USPTO) legal challenge. If these rules are promulgated, an enormous cloud of legal uncertainty will surround USPTO and all patent applications while these rules wind their way through the courts. Significant legal uncertainty is itself a social cost of regulation, especially regulation in cases where the agency's likelihood of prevailing is small.

## I.    Administrative Procedure Act

USPTO's failure to provide a rational connection between a problem and its proposed regulatory action violates not only EO 12,866, but also other provisions of law. In particular, these rules are highly vulnerable to challenge under the Administrative Procedure Act.[64]

### 1.    Failure to Disclose Critical Information

USPTO will not be permitted to rely on any evidence in support of its position that it did not put into the administrative record. In this instance, USPTO is doubly vulnerable because the 114 pages of information it has presented have little or no connection to the inadequacies it purports to address.[65]  When agencies use models to project regulatory effects, they must disclose those models and all assumptions.[66]  USPTO has computer models and assumptions,

---

[64] Senior USPTO officials have conceded as much.  See footnote 46.

[65] *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F3d 1136, 1145-46 (D.C. Cir. 2005) (rule invalidated where it merely responds to symptoms indicated in another document, "with little apparent connection" to the underlying causes of the problem or alternative recommendations).

[66] *U.S. Air Tour Ass'n v. Fed. Aviation Admin.*, 298 F3d 997, 1008 (D.C. Cir. 2002) ("When an agency uses a computer model, it must 'explain the assumptions and methodology used in preparing the model and, if the methodology is challenged, must provide a complete analytic defense.' "); *Engine Mfrs Assn v EPA*, 20 F3d 1177 (D.C. Cir. 1994) (APA requires making rulemaking data intelligibly available to allow meaningful comment so public sees 'accurate picture of reasoning'); *Solite Corp v EPA*, 952 F2d

P000282

and apparently based these rules on them.  USPTO offered to make them available to a trade association (see § I.3, below).  But USPTO did not include them in the rulemaking file, and declined to make them available when requested.[67]  Similarly, agencies are required to publish technical studies and data on which they rely; if USPTO did any such study it did not make it available for comment.

### 2.  USPTO May Not Rely on Off-Point Studies

An agency's rulemaking may not be sustained when it relies on academic studies that are not directed to the precise issue at hand.[68]  As we discuss in Attachment D, section III.2, the NPRMs rely heavily on the Lemley & Moore paper for its proposed single continuation provision, but the Lemley & Moore paper is silent on USPTO's backlog problem and suggests this as a remedy for different issues.

### 3.  *Ex Parte* Communications

USPTO may have engaged in improper *ex parte* communications with a trade association.  News reports indicate that USPTO offered to share information outside the proper channels of the administrative record.[69]  We do not know if those communications occurred, or the content of any communications that did occur.  However, the offer to selectively disclose the agency's key information raises questions that should be resolved before the rules are promulgated.

USPTO historically has kept open good lines of communication with its user base, and we strongly support agency efforts to inform itself of the practical day-to-day effects of its

---

473, 484 (D.C. Cir. 1991) ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary").  Indeed, where an agency fails to make its data available, not only is the rule invalid, but the agency is foreclosed from introducing new evidence during judicial review.  With no evidence to support "substantial justification" for its position, the agency may be exposed to attorney fees under the Equal Access to Justice Act.  *See Hanover Potato Products v Shalala*, 989 F2d 123, 128, 131 (3rd Cir. 1993) (failure of agency to make its rulemaking data available is sufficient lack of justification to warrant an award of attorney fees)

[67] See footnote 22 and accompanying text in Attachment C.

[68] *Public Citizen v Federal Motor Carrier Safety Admin*, 374 F3d 1209 (D.C. Cir. 2004) (rule invalid for relying on external studies not on the precise issue, failure to make cost-benefit analysis)

[69] Eric Yeager, "USPTO Commissioner Doll Says That Limiting Continuations Will Improve Patent Landscape," 72 *Patent, Trademark & Copyright Journal* 704ff (USPTO "invited the AIPLA board to take a look at the agency's models and the assumptions they are based upon. Those models will reveal that USPTO's proposed change to continuation practice will turn the backlog situation around").

ATTACHMENT E: THE RULES EXCEED THE AUTHORITY DELEGATED TO USPTO            PAGE E-2
UNDER THE ADMINISTRATIVE PROCEDURE ACT AND PATENT ACT

P000283

policies and practices. However, once USPTO decides to propose new regulations, it is obligated to abide by established administrative law procedures.

## II.    USPTO's Proposed Retroactive Application of the Rules Exceeds Legal Bounds

Senior officials have publicly stated that USPTO intends to give the rules retroactive effect.[70] In particular, the new rules would apply to all applications that are pending under the old rules but not yet examined as of the effective date of the new rules. This violates the law in three separate ways.

First, new provisions cannot be "submarined" past the requirements for Notice and Comment.[71]

Second, retroactivity violates limits on USPTO's authority. The Supreme Court explained the limits on agencies' authority to promulgate retroactive rules in *Bowen v Georgetown University Hospital*, 488 U.S. 204, 209, 220 (1988), as follows:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. ... By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. ... "The power to require readjustments for the past is drastic. It ... ought not to be extended so as to permit unreasonably harsh action without very plain words". Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.
>
> A rule that has unreasonable secondary retroactivity – for example, altering future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule – may for that reason be "arbitrary" or "capricious," see 5 U.S.C. § 706, and thus invalid.

*Bowen* makes clear that retroactivity is measured with respect to the activities of the regulated party and its "past investment incurred in reliance upon the prior rule," not with respect to agency action. USPTO's examination schedule is irrelevant.

---

[70] John Whealan, Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm (Feb. 17, 2006), at time mark 1:01:50, describing how USPTO will apply the rules retroactively to applications filed before the rules' effective date.

[71] *Air Transport Ass'n v. Federal Aviation Admin.*, 169 F.3d 1, 7-8 (D.C. Cir. 1999) (rule invalid where it departs unpredictably from the Notice's proposed rule).

ATTACHMENT E: THE RULES EXCEED THE AUTHORITY DELEGATED TO USPTO                                    PAGE E-3
UNDER THE ADMINISTRATIVE PROCEDURE ACT AND PATENT ACT

P000284

Third, there is no delegation of retroactive rulemaking authority in the statute. Even if the Office successfully defended a "substantial justification" within its jurisdiction (an unlikely possibility) – it has no authority to rely on that justification without authority from Congress.

## III.  USPTO Concedes that the Rules are "Substantive" and Therefore Beyond its Authority

USPTO has procedural but not substantive rulemaking authority.[72] But the cornerstone proposals of both rules are substantive, and therefore likely to be ruled beyond USPTO's authority when challenged. The NPRMs readily concede that the new rules are intended to "affect substantive rights or interests," and "encode the agency's substantive value judgment," two of the major tests[73] used to determine whether a rule is procedural or substantive. After the NPRMs were published, in the early Town Hall presentations in February 2006, USPTO officials quite openly expressed the view that both the Continuations Rule and Limits on Claims Rule were being proposed for a substantive purpose reflecting USPTO's policy judgment, and that USPTO intended to substantively alter the delicate balance of rights that Congress created.[74]

## IV.  The Rules Shift Burdens of Proof, and are Therefore Substantive

The Supreme Court has noted that shifts in burdens of proof are "substantive."[75] Under federal patent law, USPTO always has the burden of proof whenever it rejects a patent

---

[72] USPTO does "NOT … have authority to issue substantive rules," 35 U.S.C. § 2(b)(2)(A)72; *Merck & Co. v. Kessler*, 80 F.3d 1543, 1550, 38 USPQ2d 1347, 1351 (Fed. Cir. 1996) (emphasis in *Merck*). The full text of § 2 is set forth in Attachment O – note that USPTO has no responsibility to regulate, adjudicate, or gain competence in any aspect of the post-issuance economic lifetime of a patent, except for the very narrow scope of issues reviewable by reissue and reexamination.

[73] *E.g.*, *JEM Broadcasting Co. v. Federal Communications Comm'n*, 22 F.3d 320, 328 (D.C. Cir. 1994) (a rule is ineligible for procedural classification "where the agency 'encodes a substantive value judgment'" in the rule).

[74] John Whealan, Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm (Feb. 17, 2006), at time mark 58:26, discussed reasons that USPTO would *not* permit continuations. He stated that he would introduce an "intent" element, and substantially rebalance substantive rights, in derogation of the law as stated by the courts, for example, in *Kingsdown Medical Consultants Ltd v. Hollister Inc.*, 863 F.2d 867, 874, 9 USPQ2d 1384, 1390 (Fed. Cir. 1988). Mr. Whealan conceded that USPTO may well be acting illegally. *Id.* at time mark 52:10.

[75] Director, Office of Workers' Compensation Programs, Dept of Labor v. Greenwich Collieries, 512 U.S. 267, 271 (1994) ("[T]he assignment of the burden of proof is a rule of substantive law.").

ATTACHMENT E: THE RULES EXCEED THE AUTHORITY DELEGATED TO USPTO    PAGE E-4
UNDER THE ADMINISTRATIVE PROCEDURE ACT AND PATENT ACT

P000285

application, for any reason.[76] Both rules would shift burdens of proof, and are therefore "substantive" and outside the Office's authority.

The Continuations Rule proposes to shift the burden of proof on the issue of the right to file a continuation from USPTO[77] to applicants.[78] Most egregiously, USPTO's "Town Hall" slides specifically state that USPTO would deny permission to file a continuation application when the underlying problem is USPTO's own lack of diligence or violation of its own guidance documents.[79]

Similarly, the Limits on Claims Rule proposes to shift the burden of proof for patentability over prior art from USPTO to the applicant in certain circumstances. It would require the applicant to perform a search and examine all claims against all documents submitted to the Office (for potentially dozens of documents that are of only secondary relevance). It would permit the Office to disallow claims until an applicant does so and it would allow the Office to automatically reject claims that it has not examined. Finally, both rules would shift the burden of proof on the issue of "double patenting."

Each of these shifts of burden of proof are substantive, and therefore not a valid exercise of USPTO's authority to issue regulations governing application and examination procedure.

---

[76] *In re Oetiker*, 977 F.2d 1443, 1445-46, 24 USPQ2d 13443, 1444 (Fed. Cir. 1992) ("the examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a prima facie case of unpatentability. … If examination at the initial stage does not produce a *prima facie* case of unpatentability, then without more the applicant is entitled to grant of the patent" [emphasis added]); *In re Haas*, 580 F.2d 461, 198 USPQ 334 (CCPA 1978) (refusal to examine is legally the same as a rejection).

[77] 35 U.S.C. § 120 (a continuation "shall have the same effect" as an original application); 35 U.S.C. § 131 (Director of USPTO "shall cause an examination to be made of the application," not such applications as the Director picks and chooses, or some designated part of the application); *In re Bogese*, 303 F.3d 1362, 1368-69, 64 USPQ2d 1448, 1453 (Fed. Cir. 2002) (USPTO may refuse further examination of an application only after satisfying fairly strict prerequisites, including notice).

[78] The applicant must "show[] to the satisfaction of the Director that the amendment, argument, or evidence could not have been submitted during the prosecution of the prior-filed application" or "prior to the close of prosecution in the application."71 Fed. Reg. 59, col. 3, and 61, col. 2.

[79] See Attachment N, slides 82 and 83 of the Chicago Town Hall slides (Continuation will not be permitted in cases where examiner's work violated USPTO's guidance documents, or was otherwise inadequate or incomplete, even when so inadequate as to constitute "premature final rejection").

P000286

## Attachment F

## Existing Regulations or Administrative Practices Created or Contributed to the Problems USPTO Seeks to Remedy

USPTO has disclosed no analysis of the extent to which its existing regulations or administrative practices have created or contributed to the problems it seeks to remedy, as required by Sec. 1(b)(2).[80] USPTO has disclosed no analysis of alternatives to direct regulation, including most notably "providing economic incentives to encourage the desired behavior" (Sec. 1(b)(3)).

In this case, it is not regulated parties who would benefit from economic incentives; patent examination is a user fee-funded government service. Instead, it is USPTO patent examiners who need economic incentives that more closely align their rewards to the social value of the applications they are reviewing. If USPTO's internal inefficiencies were addressed, the backlog problem for which these rules are said to be the solution would be greatly reduced.

Both proposed rules appear to assume that every application can and should be shaped at filing to fit a "standard box" corresponding to a standard quantum of examination work. In Section I, we describe that "standard box," the internal incentive system under which examiners' performance is measured. We show that examination resources are not allocated based on either the level of effort required to perform a competent and thorough examination or the social value of the application. These incentives are perverse and color every aspect of the examination process, and indirectly affect how users of the system behave. In Section II, we explain the user-fee basis of USPTO's funding and note that USPTO set the fees to recover the full cost of service. What the two draft rules propose to do is stop providing certain services for which USPTO is paid. In Section III, we show that continued examinations require less examining resources than initial applications and, in some instances, may be a revenue center for USPTO. In Section IV, we show that USPTO has serious problems recruiting and retaining competent examiners. In Sections V and VI, we explain how USPTO exacerbates these problems by rewarding examiners for unproductive activity and penalizing them for reviewing technically complex applications. We believe that a regulatory impact analysis would assist the USPTO in developing internal metrics to more accurately allocate its supply of examination resources to the variety of products that its customers want to buy, rather than compel its customers to buy only the one-size-fits-all product that USPTO would find it easier to sell.

---

[80] See Attachment C, text accompanying footnote 24, in which Commissioner Doll admits USPTO did no studies to identify the source of "rework" applications in its backlog, and had not attempted to differentiate between rework applications that arise by applicant error or examiner error.

ATTACHMENT F: EXISTING REGULATIONS OR ADMINISTRATIVE PRACTICES     PAGE F-1
CREATED OR CONTRIBUTED TO THE PROBLEMS USPTO SEEKS TO REMEDY

P000287

## I.     How Examiner Performance is Measured

Patent examiner performance and productivity is based on a metric known as a "count." The count system is described in MPEP § 1705 (see Attachment Q). Examiners always get two "counts" per application (and in a few cases, a third). The first "count" is given for the examiner's First Action on the Merits (FAOM), and the second is given for "disposal." The examiner receives a "disposal" count if (1) he grants an Allowance (*i.e.*, awards a patent), (2) the applicant abandons the application, (3) the examiner issues a rejection to which the applicant files a Request for Continued Examination (RCE), or (4) certain other actions. Thus, the examiner gains a reward if his action leads to an RCE. That creates a strong incentive to issue at least one final rejection.

