# Exhibit 18

**Comment letter of David Boundy to Stephen McMillin, Deputy Director OMB  
(July 3, 2007)**



**By FAX (202) 395-1005**

Stephen S. McMillin
Deputy Director
Office of Management and Budget
Washington, DC 20503

Michael Bopp
Associate Director
Office of Management and Budget
Washington, DC 20503

July 3, 2007

      RE: Budget effects of two proposed rules

      RIN: 0651-AB93, Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims, 71 Fed. Reg. 48 (Jan. 3, 2006) ("Continuations Rule")

      RIN: 0651-AB94, Changes to Practice for the Examination of Claims in Patent Applications, 71 Fed. Reg. 61 (Jan. 3, 2006) ("Limits on Claims Rule")

Dear Mr. McMillin:

      We are writing to express our deep concern about the negative budget impact of these two rules, which are now under review by the Office of Information and Regulatory Affairs. After we met with OIRA two weeks ago to present our concerns, we were advised that we should write to you as well, to convey our observations that these two rules would conflict with the President's objective to preserve revenues.

      USPTO will admit that these two rules would (a) immediately reduce revenues on adoption, and (b) forfeit revenues of approximately $70 million[1] per year within 3 years, growing by about 10% per year thereafter. We believe that the rules will also substantially increase costs for the USPTO.

      Ironically, the USPTO is proposing to reduce its most profitable products. USPTO's projections in the Notices of Proposed Rulemaking, and materials provided on USPTO's web site[2] and in response to FOIA requests,[3] reveal no consideration[4] given to

---

    [1] Accumulating all revenues from the patents that USPTO proposes to terminate, reduced to present value.

    [2] http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/focuspp.html

A008433

Stephen S. McMillin, Michael Bopp
1BJuly 3, 2007
Page 2

the adverse budget effects of the proposed revenue cuts (some of which cannot be restored without congressional action to increase user fees), the selective effect on USPTO's highest-revenue and lowest-cost-per-revenue-dollar applications, and the adverse affects of this budget impairment on future patent quality or pendency.

**The Continuations Rule**

The NPRM for the Continuations Rule states that USPTO intends to cause a loss of 4-5% in USPTO revenue, by making it impractical for applicants to file a corresponding number of patent applications.[5] Note that USPTO's patent operations are fully funded by user fees – thus the USPTO's intended reduction in patent applications translates directly to top line revenue loss. We estimate, based on USPTO's own figures, that the revenue loss will be some tens of millions in the first year, growing to about $70 million per year by FY 2010, and thereafter grow by about 10% per year.[6]

Strikingly, the 4-5% of applications that USPTO proposes to do away with are the **highest profit** applications – the average revenues are significantly higher[7], and they are the applications that are least expensive for USPTO to examine.[8]

---

[3] In response to several FOIA requests directed to these issues, USPTO provided nothing of any material relevance or assistance in evaluating budget effects. See our letter to OIRA, http://www.whitehouse.gov/omb/oira/0651/meetings/619-3.pdf, Attachments L and N (PDF pages 72-74 and 86-282)

[4] Public comments by senior USPTO officials suggest that USPTO did almost no analysis of any issue relating to these two rule packages. For example, at one pubic meeting, in New York on April 7, 2007, a question was asked by a member of the audience, and answered by John Doll, Commissioner for Patents, as follows:

> Question: Commissioner Doll, did you do any studies to identify where these rework applications are coming from? Do you have any sense for whether they're caused by the examiner screwing up or the applicant screwing up? How are you getting into that problem?
>
> Commissioner Doll: No, I didn't differentiate between whether it was an applicant error or an examiner error.

[5] 71 Fed. Reg. at 50, col. 1-2.

[6] The full analysis is set forth in a letter from Dr. R.D. Katznelson to Susan Dudley of June 29, 2007, available at http://www.whitehouse.gov/omb/oira/0651/comments/460.pdf at pages 4-5 and Table 1, based on data supplied by USPTO at 71 Fed. Reg. at 50, col. 1-2 and in its "Chicago Slides," http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslides.zip

[7] Patents issued from continuations are maintained longer by their owners and thus generate higher maintenance fees to the USPTO than average patents. Kimberley A. Moore, Worthless Patents, Berkeley Technology Law Journal, vol. 20 no. 4, pp. 1521-52 (Fall 2005). The results are summarized at pp. 1530-31, and note that the "continuation" applications that USPTO proposes to prohibitively discourage are applications that have one of five attributes most associated with the highest levels of fee income for USPTO.

