# Exhibit 19

**Comment Letter of Steven M. Hoffberg (May 2, 2006)**

Dockets.Justia.com

COMMENTS OF STEVEN M. HOFFBERG
DEPARTMENT OF COMMERCE
Patent and Trademark Office
37 CFR Part 1
[Docket No.: 2005-P-066]
RIN 0651-AB93

Changes To Practice for Continuing Applications,
Requests for Continued Examination Practice, and
Applications Containing Patentably Indistinct Claims

Overview

The U.S. Patent and Trademark Office has made a series of proposals which it claims are to make Office more efficient, to ensure that the patent application process promotes innovation, and to improve the quality of issued patents. However, in its analysis, it provides no definition of efficiency, nor does it provide sufficient discussion of value by which one could compare the benefits of implementation of the proposed rules and their respective costs on applicants and society as a whole. The patent office serves the role of protecting the public interest in blocking issuance of patents which do not comply with statute. 35 USC § 102 states that "A person shall be entitled to a patent unless…", and thus the patent office's role is principally to implement statutory limitations on patent issuance, and should not impose burdens on applicants principally for administrative convenience.

The USPTO takes the position that its obligation to examine all claims in an application makes it inefficient. That is equivalent to an attorney claiming that having to show up in court makes him inefficient, and therefore seeking to abolish rules which compel attendance.

The proposed rule changes are allegedly intended to make the patent examination process more effective and efficient "by reducing the amount of rework by the USPTO and reducing the time it takes for the patent review process." However, it is not clear how reducing the workload of the USPTO to thereby reduce its output increases efficiency. The USPTO seeks more money for less work, the opposite of efficiency.

The Patent Office states that the proposed changes will improve the quality of issued patents and ensure that the USPTO continues to promote innovation. While it is the purpose of the patent office to issue patents, and the purpose of patents to promote progress of the useful arts, it does not necessarily stand to reason that the agenda of the patent office is to directly promote "innovation", and certainly not in a manner which distinguishes this term from "invention". Apparently, the USPTO considers its role not to necessarily promote the inventive process, as measured by patentable inventions, but also to promote the conflicting goal of promoting manufacturing, regardless of whether the manufacturer infringes patents the USPTO has issued. It should be clear that it is not

A003166

the role of the USPTO to protect infringers, except through its oversight of the patents it issues, to ensure their validity.

The patent office states: "The recognized value of patents to innovation has led to enormous increases in the number of patent applications filed each year." By this very definition, the number of patent applications correlates with "innovation", and therefore efforts to quell the number of patent applications will quell "innovation."

Thus, it is respectfully submitted that reducing the number and extent of patents which strategically target infringers through elaboration of both broad and focused claims designed to survive litigation and appeal does not promote innovation, but rather defeats the predicates of the patent system which originally ensured exclusive rights for a limited period to the inventor for his disclosed invention. The patent system has apparently evolved to focus on the "claimed invention", and now, the "initially claimed invention", and soon to be, "the invention as set forth in the ten designated claims".

The USPTO states that its "resources have not increased at the same rate as filings," however, recent changes have budgeted to the USPTO funds equivalent to the filing fees paid, and thus the USPTO should have monetary resources to cover its operations. This statement therefore makes no sense. Even if there is a mismatch between resources growth and filings, at a minimum, an 18 month pendency prior to examination means that resource expenditures lag filings, and thus this assertion is misleading at best. By its own analysis, the arbitrary limits imposed on USPTO resource growth will stifle innovation, and the appropriate action is not to take steps to reduce patent application filings.

The patent office further alleges that "it has become much more difficult to provide reliable, consistent and prompt patentability decisions." Except perhaps for the tense, this statement is true. It is quite difficult to make correct, reliable, consistent and prompt patentability decisions. There are no credible proposals, including those now presented by the USPTO, which solve this problem. The USPTO's solution is apparently to simply discriminate against a group of patent applications, perhaps those which are most valuable, and thus worthy of a greater number of claims and continuation chains. However, with a reduced volume of applications, filing fees, and ultimately resources, will decrease, thus exacerbating the problem the USPTO seeks to remedy.

The targets of the USPTO disincentives are, perhaps, the highest "profit" items; i.e., alternate claim forms focusing on common issues, applications subject to double-patenting rejections, and the like. Thus, while the USPTO claims these changes will make it more "efficient" it is perhaps more true that the opposite is true, since the average time per examination will increase due to the greater proportion of new issues, and thus, de novo searches.

The USPTO alleges that the "delay in granting a patent can slow new products coming to market," but, in fact, most patent applicants do not wait for patent issuance before marketing new inventions. It is, perhaps, competitors and would-be infringers who anxiously wait to see if a hurried, narrow patent is the best that an applicant could muster,

and thus come to market with a copy-cat product. Issuing patents for inventions that are not novel and non-obvious can impede competition and economic growth, and it is thus laudable that the USPTO seeks to address this problem. However, the rule changes by the USPTO are not rationally related to achieving these goals, and may ultimately move in the other direction. For example, except to the extent that the "examination support document" is a purely punitive measure to impose the harshest burdens on applicant available to the USPTO, to discourage perceived abuses, the USPTO seeks to abdicate its search responsibility to applicant—clearly, this proposal will not improve, but will impair patent quality. Further, the USPTO has not in any way considered its increased internal costs as a result of the proposed rules, nor the ordinary patent attorney's anticipated response to these proposed rules. In the present legal system, a patent attorney is obliged to zealously represent clients within the bounds of law, 37 C.F.R. § 10.83 (Canon 7). This obligation will no doubt cause practitioners to undertake Petitions, Appeals, and other burdensome steps in order to secure and preserve the full scope of applicants' rights.

For example, an Examination Support Document (hereinafter, "ESD") may be a complex document, tens or hundreds of pages long. If patent examiners now consider reading the specification optional, and indeed the USPTO presently allocates insufficient time for permitting the examiners to review many applications fully, how are they to obtain sufficient time to review this new complex document? How are they to treat the search reported in the ESD? If the Examiner's interpretation of the scope of the claims differs from applicant's, does the Examiner need to perform a new search?

Under the new rule limiting continuations, petitions of every adverse administrative determination, and appeals of every adverse examining decision are almost assured. The proposed rules leave simply no room for conciliation, compromise, or deferred focus on certain issues. Instead of streamlining examination, and permitting applicants and examiners to work cordially and efficiently toward a common goal, the new proposals will create a rigid environment with multiple exceptions to normal workflow.

It is the undersigned's experience that there are sufficient irregularities in the USPTO system, including lost documents and files, unexplained delays, and non-compliance with its own procedures, rules, laws, and treaties, than forcing applicants to strict compliance with the proposed rule changes would be unfair, burdensome, and antithetical to both the theory and practice of patent law as a means to secure to inventors their constitutional rights. Until the USPTO demonstrates competence in managing its own resources to assure that its process (if not its product) is predicatable and in accordance with all applicable laws, it will have little credibility in convincing its customers that they should further trust USPTO management to further restrict the process.

The USPTO alleges that, "simply hiring more patent examiners will not slow the growth in the time it takes to get a patent or improve the quality of examination." Has this assertion ever been supported by any study? On what basis is this straightforward and sustainable solution rejected? The USPTO had clear knowledge of patent filing trends before it moved to a new facility, and committed to its current staffing level and staffing

capacity. The USPTO was well forewarned, by PEPA and others, that its move to new Alexandra facilities was fraught with peril, but it proceeded, and now, instead of apologizing to its failure to heed its critics for their foresight and intuition, it instead now alleges that hiring new examiners is not an available solution. There is simply no support in administrative law and practice to impose substantive limitations on the legal rights of the public simply because the administration has misjudged its workload and resources.

