# Exhibit 20

**Comment Letter of Heritage Woods, Inc. (May 2, 2006)**

**Part 1: Pages 1-16, P000580-95**

Dockets.Justia.com



**United States Patent and Trademark Office**

**PATENTS**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Patents > Office of the Deputy Commissioner for Patent Examination Policy > Office of Patent Legal Administration > Proposed Rule Changes to Focus the Patent Process in the 21st Century > Comments Regarding Continuation Practice

**Comments on Proposed Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims, Notice of proposed rulemaking**

Prior to May 6, 2006, the organizations and persons listed below have submitted comments in response to the Proposed Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims, Notice of proposed rulemaking, first published in the Federal Register at **71 Fed. Reg. 48** (January 3, 2006) and then published in the Official Gazette at **1302 Off. Gaz. Pat. Office 1318** (January 24, 2006).

It is hoped that the public will review this list of comments submitted prior to May 6, 2006, to determine if it is complete. If any person or organization has submitted comments prior to May 6, 2006, but is not included in this listing, please submit the comment by electronic mail message to **Robert.Clarke@uspto.gov**, or contact Robert A. Clarke by telephone at (571) 272-7735.

The comments below are grouped into the following categories: intellectual property organizations, government agencies, corporations, and individuals. Each comment is attributed to the individual submitting the comment unless the comment indicates it is made on behalf of an organization.

*Please note that the following documents are provided as submitted by persons and organizations but may contain spelling corrections, artifacts of scanning, OCR, or document format conversion.*

---

**A. Intellectual Property Organizations and Government Agencies**

1. **ABA-Intellectual Property Law** [PDF]
2. **American Intellectual Property Law Association (AIPLA)** [PDF]
3. **Bar Association of the District of Columbia, PTC Section** [PDF]
4. **Boston Patent Law Association, Committee on Patent Office Practice** [PDF]
5. **Houston Intellectual Property Law Association (HIPLA)** [PDF]
6. **Intellectual Property Law Association of Chicago (IPLAC)** [PDF]
7. **Intellectual Property Owners Association (IPO)** [PDF]
8. **Intellectual Ventures, LLC** [PDF]
9. **Inventors Alliance** [PDF]
10. **Japanese Intellectual Property Association (JIPA)** [PDF]
11. **Los Angeles Intellectual Property Law Association (LAIPLA)** [PDF]
12. **Minnesota Intellectual Property Law Association (MIPLA), Chemical and Biotech Practice Committee** [PDF]
13. **Minnesota Intellectual Property Law Association (MIPLA), Intellectual Property Law Revisions Committee** [PDF]
14. **Minnesota Intellectual Property Law Association (MIPLA), Patent Prosecution Committee** [PDF]
15. **National Association of Patent Practitioners (NAPP)** [PDF]
16. **New York Intellectual Property Law Association (NYIPLA)** [PDF]
17. **North Carolina Bar Association, Intellectual Property Law Section** [PDF]
18. **Northern Virginia Patent Lawyers Club (NVPLC)** [PDF]
19. **Ohio State Bar Association, Intellectual Property Law Section** [PDF]
20. **Oregon Patent Law Association (OPLA)** [PDF]

21. **Patent Public Advisory Committee of the USPTO** [PDF]
22. **Pennsylvania Intellectual Property Forum** [PDF]
23. **Philadelphia Intellectual Property Law Association** [PDF]
24. **San Diego Intellectual Property Law Association (SDIPLA)** [PDF]
25. **U.S. Department of Juustice, Antitrust Division** [PDF]
26. **U.S. Federal Trade Commission (FTC)** [PDF]
27. **U.S. National Institute of Health, HHS** [PDF]
28. **U.S. Small Business Administration (SBA), Office of Advocacy (Advocacy)** [PDF]
29. **Washington State Patent Law Association** [PDF]

**B. Corporations and Associations**

1. **3M Innovative Properties Company** [PDF]
2. **Affymetrix, Inc.** [PDF]
3. **Altera Corporation** [PDF]
4. **Amgen** [PDF]
5. **Amylin Pharmaceuticals, Inc.** [PDF]
6. **Anatomic Research, Inc.** [PDF]
7. **Apple Computer, Inc.** [PDF]
8. **Aradigm Corporation** [PDF]
9. **Bally Technologies** [PDF]
10. **BASF AG** [PDF]
11. **Biogen Idec, Inc.** [PDF]
12. **Biotechnology Industry Organization (BIO)** [PDF]
13. **Brigham and Women's Hospital - CSRL** [PDF]
14. **Burnham Institute for Medical Research** [PDF]
15. **Business Software Alliance (BSA)** [PDF]
16. **California Healthcare Institute (CHI)** [PDF]
17. **Caterpillar Inc.** [PDF]
18. **CCIA** [PDF]
19. **Ceres, Inc.** [PDF]
20. **Cisco Systems** [PDF]
21. **Clarcor, Inc.** [PDF]
22. **Council on Government Relations** [PDF]
23. **Eastman Kodak Company** [PDF]
24. **eBay, Inc.** [PDF]
25. **E. I. du Pont Nemours and Company** [PDF]
26. **Eli Lilly and Company** [PDF]
27. **Fallbrook Technologies, Inc.** [PDF]
28. **Genentech, Inc.** [PDF]
29. **GlaxoSmithKline** [PDF]
30. **Heritage Woods, Inc.** [PDF]
31. **Honda R&D Americas, Inc.** [PDF]
32. **Human Genome Sciences, Inc.** [PDF]
33. **IBM Corporation** [PDF]
34. **Intel Corporation** [PDF]



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | *e*Business | eBiz alerts | News | Help

Patents > Office of the Deputy Commissioner for Patent Examination Policy > Office of Patent Legal Administration > Proposed Rule Changes to Focus the Patent Process in the 21st Century > Comments Regarding Claims Practice

Prior to May 6, 2006, the organizations and persons listed below have submitted comments in response to the Changes to Practice for the Examination of Claims in Patent Applications, Notice of proposed rule making, first published in the Federal Register at **71 Fed. Reg. 61** (January 3, 2006) and then published in the Official Gazette at **1302 Off. Gaz. Pat. Office 1329** (January 24, 2006).

It is hoped that the public will review this list of comments submitted prior to May 6, 2006, to determine if it is complete. If any person or organization has submitted comments prior to May 6, 2006, but is not included in this listing, please submit the comment by electronic mail message to **Robert.Clarke@uspto.gov**, or contact Robert A. Clarke by telephone at (571) 272-7735.

The comments below are grouped into the following categories: intellectual property organizations, government agencies, corporations, and individuals. Each comment is attributed to the individual submitting the comment unless the comment indicates it is made on behalf of an organization.

