# Exhibit 23

Stephen T. Schreiner and Patrick A. Doody, Patent Contaminations, How Proposed Rule Changes Will Undermine Our System and Create New Problems, IPL Newsletter, American Bar Ass'n, Intellectual Property Law Section, vol. 24, no. 3, pp. 38 ff (Spring 2006)

# IPL Newsletter

A Publication of The ABA Section of Intellectual Property Law | www.abanet.org/intelprop
Volume 24 : Number 3 : Spring 2006

# What Patent Lawyers Can Learn from Trademark Law
## The New Use of Surveys in Patent Litigation

BY KRISTA E. HOLT, MICHAEL K. MILANI, JOHN E. MALLONEE


Krista E. Holt


Michael K. Milani

John E. Mallonee

Two recently decided Federal District Court cases show that patent litigators can learn from some of the techniques employed in trademark litigation. Most experienced intellectual property lawyers understand the significant role surveys play in trademark infringement and other Lanham Act cases, but relatively few are likely to have considered using such research in patent infringement matters other than those involving design patents. Historically, surveys have generally not been used often in court other than for Lanham Act cases because of hearsay issues. However, as advances in surveys and other forms of public opinion research over the past 25 years have created a well-developed scientific and professional community supporting their use, litigators and the courts are beginning to recognize their utility beyond the traditional confines of Lanham Act litigation.

Survey evidence was admitted into evidence in the patent infringement case *Applera Corporation v. MJ Research, Inc.*[1] The survey evidence, which showed that 96 percent of the defendant's customers used its products to perform a patented process, was admitted as evidence in support of a claim of inducement to infringe. The court admitted the survey into evidence over various objections by the defendant, who also argued that without the survey evidence the inducement claim could not be proven.

Although the survey evidence in *Applera v. MJ Research* was admitted as relevant to a determination of liability, the potential exists for surveys to provide evidence relevant to the determination of damages as well. Surveys could potentially provide relevant evidence on numerous aspects of patent damages assessment. For example, market demand, user preferences for the patented features and the attractiveness of alternatives are all areas in which surveys could provide useful information in the formation of an expert opinion on patent damages.

Courts have already begun to encourage the use of properly conducted surveys in patent infringement cases. In *Advanced Medical Optics, Inc. v. Alcon, Inc.*,[2] the court refused to allow testimony from a medical expert about the preferences of other surgeons because the expert had *not* conducted a survey about those preferences. In that same matter, the court excluded survey-

(continued on page 14)

---

The authors are all employees of Ocean Tomo. Ocean Tomo is an Intellectual Property Merchant Banc specializing in the monetization of intellectual property assets. Krista Holt is a director and heads the firm's Survey practice and leads the D.C. Metro Expert Services Practice. Michael Milani is a director in the firm's Chicago Expert Services practice. John Mallonee is an associate in the firm's D.C. Metro office.



## In This Issue

Keeping Current with the Chair ................... 3
Are U.S. Courts Going Global on *Voda v. Cordis?* ..... 4
Failure to Disclose Litigation to the Patent Office ..... 20
Reliance on Advice of Counsel in the Wake
 of *Knorr-Bremse* ........................... 32
Patent Contaminations ......................... 38
*Merck KGaA v. Integra Lifesciences I, Ltd.* Follow-up ... 50
USPTO Secrecy Orders ........................ 54
ABA Day in Washington ....................... 57
I2P Group News .............................. 60
Recent Developments in Intellectual Property Law .... 64




# Patent Contaminations
## How Proposed Rule Changes Will Undermine Our System and Create New Problems
### BY STEPHEN T. SCHREINER AND PATRICK A. DOODY


Stephen T. Schreiner


Patrick A. Doody

### Introduction: The New Regulations Proposed by the PTO

One of the most controversial and radical ideas initially advanced in the Patent Reform Act of 2005 was stricken from the bill in less than a month and has little chance of ever passing through Congress. Yet this idea now may become binding on patent practitioners—not by the will of the people through legislative reform but rather by a handful of PTO officials. On January 3, 2006, the U.S. Patent and Trademark Office (PTO) proposed sweeping changes to the patent system that will fundamentally alter how inventors protect their inventions through continuation application practice.[1]

As most patent practitioners know, continuation applications are later-filed patent applications based on a previously filed patent application, in an effort to obtain the benefit of the earlier filing date.[2]

The patent statute has never restricted the number of continuation applications that an inventor can file. But this long-standing practice will go by the wayside if proposed regulations are implemented: The PTO seeks to impose a restriction essentially limiting inventors to a single continuation application in most cases and will allow subsequently filed continuations only if the applicant satisfies "subjective" criteria in addition to the statutory criteria.[3]

This is a significant change. In the past, individual inventors and start-up companies with limited funding have used continuation practice as part of a step-by-step approach to protect their inventions, particularly in instances where they do not have the resources to file multiple, simultaneous patent applications to claim every aspect of their inventions at once. Well-funded corporations often take the same approach. Pharmaceutical and biotech companies, for example, must file patent applications early in the development stage to avoid the statutory bar effect of their public use clinical trials. Many times, these organizations have no idea which drug or biologic, if any, will ultimately succeed through the multiyear, multiphase drug development process. Consequently, they file relatively broad application disclosures initially, with the intent of narrowing the scope of the claims through successive continuation and divisional application filings coincident with their drug development phase.

For many other industries, the inventor may determine whether there is a market for the invention during the pendency of the first application that would make it worthwhile to pursue additional coverage. By that time, it is hoped the PTO will have explained what aspects of the invention it believes are patentable, and the inventor can determine whether it is cost effective to file continuation applications to claim aspects of the invention beyond thosse allowed by the PTO in the initial application. Every industry and inventors from large corporations or small start-ups to sole inventors currently benefit from, and regularly utilize, continuing patent application practice.

But continuation practice, like many other aspects of the patent system, has come under sustained attack over the last several years by commentators who complain that the patent system is "broken" and requires overhaul. Rhetoric from legal scholars and other commentators demands that the PTO be overhauled because the PTO issues "bad" patents that have the effect of curbing innovation.[4]

This article examines the proposed new restrictions, where the proposals originated, and their likely impact if implemented. This article also examines the various arguments that have been advanced by the legal scholars against continuation practice and explains why the arguments are unsound. Finally, this article proposes a practical solution to why discontent and seeming problems that led to the PTO's proposed new restrictions and to the most significant problem facing the PTO today—the backlog of unexamined patent applications.

### Studies That Planted the Seed to Restrict Continuation Practice

There can be no doubt that the PTO's proposed new restrictions have been influenced by several recent studies that criticize the existing patent regime, including continuation practice.[5]

First, there was a study[6] issued by the Federal Trade Commission in October 2003 (FTC Report) that suggested continuation applications contributed to a purportedly growing body of "questionable patents."[7] According to the FTC, questionable patents create uncertainty in the marketplace for emerging technologies.[8]

Then, in 2004, the National Academy of Sciences (NAS) issued a report[9] (NAS Report) that was also criti-

---

*Stephen Schreiner and Patrick Doody are partners at the Washington, D.C., office of Hunton & Williams LLP. Mr. Schreiner's practice focuses on all aspects of intellectual property law, including patent litigation, patent prosecution, and counseling related to electronics, software, e-commerce, business methods, interactive media and other areas. Mr. Doody is a former patent examiner whose intellectual property practice includes patent infringement litigation, client counseling, licensing and transactional matters, patent prosecution, and freedom to operate opinions. The opinions expressed here are their own, and not to be attributed to the firm or its clients.*

cal of continuations. As a follow-up to its report, the NAS conducted a series of "town hall" meetings inviting commentary from interested parties. These town halls culminated in a June 2005 meeting at NAS in Washington, D.C., where Rep. Lamar Smith (R-Tex.) introduced a reform bill that included restrictions on continuation practice.[10]

A more zealous tone was taken in an oft-cited 2004 article by Mark A. Lemley and Kimberly A. Moore (L&M article), which asserted that continuation applications were more likely to result in "bad patents" and should be significantly restricted if not abolished altogether.[11]

In September 2004, Adam Jaffee, an economist from Brandeis University, and Josh Lerner, a professor at Harvard Business School, joined the fray when they published their book *Innovation and Its Discontents: How the Broken Patent System Is Endangering Innovation and Progress and What to Do About It* (*Innovation and Its Discontents*).[12] As part of what seems to be in large measure a broad-based attack on the Federal Circuit Court of Appeals, they argue that in the last several decades patents have become too easy to get and have become dangerous, excessively potent weapons.

