IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TRIANTAFYLLOS TAFAS, | ) |
|      Plaintiffs, | ) |
|      v. | )    1:07cv846 (JCC/TRJ) |
| JON W. DUDAS, et al. | ) |
|      Defendants. | ) |

CONSOLIDATED WITH

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, et al. | ) |
|      Plaintiffs, | ) |
|      v. | )    1:07cv1008 (JCC/TRJ) |
| JON W. DUDAS, et al. | ) |
|      Defendants. | ) |

**BRIEF FOR THE MINNESOTA *AMICI CURIAE***

Five prominent Minneapolis-based entities ("Minnesota *Amici*") representing a cross-section of innovative United States corporations collectively submit this *amicus curiae* brief in support of Plaintiffs' efforts to enjoin implementation of the proposed new PTO rules. Each of these companies relies heavily on patent protection as a critical means of developing and protecting its place in the myriad markets encompassed by this group. The Valspar Corporation is an historic American company dedicated since its founding in 1806 to developing and providing its customers with the most advanced paints, varnishes, stains, and other industrial

1

Dockets.Justia.com

coatings and polymers.  Donaldson Company is a leading worldwide provider of filtration

systems and replacement parts.  Donaldson is a technology-driven company committed to

innovative research and development.  Donaldson holds more than 350 issued United States

patents and 200 pending U.S. applications.  General Mills, a Fortune 250 company, ranks as the

sixth-largest food company in the world, with close to 500 issued United Sates patents and 250

pending U.S. applications covering novel products, processes, and packaging related to

consumer food products.  Anchor Wall Systems focuses on patented retaining wall designs

deployed in everything from small residential projects to massive commercial or interstate

installations.  Last but certainly not least, Ecolab holds 2,888 active patents, and continuously

pioneers new developments in cleaning, food, safety, and health protection products.  As such,

like the pharmaceutical companies that launched this litigation, and the various other *amicus*

*curiae* participants, the entities collected here stand to suffer significant harm if this Court does

not enjoin implementation of the proposed new PTO rules.

In particular, the Minnesota *Amici* seek to supplement the considerations before the Court

with a few additional succinct insights thus far not offered in the briefing to date.  Approaching

the issue from a brass tacks practical perspective, the Minnesota *Amici* note that the new PTO

rules, if given effect, would force them and hundreds of similarly situated companies to purchase

costly and not-yet-developed docketing systems for their pending patent applications, and would

necessitate the hiring of expensive additional in-house legal staff.  Ultimately, the new PTO rules

would essentially deprive them of the ability to employ patent prosecution counsel of their

choice and spread applications amongst a selection of different attorneys according to the

specific attention and expertise each individual patent application requires.

## IMPACT OF NEW PTO RULES ON *AMICI* AND SIMILAR BUSINESSES

### A.    The Relevant Rule Changes

The PTO's modifications and additions to 37 C.F.R. § 1.75(b) impose several

burdensome brand-new constraints on patent applicants, including the Minnesota *Amici*.  First of

all, the much-discussed "5/25 Rule," new section 1.75(b)(1), restricts the number of claims

allowed in an application to 5 independent claims, and 25 total claims, unless the applicant

submits an elaborate and expensive "examination support document" (ESD).  Second, section

1.75(b)(4) further provides that applications containing "patentably indistinct" claims shall be

treated as a single application for purposes of counting the number of claims toward the 5/25

Rule limit.  The PTO will count each of the so-called conflicting applications as containing the

collective number of independent and total claims from all of the applications.

Worse still, the modified rules would create *two new presumptions* bringing separate

applications within the scope of the 5/25 Rule, unless rebutted by the entity that owns the

applications.  First, section 1.78(f)(1) sets forth a presumption that any commonly-owned

applications with at least one inventor in common and filed within two months of each other

constitute "related applications" containing patentably indistinct claims.  Similarly, under section

1.78(f)(2),  any commonly-owned applications with substantial overlapping disclosure and the

same claimed filing or priority date are also presumed to contain patentably indistinct claims.  As

with the creation of the ESD requirement for claims exceeding the 5/25 Rule, this new rebuttable

presumption would shift yet another major burden in prosecution onto applicants.  In addition,

applicants with multiple pending patent applications, like the Minnesota *Amici*, would face the

ongoing danger of triggering the presumption, either through amending a claim in one of their

many active applications or filing a continuation application. Just how easy it is to trigger the

5/25 Rule and presumption unawarely is illustrated below.

