## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| TRIANTAFYLLOS TAFAS,         ) | |
|         ) | |
|     Plaintiff,      ) | |
|         ) | |
|   v.         ) | Civil Action No. 1:07cv846 (JCC/TRJ) |
|         ) | |
| JON W. DUDAS, et al.      ) | |
|         ) | |
|     Defendants.   ) | |

CONSOLIDATED WITH

| | |
|---|---|
| SMITHKLINE BEECHAM     ) | |
| CORPORATION, et al.      ) | |
|         ) | |
|     Plaintiffs,     ) | |
|         ) | |
|   v.         ) | Civil Action No. 1:07cv1008 (JCC/TRJ) |
|         ) | |
| JON W. DUDAS, et al.      ) | |
|         ) | |
|     Defendants.   ) | |

## BRIEF FOR AMICUS CURIAE
## CROPLIFE AMERICA IN SUPPORT OF THE PLAINTIFFS

Roger J. Marzulla               John C. Maginnis
Nancie G. Marzulla             Virginia Bar # 16757
MARZULLA LAW              1350 Connecticut Ave. NW, Suite 301
1350 Connecticut Ave., NW, Suite 410    Washington, DC 20036
Washington D.C. 20036         (202) 659-4420 (phone)
(202) 822-6760 (phone)         (202) 775-2463 (fax)
(202) 822-6774 (fax)           maginnislaw2@verizon.net
roger@marzulla.com
nancie@marzulla.com

ATTORNEYS FOR AMICUS CURIAE CROPLIFE AMERICA

**BRIEF FOR AMICUS CURIAE**
**CROPLIFE AMERICA IN SUPPORT OF THE PLAINTIFFS**

The current patent system provides inventors with a stable and reliable means for protecting inventions, which in turn promotes the economic growth and innovation Americans all enjoy.  Throughout the history of patent protection in this country, inventors have effectively exchanged some trade secret protection in favor of pursuing patent protection, with the understanding that through patent protection, the inventor can enjoy the rewards of the right to exclusive use of the invention for a specific term of years.  Through patent protection, the inventor can also recoup some of the significant financial investments risked in the process of productive innovation.  The patent protection system has historically included the right to fully patent all broadly disclosed inventions under a pending parent application.  The right to file continuing applications also continues to fuel further investments in innovation.

The Patent and Trademark Office's (PTO) new rules reduce the inventors' rights and the public benefit achieved through vigorous patent protection.  The new rules limit patent holders' rights to pursue new inventions under a parent application to only two continuing applications.  This means that current patent holders will lose their ability to patent any remaining, but already publicly disclosed, inventions.  This rule changes the calculus for investors, who must decide whether to forgo trade secret protection in favor of patent protection.  Such an agency rulemaking is contrary to the basic principles that have long governed patent practice, and is especially injurious for inventions that require significant investment capital to research and develop.  Ultimately, the new rules will cause rational investors to invest their limited funds elsewhere.  Accordingly, consumers, businesses, and the nation generally, will suffer.

In addition, because the new rules are to be applied retroactively, they will destroy the value of existing patent rights, which are constitutionally protected property rights.  Thus, the

new rules will work an unconstitutional taking in violation of the Just Compensation Clause of the Fifth Amendment. The remedy for the taking of a patent right is invalidation of these unconstitutional rules. In addition, PTO's failure to properly consider the property right implications of its rulemaking, as confirmed by its statement in the Federal Register that there are no takings implications of its rulemaking under EO 12630, is also arbitrary and capricious.

**INTERESTS OF AMICUS CURIAE CROPLIFE AMERICA**

The members of CropLife America (CLA) are the world's leaders in the development of improved crop protection and bioengineered plants. They invest many millions of dollars per year to develop new and better sources of food, fiber, and fuel for America and the world. America's leadership in this field of technological innovation is made possible only by the strong legal protections provided by our nation's patent system, through which CLA's member companies are able to recoup the enormous cost of developing these inventions and processes by obtaining, in return, a limited exclusive right to market these products.

CLA was organized in 1933 as a national, non-profit trade organization representing the major manufacturers, formulators, and distributors of crop protection and pest control products. Headquartered in Washington, D.C., CLA's member companies produce, sell, and distribute most of the active compounds used in crop protection products registered for use in the United States. CLA's members are responsible for obtaining EPA's registration of their products, which cannot be sold unless registered. *See* Federal Insecticide, Fungicide, and Rodenticide Act § 3, 7 U.S.C. § 136a (West 2007). CLA represents its members' interests by monitoring federal agency regulations and agency actions and related litigation to identify issues of concern to the crop protection and pest control industry, and by participating in lawsuits when its members' interests are at stake.

In the crop protection industry, only *one in approximately 140,000* studied molecules makes it from the laboratory to the field.  The average development cost for a new agrochemical averages about $185 million, and the average development time is over nine years from discovery to market.  Crop protection is therefore a high-risk area for research and investment.  CLA members in the crop protection industry require stable intellectual property protection and regulations, in order to plan their research and development strategies and to recognize a return on their investment, without which they cannot fund further technological innovation.