The examiner's reward of a count is independent of the validity of his action. Applications that should not be rejected may be rejected solely to motivate the applicant to submit an RCE. The examiner is neither rewarded for issuing "good" patents nor penalized for issuing "bad" ones. There is no difference in the examiner's reward if he rejects a "bad" claim or rejects a "good" one. It's all the same.[81]

All applications in the same technology area receive a similar "examination budget" – the amount of time the examiner has to review it[82] – irrespective of several factors that obviously are very important, both to the examiner and to the applicant:

- Whether the application has many claims, or few[83]

- Whether the application is 10 pages long or 210 pages long

- Whether the applicant cited no prior art references to USPTO or cited 200 references[84]

---

[81]  The Court of Appeals for the Federal Circuit has complained about USPTO's predilection for not revealing the basis for its adverse decisions. *See, e.g.*, *In re Oetiker*, 977 F.2d 1443, 1449, 24 USPQ2d 1443, 1447 (Fed. Cir. 1992), Plager, J., concurring ("The examiner cannot sit mum, leaving the applicant to shoot arrows into the dark hoping to somehow hit a secret objection harbored by the examiner").

[82]  USPTO scales examination budgets by technologies – for example, complex biotech patent applications receive more time than simple mechanical devices.  However, we understand that for several years USPTO has not adjusted its scaling factors to keep pace with increasing complexity in some technological areas.

[83]  An application with many claims may be burdensome to the examiner but it does not impose a genuine burden to USPTO because the applicant will have paid task-specific extra fees to cover the cost of additional examination. The Office appears not to have aligned its internal incentives to the prices it charges applicants.

[84]  In the proposed IDS Rule, (RIN 0651-AB95, "Changes to Information Disclosure Statement Requirements and Other Related Matters," 71 Fed. Reg. 38808 (July 10, 2006)), USPTO would <u>reduce</u> the fee it charges for considering large numbers of prior art references, so long as they are presented early

---

P000288

- Whether the application is a new application or a fifth continuation

  - that can be allowed after ministerial review

  - or that otherwise can be predicted to require less time to examine than a new application

- Whether the application is in actual litigation, imminent litigation or no likely litigation

- Whether the application is allowed or finally rejected.

- The value of the intellectual property the applicant seeks to protect

- The value of timely review to the applicant

Applicants give USPTO either definitive information or strong signals on all but one of these factors that should affect examination. But under current USPTO compensation metrics, this information does not affect an examiner's time budget.[85]

Finally, the examiner's reward is the same whether he performs a competent and thorough review, or a sloppy, careless and uninformed one – one count for a first action on the merits, one count for disposal. Indeed, in response to a question of whether USPTO permitted and incentivized "hide the ball" examination techniques in violation of the agency's guidance document, USPTO stated in a formal written decision that it would not review whether or not counts were actually earned by *bona fide* examination.[86]

## II. The December 2004 Increase in USPTO User Fees Was Advertised as the Solution to the Backlog Problem

Effective December 2004, USPTO obtained the authority to impose higher user fees. For example, the fee for each claim in excess of 20 was raised from $18 to $50 and for each

---

in examination. One option for regulatory analysis is the idea of calibrating its examination fees and examiner time budget to account for cases where there is a great deal of potentially material prior art, as required by 35 U.S.C. § 41(d)(2).

[85] Many public comments have reminded USPTO that it has both the authority and the requisite information it needs to rationally allocate examination time. See "Changes To Implement the Patent Business Goals, Notice of Proposed Rulemaking" 64 Fed. Reg. 53772-53845 (October 4, 1999), Alternatives (2) and (3) ("(2) charge fees for an application based upon what it costs (e.g., number of claims, pages of specification, technology, IDS citations) to examine the application; and (3) credit examiners based upon the number of claims in the application"); Comments of Heritage Woods, http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/ heritagewoods_con.pdf, pages 23-32 (discussing various alternatives to the Rules).

[86] 09/385,394, Decision on Petition for Feb. 10, 2006, "[I]nternal Office procedures (i.e., crediting of work completed) are neither petitionable or appealable and will not be addressed further…" The agency's practice with respect to counts and "final rejection" are discussed further in Attachment J.

P000289

independent claim in excess of 3 was raised from $86 to $200.[87]  The patent bar and users of the patent system, including many signatories to this letter, supported these increases precisely because USPTO assured us that backlog would decline if only they had the funds to dramatically increase staffing and establish incentives that improved examiner retention. Users of the patent system agreed that Congress had "starved" USPTO during the period 1992-2003 by diverting hundreds of millions of dollars of user fee revenue: [88, 89]

> AIPLA supported the fee increase, which was said to be necessary "to substantially cut the size of [the PTO's] inventory," because we believed that it would allow the PTO to both improve quality of the patents it granted and reduce the pendency of its backlog of patent applications. Congress did increase patent fees beginning in fiscal year 2005, and the PTO is now in the second year of that increase. It hired approximately 1,000 new patent examiners in FY 2005 and plans to hire 1,000 more for each of the next four years. We understand that the Office has experienced some difficulties in training and retaining these new examiners. We also understand that the Office has developed a new approach to training examiners and is targeting new hires that will be more likely to make their career in the PTO.

> On the other hand, the Office has repeatedly stated, without providing any justification, that it "cannot hire its way out" of the backlog situation in which it finds itself. Absent some compelling evidence to back up this claim, AIPLA cannot accept this mere statement as justification for the proposed rule changes.

> While it is true that hiring additional examiners would not instantly reduce the backlog of pending applications, any search for a remedy to this problem must consider the PTO's current situation and how it got there. Congress essentially starved the PTO of the resources it needed to keep pace with the increase in patent application filings from roughly FY 1992 through FY 2003, diverting nearly $800 million in fees generated by this increase. Hundreds of examiners, who would be fully trained and experienced today, were not hired. Many of the examiners in the

---

[87] Compare 37 C.F.R. § 1.17 from 2004 and today (Attachment P).  For example, an application with 10 independent claims and 52 total claims would incur $3,000 (= {(10-3) × $200} + {(52-20) × $50}) in "excess claims," in addition to the $1,000 filing fee for a basic application.  Thus a moderately complex application costs four times the filing fee of a basic application.

[88] See AIPLA's comment letter on the Continuations Rule, April 24, 2006, http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/aipla.pdf at page 3 (page 4 of the pdf) ("Congress essentially starved USPTO of the resources it needed to keep pace with the increase in patent application filings from roughly FY 1992 through FY 2003, diverting nearly $800 million in fees generated by this increase. Hundreds of examiners, who would be fully trained and experienced today, were not hired.")

[89] AIPLA's letter, *loc. cit.*; *Figueroa v. United States*, 466 F.3d 1023, 1027-28 (Fed. Cir. 2006) (describing the history of "fee diversion," Congressional failure to authorize USPTO's authority to spend the fee income it earned).

---

ATTACHMENT F: EXISTING REGULATIONS OR ADMINISTRATIVE PRACTICES          PAGE F-4
CREATED OR CONTRIBUTED TO THE PROBLEMS USPTO SEEKS TO REMEDY

PTO at that time have aged and are retiring. Now the Office must find and train the needed examiners, and must provide an attractive workplace and appealing working conditions in order to retain them. This solution will take time; it will not happen overnight. But neither did the crisis in which the Office finds itself arise overnight.

The purpose of the additional user fee revenue was to increase hiring, and indeed, USPTO forecasts that with these new hires and low attrition, the pendency time will be under 35 months in 2011, while without hiring pendency would have exceeded 40 months.[90]  Now USPTO officials say that the Office "cannot hire its way out" of the backlog.[91]

## III.    Continued Examinations Require Less Examining Resources than Initial Applications

In the preamble to the proposed Continuations Rule, USPTO assumes that the resources needed to examine initial and continuation applications are identical. Therefore, every continuing application not submitted means an initial application will be examined instead.[92] There are three scenarios under which this assumption could hold: the first is rare, and the other two are highly implausible. The rare scenario requires that the examiner who reviewed a parent application not review the corresponding continuation application. The first implausible scenario concedes that the same examiner reviews both applications, but assumes that at the time he reviews the continued examination he has no recollection of the earlier application.[93] In the second implausible scenario, all effort expended in earlier examination becomes irrelevant and unusable in continued examination.  USPTO has presented no evidence supporting any of these propositions.  In fact, common sense suggests that they are true only in unusual circumstances and therefore should not be used as the basis for extrapolating changes in USPTO output. Continuations are almost always reviewed by the same examiner – the only routine exception is when the earlier examiner leaves USPTO employment. The typical time lag between rounds of examination is five to ten months, so a complete lack of recollection is unlikely.

---

[90] See Chicago Town Hall Slides at 51.

[91] Eric Yeager, "USPTO Commissioner Doll Says That Limiting Continuations Will Improve Patent Landscape," 72 Patent, Trademark & Copyright Journal 704ff ("'We can't hire our way out of the patent application backlog, and that is certain,' Doll said."). Even if it is assumed that USPTO's forecasts are valid and reliable, the effect of these two rules would be to reduce pendency by just three months. See Attachment N, slide 53 of the Chicago Town Hall Slides, reproduced at Attachment H, section II.

[92] 71 Fed. Reg. 50, col. 1.

[93] A parallel is easy to make to OMB's experience in regulatory review. Staff turnover sometimes means final proposed and draft final rules are reviewed by different Desk Officers, especially when a significant period of time has elapsed. Rarely, however, does a Desk Officer reviewing a draft final rule have no recollection of his own prior review of the draft proposed rule.

---

Instead, it is far more likely that the same examiner reviews both the original and continuation applications, and recalls a significant amount of detail.[94]  Examiners reuse the prior art search (the single largest time commitment in reviewing a new application for the first time) from earlier rounds of examination, and only do "follow up" searches of prior art that was recently published.  Therefore, the examining resources necessary to examine a continuation are almost certain to be less than those needed to examine a new application. That means for every continued application USPTO does not examine, it will examine a fraction of one new application with the same resources.[95]

Continuation applications, CIPs, and RCEs appear to be at least self-funding[96] and may be profit centers for USPTO.  We predict, for example, that continuation applications on average require significantly less examination resources and generate higher levels of maintenance fee revenue than original applications.  We also predict that a well-conducted Regulatory Impact Analysis would show that the perverse incentive structures described in Section I, and problems the Office has recruiting and retaining competent examiners, are greater contributors to backlog than the application attributes it proposes to regulate.[97]  If the inefficiencies created internally by USPTO were addressed, we predict that USPTO's backlog would be brought under control.   Of course, performing a Regulatory Impact Analysis that complies with Circular A-4 would allow USPTO to evaluate these various issues and enable it to structure reforms that attack the underlying problem rather than unrelated but observable symptoms.

## IV.    USPTO Has Serious Problems Recruiting and (Especially) Retaining Competent Examiners

To work as a patent examiner, one must have earned a college degree in a relevant technical field plus, in some technological fields, have a higher lever degree, such as a master's or Ph.D.  Job postings on the USPTO web site give a starting salary of $38,435, and promotion

---

[94] USPTO will have ample data that can be analyzed to determine how often the examiner of the continuation application is not the same as the examiner of the earlier application.  We encourage USPTO to include an analysis of this data in preparing a complete regulatory analysis of the impact of the Continuations Rule.

[95] The parallel to OMB review applies here as well. The resources it needs to review draft rules and ICRs would be significantly greater if every submission were new and there was no institutional memory.

[96]  If they are not, then USPTO has set its fees in violation of statute, and has both the obligation and authority to reset its fees.  35 U.S.C. § 41(d)(2) ("The Director shall establish fees … to recover the estimated average cost to the Office…"); *see also* footnote 29.

[97] See Section IV below and Chicago Town Hall slides (Attachment N) at 20 (shows hiring and attrition over the past few years).

P000292

potential limited to GS-14 equivalent.[98]  Postings indicate that higher salaries ($63,885 - $83,052) are available for examiners with Ph.D. degrees or the equivalent.[99]  These salaries may be competitive for newly minted degree-holders, but they probably are not sufficient to retain employees, especially in the expensive metropolitan Washington, DC area. GS-15 positions pay better ($120,982-$145,400), but they require years of experience and usually involve management responsibilities.

The retention problem is made worse by the fact that examiners obtain extremely valuable, specialized human capital while employed at USPTO, and they must leave government service to capitalize on it.[100]  Starting private sector salaries for persons with similar skills and human capital are much higher – for example, a median starting salary in the Virginia suburbs for an electrical engineer with a Master's Degree and one year experience in some technical fields is about $70,000 per year.  Many examiners leave USPTO to attend law school, or more frequently attend law school at night while still employed at the USPTO, to become patent lawyers.  Attorneys with 7-9 years' experience in law firms earn about $200,000 per year.[101]

In short, examiner retention is a significant problem and one that may well be endemic to the nature of USPTO's work. It may, in fact, be an impossible problem to solve without returning to the deferred compensation civil service model, which rewarded long term service.[102]  Labor markets are brutally efficient at allocating resources, and USPTO simply may not be able to overcome normal market forces with any of the tools at its disposal.

---

[98] See http://jobsearch.usajobs.opm.gov/getjob.asp?JobID=53094580&jbf574=CM56&brd=3876&AVSDM=2007%2D04%2D14+13%3A00%3A07&q=EXAMINER&vw=d&Logo=0&FedPub=Y&caller=%2Fa9pto%2Easp&FedEmp=N&SUBMIT1.x=0&SUBMIT1.y=0&ss=0&SUBMIT1=Search+for+Jobs&TabNum=1&rc=3.

[99] See http://jobsearch.usajobs.opm.gov/getjob.asp?JobID=53094737&AVSDM=2007%2D04%2D14+13%3A00%3A05&Logo=0&q=EXAMINER&FedEmp=N&jbf574=CM56&brd=3876&vw=d&ss=0&FedPub=Y&caller=/a9pto.asp&SUBMIT1.x=0&SUBMIT1.y=0&SUBMIT1=Search+for+Jobs.

[100] Attrition also has social benefits: *e.g.*, the corps of patent experts outside the government performs better because there is a cohort that has worked on the "other side" of the table. The challenge to USPTO is to avoid excess attrition, especially among its most competent examiners.

[101] American Intellectual Property Law Assn, Report of the Economic Survey 2005, page I-52.

[102] We are aware of no serious interest in such a change. We mention it only to point out that potential solutions may exist if the problem of retention *per se* is deemed crucial.