Stephen S. McMillin, Michael Bopp
1BJuly 3, 2007
Page 3

The Continuations Rule will almost certainly raise USPTO costs. The rule proposes to essentially abolish use of continuation applications as a low-cost mechanism for resolving disputes between an individual examiner and an applicant, and to compel use of appeal to the USPTO's administrative tribunal. Appeal is a far more contentious mechanism than a continuation application, and requires the deep substantive involvement of a minimum of six USPTO personnel, plus administrative assistance of a number more.[9] Though USPTO provided no information on costs, common sense suggests that appeals must be far more expensive for the USPTO than the continuation process that USPTO proposes to curb. There is also no question that appeals are far more expensive for applicants, and there can be little question that applicants' adaptive responses to the rules will force some of these increased costs back to USPTO.

There is no dispute that USPTO proposes to cut revenue. Even on USPTO's rosy speculation in the NPRM, any cost savings are years in the future. USPTO's speculation, at least as it was described in oral presentations, is based on selective "cherry picking" of likely effects, and ignores those effects and responses that will raise costs. We urge you to require USPTO to engage in the legally-required transparent Notice and Comment procedure, by disclosing any data and analysis supporting any cost savings it might claim, including each budget issue that was raised in the public comment letters.

**The Limits on Claims Rule**

The Limits on Claims rule proposes to limit the number of "claims" that may be presented in a patent application. USPTO charges user fees for these claims, that rise at a more-than-proportional rate.

USPTO will concede that the rule proposes an immediate downward effect on revenue. Though the NPRM proposes a euphemistically-labeled "burden sharing"

---

[8] USPTO has provided no data whatsoever on comparative costs of examining various types of applications. However, our experience as users of USPTO services informs us that continuation applications tend to sail through the examination process much faster, because most of the contentious issues have already been resolved in prior patent applications. *See*, *e.g.*, public comment letter of 3M Corp., http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/3m_con.pdf at pp. 2-3; letter of R.D. Katznelson, at pages 16-17.

[9] Our best data suggest that the costs that USPTO proposes to impose on applicants are overwhelmingly the costs of *correcting errors made by the USPTO itself*. One public comment letter, relying on USPTO web site and FOIA statistics, found that over 80% of prolonged disputes between applicants and examiners are the result of errors by the examiner. http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/heritagewoods_con.pdf at pages 2-4. Another, performed by a law firm on a sample of its own applications, found that USPTO itself was forced to admit procedural or substantive error in over 92% of prolonged disputes. http://www.uspto.gov/web/offices/pac/dapp/opla/comments/ fpp_continuation/aipla.pdf at page 10 (PDF page 11). Others have observed that this 80-90% USPTO defect rate likely arises because of lack of enforcement of USPTO internal management controls and administrative law obligations. heritagewoods_con.pdf at pages 23-29.

Stephen S. McMillin, Michael Bopp
1BJuly 3, 2007
Page 4

procedure to mitigate the harshest effects of the Limits on Claims rule, in an unguarded moment caught on a recorded web video, one of USPTO's primary architects of these rule packages, concedes that the "burden sharing" procedure conflicts with other requirements of law so that no one will actually use it.[10]  We believe that USPTO understands that it is proposing to essentially "zero out" applications that would fall within the Limits on Claims rule, and the user fees that go with them.

Four factors that USPTO did not consider (at least not in any document that USPTO made available during the rulemaking process or by FOIA request), suggest that the Limits on Claims rule will be revenue-negative, and that the loss in revenue will be significantly greater than the costs USPTO hopes to save.

First, USPTO simply ignored the budget effects of adaptive responses by applicants, even the responses that USPTO itself has stated it intends to encourage. USPTO's public presentations frankly warned applicants that they will have to prophylactically file *more* applications, *sooner*, to preserve rights.  USPTO also acknowledged that there will be a "bubble" of applications as soon as the final rules are announced.  Once these applications are filed, they will have to be examined, driving up USPTO's costs in the short term.  But, because many will be speculative prophylaxis, of low value, they will be abandoned *after* USPTO incurs its examination costs but *before issue and maintenance fees* begin to flow.  That is, USPTO will **lose about 90%** of the revenue associated with these patents, even though it will continue to bear essentially 100% of the cost.[11]

Second, various web forums have discussed various techniques to deal with the rules.  They tend to increase USPTO's costs.  USPTO has not accounted for these adaptive responses.