The USPTO states that it is seeking the "participation" of applicants in facilitating more effective and efficient patent examination. However, it is clear that the USPTO management does not seek cooperation of applicants, and rather seeks to instill an air of antagonism, by imposing a punishment in the form of an ESD and limitations on continuation applications. It compares the proposed ESD to a Appeal Brief. A particular difference between the ESD and Appeal Brief is that in the proposed ESD, applicant must provide a search, claim interpretation, and detailed analysis of search results with respect to each element of each claim, whereas in an appeal brief, the focus is on the rejection formulated by the Examiner and his or her interpretation of the references.

Director Dudas is quoted as saying: "Better quality applications mean better examination. We need more focus throughout and closure to the examination process." In fact, it is not at all clear that the quality of patent applications is at all an issue in the essential problems faced by the USPTO; it is the quality of issued patents which has raised concerns. Again, it would be useful to publish any study which purports to implicate patent application quality as a particular and limiting factor in examination.

The USPTO reports that, in FY 2004, almost one-third of the 355,000 new patent applications had already been reviewed and rejected by the USPTO, but applicants resubmitted them mostly with only minor changes. How many of these resubmitted applications "with minor changes" were then deemed allowable? It is the experience of the undersigned than a very large proportion of such "resubmitted" applications are allowed. Why does the USPTO not simply change its policies to allow these "minor changes" to be made efficiently in the original application, and therefore potentially reduce 30% of its workload with no prejudice to applicants? It is the experience of the undersigned that USPTO policies have, to date, encouraged refiling as a means to generate more fees, and disposal credits to examiners. Existing policies, not addressed in the proposed rules, permits examiners to prematurely or unreasonably foreclose consideration of claims without redress by applicants, knowing that applicants will almost always pay the filing fees to commence a new application or continue the existing application, rather than confront the Examiner and the system which supports these actions.

The USPTO should, instead of directing its wrath at applicants who seek to exercise their legal and constitutional rights, focus its inquiry internally to determine what aspects of its own operations lead to applicant strategies which are now seen as undesirable.

SUMMARY

The United States Patent and Trademark Office proposes to, through its rulemaking authority, limit the ability of applicants to file continuing applications, and thereby abridge the right to claim priority to earlier-filed applications, provided under 35 USC 120. Rules which unnecessarily limit the right to claim priority are neither necessary nor appropriate for the functioning of the USPTO, and therefore the proposed rules should be withdrawn.

The USPTO further distinguishes, without any statutory authority, between patent applications which claim domestic priority, and those which do not. There is no statutory sanction for such discrimination.

BACKGROUND

Present patent practice permits applicants to file an unlimited chain of applications claiming priority to an earlier-filed application. Changes in the past 12 years have significantly limited the practical effect of such continuations, by providing that the life of a patent shall expire twenty years from the earliest non-provisional filing date.

The USPTO, which acknowledges a significant benefit from continuing patent applications in permitting an examiner substantially more time to examine common issues in a continuing application, and permitting applicants multiple opportunities to refine claims so that they are valid, and clearly define the subject matter which applicant regards as the invention, nevertheless seeks to substantially curtail the ability of applicants to claim domestic priority, limiting each case in the normal instance to one continuation of any type, without providing any remedy for the lost opportunities to produce higher quality patents which place the public on full notice of the protected scope.

The USPTO thus states: "Continued examination practice, including the use of both continuing applications and requests for continued examination, permits applicants to obtain further examination and advance an application to final agency action. This practice allows applicants to craft their claims in light of the examiner's evidence and arguments, which in turn may lead to well-designed claims that give the public notice of precisely what the applicant regards as his or her invention."

A continuing patent application may be filed for four basic reasons: (1) to await a change in statute or examination policy to allow a beneficial result; (2) to provide an additional opportunities to overcome a rejection of an application; (3) to provide additional opportunity to gain protection beyond that already secured; and (4) to maintain pendency of an application to permit claims to be crafted in light of an evolving marketplace. Since each of these practices has a different purpose and different effect on the USPTO, a "one-size-fits-all" remedy seeking to collectively curb the practices is inappropriate. With respect to the first and fourth motivations, a simple solution which reduces the USPTO examining burden while preserving applicant's statutory rights is to provide a convenient,

A003170

attractive method for suspending prosecution on an application indefinitely, removing the application from the active docket of the USPTO. This is only limited by 35 USC § 131, which mandates a response by applicant to Office Actions within six months. Thus, a suspended application musty not have an outstanding action. With respect to the second motivation, the USPTO should make no significant changes, except perhaps to remove restrictions on "after final" prosecution, allowing applicants a full opportunity to resolve the issues, in conjunction with the examiner, and bring the application to conclusion. Examiners should be compensated and encouraged for efficiently and quickly advancing cases to the extent consistent with their examination responsibilities. In the third case, it is respectfully submitted that the burden on the USPTO is low, since, if the claims are patentably indistinct from a prior patent, the search and examination is simplified, and formal issues in the applications and claims will likely be minimal.

The USPTO states that it "is making every effort to become more efficient, to ensure that the patent application process promotes innovation, and to improve the quality of issued patents." While this is laudable, the efficiency of the USPTO should not be so primary a goal that the rights of applicants are ignored or trampled and the quality of patents suffers.

The effect of patents on innovation is not straightforward, and thus it is not possible to simply draw the conclusion that expedited examination of patent applications will enhance innovation. Indeed, it is argued that "important" patent applications deemed worthy of multiple continuation applications may well be the biggest drivers of innovation, while the unselected group of patent applications are, on the average, less important and valuable.

The ability of the patent system to drive innovation is a function of the availability of both basic protection for inventions, and a full measure of damages after proven infringement. In the later case, it appears that many patents which have been successfully asserted for substantial damages have a number of related US patents in a family, and further, many patent infringement actions which end in a judgment for defendant could have had the opposite result had "optimal" claims been prosecuted and available for assertion. Since the driver for innovation is not simply issuance of a patent, but issuance of a valuable patent which is enforceable and encompasses a significant market, the stated goal of the USPTO is irrationally related to the means by which it proposes to achieve that goal. Further, many of the proposals of the USPTO will generate otherwise unnecessary estoppels, which will decrease the scope and value of patents, even where the statements of applicant are unnecessary for efficient examination of the application. While it is indeed the function of the USPTO to create a record of the examination proceeding to allow interpretation of issued patents, it is not the role of the USPTO to create new requirements for prejudicial information which are arbitrary and irrationally related to any legitimate task of the agency.

It is only when one views the USPTO's secondary goal of reducing average application pendency, without regard for its effect on innovation, applicants, and the economy, that the rules appear to have proper context. While reducing minimum pendency is indeed an

issue to be addressed, this should not be the principal goal of the USPTO, especially to the exclusion of other substantial considerations.

With respect to continued examination practice, the Office is proposing to revise the patent rules of practice to "better focus the application process." The revised rules would require that "second or subsequent continued examination filings, whether a continuation application, a continuation-in-part application, or a request for continued examination, be supported by a showing as to why the amendment, argument, or evidence presented could not have been previously submitted." Thus, the USPTO seeks to impose a presumption against the right of applicant to claim benefit of earlier priority in these cases.