*Please note that the following documents are provided as submitted by persons and organizations but may contain spelling corrections, artifacts of scanning, OCR, or document format conversion.*

---

**A. Intellectual Property Organizations and Government Agencies**

1. **ABA-Intellectual Property Law** [PDF]
2. **American Intellectual Property Law Association (AIPLA)** [PDF]
3. **Bar Association of the District of Columbia, PTC Section** [PDF]
4. **Boston Patent Law Association, Committee on Patent Office Practice** [PDF]
5. **Japanese Intellectual Property Association (JIPA)** [PDF]
6. **Intellectual Property Law Association of Chicago (IPLAC)** [PDF]
7. **Intellectual Property Owners Association (IPO)** [PDF]
8. **Intellectual Ventures, LLC** [PDF]
9. **Inventors Alliance** [PDF]
10. **Minnesota Intellectual Property Law Association (MIPLA), Chemical and Biotech Practice Committee** [PDF]
11. **Minnesota Intellectual Property Law Association (MIPLA), Intellectual Property Law Revisions Committee** [PDF]
12. **Minnesota Intellectual Property Law Association (MIPLA), Patent Prosecution Committee** [PDF]
13. **National Association of Patent Practitioners (NAPP)** [PDF]
14. **New York Intellectual Property Law Association (NYIPLA)** [PDF]
15. **North Carolina Bar Association, Intellectual Property Law Section** [PDF]
16. **Northern Virginia Patent Lawyers Club (NVPLC)** [PDF]
17. **Ohio State Bar Association, Intellectual Property Law Section** [PDF]
18. **Oregon Patent Law Association (OPLA)** [PDF]
19. **Patent Public Advisory Committee of the USPTO** [PDF]
20. **Pennsylvania Intellectual Property Forum** [PDF]
21. **Philadelphia Intellectual Property Law Association** [PDF]
22. **San Diego Intellectual Property Law Association (SDIPLA)** [PDF]
23. **U.S. Department of Juustice, Antitrust Division** [PDF]

24. **U.S. Small Business Administration (SBA), Office of Advocacy (Advocacy)** [PDF]
25. **Washington State Patent Law Association** [PDF]

## B. Corporations and Associations

1. **3M Innovative Properties Company** [PDF]
2. **Altera Corporation** [PDF]
3. **Amgen** [PDF]
4. **Amylin Pharmaceuticals, Inc.** [PDF]
5. **Anatomic Research, Inc.** [PDF]
6. **Apple Computer, Inc.** [PDF]
7. **Bally Technologies** [PDF]
8. **BASF AG** [PDF]
9. **Biogen Idec, Inc.** [PDF]
10. **Biotechnology Industry Organization (BIO)** [PDF]
11. **Brigham and Women's Hospital - CSRL** [PDF]
12. **Caterpillar Inc.** [PDF]
13. **Council on Government Relations** [PDF]
14. **Eastman Kodak Company** [PDF]
15. **E. I. du Pont Nemours and Company** [PDF]
16. **Eli Lilly and Company** [PDF]
17. **GlaxoSmithKline** [PDF]
18. **Heritage Woods, Inc.** [PDF]
19. **Human Genome Sciences, Inc.** [PDF]
20. **IBM Corporation** [PDF]
21. **InterDigital Communication Corporation** [PDF]
22. **Massachussetts General Hospital-CSRL** [PDF]
23. **Maxygen, Inc.** [PDF]
24. **Medarex, Inc.** [PDF]
25. **Microsoft Corporation** [PDF]
26. **Miller Patent Services** [PDF]
27. **National Venture Capital Association** [PDF]
28. **Novartis Vaccines Diagnostics, Inc.** [PDF]
29. **Pfizer, Inc.** [PDF]
30. **Pharmaceutical Research and Manufacturers of America (PhRMA)** [PDF]
31. **SanDisk Corporation** [PDF]
32. **Telik, Inc.** [PDF]
33. **Texas Instruments** [PDF]
34. **University of California** [PDF]
35. **Walker Digital Management, LLC** [PDF]
36. **Wisconsin Alumni Research Foundation** [PDF]
37. **Wyeth** [PDF]
38. **ZymoGenetics, Inc.** [PDF]

## C. Law Firms

1. **Bachman & LaPointe, PC** [PDF]

# Heritage Woods, Inc.

May 2, 2006

Mail Stop Comments—Patents
Attn: Robert W. Bahr and Robert A. Clarke
Commissioner for Patents
P.O. Box 1450
Alexandria, VA, 22313–1450

**Comments on**

**"Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims" (71 Fed. Reg. 48, January 3, 2006) and**

**"Changes to Practice for the Examination of Claims in Patent Applications" (71 Fed. Reg. 61, January 3, 2006)**

Heritage Woods, Inc. appreciates the opportunity to comment on the two proposed rule packages published in January 2006.

Heritage Woods is a small business that relies on its patents to protect its product line from larger competitors. This letter also expresses concerns of other small businesses who rely on their patents.

The two proposed rule packages noted above have been brought to our attention by patent counsel. While there are a few good ideas in the two rule packages, and Heritage Woods appreciates the PTO's effort to correct a perceived problem, the packages as a whole will cause and aggravate more problems than they solve. They will remarkably increase the cost of the patent system as a whole – the costs of obtaining a patent will go up by a large factor, and the costs of litigation will go up even more.

Ironically, both packages will have the most negative effect on the most important inventions and applications. The "Examination of Claims" rule package (71 Fed. Reg. 61) explicitly embodies a view that large applications are "bad" and should be penalized. However, from both a commercial point of view and from a patent public policy point of view, large applications are good: they are the applications that are directed to economically-important inventions, and they provide the greatest disclosure of ideas to the public – which is, after all, the main public good of the patent system. They are immensely cost-effective to the patent system – a patent that has many claims is a much more efficient dispute-resolution document than a short imprecise patent that needs to rely heavily on fuzzy notions of "equivalents." A patent is analogous to a commercial contract – a contract this is fully negotiated, and that expressly spells

Order Entry: P.O. Box 888215, Grand Rapids, Michigan 49588-8215
Corporate Office: 6543 Thornapple River Drive SE, Alto, Michigan 49302-9765
Phone: (616) 698-9644 • (800) 809-9644

P000580

out all the rights and obligations of the parties, is far cheaper in the long run than a brief contract that leaves most issues to be fought out later.

Other analogies to contracts demonstrate the perverse effects of these rule packages. These rule packages infect the examination/prosecution negotiation process with the factors that make any contract negotiation harder. As a general rule, a commercial contract is more easily negotiated if the parties can disclose their concerns, incentives, and positions early in the negotiation, and harder if a position is kept hidden until late, and if there are hard deadlines and hard positions that cannot be moved as new issues emerge. Both these proposals are expressly directed at putting the negation onto the worst possible ground for efficient resolution of issues.

The PTO solicited very little public comment before announcing these rule packages. In public comment forums, we understand that many PTO customers expressed that the issues targeted by these proposals are not the issues that matter. PTO officials conceded that the PTO had done no self-study to identify the cause of the problems targeted, let alone any study to show how the proposed rules would lead to resolution of the problems. The rule proposals seem to be narrowly focused on solving the PTO's problems, to the near exclusion of considering the issues that matter to the PTO's various constituencies.