And finally in August 2005, the National Academy of Public Administration (NAPA) issued a report on behalf of the PTO (NAPA Report) alleging that continuation applications contribute to the large backlog of applications that the PTO must examine and largely for that reason should be restricted.[13]

Many of these studies rely on factually inaccurate statements about how the patent system works. These studies also fail to recognize the lengthy tradition that continuation practice has in our patent system and why it is important to inventors. Instead, the studies seem to focus only on how to "streamline" (i.e., restrict) various aspects of our patent system, including continuation practice. The potential adverse impact on our inventors and on the protection of their innovations is given scant attention.

**Studies Urging Restrictions on Continuation Practice Ignore Its History and Continued Importance to Today's Inventors**

The NAPA Report's recommendations on continuations rely heavily on the 2004 L&M article. The PTO cites to the L&M article in seeking to justify the new restrictions.[14] The L&M article takes an unequivocal position in using provocative, though subjective, terms—"curious,"[15] "remarkable,"[16] "abus[ive],"[17] "pernicious,"[18] and "odd"[19]—to criticize continuation applications as a practice that should be severely restricted or even abolished.[20]

If a person knew nothing other than what is found in these papers, then a number of facts about continuation applications would come as a surprise. Continuation practice has been statutorily recognized for more than 50 years since the passage of the Patent Act of 1952.[21] That legislation merely codified long-standing practice that has been in place for well over a century. For example, Supreme Court precedent dating to 1863 recognized continuation applications.[22] In short, continuation practice is a firmly established part of the U.S. patent system that is hard to square with the dismissive tone of some of these scholars.

Many prominent inventors have employed patent continuations to secure proper patent coverage for their inventions. For example, Thomas Edison filed them. The inventors of the transistor (and winners of the 1956 Nobel Prize), John Bardeen and Walter Brattain, filed one. Prominent inventors of more recent vintage, such as Dean Kamen, inventor of the Segway® transportation device, the IBOT® self-balancing wheelchair that can climb stairs, and other important inventions, have filed them.[23]

Patent continuations are not just important to sole inventors or inventors from small start-up companies. Continuations are used by the vast majority of large technology-driven corporations. For example, more than 95 percent of Fortune 50 companies that regularly file for patents have used continuations.[24] More than 80 percent of the top 50 companies from *Business Week*'s "Top 100 Info Tech Companies" have filed continuation applications.[25]

In sum, continuation applications have a long history in the U.S. patent system and have been—and continue to be—filed by our most important technology innovators, large and small.

**As It Presently Exists, Continuation Practice Brings Significant Efficiencies to the Patent System**

Continuation applications are important because they allow the inventor to secure patent coverage for the various aspects of the invention that are not captured in the first patent. There are a number of reasons why the first patent may not provide full and adequate coverage.

In many cases, because the examiner does not yet fully appreciate the invention, he or she may only be willing to initially issue relatively narrow claims for the invention. The inventor may agree to an initial focused or narrow patent because the company may need some immediate coverage for a product going to market or to secure venture capital funding to keep a start-up afloat. The inventor can then file a continuation application to pursue the more robust patent coverage that the inventor believes she deserves.

Continuations are also critical because patent applications are almost always (more than 95 percent of the time in our experience) rejected on the first examination.[26] This is virtually automatic.[27] Typically, the inventor responds by making some kind of amendment and/or argument. The examiner often responds by issuing a "final rejection." Often the final rejection is a completely new rejection. Today, an inventor typically files a continuation so that the examiner will address the inventor's response to the new rejection. If the PTO removes that option, many inventors would get only a single opportunity to respond to the examiner and would be required to appeal every final rejection. In short, we will have "one and done" examination. Moreover, these appeals would be made on applications that simply are not ripe for an appeal. This will be very inefficient.

Continuation applications are also increasingly important because of recent court decisions that restrict how patents are interpreted and applied. Some recent examples include *Festo* (limiting the availability of the doctrine of equivalents, which prevents others from avoiding patents by making insubstantial changes to their otherwise infringing products); *Johnson & Johnston* (providing that an inventor may unknowingly dedicate parts of the invention to the public if not claimed the right way); and *Phillips* (providing that the scope of the patent is more narrowly keyed to how it is described in the specification).[28] The inadvertent omission or unnecessary inclusion of a single word in a patent claim can allow a competitor to steal the heart of the invention without infringing the patent. Continuations are needed to allow the inventor to secure adequate protection for the invention in view of the recent court decisions.

Finally, continuation applications are efficient because they provide a mechanism for inventors to obtain adequate patent coverage on those inventions they consider important and valuable. In other words, there is a self-selection process at play. If the inventor considers the invention an important advance, the inventor will likely pursue the best coverage possible by filing a continuation. If the inventor considers the invention to be more peripheral to the core business of the company, it is unlikely that a continuation will be filed. This selection behavior is efficient.

### "Feelings Are Not Fact": Studies Urging Restrictions on Access to the Patent System Including Continuation Practice Have Questionable Factual Underpinnings[29]

The drumbeat from patent critics is that the patent system is broken and needs fixing. The working premise is that over the last 20 years the patent grant rate has increased dramatically (patents have become too easy to get), while at the same time the patent error rate has also increased (too many invalid patents are being issued).

But these patent reform commentators can be broadly criticized for asserting the patent system is broken without solid supporting data. "Classic information cascade" may be at work again—many people repeating the same unsupported assertion over and over until it appears to be accepted truth.[30] More recently, PTO Director Dudas seemed to be targeting information cascade when he admonished patent critics at the 2006 AIPLA Midwinter Meeting that, as he often explains to his children, "feelings are not fact"—fact requires hard data.[31] Director Dudas went on to rebut the assertion that patents have become too easy to get and are often invalid. He pointed out that the *patent allowance rate is the lowest since records have been maintained*. Also, the PTO's *error rate has been on the steady decrease*, from 5.3 percent in 2004, 4.5 percent in 2005, and 2.3 percent for first quarter 2006—the lowest error rate in 30 years.[32] Director Dudas also noted that "those who think that the IP system is a burdensome dysfunctional system that needs to be torn down are 'wrong but sincere,'"[33] and that "[s]tatistics show that a smaller percentage of issued patents are being litigated today than in the past . . . and the number of lawsuits filed in relation to the number of patent applications filed each year has been on a downward slope since 1990."[34]

People will always argue about how the statistics are computed—some will say that the PTO's allowance rate is computed so that it is higher or lower than it really is. But what is important is *trend*. The patent critics claim a dramatic trend in increasing grant rates and error rates that has brought the patent system to the brink of disaster. But the trend data do not support this crisis mentality—quite the opposite; the trend is lower allowance and lower error rates.

We think Director Dudas was right. For example, *Innovation and Its Discontents* repeatedly asserts patents have become pitifully easy to get over the last 20 years: "much easier to get patents,"[35] "much more likely to have the patent granted,"[36] "dramatic increase . . . in the fraction [of patent applications] that are successful in producing granted patents,"[37] "weakening of examination standards,"[38] "[p]atents have become so easy to get,"[39] "emergence of broad, apparently invalid patents in particular industries,"[40] "the granting of patents despite clear evidence of invalidity,"[41] "declining U.S. patent quality,"[42] and the ultimate kick in the PTO's shins that "in practice the [U.S. patent] system seems more akin to a registration system . . . a determined patentee can get almost any award he seeks."[43] The problem is that no hard data are provided to support these assertions, which are treated as established fact. The statistics demonstrate the opposite: the PTO's patent grant rate is at its lowest in decades.[44]

Both the FTC and NAPA studies focused on "questionable patents" that undermine certainty in the technology marketplace.[45] But the exhaustive FTC Report provides no statistics showing a trend of "questionable" patents being issued at a higher rate.[46] Nor does the FTC Report provide any statistics on continuation patents in the context of the allegedly growing "questionable patents" problem.