The Minnesota *Amici* agree with Plaintiffs' well-articulated position, along with the

Declaration of former PTO commissioner Mr. Manbeck, that the PTO lacked the authority to

enact the new rules at issue. *See* Manbeck Declaration at ¶¶ 6-12. Nothing in the extant grant of

rulemaking authority to the PTO permits a commissioner substantively to interfere with

Congress's power to "secur[e] for limited times to … inventors the exclusive right to their

respective … discoveries." U.S. Const, Art.1 § 8. Congress enacted the patent code to effectuate

this Constitutional provision, and thereunder established the presumption that "A person shall be

entitled to a patent unless —" the invention is proved by the PTO to be not novel, obvious, or

otherwise deficient. Congress further established that an applicant may present for examination

"one or more claims particularly pointing out and distinctly claiming the subject matter the

applicant regards as his invention." 35 U.S.C. § 112; *see* 35 U.S.C. §§ 102-103. No part of the

statutory patent scheme provides the PTO with authority to restrict the number of claims or

continuation applications; nor does it allow the PTO to shift the burden to applicants essentially

to conduct a major portion of the examination by way of the ESD, and in that fashion to prove

affirmatively their entitlement to a patent. *See Merck & Co. v. Kessler*, 80 F.3d 1543, 1549-50

(Fed. Cir. 1996) (PTO lacks authority to issue substantive rules); 35 U.S.C. § 2(b)(2).

**B.    Impact of the Rule Changes on the *Amici* and Similar Entities**

The deleterious impact of these unauthorized rule changes that prompted the Minnesota

*Amici* to submit this brief, something the other participants in this litigation have not discussed in

detail in submissions to the Court, emerges from the duty for an entity prosecuting multiple

patent applications to know and immediately disclose when filing a continuation or amending

claims in a pending application that the new filing throws the affected application into a presumptive "related application" situation vis-à-vis one or more other co-owned patent applications. Unwittingly stepping into that quagmire under the new rules would automatically trigger the 5/25 Rule constraints, and could jeopardize valuable patent rights covering otherwise statutorily-patentable innovations for reasons entirely unrelated to legitimate questions of patentability. The risk of such a deprivation will lead the Minnesota *Amici* and other similarly situated companies to incur significant costs to avoid that unfair scenario.

Large innovation-driven companies like the Minnesota *Amici* routinely employ multiple patent counsel to draft, file, and prosecute numerous applications. At the moment, nine different outside firms are handling the preparation and prosecution of pending United States patent applications for General Mills; while Valspar presently uses seven separate outside attorneys in prosecuting its 108 pending U.S. applications. The roster of counsel utilized by a company may include large law firms, small boutique patent firms, and solo practitioners. Patent applications may be distributed amongst various patent counsel based on any number of considerations, including the technical field and nature of the invention underlying the application, the relationship between various applications, diversity objectives, or even simply the work load across the different patent counsel on the roster at any given time. Often, once the prosecution process gets underway for an application, the degree of direct supervision by the owner of the patent rights may be minimal. And the various patent counsel involved normally have little or no reason to maintain any awareness of the other counsel retained by the patent-owner.

At the same time, within companies like the Minnesota *Amici*, a particular inventor may participate in developing any number of different patentable technologies. Some of the resultant inventions may be related to one another, others may not. Separate patent applications may also

arise from the same project, with one or more common inventors, but covering different facets of a technological breakthrough.  These separate applications, which may share common inventors, could well be spread out to different patent counsel to prosecute.

To place this in the context of the new PTO rules at issue, consider the following scenario:  Imagine that Valspar hires Attorney A to file a patent application for a polymer in January of 2008 under the new rules.  More than two months later, in April, Valspar uses Attorney B (who works at a different firm) to file a patent application covering a paint bucket, which happens to have an inventor in common with the polymer case.  Attorney B incorporates by reference the polymer application into the paint bucket application, thus they have substantial overlapping disclosure.  Each application contains 3 independent claims and 15 total claims.  At this point, the section 1.78(f) date requirements are not met and the 5/25 Rule is *not* triggered. On 18 September 2008, however, Attorney A and Attorney B each happen to file a continuation application in their respective case. To remain safely under the 5/25 limits for their cases, the attorneys make sure to limit their respective continuation applications to 2 independent and 10 total claims each.  Unbeknownst to Valspar or its two outside patent prosecutors, though, under new section 1.78(f)(2), because the continuation applications share a common inventor, contain substantial overlapping disclosure, and were co-incidentally filed on the same day, the 5/25 Rule and the presumption of patentably indistinct claims suddenly applies.  *See* 35 U.S.C. § 1.78(f)(2)(i).  No system at Valspar or in the offices of either attorney will recognize that this "conflict" has arisen between the applications.  Nonetheless, the new rules would require Valspar within four months to rebut the presumption that the paint bucket applications contain patentably indistinct claims from the polymer applications or file a terminal disclaimer.  *See id*. §§ 1.78(f)

(2)(ii) & (2)(iii).  If not, the PTO may force Valspar to cancel the conflicting claims or submit an

ESD to preserve the opportunity to pursue those claims.  *See id*. § 1.75(b).