CLA also represents the interests of the plant science industry.  Using biotechnology and modern plant breeding techniques, CLA members have developed crop plants and seeds that deliver many kinds of benefits to growers and society.  First, bioengineered crop plants can carry traits that allow growers to increase crop yield and net profit from each acre of their land.  Growers in the United States currently raise bioengineered varieties of canola, corn, cotton, papaya, soybeans, and squash that contain yield-enhancing traits such as insect, disease, and herbicide resistance.  *See* Fernandez-Cornejo & Caswell, *The First Decade of Genetically-Engineered Crops in the United States* 6 (USDA, Apr. 2006), *available at* http://www.ers.usda.gov/publications/eib11/eib11.pdf.  By taking advantage of those traits, domestic growers have increased crop production by 8.3 billion pounds in 2005 even as they reduced their costs by $1.4 billion. *See* Sujatha Sankula, *Quantification of the Impacts on US Agriculture of Biotechnology-Derived Crops Planted in 2005*, at 2 (National Center for Food and Agricultural Policy, Nov. 2006).

The immense benefits that crop protection and biotechnology have delivered do not come without cost.  The process of researching promising chemical formulations and genetic traits and commercializing the resulting products is expensive and time-consuming.  For example,

Monsanto Company invested decades and hundreds of millions of dollars in developing a trait for tolerance to herbicides that could be used in crop plants, and Pioneer Hi-Bred International Inc. and Syngenta (along with its predecessors) each invested comparable time and sums in developing crop plant traits for insect resistance. Although many of these investments have proven valuable in hindsight, for every innovation that is commercialized, companies must investigate numerous possibilities that do not yield significant economic return.

Though such concerns are especially salient in the crop protection and biotechnology industries, they are hardly unique to it. Instead, they are the paradigmatic concerns faced by any company that invests in innovation with the intent of realizing a return on its investment. To encourage such companies to risk "often enormous costs in terms of time, research, and development," *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974), the Patent Clause of the U.S. Constitution gives Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The laws Congress has passed pursuant to the Patent Clause, *see, e.g.*, 35 U.S.C. §§ 101-105, apply to protect not only those who develop novel inanimate objects, but also those who invent novel living organisms, including, among other things, bioengineered bacteria and plant breeds. *See Diamond v. Chakrabarty*, 447 U.S. 303, 313 (1980) ("[T]he relevant distinction [is] not between living and inanimate things, but between products of nature, whether living or not, and human-made inventions."); *see also J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001).

## FACTUAL AND PROCEDURAL BACKGROUND

Amicus Curiae, CropLife America, adopts the Factual and Procedural Background set forth by Plaintiff, GlaxoSmithKline (GSK).

Pursuant to the Court's Order, CLA files this amicus brief in support of Plaintiffs.  *See* Order, *Tafas v. Dudas*, Nos. 1:107cv846, 1:07cv1008 (consolidated) (E.D. Va. Nov 29, 2007).

## ARGUMENT

I.    **THE PTO'S REGULATION IS INVALID AS AN UNCONSTITUTIONAL RETROACTIVE TAKING OF CLA'S MEMBERS' PROPERTY RIGHTS IN THEIR PENDING PATENT APPLICATIONS**

As the PTO acknowledged in the Final Rules, "[s]everal commenters argued that . . . the new requirements would constitute a taking by the Federal Government."  72 Fed. Reg. 46,716, 46,828 (Aug. 21, 2007).  Those commenters were correct, and PTO's cavalier and cursory disposition of the Fifth Amendment takings implications of its rule was arbitrary and capricious.  *See Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency rule is arbitrary and capricious "if the agency . . . has entirely failed to consider an important aspect of the problem").  As the D. C. Circuit held in *Nat'l Wildlife Fed. v. Interstate Commerce Comm'n*, 850 F.2d 694, 705-06 (D.C. Cir. 1988), a rule is invalid under the Administrative Procedures Act (APA) where the agency's "analysis of the takings issues was insufficient to support its conclusion that the application of the Rules will never require compensation . . . ."

Many of CLA's members own pending patent applications for crop protection and plant science inventions, representing considerable financial investment and years of research, development, and testing.  These companies made their enormous investments in technological innovation, and exchanged their trade secrets for patent applications in the reasonable expectation that the applications they own could be supplemented with an unlimited number of continuing applications (putting aside the doctrine of prosecution laches) under the PTO's rules in effect at the time of application.  *See* Tafas Pl.'s Br. 26; GSK Pls.' Br. 5.  These patent

applications are property within the meaning of the Fifth Amendment. The PTO's new rule, which retroactively eliminates much of the patent law's protection of those patent applications, takes CLA members' property in violation of the Fifth Amendment and is therefore invalid and unconstitutional.

The Fifth Amendment, which provides that "private property [shall not] be taken for public use without just compensation," U.S. Const. amend. V, embodies a "historical compact" between the people and the government, which has become part of our "constitutional culture":

> [W]e think that the notion pressed by the council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Just Compensation Clause that has become part of our constitutional culture.

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028 (1992).