ATTACHMENT F: EXISTING REGULATIONS OR ADMINISTRATIVE PRACTICES                PAGE F-7
CREATED OR CONTRIBUTED TO THE PROBLEMS USPTO SEEKS TO REMEDY

P000293

## V.     USPTO Actively Incentivizes its Examiners to Turn Out Faulty Work Product that Delays Examination

The "flat rate" of two counts per application gives examiners a strong incentive to turn out haphazard, incomplete work product.

- An examiner gets one "disposal" count, whether that disposal is in the form of an allowance, an abandonment, or an applicant's filing of a continuation application. (MPEP § 1705, Attachment Q).

- At least as of spring 2006, examiners were not subject to any penalty relating to promotion, retention or compensation, for turning out bad work.[103]

This combination of incentive structures ensures that examiners have only weak incentives to examine applications in a way that advances them toward a meaningful conclusion.[104]

USPTO's continued use of "flat rate" time budgets, and acceptance of perverse incentives and misallocation of resources, is especially surprising after 2003.  In 1999, Congress ordered USPTO to analyze its cost and fee structures to better align USPTO's operations with the needs

---

[103]  Public remarks of Stephen Kunin, former Deputy Assistant Commissioner for Patent Examination Policy, USPTO "Town Hall" Meeting, New York, NY, April 7, 2006.

[104]  When an application claims two inventions that are "independent and distinct" of each other, the law permits USPTO to "divide" it, or "restrict" an application to one invention ("division" and "restriction" meaning the same thing).  Restriction allows USPTO to legitimately assign different inventions that may be included in a single application to multiple examiners with different subject matter expertise.  However, both the fee schedule and the "count" system incentivize USPTO to improperly divide a single invention into many daughter applications.  USPTO's guidance — the Manual on Patent Examination practice -- allows the Office even wider latitude -- to divide applications with inventions that are "independent or distinct."

Thus, several different examiners often review similar applications involving different aspects of the same invention at the same time.  Economies of scale in examination are lost, and applicants have to provide duplicative (or even inconsistent) arguments to satisfy multiple examiners arguably interpreting the same law and guidance.  We predict that a well-conducted regulatory impact analysis would show that USPTO's restriction practice is a major contributor to inefficiency and backlog.

In 2003, USPTO published for comment a White Paper setting forth 10 ideas for reforming restriction practice. The Office received 26 comments that contain a wealth of insight and helpful advice. These public comments used to be linked on its webpage containing links to public comments on dozens of proposed Office actions. See http://www.uspto.gov/web/offices/pac/dapp/opla/comments/index.html, row titled "Summary of Public Comments and the Restriction Reform Options to be Studied by the United States Patent and Trademark Office (November 2003)". USPTO has replaced the link to these public comments with a link to its own 9-page summary of the comments.

---

ATTACHMENT F: EXISTING REGULATIONS OR ADMINISTRATIVE PRACTICES      PAGE F-8
CREATED OR CONTRIBUTED TO THE PROBLEMS USPTO SEEKS TO REMEDY

P000294

of inventors.[105]  USPTO did so[106], and restructured both its fee calculation algorithms and relative fee levels in 2004

> to more closely align applicant payment and USPTO revenue with actual cost, reduce the incentives for applicants to pursue wasteful examination, and recover USPTO cost of operations more directly.  The net effect is to elicit a level of participation from applicants … that provides economies in examination while maintaining and improving timeliness and quality.  These benefits arise from a proposed structure that … better aligns fees with the value provided, that minimizes additional administrative complexity, and that retains the financial incentives for inventors of less financial means.

Since then, a number of public comments to a number of past USPTO Requests for Comment have noted the misallocation of resources that arises because of the "flat rate" count system. These comments noted that the problem under study by USPTO was the product of the count system and could be cured by applying the same logic to examination budgets as USPTO applied to fees. USPTO has apparently ignored those suggestions.[107]

Many of the public comments noted that applicants are happy to pay the costs of thorough examination, subject to two conditions: (a) the fees charged should be reasonably tailored to the Office's costs, and (b) the Office must ensure that examination proceeds in a predictable way under regular procedures.  The Office's response to these offers has not been encouraging.[108]

---

[105]  American Inventors Protection Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-555, § 4204 (directing USPTO to "conduct a study of alternative fee structures that could be adopted [by the Office] to encourage maximum participation by the inventor community in the United States.").

[106]  The results of that study are reported in part at http://www.uspto.gov/web/offices/com/strat21/ action/sr1fr1.htm.

[107]  See, for example, http://www.uspto.gov/web/offices/pac/dapp/opla/preognotice/ unitycommentssummary.pdf, which contains no mention of the issue, though the idea was raised in several of the comment letters.

[108]  For example, in late April 2002, the Office proposed a punitive exponential fee structure (literally exponential, $size^{1.25}$), rather than a linear cost-recovery fee structure.  See http://web.archive.org/web/20021005230103/http://www.uspto.gov/web/offices/com/strat2001/ faq.htm#q53. Some applications would have required filing fees in the millions of dollars.  The Office appears to be unwilling or unable to propose economically-rational "burden sharing" and instead appears overtly confrontational, and oppositional to those inventors who have complex inventions.

---

ATTACHMENT F: EXISTING REGULATIONS OR ADMINISTRATIVE PRACTICES          PAGE F-9
CREATED OR CONTRIBUTED TO THE PROBLEMS USPTO SEEKS TO REMEDY

P000295

## VI.   A Significant Fraction of "Continuation" Applications May Be Generated Because of Perverse Incentives Relating to "Final Rejection"

USPTO's guidance document, the MPEP, sets out the criteria for "metering" the quantum of examination given an application for each filing fee.  When that quantum of examination has been performed, and the application has not been allowed, the applicant has several options – almost always, a continuation application is by a factor of 3-10 the least expensive.  This continuation application occasions a new filing fee to get a new quantum of examination.  The "meter" is supposed to run out when an examiner has given two thorough rounds of examination to the application, so that the second rejection can be made "final."[109]

Applicants can respond in several ways to an Office Action that fails to meet the criteria for final rejection:

(1) An applicant can request that the examiner withdraw the finality of the office action.

This rarely works. The examiner's compensation is directly on the line; a petition is a direct request that the examiner commit more effort in return for no additional reward in "counts" (see section I of this Attachment F). Also, examiners are not held accountable for breach of the agency's guidance documents[110], and most examiners lack the legal training to decide such questions with precision.  Not surprisingly, many examiners are extremely reluctant to withdraw

---

[109] Guidance for the required thoroughness for these two rounds is stated in the MPEP, especially Chapter 2100 (specifying the tasks an examiner must do in each round of examination) and § 706.07(a), which defines the conditions under which a rejection may be made "final":

"Under present practice, second or any subsequent actions on the merits shall be final, except where the examiner introduces a new ground of rejection that is neither necessitated by applicant's amendment of the claims nor based on information submitted in an information disclosure statement …. Where information is submitted in an information disclosure statement …, the examiner may use the information submitted, …, and make the next Office action final whether or not the claims have been amended, provided that no other new ground of rejection which was not necessitated by amendment to the claims is introduced by the examiner. … Furthermore, a second or any subsequent action on the merits in any application or patent undergoing reexamination proceedings will not be made final if it includes a rejection, on newly cited art, other than information submitted in an information disclosure statement …, of any claim not amended by applicant or patent owner in spite of the fact that other claims may have been amended to require newly cited art. …"

However, as we discuss in Attachment J, that guidance is not enforced in the context of "premature final rejection" or any other.

[110] Public remarks of Stephen Kunin, former Deputy Assistant Commissioner for Patent Examination Policy, USPTO "Town Hall" Meeting, New York, NY, April 7, 2006.

---

P000296

final rejection and give further examination, no matter how incomplete or untimely the examination was.

> (2) If the examiner declines request (1), an applicant can <u>petition</u> to withdraw the finality of the office action.

Attorney fees for this petition are typically $3,000-15,000.  In our experience, this is never successful because USPTO as a matter of course does not grant them (see Attachment J). Also, higher-level decision-makers are being asked to act contrary to their own financial interests.  See MPEP § 1706.

> (3) The applicant can file a Request for Continued Examination (RCE) and continue prosecuting the application.

Considering that the filing fee for an RCE is $790 (halved for small entities) compared with the cost of preparing and filing a petition, not to mention its likelihood of success, it makes sense to file the RCE. Examiners like RCEs because they earn at least one, and usually two, more "counts," usually with less effort than would be required to review a new application.

A very substantial fraction of the continuation applications of which USPTO complains are likely to be the consequence of its compensation metrics, and the Office's delegation of the relevant questions to officials that have a direct financial interest in the outcome.  Given the economic incentives USPTO gives its employees, it seems at best incongruous that the Continuations Rule would restrict the option that is the most economically expeditious way of handling premature final rejection.

As applicants possess a dispersed data set that defies systematic analysis, our comments here are necessarily anecdotal.  A complete regulatory analysis in compliance with Circular A-4 would allow USPTO to utilize their vast database to perform a thorough analysis of this issue.

P000297

# Attachment G

# USPTO Did Not Rely on the Best Available Scientific, Technical, Economic and Other Information

Sec 1(b)(7) of Executive Order 12,866 requires agencies to base their regulations on the best available information. Fortunately, USPTO collects vast quantities of useful data on patent applications. It has at its disposal a database containing millions of records.

Unfortunately, there is little evidence from the preambles to the NPRMs that USPTO adequately utilized this database – to diagnose the problems it wanted to solve, to identify regulatory alternatives, or to choose among such alternatives. To the best of our knowledge based on USPTO's response to a FOIA request by one of the coalition members, the entire administrative record for both of these NPRMs consists of 114 pages:[111]

- o Data tables from slides delivered at the Los Angeles Intellectual Property Law Association's "Washington and the West" Conference, January 25, 2006, ("The State of the Patent System; Background for Rule Proposal")

- o An 85-slide presentation delivered by Commissioner for Patents John Doll dated February 1, 2006, and delivered first at the Chicago Town Hall meeting, and subsequently many times elsewhere ("Chicago Town Hall Slides")

## I.    The Data Tables[112]

The data tables provide summary statistics on a number of phenomena of potential interest. Many of these data tables are duplicative over data contained in the Chicago Town Hall Slides. To the extent that there is overlap, we defer discussion of this data to section II below. Data that is not duplicative over the Chicago Town Hall slides include the following:

1. a data table showing the first action pendency and average total pendency for various technology centers

2. data illustrating the increase in continuation (continuation, CPA/RCE, CIP) filing rates from FY1980 to FY2005

3. data illustrating the increase in continuation filing percentage (as percent of total filings) from FY1980 to FY2005

---

[111] See Attachment N.

[112] Id.

P000298

4.  data illustrating the drop in appeal pendency from FY2001 to FY2005

5.  a brief description of appeal programs through which applications are reviewed by senior examiners before review by the Board of Patent Interferences and Appeals (BPAI)

For (1) through (3) above, no analysis of the data is provided to examine obvious questions concerning the underlying causes for the data (*e.g.*, why are the pendency figures as shown in (1) above? why has there been an increase in continuation filings from FY1980 to FY2005?). Without an analysis of underlying causes there is no way of determining if the changes proposed in the Continuations Rule will reverse the trends shown in the data or otherwise improve performance.

For (4) above, the data illustrate what we acknowledge to be a success story – the ability of USPTO to drive down the appeal pendency over the past 5 years. However, what is lacking is an analysis of the potential impact on this positive trend if the Continuations Rule is implemented. We believe that if the rule is promulgated as proposed, appeals will drastically increase as applicants attempt to preserve their limited number of continuations and RCEs. We predict that the data from FY 2001 to FY2008 or FY2009 will look far different, resembling more of a V shape as the positive trend of the past few years is suddenly reversed.

For (5) above, USPTO describes several appeal programs that have been instituted to provide review of appeal cases by senior examiners to limit the need for the BPAI to hear cases in which the examiner is most certainly to be reversed. These programs have helped reduce the BPAI's backlog and should be commended. Again, what is lacking is an analysis of the potential impact on these programs if the Continuations Rule is implemented. As noted above, we believe the Continuations Rule will result in a drastic increase in the number of appeals. The description provided in (5) highlights the fact that this increase is likely to have a tremendous impact not only on the Administrative Law Judges that sit on the BPAI, but also on the most senior examiners in the examining corps. We believe that such a drain on examining resources will contribute to rather than alleviate the backlog that USPTO seeks to reduce.

## II.    The Chicago Town Hall Slides[113]

These slides appear to be a presentation (or set of presentations), but to the best of our knowledge they were distributed at the various Town Hall meetings but never actually presented

---

[113] See  http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslides.ppt (PowerPoint) and (http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslidestext.html (HTML), Attachment N. USPTO directs readers as follows:

For background and justification, see slides 8-30 and 48-60
For proposals on [Continuations Rule], see slides 31-38 and 72-85
For proposals on [Limits on Claims Rule], see slides 39-47 and 61-71

or discussed. Most of the slides that contain data are only descriptive rather than analytical (*i.e.*, they do not contain the results of inferential statistical analyses) or they describe selected results of forecasting. Several slides deserve particular attention.

      Slides 50-54 are forecasts of patent pendency under six alternative scenarios. The details behind these scenarios, including the modeling USPTO performed to construct the slides, have not been disclosed by USPTO. Moreover, when some of the signatories of this letter asked USPTO for the underlying data and models used to produce the forecasts, USPTO officials declined to do so on the ground that the data and models were pre-decisional and thus not subject to public disclosure. In Attachment K, we show USPTO has failed to adhere to the letter and spirit of the Information Quality Act and OMB's government-wide Information Quality Guidelines.

# Attachment H

# USPTO's Claimed Reduction in Backlog Is Unlikely to Materialize

In the preambles to its draft rules, USPTO claims that they will reduce the Office's backlog but does not provide any reproducible quantitative estimates of how much reduction will be realized. In fact, the preamble does not provide usable data on the size of the backlog. The only place we can find estimates of either the magnitude of the problem USPTO is trying to solve or the effects of these draft rules is in the Chicago Town Meeting slides.[114]

## I.    What does USPTO Expect to Achieve?

Below we have reproduced Slide 53, which summarizes average patent pendency (in months of examination time) and forecasts patent pendency under four scenarios, assuming an 8.1% annual increase in patent applications submitted:[115]

- Business as usual (RED line at top)

- 1,000 new hires, low examiner attrition (YELLOW line second from top)

- 1,000 new hires, low examiner attrition, plus proposed Limits on Claims Rule and proposed Continuations Rules (BLUE line third from top)

- BLUE scenario plus third planned rule[116] that would require a Patentability Report, similar to an Examination Support Document, to be filed with any new application of any significance (PURPLE line at bottom)

_____

[114] For the complete slide set, see Attachment N.  In Attachment L, we report that USPTO has refused to make public the data, models and assumptions used to construct these forecasts. In Attachment K, we show why this violates the federal Information Quality Act and OMB's implementing Information Quality Guidelines. In Attachment E, we explain why these (and other) defects lead to a material violation of the Administrative Procedure Act.