Third, the single largest determinant in patentees' payment of maintenance fees is the number of claims[12] – the attribute that USPTO seeks to reduce.  Maintenance fees are over ¾ of the total fees generated by a patent, and they are "free money" for USPTO –

---

[10] "If you want all your claims examined up front, you can have it done, but it's going to cost you, you're going to have to do some work, which in the current law of inequitable conduct, nobody's going to want to do." See Duke University Law School, Fifth Annual Hot Topics in Intellectual Property Law Symposium, http://realserver.law.duke.edu/ramgen/spring06/students/02172006a.rm, at time mark 1:02:58.

[11]  The revenue life cycle for a patent includes $1000 due at filing, $1400 due at issue, and $7000 in maintenance fees.  All of these fees are optional – when a patent is found to be of low value, the patentee simply declines to pay the fee, and the patent goes abandoned.  However, the USPTO currently obligates itself to incur its full costs on payment of the $1000 filing fee.

[12]  Moore, Worthless Patents, at pp. 1530-31; *see also* J.A. Barney, A Study Of Patent Mortality Rates Using Statistical Survival Analysis To Rate And Value Patent Assets, *AIPLA Quarterly Journal*, vol. 30, no. 3, pp. 317-352 (September 2002) (showing in Figure 4 that non-payment of a maintenance fee is twice as likely for a patent with 3 independent claims as for a patent with 12 or more independent claims).

Stephen S. McMillin, Michael Bopp
1BJuly 3, 2007
Page 5

the administrative costs are trivial. It is unquestionable that the Limits on Claims rule will make patentees less willing to pay these fees. USPTO has declined our FOIA requests for the data that it has that would allow us to make a quantitative prediction, but it is a safe qualitative prediction that the Limits on Claims rule will cut USPTO off from its most profitable stream of revenue.

Fourth, we believe that the applications that would be curbed by the Limits on Claims rule are among the more profitable for USPTO. The incremental revenue for claims comes at relatively low examination cost for USPTO: claims in a single application are necessarily closely related, and therefore examination burden for claims in an application grows much less than linearly, even though fees grow at a somewhat-more-than-proportional linear rate.[13] For example, an application with twice as many claims as another generates substantially higher lifetime revenue (*e.g.*, 2 to 4 times the filing fees, and higher likelihood of full maintenance fees), but we believe that such applications generally cost only slightly more to examine.

We are reasonably certain that the Limits on Claims rule will have direct and immediate adverse affects on revenue and costs, accelerating quickly. The Limits on Claims rule will substantially raise USPTO's average costs per dollar of revenue.

**Effects on future business growth and tax revenue**

A number of the public comment letters noted that the patent applications targeted by these rules are overwhelmingly the very applications that matter most in building tomorrow's innovative businesses. Though the revenue effect of terminating access to these business assets is a long term one, it is likely to be far larger, and far more harmful to the public at large.

**Alternatives exist that would likely cut USPTO's costs with literally <u>no</u> adverse effect, but USPTO failed to consider them**

The various public comment letters noted a number of alternatives that USPTO could explore that would be more likely to solve any problem that USPTO might believe to exist.[14] As one example, in 2004, Congress gave USPTO the authority to ditch the **least profitable** part of its workload, but USPTO has failed to implement this authorization. Under prior law, USPTO was required to examine *every* application, even those that applicants had lost interest in, applications that have zero likelihood of generating the 90% of potential fee revenue that arises from issue and maintenance fees.

---

[13] If claims in an application are directed to inventions that are "distinct" from each other, then the USPTO "divides" the application, so that the claims in each daughter application are closely correlated to each other. 35 U.S.C. § 121; 37 C.F.R. § 1.141-146. USPTO then collects two sets of filing fees, and usually more claim fees, to examine the two inventions.

[14] http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/continuation_comments.html and http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_claims/claims_comments.html .

A008437

Stephen S. McMillin, Michael Bopp
1BJuly 3, 2007
Page 6

At the request of USPTO, Congress authorized "examination on request," a procedure long used in several countries, including Japan and Canada, which would allow USPTO to let applications lie fallow until the applicant expressly requested examination and paid a fee.  Experience in other countries suggests that a substantial fraction of applications would be abandoned with no expenditure of effort by USPTO, reflecting a potential immediate savings of 20-25% in workload and financial efficiency.[15]  This would provide new opportunities for budget restraints by slowing down USPTO workforce growth.  USPTO has not even floated a proposed a rule to implement this authority.  Until USPTO demonstrates that its effort is directed to tasks that matter at least a *little* bit, we suggest that these two rules are premature.