35 USC § 120 provides:

35 U.S.C. 120 Benefit of earlier filing date in the United States.

> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have **the same effect**, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. No application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director. The Director may consider the failure to submit such an amendment within that time period as a waiver of any benefit under this section. The Director may establish procedures, including the payment of a surcharge, to accept an unintentionally delayed submission of an amendment under this section.

It is thus clear that Congress, in its wisdom, knew how to grant the Director authority to make rules limiting the right of applicant to claim priority, but only chose to delegate such authority with respect to late claiming of priority benefit. On the other hand, Congress provided no authority to the Director to abridge applicant's right to file continuation applications, and indeed stated unequivocally that there should be no discrimination between original filings and continuations. Thus, it appears to be outside of the authority of the Director to limit the rights of applicants to file regular continuation applications, and thus the predicate for the proposed rules is absent.

Even were the Director authorized to limit the right of applicant to file a continuation, the exercise of that discretion in the manner proposed is arbitrary and capricious.

The USPTO alleges that "it is expected that these rules will make the exchange between examiners and applicants more efficient and effective. The revised rules should also improve the quality of issued patents, making them easier to evaluate, enforce, and litigate. Moreover, under the revised rules patents should issue sooner, thus giving the

A003172

public a clearer understanding of what is patented." In fact, the proposed rules given an unfair advantage to the Examiner in rendering and maintaining his rejection(s), even if unfounded, in that applicant is provided with only limited redress for an unfavorable decision, even if demonstrably not in accordance with USPTO practices, rules, and applicable laws and treaties. Especially when considered in conjunction with the proposed limitations on examination of more than 10 claims, applicants will be necessarily deprived of due protection of their inventions available under the express terms of the Patent Act, thus stifling innovation. Make no mistake: interaction of examiners and applicants under the proposed rules will be less efficient, more adversarial, and patent quality will suffer. Patent issuance may be substantially delayed by requiring appeals, under which the workload of the BPAI, may increase ten-fold or more. New opportunities for the USPTO to render final action prior to a real and complete examination of all issues will result in a new initial examination burden imposed on the BPAI.

The USPTO alleges that the problem it seeks to address is "the burden of examining multiple applications that have the same effective filing date, overlapping disclosure, a common inventor, and common assignee by requiring that all patentably indistinct claims in such applications be submitted in a single application." Indeed, the USPTO inherently presumes that all patentably distinct claims can be prosecuted in the same application. There are a large number of circumstances where this is impossible, and the proposed rules would tend to foreclose patent protection, and therefore frustrate the purposes of the patent system. For example, claims may only be added to an application if they are invented by the named inventive entity. In some cases, a patentably indistinct invention is made by a different inventive entity. Under the CREATE Act, such inventions are not prior art to one another, and are thus this circumstances is statutorily encouraged. The USPTO, however, seeks to substantially abridge the rights granted under the CREATE Act, and thus contradict Congressional intent and mandate. Likewise, in order to present a claim in an application, it must be supported in the specification, in the manner provided in 35 USC § 112, which will not always be the case. In further cases, the action of an Examiner during prosecution seeks to parse the single specification into multiple patent applications, without regard as to whether it would be administratively efficient or whether the inventions which are excluded are truly patentably indistinct. In other cases, USPTO practices discourage or prevent inclusion of patentably indistinct claims in a common application.

It is noted that the undersigned has on many occasions argued that a restriction of an application should traversed based on administrative efficiency, an argument regularly rejected by Examiners. The argument presented in favor of restriction is, not that the claims are truly patentable indistinct, but rather that the supposed PTO search classes are different and therefore that the "inventions have achieved a separate status in the art". In many of these cases, the required search is necessarily coextensive, and that the classification system on which the requirement is based is archaic, arbitrary and erroneous. If the USPTO truly considered multiple related applications involving common issues to be a drain on its resources, it could simply instruct its examiners to restrict based on the elements of a claimed invention and the required logical search,

rather than an unduly restrictive classification system which by no means should limit the scope of an Examiner's search, which is in any case by computer and thus readily crosses classes. It is telling that, in promulgating requirements for Examination Support Documents in related proposed rulemaking, the USPTO does not permit arbitrary limitations on search scope by way of USPTO classification.

Likewise, in after-final prosecution, it is common that a purely narrowing amendment is treated as a "new issue", and therefore precluded from entry, even when this amendment is well within the scope of the searched and examined subject matter and was discussed during prosecution by both applicant and Examiner. According to 37 CFR § 104(b), "The examiner's action will be complete as to all matters...." If the USPTO truly sought to streamline its processes, it would permit and encourage examiners to completely search the full claim scope of an application for initial examination in accordance with its existing rules, and permit reliance on the completeness of that search and examination to resolve issues that arise thereafter. By permitting and encouraging examiners to perform an incomplete search according to present policies, and therefore limiting reasonable reliance on the completeness of that search, prosecution is hindered and continuation applications compelled.

It is also troubling that the USPTO includes a "could have been raised earlier" standard into the limitations on filing of a continuation application. In many cases, the rational basis for determining what claims to prosecute at any given time is a subjective opinion on the part of counsel. Further, with the currently proposed limitations on designated claims, under penalty of having to file an egregious Examination Support Document if the number of designated claims exceeds ten, this will impose a de facto limitation on the filing of complete claim sets, though it is clear that the USPTO will not permit this to be raised as an excuse. There is no basis in statute or sound patent practice to place a burden on applicant to justify the filing of a continuation application complying with 35 USC § 120.

The USPTO proposes that its rules will mean faster and more effective examination for the vast majority of applicants without any additional work on the applicant's part. In fact, the USPTO's own statistics show that about 1/3 of applications filed claim earlier domestic priority. This clearly indicates that the effect of the rule will extend to a large portion of the applicant pool. Further, the changes substantially limit available remedies to redress errors made during examination, and thus will affect prosecution by applicants whether they initially intend to file a continuation or not.

The USPTO states that the current volume of continued examination filings - including both continuing applications and requests for continued examination - and duplicative applications that contain "conflicting" or patentably indistinct claims, are having a crippling effect on the Office's ability to examine 'new' (i.e., non-continuing) applications. The cumulative effect of these continued examination filings is too often to divert patent examining resources from the examination of new applications to new technology and innovations, to the examination of applications that have already been examined, have issued as patents, or have been abandoned." The problem of issuing

patents with "patently indistinct" claims has evolved from a judicial philosophy.
However, the USPTO has now sought to impose new restrictions having nothing to do
with that philosophy.  According to traditional patent law, patents containing patentably
indistinct claims are not only permitted (subject to a terminal disclaimer), but
encouraged.  MPEP § 804.02 states, in pertinent part:

> A rejection based on a nonstatutory type of double patenting can be avoided by
> filing a terminal disclaimer in the application or proceeding in which the rejection
> is made. In re Vogel, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); In re Knohl,
> 386 F.2d 476, 155 USPQ 586 (CCPA 1967); and In re Griswold, 365 F.2d 834,
> 150 USPQ 804 (CCPA 1966). **The use of a terminal disclaimer in overcoming
> a nonstatutory double patenting rejection is in the public interest because it
> encourages the disclosure of additional developments, the earlier filing of
> applications, and the earlier expiration of patents whereby the inventions
> covered become freely available to the public.** In re Jentoft, 392 F.2d 633, 157
> USPQ 363 (CCPA 1968); In re Eckel, 393 F.2d 848, 157 USPQ 415 (CCPA
> 1968); and In re Braithwaite, 379 F.2d 594, 154 USPQ 29 (CCPA 1967).