The message of these rule package to inventors is clear: stop inventing complex or worthwhile inventions. The rationale for the PTO to send this message is not clear. The proposals are based on bad assumptions, bad data, and bad analysis, and should be withdrawn. The PTO should initiate a dialog with its customers. The first and most crucial step in this dialog should be to identify the criteria that matter most to applicants, and metrics to measure them. Once problems are soundly identified, then practical and efficient solutions to the problems usually emerge fairly readily, and there is no reason to believe this will not be the case here.

I. **Both Rule Packages are Based on Questionable or Faulty Data, Unsupported Assumptions, and Failure to Consider Important Aspects of the Problem**

**Comment 1. "Rework" Is Overwhelmingly the Product of Errors Within the PTO, Not Applicant Behavior that these Rule Proposals Seek to Curb.** Both Notices of Proposed Rulemaking, and the public statements of PTO officials announcing them, note that the proposed rules are directed to cutting down "rework." Because the PTO has apparently made no attempt to identify the cause of the problems identified, neither Notice identifies any "rational connection" between the rules as proposed and any hoped-for causal reduction in "rework."[1] Further, it appears that the PTO has neglected to consider the statistics that it has collected, that do fairly directly establish a cause of "rework," a cause that will be aggravated by the two rule packages.

The following table combines statistics of *ex parte* appeals obtained from the PTO's web pages[2], and statistics obtained via Freedom of Information Act requests.

---

[1] Any rulemaking must be accompanied by a showing of "rational connection between the facts found and the choice made," *Motor Vehicle Manufacturers Assn. of the U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983).

[2] http://www.uspto.gov/web/offices/dcom/bpai/docs/receipts/index.htm. This table reflects only utility applications – where the data permits design applications to be subtracted out, they have been.

P000581

# Dispositions of Appeals - from Appeal Conference to Board Final Decision

## In-Group Appeal Conference

| Year | Appeal Briefs | Examiner Actions | Examiner's Answer | | Reopen | | Allowance | | Dismissed | | Withdrawn | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 5,609 | 5,548 | 3,235 | 58.3% | 698 | 12.6% | 1,540 | 27.8% | 69 | 1.7% | 70 | 1.7% | 76 | 1.4% |
| 1999 | 5,500 | 5,432 | 2,862 | 52.7% | 825 | 15.2% | 1,673 | 30.8% | 169 | 3.7% | 5 | 0.1% | 74 | 1.4% |
| 2000 | 5,934 | 5,873 | 2,758 | 47.0% | 1,214 | 20.7% | 1,813 | 30.9% | 152 | 3.1% | 10 | 0.2% | 89 | 1.5% |
| 2001 | 6,706 | 6,633 | 2,707 | 40.8% | 1,651 | 24.9% | 2,195 | 33.1% | 143 | 2.8% | 0 | 0.0% | 83 | 1.3% |
| 2002 | 7,001 | 6,885 | 2,709 | 39.3% | 1,855 | 26.9% | 2,264 | 32.9% | 92 | 1.8% | 0 | 0.0% | 58 | 0.8% |
| 2003 | 8,289 | 8,141 | 3,248 | 39.9% | 2,419 | 29.7% | 2,424 | 29.8% | 61 | 1.6% | 0 | 0.0% | 52 | 0.6% |
| 2004 | 9,740 | 9,126 | 3,676 | 40.3% | 2,969 | 32.5% | 2,394 | 26.2% | 80 | 2.3% | 0 | 0.0% | 88 | 1.0% |
| 2005 | 11,263 | 9,726 | 4,120 | 42.4% | 3,370 | 34.6% | 2,147 | 22.1% | 111 | 3.8% | 0 | 0.0% | 93 | 1.0% |

## Examiner's Answers that Reach the Board of Patent Appeals

| Year | Total Dispos'ns | Affirmed | | Modified / Affr'd in Part, Rev'd in Part | | Reversed in full | | Remanded | | Total Net Affirmance (Appl Conf and Board) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 4,091 | 1,464 | 35.8% | 391 | 9.6% | 1,239 | 30.3% | 997 | 24.4% | 24% |
| 1999 | 4,520 | 1,283 | 28.4% | 504 | 11.2% | 1,573 | 34.8% | 986 | 21.8% | 18% |
| 2000 | 4,963 | 1,442 | 29.1% | 518 | 10.4% | 1,930 | 38.9% | 911 | 18.4% | 16% |
| 2001 | 5,075 | 1,516 | 29.9% | 459 | 9.0% | 1,868 | 36.8% | 1,089 | 21.5% | 14% |
| 2002 | 5,062 | 1,509 | 29.8% | 471 | 9.3% | 1,895 | 37.4% | 1,095 | 21.6% | 14% |
| 2003 | 3,815 | 1,398 | 36.6% | 413 | 10.8% | 1,490 | 39.1% | 453 | 11.9% | 17% |
| 2004 | 3,436 | 1,276 | 37.1% | 401 | 11.7% | 1,282 | 37.3% | 397 | 11.6% | 17% |
| 2005 | 2,925 | 1,113 | 38.1% | 366 | 12.5% | 1,159 | 39.6% | 176 | 6.0% | 19% |

P000582

It appears that the Patent Office has literally done <u>nothing</u> to identify the cause of the problem it's trying to solve. Neither Notice discloses any attempt by the PTO to identify the cause of "rework." On Friday, April 7, 2006, at the New York "Townhall meeting," Commissioner Doll was asked if the PTO had made any attempt to identify the cause of the rework, particularly whether the PTO had made any attempt to determine whether "rework" was caused by examiner error or applicant dalliance. Mr. Doll virtuously answered forthrightly and directly: "No." In response to several Freedom of Information Act requests for documents in which the PTO might has identified the cause of its "rework" problem, or set out any diagnosis or analysis, the PTO insisted that there are no such documents. If the PTO doesn't know what disease is causing the symptoms, it's premature to propose major surgery.

However, facts were available that permitted such diagnosis. The PTO's own statistics show that, at Appeal Conference, an examiner is successful at persuading two other examiners only 40% of the time – 60% of examiners' positions are repudiated by colleagues. Of the 40% of examiner positions that survive the Appeal Conference level, **less than 40% are affirmed** by the Board. In all recent years but one, the Board **reverses more often than it affirms**.[3]

Taken together, these two sets of statistics suggest that in contested applications, **examiners are affirmed by colleagues or the Board only about 20% of the time**.[4] This suggests that the overwhelming cause of "rework" and extended continuation practice is **errors by the examiner**, not nefarious or dilatory applicants. Rule changes directed at applicants will have almost no effect on "rework."

When an agency's substantive results are this flawed, the courts conclude that the agency's procedures are unconstitutionally flawed. When an agency's own figures show reversal rates of **one third**, the agency's procedures "cannot be defended," and the agency is in violation of its duties to provide due process. *Mattern v. Weinberger*, 519 F.2d 150, 161 (3rd Cir. 1975), *gvr'd on other grounds*, 425 U.S. 987 (1976). A reversal rate approaching **eighty percent** is beyond anything that appears in any case – apparently no other agency tolerates that of itself.