The L&M article takes specific aim at continuation patents as being a special species of questionable patents called "bad patents":

> But continuation applications are more likely than average to result in bad patents. This is particularly troublesome for society because our empirical evidence suggests that patents based on continuation applications are far more likely to be litigated than other sorts of patents.[47]

The evidence that continuation patents tend to be "bad patents" apparently stems from the following: continuations represent about 23 percent of all patents but about 52 percent of litigated patents.[48]

The faulty logic is that patents that tend to be litigated are bad patents.[49] Put another way, the suggestion is that property rights that the owner is more likely to protect should not be granted in the first place. In other property contexts such as in real property, the law has long provided the very opposite, which is that property not protected against trespassers is lost—that is, adverse possession[50]

Looking at the issue another way, it is well known that pharmaceutical patents are more likely to be enforced than are mechanical patents. If one applies the logic that patents more likely to be litigated must be bad patents, pharmaceutical patents should be abolished or restricted because of their high rate of enforcement. This extension of the scholars' logic obviously is misplaced, as it would be a disaster for the U.S. pharmaceutical industry and for the millions of people around the world whose lives are saved by innovative drugs. If patent protection for these drugs were not available, would pharmaceutical companies invest billions of dollars to create new drugs, especially when the only protection they can obtain is by patent?[51] This illustrates the problem with correlating patent enforcement with patent quality.

### The Relevant Inquiry for What is a "Bad Patent" is Patent Validity

There is a better test for what is a bad patent. A bad patent is one that is invalid—it should have never been granted. Surprisingly, as noted above, the various studies that urge restriction of continuation practice provide no statistics on how often continuation patents are invalidated compared with other patents. These studies likewise fail to show that a greater percentage of patents are invalidated today than were those in the past.

What do the relevant statistics say? Though there does not appear to be any comprehensive study in the patent literature,[52] statistics based on recent U.S. Court of Appeals for the Federal Circuit (CAFC) decisions suggest that patents issuing from continuation applications are *less* likely to be invalid than are other patents. The CAFC has exclusive jurisdiction for patent appeals and is effectively the ultimate arbiter on patent validity.[53] From reported 2004–2005 decisions, patents issuing from continuation applications were invalidated about *5 percent less frequently than* were original patents.[54]

Thus, the charge that continuation patents tend to be bad patents is not supported by recent CAFC statistics. Actually, this is not surprising as both the inventor and the patent examiner have a better collective appreciation for the invention and the relevant prior art when a continuation application is evaluated following the examination of the original application. In layperson's terms, all parties concerned are well up the learning curve and make better-informed judgments.

### Other Justifications for Restrictions on Continuation Practice Are Unpersuasive, including the One Offered by the PTO to Justify the Proposed New Rules: PTO Backlog

The NAPA Report and the L&M article also make the assertion that inventors sometimes file continuation applications in an effort to "wear down" the patent examiner.[55] No evidence, empirical or even anecdotal, is provided to support this assertion. We can only speak anecdotally—after more than 20 years of combined experience prosecuting and/or examining many applications, we have never encountered an applicant attempting to "wear down" the PTO examiner or a PTO examiner "giving in" to an applicant from repeated refilings.[56] If anything, the inventors' resolve and resources are eroded by stalwart examiners, resulting in further claim amendments or abandoned applications.

Both the PTO's proposed new rules and the NAPA Report focus on the effect of continuation applications on the PTO's workload and the average pendency (time from filing a patent application to the patent grant) for all patents.[57] It is a truism that if all other things are held constant, the filing of more patent applications with the PTO results in more work and longer average processing times. But that is true for all types of patent applications, not just continuation applications. This is not a justification for restricting continuation practice. The real issue here is one that has nothing to do with continuation practice and one that has universal consensus: The PTO needs more manpower and better resources to continue to be the best patent-examining corps in the world.

Nevertheless, the PTO's main rationale to justify the new rules is that there is a significant backlog of unexamined applications at the PTO and continuation applications



Figure 1. Total Continuation Filings

■ 1 CPA/RCE   ☐ 1 Con   ■ 2 or more CPA/RCE   ☐ 2 or more Cons*

Figure 2. The Proposed New Rules Will Bring Unintended Consequences and Create New Inefficiencies

[Bar chart showing filings for years 2002, 2003, 2004, 2005 with categories: 1 CPA/RCE, 1 Con, 2 or more CPA/RCE, 2 or more Cons*. Arrows annotate trends labeled "RCEs" and "CONs".]

■ 1 CPA/RCE    □ 1 Con    ■ 2 or more CPA/RCE    □ 2 or more Cons*

are a significant component of the backlog—thus continuation practice must be restricted to reduce the backlog[58]

The PTO proposes to reduce the backlog by essentially permitting an inventor to file only one continuation application and eliminating second or later continuation applications. But according to the PTO's own statistics, second or later continuation applications were only *5.9 percent* of the filings in 2005.[59] Thus, the PTO's proposed new rules will impose significant new restrictions on inventors and change hundreds of years of established practice—*while barely making a dent in the purported problem, using the PTO's own data and agreeing with its statistics.*

Of course, sometimes a problem is of concern not because of absolute numbers today but because of its trend—that is, if it is a *rapidly growing problem.* But that is not really the case with the continuations targeted by the new rules. Figure 1, on page 41, from Commissioner John Doll's presentation at the American Intellectual Property Law Association (AIPLA) Midwinter 2006 meeting,[60] has been annotated with the arrows to show that the trend of second or later continuing applications has shown only a slight increase over the last four years.

So clearly the new regulations do not address a significantly growing problem. Moreover, Figure 1 shows that the actual percentage of second continuations filed per total applications filed, which is the more relevant variable to consider, has decreased over the past four years.[61]

**The PTO's One-Size-Fits-All Restriction Is Misdirected in Treating RCEs, CONs, and CIPs as the Same**

The proposed new rules treat RCEs, CONs, and CIPs in identical fashion—the inventor is basically permitted to file only one RCE *or* one CON *or* one CIP as a matter of right.[62] But RCEs, CONs, and CIPs are different types of filings that should not be lumped together.

An RCE is a request for further examination of an application. It is not a new or separate patent application; in fact, no new application serial number is assigned.[63] The examiner simply considers new argument, amendment, or evidence for the same application. The typical scenario is when an examiner issues a "final rejection" that contains a completely new ground of rejection. The only way for the applicant to respond to the new ground of rejection and get the examiner to consider the response is to file an RCE.

On the other hand, a CON is the filing of a separate patent application that is given a new application serial number.[64] A typical scenario for a CON is when certain discrete aspects of the invention are allowed in a first application, and the inventor seeks protection for other disclosed aspects of the invention. Or as discussed previously, sometimes the examiner is willing to allow a quick narrow patent and requires the inventor to file a CON to examine for broader coverage.

A CIP, like a CON, is the filing of a separate patent application that is accorded a new application serial number.[65] What distinguishes a CIP is that it includes new subject matter not found in the original application.[66] Usually, CIPs are filed to disclose improvements to the invention developed after the initial application is filed.