Naturally a diversified corporation that relies substantially on patent rights to protect its

intellectual property keeps personnel and management systems in place to track the progress of

its patent applications, at least to a reasonable degree.  Valspar, for example, relies on an in-

house staff of two lawyers who work primarily with its intellectual property; while General Mills

employs four in-house patent attorneys assisted by three paralegals.  The Minnesota *Amici* also

maintain, at significant expense, patent docket tracking software to store and coordinate certain

types of information on pending applications, as well as issued patents.  One such system, used

by Valspar, is known as CPI.  This CPI system as implemented by Valspar is only accessible

within the firewall of the Valspar network.  Consequently, its data is not visible to Valspar's

outside counsel.  Those outside attorneys must use other systems to organize the many cases they

handle for all of their clients.  And each system at an individual firm remains likewise isolated

from any other system.  Unfortunately the current methods and software for managing a

company's patent applications do not capture or permit the ready display of the sort of

information that would be necessary to notice every time a patent attorney prosecuting one

application might amend a claim in that application to trigger a presumption that the claim is

patentably indistinct from a claim in some other co-owned application with at least one common

inventor.  Notably, existing systems lack the features to identify when applications filed on the

same date may contain "substantial overlapping disclosure," per new section 1.78(f)(2).

In order to comply with the dictates of the new rules, were they implemented, the

Minnesota *Amici* anticipate at least three costly and undesirable changes in how they manage

their patent applications and outside prosecution counsel:  *First*, a company with a complex

patent portfolio would need to develop a far-more-sophisticated management information system

for tracking all of its pending patent applications. The new system would have to know,

basically on a specification-wide basis, something about the scope of each specification, how

many pending claims each has, and how all of the pending patent applications and claims relate

to each other. In addition, the system would need to know when any claim is amended, in order

to verify that it has not become presumptively patentably indistinct from any other claim and

triggered the new 5/25 Rules. The Minnesota *Amici* know of no system that contains these

features. An Internet-accessible system recently became available that would theoretically allow

for remote log-in by various outside counsel. The cost of this system would add recurring

monthly charges of $1,000 to $2,000 per month for each of the Minnesota *Amici*. The initial

investment to switch over fully to this system could range as high as $40,000.

     ***Second***, each of the Minnesota *Amici*, and comparable companies, would need to add

legal staff to coordinate the assignment and tracking of patent applications more carefully, to

guarantee that they would know immediately when any proposed filing or amendment in one

application could affect any other application under the 5/25 Rule. Assuming that this task

would consume the time of at least one full-time lawyer per hundred active cases, and would

require someone with at least a moderate level of prior experience and familiarity with

prosecution to stay abreast of common inventors, substantial overlapping disclosure, and other

concerns brought to the fore by the new PTO rules, this would add an estimated $200,000 to

$400,000 per year to the budget for the average Minnesota *Amici* legal department. This does

not include additional billable time spent by each of the company's outside patent counsel to

assist in the heightened application tracking required in practice under the new rules.

*Third*, and ultimately the overriding problem and likely reality, is that none of this may truly offer a viable solution to the danger posed by the new PTO rules in this regard. To ensure compliance in the end may necessitate directing all of a company's patent applications to a single lawyer or law firm. Only then would someone sit in a position to know on a daily basis, for each and every claim of all of a business's pending patent applications, whether a proposed claim amendment could bring two applications into conflict and trigger requirements of the new rules.

Beyond the literal *ultra vires* restrictions in the new PTO rules, the practical consequences of these rules would operate to further abridge the Constitutional and statutory rights of inventors and patent owners in their intellectual property. By forcing companies that rely on patent rights in their business to install not-yet-developed docketing systems, hire additional legal staff, and ultimately consolidate patent prosecution work in a single patent counsel or firm, the PTO would throw significant hurdles in the path of an entity simply trying to take optimal advantage of its Constitutionally-grounded and statutorily-secured entitlements. Accordingly, this Court should apply existing Federal Circuit precedent and observe the legislative boundaries of the PTO's authority under 35 U.S.C. § 2(b)(2), and preclude the PTO from substantively constricting the rights of patent applicants. *See Merck*, 80 F.3d at 1549-50.