The historical compact recorded in the Just Compensation Clause is an understanding that government's power will be constrained by principles of fairness. *Armstrong v. United States*, 364 U.S. 40 (1960). While a government can, under some circumstances, "take" private property for public use, any such taking is void unless it provides for fair payment in return. U.S. Const. amend. V; *Fuller v. United States*, 409 U.S. 488, 490 (1973) ("The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness as it does from technical concepts of property law."). Thus, the Constitution's protection of property rights is, at bottom, a fundamental protection of individual civil liberty:

> Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation . . . is in truth a "personal" right. . . . In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized.

*Lynch v. Household Finance Corp.,* 405 U.S. 538, 552 (1972).

A.    **The Supreme Court Has Held that Intellectual Property, Including Patents, Is Property Protected by the Fifth Amendment Against Unconstitutional Taking**

In *Ruckelshaus v. Monsanto*, 467 U.S. 986 (1984), the Supreme Court held that the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136-136y, which deprived Monsanto of trade secret and test data, were an unconstitutional taking of Monsanto's intellectual property rights.  Before 1978, FIFRA generally protected Monsanto's data submissions against public disclosure, in effect extending Monsanto's patents because others could not sell the product (although no longer under patent protection) without EPA approval, and EPA approval could not be obtained without Monsanto's test data:

> Upon expiration of the 17-year period of patent protection, the patent law no longer prohibits companies from making, using, or selling the formerly patented product.  In the case of formerly patented pesticide chemicals, the expiration of the patent period by itself is not sufficient to allow companies to legally sell pesticide products containing that active ingredient, because FIFRA requires those companies must first obtain a pesticide registration before selling their pesticide products.  Under the 1972 and 1975 amendments, a data submitter could prevent a subsequent application from relying on data it had submitted to EPA and thereby prevent that applicant from obtaining a registration unless the applicant submitted his own information.

*Monsanto Co. v. Acting Adm'r, Envtl. Prot. Agency*, 564 F. Supp. 522, 560-61 (E.D. Mo. 1983).

In ruling for Monsanto, the Supreme Court acknowledged the critical importance of intellectual property protection — including patents and trade secrets — in providing necessary economic incentives to spur development of agricultural products, which require many years and millions of dollars to develop:

> [D]evelopment of a potential commercial pesticide candidate typically requires the expenditure of $5 million to $15 million annually for several years.  The development process may take between 14 and 22 years, and it is usually that long before a company can expect any return on its investment.  For every manufacturing-use pesticide the average company finally markets, it will have

screened and tested 20,000 others. Monsanto has a significantly better-than-average success rate; it successfully markets 1 out of every 10,000 chemicals tested.

*Ruckelshaus v. Monsanto*, 467 U.S. 986, 998 (1984).

Recognizing that "[a]lthough this Court never has squarely addressed the question whether a person can have a property interest in a trade secret, which is admittedly intangible, the Court has found other kinds of intangible interests to be property for purposes of the Fifth Amendment's Taking Clause[,]" the Court went on to comment on its long-standing principle that "[t]hat intangible property rights protected by state law are deserving of the protection of the Taking Clause . . . ." *Id.* at 1004; *see also Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985) ("It is beyond reasonable debate that patents are property. In *Consolidated Fruit Jar Co. v. Wright*, 4 Otto 92, 96, 94 U.S. 92, 96, 24 L.Ed. 68 (1876) the Supreme Court stated: 'A patent for an invention is as much property as a patent for land. The right rests on the same foundation and is surrounded and protected by the same sanctions.'").

In finding the FIFRA amendments an unconstitutional taking of Monsanto's intellectual property rights, the Supreme Court emphasized that, as with patents, "the value of a trade secret lies in the competitive advantage it gives its owner over competitors." *Monsanto*, 467 U.S. at 1012 n.15. Like a patent, the Supreme Court held that the essence of trade secret ownership lies in the right to exclude others (and thus obtain a competitive advantage), and that government's elimination of that right (and thus the competitive advantage it affords) is unconstitutional:

> The right to exclude others is generally one of the most essential sticks in the bundle of rights that are commonly characterized as property. With respect to a trade secret, the right to exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data.[] . . . The economic value of that property right lies in the competitive advantage over others that Monsanto enjoys by virtue

of its exclusive access to the data, and disclosure or use by others of the data
would destroy that competitive edge.

*Id.* at 1011-12 (citation, footnote, and internal quotation marks omitted).

Government may not "redefine" an intellectual property right — be it a patent, trade

secret or confidential test data — without violating the Fifth Amendment. *Webb's Fabulous*

*Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) ("a State, by *ipse dixit*, may not

transform private property into public property without compensation").

> **B.    PTO's Retroactive Elimination of Continuing Patent Application Rights Is
> Invalid as an Unconstitutional Taking Under the Fifth Amendment**

As described in the amicus curiae brief of the American Intellectual Property Law

Association (AIPLA), the PTO's rule retroactively deprives owners of existing patent

applications of their current rights because "[i]mplementing the new Rules will, as a practical

matter, compel IP owners to (1) abandon pending patent claims, (2) abandon entire patent

applications, and (3) surrender currently existing claim scope without adequate opportunity for

consideration by the PTO . . . ."  AIPLA Br. in Support of GSK Pls. 3, *Tafas v. Dudas*, No.