[115] This graph may be most interesting for what it does not include: there are no scenarios showing how internal USPTO reforms such as revising the "count" system, reining in excessive and inappropriate use of restriction practice, or providing better examiner oversight, to name just two examples, would drive down pendency.  A regulatory impact analysis would allow the USPTO to prepare a complete list of scenarios showing the impacts of both internal and external reforms that could help the USPTO address its backlog problem.

[116] "Patentability Reports" of this slide appear to correspond to "Patentability Justification" documents that would be required under a third rule, the "IDS Rule," RIN 0651-AB95, "Changes to Information Disclosure Statement Requirements and Other Related Matters," 71 Fed. Reg. 38808 (July 10, 2006).  However, this is merely an inference because to our knowledge, USPTO has not public disclosed what would be required in a "Patentability Report."

The graph appears to convey one of two messages. One possibility is that average patent pendency historically ranged within a fairly narrow band, but since 2002 it has wildly escaped its historic range. Alternatively, the increase in patent pendency occurred beginning in 1994 and 2002 was simply an aberration. Statutory changes occurred in 1995 and 1999, but the upward trend shows no significant discontinuities around those years.  USPTO offers no explanation for it, either – not in the Chicago Town Hall slides or in the preambles to the proposed rules. Yet it offers these rules as the solution to a problem whose origin they have not clearly identified. Further, USPTO's graph clearly intends to communicate that unless drastic action is taken to address the backlog, by 2011 average patent pendency will have doubled since the mid-1990s (red line).

Most of the increase shown on the graph is forecast, not data. The choice of baseline is a critical element of any analysis and comparison, but USPTO has not disclosed that information. Moreover, the visual appearance is misleading because the vertical axis does not begin at the origin.[117]

---

[117] Plotting data on a graph using only a portion of the scale exaggerates the visual appearance of variation. This is especially problematic when, as in this case, the scale excludes zero.

P000302

**Pendency - Updated FY 05 Actuals**



As described elsewhere in Attachment, as well as in Attachment K, it is perilous to draw inferences from these statistics.[118] We have focused here on the visual messages that USPTO appears to want the public to take away.

USPTO forecasts that if nothing is done, the upward trend from 1994 to 1999, which abated from 1999 to 2002 for unexplained reasons, will return (red line). The basis for this forecast is unclear, and USPTO has not disclosed the analysis which produced it. USPTO also forecasts that as a result of these draft rules, by 2011 average patent pendency will decline from about 34 months (yellow line) to about 31 months (blue line), or about 10%. Similarly, the basis for this forecast also has not been disclosed.

---

[118] In Attachment K, we explain why USPTO's presentation of influential information does not adhere to applicable information quality standards with respect to transparency, reproducibility, and presentational objectivity. In Sections II and III below, we show why the influential information USPTO relies on does not adhere to the substantive objectivity standard, either.

ATTACHMENT H: USPTO'S CLAIMS OF REDUCTIONS IN BURDEN ON USPTO    PAGE H-3
ARE INVALID AND UNRELIABLE

## II.    What's Wrong with the Influential Statistical Information USPTO Reports?

### 1.   USPTO Relies on a Biased Measure of Central Tendency

USPTO shows us only the (apparently) arithmetic mean for each year. Arithmetic means are unbiased measures of central tendency only for distributions that are normally distributed. But the distribution of patent pendency times is known to be highly skewed.[119] Thus, the arithmetic mean is an upwardly-biased indicator of central tendency. We have no way to know what the curve would look like if an unbiased measure had been used instead. We do know, however, that inferences based on a biased statistic will themselves be biased.[120]

Moreover, central tendency is not the only interesting statistic about a distribution. For example, regulatory design could be different if variation from the mean is  more serious problem than the magnitude of the mean itself, or if the tails of the distribution are especially important. From the limited information reported by USPTO, we have no idea what's important.

### 2.   The Influential Statistical Information is Misleading and/or Not Predictive

As described further in Section V of this attachment, the influential statistical information provided overstates the likely impact of the rules on USPTO backlog.  It also understates the proportion of applications that would be affected. With respect to the proposed Limits on Claims Rule, USPTO asserts that it would have had no effect on the 98.8 percent of historic applications for which there were 10 or fewer independent claims. But the proposed rule would expand the definition of an independent claim, so that some claims now classified as "dependent" become "independent."[121]  By changing the underlying basis for its statistic, USPTO undermines the utility of the historic data for estimating this percentage.

---

[119] Lemley & Moore (2004), the primary authority on which USPTO relies for the conclusion that continued examinations ought to be severely attenuated, shows how skewed the distribution is in their Figures 1, 3 and 4.  For more discussion of this reference, see Attachment D.

[120] The use of biased statistics is a violation of both the presentational and substantive objectivity standards in OMB's and USPTO's information quality guidelines. See Attachment K, Sec. III. Because USPTO's forecasts are not transparent and reproducible, they are presumptively non-compliant with these standards, as well.

[121]  The patent law divides claims into "independent" and "dependent" claims.  Generally, independent claims describe the broadest concept of the invention, and therefore present more issues and are more difficult to examine.  Dependent claims cover refinements of an invention, and serve several purposes: (a) to provide fallback positions in case prior art is discovered in the future that invalidates the broader claims, (b) to cover various legal technicalities, and (c) to teach the examiner about the invention to secure better examination of the independent claims.  It is not clear what alternative means the USPTO intends to provide to cover these three needs.  Further, the dividing line between "dependent" and

P000304

Further, to the degree that USPTO expects this rule to reduce the number of applications that applicants file, the USPTO has provided no estimate of the social costs of this change. Scholarly studies have shown that the number of claims is the single strongest predictor of patent value,[122] so a mere showing of number of patents affected is unlikely to be relevant to any regulatory impact analysis.

## III.    What Critical Influential Statistical Information Does USPTO *Not* Report?

USPTO maintains a vast database containing millions of records. For each patent application, USPTO can trace its entire procedural history. Virtually all of these data have been ignored.

### 1.  Distributions

Each annual "average" that USPTO reports is a value from a distribution for that year. Knowing the distribution of the data for each year helps analysts better understand how to interpret the data.  Fortunately, USPTO has a rich database. It would be easy for the Office to report the entire distribution and not just a single summary statistic. OMB has been eager to see agencies perform uncertainty analysis,[123] but many agencies and the National Academy of Sciences have complained that the data to support uncertainty analysis are often unavailable.[124] Whatever the merits of those objections, they do not apply in this case because USPTO has at its disposal the kind of database that would make other agencies and scholarly researchers envious.

### 2.  Disaggregation across multiple margins

Patent applications are not all the same. The most obvious margins on which they differ include type (e.g., original, continued, RCE), technology area (USPTO has 8 technology centers), number of claims, and number of prior art references. These margins matter greatly for understanding the patent process and the legitimate complexity inherent to an application; USPTO aggregates them together as if they are all the same.

---

"independent" is specified by statute, as are the respective fees, 35 U.S.C. § 41(a), 112 ¶ 4, so it is questionable whether the USPTO has authority to change either the definition or fee by rule.

[122] Kimberley A. Moore, Worthless Patents, Berkeley Technology Law Journal vol. 20 no. 4, pp. 1521-52, 1530-31 (Fall 2005).

[123] Office of Management and Budget. Circular A-4: Regulatory Analysis (2003); Final Information Quality Bulletin for Peer Review, 70 Fed. Reg. 2664; Proposed Risk Assessment Bulletin (2006) (http://www.whitehouse.gov/omb/inforeg/proposed_risk_assessment_bulletin_010906.pdf).

[124] National Research Council, Scientific Review of the Proposed Risk Assessment Bulletin from the Office of Management and Budget (2007) (http://www.nap.edu/catalog/11811.html).

As a first and very simple step in exploratory data analysis, USPTO ought to disaggregate its patent pendency distributions by application type and technology area and test whether they are different. For example, is average patent pendency for RCEs much shorter than for original applications? If so, what might explain these facts? How could limiting continuation practice have any significant effect on backlog if it is discovered to be a minor contributor?[125] Is the distribution significantly different by technology sector? If so, why does it make sense to write rules that apply uniformly to all technology sectors?

USPTO's database is remarkably rich. Properly analyzed, it would reveal myriad clues about the reason for the Office's growing backlog problem. But without this analysis, it is difficult to reach any other conclusion but that the limited statistical information revealed is intended to support predetermined policy conclusions and not to inform regulatory decision-making.

## IV.    Backlog as Evidence of a Congestion Externality

In addition to utilizing USPTO's database for clues, it helps to step back from the details of the patent process and think seriously about what kind of a problem it is. We believe that, at its root, the backlog problem is best understood as a congestion externality.[126] Prospective patentees must submit their applications to the examining group that deals with a specific technological field — there are several hundred non-interchangeable examining groups — and an applicant cannot just pick the one with the shortest queue. Moreover, generally they have to join the queue at the end.[127] The more applicants there are in a given line, the greater is the congestion externality that each application imposes on the others.

---

[125] If the average RCE consumes about 1/3 the examining resources as the average original application, then 100,000 RCEs contribute as much to backlog as 33,000 original applications.

[126] There is a rich economic literature on congestion externalities that ought to be the subject of a chapter in the Regulatory Impact Analysis that USPTO ought to perform, or obtain from a competent third party. The literature suggests two general solutions: property rights and Pigouvian taxes. Additional chapters of the RIA should address these competing ideas.

[127] USPTO has established an expedited application process that permits applicants to jump to the head of the queue in some situations.

For example, applications for "design patents" (a patent on the ornamental appearance of an object, as opposed to utility patents that cover traditional functional inventions) can be expedited if the application is filed in complete condition, and the applicant states that a preexamiantion search was conducted, for an extra fee of $900 (in addition to the filing and examination fees of $430.00). 37 C.F.R. §§ 1.155, 1.17(k).

The rules for expedited examination of utility patents have varied over the years, but have never involved an extra fee. Under rules in effect since August 2005, most instances of accelerated examination require that an applicant produce and submit an Examination Support Document. Thus, USPTO does not

P000306

The process is analogous to the toll plaza at the George Washington Bridge. First, drivers (patent applicants) must choose a lane (technology center) and cannot (or are not supposed to) cut in front of others. The (application) fee for crossing the bridge is the same for similar vehicles (applications). The threshold value of getting across the bridge (getting a patent) is the same, but the value of getting across quickly (short patent pendency) and being on the other side (the value of intellectual property rights protected) varies a lot.[128]

Understanding backlog as a congestion externality helps conjure up ideas for how to solve the problem.  For example, more toll booth operators (patent examiners) can be added or "HOT" lanes (accelerated examination) installed to allow expedited passage to those with urgent need to cross the bridge. USPTO has hired more patent examiners and provides for accelerated examination[127]; thus, there is a precedent for USPTO offering the equivalent of HOT lanes for patent applicants in a hurry to secure approval.[127]

 Understanding USPTO's backlog problem as a congestion externality also helps explain what is conceptually wrong with USPTO's proposed rules. The Continuations Rule would deny applicants the right to suspend their progress in the queue – the toll plaza analogy for continuation practice – but it would not change either the length of the queue or move applicants through it more quickly – indeed, a study might show that it increases average service time. Similarly, the Limits on Claims Rule would try to shorten the queue by denying some applicants the right to enter it, and making it easier for toll booth operators to process those who remain, but at the cost of refusing to provide any service to those who used to pay full asking price for a premium service.[129]  If applicants respond by dividing their applications into multiple parts, analogous to a trucking company that would divide cargo into multiple small red trucks if big

---

charge a higher price to gain access to its HOT lane for utility patents. Rather, it shifts much of the cost and obligation of substantive examination to the applicant. Whether USPTO has designed its "HOT" lanes optimally is a matter for regulatory analysis.

[128] This comparison also highlights important differences between the bridge analogy and the patent application process. First, there are alternative ways to get into Manhattan but there are no alternatives to USPTO. Second, the value of securing a patent varies by orders of magnitude across applicants.  Third, whereas no one considers the task of crossing the bridge complete having merely gotten into line, in the patent application process getting in line is what establishes your property right. Being first in line with a specific invention is not a matter of mere machismo or pride, but it's essential for success.  Finally, continuation practice is akin to voluntarily suspending one's progress in the queue. A driver might not do this in line at the George Washington Bridge, but people often let others pass in other kinds of line in order to delay their own processing.

[129] USPTO proposes to act like an airline that has a vibrant demand for first class seats, but stops offering first class service. No regulation is needed to solve this problem. Customers seeking first class service would flock to competing airlines. USPTO does not have any competitors.

ATTACHMENT H: USPTO'S CLAIMS OF REDUCTIONS IN BURDEN ON USPTO                    PAGE H-7
ARE INVALID AND UNRELIABLE

blue trucks are not allowed to cross the bridge, the rule will increase the length of the queue rather than reduce it.[130]

Other alternatives that were known to the PTO but not considered in the NPRM are mentioned in Attachment I, at Section III.

## V.     The Limited Data Presented by USPTO Indicate that the Continuations Rule Will Not Effectively Decrease Backlog

In the preamble, USPTO provides internally inconsistent information about the nature of the backlog problem, the extent to which continued examinations contribute to it, and what effect on backlog the rule might have. This information is problematic for the following reasons:

- It incorrectly compares filings during a fiscal year with actions taken by USPTO during the same fiscal year irrespective of the fiscal year in which the applications acted upon were filed

- It exaggerates what the proposed rule could accomplish even under best-case assumptions

- It incorrectly assumes that the amount of effort to examine a continuation is the same as the amount of effort to examine a new application

These errors misrepresent the problem of backlog and exaggerate the likely effect of the proposed rule on backlog.

### 1.     USPTO's Estimate of the Resources Devoted to Continuations Is Invalid

USPTO says that roughly 30 percent of the Office's examining resources must be applied to examining continued examination filings.[131]  This calculation is based on 317,000 non-provisional applications filed, which includes 62,870 continuing applications, and 52,750 RCEs. The figure of 30% is obtained by simple division.