    Our letter to OIRA noted myriad defects: USPTO provided very little analysis of economic effects, relied on poor-quality information, and withheld material information during the public comment period and from FOIA requests.  Therefore, our analysis is necessarily limited by the poor information quality of the USPTO's Notices and supporting materials.  We believe, however, that our qualitative results are correct, even if the precise quantitative results are no more reliable than the USPTO's data.

    We suggest that similar defects likely infect any budget analysis that USPTO may have provided to your Office.  We suggest that you confer at some length with USPTO budget officials to ensure that these rules do not impair the long term financial health of the agency, and the vitality of the patent system that is so crucial to tomorrow's business climate, and that other better alternatives are not prematurely dismissed.

    Sincerely,

David E. Boundy
Vice President, Intellectual Property
Cantor Fitzgerald L.P.
110 East 59th St.
New York, NY   10022
(212) 294 7848

On behalf of the undersigned companies

cc:  Susan Dudley, David Rostker

---

[15] Letter of R.D. Katznelson, at pages 20-22.

## SIGNATORIES

Bryan P. Lord
General Counsel
AmberWave Systems Corp.
Salem, NH

Dr. James E. Butler
Senior Director, Patents
Amylin Pharmaceuticals
San Diego, CA

Michael C. Schiffer
Vice President, General Patent Counsel
Beckman Coulter Inc
Fullerton, CA

Karin Eastham
Executive Vice President and COO
Burnham Institute for Medical Research
La Jolla, CA

David L. Gollaher
President & CEO
California Healthcare Institute
La Jolla, CA

Dean Alderucci
Chief Operating Officer and Assistant
    General Counsel
Innovation Division
Cantor Fitzgerald L.P.
New York, NY

Dennis F. Willson
President and Chief Executive Officer
Cytokine PharmaSciences, Inc.
King of Prussia, PA

Janet E. Hasak
Associate General Counsel – Director
Genentech, Inc.
South San Francisco, CA

Sherry M. Knowles
Senior Vice President
Corporate Intellectual Property
GlaxoSmithKline
King of Prussia, PA

Shirley Hubers
Vice President
Heritage Woods, Inc.
Alto, MI

Marcus J. Millet, on behalf of the firm
Lerner, David, Littenberg, Krumholz &
    Mentlik, LLP
600 South Avenue West
Westfield, NJ 07090

Michael Erlanger
Chairman and CEO
Marketcore, Inc.
Westport, CT

Mark Nowotarski
President
Markets, Patents & Alliances LLC
Stamford, CT

Joe Kiani
Chairman and CEO
Masimo Corp.
Irvine, CA

Dr. Diana Hamlet-Cox
Vice President and Chief Patent Counsel
Medarex, Inc.
Milpitas, CA  95035

Mark Leahey
Executive Director
Medical Devices Manufacturers' Assn.
Washington, D.C.

Stephen S. McMillin, Michael Bopp
1BJuly 3, 2007
Page 8

Neal Gutterson, Ph.D.
President and Chief Executive Officer
Mendel Biotechnology, Inc.
Hayward, CA

Paul K. Laikind
Director, President, and CEO
Metabasis Therapeutics, Inc.
La Jolla, CA

Reza Green
Chief Patent Counsel
Novo Nordisk Inc.
Princeton, NJ

Douglas G. Lowenstein
Chairman & CEO
Polestar Capital Partners LLC
New York, NY

Liza K. Toth
Associate Chief Intellectual Property
    Counsel
Senior Director
SanDisk Corporation
Milpitas, Ca.  95035-7932

Thomas Fitting
Chief Patent Counsel
The Scripps Research Institute
La Jolla, CA

Kerry A. Flynn
Vice President, Intellectual Property
Shire
700 Main St.
Cambridge, MA

Michael M. Wick, Chairman
CEO & President
Telik, Inc.
Palo Alto, CA

David A. Manspeizer
Vice President--Intellectual Property and
    Associate General Counsel
Wyeth
Madison, NJ

Jennifer K. Johnson
Senior Associate General Counsel, Patents
ZymoGenetics, Inc.
Seattle, WA