The USPTO also seeks to protect the public interest in knowing what claims are likely to
be pending.  Presumably, the Public PAIR system serves this purpose, and is readily
available to all who seek its use.  The USPTO could make that system fully searchable
with small effort, yet has intentionally chosen to limit the PAIR system to images,
without even rudimentary searchable text, or linkages to its patent and published patent
application databases.

While it is true that the function of issued patent claims, and published pending
application claims, is to place the public on notice of what subject matter is covered, and
is provisionally protected (subject to later issuance), the fact is that applicant has a right
to claim any subject matter disclosed in the application, and thus the public is advised to
review the disclosure of the patent application if it is interested in understanding the
scope of applicants potential rights.

While "some commentators have noted that the current unrestricted continuing
application and request for continued examination practices preclude the Office from
ever finally rejecting an application or even from ever finally allowing an application"
(See Mark A. Lemley and Kimberly A. Moore, Ending Abuse of Patent Continuations,
84 B.U. L. Rev. 63, 64 (2004)), other commentators believe that the essence of the patent
prosecution system requires a balance between a literalist construction of claims by the
Courts and availability of alternate claim scope protection in pending applications before
the USPTO, subject to prosecution history estoppel.  Any perturbation of this balance by
one leads to disequilibrium and unforeseen consequences in the system as a whole.
Certainly, unilateral changes in patent practices by the USPTO will necessarily cause a
rethinking of judicial philosophy, likely resulting in greater uncertainty.  Thus, Courts
may be forced to grant a more liberal Doctrine of Equivalents in face of restrictive
opportunities to obtain appropriate patent protection.  To the extent that the USPTO
believes that a direct effect of its proposed changes will be to better allow the public to

ascertain the ultimate scope of an applicant's rights, an indirect effect will undoubtedly move in the opposite direction.

The Office cites 35 USC § 2(b), which authorizes the Office to establish regulations, **not inconsistent with law**, which shall govern the conduct of proceedings in the Office, and facilitate and expedite the processing of patent applications. This catch-all does not permit a contradiction or contravention of statutory rights, e.g., 35 USC § 120.

The USPTO addresses "a small minority of applicants" which have misused continued examination practice with multiple continued examination filings in order to simply delay the conclusion of examination, which apparently skirts applicant's duty to make a bona fide attempt to advance the application to final agency action. It would appear that, in such cases, the USPTO can and should take specific action, and indeed has taken such action in the past. To the extent that equitable factors compel advancement of applications, the USPTO may take action against offending applicants, but should not do so under a false pretense of increased efficiency and increased resources.

The USPTO also takes aim at applicants who seek to keep applications in pending status while awaiting developments in similar or parallel technology and then later amending the pending application to cover the developments. However, while the USPTO unilaterally seeks to restrict that practice, the courts have expressly permitted the addition of such claims, when supported under 35 USC § 112, para. 1, to encompass products or processes discovered in the marketplace. See PIN/NIP, Inc., v. Platt Chemical Co., 304 F.3d 1235, 1247, 64 USPQ2d 1344,
1352 (Fed. Cir. 2002). Therefore, it is not clear that maintaining pending applications for the purposes described are in any way against public policy, or are indeed undesirable. Likewise, it is not clear that the USPTO proposal will encourage or promote innovation according to the Constitutional scheme (Article I, section 8), since the net result will be narrowly focused patent applications which disclose no more than that which is initially intended to be claimed, thus depriving the public of a dense and complete, early disclosure of the invention. It is also not explained by the USPTO how its proposed rules will "improve the quality of issued patents." By permitting applicants and examiners a second chance at examination, the applicant has time to permit the claims to mature, and the examiner is afforded additional time to examine all of the issues. Thus, it is likely that continuation applications are of higher quality than initial (non-domestic priority) applications.

The USPTO alleges that the revised rules would ease the burden of examining multiple applications that have the same effective filing date, overlapping disclosure, a common inventor, and common assignee by requiring that all patentably indistinct claims in such applications be submitted in a single application absent good and sufficient reason. Disregarding momentarily the unsupported nature of the core premise of this assertion, that there is indeed a "burden" presented, and that this "burden" represents a problem in need of solution, it is not clear that the rules would indeed reduce the workload on any examiner or on the USPTO as a whole. The Examination burden resulting from an application requires a search of the relevant art, including obvious variations of the claim

elements, and perhaps alternates to the elements themselves. Therefore, the search for both claim sets is apparently identical; if the claims are patentably indistinct, then the prior art appropriate for citation against both sets of claims is identical or nearly so. Likewise, if both sets of claims could have been presented together in the same application, as implied by the USPTO (which is doubtful under the various existing and proposed rules), then the incremental examination burden is infinitesimal, and the alleged burden is vastly overstated. Thus, to the extent that the USPTO's burden in examining two related patent applications is vastly more than examining a single application with the claims of both, the issue is one of internal processes of the USPTO, not applicant behavior.

In associated rulemaking, the USPTO has alleged that examination of non-designated claims to assure patentability after allowance of claims is somehow a much lesser burden than examining them together with the designated claims. It is not clear why examining a second set of patentably indistinct claims is somehow an extraordinary burden on the USPTO, while examining non-designated claims essentially after close of prosecution on related, (and presumably patentably indistinct) claims, is somehow the solution to all of its problems. These seeming inconsistencies belie the fact that the proposals in the two proposed rule sets are more related to effecting a secondary agenda of weakening the US patent system to reduce the number of patents per se, imposing requirements for additional estoppels on the official record, and especially to disproportionately reduce the number of valuable patents which result from an aggressive, though legal, patent prosecution strategy. If public policy indeed does compel a reduction in these types of patents, it is for Congress, not the USPTO, to make and implement policy.

PALM records apparently show that, in fiscal year 2005, the USPTO received approximately 317,000 nonprovisional applications, and that about 62,870 of these nonprovisional applications were continuing applications. In addition, PALM records apparently reveal about 52,750 requests for continued examination in fiscal year 2005. Thus, the USPTO alleges that about thirty percent $(63,000 + 52,000)/(317,000 + 52,000)$ of the examining resources must be applied to examining continued examination filings that require reworking earlier applications instead of examining new applications. This raises two particular questions. Why do so-called rework applications require the same resources as applications in which the issues are first presented? How many of these rework applications could have been averted by altering internal USPTO policies to encourage and enable patent applicants to non-prejudicially resolve the issues during the initial and secondary presentation of the patent application? The USPTO presents, to those who are not patent professionals, a self-selected set of statistics which tell only a small portion of the story. Behind these statistics, however, is a strategic plan, formulated over many years, which intentionally fails to provide sufficient time and resources for examiners to perform a complete and reliable examination, and which therefore compels applicants to request "rework", much as consumers return defective merchandise for warranty repair. Banning the warranty repair does not improve the quality. While it is apparently true that the number of newly presented patent applications has been growing over time, and thus the intrinsic examination burden has grown, the response to this growth by the USPTO has not been productive or calculated

to constructively respond to the demands; thus the backlog has grown and the amount of rework has grown. Simply seeking to regulate out of existence the rework demand will not solve the problem, and indeed even if the proposed rules go into effect, it will be many years before the backlog is reduced to permit examination of applications before publication at eighteen months.