These proposed rules bear no rational relationship to the PTO's "rework" problems. The proposed rules fail to consider the single most "important aspect of the problem,"[5] will do very little to relieve "rework," and do nothing to help the Office comply with its due process duties

---

[3] In a recent internet news item, a law firm that has filed over 100 requests for pre-Appeal Brief review reported that over **90%** of rejections are reversed during Pre-Appeal Brief Review phase.

[4] This statistic does not include the number of further rejections reversed by the Federal Circuit.

No doubt, there are many methodological errors in the spreadsheet, due to unavailability of detailed statistics. For example, the cases decided by the Board in Fiscal Year X are not the same population of applications reviewed by Appeal Conferences in year X. The spreadsheet assumes that the Board's "affirmed in part" reflects a 50-50 break between applicant and examiner, an obvious oversimplification. However, given the magnitude of the final result, there is no question that the PTO is far in violation of its due process duties to provide processes that keep the error rate below 1/3.

[5] *Motor Vehicle Manufacturers Assn. of the U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983) (agency may not "entirely fail[ ] to consider an important aspect of the problem").

P000583

under the Administrative Procedure Act and Due Process clause of the Constitution. Alternative proposals that address the actual measurable problem are discussed below at § IV.

Neither rule package can be promulgated on the current record.

**Comment 2.   The Benefit to Be Expected from the Two Rule Packages is Modest at Best.**  By the Patent Office's own figures, the improvement that can be expected from these two rule packages is very modest.  This is the chart that the PTO has been using in its presentations.



Note that the current baseline projection – the yellow projection – and the projection for adoption of both rule packages – the blue line – are very close together.  The divergence between them is probably less than the error tolerance in the projections themselves.

The red curve and the purple curve are apparently irrelevant to these two particular rule packages, and only confuse the analysis.

**Comment 3.   The PTO's Statements Regarding Hiring Are Inconsistent with the Small Amount of Information That Has Been Made Public.**  In a number of public statements, PTO officials have stated the PTO can't "hire its way out" of its backlog.  Yet, the PTO's own projection graph shows that the second-biggest reduction in pendency – the difference between the red curve and the yellow curve – is due to hiring and retention.  The only larger effect, between the blue and dotted-yellow curves, is for "Patentability Reports," a proposal that has not yet been made public, that remains entirely theoretical.

P000584

The PTO should not prematurely discount the effects of the single best concrete solution it has proposed.

**Comment 4.   The Two Rule Packages Fail to Show the Agency Considered Costs to be Imposed on the Public.**   The rule packages assume that application pendency is the criterion that trumps all others for all applicants.  Simply not true.  When the PTO delays an application, the statutory protections of 35 U.S.C. § 154 provide compensating extension of patent term, so extended pendency is often no net loss to the applicant.  There are several things that are more important: (a) business confidence that issued patents have been well searched and are valid, (b) complete communication of an examiner's entire view in the <u>first</u> communication from the Office, so that an applicant can determine what is patentable and what is not – like a negotiation where both sides put all their concerns on the table early, so that they can quickly reach agreement, and (c) total end-to-end cost, including both attorney fees and PTO fees.  Both proposals are apparently directed at lowering the number of applications filed by raising total costs, violating (c).  The "Examination of Claims" proposal is especially antithetical to both (a) and (b).  The "Continuations" rule package weakens (a).

Further, the Notices fail to estimate the costs to be imposed on applicants.  Agencies cannot propose major rule changes, without consideration of costs imposed on other stakeholders, with no cogent explanation of a connection between problem and proposed solution, and with no supporting documentation. *Motor Vehicle Manufacturers Assn. of the U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 55 (U.S. Sup. Ct. 1983).  The PTO must consider <u>all</u> the costs attendant its proposed rule – it may not simply consider its own costs and ignore the costs it proposes to impose on applicants.

Neither rule package can be adopted on the current record.

**Comment 5.   The Two Rule Packages are Logically Inconsistent With Each Other.** The two rule proposals are fundamentally inconsistent with each other.  The "Examination of Claims" rule package (71 Fed. Reg. 61) is directed at allowing the PTO to examine less than an entire application.  This will necessarily increase the need for continuation applications, for example, where the subject matter that emerges as ultimately patentable is set out in claims initially filed as dependent claims.

In direct opposition to the "Examination of Claims" package, the "Continuations" rule package (71 Fed. Reg. 48) is directed at confining the use of continuations.

The two rule packages are logically inconsistent with each other.  Taken together, they are arbitrary and capricious.

## II.   71 Fed.Reg. 48 – Limiting Continuation Applications and Presumption of Double Patenting

This rule package would limit applicants' ability to file continuation, continuation-in-part, divisional, or request for continued examination.  The standards announced in the PTO's public presentations are very similar to the standards for reopening a final judgment after full discovery, trial and appeal, rather than standards for an investigatory proceeding of first instance. The effects would be most draconian for the biggest innovations: where simple inventions to minor improvements would be almost unaffected, the ability to patent a family of related inventions arising out of a large research project would be sharply curtailed.

A.     **Proposed 37 C.F.R. § 1.78(d)(i) – Limiting Priority Claims Under 35 U.S.C. § 120, 121 and 365(c)**

1.     **Proposed 37 C.F.R. § 1.78(d)(i) Exceeds the PTO's Statutory Authority**

**Comment 6.**   The PTO has no statutory authority to promulgate this rule with respect to continuations or voluntary divisionals under 35 U.S.C. § 120.  Section 120 states that a later application "shall" be given priority benefit when certain conditions are met.  The statute offers no authority for the Office to further restrict the timing or depth of a chain of continuations, beyond the statutory requirement for co-pendency.  Section 120 gives the Director rule-making discretion in some areas, but not the area covered by the proposed rule.  The PTO lacks authority to add further conditions, or to add rules outside the scope of discretion delegated in § 120.

The "administrative convenience" of an agency may not be used to subvert a statutory right.  *In re Weber*, 580 F.2d 455, 458, 198 USPQ 328, 332 (CCPA 1978) ("[I]n drawing priorities between the Commissioner as administrator and the applicant as beneficiary of his statutory rights, we conclude that the statutory rights are paramount."); *Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 483, 226 USPQ 985, 987 (Fed. Cir. 1985) ("administrative convenience or even necessity cannot override the constitutional requirements of due process").

2.     **Proposed Rule 1.78(d)(i) is Directly Contrary to the PTO's Economic Interest, and Will Result in Further Degradations in Pendency**

**Comment 7.**   The Notice makes a "problem" out of a situation that any other business entity would turn into a profit center.  The Notice complains that PTO's customers want to pay the PTO its full rate to do exactly the same work a second time.  The Notice posits that many applications are filed directed to non-patentably-distinct claims, claims that can be examined at near-zero incremental effort.