The point of all of this is that RCEs, CONs, and CIPs are different types of filings that are filed by inventors for different reasons. The PTO's new rule is off the mark in treating these filings as the same. It is unfair to inventors who may be forced to choose between filing a single RCE, CON, or CIP. Worse yet, those decisions will be made with poor, or less than complete, information. For example, an

inventor facing a final office action in his or her application is faced with difficult choices. Should this inventor file an appeal that may be expensive, time-consuming, and premature for the application but will preserve the inventor's right to later file a CON or CIP? Or should this inventor file an RCE, knowing that he or she will be forgoing the right to file any CON or CIP in the future? The new rules will foist these kinds of decisions on our inventors.

There is yet another compelling reason that the PTO should not impose a restriction that treats RCEs, CONs, and CIPs the same: these three types of filings are very different in their relationship to the application backlog issue the PTO claims to be addressing. Figure 2, on page 42, from Commissioner John Doll's 2006 AIPLA presentation,[67] is annotated with the arrows showing the magnitude and trend for RCEs and CONs. As the annotated slopes show, the number of CONs filed is much lower than is the number of RCEs filed, and the rate of increase in CON filings is much less than is the rate of increase in RCE filings. This illustrates our point that lumping RCEs and CONs together in the PTO's new rules simply does not make sense.

The proposed new rules will lead to inefficiencies that more than offset any marginal reduction in application backlog. First, there will be many more appeals to the PTO Board of Patent Appeals & Interferences (BPAI); in fact, we believe the new rules will likely cause a near *threefold increase* in the number of appeals filed.

For example, Figure 1 shows that about 15,000 second or later RCEs/CPAs/CONs were filed in 2005. An RCE/CPA/CON filing involves a PTO filing fee of about $1,000 on average,[68] and on top of that are attorney fees for preparing the claims and argument, meaning that the typical filing will cost the applicant on the order of $4,000 or more. The willingness to pay this significant amount of money and to make a second or later filing means that these are very committed applicants. If these committed applicants lose the option to file second RCEs/CONs under the proposed new rules, a very high percentage of them—50 percent is a reasonable estimate—will pursue the only remaining recourse: an appeal. Thus, a conservative estimate is that 7,500 additional appeals to the BPAI will result from the new rules. The PTO reports that 2,834 appeals were filed in 2005.[69] Therefore, the imposition of the new rules will likely almost triple (2.65 times) the number of appeals that currently are filed, resulting in an instantly overburdened Board of Appeals.Z

Inventors will shoulder the burden of the cost and delay associated with these appeals. Also, inventors may be forced to appeal rejected applications earlier in the examination process based on less information than they would otherwise have. The BPAI will likely find itself overwhelmed with appeals that would never have been filed if the continuation process were available. Finally, applicants will petition more restriction requirements, final rejections, and advisory actions, all making the patent examination process more acrimonious.

All of this will add more time to the already lengthy examination process, effectively adding sand to the gears of PTO's inner machinery. Of graver concern is that the PTO's new rule will achieve at best a few percentage points reduction in applications (a modest reduction in examiner workload that solves no fundamental problem) at the cost of a threefold increase in appeals—a profound change that creates an entirely new problem that will likely break the patent appeals system.

Inventors may also take proactive measures to reduce the effects of the new restrictions. For example, instead of filing a single initial application, many inventors may file multiple initial applications simultaneously. They will do this to have "placeholder" applications on file to preserve the option for more complete patent protection that otherwise would have been pursued through the continuation process. And because these applications will be submitted based on less information, they will be of lower quality.[70] This unintended consequence of these proposed rules, is not good for the PTO because it likely will be confronted with more, not fewer, applications.



Figure 3. Percent Continuations per Filed Case (Issued Patents)

This is not good for the inventors, who will be wasting valuable capital on guesswork about the prospects for their invention at the PTO. Invariably, there will be cases where too many applications are submitted on unimportant inventions and too few on important ones. This is inefficient for all.

There will be other potential adverse consequences. Inventors will feel the need to submit more claims in their applications. Commentators have already pointed out that the PTO is being burdened by the trend of inventors submitting a greater number of claims in their patent applications.[71] This may be exacerbated if continuation practice is restricted.

### The PTO's Proposed New Rules Seek to Implement Changes Rejected to Date Through the Legislative Process

So why is the PTO proposing these controversial regulations that threaten long-standing practice in our patent system? The short answer is that the PTO is attempting an end run around the failure of legislation that attempted the very same thing. As noted above, the Patent Reform Act of 2005, sponsored by Rep. Lamar Smith (R-Tex.), included a specific provision authorizing the PTO to promulgate rules restricting continuation practice.[72] But broad-based opposition in the technology sector, the patent bar, and portions of academia resulted in that provision (along with the provision regarding denying injunctive relief for patentees who did not "work" their invention) being removed from the proposed bill in just over one month.

The PTO has now taken matters in its own hands by proposing restrictions that may become effective without the specific authorization of Congress and without a public hearing.[73] The PTO claims that an existing provision of the patent statute provides authority for the new regulations, but that is untenable.[74] Certainly the sponsors of the Patent Reform Act of 2005 believed that Congress had to act to permit such a substantive, significant change to the patent system, and they were right.

We find it very troubling that the PTO seeks such a radical change to long-standing patent practice in a manner that circumvents the legislative process. The U.S. patent system is designed to serve the greater public good. Protection for the greater public good is best provided through the legislative process, not through an administrative agency issuing changes without hearings and without a vote.

### Finding a Solution to the Problem Begins with Determining the Basis of the Problem

Before the PTO can solve the problems it is facing, it must first determine, to the extent possible, the cause of the problem. One problem facing the PTO (the one allegedly solved by the proposed rules) is its backlog of unexamined pending patent applications. Although it sounds the alarm in asserting that continuation applications are having a "crippling effect" on examination processing,[75] the PTO has not provided any evidence to show that continuation applications are the root cause of the backlog.[76] Continuation applications are just one component of the many applications being filed by our inventors. Eliminating continuation applications will not solve the backlog problem any more than outlawing Chevies will solve the traffic congestion problem.

Figure 3, on page 43, reveals that, with the exception of the anomaly in the mid-1990s resulting from enactment of the 20-year patent term from date of filing as part of the GATT legislation, the percentage of continuations has stayed roughly about the same (about 27 percent) since 1975.

Although it asserts the primary reason for the change to continuation practice is to reduce the backlog of applications,[77] the PTO's statistics reveal that the percentage of new cases that are continuations and that are filed in the art units/groups with the greatest backlog is at or below the average percentage.[78] This tells us that the backlog is not driven by the continuation rate.

Rather than being the product of out-of-control continuation practice, we believe that the backlog is largely attributable to patent examination inefficiencies. These inefficiencies may be the result of the following observations that stem from the authors' years of patent examination and prosecution experience. We believe that there are in general two types of examiners: (1) proactive; and (2) reactive.[79] The proactive examiner is an examiner who works with the patent attorney to resolve problems with the application, suggesting alternative claim language to overcome rejections and typically finding ways to advance a meritorious application (unless the examiner truly believes there is nothing patentable, in which case the examiner conveys that early on to the applicant so as not to prolong prosecution). The proactive examiner has a shorter pendency and consequently moves pending applications through the system at a faster rate.

In contrast, the reactive examiner tries to find ways to reject an application claim instead of seeking ways to allow an application claim (or amended versions thereof) or provide clear statements to the applicant to assist in final resolution of the application via appeal or abandonment. The reactive examiner offers few or no suggestions for claim language or claim limitations that will distinguish over the cited art and typically responds to requests by applicants for suggestions with "it's not my job, that is yours." The reactive examiner often issues premature final rejections and almost never enters an amendment or considers evidence after final.[80]

We suspect, although we have no statistics to prove it (we doubt that the PTO has these statistics either), that the examining groups with the greatest backlog are those containing the greatest number of reactive examiners. The greater number of reactive examiners leads to the greater inefficiencies in the groups having the greatest backlog. The solution to the backlog problem naturally follows from the root cause elucidated above. The PTO needs to adopt incentives to encourage more proactive examination and to adopt penalties to discourage reactive examination. Obviously, this does not mean that

examiners should automatically allow every claim. Rather, the goal should be for an examiner to work with the applicant in a less adversarial, more productive manner, rather than to simply react to the applicant and find ways to reject the pending claims. If the examiner does not believe any subject matter is patentable, then the examiner should convey that to the applicant early in prosecution so the claims can be appealed or abandoned.