### CONCLUSION

For the foregoing reasons, Valspar, Anchor Wall Systems, Donaldson Company, Ecolab, and General Mills urge the Court to grant the injunction sought by Plaintiffs. The proposed new PTO rules before the Court will significantly harm the Minnesota *Amici*, and countless other companies striving to advance the state of technological progress in innumerable industries. Despite the burdens laid out above, these rules will not meaningfully advance the PTO's goal of increasing efficiency and improving the patent system. Above all, the Minnesota *Amici* would

welcome the opportunity to participate more fruitfully in any attempt by the PTO to solicit

greater dialogue than has occurred so far toward that end, to improve the system for everyone.


Date:   December 27, 2007                    Respectfully submitted,


_____/s/_____
Jackson D. Toof
VA Bar # 48842
Arent Fox LLP
**Counsel for Minnesota** *Amici*

1050 Connecticut Avenue, N.W.
Washington, DC  20036
Phone: (202) 857-6130
Fax:    (202) 857-6395
toof.jackson@arentfox.com


**Of Counsel for Minnesota** *Amici***:**

David P. Swenson
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
Phone: (612) 349-8517
Fax:    (612) 339-4181
dpswenson@rkmc.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of December 2007, I caused a copy of the foregoing Brief for the Minnesota *Amici Curiae* to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following:


Elizabeth M. Locke
Kirkland & Ellis LLP
655 15th Street, NW – Suite 1200
Washington, DC  20005
E-Mail:  elocke@kirkland.com

and

Craig C. Reilly
Richard McGettigan Reilly & West PC
1725 Duke Street – Suite 600
Alexandria, VA  22314
E-Mail:  craig.reilly @rmrwlaw.com

*Counsel for GSK Plaintiffs*


Joseph Dale Wilson, III
Kelley Drye & Warren LLP
Washington Harbour
3050 K Street NW – Suite 400
Washington, DC  20007
E-Mail:  jwilson@kelleydrye.com

*Counsel for Plaintiff Tafas*


Lauren A. Wetzler
United States Attorney's Office
2100 Jamison Ave.
Alexandria, VA  22314
E-Mail: Lauren.wetzler@usdoj.gov

*Counsel for Defendants*


11

Thomas J. O'Brien
Morgan, Lewis & Bockius
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004
E-Mail:  to'obrien@morganlewis.com

*Counsel for Amicus American Intellectual Property Lawyers Association*


Dawn-Marie Bey
Kilpatrick Stockton, LLP
700 13th Street, N.W. Suite 800
Washington, D.C. 20005
E-Mail:  dbey@kslaw.com

*Counsel for Amicus Hexas, LLC, The Roskamp Institute, Tikvah Therapeutics, Inc.*


James Murphy Dowd
Wilmer Cutler Pickering Hale & Dorr LLP
1455 Pennsylvania Ave., N.W.
Washington, D.C. 20004
E-Mail:  james.dowd@wilmerhale.com

*Counsel for Amicus Pharmaceutical Research and Manufacturers of America*


Randall Karl Miller
Arnold & Porter LLP
1600 Tysons Blvd., Suite 900
McLean, VA 22102
E-Mail:  randall_miller@aporter.com

*Counsel for Amici BIO and Monsanto Company*


Charles Gorenstein
Michael K. Mutter
Birch, Stewart, Kolasch & Birch, LLP
8110 Gatehouse Rd. Suite 100 East
Falls Church, VA 22042
E-Mail:  cg@bskb.com

*Counsel for Amicus Intellectual Property Institute of the William Mitchell College of Law*

Rebecca M. Carr
Pillsbury Winthrop
Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037
E-Mail: Rebecca.carr@pillsburylaw.com

*Counsel for Amicus Elan Pharmaceuticals, Inc.*

By:_____/s/_____
          Jackson D. Toof
          VA Bar # 48842
          Arent Fox LLP
          **Counsel for Minnesota *Amici***

          1050 Connecticut Avenue, NW
          Washington, DC  20036
          Phone:  202.857.6130
          Fax:     202.857.6395
          toof.jackson@arentfox.com


          **Of Counsel for Minnesota *Amici*:**

          David P. Swenson
          Robins, Kaplan, Miller & Ciresi L.L.P.
          2800 LaSalle Plaza
          800 LaSalle Avenue
          Minneapolis, MN  55402-2015
          Phone:  (612) 349-8517
          Fax:     (612) 339-4181
          dpswenson@rkmc.com