1:07cv1008 (Docket No. 30) (E.D. Va. Oct. 25, 2007).  What this means in practice is that

current applicants will lose the all-important priority date for at least some of their inventions —

rights which they currently possess, and which they relied on in undertaking the multi-year and

multi-million dollar development process which led to the invention and patent application.  This

retroactive taking of patent applicants' property rights violates the Fifth Amendment, and is

therefore invalid.

In *Eastern Enters. v. Apfel*, 524 U.S. 498 (1998), the Supreme Court ruled that

"[r]etroactivity is generally disfavored in the law, in accordance with "fundamental notions of

justice" that have been recognized throughout history, the Supreme Court analogized the role of

the Fifth Amendment to the *Ex Post Facto* clause as a bulwark against retroactive statutes or

regulations which impair pre-existing property rights:

> Our Constitution expresses concern with retroactive laws through several of its
> provisions, including the *Ex Post Facto* and Takings Clauses.  In *Calder v. Bull,* 3
> Dall. 386, 1 L.Ed. 648 (1798), this Court held that the *Ex Post Facto* Clause is
> directed at the retroactivity of penal legislation, while suggesting that the Takings
> Clause provides a similar safeguard against retrospective legislation concerning
> property rights. . . . In *Security Industrial Bank,* we considered a Takings Clause
> challenge to a Bankruptcy Code provision permitting debtors to avoid certain
> liens, possibly including those predating the statute's enactment.  We expressed
> "substantial doubt whether the retroactive destruction of the appellees' liens . . .
> comport[ed] with the Fifth Amendment," and therefore construed the statute as
> applying only to lien interests vesting after the legislation took effect.  Similar
> concerns led this Court to strike down a bankruptcy provision as an
> unconstitutional taking where it affected substantive rights acquired before the
> provision was adopted.

*Id.* at 534-35 (citations omitted).

By retroactively depriving patent applicants of their right to file additional continuing

applications for new uses, the PTO has deprived them of a substantial portion (perhaps the only

economically valuable portion) of their rights under the patent law.  This retroactive taking of

these valuable property rights is unconstitutional under the Fifth Amendment, and must therefore

be declared invalid.  *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555,601-

602 (1935) (voiding the Frazier-Lemke Act because, "the Fifth Amendment commands that,

however great the nation's need, private property shall not be thus taken even for a wholly public

use without just compensation" (cited approvingly in *Eastern Enterprises*, 524 U.S. at 534)).

The PTO's assertion that "the Final Rules do not disproportionately concentrate any

burden on a few persons, but rather implement regulatory changes that affect the public

generally[,]" Defs.' Br. 47, is groundless and nonsensical.  Although the record does not indicate

the number of existing patent applicants affected by the rules, clearly the rules affect only that

limited class of persons and not, as the PTO asserts, "the public generally."

Nor is the PTO's assertion that "[e]ven if the Final Rules are less than optimal from any particular applicant's perspective, their 'bundle' of rights remains intact[,]" Defs.' Br. 48, valid. A patent right has (if the bundle of sticks analogy is to be used) only one stick:  the right to exclude others from marketing the invention for the term of the patent.  When the PTO takes this right away, it takes the entire property right.  *See Monsanto*, 467 U.S. at 1002 (disclosure of the trade secret destroys the property right); *Vulcan Materials v. City of Tehuacana*, 369 F.3d 882, 889 n.5 (5th Cir. 2004) ("Clearly, where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a [categorical] taking because the aggregate must be viewed in its entirety — i.e., the relevant parcel includes all of the rights possessed by the owner.  [Plaintiff], however, does not possess a full 'bundle' of property rights and, therefore, the relevant parcel for the purposes of its takings claim is the only estate in which it has an interest — the limestone lease — and the value of other interests — i.e., surface agricultural uses — cannot be considered in determining whether all economically viable use of the property has been destroyed." (citations and internal quotation marks omitted)).

Finally, the PTO misstates and misapplies the *Penn Central* test for regulatory takings. *See Penn Cent. Trans. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *see also* Defs.' Br. 48. A physical occupation is a taking *per se*, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426-27 (1982), to which the *Penn Central* test does not apply at all.  Second, the PTO's assertion that "the economic impact on regulated parties is not significant[,]" Defs.' Br. 48, is utterly unsupported, and is refuted by the uncontradicted evidence of millions of dollars worth of research and development work, which will lose patent protection if this rule goes into effect.  Finally, the PTO's assertion that "GSK's "investment-backed expectations" remain largely intact after the Final Rules due to the many measures the USPTO has taken to ensure that

applicants may obtain patent protection for their disclosed, but as yet unclaimed, inventions[,]"
Defs.' Br. 49, utterly ignores the central point of this case: that Plaintiffs and all other owners of
current patent applications will lose patent protection, worth millions of dollars, if these new
rules go into effect.