---

[130] USPTO's use of aggregate statistics to describe its backlog problem also masks the extent to which they are the result of how the Office deploys resources.  For example, the backlog in the software and electronics areas is much longer than for most chemical or biotechnology applications. This is due in large part to the difficulties USPTO has recruiting and retaining qualified examiners in areas where federal salaries do not compete with private sector options.  Also, examiner compliance with agency guidance is notably different across technology groups, subjective impression confirmed by remarkably different outcomes on appeals from different technology areas.  The use of differentiated statistical measures would suggest more reasonably available alternatives for regulatory analysis.

[131] 71 Fed. Reg. 48.

P000308

However, filings in any given year do not equal workload, nor is it a proxy for patent pendency. A queuing model, not simple arithmetic, is needed to accurately describe the process flow and identify the sources of backlog.[132]

## 2.  USPTO's Estimate of the Reduction in Backlog From the Rule is Invalid

In the NPRM, USPTO says it issued 289,000 First Office Actions in 2005.  By subtracting the number of continuing applications (62,870) from the non-provisional applications filed (317,000), the Office concludes that, had there been no continuation examination filings, it could have issued an office action in every new application received in 2005 (317,000 – 62,870 = 254,130) and reduced the backlog by 35,000 (289,000 – 254,130 = 34,870). The calculation assumes (incorrectly) that the First Office Actions taken in 2005 were on applications filed in 2005. But the obvious implication of the calculation remains: continued examination is the presumptive source of the backlog problem, even though the increased backlog is new but continued examination is not.

However, USPTO also reveals that the number of continued examinations affected by this proposed rule is a small subset of this total. Of the 62,870 continuing applications submitted in fiscal 2005, 44,500 were continuation/continuation-in-part (CIP) applications, and only 11,800 of them were second or subsequent continuations.  Of the 52,750 RCEs, only about 10,000 were second or subsequent continuations.[133]  At most, the proposed Continuations Rule could affect about 21,800 of all applications submitted in fiscal 2005, or 7%. Thus, under best-case assumptions the proposed rule would increase throughput by about one-fourth as much as USPTO claims.[134]  If the draft final rule submitted to OMB differs from the rule proposed in the NPRMs by allowing more than one continuation as of right, the reduction in backlog would be even smaller.

## 3.  Original and Continuation Applications Do Not Impose the Same Examination Burden

USPTO assumes that there is a one-for-one trade-off between the resources needed to examine original and continued applications. This is extremely unlikely. Continued examinations are generally less demanding because the examiner is already familiar with the issues and the

---

[132] The operations research literature is rich with queuing models. Surely one of them fits USPTO's circumstances.

[133] 71 Fed. Reg. 50.

[134] This assumes, of course, that none of the 21,800 applications could have satisfied the (unspecified) discretionary criteria for an "allowable" second or further continuation.  Surely USPTO did not intend that it would exercise its discretion in such an extreme manner.  *But see* remarks of John Whealan discussed in Attachment M, § II.2.

ATTACHMENT H: USPTO'S CLAIMS OF REDUCTIONS IN BURDEN ON USPTO    PAGE H-9
ARE INVALID AND UNRELIABLE

P000309

scope of the remaining issues to be resolved is narrower. The examiner of an RCE has even more of an advantage, as this is merely continued prosecution of the same set of claims.[135]

For a continuation application to require the same effort by USPTO, the identity of the examiner must change. But the lag time between a Final Rejection and the filing of a Request for Continued Examination is typically a matter of a few months, sometimes weeks. Thus, if continued examination poses the same workload burden on USPTO as an original application, the underlying problem probably is excessive examiner attrition.[136]

### 4. Gains in Throughput from the Proposed Rule Are Modest or Nonexistent

At 7%, the upper-bound gain in throughput from the proposed rule would be modest. If just half of applicants could satisfy the (unspecified) criteria for a second or subsequent examination, the gain in throughput would be so small as to be not statistically significant under normal rules of thumb for statistical inference. Ironically, USPTO admits as much:

> [T]he Office's proposed requirements for seeking second and subsequent continuations will not have an effect on the vast majority of patent applications.[137]

It is impossible to see how a "reform" that affects such a small fraction of applications could have an effect larger than the uncertainties in USPTO's projections.

None of these calculations take into account the certainty that applicants will adapt to the new rules in ways that adversely affect backlog. For example, if the right to second and subsequent continued examinations is limited unpredictably, applicants will be much more likely to appeal adverse decisions; in many cases, appeal would become the only alternative. The effect on backlog of a massive increase in appeals is hard to quantify, but it is reasonably clear that it will slow down the examination process and lead to increased backlog.

A high-quality examination in the first instance will always make the examination of a continuation more effective. However, if the initial examination is piecemeal or slipshod (which the proposed Limits on Claims rule would mandate for complex applications), there is less useful work product that the examiner of a continuation (either the same examiner or a new examiner) can build on. Thus, the amount of "rework" associated with a continuation is a function of the

---

[135] At the same time, the filing fee for continued examination is the same. That means USPTO "makes money" on continued examinations, as we describe in Attachment F section III.

[136] USPTO has acknowledged that it has a serious problem with examiner attrition, a matter that we discuss in Attachment F, Section IV. A properly performed analysis of the backlog problem would ascertain the extent to which throughput is slowed by the need for new examiners to get up to speed on old applications. A comparison of examination times for original applications and RCEs would reveal whether they require the same level of examination effort.

[137] 71 Fed. Reg. 50.

ATTACHMENT H: USPTO'S CLAIMS OF REDUCTIONS IN BURDEN ON USPTO                    PAGE H-10
ARE INVALID AND UNRELIABLE

P000310

incentives the USPTO provides to ensure high quality examination at first application.  We suggest that a regulatory analysis should examine the extent to which high-quality first examination reduces the amount of "rework," or equivalently, the extent to which low-quality first examination leads to "traffic accordion" pileups.

# Attachment I

# USPTO Cannot Show that the Proposed Rules are the "Most Cost-effective" Solution

Even if it is assumed that regulation of some sort is essential, USPTO has disclosed no evidence that it has chosen the most cost-effective regulatory approach, as required by Sec. 1(b)(5).  All data made public by USPTO suggests that USPTO did not even ask the relevant questions.[138]

## I.    The NPRMs are Essentially Silent on Social Costs and Benefits

USPTO has not disclosed any analysis beyond the undocumented scenarios portrayed graphically in the Chicago Town Hall slides.[139]   Therefore, it is impossible for USPTO to have met any reasonable burden of proof that its draft rules are the most cost-effective regulatory approach just to reduce its own backlog.

This is clearly true if the regulatory objective is founded on the regulatory philosophy and principles of Executive Order 12,866: USPTO has disclosed no data, analysis, or even a credible qualitative argument, as required by Sec. 1(b)(5), that the <u>social</u> costs of these rules are justified by their <u>social</u> benefits, including:

- the effect of restricted access to patent protection on businesses' access to the capital markets, especially for venture businesses whose only book assets may be their intellectual property

- the effect on business R&D activities, if the value of patent protection is reduced

- the effect on the quality of patent disclosures, and the public's ability to make use of those disclosures, that will attend applicants' adjustments to the rules (for example the "disclosure splitting" into non-overlapping disclosures contemplated by the Limits on Claims Rule)

- the costs of exercising published rights to petition premature final rejection and appeal rejections as contemplated by the Continuations Rule, or preparation of Examination

---

[138] See Attachment D, footnote 24, in which Commissioner Doll admits USPTO did no study to identify the source of rework applications in its backlog, and had not attempted to differentiate between rework caused by applicants vs. caused by USPTO itself; Attachment C section IV, discussing an email of Deputy Director Office of Patent Legal Administration Robert Clarke in which USPTO refuses to disclose any study it may have done.

[139] In Attachment L, we report that USPTO failed to disclose critical information despite repeated requests. In Attachment K, we show why the influential information on which USPTO relies does not adhere to applicable information quality standards.

Support Documents contemplated by the Limits on Claims Rule (discussed in Sec. II of this Attachment I and in Attachment J)

- the social cost of patent protection that must be abandoned because of the increased costs imposed by the Rules

- the social value of reduced backlog, in view of the patent term protections of 35 U.S.C. § 154(b)

- the cost of increased litigation caused by reduced certainty and specificity that may arise because of abbreviated examination

USPTO alludes to various problems and asserts that inventors will benefit from these rules, but neither allusion nor assertion substitute for analysis. This is also true even if it is assumed that the only regulatory objective of interest is reducing USPTO's backlog, because USPTO has presented no analysis of alternative ways to reduce backlog. USPTO has monetized none of the effects, making both benefit-cost analysis and cost-effectiveness analysis impossible.

## II.    The Rules Foreclose Reliance on Lower-Cost Alternatives

We describe below just a few examples of additional social costs, none of which were discussed in the NPRMs. USPTO likely did not disclose any data or analysis of social costs because, as one senior USPTO official admitted publicly, the procedures for compliance were apparently still in the "anecdotal" and "in my head" stage, weeks after the publication of the NPRMs.[140]

Town Hall slides[141] 80 and 81 illustrate how the Continuations rule will force applicants to take expensive steps and to anticipate USPTO decisions because, with fewer steps to the process, each one remaining has proportionally greater stakes. Slide 80 reads as follows, describing one of the very narrow circumstances in which USPTO proposes to allow continuation applications (emphasis added):

**Examples of a Showing for Filing a Second Continuing Application**

Example 2: In a continuation application,

- Data necessary to support a showing of unexpected results just became available to overcome a final rejection under 35 U.S.C. 103, and

---

[140] John Whealan, speaking at Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ ramgen/spring06/students/ 02172006a.rm (Feb. 17, 2006), at time mark 57:45, stating that procedures were still "in my head" and under development.

[141] See Attachment N.

- The data is the result of a lengthy experimentation that was <u>started after applicant received the rejection for the first time (emphasis added)</u>.

It frequently happens that data could exist before the time cutoff set in this slide, but they are expensive to collect or prepare for submission; or, because the examiner's position is not clearly articulated, it is difficult to present the data in precisely the form that will be persuasive to the examiner. If there is a lower-cost approach to replying to the examiner, and hold the higher-cost alternatives in reserve, then that is what is done. If the examiner is persuaded by these lower-cost alternatives, the higher cost approaches are not needed. However, USPTO proposes to require the applicant to gather every bit of available data and present it at the earliest opportunity, because of a new "use it or lose it" approach.[142]

Example 2 has a further practical difficulty that USPTO failed to appreciate. Experiments that start late enough to fall within Example 2 are often themselves expensive – and take longer than the six month window available to respond to an Office Action. Thus, it may very well be that experiments where costs were avoided by <u>starting</u> late enough to be permissible within "Example 2" are the very experiments that <u>cannot be completed</u> within the time window available.

Slide 81, which reads as follows, goes even further:

Example 3: In a continuation application,

- The final rejection contains a <u>new ground of rejection</u> that could not have been anticipated by the applicant, and

- The applicant seeks to submit evidence which <u>could not have been submitted earlier</u> to overcome this new rejection (emphasis added).

Slide 81 expressly requires applicants to anticipate "new grounds of rejection" that the examiner has never articulated, but <u>could be</u> anticipated, and anticipate what data <u>could be</u> submitted to respond to that unarticulated rejection that <u>could be</u> raised some time in the indefinite future. USPTO proposes that applicants must predict <u>all</u> issues that an examiner <u>might</u> raise any time during prosecution, and flood the examiner with all data that might become relevant, before the examiner raises "the rejection for the first time," without regard for cost.

---

[142] Ironically, it appears that USPTO itself is attempting to introduce explanations that it <u>could have</u> prepared and submitted earlier, but did not. Six weeks into the Notice and Comment period, it still had no clear idea of the standard it intended to apply. John Whealan, speaking at Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm (Feb. 17, 2006), at time mark 57:45 stated "[Y]ou're going to have to explain why you need to do this, and why you didn't do it sooner. Now what satisfies that explanation? I've been on the road doing this a couple weeks now, and I've actually got some people working on some examples that we may try to put out. But anecdotally, in my head, what would satisfy it?"

P000314

### III.    A Number of Available Alternatives were Known to USPTO but Not Considered

Cost-effectiveness cannot exist absent a comparison to alternatives, yet there is no public evidence that the Office considered any alternatives at all. Therefore, USPTO cannot possibly show that its draft rules are the "most cost-effective regulatory approach," as required by Sec. 1(b)(5).

USPTO knew of a number of alternatives, including the alternatives listed in a 1999 Federal Register notice, used by other patent offices, proposed by USPTO and enabled in the 1999 American Inventors Protection Act, or the like.[143]  These alternatives were not discussed in the NPRMs.  We list a few here.  USPTO's regulatory impact analysis should include analysis of each of these alternatives:

1.  Are the fees as adjusted in December 2004 sufficient to cover USPTO's costs for the activities involved in examination of applications?  USPTO represented to Congress that the new fee levels would "correlate fees with the extra effort required to meet the demands of certain kinds of patent requests. This proposal would generate the levels of patent and trademark fee income needed to implement the goals and objectives of the strategic plan."[144]

2.  Credit examiners based upon the number of claims in the application, and other measures of complexity (see Attachment F, § V).

3.  Defer examination until an applicant requests it, as in Japan and Canada – permit an application to simply lie pending for some period of time until the applicant requests examination and pays a fee.  Based on the rate at which applicants pay 4-year maintenance fees, perhaps 10-20% of applications will never be examined.

The suggestions of Stephen G. Kunin, the recently-retired Deputy Assistant Commissioner for Patent Examination Policy, are particularly astute, and deserve particular consideration:[145]

4.  Improve examiner productivity by various performance-based, or billable hour pay systems

---

[143] "Changes To Implement the Patent Business Goals, Notice of Proposed Rulemaking" 64 Fed. Reg. 53772-53845 (October 4, 1999) (see Attachment D, Appendix 1); 35 U.S.C. § 41 as amended in 1999 (restructuring fees to permit some of the alternatives discussed here).

[144] USPTO Strategic Plan, Fee Purpose, http://web.archive.org/web/20030407093355/ www.uspto.gov/web/offices/com/strat21/feepurpose.htm

[145] Slides of Stephen G. Kunin, the recently-retired Deputy Assistant Commissioner for Patent Examination Policy, titled "PTO Rulemaking Alternatives" presented at USPTO "Town Hall" Meeting, New York, NY, April 7, 2006, available at  http://www.aipla.org/Content/ContentGroups/ Speaker_Papers/Road_Show_Papers/200612/AIPA/kuninPPT.pdf.