The USPTO reportedly issued over 289,000 first Office actions on the merits in fiscal year 2005. While this is laudable, the USPTO fails to consider its own internal error rate in prematurely rejecting allowable subject matter as a factor in limiting throughput. The USPTO reports a ~55% allowance rate for patent applications, but that a third of its workload represents resubmitted applications with "minor" changes. It is believed that ~75%-90% of applications are allowed on a second prosecution opportunity (anecdotal experience). If the USPTO simply focused on initially examining patent applications in a single process, then possibly a third of its workload could simply be saved. Thus, instead of banning certain patent applications, and impeding innovation in the process, it could enhance its productivity and enhance innovation at the same time. Inexplicably, the USPTO has proposed simply reducing its workload by reducing patent applications, and claiming that this makes it more efficient. Analogously, the FDA could argue that it is necessary to enhance its efficiency by banning certain drug applications, or FEMA deciding that it would simply not respond to hurricanes after September 1, to reduce its workload. The EPA could simply ignore regulation of compounds its commissioner could not pronounce. The Defense Department could reduce its costs by banning all floating vessels. In all aspects of government, an agency could try to use regulation to reduce its workload. That does not make it legal, justifiable, logical, or prudent. The analysis presented by the USPTO is woefully inadequate, and a complete analysis would reveal a quite different story.

The USPTO claims that continuing applications are a critical problem in need of resolution. However, the USPTO itself has previously encouraged the filing of various types of continuing applications, in order to permit it to "streamline" prosecution and enforce its "two office action per application" procedure. Thus, it could be stated that USPTO is not victim of continuing applications, but rather the beneficiary; the continuing patent application process permits the USPTO to parse applications into 12 hour (average) blocks of examining time, and if an application cannot be deemed allowable within this amount of time, applicant is compelled to incur additional expense to proceed with a continuing application.

The USPTO also alleges that multiple patent applications containing patentably indistinct claims are also a critical impediment to its ability to perform its function. Many patent applications containing allegedly patentably indistinct claims are not in fact truly non-obvious variants. That is, in many cases, a rejection is made by an examiner, but which makes little sense for applicant to traverse. Thus, in face of a rejection based on patentably indistinct, but otherwise allowable claims, a terminal disclaimer is normally submitted. Since the rejection remains unchallenged, the USPTO now adopts this acquiescence as an admission of truth. However, the USPTO does not reveal any independent studies of its own review of the veracity of such rejections. This is critical,

since an implicit presumption in the USPTO's notice of proposed rulemaking is that by limiting applicant's right to prosecute patents including such claims, that a correspondingly reduced number of applications will be presented for examination. However, if applicants are required to traverse these rejections, by either arguing for non-obvious distinctions between the claims, or by amending the claims to alter their presentation and thus include substantively different elements, the net result may be no different number of patent applications presented for examination, and in increased examination burden, due to the now substantial differences between the respective applications. Without a particular and scientific analysis of this issue, the implementation of the proposed rules seeking to limit these types of claims, especially in view of a public policy which favors issuance of patents for patentably indistinct claims, any effort to effectively ban such claims is premature, imprudent, and ill-advised, as well as arbitrary and capricious.

The USPTO couches its hostility toward patent applications including patentably indistinct claims by stating that they: "are impairing the Office's ability to examine new applications without real certainty that these practices effectively advance prosecution, improve patent quality, or serve the typical applicant or the public." Assuming such patent claims are patentable, and proceed to allowance and issue, they most certainly do advance prosecution. The USPTO alleges that these patents raise the issue of potential poor patent quality, yet abhors a second chance to examine the application on what must be presumed to be the same issues, giving the examiner an opportunity to issue a "better" patent. Why? How do the proposed rules improve the quality of patents, when the expressly impede the ability of applicant and the USPTO to spend more than an average of 12 hours to focus on the issues?

The rules decidedly do not "give the public earlier notice of just what patentees claim." The current application publication procedure and public access to many file wrappers clearly permit the public to monitor progress of patent applications, including their claims.

The USPTO performs a limited and disingenuous analysis of the impact of its proposals:

> Of the roughly 63,000 continuing applications filed in fiscal year 2005, about 44,500 were designated as continuation/continuation-in-part (CIP) applications, and about 18,500 were designated as divisional applications. About 11,800 of the continuation/CIP applications were second or subsequent continuation/CIP applications. Of the over 52,000 requests for continued examination filed in fiscal year 2005, just under 10,000 were second or subsequent requests for continued examination. Thus, the Office's proposed requirements for seeking second and subsequent continuations will not have an effect on the vast majority of patent applications.

In fact, the rules as actually proposed link together related applications, such that approximately one-third of patent applications will be directly affected (anecdotal evidence), and prosecution of another third of applications will be substantially impacted

A003179

due to response to the potential impact and new limitations on practice. All applications will be affected, since practitioners must in all cases perform a due diligence investigation and zealously represent their client's interests. Further, the limitations on claims in related rulemaking will increase the number of independently filed patent applications, while the presently proposed rules will increase the number of appeals and petitions.

While the Director does have some authority to compel applicants to advance prosecution, this authority does not require new rules, and any need based on existing precedent to invoke this authority is exceedingly rare. In contrast to the analysis of the USPTO, the right to file continuation applications is set forth in 35 USC § 120, and the Director is not free to simply abridge that right.

The USPTO states that "Applicants should understand, however, that there is not an unfettered right to file multiple continuing applications without making a bona fide attempt to claim the applicant's invention." However, the proposed rules go well beyond any remedy to a perceived problem, and indeed, the proposed rules are not narrowly tailored to address any issue relating thereto. The USPTO confuses applications which do not represent "a bona fide attempt to claim the applicant's invention", with applications intended to secure and/or extend applicants protection beyond that available in two examinations. While the USPTO states that the proposed rules do not set a per se limit on the number of continuing applications, in fact they create such burdens and evidentiary hurdles on applicants in filing multiple applications, not derived from statute or case law, that they effectively abridge applicant's rights and result in a regulatory taking.

The USPTO states that the proposed rules require that applicants who file multiple continuing applications from the same initial application show that the third and following applications in the chain are necessary to advance prosecution. The rules do not, in fact, seek any such showing, nor is any such showing sufficient to meet the requirements of the proposed rules. The USPTO, rather, seeks to impose a much stricter requirement, "that any second or subsequent continuing application show to the satisfaction of the Director that the amendment, argument, or evidence could not have been submitted during the prosecution of the initial application or the first continuing application." This represents an arbitrary and capricious limitation, which, while not literally placing an absolute limit on the number of copending continuing applications originating from an original application, effectively places such a limit. There is simply no sanction in statutory law or case law to impose any such burden on applicant, and the case law endorses a far more liberal standard. In re Bogese I and II represent a case of apparently egregious conduct by applicant, who was warned by the USPTO of potential loss of rights, and who was given an opportunity for judicial appeal of an adverse equitable determination. In re Bogese does not stand for the proposition that the USPTO may adopt a one-size-fits-all approach to formulating a harsh forfeiture punishment, especially where there is no finding of culpability.

A003180

While control of continued examination practice is indeed within the inherent regulatory scope of the USPTO, the proposed rules are not limited to these types of applications, and thus do not draw a required distinction.