There is no economically rational basis to believe that multiple, not-patentably-distinct applications are bad for the PTO.  If not-patentably-distinct applications really are being filed in any significant number, then the PTO is getting "free" income – if two applications really are similar, then the PTO pockets the fee income, and has very little work to do.  If this is really happening, then these applicants are subsidizing everyone else, including the PTO.  Discouraging it will result in a larger proportional loss in fee income than reduction in work expended.  The work-to-fee ratio will worsen.  The PTO's ability to hire in the future will be compromised.  Pendency times will further degrade.

If PTO's business operations are anomalous exceptions to the laws of economics, then crucial facts were omitted from the Notice of Proposed Rulemaking.  The public should be provided with those facts: why are these applications costing more in PTO resources than the fee income they generate?  Perhaps once these facts are disclosed, a rational rule proposal could be framed.  On the facts articulated in the Notice, proposed § 1.78(d) is arbitrary and capricious.

Because the PTO proposes to increase its own average costs for processing patent applications, this cost will likely be reflected back to applicants.

**Comment 8.   The Rule Proposal is Based on a Double Standard.**  The Notice states that "The current unrestricted continued examination practice, however, does not provide adequate incentives to assure that the exchanges between an applicant and the examiner during

P000586

the examination process are efficient." This is simply counterfactual. Prosecution costs impose great efficiency incentives on applicants. The 1995 statutory amendments, with the 20-year-from-filing patent term, provides significant incentives to advance prosecution as efficiently as possible. Further, as a practical economic matter, very few applications are filed after years 7 or so – as the remainder of the 20 year patent term winds down, the economic value of a new application falls below the cost of filing long before 20 years. The doctrine of prosecution laches, and the "fair warning" procedure exemplified in *In re Bogese*, 303 F.3d 1362, 64 USPQ2d 1448 (Fed. Cir. 2002) are a fair and efficient way to deal with anomalies.

On the other hand, applicants might fairly ask, what incentive does the PTO provide to examiners to write complete office actions, to avoid doing the things that the Manual of Patent Examining Procedure (MPEP) says may not be done, and to avoid making up new rules as they go along? At the April 9 New York Town Hall, a former Deputy Assistant Commissioner for patent Examination Policy stated that examiners face no internal liability or discipline for bad examination. **No matter how bad** an examiner's work is, the examiner is compensated and promoted based **purely on quantity**. Some Technology Center Directors actively incentivize their examiners to **not** examine applications. For example, in a Decision on Petition of 12/8/05, 09/385,394, addressed to an independent claim had been entirely ignored (except a *pro forma* statement that it was rejected), the Technology Center Director in 2183 states that "Petitioner should be advised that there is no requirement that an element for element or limitation for limitation identification (between the claims and reference(s) be provided to applicant in the grounds of rejection set forth in the examination process..." in the context of three references that total 70 columns of text. The 2183 Technology Center Director expressly blessed an examiner that **kept his position secret** during regular examination, even on independent claims, and then disclosed it in post-final advisory actions. In 2183, examiners earn full "counts" **and** get to force the application into an RCE, for even more counts. In this art unit, there are no "adequate incentives to assure that the exchanges between an applicant and the examiner during the examination process are efficient."

The solution to the "rework" problems identified in the Notices resides in enforcing the PTO's existing rules during the § 131 examination phase – for example, requiring examiners to set forth findings on all legally-relevant issues, *In re Berg*, 320 F.3d 1310, 1315, 65 USPQ2d 2003, 2007 (Fed. Cir. 2003) (examiners must set forth findings on the prior art relative to each element of a claim, and motivation to combine or modify); 35 U.S.C. §§ 131, 132 (Director "shall cause an examination to be made" and shall "state reasons" for any rejection); *e.g.*, MPEP §§ 2112, 2143-2143.03, 2144.03 (examiner must state findings on various factors), as opposed to the current policy of refusing to consider all requests in any forum requesting enforcement of those rules and legal requirements, thereby allowing examiners to pick and choose which rules to follow and which to ignore. Several mechanisms for enforcement, most of which are required under current law, are discussed in § IV.

The PTO's outright refusal to enforce its own rules or the Administrative Procedure Act during § 131/132 examination phase, and its insistence that examiners have "freedom to independently decide" whether or not to follow PTO rules[6], even if that means arbitrary and

---

[6] *See, e.g.*, *Boundy v. Patent and Trademark Office*, E.D. Va. 03-CV-557A, Defendant [PTO's] Reply to Cross Motion for Summary Judgment at 16 (April 23, 2004) (PTO asserts that examiners have "free exercise of their [judgment]" in choosing whether to follow or ignore instructions of the Director in

P000587

capricious rejection, costs businesses at least $100 million per year in excess and unjustified legal costs. A fair estimate is that at least 20% of this falls on small businesses.

### 3.    Proposed 37 C.F.R. § 1.78(d)(i) is Unwise and Unwarranted

**Comment 9.**   Appeals are costly for both applicants and the PTO – this rule change will force many applications from an inexpensive forum to a more expensive one.

A typical Response to Office Action costs $2000-$8000 to prepare. An appeal costs about 2 to 3 times that. The proposal will likely cost several tens of millions of dollars per year extra for small businesses.

### B.    Proposed 37 C.F.R. § 1.78(d)(ii) Is Unwise and Inefficient, and an Unconstitutional Denial of Due Process

The discussion section explains that § 1.78(d)(ii) would forbid "voluntary" divisionals. <u>Only</u> "involuntary divisionals," that is divisionals filed after a unity of invention objection under PCT Rule 13, or a restriction under 35 U.S.C. § 121 , would be permitted. The only claims permitted in a divisional would be the ones divided from the parent case. A divisional would only be permitted to claim priority from that single parent. "Voluntary" divisionals, where a single application is filed with a large specification describing all inventions, and applications with the claims directed to the appropriate patentably-distinct inventions described in that specification, would no longer be permitted. The opportunity currently available to applicants, to claim inventions as they become apparent in light of the prior art, would be closed off.

**Comment 10.** At Townhall presentations, the PTO stated that it intends this rule to cut off at least ten thousand patent applications per year, perhaps more. The economic effects are difficult to estimate with any certainty, but it is safe to say that this proposal will unquestionably destroy *many tens of millions of dollars* of value for small businesses each year, very likely *hundreds of millions*, and perhaps *billions*.

**Comment 11.  Proposed 37 C.F.R. § 1.78(d)(ii) Requires Applications to be Presented to the PTO in a Form that is Inefficient for the PTO and for Applicants.** This proposal overlooks a key fact: by and large, applicants' and the PTO's interests are essentially aligned on these issues: claims that are more efficiently prosecuted together are by and large more efficiently examined together. Applicants generally make these determinations based on the same economic and practical considerations that apply to the PTO, and the law presumes that the choices are reasonable. Before an application is filed, an applicant is in a far better position to know which situation applies. The law allows the PTO to overcome the presumption if it can come forward with evidence to the contrary. Current law on this particular issue is just right.[7] The requirement that all claims be presented together, no matter how distant they are from each other, is simply irrational.