**One Possible Solution Is to Provide Incentives to Examiners and Reduce the Need for Continuations**

We mentioned above that the PTO could go a long way to solving its backlog problem by offering incentives to examiners to move cases faster through the examination process and provide disincentives to discourage them from forcing applicants to file continuations. These measures can reduce unnecessary filings that are the result of inefficient examination. Also, inefficient behavior by the patent applicant might be addressed by discouraging applicants from filing unnecessary continuations.

Because we believe that inefficient examination drives the backlog problem, a properly directed solution should seek to improve examination. PTO examiners operate under a quota system whereby they must have a certain number of examination credits (called "counts") each year. Today, an examiner gets one count for an initial patent examination (e.g., a first office action rejecting the application) and another for a final disposition (e.g., a subsequent office action resulting in abandonment, an appeal, an allowance, or an interference).

The PTO can reduce the backlog by tweaking the count system to improve examination efficiency. For example, the PTO could reward examiners with an additional count, or portion thereof, for final disposition of an original (noncontinuation) application (e.g., by allowance or by abandonment without filing a continuation or appeal). In addition, the PTO could hold back the count normally awarded when an original application is abandoned in favor of a new continuation application until the continuation application is disposed of. This could be applied only after the second continuation is filed and would not apply to the first continuation. These kinds of adjustments could provide examiners with the incentive to improve performance. At the same time, the PTO could charge more for each successive continuation application (e.g., say 1.5X, 2X, 3X, 4X, etc.), giving the inventor incentive to pursue a more efficient prosecution strategy.

Another possible tweak to enhance efficiency could be to award examiners a full or partial count for issuing a second *nonfinal* office action. Under the current count system, examiners normally do not receive production credit for issuing a second office action that is nonfinal. Thus, examiners are greatly incentivized to make all second office actions final, even if the rejection is a completely new rejection based on new prior art. The bias toward immediate final rejections means that examination is often prematurely terminated, which causes more RCEs and CONs to be filed. The number of RCEs and CONs filed would be greatly reduced if examiners were given credit for all nonfinal office actions.

We do not suggest there are not different or even better ways in which to adjust the PTO's count system and the fee structure to make the patent system more efficient. The important point is that the backlog problem is best addressed through that kind of solution as opposed to simply restricting access to the system by limiting the number of applications, number of claims, and so forth, as the PTO currently proposes.

Implementing such awards and penalties will greatly encourage efficient examination, discourage inefficient examination, and discourage inefficient patent prosecution on behalf of the applicant. The logical result will be to move patent applications much more quickly through the PTO system, result in higher quality patents, and significantly reduce the present backlog.

**Conclusion**

The PTO's proposed new rules to restrict continuation practice undermine an important mechanism for inventors to protect their inventions. Continuation applications have played, and continue to play, an important and legitimate role in our patent system. The new rules not only will harm inventors by limiting access to the patent system, but they will not make any appreciable reduction in application backlog at the PTO. In fact, they are likely to cause a multifold increase in appeals filed with the BPAI and in the number of petitions and other filings made by inventors. In closing, the proposed new rules completely miss the mark and for that reason should not be implemented.

**Endnotes**

1. *See* Changes to Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentably Indistinct Claims, 71 Fed. Reg. 48 (proposed Jan. 3, 2006) (to be codified at 37 C.F.R. §§ 1.78, 1.114, and 1.495).

2. *See* 35 U.S.C. § 120, which allows for continuation applications. Another provision, 35 U.S.C. § 132(b), allows the inventor to request continued examination (referred to as an "RCE") of an existing application. Unlike a filing under Section 120, the filing of an RCE under Section 132(b) does not result in a new application. Thus, most patent practitioners do not consider RCEs to be continuation applications. Still, the proposed new PTO rules do not make any distinction between the two in grouping them together as "continuing" applications.

3. *See* 71 Fed. Reg. 61.

4. Many of these critics admonishing the PTO and recommending draconian changes are legal scholars who have some fundamental misunderstandings about how the PTO works. We do not mean to suggest that one must be a patent attorney to venture an opinion on the U.S. patent system—that is certainly not the case. On the other hand, some of the more questionable proposals on how to "fix" the patent system come from individuals with who have never prepared or examined a patent application and who have no firsthand experience in the patent prosecution process.

5. Interestingly, many of these studies cite as authority the same factually inaccurate statements and cross-reference each other's work as authority. Just one example is the purported phe-

nomenon of patent applicants using continuation applications to "wear down" patent examiners, discussed further *infra*. The 2005 PTO report entitled *U.S. Patent and Trademark Office: Transforming to Meet the Challenges of the 21st Century*, see *infra* note 13, refers to this purported problem, as does the 2004 Lemley & Moore article entitled *Ending Abuse of Patent Continuations*, see *infra* note 11. In fact, the PTO report cites to the Lemley & Moore article as authority for the proposition. But neither article provides any evidence that "wearing down" is real, and in fact, both authors can speak from practical experience as practicing patent attorneys and former examiners, that examiners are not "worn down" by repeated refilings.

6. U.S. FEDERAL TRADE COMMISSION, TO PROMOTE INNOVATION: THE PROPER BALANCE OF COMPETITION AND PATENT LAW AND POLICY 5 (2003).

7. *Id.* at 5, 7, 16 ("A poor quality or questionable patent is one that is likely invalid or contains claims that are overly broad.... Questionable patents contribute to the patent thicket.... If the applicant uses procedures such as continuing applications to extend the period of patent prosecution, the potential for anticompetitive hold up increases."); *see also* Ch. 4 "Competition Perspectives on Substantive Standards of Patentability" at 26–31.

8. *Id.* at 5–7.

9. *See* NATIONAL RESEARCH COUNCIL, NATIONAL ACADEMY OF SCIENCES, A PATENT SYSTEM FOR THE 21ST CENTURY (Stephen A. Merrill, Richard C. Levin & Mark B. Myers eds., National Academies Press 2004).

10. *See* Patent Reform Act of 2005, H.R. 2795, 109th Cong., § 8 (2005) (amending Title 35 by adding Section 123 "Limitations on Continuation Applications").

11. *See* Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. REV. 63 (2004) [hereinafter Lemley & Moore]. The PTO refers to this article as a basis for promulgating the proposed rule changes.

12. ADAM B. JAFFEE & JOSH LERNER, INNOVATION AND ITS DISCONTENTS: HOW OUR BROKEN PATENT SYSTEM IS ENDANGERING INNOVATION AND PROGRESS AND WHAT TO DO ABOUT IT (Princeton University Press 2004).

13. *See* NATIONAL ACADEMY OF PUBLIC ADMINISTRATION, U.S. PATENT AND TRADEMARK OFFICE: TRANSFORMING TO MEET THE CHALLENGES OF THE 21ST CENTURY 50-53 (2005) [hereinafter NAPA REPORT]. This publication cites many of the previous authors' work, and provides little statistical evidence to support the allegations that continuations are the root cause of the backlog at the PTO.

14. *See* Changes to Practice for Continuing Applications, 71 Fed. Reg. 48, 49 (proposed Jan. 3, 2006) (to be codified at 37 C.F.R. pt. 1).

15. Lemley & Moore, *supra* note 11, at 66.

16. *Id.* at 64.

17. *Id.* at 65.

18. *Id.*

19. *Id.* at 71.