## II.    THE PTO'S FAILURE TO IDENTIFY THE TAKINGS IMPLICATIONS OF THIS REGULATION, AS REQUIRED BY EXECUTIVE ORDER 12,630, IS ARBITRARY AND CAPRICIOUS

The PTO's disregard of the Fifth Amendment takings implications of its proposed rule
was arbitrary and capricious agency action, rendering the rule invalid under the Administrative
Procedure Act. 5 U.S.C. § 706 (West 2007) ("The reviewing court shall . . . hold unlawful and
set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law.").

In its Notice of "Changes To Practice for Continued Examination Filings, Patent
Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent
Applications," the PTO asserts: "[t]his rule making will not effect a taking of private property or
otherwise have taking implications under Executive Order 12630." 72 Fed. Reg. 46,716, 46,834
(Aug. 21, 2007) (to be codified at 37 C.F.R. pt. 1). As described in Section I above, the PTO's
conclusion is wrong as a matter of fact and as a matter of constitutional law. The promulgation
of this regulation, with its potentially massive but undisclosed takings implications, is also
arbitrary and capricious and decidedly not in accordance with the Fifth Amendment.

Executive Order 12,630, "Governmental Actions and Interference With Constitutionally
Protected Property Rights," requires that:

> Executive departments and agencies shall, to the extent permitted by law, identify
> the takings implications of proposed regulatory actions and address the merits of
> those actions in light of the identified takings implications, if any, in all required
> submissions made to the Office of Management and Budget. Significant takings

> implications should also be identified and discussed in notices of proposed rule-
> making and messages transmitting legislative proposals to the Congress, stating
> the departments' and agencies' conclusions on the takings issues.

Exec. Order No. 12,630, 53 Fed. Reg. 8,859, 8,862 (Mar. 18, 1988).  This requirement "ensure[s]

that government actions are undertaken on a well-reasoned basis with due regard for fiscal

accountability, for the financial impact of the obligations imposed on the Federal government by

the Just Compensation Clause of the Fifth Amendment, and for the Constitution . . . ."  *Id*. at

8,859.  Noting that "[r]esponsible fiscal management and fundamental principles of good

government require that government decision-makers evaluate carefully the effect of their

administrative, regulatory, and legislative actions on constitutionally protected property rights,"

Executive Order 12,630 requires that "[e]xecutive departments and agencies should review their

actions carefully to prevent unnecessary takings . . . ."  *Id*.  This Executive Order specifically

encompasses "Federal regulations, [and] proposed Federal regulations," *id*., such as the PTO

regulation under review here.

> In his legislative and administrative message to the Congress, President Reagan explained

the reason he was promulgating this Executive Order:

> It was an axiom of our Founding Fathers and free Englishmen before them that
> the right to own and control property was the foundation of all other individual
> liberties.  To protect these rights, the Administration has urged the courts to
> restore the constitutional right of a citizen to receive just compensation when
> government at any level takes private property through regulation or other means.
> Last spring, the Supreme Court adopted this view in *Nollan v. California Coastal
> Commission.*  In a second case, the Court held that the Fifth Amendment requires
> government to compensate citizens for temporary losses that occur while they are
> challenging such a government regulatory "taking" in court.  In the wake of these
> decisions, this Administration is now implementing new procedures to ensure that
> federal regulations do not violate the Fifth Amendment prohibition on taking

private property; or if they do take a citizen's property for public use, to ensure
that he receives constitutionally required just compensation.

*President's Legislative and Administrative Message to Congress*, 24 Weekly Comp. Pres. Doc.

91 (Jan. 25, 1988).

The PTO was well aware that its Proposed Rule raised significant Fifth Amendment

issues.  As the Notice of Final Rule states, " [s]everal comments argued that . . . the new

requirements would constitute a taking by the Federal Government."  72 Fed. Reg. 46,716,

46,828 (Aug. 21, 2007) (to be codified at 37 C.F.R. pt.1).  The PTO was not free to ignore these

significant Fifth Amendment challenges to the validity of its proposed rule.  The Supreme Court

has noted that "the Takings Clause of the Fifth Amendment [is] as much a part of the Bill of

Rights as the First Amendment or Fourth Amendment . . . ."  *Dolan v. City of Tigard*, 512 U.S.

374, 392 (1994).  And the Constitution — including the Fifth Amendment — is by its own terms

"the supreme law of the land."  U.S. Const. art. VI, cl. 2 ("This Constitution . . . shall be the

supreme Law of the Land; and the Judges in every State shall be bound thereby"); *Ex rel.*

*Howlett v. Rose*, 496 U.S. 356, 370 (1990) ("The language of the Supremacy Clause . . . and our

cases confirm that state courts have the coordinate authority and consequent responsibility to

enforce the supreme law of the land.").

## III.    THE CONSTITUTION AUTHORIZES LAWS TO PROTECT PATENT RIGHTS IN ORDER TO PROMOTE ECONOMIC GROWTH AND INNOVATION

Beyond being arbitrary and capricious for failure to consider the property rights

implications of its new rules, the PTO also ignored the historic underpinnings of patent law,

including the intent of the Founders.