5. Improve examiner productivity by close review of work quality, including review of completeness of rejections as well as allowances

6. Mandatory technical training for all examiners in all fields of technology

7. Reinforce "compact prosecution" principles, not weaken them as proposed by the Rules: provide a thorough search and examination of all claims, and a thorough search of subject matter reasonably expected to be claimed, with a complete first Office Action, and early indication of allowable subject matter

8. Do examination right the first time: Reduce rework caused by inadequate searches and improper claim interpretation, by instituting patentability review conferences before Final Action (that is, implement "second set of eyes" review for rejections, as well as allowances)

9. Examine related cases together, rather than further fractionating them as proposed in the Limits on Claims rule: batch search and examine related applications regardless of filing dates, provide incentives to applicants to identify related cases and hold pre-first office action interviews

10. Modify the order in which applications are examined: Offer expedited examination for PCT national stage entry applications

11. Permit third parties to request examination of long pending applications by submitting a document equivalent to the petition to make special accelerated examining procedure

12. Modify examiner goals and incentives to align examiners' incentives with efficient examination: Reduce production credits for continuation applications and RCE

13. Reevaluate examiner production expectancies and provide more time for the search and first office action; provide examiners with time to review amendments and evidence submitted after final rejection to negotiate allowances by examiner's amendment

14. Exploit searches from foreign patent offices and reduce examiner search time accordingly, especially for PCT cases

15. Eliminate second action Final Rejection Practice that forces the filing of RCE, and the attendant examiner incentives to stall, especially where examiner applies new grounds of rejection or applies new prior art

16. Reduce restriction requirements by adopting a unity of invention standard for national applications

17. Restriction requirements should be made only after a search of the first claimed invention

18. Do away with "second pair of eyes" program as currently implemented (because only allowances are reviewed, an examiner has no practical authority to issue patents; anonymous and unaccountable second reviewers, with little exposure to the application, withdraw a high proportion of allowances)

19. Deal with continuation abuse through finely crafted rules based on prosecution laches (the Continuations Rule states that it is not an attempt to codify *Bogese*, but it isn't clear why)

Other insightful alternatives are set forth in the comment letters, for example, those included in Attachment A:

20. USPTO should take more care that its employees carefully observe published guidance procedures, and should provide enforcement of those procedures during examination phase

21. USPTO should provide some form of enforcement of its procedural rules and guidance through legally-trained ombudsmen, and should remove this function from Technology Center Directors who have a financial interest in denying enforcement of USPTO procedural requirements

22. Several rules should be restored to their 1990's form, which permitted applicants to take certain steps during the interval before an examiner resumed examination, rather than imposing arbitrary date cutoffs that have the effect of requiring examiners to examine claims that applicant no longer wants to have examined

23. Provide applicants more opportunity to assist an examiner in focusing on the relevant issues, through more telephone interviews, and the like

A Regulatory Impact Analysis that complies with Circular A-4 and includes an analysis of the various issues raised in this Attachment I would allow USPTO to determine if the approach it has taken in the proposed rules is, in fact, the most cost-effective solution for the identified problem.

# Attachment J

# USPTO's Promises of Procedural Remedies Against Substantive Harshness are Illusory

Many of the public comment letters observed that the proposed rules would have harsh consequences that could deprive innovators of valid intellectual property claims.  The letters observed that there would be little recourse if USPTO rejected an application before fully evaluating it.  In the slides[146] handed out by USPTO at various public discussions, senior officials advised applicants to use "Petitions to the Director"[147] to reopen prosecution when an application was prematurely "finally" rejected, as an alternative to a continuation application.

Petitions directed to premature final rejection are complex and difficult to prepare[148], and (under current practice) are cost-effective in only a small number of cases.  Nonetheless, at least

---

[146] See Attachment N, slide 82 and 83.

[147]  There are two paths of review within USPTO: appeal to the Board of Patent Appeals, 37 C.F.R. 41.1 *et seq.*, and Petition to the Director under 37 C.F.R. § 1.181.  Generally, if the question is one whose answer is either "'Yes,' this claim is patentable," or 'No,' it isn't," then the issue is appealable.  All non-appealable issues are necessarily petitionable, 37 C.F.R. § 1.181(a)(1), plus there is some area of overlap.

At least some decisions reflect a "reverse turf war" within the USPTO: neither the Director nor the Board of Patent Appeals will entertain issues relating to incomplete examination, and neither will issue mandatory orders to examiners to compel complete examination as required by the MPEP.  To further aggravate the situation, the Board will not entertain an appeal on the merits where the examiner has failed procedurally to articulate his/her basis for rejecting claims in the manner required by the agency's guidance document.  *Ex parte Rozzi*, 63 USPQ2d 1196 (BPAI 2002) (Board will not act as tribunal of first instance); *Ex parte Gambogi*, 62 USPQ2d 1209, 1212 (BPAI 2001) ("We decline to substitute speculation" for the "more definite statement of the grounds of rejections" that has to come from the examiner, and "We decline to tell an examiner precisely how to set out a rejection."); *Ex parte Braeken*, 54 USPQ2d 1110 (BPAI 1999) (appeal is not "ripe," and Board declines to either examine or decide the appeal).  However, officials deciding petitions take an incompatible view, that all issues relating even indirectly to claims are not petitionable, even those issues going to whether the examiner examined and rejected claims at all, whether agency guidance was violated, or whether examination was complete enough to permit the Board to hear an appeal, even if the issue is specifically designated as petitionable in the MPEP.  *See, e.g.*, 09/385,394, Decision of Nov. 8, 2005 (holding an issue of premature final rejection to be appealable; contrary agency guidance in MPEP § 706.07(c) is not acknowledged, let alone distinguished).

[148]  Our limited experience is that these petitions can cost anywhere from about $3,000 to $15,000 each.  Because it is all attorney time, this cost applies to large and small entities alike.  To put it in perspective, the cost of filing a continuation application, such as a Request for Continued Examination, is

---

P000318

one signatory to this letter attempted to utilize the USPTO's "premature final rejection" procedures on several occasions. These petitions were all dismissed or denied on various grounds that never reached the merits of the precise breaches of guidance that were raised:

- Various USPTO officials stated that they never grant such petitions, because premature final rejection is appealable subject matter, not petitionable.[149] These officials cite no authority for the proposition, and fail to distinguish contrary agency precedent and guidance.[150]

- USPTO petitions decisions often recharacterize issues to irrelevant grounds and thereby avoid deciding the precise breach complained of.[151]

- UPSTO decisions often do not carefully and accurately state the law.[152]

- "Premature final rejection" is inherently a time-sensitive issue, and must be decided before deadlines run out,[153] else an applicant must either act in a way that diminishes the remedy grantable by the petition, or face abandonment of the application. Decisions on this class of petition appear to be selectively delayed[154] until that time deadline has

---

$790 ($395 for small entities) plus about ½ hour of attorney time. In contrast, the cost of filing this petition is roughly equal to the total post-filing cost of prosecuting a typical application.

[149] *See, e.g.*, 09/385,394, Decision of Nov. 8, 2005 (holding an issue of premature final rejection to be appealable, not petitionable).

[150] *E.g.*, MPEP § 706.07(c), "prematureness of a final rejection … is purely a question of practice, wholly distinct from the tenability of the rejection. It may therefore not be advanced as a ground for appeal, or made the basis of complaint before the Board of Patent Appeals… It is reviewable by petition under 37 CFR 1.181."

[151] For example, in 09/385, 394, issues directed to untimely examination were denied because examination was eventually completed. Issues relating to incomplete examination were denied because the petitions examiner would only consider timeliness. A typical set of errors is set forth in a Petition filed April 10, 2006, seeking higher review of lower-level decisions in application 09/385,394.

[152] 09/385,394, Decision of May 4, 2004, at page 6, stating that the test for mootness is whether an event is "likely to recur," and refusing to issue an order to ensure that it will not recur, when Supreme Court precedent provides mootness of a federal agency action only when the agency accepts a "heavy burden" of showing that it will cease all "offending conduct," *Adarand Constructors v. Slater*, 528 U.S. 216, 221-22 (U.S. Sup. Ct. 2000); *see also* 09/385,394, Decision of Nov. 8, 2005, at page 5, stating that the *Kronig* and *Wiechert* decisions will not be followed because "it cannot be seen."

[153] 37 C.F.R. § 1.181(f) ("The mere filing of a petition will not stay any period for reply that may be running…")

[154] 09/385,394, a Petition for Review of Premature Final Rejection filed April 10, 2006 remains on the docket for consideration by Brian Hearn in the Office of Petitions fourteen months later. The Petitions Office representative contacted on June 6, 2007 confirmed that Mr. Hearn's backlog is 2-4

---

lapsed.  USPTO then denies the petition as moot, but refuses to honor the procedural benefits that accrue to an applicant on the USPTO's determination of mootness.[155]

Based on this experience, the protections provided for in the USPTO's guidance document to deal with procedural error by its examiners, and relied upon by the USPTO in addressing applicants concerns about the harshness of the Continuations Rule, do not appear to exist in practice.[156]

While we appreciate that this experience may be anecdotal, we submit that all such evidence presented by patent practitioners will necessarily be anecdotal.  Patent applicants possess a widely dispersed data set that defies systematic collection.  The USPTO, on the other hand, possesses a centralized database and full knowledge of whether petitions to the Director will present an effective check and remedy for procedural errors and violations of agency guidance by examiners during prosecution.  We believe that the USPTO should perform a thorough analysis that complies with Circular A-4, and that this analysis should include a transparent reporting and analysis of the petitions filed to dispute improper finality and the resolution of such petitions, and whether these petitions are being soundly decided on the law.

---

months.  Similarly, two petitions on different issues were filed in the same art unit at about the same time: a petition directed to an unrelated issue was decided in a few weeks, while the Final Rejection petition filed on April 8, 2005 was decided on September 9, five months.

[155] Under Supreme Court precedent, the legal effect of an assertion of mootness by the USPTO is often identical in consequence to a grant of all relief sought in the petition – a party asserting mootness accepts responsibility for "completely and totally eradicating all effects of the alleged violation," and states "with assurance that there is no reasonable expectation that the alleged violation will recur."  That is, by asserting mootness, USPTO waives all challenges to even unproved "allegations" raised in a petition, and accepts the responsibility to eradicate all effects.  However, at the highest levels an applicant can access, USPTO uses mootness as a way to <u>deny</u> all relief, not to implement an obligation to eradicate all effects.  See, e.g., 09/385,394, Decision of Dec. 4, 2003.

[156] USPTO often does not adhere to its own guidance. *See, e.g., In re Alappat*, 33 F.3d. 1527, 1580, 31 USPQ2d 1545, 1588 (Fed. Cir. 1994) (en banc) (Plager, J., concurring) ("The Commissioner [of Patents] has an obligation to ensure that all parts of the agency … conform to official policy of the agency, including official interpretations of the agency's organic legislation.  Otherwise the citizenry would be subject to the whims of individual agency officials of whatever rank or level, and the Rule of Law would lose all meaning…").

# Attachment K

# USPTO Failed to Comply with Applicable Information Quality Principles and Guidelines

The Federal Information Quality Act and OMB's government-wide Information Quality Guidelines have been in place for almost five years.[157] USPTO, separate from the Department of Commerce of which it is part, issued its own guidelines implementing OMB's guidelines taking into account its particular needs.[158]

Both OMB's and USPTO's guidelines require that information USPTO disseminates satisfy applicable quality standards.[159] The standards relevant to these draft rules are *utility*, *reproducibility* and *objectivity*.

USPTO's definitions of these terms follow the definitions established by OMB. In addition, because the information in question constitutes the agency's basis for regulatory decision-making, it is inherently influential.[160]

## I.    Utility

"Utility" refers to the usefulness of the information to its intended users, including the public. In assessing the usefulness of information that the agency disseminates to the public, the agency considers the uses of the information not only from its own perspective but also from the perspective of the public (Sec. 6(b)).

In principle, it's possible that the limited information disclosed by USPTO in support of these two draft rules is sufficiently useful from its own perspective. However, it is inarguably false that this information is useful "from the perspective of the public." As documented in Attachment L and Attachment N, USPTO's responses to both informal and formal requests for supporting data, models and assumptions, and its apparent willingness to provide selected

---

[157] Office of Management and Budget, "Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Notice; Republication, 67 Fed. Reg. 8452.

[158] U.S. Patent and Trademark Office, "Information Quality Guidelines," online at http://www.uspto.gov/web/offices/ac/ido/infoqualityguide.html.

[159] Nothing in this Attachment should be construed to imply that the domain of information disclosed by USPTO is sufficient for purposes of Executive Order 12,866. We restrict our review to the information that USPTO actually disclosed.

[160] "Influential" information is defined by USPTO as "information that will have or does have clear and substantial impact on important public policies or important private sector decisions consisting primarily of statistical information on USPTO filings and operations."

individuals with privileged access, proves that agency officials know that the public considers the information it has disseminated to have little or no utility.

## II.    Reproducibility

"Reproducibility" means that the information is capable of being substantially reproduced, subject to an acceptable degree of imprecision.  For information judged to have more (less) important impacts, the degree of imprecision that is tolerated is reduced (increased).  With respect to analytical results, "capable of being substantially reproduced" means that independent analysis of the original or supporting data using identical methods would generate similar analytical results, subject to an acceptable degree of imprecision or error (Sec. 7).

The reason that the Administrative Procedure Act and E-Government Act of 2002 require disclosure of an agency's data, models and assumptions is to provide informed comment during the prescribed public comment period. As a prerequisite, the public must be able to reproduce USPTO's own analyses. Without access, it is simply impossible to do so.[161]

## III.    Objectivity

Objectivity" involves two distinct elements, presentation and substance.  The presentation element includes whether disseminated information is being presented in an accurate, clear, complete, unbiased manner, and within a proper context.  Sometimes, in disseminating certain types of information to the public, other information must be disseminated in order to ensure an accurate, complete, and unbiased presentation.  Sources of the disseminated information (to the extent possible, consistent with confidentiality protections) and, in a scientific, or statistical context, the supporting data and models need to be identified, so that the public can assess for itself whether there may be some reason to question the objectivity of the sources.  Where appropriate, supporting data shall have full, accurate, transparent documentation, and error sources affecting data quality shall be identified and disclosed to users.  The substance element focuses on ensuring accurate, reliable, and unbiased information.  In a scientific, or statistical context, the original or supporting data shall be generated, and the analytical results shall be developed, using sound statistical and research methods.  If the results have been subject to formal, independent, external peer review, the information can generally be considered of acceptable objectivity (Sec. 6(a)).