The USPTO states that "it appreciates that applicants sometimes use continued examination practice to obtain further examination rather than file an appeal to avoid the delays that historically have been associated with the appeal process. The Office, however, has taken major steps to eliminate such delays. The Board of Patent Appeals and Interferences (BPAI) has radically reduced the inventory of pending appeals from 9,201 at the close of fiscal year 1997 to 882 at the close of fiscal year 2005." In fact, the continuing examination process may well be a critical reason why the BPAI has been able to reduce its backlog. Yet, the USPTO does not address the delicate balance between opportunities for normal prosecution and appeal. While appeal may now be an efficient process, it consumes more resources than normal examination, and it is therefore contradictory for the USPTO to encourage appeal over continued examination as a means to promote efficiency, especially where applicant is willing to present the issues to the examiner again.

The USPTO suggests that "efficient examination … requires that applicants share some of the burden of examination when they file multiple applications containing 'conflicting' or patentably indistinct claims." In fact, there is no basis in law or practice to shift examining burden to applicant, especially when this is implemented by way of a non-statutory presumption that may be dispositive of applicant's rights. The Patent Act provides for an examination of applications by the USPTO, starting with a presumption of patentability, that is, "a person shall be entitled to a patent unless…." (See 35 USC § 102). It is always the burden of the USPTO to review claims to ensure that there is no double patenting, or patentably indistinct claims without terminal disclaimers. In fact, a failure of the USPTO to properly determine the existence of such claims is to the detriment of applicant, so cooperation is likely available from the vast majority of applicants. However, by shifting the burden to applicant to prove patentability, instead of maintaining the burden on the USPTO to prove unpatentability, the net result will likely be rejections of claims without a sound basis, which is itself a form of inefficiency of the USPTO and a burden on innovation. The workload on the office will likely be the same, or even increased, since even without a sound basis for a rejection, unpatentability will be "presumed", and thus applicants will be forced to assert arguments to the contrary, adding unnecessary issues to the examination process.

Given claim number limitations in related proposed rules, and the fact that the presumed patentably indistinct claims will likely be part of a strategy to overcome the proposed USPTO limitations on obtaining a full and fair examination of all inventions disclosed in an application, most rejections under this new rule will be contested, often vigorously. Since the net result of a determination of patentably indistinct claims is not simply a requirement for a terminal disclaimer, but a true legal prejudice (given at least the limitation on filing more than two continuations), applicants and their attorneys will be forced to appeal such rejections if they are maintained. Thus, the proposed rule will not create efficiency as compared to the present practice of having an examiner perform his

function and actually review the related application(s) to determine if a rejection is truly warranted, in accordance with the statutory scheme of examination. The only true workload savings on the USPTO is the identification of some potentially related applications, since the presumed rejected claims will have to be reviewed in any case. However, there may be applications which must also be reviewed, for which the new presumption does not apply. Therefore, a search will be required by the Examiner for such related applications in any case.

Another part of the statutory examination scheme is identification of interfering and potentially interfering subject matter. In most cases, there is no legal relationship between the owners of interfering applications, and examiners are obliged to search for such applications, since failure to do so would be a breach of the examination responsibility, undermine the presumption of administrative regularity and reduce confidence in the USPTO. Since a proper search for patent applications having similar claims is therefore required in any case, the proposed presumption would save little time and effort in searching.

The USPTO compounds its error when it states "where an applicant chooses to file multiple applications that are substantially the same, it will be the applicant's responsibility to assist the Office in resolving potential double patenting situations rather than taking no action until faced with a double patenting rejection." That is, the USPTO fabricates, by way of administrative reverse presumption, the existence of a problem (the alleged double patenting), and then forces applicant to resolve this unsupported presumption, rather than allowing the normal examination process to reveal whether or not there truly exists a problem. The USPTO has not provided any data which would indicate how much time and effort it might save as a result of this presumption, nor what it anticipates the costs to applicants as a result of presuming unpatentability.

Discussion of Specific Rules

Rule 37 CFR § 1.78 should not be amended in a manner which contravenes the plain meaning of 35 USC § 120, or other statutes. Likewise, even where the proposed rule changes are within the discretion of the Director, no change should be made which abuses that discretion or works an undue hardship on applicants, or amounts to a regulatory taking under the Fifth Amendment.

The purpose of the Patent Act is to promote the sciences by the issuance of patents, part of a Constitutional scheme for providing protection to inventors for a full and early disclosure of their invention. To the extent that the proposed rule changes seek to discourage complete and early filing of applications, they are against public policy.

The USPTO proposes that it will refuse to enter, or will delete if already present, any specific reference to a prior-filed application that is not permitted by 37 CFR § 1.78(d)(1). However, it appears that this confabulates the authority of the Director under 35 USC § 120 to refuse amendment of an application to contain a reference to an earlier-filed application after it is filed, with applicant's generally unfettered right to file the application including a claim for priority. There is no known statutory authority for refusing continuing status for an application, and In re Bogese does not contradict this conclusion. In re Bogese was grounded on equitable considerations relating to the facts of that case, and does not in any way support a blanket rule which limits applicant's statutory rights without specific notice as to the reasons why a forfeiture is required. Further, the proposed Petition is seen as an unreasonable and burdensome requirement to secure rights which belong to applicant, according to a standard which impermissibly creates a new burden.

The USPTO and Courts have, for many years, encouraged "omnibus" patent applications which disclose a number of inventions relating to the same project, in order to assure a disclosure of "best mode", and an enabling embodiment. This, in turn, leads to the potential for many continuations and divisionals each directed toward slightly or completely different inventions. This system has worked well, since it preserves applicant's rights by virtue of a pending application, while limiting the examining burden on the USPTO at any given time due to serial prosecution. The proposed rule changes would have the effect of accelerating the filing of a large number of independent patent applications, with the same or differing disclosures, accompanied by arguments why the claims are not overlapping. While the impact of this change would perhaps be limited by the massive filing fees to be incurred immediately, without the benefit of maturation of the market for the technologies to determine their success, there is no doubt that applicants will be forced to pursue parallel patent prosecution instead of serial prosecution, and that the net result will likely be a doubling in the number of new applications to be filed. Thus, instead of reducing the number of new patent applications by less than one-third, the likely result of the rule changes will be a doubling of new examination workload. Since the stated purpose of the proposed new rules is to avert additional patent applications, it is clear that the proposed rules will produce a contrary and unintended effect, and therefore the proposed rules are arbitrary and capricious.

It is not at all clear why, if the USPTO seeks to "share examining burden" with applicant, it does not permit and encourage applicants to formulate their own claim grouping for patent prosecution purposes. That is, if applicants voluntarily limit claims in an application to a single "invention", then this eliminates the need for the Examiner to issue an extra action requiring restriction, thus expediting prosecution and enhancing efficiency. However, the proposed rules seek to require, at risk of waiver, a presentation of all separately patentable inventions immediately, and thus delay examination on the merits by requiring a restriction requirement, and impose a large burden on the Examiner due to multiple parallel patent prosecutions for related patent applications resulting from that restriction requirement. In conjunction with its proposed limitations on claims, it is likely that applicants will present ten separate inventions in each application (with possible additional elections within non-designated claims), making the process unduly cumbersome, and defeating the stated purposes of the proposed rulemaking. Thus, "voluntary" divisional applications should be promoted as a means for limiting the examination burden, and not essentially precluded as proposed by the USPTO.