**Comment 12. Proposed 37 C.F.R. § 1.78(d)(ii) is Likely an Unconstitutional Denial of Due Process.** This proposal is an unconstitutional denial of due process. Even though the

---

the MPEP and 37 C.F.R. § 1.104); *Boundy v. PTO*, Defendants' Answer, ¶ 10 (PTO denies that its officials have "any responsibilities" under the Administrative Procedure Act).

[7]   There are other problems with restriction practice, which were noted in various comments on the PTO's White Papers in 2002 and 2003 – this proposal aggravates those concerns.

P000588

TO is not obligated to issue patents, it is bound to give a rational explanation when it denies a tent, and may not take away patent term based on a bare "presumption" without consideration the facts – the PTO is subject to both constitutional and administrative law notions of rocedural due process.[8] The PTO's own slides show that in many art units, it takes <u>over four ears</u> to even get a restriction requirement. Then, after a divisional is filed, that application will vait years more for a first action on the merits, or to be divided further.[9] Only one of these long lelays is protected by § 154 term adjustment; the second is not. The denial of years of patent erm, with neither evidence nor rational connection between the facts cited in the Notice and the proposed rule, and with no explanation for why the PTO is in a better position to make these determinations than applicants, is likely unconstitutional. It is also a violation of the minimal "examin[ation of] the relevant data and articulate[ion of] a satisfactory explanation" required for rule making under the Administrative Procedure Act.[10]

### C.    Proposed 37 C.F.R. § 1.78(f)(2) – Presumption of Double Patenting

Proposed Rule 1.78(f)(2) proposes to substitute a "presumption" of double patenting, based solely on priority claim, overlapping inventorship, and common ownership, and to displace the fact-based showing required under current law.

#### 1.    This rule is Beyond the PTO's Statutory Authority

**Comment 13.** A rejection based on a mere presumption – with no consideration whatsoever of the claims themselves – is beyond the Office's authority.

The burden of establishing a *prima facie* rejection is always on the PTO. *In re Oetiker*, 977 F.2d 1443, 1445-46, 24 USPQ2d 13443, 1444 (Fed. Cir. 1992) ("the examiner bears the initial burden, on review of the prior art or <u>on any other ground</u>, of presenting a *prima facie* case of unpatentability. … If examination at the initial stage does not produce a *prima facie* case of unpatentability, then <u>without more the applicant is entitled to grant of the patent</u>." emphasis added); *In re Haas*, 580 F.2d 461, 198 USPQ 334 (CCPA 1978) (refusal to examine is legally the same as a rejection). The PTO does "NOT … have authority to issue substantive rules," 35 U.S.C. § 2(b)(2)(A)[11]; *Merck & Co. v. Kessler*, 80 F.3d 1543, 1550, 38 USPQ2d 1347, 1351

---

[8] A patent applicant's entitlement is essentially similar to the Constitutional right to either grant of a prospective application for a law admission or a sound explanation for denial, set forth in *Board of Regents v. Roth*, 408 U.S. 564, 576 n. 15 (1972). The "entitlement" prong of *Regents* is provided by statute and Federal Circuit law. "A person shall be <u>entitled</u> to a patent unless…" 35 U.S.C. § 102. "If the PTO fails to meet this burden, then the applicant is <u>entitled</u> to the patent." *In re Glaug*, 283 F.3d 1335, 1338 (Fed. Cir. 2002) (emphasis added).

[9] For example, 10/427,519 was filed as a divisional application in May 2003, reasonably promptly after a restriction became final in the parent. A status report received in March 2006 indicate that it will not be examined until at least February 2008, five years after filing, **nearly 10 years after i effective filing date**. This application has lost five years of patent term under the approach proposed i 37 C.F.R. § 1.78(d)(ii).

[10] *Motor Vehicle Manufacturers Assn. of the U.S. v. State Farm Mutual Auto Insurance Co.*, U.S. 29, 43 (1983)

[11] Written accounts of the Houston Townhall "road show" report that Assistant Commission Focarino frankly acknowledged that the rule packages have, and were intended to have, substantive

(Fed. Cir. 1996) (emphasis in *Merck*) that result in non-examination of claims, and no authority to overrule the Federal Circuit's instructions on its burden to demonstrate unpatentability. The PTO may not substitute a "presumption" for its duty to examine a claim before it can reject it.

The PTO is forbidden from considering the specification in any double patenting issue. *In re Boylan*, 392 F.2d 1017, 1018 n.1, 157 USPQ 370, 371 n.1 (CCPA 1968). A double-patenting "presumption" based on the specification is beyond the PTO's authority.

## 2.    The Presumption Has Absurd Consequences

**Comment 14.** Presumptions are only created where the efficient means to rebut the presumption lies with the party against whom the presumption operates. This is manifestly not the case here – the easier showing lies with the examiner, and the showing that the Notice proposes to thrust on applicants is nearly impossible.

A rule requiring an applicant to rebut a "presumption" that "there is at least one claim that is not patentably distinct from at least one of the claims in one or more other … applications" is unreasonably onerous. For example, if there are 20 claims in each of two applications, the applicant must make **400** showings of distinctness. If there are 20 claims in each of 4 applications, the applicant must make **2400** showings. The law sharply frowns on "presumptions" that require a party to "prove a negative" – the procedural consequences of such presumptions are simply unmanageable.

The law requires an examiner to perform a simple task: pick out and analyze only <u>one</u> claim from one application, and <u>one</u> claim from a reference application/patent, and make a routine anticipation or obviousness showing. There is no rational basis to depart from this efficient procedure for identifying and resolving any *bona fide* double patenting issue.

The cost for small businesses of making the ***hundreds*** of showings required to rebut the proposed presumption is certainly tens of millions of dollars per year, and likely hundreds of millions.

## 3.    The 37 C.F.R. § 1.78(f)(2) Presumption is Unwarranted

**Comment 15.** Further, the presumption is simply unwarranted. For example, in the computer arts, it's common that a major new product may have dozens of patentably distinct inventions. Often, the most efficient and best way to prepare applications to such inventions, and to ensure that there is no "best mode" problem, is to file one omnibus specification, with claims directed to the different inventions broken out in different applications. This is good from a public policy point of view – why penalize it?

Applicants are well aware of the harsh consequences of double patenting – striking of a patent. That is great incentive to avoid it. The PTO need not create a "presumption" that is overwhelmingly counterfactual.

---

effect, and were intended to preempt action by Congress. If the statements are proved at litigation seeking to invalidate these rules, both rule packages are invalid.