20. Many of the statements made in the L&M Article are premised on fundamental misstatements of how the patent system works. A few examples include: (1) that the only way an examiner can dispose of a patent application is to allow it; (2) that an examiner cannot finally reject a claim; and (3) the use of out-dated statistical data to show that prosecuting a continuation application (e.g., RCE, CPA, or continuation, and not a divisional or CIP) does not take any less time than prosecuting an original application (their statistics averaged over more than 20 years allegedly shows that it takes 1.9 years to prosecute an original case from filing to issuance, but in the present real world nearly every Group at the PTO has a backlog that is longer than that time period to even issue a first office action).

21. Ch. 950, 66 Stat. 792 (1952).

22. Godfrey v. Eames, 68 U.S. 317 (1864). *See also* General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175 (1938); Birdsell v. Shaliol, 112 U.S. 485 (1884); Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486 (1877).

23. *See, e.g.*, U.S. Pat. No. 1,908,830 (electroplating device to Edison); 2,524,035 (transistor patent to Bardeen and Brattain); 6,969,079 (Segway® patent to Kamen). A complete list of Edison's 1093 U.S. patents can be found at http://edison.rutgers.edu/patents.htm

24. Statistic based on the 2005 Fortune 50 for companies having more than five patents as of a search at www.uspto.gov on December 3, 2005. The statistic was computed by counting the number of Fortune 50 companies having more than five patents, and dividing that number by the number of those patent-owning companies that had filed at least one continuation application.

25. Statistic based on the 2005 *Business Week* "Top 100 Info Tech Companies" for companies having more than 5 patents as of a search at www.uspto.gov on December 3, 2005. The statistic was computed based on the top 50 of the *Business Week* Top 100 Info Tech Companies in 2005. We counted the number of companies having more than five patents and divided that number by the number of those patent-owning companies that had filed at least one continuation application.

26. We believe that the 95 percent rate of rejections in the first office action is conservative—the actual number is probably higher, though we are aware of no formal studies on the issue. At the April 25, 2006 USPTO Town Hall Meeting on the new rules held at the PTO in Alexandria, Virginia (and attended by one of the authors of this article), Commissioner Doll stated that 12 percent of original applications receive first action allowances. That would translate to 88 percent of applications being rejected on the first action. We suspect that Commissioner Doll's roughly 90 percent figure does not take into account first actions that are restriction requirements or requests for information under Rule 105. If those are factored in, we believe that Commissioner Doll's figure would be in line with our 95 percent estimate based on our experience and discussions with other patent prosecutors.

27. It is so rare for a patent application not to be rejected on the first examination that patent attorneys give the exception a special name: a "first action allowance." *Innovation and Its Discontents* asserts that the PTO's production quota system, discussed in detail *infra*, "creates an obvious incentive for examiners to 'go easy' on applicants and allow their patents to be granted" and are sometimes "encouraged to issue more 'first action patents'". *See Innovation and Its Discontents* at 136. No evidence supports these assertions, and these authors respectfully disagree. If anything, as discussed *infra*, the PTO's quota system encourages premature final rejections of patent applications, not accelerated allowance.

28. *See* Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd, 344 F.3d 1359 (Fed. Cir. 2003); Johnson & Johnston Assocs., Inc. v. R.E. Service Co., Inc., 285 F.3d 1046 (Fed. Cir. 2002); Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005).

29. What is interesting about the recent attack on the U.S. patent system is how new arguments for its overhaul are invoked as soon as old arguments are debunked or mooted. The old argument for restricting continuation applications was that they could lead to "submarine patents." These patents are most notoriously associated with inventor Jerome Lemelson, who filed patent applications in the 1950s and kept them alive through the 1990s with continuations. In submarine-like fashion, Lemelson's patents would suddenly surface to threaten an established industry after years of being submerged at the PTO. But a 1-2-3 punch has now eliminated the submarine patent: (1) the 1995 GATT legislation change from a 17-year-from-issue to a 20-year-from-filing date patent term (meaning that delayed prosecution shortens the patent term) (*see* 35 U.S.C. §154(2)); (2) the 1999 American Inventor Protection Act change from patent applications being held in secret at the PTO to most applications being published (meaning there is no surprise because the application is published) (*see* 35 U.S.C. §122(b)); and (3) the CAFC's application of the "prosecution laches" doctrine in *Symbol Technologies* (meaning that applications purposefully delayed can result in unenforceable patents) (*see Symbol Technologies, Inc. v. Lemelson Medical, Educ. &*

Research Foundation, 422 F.3d 1378 (Fed. Cir. 2005)).

There seems to be consensus that the submarine patent is dead. At the March 2005 "Patent Trolls" conference in Washington, D.C., sponsored by the Intellectual Property Owners (IPO) Association and attended by one of the coauthors, there seemed to be no disagreement with assertions by several speakers that submarine patents were no longer an issue. Perhaps as a result, some patent critics moved to the new argument that continuations simply lead to "bad patents." As we shall show *infra*, there is no evidence to support this argument, in fact, the statistics suggest otherwise.

More recently, perhaps because the "bad patent" argument hasn't gotten traction, a third argument is being made to restrict continuation applications. The latest argument is that the issue is application backlog, and continuation applications should be restricted to solve the backlog problem. We will show *infra* that continuation applications are not the cause of backlog and their restriction will not solve that problem.

The arguments against continuations are not consistent—they shift. What is consistent is the goal of finding reasons to restrict or eliminate continuation practice.

30. *See* John R. Allison & Emerson H. Tiller, *The Business Method Patent Myth*, 18 BERKELEY TECH. L.J. 987, 1079–1080 (2003) (information cascade in the context of the business method patent controversy).

31. *See* Neil E. Graham, *Perception Gap Hindering Efforts to Improve Patent System, Dudas Says*, 71 PAT. TRADEMARK & COPYRIGHT J. (BNA) 374 (2006) (reporting on remarks made at the 2006 AIPLA Midwinter Institute) [hereinafter *Perception Gap*], note 13, at 374.

32. *Id.*

33. *Id.*

34. *Id.* at 375. Director Dudas' comments are confirmed by an independent study by the Intellectual Property Law Owners Association (IPO) that determined that at the number of patent suits declined by 11.5 percent during 2005. *See* IPO DAILY NEWS, Apr. 19, 2006.

35. *Innovation and Its Discontents* at 2.

36. *Id.* at 4.

37. *Id.* at 10.

38. *Id.* at 11.

39. *Id.* at 19.

40. *Id.*

41. *Id.* at 34.

42. *Id.* at 142.

43. *Id.* at 142.

44. *See Perception Gap, supra* note 31.

45. *See, e.g.,* FTC Report at 5 ("Questionable Patents"); NAPA Report at xxi ("gam[ing] the system.").

46. Interestingly, the NAPA Report supports our view that the claim that patent quality is in a precipitous decline is perception unsupported by hard data. The NAPA Report expresses its dissent from the prevailing view in polite fashion:

> For the last 25 years, USPTO has assessed quality by determining whether the claims in a patent clearly meet the statutory criteria. To make this assessment, USPTO reviews between two to three percent of approved applications. The error rate from FYs 2000-2004 varied from a high 6.6 to a low of 4.2 percent. Although the error rate has remained fairly stable, several studies, congressional hearings, and scholarly articles report perceptions that patent quality has declined, particularly in areas of technology in which patents have only recently been granted, such as computer software and business methods. *However, these concerns have not been quantified.*

NAPA Report at xxii [emphasis added].

> Congress grew sufficiently concerned over statements that the quality of patents USPTO issued had declined that it held hearings on this topic in July 2003 [footnote omitted]. Examples of poor quality or 'questionable' patents are generally anecdotal and the extent to which USPTO is allowing such patents has not been quantified.

NAPA Report at 61 [emphasis added].

47. Lemley & Moore, *supra* note 11, at 75–76. This statement is perplexing when one considers the opposite conclusions the authors reached in a previous article. *See infra* note 49.

48. *Id.* at 76 n.44.