**A.      Patent Protection Has Historically Been Intended to Foster Economic Growth and Provide National Benefit Through Innovation**

English precedent for law and policy defending the rights of inventors dates to the early 1600s.  Sir Edward Coke, whose writings on the English common law were the definitive legal texts for some 300 years, noted the importance of securing patent rights in order to foster economic growth and national strength.  As explained in a treatise on early English patent law:

> English sovereigns had by the early 17th Century established the practice of entertaining petitions for letters patent in new arts and manufactures. . . . The grant of patent rights for [a new art or trade] was said to play a role in inducing the inventor or discoverer to introduce the new technology into the domestic English economy.  Thus, patent rights for inventions were prudent "for the good of the realm," and not void at common law.  Lord Coke asserted, for example, that "the reason wherefore such a privilege is good in law is because the inventor bringeth to and for the commonwealth a new manufacture by his invention, costs, and charges, and therefore it is reason that he should have a privilege for his reward, (and the encouragement of others in the like) for a convenient time."

1 *Moy's Walker on Patents* § 1:5 (4th ed. 2003) (quoting 3 Edward Coke, *The Institutes of the Laws of England* 184 (W. Clarke & Sons ed. 1817)).

In fact, the roots of patent law reach even deeper and leading commentators have tried to correct the mistaken impression that England was the first to develop a system of protecting intellectual property rights.  *See, e.g.*, Frank D. Prager, *Historic Background and Foundation of American Patent Law*, 5 Am. J. Leg. Hist. 309 (1961).  In 1474, for instance, Venice enacted what may be the first patent statute:

> WE HAVE among us men of great genius, apt to invent and discover ingenious devices . . . . Now, if provision were made for the works and devices discovered by such persons, so that others who may see them could not build them and take the inventor's honor away, more men would then apply their genius, would discover, and would build devices of great utility and benefit to our commonwealth.

Edward C. Walterscheid, *The Early Evolution of the United States Patent Law: Antecedents (Part I)*, 76 J. Pat. & Trademark Off. Soc'y 697, 708 (1994).  While the concept of the state

granting some form of exclusive rights in inventions originated first in Italy in the fifteenth

century, it spread rapidly throughout Europe. *Id.* at 705-06 (citing numerous authorities).

> **B**.    **The Framers of the U.S. Constitution Recognized that "Progress" in Science and Innovation by Protecting Intellectual Property Rights Will Promote Economic Growth and Innovation**

United States patent law derives from a constitutional grant of authority to the Congress

"to promote the Progress of Science and useful Arts, by securing for limited Times to Authors

and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art.

1, § 8, cl. 8. The Articles of Confederation did not include this grant, and therefore its express

inclusion in the Constitution signifies the importance the Framers attached to establishing a

strong system of enforceable intellectual property rights. Chief Justice Marshall noted:

> To promote the progress of useful arts is the interest and policy of every enlightened government. It entered into the views of the framers of our Constitution, and the power 'to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries' is among those expressly given to Congress.

*Grant v. Raymond*, 31 U.S. 218, 241 (1832).

A patent custom involving exclusive grants of privilege with respect to invention existed

in a number of the American colonies and states prior to the formation of the federal patent

system. Walterscheid, *The Early Evolution of the United States Patent Law: Antecedents (Part

V)*, 78 J. Pat. & Trademark Off. Soc'y 615, 628 (1996). Early patents of inventions issued by

individual states indicate recognition of a robust defense of patent rights. However, the

ineffective mishmash of state patents led Noah Webster in 1788 to emphasize the need for

federal authority to protect patent rights:

> The authors of useful inventions are among the benefactors of the public and are entitled to some peculiar advantages for their ingenuity and labor. The productions of genius and the imagination are if possible more really and exclusively property than houses and land and are equally entitled to legal

> security.  The want of some regulation for this purpose may be numbered among
> the defects of the American government.

Prager, *Proposals for the Patent Act of 1790*, J. Patent Office Soc'y 36, 157 (1954) (citation omitted).

George Washington spurred development of a strong system of patent rights in his State of the Union address to the First Congress:  "I cannot forbear intimating to you, the expediency of giving effectual encouragement as well to the introduction of new and useful inventions from abroad, as to the exertions of skill and genius in producing them at home."  3 The First Federal Congress Project, *The Documentary History of the First Federal Congress of the United States of America, March 4, 1789 – March 3, 1791* 253 (Linda Grant DePauw et al. eds. 1977-1995).

The Supreme Court has underscored the contributions of Thomas Jefferson to modern patent law, often relying on him as an authority to interpret the patent clause.  *See, e.g.*, *Graham v. John Deere Co.*, 383 U.S. 1 (1966).  An inventor himself, Jefferson had an "active interest and influence in the early development of the patent system" and "Jefferson's views on the general nature of the limited patent monopoly under the Constitution, as well as his conclusions as to conditions for patentability under the statutory scheme, are worthy of note."  *Id*. at 7.  In essence, Jefferson was "the driving force behind early federal patent policy."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 147 (1989).  The Patent Act of 1793 "embodied Jefferson's philosophy that 'ingenuity should receive a liberal encouragement.'"  *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).  According to Jefferson, the purpose of patent protection is to reward the inventor and encourage innovation:

> [Jefferson] rejected a natural-rights theory in intellectual property rights and clearly
> recognized the social and economic rationale of the patent system.  The patent

monopoly was not designed to secure to the inventor his natural right in his discoveries.  Rather, it was a reward, an inducement, to bring forth new knowledge.