In this case, both presentational and substantive objectivity are important.  Most clearly, USPTO's forecasts of future backlog must be "accurate, reliable, and unbiased."  Whether the

---

[161] This is not a Shelby Amendment "data access" issue given an information quality veneer. The data, models and assumptions in question are USPTO's, not those of an arguably independent third party.

agency's forecasts meet these tests speaks directly to the merits of its stated regulatory objective, assuming arguendo that the stated objective is defensible under law and Executive Order 12,866.

To be presentationally objective, USPTO's forecasts must be presented in "an accurate, clear, complete, [and] unbiased manner, and within a proper context." We are especially concerned about "completeness" and "proper context." For USPTO's forecasts to be complete, they must at a minimum include information about how rates are predicted to vary by application type, art and technology center. In addition, additional information is needed about variability and uncertainty.[162] To be in a "proper context," it is essential to have "accurate, reliable, and unbiased" information about the <u>effects</u> these rules would have on applicants and innovation.

USPTO's forecasts are presented without documentation in any of these areas. The forecasts have no utility for the regulated public; are not reproducible; and cannot satisfy the presentational objectivity test.

USPTO might have been able to meet these quality standards if it had subjected its analyses to independent external peer review, in accordance with OMB's government-wide standards.[163] According to USPTO, it does not use peer review as a tool for pre-dissemination review to ensure that applicable information quality standards are met.[164] Rather, it utilizes other unspecified procedures.[165]

---

[162] <u>Variability</u> is a measure of the extent to which random influences would affect predicted backlogs. <u>Uncertainty</u> is a measure of the extent to which predicted backlogs would change if the different assumptions or models were used, especially if USPTO's models have not been validated.

[163] Office of Management and Budget, "Final Information Quality Bulletin for Peer Review," 70 Fed. Reg. 2664.

[164] "Based on the review it has conducted, the United States Patent and Trademark Office believes that it does not currently produce or sponsor the distribution of influential scientific information (including highly influential scientific assessments) within the definitions promulgated by OMB. As a result, at this time the United States Patent and Trademark Office has no agenda of forthcoming influential scientific disseminations to post on its website in accordance with OMB's Information Quality Bulletin for Peer Review." See http://www.uspto.gov/main/policy/infoquality_peer.htm.

[165] "Historically, a pre-dissemination review process of all USPTO information disseminated is incorporated into the normal process of formulating the information. This review is at a level appropriate to the information, taking into account the information's importance, balanced against the resources required and the time available to conduct the review. USPTO's business units treat information quality as integral to every step of USPTO's development of information, including creation, collection, maintenance, and dissemination. USPTO receives and relies on feedback from both internal and external customers if the accuracy or completeness of the information disseminated is below standard. Corrective measures are taken immediately to limit the impact and re-disseminate the corrected information. In an unbiased manner, USPTO makes every effort to provide complete databases on USPTO website of all patents and trademarks that have ever been captured electronically. All USPTO information

dissemination products are labeled and initially distributed with the accompanying file specifications for clarity and proper context.  Several file specifications are available on USPTO website....." See USPTO Information Quality Guidelines Section VII(A).

# Attachment L

# USPTO Has Withheld Data and Analysis Essential for Evaluating its Proposals

**I.    Data, Models and Assumptions Withheld**

USPTO has made limited data available for the public to review in preparing its public comments. We identify and discuss these data in Attachment G.  Data consist of selected tables[166] and an 85-slide PowerPoint presentation widely referred to as the Chicago Town Hall Slides.[167]

The stated problem USPTO intends to remedy is rising backlog, and slides 50-54 of the Chicago Town Hall Slides display USPTO's forecasts of future backlog under six scenarios. To independently analyze these forecasts, the public must have access to the data and models that USPTO used to derive them

On May 3, 2006, one of the signatories of this letter asked Robert Clarke, Deputy Director, Office of Patent Legal Administration, USPTO, to provide the underlying data, models and assumptions. He replied that no publicly releasable information could be provided:

We do not have a complete package of supporting information that is available for public inspection. The study for these packages was substantiated in a series of pre-decisional electronic communications that has not been made available to the public.[168]

On September 12, 2006, one of the signatories sent USPTO a formal request for this information under the Freedom of Information Act (FOIA). On October 12, 2006, USPTO's FOIA Officer Robert Fawcett replied:

The United States Patent and Trademark Office (USPTO) identified 114 pages of documents that are responsive to your request and are releasable. A copy of the material is enclosed.

---

[166] See http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/laiplabackgroundtext.html.

[167] See http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslides.ppt (PowerPoint) and (http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslidestext.html (HTML).

[168] Dean Alderucci, Comments of Cantor Fitzgerald in Response to the Proposed Rules of the U.S. Patent and Trademark Office at 71 Fed. Reg. 48  (January 3, 2006) and 71 Fed. Reg. 62 (January 3, 2006) at Exhibit A (online at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/ fpp_continuation/continuation_comments.html, Individual Comment #3.

The 114 pages enclosed consisted of the data tables and the Chicago Town Hall Slides and other information now on USPTO's web pages.[169]

USPTO's refusal to disclose critical information apparently does not apply to all members of the public. During the annual meeting of the American Intellectual Property Law Association (AIPLA), on October 19, 2006, Commissioner for Patents John Doll offered to share the agency's models and assumptions with AIPLA's board of directors.[170] Like many of the signatories of this letter (see page 6 of the principal letter and Attachment A), AIPLA formally opposed both the Continuations Rule and the Limits on Claims Rule.[171] Nevertheless, selective disclosure of critical data, models and assumptions is fundamentally incompatible with any reasonable standard of good governance.

## II.     Legal Vulnerability

Under administrative law USPTO must make the technical bases for its proposed rules available at the beginning of the Notice and Comment period. This is not new.

*Connecticut Light and Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982) explains the need for agency transparency as follows:

> The purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticisms to the agency during the rule-making process. If the notice of proposed rule-making fails to provide an accurate picture of the

---

[169] See Attachment N.

[170] Eric Yeager, "USPTO Commissioner Doll Says That Limiting Continuations Will Improve Patent Landscape," 72 *Patent, Trademark & Copyright Journal* 704ff ("USPTO invited the AIPLA board to take a look at the agency's models and the assumptions they are based upon. Those models will reveal that USPTO's proposed change to continuation practice will turn the backlog situation around").

[171] "These proposed changes, taken individually or together, are troubling. In one instance, the Office proposes to severely limit the number of claims it would accept in an application for initial examination. We believe that this would tend to limit the ability of an applicant to obtain claims for an invention that are commensurate with the full scope of the contribution by the inventor(s). In the other instance, the Office proposes to severely limit the opportunity for continued presentation of claims by means of continuation and continued examination practice. Standing alone, this proposal would disadvantage applicants by prematurely truncating prosecution of their applications; however, it would further disadvantage applicants when combined with the limited number of claims proposed to be accepted for initial examination. As a practical matter, these proposals would place great pressure on applicants (1) to reduce the scope of the claims pursued (whether in a single application or in unrelated applications) and (2) to accept more narrow claims as a result of the more limited opportunity for continued presentation of claims. Inventors would be far less able to adequately protect their property." See Letter to Undersecretary of Commerce Jon Dudas from AIPLA Executive Director Michael Kirk at 2, online at http://www.aipla.org/Content/ContentGroups/Issues_and_Advocacy/Comments2/Patent_and_Trademark_Office/20066/ContinuationLetter.pdf.

ATTACHMENT L: USPTO HAS WITHHELD DATA AND ANALYSIS ESSENTIAL FOR     PAGE L-2
EVALUATING ITS PROPOSALS

reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals. As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making. <u>In order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.</u> To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport. <u>An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.</u>
(Emphasis added)

Other courts have similarly recognized the importance of ensuring that regulated parties have access to the complete public record and all data on which an agency relies.[172]

In Attachment E, we outlined why USPTO lacks the statutory authority to issue substantive rules and why the Office is vulnerable to legal challenge for exceeding its authority. By withholding critical information, USPTO also has committed a fatal error in administrative law sufficient to justify a federal court to vacate these rules before ever reaching any argument about USPTO's statutory authority.

---

[172] *See also Hanover Potato Products, Inc. v. Shalala*, 989 F.2d 123, 130, fn. 9 (3rd Cir. 1993) (*citing Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C.Cir.1977) ( "[e]ven the possibility that there is here one administrative record for the public and this court and another for the [agency] and those 'in the know' is intolerable") and stating "We believe a regulated party automatically suffers prejudice when members of the public who may submit comments are denied access to the complete public record.")

# Attachment L

# USPTO Has Withheld Data and Analysis Essential for Evaluating its Proposals

## I.      Data, Models and Assumptions Withheld

USPTO has made limited data available for the public to review in preparing its public comments. We identify and discuss these data in Attachment G.  Data consist of selected tables[166] and an 85-slide PowerPoint presentation widely referred to as the Chicago Town Hall Slides.[167]

The stated problem USPTO intends to remedy is rising backlog, and slides 50-54 of the Chicago Town Hall Slides display USPTO's forecasts of future backlog under six scenarios. To independently analyze these forecasts, the public must have access to the data and models that USPTO used to derive them

On May 3, 2006, one of the signatories of this letter asked Robert Clarke, Deputy Director, Office of Patent Legal Administration, USPTO, to provide the underlying data, models and assumptions. He replied that no publicly releasable information could be provided:

> We do not have a complete package of supporting information that is available for public inspection. The study for these packages was substantiated in a series of pre-decisional electronic communications that has not been made available to the public.[168]

On September 12, 2006, one of the signatories sent USPTO a formal request for this information under the Freedom of Information Act (FOIA). On October 12, 2006, USPTO's FOIA Officer Robert Fawcett replied:

> The United States Patent and Trademark Office (USPTO) identified 114 pages of documents that are responsive to your request and are releasable. A copy of the material is enclosed.

---

[166] See http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/laiplabackgroundtext.html.

[167] See http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslides.ppt (PowerPoint) and (http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslidestext.html (HTML).

[168] Dean Alderucci, Comments of Cantor Fitzgerald in Response to the Proposed Rules of the U.S. Patent and Trademark Office at 71 Fed. Reg. 48  (January 3, 2006) and 71 Fed. Reg. 62 (January 3, 2006) at Exhibit A (online at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/ fpp_continuation/continuation_comments.html, Individual Comment #3.

P000328

The 114 pages enclosed consisted of the data tables and the Chicago Town Hall Slides and other information now on USPTO's web pages.[169]

USPTO's refusal to disclose critical information apparently does not apply to all members of the public. During the annual meeting of the American Intellectual Property Law Association (AIPLA), on October 19, 2006, Commissioner for Patents John Doll offered to share the agency's models and assumptions with AIPLA's board of directors.[170] Like many of the signatories of this letter (see page 6 of the principal letter and Attachment A), AIPLA formally opposed both the Continuations Rule and the Limits on Claims Rule.[171] Nevertheless, selective disclosure of critical data, models and assumptions is fundamentally incompatible with any reasonable standard of good governance.

## II.    Legal Vulnerability

Under administrative law USPTO must make the technical bases for its proposed rules available at the beginning of the Notice and Comment period. This is not new.

*Connecticut Light and Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982) explains the need for agency transparency as follows:

> The purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticisms to the agency during the rule-making process. If the notice of proposed rule-making fails to provide an accurate picture of the

---

[169] See Attachment N.

[170] Eric Yeager, "USPTO Commissioner Doll Says That Limiting Continuations Will Improve Patent Landscape," 72 *Patent, Trademark & Copyright Journal* 704ff ("USPTO invited the AIPLA board to take a look at the agency's models and the assumptions they are based upon. Those models will reveal that USPTO's proposed change to continuation practice will turn the backlog situation around").

[171] "These proposed changes, taken individually or together, are troubling. In one instance, the Office proposes to severely limit the number of claims it would accept in an application for initial examination. We believe that this would tend to limit the ability of an applicant to obtain claims for an invention that are commensurate with the full scope of the contribution by the inventor(s). In the other instance, the Office proposes to severely limit the opportunity for continued presentation of claims by means of continuation and continued examination practice. Standing alone, this proposal would disadvantage applicants by prematurely truncating prosecution of their applications; however, it would further disadvantage applicants when combined with the limited number of claims proposed to be accepted for initial examination. As a practical matter, these proposals would place great pressure on applicants (1) to reduce the scope of the claims pursued (whether in a single application or in unrelated applications) and (2) to accept more narrow claims as a result of the more limited opportunity for continued presentation of claims. Inventors would be far less able to adequately protect their property." See Letter to Undersecretary of Commerce Jon Dudas from AIPLA Executive Director Michael Kirk at 2, online at http://www.aipla.org/Content/ContentGroups/Issues_and_Advocacy/Comments2/Patent_and_Trademark_Office/20066/ContinuationLetter.pdf.

---

ATTACHMENT L: USPTO HAS WITHHELD DATA AND ANALYSIS ESSENTIAL FOR    PAGE L-2
EVALUATING ITS PROPOSALS

P000329

reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals.  As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making.  <u>In order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules</u>.  To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport.  <u>An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary</u>.
(Emphasis added)

Other courts have similarly recognized the importance of ensuring that regulated parties have access to the complete public record and all data on which an agency relies.[172]

In Attachment E, we outlined why USPTO lacks the statutory authority to issue substantive rules and why the Office is vulnerable to legal challenge for exceeding its authority. By withholding critical information, USPTO also has committed a fatal error in administrative law sufficient to justify a federal court to vacate these rules before ever reaching any argument about USPTO's statutory authority.

---

[172] *See also Hanover Potato Products, Inc. v. Shalala*, 989 F.2d 123, 130, fn. 9 (3rd Cir. 1993) (*citing Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C.Cir.1977) ( "[e]ven the possibility that there is here one administrative record for the public and this court and another for the [agency] and those 'in the know' is intolerable") and stating "We believe a regulated party automatically suffers prejudice when members of the public who may submit comments are denied access to the complete public record.")

# Attachment M

# USPTO's Estimates of Paperwork Burden are Invalid and Unreliable

Paperwork burdens are an important part of the patent application and examination process. Indeed, except for the indirect effects that the process has on innovation and property rights, the largest effects of the system are realized as paperwork burden.

USPTO has disclosed no analysis of the likely social costs and benefits of these draft rules (Sec. 1(b)(6)). The benefits USPTO emphasizes are reductions in burden to USPTO. In Attachment H, we show that even these benefits are largely illusory, and that there is a high probability that these rules will result in a significant increase in patent applications (in response to the "Limits on Claims" Rule) and overload the senior examining corps and Board of Patent Appeals and Interferences (in response to the "Continuations" Rule). USPTO has set forth no reasoned determination that the benefits of these regulations justify the costs (Sec. 1(b)(6)). Without even a rudimentary analysis of benefits and costs, a reasoned determination simply isn't possible.