The proposed standard for permitting consideration of "an amendment, argument or evidence" in a second or later continuation application appears untenable. The USPTO process will, instead of permitting an examiner to determine simply whether the application is allowable, and thus promote the purposes of the Patent Act, instead divert review of the application to a petitions examiner who will not consider the merits of the application, for a proposed fee similar to the examination fee itself. That is, instead of applicants receiving an examination for their fees, they will receive an administrative review of whether the application can be examined. Given the potential workload of such Petitions, the USPTO will have to hire more examiners simply for this purpose. If the proposed petition fees ($400) have any rational basis, it would appear to be a gross injustice to divert resources of both applicant and the USPTO to this endeavor, with little if any gain. Further, the potential loss of patentable inventions must be considered a massive societal cost not considered in the USPTO's notice of proposed rulemaking.

The USPTO alleges that "multiple opportunities are given to submit any desired amendment, argument, or evidence," but that "an amendment, argument, or evidence … refused entry because prosecution in the prior-filed application is again closed will not by itself be a sufficient reason to warrant the grant of a petition under Sec. 1.78(d)(1)(iv)…." In fact, the USPTO seeks to regulate out of existence patent applications having more than 10 claims presented for full examination, and thus the rules promote conflicting ends. On one hand, one set of proposed rules seeks to promote a full examination of all issues within the first application or first continuation, while another set of proposed rules seeks to narrowly limit the scope of an examination to ten designated claims. The only consistency apparent is that the USPTO seeks to reduce its examination responsibility, without regard to the costs to applicants and to society.

The USPTO states that if a claim for the benefit of a prior-filed application is not permitted by 37 CFR § 1.78(d)(1), it will refuse any priority claim to the prior application, and that the entry of or failure to delete a specific reference to a prior-filed

application that is not permitted by 37 CFR § 1.78(d)(1) does not constitute a waiver. This proposed rule poses a potential substantial hardship. It is not uncommon for decisions on Petition to be inexplicably delayed for months or years, and it is possible that, even if a Petition is filed, that examination will be complete and the patent issued before decision on the Petition is made. If the USPTO is to use the required Petition as a vehicle for controlling its workflow, it must guaranty that the decision on the Petition is available before it is moot, that it will not itself delay prosecution, and further that the decision as to whether the Petition should have been granted is effectively appealable in time for applicant to take alternate action. Such a guaranty could take the form, for example, of a presumption that the Petition is granted if the Examiner acts on the case. Otherwise, the Petition serves no valid purpose, and only interferes with prosecution and reduces efficiency. Further, if the Petition is delayed past the point of being moot, the Petition fee should be refunded as being unearned.

The proposed amendment to 37 CFR § 1.78(d)(3) will produce a potential hardship where it is unclear whether a change to the application or claims makes the application a continuation, continuation-in-part, or divisional. This is especially the case where the Office compels submission of a clean specification including preliminary amendments, or where applicant revises a claim after a restriction requirement is made. There appears to be little benefit to the USPTO or public by requiring this election, but this potentially imposes an undue burden on applicant.

Proposed 37 CFR § 1.78(d)(3) provides that if an application is identified as a continuation-in-part application, the applicant must identify which claim or claims in the continuation-in-part application are disclosed in the manner provided by 35 USC § 112, para. 1, in the prior-filed application, or waive benefit of an earlier priority claim. In many cases, this is not a hardship (although the benefit to the USPTO is unclear), while in others, the issue of whether the claim is supported by an earlier text is ultimately a legal issue which should be determined as a result of examination. For example, it may be contested whether an earlier application enables subject matter which is otherwise disclosed. On other cases, 35 USC § 112, para. 6 will operate to give identical claim language separate meaning depending on which disclosure is referenced. It is thus possible for a claim to have two priorities, the legal effect of which depends on judicial determination. While it may be useful for the examiner to have a clear understanding of the effective priority date for a claim during a search, seeking an essentially irrevocable commitment from applicant on this issue prior to examination is both unfair and unreasonable.

Proposed 37 CFR § 1.78(e) provides that a petition to accept an unintentionally delayed priority claim will not be granted in an application in which a request for continued examination under 37 CFR § 1.114 has been filed. This provision may result in a substantial forfeiture of rights, and must be carefully considered. If, in a continued prosecution application, a new reference appears, which could otherwise be overcome by a claim of priority to a copending application, or if the Examiner takes the new position that two applications, one of which would act as a statutory bar to the other, include claims which are patentably indistinct, the result of the new rule would be to preclude a

claim of priority as a method of overcoming the reference. It is not clear how this rule benefits the USPTO, yet it is clear that it produces a detriment to applicants.

Proposed 37 CFR § 1.78(f) includes a mandatory cross referencing of certain patent applications. While such cross referencing may be useful, it appears that the only substantial examination question between such applications is whether there is double-patenting. In cases where this concern is unwarranted, it is not clear why the USPTO should impose harsh remedies for a failure to disclose. Further, the proposed deadline is optimistic at best, and the proposed urgent disclosure within four months of filing serves no legitimate purpose when examination of applications is normally delayed by 12-24 months.

As stated above, the rebuttable presumption under proposed 37 CFR § 1.78(f)(2) finds no basis in statute or law, and is imprudent, arbitrary and capricious. If claims are indeed patentably indistinct, it should be easy for examiners to spot this circumstance, while imposing a presumption of unpatentability will impose hardship, cost, and increased workload on the USPTO and applicants. It is further noted that traversing the proposed rebuttable presumption requires explaining to the satisfaction of the <u>Director</u>, not the examiner, raising the issue as to whether an adverse determination is redressed by way of appeal to the BPAI or in an action for mandamus in the District Court. (Contrast with language of 37 CFR § 104). If this determination is not considered appealable to the BPAI, it would pose particular issues of workflow within the USPTO, and likely violate 35 USC § 134.

The alleged primary impact of this change would be to "require applicants to make a bona fide attempt to advance the application to final agency action by submitting any desired amendment, argument, or evidence prior to the close of prosecution after a single continuation or continuation-in-part application or single request for continued examination (except as permitted by Sec. 1.116 or Sec. 41.33)." In fact, the requirement for such a bona fide attempt is fabricated out of whole cloth. No court or legislation has ever imposed such a requirement on applicants, and the underlying policies should be left for Congress, not the administrative agency, to decide, especially in the presence of clear statutory language which evidences a contrary legislative intend and mandate. The requirement drawn from the holding in In re Bogese is that applicant must make bona fide attempts to advance prosecution, not present all possible evidence, arguments, and amendments before close of a single continuation. Indeed, the USPTO has made no proposals to permit the examining corps sufficient time to consider the mass of information if it were to be received.

It is further noted that the proposed rules do not address the possibility that applicant may have insufficient information regarding patentability to make the legal assertions required by the USPTO in the proposed rules. For example, different groups of inventors, even to a common assignee, may present different fact patterns, which must be resolved through the examination process. For example, inventive group I may have literally disclosed elements of an invention, which a prophetic example supporting enablement, while later, inventive group II may have filed a patent application including an identical claims, and

an example describing work actually performed. In this case, the Examiner would impose a provisional double patenting rejection, which should be resolved before issuance of the second patent. Since there is no presumption of unpatentability, the Examiner must determine patentability of both applications, in particular whether group I's application is enabled. If group I is determined to be the first inventor, group II must amend the claims or withdraw the application. If group I's application is not enabled, then group II's application may proceed. While such examination issues are admittedly rare, the proposed rules would generally preclude presentation and resolution of these complex issues, without good cause. In the presence of a presumption of double patenting, both groups of applicants would be forced to make admissions and allegations, thus prejudicing presentation of the issues.