P000590

### D.  Proposed 37 C.F.R. § 1.78(f)(3) Is Beyond the PTO's Authority, and is an Unwise Attempt to Exert Influence Outside the Area of the PTO's Expertise

#### 1.  "Patentably Indistinct" Claims Are a Necessary and Desirable Component of U.S. Patent Law, and Should Not be Limited

**Comment 16.** Applicants file claims that are "barely distinct" for a variety of reasons relating to the post-issue phase of a patent's life. These reasons are all perfectly legitimate, and are essential if claims are to serve their "notice" function. Such claims sharply reduce the costs of patent litigation, by turning unclear cases into clear ones. However, because they relate to post-issuance phase, where the PTO has **no** authority and very little experience, the PTO may not appreciate the effects of its Proposed Rules.[12]

Applicants <u>must</u> file parallel claims that consider the following:

- Claims directed to various phases of the life cycle or operating cycle of the invention

- Claims to deal with territoriality issues such as imports, exports, international communications systems, temporary presence of vehicles, etc. For example, in a communications system, it can be crucial to have separate claims directed to the sender, the receiver, and the switch that routes messages between them.

- Claims to deal with exhaustion, repair, replaceable or consumable parts

- Claims directed to literally cover foreseeable equivalents – thereby simplifying complex "doctrine of equivalents" cases to clear literal infringement cases

- Claims to deal with claim construction rules for means-plus-function, product-by-process, functional apparatus, structural apparatus, method-of-making, and method-of-using claims

- Claims to deal with various limitations on damages

- Limitations, such as intent, on the doctrines of induced or contributory infringement

These claims are an essential part of the patent system. They profoundly reduce the cost of patent litigation, by reducing "stretch" cases of infringement to simple ones. On the Patent Office's own version of the facts, these applications require very little incremental examining effort. The Notice reflects a misunderstanding of the net economic effect of the proposed rules.

By denying applicants the ability to prosecute claims whose infringement is easily determined, and thereby forcing the litigation of "doctrine of equivalents" issues, or other similar issues cataloged in II.D.1, under poorly-targeted claims, this proposal will likely add at least 10%, and possible 20%, to the cost of a typical patent litigation – which could easily amount to

---

[12] *Merck & Co. v. Kessler*, 80 F.3d 1543, 1550, 38 USPQ2d 1347, 1351 (Fed. Cir. 1996) (The PTO does "NOT … have authority to issue substantive rules," 35 U.S.C. § 2(b)(2)(A), emphasis in *Merck*); *Motor Vehicle Manufacturers Assn. of the U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 42-43 (1983) (an agency may not reach beyond the "scope of the authority delegated to the agency by the statute," may not [rely] on factors which Congress has not intended it to consider," and may not "[offer] an explanation for its decision that … is so implausible that it could not be … the product of agency expertise.")

P000591

at least *$400 million* annually.[13] About $40 million of this cost will fall on small businesses. A number of these litigations will be lost when they should have been won, because the PTO proposes to deny applicants the right to meet the obligations of substantive law listed above (an analysis that the Notice of Proposed Rulemaking pointedly ignores) destroying *hundreds of millions of dollars*, perhaps *billions*, of business value annually. About 20% of this large number will fall on small businesses.

**Comment 17. Proposed 37 C.F.R. § 1.78(f)(3) Violates Substantive Law.** "[T]here is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application." *Kingsdown Medical Consultants Ltd v. Hollister Inc.*, 863 F.2d 867, 874, 9 USPQ2d 1384, 1390 (Fed. Cir. 1988). Competitors have 18½ years to exploit an applicant's published specification, to appropriate the ideas while designing around the claims. The PTO's Notice is infirm for two separate reasons: (a) it analyzes only one side of the equation, and makes no attempt to balance policy goals and harms, and (b) the one-sided policy reasons stated in the Notice are simply not within the delegation to the PTO.

### 2. The PTO Articulates No Grant of Authority that Authorizes Any Procedure in Addition to a Terminal Disclaimers to Cure Obviousness-Type Double Patenting

**Comment 18.** As part of the *quid pro quo* in creating the doctrine of "obviousness type" double patenting, the CCPA instructed the PTO that it must provide adequate procedures to accept terminal disclaimers in obviousness-type double patenting situations. *E.g., In re Jursich*, 410 F.2d 803, 161 USPQ 675 (CCPA 1969). The proposal of § 1.78(f)(3), to add any further requirement above a terminal disclaimer, is beyond the PTO's authority.[14]

Under current law, preparing a terminal disclaimer costs about $100-$200. Preparing each petition described in the proposal will cost several thousand dollars. The cost of this proposal is approximately $10 million annually, about 20% of which will fall on small businesses.

### E. Proposed 37 C.F.R. § 1.78(f)(1) is Sound as Far as it Goes

**Comment 19.** Proposed 37 C.F.R. § 1.78(f)(1) requires that an applicant identify to the Office all applications that are related by certain criteria.

This is a sound proposal – it seeks information that is reasonably likely to save more than it costs to provide, from the party that is in the best position to provide it, and requests information that will likely be genuinely useful in efficiently handling applications.

The silence of the rule on extensions of time presumably means that extension by mere petition and payment of fees will be available. This is crucial – when prosecuting applications on behalf of foreign clients, even simple matters like obtaining signatures on declarations can

---

[13] The total patent litigation budget for the U.S. appears to be at least $2 billion per year.

[14] The rule is further infirm for reasons set forth in footnote 11.

take months, for the path from U.S. attorney to foreign attorney to foreign in-house counsel to inventors and back again.

The proposal does not specify a penalty for failure to provide this information within the four month time provided. An unreasonable penalty with any substantive consequence – such as abandonment – would be improper.

### F.    Proposed 37 C.F.R. § 1.78(f)(3) Should Not Be Adopted

Proposed 37 C.F.R. § 1.78(f)(3) suggests that claims that are not "patentably distinct" but not identical may be required to be cancelled. The statutory authority and rational basis for 37 C.F.R. § 1.78(f)(3) is not apparent.

Requiring cancellation of claims will add tens, perhaps hundreds, of millions of dollars a year in litigation costs, about 20% of which will fall on small businesses.

**Comment 20. 37 C.F.R. § 1.78(f)(3) is Beyond the PTO's Legal Authority.** Where two applications claim subject matter that is not "patentably distinct" but not *identical*, the PTO must allow cure of any double patenting issue by filing a terminal disclaimer. *In re Boylan*, 392 F.2d 1017, 1021-22, 157 USPQ 370, 374-75 (CCPA 1968). Once a terminal disclaimer is filed, any showing of "good and sufficient reason" as proposed by Rule 78(f)(3) is legally irrelevant, and may not be required by the PTO.

**Comment 21. Proposed 37 C.F.R. § 1.78(f)(3) is Unwise Because it Will Increase the Cost of Patent Litigation.** As discussed in § II.D.1, claims that are not "patentably distinct," but that are distinct for infringement purposes, are essential for a variety of reasons. For example, it's often essential to allow some claims to issue to exclude an infringer, and to then pursue other claims, that may be not patentably distinct, in a continuation application. The Notice identifies no public policy reason for limiting an applicant's statutory right to frame claims that simplify any litigation or licensing transaction.