49. The 23 percent filed/52 percent litigated statistic should be interpreted to reach the very opposite conclusion, however, patents issuing from continuation applications tend to be good patents. First, inventors are more likely to file continuation applications for inventions they perceive to be significant. Second, it is reasonable to expect that patents on significant inventions are more likely to be litigated. Thus, the supra-representation of continuation patents in litigations may be because they are good patents covering important inventions, not bad patents. This "litigated patents tend to be good patents" interpretation of the statistic is consistent with an earlier paper coauthored by Professors Lemley and Moore which espoused a "patent value theory" based on the premise that litigated patents tend to be valuable patents. *See* John R. Allison et al., *Valuable Patents* (Univ. of Cal. at Berkeley, Sch. of Law Public Law and Legal Theory Research Paper Series, Research Paper No. 133, 2003), *available at* http://papers.ssrn.com/abstract=426020. Interestingly, that article argues that litigated patents tend to be the more valuable patents, and that more patents issuing from continuation applications are litigated than original applications. Thus, patents issuing from continuation applications are, in fact, the more valuable patents. The article specifically states that "value is important to policy analysis of the patent system, because it can help us distinguish important from frivolous or merely run-of-the-mill patents, and to design our patent policy to give greater emphasis to more important patents." *Id.* at 18 (citing Mark A. Lemley, *Rational Ignorance at the Patent Office*, 95 Nw. U. L. REV. 1495 (2001)).

50. *See Restatement (First) of Property*, ch. 15, "Protection of Future Interests as Affected by Statutes of Limitations and the Doctrine of Prescription," *Introductory Note* (creation of interests by adverse possession) (American Law Institute: 1936).

51. Drug companies do not have the luxury of trade secret protection because the pharmaceutical formulations must be made public. Those companies that succeed in obtaining FDA approval do enjoy a brief reprieve from competition by the FDA exclusion, but that brief period (about five years) is wholly insufficient to compensate the drug companies' R&D expenditures to develop new drugs (most reports place the R&D expenditure to bring a new drug to market at or above $800 million dollars).

52. An excellent study of validity rates is provided by John R. Allison & Mark A. Lemley in *Empirical Evidence on the Validity of Litigated Patents*, 26 AIPLA Q.J. 185 (1998), that considers validity rates according to a variety of parameters. Unfortunately, whether a patent is a continuation patent or an original patent is not one of them.

53. *See* 28 U.S.C. §1295 ("Jurisdiction of the United States Court of Appeals for the Federal Circuit").

54. This statistic was calculated based on published 2004 and 2005 CAFC decisions. *See* http://www.fedcir.gov. The percentage of decisions unfavorable to patent validity was about 36.5 percent for patents issuing from continuation applications versus 41.4 percent for original patents. The statistics were computed by examining all of the Federal Circuit patent decisions from 2005–2005 that included findings on validity appealed from trial courts. For each litigated patent, the holding was grouped into one of four categories: (a) invalidity upheld, (b) validity finding reversed, (c) invalidity finding reversed, and (d) validity finding upheld. Each litigated patent was also categorized as an original (non-continuation) patent or a continuation patent. We then computed the rate of findings unfavorable to validity [i.e., (a) and (b) type findings] for original patents, which was 41.4 percent, and for continuation patents, which as 36.5 percent. Obviously, a more comprehensive statistical study is warranted

since the 2004–2005 sample size likely is not large enough to provide a statistically significant result.

55. See NAPA REPORT, supra note 13, at 51; Lemley & Moore, supra note 11, at 65.

56. One of the authors of this article, who was an examiner for four years, recalls an applicant who repeatedly re-filed applications for his patent.. The author did not complain and was in no way "worn down" because these re-filed applications provided the author with free "counts" that helped improve his production quota. He later realized that the reason for the repeated continuation filings was that the applicant was waiting for the Federal Circuit to decide two important cases before it, both concerning In re Durden 763 F.2d 1406 (Fed. Cir. 1985). The claims of the application essentially recited a method of distilling a previously-patented composition (the composition being allowed in the originally filed application). The claims were properly rejected under existing case law (e.g., In re Durden), but were later allowed after the Federal Circuit's decisions in In re Ochiai, 71 F.3d 1565 (Fed. Cir. 1995) and In re Brouwer, 77 F.3d 422 (Fed. Cir. 1996).

57. See Changes to Practice for Continuing Applications, 71 Fed. Reg. 48, 49–50 (proposed Jan. 3, 2006) (to be codified at 37 C.F.R. pt. 1); NAPA REPORT at 50-51. These refer to statistics from the L&M Article, but those statistics are in fact not indicative of today's PTO. The L&M Article alleges that the average time from filing to patenting for an original application is about 1.9 years, whereas the average time from filing to patenting for a continuation application is only slightly less than that (we suspect those statistics included divisional and continuation-in-part applications, which should not have been included). In the majority of the PTO's groups, there is a backlog that exceeds 1.9 years from initial filing to only the *first office action*. See www.uspto.gov/web/offices/pac/dapp/opla/presentation/solicitor-text.html printed on March 29, 2006, "FY 05 Patent Pendency" [average times for first office action: TC 1600 (23.0 months), TC 1700 (19.7 months), TC 2100 (32.7 months), TC 2600 (30.5 months), TC 2800 (14.5 months), TC 3600 (18.4 months), and TC 3700 (18.3 months). The statistics presented in the L&M article, which are averaged over about a 30-year period, therefore provide little relevant information in today's PTO.

58. See 71 Fed. Reg. 49–50.

59. See 71 Fed. Reg. 48, 50. According to the PTO, 317,000 nonprovisional applications were filed in 2005, as well as 52,750 Requests for Continued Examination (RCEs). Following the PTO's methodology of treating an RCE as a new application, there was 369,750 (i.e., 317,000 + 52,750) application filings in 2005. Of that number, 11,800 were second or later conventional continuations (CONs) or continuations-in-part (CIPs). Only 10,000 were second or later RCEs. Following the PTO's lead, and treating CONs, CIPs and RCEs broadly under the umbrella as continuing applications, the proportion of applications that were second or later continuing applications is 21,800/369,750 , or 5.90 percent.

60. See John Doll, Commissioner for Patents, USPTO Request for Public Input: Strategic Planning, slide 56 (Feb. 4, 2006), www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslides.ppt.

61. The chart reveals only the number of continuation (CONs) applications filed, not the percentage of continuations based on total applications, which is the more relevant variable to consider in this context. The number of total applications filed has increased steadily over the past four (or more) years, so the fact that the number of second continuations filed has stayed about the same reveals that the percentage has steadily decreased. We show later in this article that the percentage of continuations per total applications filed (for issued patents) has not increased to any appreciable extent in over 30 years (save for the exception of the mid 1990s, which can be explained by the run-up to, and ultimate passage of, the Uruguay Round TRIPS agreement).

62. See 71 Fed. Reg. 58–61 (proposed new Rules 78 and 114).

63. See 37 C.F.R. § 114.

64. See 37 C.F.R. § 1.53(b)(1)

65. See 37 C.F.R. § 1.53(b)(2)

66. A typical scenario for a CIP is when the inventor files his or her application for the original invention and, as development continues and improvements are identified, files a later application that includes the improvement. See 4A Chisum on Patents § 13.03[3] (Matthew Bender & Co. 2004) ("A continuation-in-part application may be used to add improvements developed since the filing date of the parent application . . .") [cite omitted]. As a concrete example, an inventor solving the cold fusion problem might file an initial application disclosing her first discovery that energy could be generated at an efficiency of X% at room temperature by running electricity through heavy water. Later, as the inventor continues to work in a laboratory to perfect the invention, she might discover that the cold fusion technique works at a higher efficiency of X + 25% if conducted at less than room temperature, let's say a range of 50-60 degrees Fahrenheit. In that case, the inventor would file a CIP that discloses the higher-efficiency approach to cold fusion in addition to the original approach.