*Graham*, 383 U.S. at 8-9.

### C.     The Constitution Commands Vigorous Protection of Patent Rights

The Fifth Amendment explicitly protects property:  "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  The Patent Clause also extends special protection to intellectual property, empowering Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. Art. I, § 8, cl. 8.  "Innovation, advancement, and things which add to the sum of useful knowledge are inherent requisites in a patent system which by constitutional command must 'promote the Progress of . . . useful Arts.'  This is the standard expressed in the Constitution and it may not be ignored."  *Graham,* 383 U.S. at 7.

This constitutional command reflects the principle that innovation is best advanced through strong patent protection that preserves the inventor's financial incentive.  "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'"  *Mazer v. Stein*, 347 U.S. 201, 219 (1954).  The Supreme Court elaborated in *Gibbons v. Ogden*:

> The limitation [conferred by patent rights] is not for the advantage of the inventor, but of society at large, which is to take the benefit of the invention after the period of limitation has expired. . . . It is virtually a contract between each patentee and the people of the United States, by which the time of exclusive and secure enjoyment is limited, and then the benefit of the discovery results to the public.

22 U.S. 1, 174 (1824); *see also Graham*, 383 U.S. at  9 n.2 ("'Society may give an exclusive right to the profits arising from [inventions], as an encouragement to men to pursue ideas which

19

may produce utility . . . .'" (quoting VI *Writings of Thomas Jefferson* at 180-81 (Washington

ed.))).  Securing patent rights thus "will have a positive effect on society through the introduction

of new products and processes of manufacture into the economy, and the emanations by way of

increased employment and better lives for our citizens."  *Kewanee Oil Co. v. Bicron Corp.*, 416

U.S. 470, 480 (1974).

## CONCLUSION

For all of these reasons, CropLife America, as amicus curiae, respectfully asks this Court

to hold that PTO's Final Rules are invalid as an unconstitutional taking of valuable patent rights.

Respectfully submitted,

_____/s/_____

December 27, 2007                John C. Maginnis
                                 Virginia Bar # 16757
                                 1350 Connecticut Ave. NW, Suite 301
                                 Washington, DC 20036
                                 (202) 659-4420 (phone)
                                 (202) 775-2463 (fax)
                                 maginnisdclaw@msn.com

                                 Roger J. Marzulla
                                 Nancie G. Marzulla
                                 MARZULLA LAW
                                 1350 Connecticut Ave. NW, Suite 410
                                 Washington, DC 20036
                                 Phone: (202) 822-6760
                                 Fax: (202) 822-6760
                                 roger@marzulla.com
                                 nancie@marzulla.com

                                 *Attorneys for Amicus Curiae Croplife America*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th Day of December, 2007, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

**Joseph Dale Wilson, III**
Kelley Drye & Warren LLP
Washington Harbour
3050 K Street NW
Suite 400
Washington, DC 20007
202-342-8504
Fax: 202-342-8451
Email: jwilson@kelleydrye.com

**Joanna Elizabeth Baden-Mayer**
Collier Shannon & Scott PLLC
3050 K St NW
Suite 400
Washington, DC 20007-5108
202-342-8400
Fax: 202-342-8451
Email: jbaden-mayer@kelleydrye.com

*Counsel for the Plaintiff Tafas*

**Craig Crandall Reilly**
Richard McGettigan Reilly & West PC
1725 Duke St
Suite 600
Alexandria, VA 22314
(703) 549-5353
Email: craig.reilly@rmrwlaw.com

**Daniel Sean Trainor**
Kirkland & Ellis LLP
655 15th St NW
Suite 1200
Washington, DC 20005
202-879-5000
Fax: 202-879-5229
Email: dtrainor@kirkland.com

**Elizabeth Marie Locke**
Kirkland & Ellis LLP
655 15th St NW
Suite 1200
Washington, DC 20005
202-879-5000
Fax: 202-879-5200
Email: elocke@kirkland.com

*Counsel for GSK Plaintiffs*

**Lauren A. Wetzler**
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
(703) 299-3752
Fax: (703) 299-3983
Email: lauren.wetzler@usdoj.gov

*Counsel for Defendants*

**James Murphy Dowd**
Wilmer Cutler Pickering Hale & Dorr LLP
1455 Pennsylvania Ave NW
Washington, DC 20004
(202) 942-8400
Email: james.dowd@wilmerhale.com

*Counsel for Amicus Pharmaceutical Research and Manufacturers of America*

**Randall Karl Miller**
Arnold & Porter LLP
1600 Tysons Blvd
Suite 900
McLean, VA 22102
(703) 720-7000
Email: randall_miller@aporter.com

*Counsel for Amicus Biotechnology Industry Organization and the Monsanto Company*

**Scott Jeffrey Pivnick**
Pillsbury Winthrop Shaw Pittman LLP
1650 Tysons Blvd
Suite 1400
McLean, VA 22102
(703) 770-7864
Email: scott.pivnick@pillsburylaw.com