## I.    USPTO's Baseline Estimates of Paperwork Burden

### 1.    ICR

Both rules refer to the same Information Collection Request (ICR 0651-0031). The Limits on Claims Rule would require applicants to submit Examination Support Documents (ESDs) for applications designating more than 10 claims for initial examination; the ESD is an element of ICR 0651-0032.

### 2.    Burden estimates

The following data come from OMB's paperwork Approved Information Collection Inventory[173] (with averages calculated for convenience):

ICR 0651-0031

2,495,139 respondents
3,724,791 hours
$114,723,236

Average hours per respondent: 1.5
Average cost per respondent: $46

---

[173] See http://www.reginfo.gov/public/do/PRAMain.

ICR 0651-0032 (ESD only)

    10,000 responses
    240,000 hours
    $3,900

    Average hours per respondent: 24
    Average cost per respondent: $0.39

To put these burdens in perspective, the average billing rate of a patent lawyer who prepares an application exceeds $300 per hour (USPTO uses $304). If USPTO's estimates of burden and non-labor cost are reasonably accurate, the total cost of paperwork burden exceeds $1.2 billion for ICR 0651-0031 and $72 million for ESDs.[174]

Based on hundreds of man-years of experience combined in the signatories of this letter, we believe that these estimates grossly understate the true burden. If USPTO's figures were correct, the cost of applying for a patent for the average applicant would be approximately $350.[175]  Even the simplest patent applications cost over $5,000, relatively complex computer inventions cost average about $10,000, and complex applications can cost $30,000 or more.[176]

USPTO's burden estimate for preparing an ESD is 24 hours.[177]  We've been unable to determine how the Office arrived at this estimate. The most recent substantive ICR submitted to OMB (and approved on June 5, 2007) has a published supporting statement, but it is silent about the burden of ESDs. None of the previous five substantive ICRs, going back to 1999, has an available supporting statement.

---

[174] USPTO's burden estimates exclude the time and cost associated with appeals.

[175] For the purposes of this analysis, we exclude user fees paid to USPTO to pay for examination services. In FY 2006, USPTO's patent operations recognized $1.384 billion in fee income. http://www.uspto.gov/web/offices/com/annual/2006/2006annualreport.pdf page 63.

[176] American Intellectual Property Law Assn, Report of the Economic Survey 2005, page I-94 to I-95.

[177] See OMB's Information Collection Inventory, Department of Commerce, ICR 0651-0032, row 2 ("Examination support document filed in certain nonprovisional applications covering the independent claims and the designated dependent claims (proposed 37 CFR 1.75(b)"). http://www.reginfo.gov/public/do/PRAMain.

P000332

| OMB Control Number History for ICR 0651-0032 Related to ESD Requirement in Proposed Limits on Claims Rule | | | | | | |
|---|---|---|---|---|---|---|
| ICR Reference Number | Date Review Concluded by OMB | Respondents | Burden Hours | Dollars | Supporting Statement? | Supporting Statement Explains ESD Burden? |
| 200702-0651-008 | 06/05/2007 | 543,591 | 10,677,624 | $ 243,201,076 | Yes | No |
| 200506-0651-001 | 07/31/2006 | 454,287 | 4,171,568 | $ 575,550,000 | No | -- |
| 200309-0651-007 | 07/31/2006 | 454,287 | 4,171,568 | $ 493,593,000 | No | -- |
| 200304-0651-002 | 07/14/2003 | 454,287 | 4,171,568 | $ 258,115,000 | No | -- |
| 200004-0651-002 | 08/07/2000 | 344,100 | 2,990,360 | $ 7,095,000 | No | -- |
| 199908-0651-001 | 10/26/1999 | 344,000 | 2,994,160 | $ 7,095,000 | No | -- |
| Actions reported by OMB as non-substantive or emergencies extension are excluded\ | | | | | | |

Currently, ESDs are only required for accelerated examination. We have reviewed a few and it is our judgment that they require much more than 24 hours of effort. In order to prepare an Examination Support Document, the applicant must:

1. Perform a pre-examination search of all U.S. patents and patent application publications, foreign patent documents, and non-patent literature directed to the designated claims, giving the claims the broadest reasonable interpretation. This pre-examination search could easily uncover 25 to 100 or more documents. While some of these documents could be 1-2 pages, the vast majority of these documents will likely be 10-20 pages in length, and in for some inventions, particularly biotechnology, it would not be uncommon for many if not most of these documents to be from 50 to 100 pages or more in length.

2. Have their patent attorney analyze in detail all of the documents uncovered by the search to determine the documents that are most closely related to the claims designated for examination. This analysis is quite time consuming and far exceeds a mere reading of the documents. The patent attorney must fully understand how the teachings of the document relate (or don't relate) to the claimed invention. If the resulting patent were ever litigated, improperly excluding just one document that a court later finds to be highly relevant could result in the patent being unenforceable. The relevance of a document could turn on a description in one paragraph or one data table of a 100+ page document.

3. Once the patent attorney has determined the documents that are most closely related to the designated claims, the patent attorney's assistant or paralegal must prepare a form to

submit to the USPTO listing these documents ("the cited references"). For a small number of documents, this is not a very time consuming task.

4. The patent attorney must then prepare a description that identifies all of the portions of the designated claims that are disclosed by each of the cited references. These statements could be used against the applicant by USPTO or the courts. Thus, the patent attorney must take a lot of time and care in crafting this description.

5. The patent attorney must then prepare a detailed explanation of how each of the designated claims are patentable over the cited references. If the resulting patent were ever litigated, this explanation could come under intense scrutiny, and imprecision in the language of the explanation could result in the patent being held unenforceable. Thus, the patent attorney must take a lot of time and care in crafting this explanation.

6. The patent attorney must then prepare a concise statement of the utility of the invention as defined in each of the independent claims.

7. Finally, the patent attorney must prepare a description of where each limitation of the designated claims is provided by the description provided by the application (and in some circumstances in other applications as well). If the resulting patent were ever litigated, this description could come under intense scrutiny, and imprecision in the language of the explanation could result in the patent being held unenforceable. Thus, the patent attorney must take a lot of time and care in crafting this description.

The Examination Support Document in essence outsources the research behind an examination to the applicant. As noted above, every statement or omission made in the ESD could be grounds for invalidating the patent during litigation. Applicants will have to take an extraordinary amount of time in preparing such documents in an attempt to limit these potential adverse effects of future litigation. Similar misstatement or omissions by examiners cannot be used in litigation to render the patent invalid. Accordingly, USPTO is charging applicants for this research, then outsourcing it back to the applicant, who for legal reasons is the highest cost provider.

We've been unable to determine how USPTO arrived at an estimate that the Office could expect to receive 10,000 ESDs annually or how they would require only 24 hours to prepare an ESD (as stated in the ICR Inventory), or reconcile these figures with the absence of any burden at all from preparing ESDs (as set forth in the proposed Limits on Claims Rule).[178] As for the non-labor costs, USPTO's estimate needs no further discussion.

---

[178] We can speculate that USPTO concluded that the preparation of an ESD requires three work days, or perhaps that is the amount of time that it would take an <u>examiner</u> to prepare an ESD; after all, several of the tasks required to prepare an ESD are typical "examiner" tasks. However, as noted above, examiners do not need to take inequitable conduct concerns into account when preparing ESDs and other documents whereas this is a crucial element in the private practice in patent law.

ATTACHMENT M: USPTO'S ESTIMATES OF PAPERWORK BURDEN ARE INVALID                    PAGE M-4
AND UNRELIABLE

II.     **USPTO's Predicted Changes in Paperwork Burden**

1.     **ICR**

The Limits on Claims Rule would limit applicants to initial examination of 10 claims or require them to prepare an ESD. The Continuations Rule could cause applicants to submit vastly more mature and elaborate applications at very early stages of the process. Alternatively, the Limits on Claims Rule apparently invites applicants to spend extra time and money splitting the disclosure that would now be placed in a single application into several separate applications.[179] It is understood that these changes would significantly increase the cost of submitting patent applications on complex inventions. At a symposium held at Duke University in February 2006, the Deputy General Counsel for Intellectual Property Law and Solicitor of USPTO, John Whealan, acknowledged the increased applicant burden, and cited it as a rentseeking benefit to the patent bar:

> "The good news is, for you patent prosecutors out there, your rates should go up, not your rates, but your hours, because this is going to take probably more work to do."[180]

Mr. Whealan was the Office's designated speaker at Duke and at many other USPTO's "Town Hall" meetings, so he must be presumed to speak with authority for USPTO. The question therefore is not whether paperwork burdens will increase under these rules; it's how much.

2.     **Burden estimates set forth in the two draft rules**

The proposed rules provide the following estimates of paperwork burden for ICR 0651-0031

2,284,439 respondents
2,732,441 hours

This is a decrease of 210,700 respondents (8.4%) and a decrease in burden hours of 992,350 (27%). The average burden would decline from 1.5 hours to 1.2 hours, meaning that the applications not submitted average 4.7 hours each. At first blush, this appears to be consistent with both the data found in the Continuations Rule that about 30% of USPTO's workload is

---

[179] The invitation is either illusory, or *extremely* difficult to comply with: in the Continuations rule, proposed 37 C.F.R. §1.78(f)(2) establishes a rebuttable presumption of double patenting when there is a "substantial overlapping disclosure" between one application and any other applications or patents that share the same filing date and name at least one inventor in common.

[180] See Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm (Feb. 17, 2006), at time mark 1:01:03.

P000335

associated with continuations[181] and our calculation that about 7% of total applications would be affected by the Continuations Rule – so long as one presumes that the intellectual property behind these applications simply vanishes.

The Limits on Claims Rule includes a new requirement that applicants prepare Examination Support Documents (ESDs) if they want to have more than 10 claims initially examined. However, the paperwork notice contained in the preamble identifies no new burden from ESDs. Although this may appear to be counterintuitive, it might not be: USPTO has indicated that it expects that no applicants will avail themselves of the opportunity to submit an ESD.  John Whealan admitted as much at the Duke University symposium:

> "You file 50 [claims,] we're going to look at ten. . . .   We'll look at the independents, a couple dependents.  If you want all your claims examined up front, you can have it done, but it's going to cost you, you're going to have to do some work, which in the current law of inequitable conduct, nobody's going to want to do."[182]

The "law of inequitable conduct" imposes on patent attorneys a duty of "candor, good faith and honesty" in their dealings with USPTO, and the chief duty is to provide the Office with all prior art materials that "a reasonable examiner would have considered … important in deciding whether to allow … the application."[183]  It is not a trivial matter,[184] and for that reason USPTO's chief litigator believes that the ESD requirement constitutes a "poison pill" that will ensure no applicant opts to have more than 10 claims initially examined.  And Mr. Whealan is not alone in recognizing the practical effect of this doctrine. In its comments to USPTO opposing the proposed Continuations Rule, the American Intellectual Property Lawyers Association specifically noted that the alternatives the agency was offering had limited value precisely

---

[181] It is inconsistent with the data in Attachment H, which shows that far less than 30% of all applications are second and subsequent continuation that would be terminated by the draft rule.

[182] See Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm, at time mark 1:02:58.

[183] *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1316, 77 USPQ2d 1823, 1829 (Fed. Cir. 2006).

[184] If a court finds that inequitable conduct has been committed, all patent rights are taken away and the patent is unenforceable.  Severe sanctions per se are not objectionable, but the circumstances under which they are imposed can be highly unpredictable.  See, e.g., "United States: Patent Prosecutors Beware, Litigators Take Note: Federal Circuit Affirms Novel Inequitable Conduct Ruling," describing the Federal Circuit's recent decision in *McKesson Information Solutions v. Bridge Medical* (Fed. Cir. 2007). (on-line at: http://www.mondaq.com/article.asp?articleid=48813). The inability to predict what behavior could have devastating consequences leads patent lawyers to act in highly risk-averse ways.

because the threat posed in litigation by the law of inequitable conduct meant that the burden of submitting applications would be much higher:

> The Office argues that neither proposal is "absolute" in the sense that applicants are not absolutely precluded from filing a second continuation application or a second request for continuing examination, nor are they absolutely precluded from presenting more than ten claims for examination. In a practical sense, however, these alternatives will be of little comfort to applicants, who will have to pay the higher costs of performing the initial search and examination themselves and pursuing continued claim presentation opportunities through the more costly administrative route of petition and/or appeal and a much higher potential for subsequent inequitable conduct allegations.[185]

### 3. Adaptive responses by patent applicants not accounted for by USPTO

USPTO's estimates of the change in paperwork burden require at least two very strong assumptions to be valid. First, if continuations above some number are essentially abolished, applicants will simply drop the applications as if they were superfluous. Second, if applicants have to submit an ESD in order to have more than 10 claims initially examined, all claims beyond 10 independent claims will disappear. Neither assumption is remotely plausible.

With respect to the Continuations Rule, applicants will engage in various forms of adaptive response, including some combination of the following practices. First, they will devote more effort to their initial applications and to the single continuations that they still would be permitted by right. These additional efforts must translate into greater burden. So, even if the number of respondents were to decline exactly as USPTO forecasts, each application that otherwise would have been reasonably expected to consist of multiple continuations will be more burdensome to prepare. Also, because the right to subsequent continuations will be essentially abolished, many more Final Rejections will be petitioned and/or appealed. Petitions and appeals should be estimated and counted as paperwork burden, especially when they are the direct result of a policy change that putatively results in burden reduction.

With respect to the Limits on Claims Rule, applicants will engage in various other forms of adaptive response, including some combination of the following practices. In some cases, they will divide a complex invention into multiple applications to ensure that claims to each aspect of the invention are initially examined. Also, they will draft certain claims in ways not warranted by patent law, simply to gain full examination of subject matter within the 10-claim limit. Both of these predictable adaptive responses entail greater paperwork burden.

USPTO has ignored all of these adaptive responses in estimating paperwork burden.

---

[185] See Comments by AIPLA at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/ fpp_continuation/aipla.pdf, footnote 1.

P000337

### 4. Appeals

We've already pointed out that USPTO has ignored the paperwork burden associated with increased numbers of appeals to the Board of Patent Appeals and Interferences (BPAI), and the increased numbers of petitions to the Director relating to premature final rejection. It also has ignored the likelihood that these rules would inundate the BPAI and petitions office.  By limiting continuing examination, USPTO raises the stakes associated with Final Rejections and will thus increase the number of both proceedings.

P000338