The USPTO, in addition to shifting its inherent examining burden, seeks to prejudice applicants by formulating a policy that will shift examining responsibility to applicant, requiring it to resolve all double patenting issues unilaterally, but that permits an examiner to impose a new double patenting rejection in a second or subsequent Office action that will not preclude the Office action from being made final. This new policy of precluding examination of all issues presented will, even in the case of a new rejection, of course, require an amendment of 37 CFR § 104(b), in which the USPTO admits as a matter of formal policy that examiners only selectively analyze and examine certain issues presented by an application, and do not fully examine an application. Applicants will be forced, as a matter of course, to appeal most cases, and permit the BPAI to conduct the first full examination of the application.

The proposed amendment to 37 CFR § 1.78(f)(3) makes an underlying presumption that all patentably indistinct claims can be supported and examined in the same application. This simplistic analysis fails to consider all of the legitimate reasons for serial prosecution of similar claims, and that there is no consistency between treatment of claims by different examiners or even the same examiner. Two claims presented together may be restricted, but if not presented together could be subject to double patenting rejection. Claims which are admittedly indistinct are refused entry after final rejection because of presentation of "new issues". What new issues? If indeed, these patentably indistinct claims do invariably raise new issues, don't they deserve a separate examination as a matter of right?

If these claims are truly patentably indistinct, and proposed policies seek to encourage or mandate examination together in a single application, why does current USPTO policy prevent this, and is there any explanation for this change-of-heart? Wouldn't a better solution to this so-called problem be to simply permit and encourage applicants to add patentably indistinct claims to a patent application after a determination that an original set of claims is allowable, and therefore that claims which essentially claim the same invention are also allowable? For example, 37 CFR § 1.312 could be amended to permit addition of claims which are patentably indistinct from pending claims. Ex Parte Quayle could be reversed.

A003187

In light of current examination procedures and longstanding USPTO policies, it is not credible that the USPTO will effect substantial positive results as a result of the proposed rule changes, and it is more likely that these will be used to abuse applicants and impose unnecessary costs and burdens.

Proposed 37 CFR § 1.78(h) seeks to treat separate legal entities as a "common owner", even without evidence of control or even cooperation at the time of patent prosecution. The requirements of the proposed rules may be impossible to meet where two legal entities are treated as one under an unsupported presumption. For example, one entity may not even be aware of a patent application filed by another.

Regulatory Flexibility Act

The proposed rules would impact and have a significant, disproportionate adverse impact on a substantial number of small entities. The disproportionate impact comes from, inter alia, the massive burden imposed on applicants in even simple patent prosecution, since the proposed rules provide a large number of opportunities for irrevocable forfeiture of rights. Since small entities are, by their nature, limited in size and resources, even a single patent application will necessarily incur massive legal and due diligence expenses at all stages. It is anticipated that patent prosecution expenses in the simplest patent applications which result in immediate allowance will increase by $5,000-10,000, and for those which result in final rejection will increase by $10,000-50,000.

In Fiscal Year 2005, the USPTO reports it received approximately 317,000 nonprovisional applications (~93,000 small entity). Of those, about 62,870 (about 19,700 small entity) were continuing applications. Assuming an average of $10,000 additional burden from the new rules per continuing application, the result is a $628,700,000 per year tax on innovation ($197,000,000 small entity), with only minor advantages to the USPTO, and perhaps no net advantage. Extracting the number of non-continuing applications, and assuming an increased prosecution expense of $5,000 per application, the net burden would be increased by $1,270,650,000 per year ($366,500,000 small entity), a fantastic sum, unjustified by the circumstances and alleged benefits.

The USPTO reports that it received 52,750 (about 8,970 small entity) requests for continued examination. Since the first request for continued examination would become a terminal event in prosecution, failure is not an option, and it is anticipated that the legal expenses for each would be increased by $10,000-50,000, with an average of $25,000. This leads to a burden of $1,318,750,000 per year ($224,250,000 small entity).

The USPTO reports that about 11,790 (about 4,470 small entity) applications were a second or subsequent continuation or continuation-in-part application, which would essentially be banned according to the proposed rules. While it is difficult to place a value on these applications, if 70% of these would have been issued under the existing rules, and each patent application has an average value of at least $100,000 to the applicant, the net effect of this ban is a regulatory taking in the amount of at least $825,300,000 per year ($312,900,000 small entity).

A003188

The proposed rule change will affect all patent applicants, large and small. However addressing the Petition fee alone, to be decided under a standard which many applicants may have difficulty meeting, the result is $8,686,000 in petitions fees if each of the 11,790 second or subsequent continuing applications and 9,925 second for continuing examination, respectively, were petitioned. Assuming the fees are set to recover expenditures, and an average Petitions examiner salary of $65,000, the net result is an addition of almost 134 new petitions examiners solely for this purpose. (Why not simply hire 134 new additional patent examiners?)(Where are these new petitions examiners going to be housed?)

The USPTO reports that, of the 62,870 continuing applications filed in fiscal year 2005, about 18,370 (about 4,000 small entity) were designated as divisional applications. However, the proposed rules seek to redefine "divisional application", so it is not clear how many new applications would fall under the proposed rules.

It is estimated that the costs for preparing arguments to rebut a presumption of double patenting will cost about $4,000 per application. The USPTO reports that 17,600 terminal disclaimers were filed in fiscal year 2004; however, the burden is also on applications in which a requirement for terminal disclaimer is avoided, and on the applications with respect to which the requirement is asserted. It is estimated that this amounts to about 50,000 applications per year, resulting in an economic burden of about $200,000,000 per year ($43,750,000 small entity). Note that, due to the great incentives to prosecute applications in parallel rather than in series, the double patenting rejections will more often involve two pending applications than is currently the case.

It is further noted that these calculations employ the USPTO's reported numbers. In fact, the USPTO small entity definition is only for purposes of paying fees (and expressly not for other purposes), and does not actually represent the number of applicants who are small entities, which is generally a higher number, since entities which otherwise qualify as small entities are treated as large entities for payment of fees if they license rights to a large entity.

The massive burden being imposed on patent applicants, in the name of "sharing the examination burden" is completely unjustified by the analysis provided by the USPTO and existing law, and the rules represent an arbitrary and capricious exercise of administrative rulemaking.

Respectfully submitted,


Steven M. Hoffberg

The foregoing does not represent the opinions of Milde & Hoffberg, LLP, or its clients.

**M&H** LLP

Intellectual Property
Protection, Defense, and
Strategies

| **Steven M. Hoffberg**<br>*Partner* | **Milde & Hoffberg, LLP**<br>Suite 460, 10 Bank Street<br>White Plains, NY 10606 |
|---|---|
| steve@mildehoffberg.com<br>www.MildeHoffberg.com<br>Skype ID mildehoffberg | tel. 914-949-3100<br>fax. 914-949-3416<br>mobile 914-316-3670 |

This message (and attachments), may contain confidential and/or privileged information, intended only for the use of the named or implied recipient. If you are not the intended recipient, or receive this in error, please inform the sender and destroy all copies of the email and attachments. Unauthorized disclosure, copying, distribution or use of this transmission is strictly prohibited.
IRS CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this communication (and attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

A003190