**Comment 22. Proposed 37 C.F.R. § 1.78(f)(3) Identifies No Public Policy Problem that is Not Cured by Terminal Disclaimer.** The Notice identifies no problem specific to these applications that needs to be solved. The public's interest is fully protected by terminal disclaimer procedure. On the PTO's own version of the facts, these applications require very little examination, and bring in full revenues for the PTO, and are a net benefit to the PTO.

### G.    Proposed 37 C.F.R. § 1.78(f)(3), § 1.114(f): "Good and Sufficient Reasons" and "Satisfaction of the Director" Standards Are Illegal under The Administrative Procedure Act and Have Not Been Applied Fairly In the Context of Other Rules; In Addition to Discretionary Standards, Any Rules Adopted Should Specify an Objective Standard under Which Relief is Mandatory

Proposed 37 C.F.R. § 1.78(f)(3), § 1.114(f) propose to turn the right to file applications over to the whim of the Director, as exercised (in first instance) by examiners.

**Comment 23.** Rules that turn on the personal "satisfaction of the Director" are unconstitutional. *Lightfoot v. District of Columbia*, 339 F.Supp.2d 78, 88 (D. D.C. 2004) ("If Due Process is to mean anything, it is a fundamental guarantee that stakeholders are provided both sufficient notice and fair procedures… [A]dministrators must provide a public framework

for principled decision-making and create clear boundaries for that discretion. [A]dministrative officers [are required] to articulate the standards and principles that govern their discretionary decisions in as much detail as possible."); *Pressly Ridge Schools Inc. v. Stottelmeyer*, 947 F.Supp. 929 (D. W.Va. 1997) ("Constitutional "[due] process further requires that decisions ... must be made according to 'ascertainable standards'""); *Burke v U.S. Dept of Justice Drug Enforcement Agency*, 968 F.Supp. 672, 680-81 (M.D. Ala. 1997) (listing adjudicatory and notice principles required by due process, "agencies following unwritten policies or procedures violate [ ] due process rights").

Further, the PTO has set up incentives for PTO personnel to abuse such rules. The PTO's Annual Reports have noted for several years that under 10% of examiners (and, anecdotally, a similar proportion of Technology Center Directors) have the legal training – and none have the incentive, under the PTO's compensation structure – to adjudicate procedural issues in favor of an applicant. For example, in a Decision on Petition in 09/385,394 (Nov. 8, 2005), directed to an issue arising under 37 C.F.R. § 1.116(b)(3) (entry of an amendment on a showing of certain "good and sufficient reasons"), and in a telephone interview summarized in an Interview Summary paper of 12/1/2005, the T.C. Director states that he does not consider particular facts, and he does not consider agency or Federal Circuit precedent – he denies all Rule 116(b)(3) petitions *per se* pursuant to a statement in the MPEP. Applicants have reason to be apprehensive of any further discretion to be given to examiners and Technology Center Directors to force applications to go abandoned.

Given the PTO management's refusal to enforce uniform standards of examination or provisions of the Administrative Procedure Act during § 131/132 examination phase,[15] it will be incredibly difficult and costly to determine what showing will be to "the satisfaction of" the individual deciding such petitions. These petitions will cost several tens of millions of dollars per year, about 20% of which will fall on small businesses.

**Comment 24.** The current rules provide that an applicant may continue to seek agreement with an examiner for so long as the applicant perceives forward progress, and is the only mechanism by which an applicant can differentiate between a "stubborn" examiner (71 Fed.Reg. at 51) and an "educable" examiner. Under the current fee structure, the PTO shifts the cost of this continued negotiation to applicants. Conventional theories of negotiation, rule making and burden allocation suggest that current law, where costs and rights reside together, is exactly right. The PTO offers no explanation for departing from this balance, and articulates no underlying facts that suggest that this rule will address the problem articulated. *Motor Vehicle Mfrs*, 463 U.S. at 43. The rule cannot be promulgated on the record made thus far.

**Comment 25.** It appears the PTO is trying to have things both ways. In the "Townhall" slides, the PTO set out a *very* narrow all-but-*per se* standard it intends to apply. Yet, the Comments to the Notice acknowledge that the PTO has no authority to promulgate such a rule formally. The PTO may not do by informal interpretation what it may not do by formal rulemaking.

---

[15] See footnote 6 and §§ IV.A, IV.B and IV.C.

P000594

**H.    The "Good and Sufficient Reasons" Informally Proposed In Slides Require Applicants are Unworkable**

**Comment 26.** In the slides presented at the "Townhall" road shows, the PTO has given several examples of reasons that will be considered "good and sufficient."

The general tenor of these standards is that applicants will be forced to read examiners' minds, to respond to positions that examiners have not yet put on paper.

For example, one standard approach to resolving an examiner's erroneous view of a technological fact is to first provide a standard treatise that lays out the technological error in the examiner's view. Only if the examiner maintains a technologically-wrong position, then an affidavit may be filed to fill in any gaps in the treatise, and to remove any latitude the examiner has on the technological issue. This is the cost-minimizing approach. Finding and photocopying a few pages of a treatise is relatively cheap. Affidavits are expensive - $5-10,000 for drafting and review by an independent -- and therefore paid -- expert. Under the proposed rules, the opportunity to proceed in two stages would be all but lost: an applicant has to read an examiner's mind to determine when the examiner will adhere to a position that is simply wrong, and when the examiner will disagree with a standard treatise[16] -- instead, an applicant must preemptively attack such errors by affidavit before attempting less expensive approaches. These affidavits will cost several tens of millions, and perhaps $100 million, annually, about 20% of which will fall on small businesses.

Limiting continuations in the manner posed will force pulling this trigger, and a number of others, too early in a number of cases. It will turn prosecution from a mutual negotiation to a far more confrontational exercise.

**I.    Proposed 37 C.F.R. § 1.114(f) – Limit of One RCE**

This rule is unwise and unwarranted, for reasons discussed in § II.A.

**III.    71 Fed. Reg. 61, Refusal to Examine More than 10 Claims Unless Designated in an "Examination Support Document"**

The centerpiece proposal of this rule package is that the PTO will only examine 10 claims per application, unless an applicant files an Examination Support Document (ESD).

The requirements for an ESD are remarkably damaging to substantive patent rights and onerous and expensive to meet. Either there was a deliberate intent to frame the ESD as an "option" that would <u>never</u> be exercised, or the PTO is acting in ignorance of the consequences on patentees.

---

[16] Such errors by "stubborn" examiners are more frequent than one would hope. For example, <u>several</u> such errors by the same examiner are discussed in 09/626,325, Petition and Affidavit of 12/20/2005 (examiner ignores all sources but one, even after admitting that the one he relies on requires correction); 09/385,394, Affidavit of 5/2/2003 (rebutting the examiner's statement that a number keeps its same value when it is rewritten with its digits in reverse order). Until the PTO holds examiners accountable for the costs that bad examination and groundless rejections impose on the PTO (see remarks of former Deputy Assistant Commissioner in Comment 7), and removes the incentives for an examiner to adhere to them to earn disposal counts, the PTO should not raise costs or limit options for applicants to counter.