67. See supra note 60.

68. See 37 C.F.R. §§ 1.16–1.17.

69. See www.uspto.gov/web/offices/com/annual/2005/ 060414_table14.html.

70. The proposed rules provide other limitations and restrictions, however, on applicants who file multiple applications simultaneously, or within a two-month period, with the tandem proposal that attempts to limit the number of claims examined by the PTO. See Changes to Practice for Continuing Applications, 71 Fed. Reg. 48 (proposed Jan. 3, 2006) (to be codified at 37 C.F.R. pt. 1); Changes to Practice for the Examination of Claims in Patent Applications, 71 Fed. Reg. 61 (proposed Jan. 3, 2006) (to be codified at 37 C.F.R. pt. 1).

71. Indeed, the PTO seeks to limit the number of claims examined in any application to 10 "representative" claims. See 71 Fed. Reg. 61, 66–68.

72. See supra note 10 and accompanying text.

73. See 71 Fed. Reg. at 49–50.

74. The Patent Office derives its rulemaking authority from 35 U.S.C. § 2(b)(2) (2000), which states, in pertinent part: "The Office may establish regulations, not inconsistent with law." If implemented, however, the proposed rules would exceed the Patent Office's rulemaking authority for at least the following reasons: 35 U.S.C. §120 states that "[a]n application for patent for an invention . . . shall have the same effect, as to such invention, as though filed on the date of the prior application"; 35 U.S.C. § 121 contains similar language; and, finally, the use of the word "shall" means that Congress intended the statute to represent the minimum requirements to obtain the benefit of the filing date of the prior application.

In addition, an agency, like the PTO, "may not promulgate a rule or regulation that adds a requirement that does not exist under the statute." 2 Am. Jur. 2d Administrative Law § 132 (2004). Likewise, a regulation that contravenes a statute is invalid. R & W Flammann, GmbH v. United States, 339 F.3d 1320, 1324 (Fed. Cir. 2003) (citing United States v. Vogel Fertilizer Co., 455 U.S. 16 (1982). The Federal Circuit further has held that "[e]ven substantive rules cannot be promulgated that are contrary to statute. If the intent of Congress is clear, that is the end of the matter." Travelstead v. Derwinski, 978 F.2d 1244, 1250 (Fed. Cir. 1992), (citing Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837 (1984). The Court of Customs and Patent Appeals has held that there is no statutory basis under 35 U.S.C. § 120 to limit the number of continuation applications allowed an applicant who otherwise complies with the requirements of that statutory provision. See In re Henriksen, 399 F.2d 253, 261 (C.C.P.A. 1968).

75. See 71 Fed. Reg. at 49.

76. We have gathered data for the percentage of continuations filed for issued patents from applications having filing dates between the years of 1975 and 2001. Our data includes all continuing applications (file-wrapper continuations, [FWCs], CIPs, divisionals, and regular continuations), but does not include Continued Prosecution Applications (CPAs) and RCEs because there is no way of obtaining this information from an issued patent other then

*(continued on page 83)*

## Patent Contaminations

*(continued from page 48)*

its file history. Including CPA and RCE filings would have increased the percentage of continuations by a small fraction in the years following 1998. *See* 37 C.F.R. § 1.53(d), which became effective in December 1997. Statements made in the L&M article (*see supra* note 11 and accompanying text) that the percentage of continuations has been on a steady increase up until the mid 1990's may have been based on data from the PTO. The PTO presented a recent chart that does show an increase since 1980 in the percentage of continuations based on applications filed. *See* www.uspto.gov/web/offices/pac/dapp/opla/presentation/laiplaback ground.ppt, slide 10. But the PTO's chart does not include CIP applications or divisionals. Additionally, it does not appear to include FWCs, which understates the rates of continuation filings prior to 1997 when FWCs were available to applicants. On the other hand, the PTO chart includes CPA and RCE filings (which replaced the FWC procedure after 1997), which weights the continuation filing rate after 1997. Thus, it is not surprising then that the PTO's chart shows a noticeable increase in the percentage of continuations since the mid to late 1990s. Our data includes all continuations and does not attempt to select certain types of continuations, and shows that the percentage of continuations actually has stayed, on average, statistically the same, at or about 27 percent (with exceptions in the mid-1990s where the rate surged to over 50 percent in 1995 due to the enactment of TRIPS, and nearly 40 percent the year before in anticipation of enactment of that legislation). Using the PTO's logic, one would have anticipated a huge backlog in the mid- to late 90s, but that did not exist. Since that time, the percentage of continuations appears to have decreased or stayed statistically the same, while the backlog has increased.

77. Recent statements by the General Counsel of the PTO and by John Doll seem to back off from some of the commentary in the *Federal Register* notices of Jan. 3, 2006. At a "Town Hall" meeting in Chicago on Feb. 1, 2006, and at the AIPLA Mid-Winter meeting in Palm Springs on Feb. 4, 2006, both John Doll and James Toupin, the PTO's general counsel, stated that the "number one reason we would like to do this is to make patent examination quality better. . . . Better quality applications mean better examination. We need more focus throughout and closure to the examination process." Press Release, United States Patent & Trademark Office, Chicago Town Hall Meeting Focuses on Proposed Rule Changes to Improve Patent Examination (Feb. 1, 2006), *available at* www.uspto.gov/web/offices/com/speeches/06-07.htm.

78. *See* John Doll, Commissioner for Patents, USPTO Request for Public Input: Strategic Planning, slides 14 and 18. (Feb. 4, 2006), www.uspto.gov/web/offices/pac/dapp/opla/presentation/ chicagoslides.ppt. The Technology Centers (TCs) with the greatest backlog are TCs 1700, 2600, 2800, and 3700. *See id.* at Slide 14. Each of these TCs has a continuation rate that is less than the average for 2005. *See id.* at Slide 18.

79. Clearly, there are a number of examiners that might not necessarily fall into either category, and may fall into both at times, but the two types of examiners, we believe, represent a majority of examiners at the PTO.

80. Applicants typically do not challenge these actions by petition to the Director, even though they likely would be successful. The rationale for this is that the applicant does not want to alienate the examiner by going over the examiner's head via petition to the Technology Center Director, but rather will try to work the issues out in a continuation application. All of this will change dramatically if the proposed rules take effect. The examination process will become increasingly acrimonious, applicants will petition premature final rejections, nearly every refusal to enter an amendment or

---

# Planning Public Service
## Making Service Part of the Workplace Is Good for the Profession and the Public

By *Michael S. Greco*
President, American Bar Association



Most lawyers feel a keen responsibility to the public, demonstrated now by the thousands of lawyers who are volunteering to assist victims of last year's hurricanes. Increasingly, however, lawyers today are facing the more rigorous demands of modern practice, which deplete their time and energy for pro bono and public service work.

This tension between the law's public interest roots and today's business realities must be addressed for the good of the profession and society. Lawyers feel less fulfilled in their work, while the public's need for volunteer legal services remains severe.

I have appointed the Commission on the Renaissance of Idealism in the Legal Profession to help lawyers strike a better balance in their law practices and allow them to perform more public service. The commission is led by Honorary Co-chairs U.S. Supreme Court Justice Ruth Bader Ginsburg and Theodore C. Sorensen, special counsel to President John F. Kennedy, and is chaired by Mark D. Agrast of Washington, D.C.

I charged the commission with developing workplace policies and practices that would enable lawyers to do more pro bono and public service, and it already has developed the *Pro Bono and Public Service Best Practices Resource Guide.*

The guide is a free, online clearinghouse of more than 160 successful pro bono and public service programs from all practice areas. Lawyers may use best practices in the guide as models, drawing on other lawyers' ideas and experiences.

Additionally, legal employers who have implemented effective pro bono programs and public service projects are encouraged to submit them online so their ideas may benefit others in the profession and people in need of assistance.

When I took office as president of the ABA, I asked all lawyers to do more pro bono and public service, but I am not asking lawyers to do it alone. I urge you to visit the commission's website, **www.abanet.org/renaissance**, to learn from the guide's best practices and to help others by submitting your own. It is time for lawyers to balance professional interests with the public interest. The needs of society and our profession depend on it.