**Rebecca Malkin Carr**
Pillsbury Winthrop Shaw Pittman LLP
2300 N St NW
Washington, DC 20037
202-663-8000
Fax: 202-663-8007
Email: rebecca.carr@pillsburylaw.com

*Counsel for Amicus Elan Pharmaceuticals, Inc.*

**Thomas J. O'Brien**
Morgan, Lewis & Bockius
1111 Pennsylvania Ave, NW
Washington, DC 20004
202-739--5186
Fax: (202) 739-3001
Email: to'brien@morganlewis.com

*Counsel for American Intellectual Property Law Institute*

**Dawn-Marie Bey**
King & Spalding LLP
1700 Pennsylvania Avenue
Suite 200
Washington, DC 20006
(202) 626-8978
Fax: 202 626-3737
Email: dbey@kslaw.com

*Counsel for Amicus HEXAS, LLC, The Roskamp Institute, and Tikvah Therapeutics, Inc.*

**Charles Gorenstein**
Birch Stewart Kolasch & Birch LLP
8110 Gatehouse Rd
PO Box 747
Falls Church, VA 22040-0747
(703) 205-8000
Email: cg@bskb.com

*Counsel for Amicus Intellectual Property Institute of William Mitchell College of Law*

**Robert Emmett Scully, Jr.**
Stites & Harbison, PLLC
1199 North Fairfax St.
Suite 900
Alexandria, VA 22314
(703) 739- 4900
Fax: (703) 739- 9577
Email: rscully@stites.com

*Counsel for Amicus Human Genome Sciences, Inc.*

**Craig James Franco**
Odin Feldman & Pittleman PC
9302 Lee Highway
Suite 1100
Fairfax, VA 22031
(703) 218-2100
Email: craig.franco@ofplaw.com

*Counsel for Amicus Polestar Capital Associates, LLC and Norseman Group, LLC*

**Matthew Christian Schruers**
Computer & Communications Industry Association
900 17th St NW
Suite 1100
Washington, DC 20006
(202) 470-3620
Email: MSchruers@ccianet.org

*Counsel for Computer and Communications Industry Association; AARP; Consumer Federation of America; Essential Action; Foundation for Taxpayer and Consumer Rights; Initiative for Medicines, Access and Knowledge; Knowledge Ecology International; Prescription Access Litigation; Public Knowledge; Research on Innovation; and Software Freedom Law Center*

**Jonathan Dyste Link**
Townsend and Townsend and Crew LLP
1301 K St NW
9Th Floor, East Tower
Washington, DC 20005
202-481-9900
Fax: 202-481-3972
Email: jlink@townsend.com

*Counsel for Amicus CFPH, Inc.*

**Maurice Francis Mullins**
Spotts Fain PC
411 E Franklin St
Suite 600
PO Box 1555
Richmond, VA 23218-1555
(804) 697-2069
Fax: (804) 697-2169
Email: cmullins@spottsfain.com

*Counsel for Amicus Micron Technology, Inc.*

**Jackson David Toof**
Robins Kaplan Miller & Ciresi LLP
1875 Eye St NW
Suite 300
Washington, DC 20006-1307
202-857-6130
Fax: 202-223-8604
Email: toof.jackson@arentfox.com

*Counsel for Amicus Valspar Corporation, General Mills Inc., Donaldson Company, Inc., Ecolab, Inc., Anchor Wall Systems, Inc.,*

**Robert C. Gill**
Saul Ewing LLP
2600 Virginia Ave NW
Suite 1000
Washington, DC 20037
202-295-6605
Fax: 202-295-6705
Email: rgill@saul.com

*Counsel for Amicus PA Bioadvance, Life Sciences Greenhouse of Pennsylvania, Pittsburgh Life Sciences Greenhouse*

**Blair Elizabeth Taylor**
Venable LLP
575 7th St NW
Washington, DC 20004
**NA**
(202) 344-4000
Email: btaylor@cov.com

*Counsel for Amicus Intellectual Property Owners Association*

**Kenneth Carrington Bass, III**
Sterne, Kessler, Goldstein & Fox
1100 New York Ave NW
Suite 600
Washington, DC 20005
(202) 772-8825
Fax: (202) 371-2540
Email: kbass@skgf.com

*Counsel for Amicus AmberWave Systems Corporation, Fallbrook Technologies, Inc.,
InterDigital Communications LLC, Nano-Terra, Inc., Tessara, Inc.*

**Kevin Michael Henry**
Sidley Austin Brown & Wood LLP
1501 K St NW
Washington, DC 20005
(202) 736-8000
Email: khenry@sidley.com

*Counsel for Amicus Washington Legal Foundation*

_____/s/_____
John C. Maginnis
Virginia Bar # 16757
ATTORNEY FOR *AMICUS CURIAE*
CROPLIFE AMERICA
1350 Connecticut Ave. NW, Suite 301
Washington, DC 20036
(202) 659-4420 (phone)
(202) 775-2463 (fax)
maginnislaw2@verizon.net