The Notices do not identity any dilatory or nefarious motives for an applicant to file complicated applications. The reason is simple – there are none. Almost all patent applications are drafted in response to real world business needs and economic value.

**If the PTO believes that complex inventions, interrelated inventions arising out of a single R&D effort, detailed patent disclosures, and claims that foster easy dispute resolution are problems, not virtues, then the PTO's metrics are wrong. The metrics need to change, not the inventions or applicants' efforts to meet the demands of substantive law.** The primary metrics by which the PTO measures itself – pendency, and "3 counts per application," no matter how large, were designed in the 1960's, when most applications were directed to relatively simple inventions, and were of much more uniform size than they are today. The PTO's metrics bear little relationship to today's workflow – when applications are far more variable in size and complexity than they were four decades ago. Possible revisions of these metrics are suggested in § IV.G, below.

Many of the factual suppositions in the two Notices, for example, that many applications are filed with "patentably indistinct claims," and that these applications are responsible for the PTO's cost burdens, are internally inconsistent. Applicants have little or no incentive to do so. Applications are rarely split more finely than they should be split. Indeed, an applicant's incentives are almost always to combine more inventions into fewer applications. And as noted above, to the degree these applications exist, they are "free money" for the PTO, not costs.

### B. Proposed 37 C.F.R. § 1.75(b) is Contrary to Law, and Will Limit the PTO's Ability to Finally Dispose of Applications

Proposed 37 C.F.R. § 1.75(b) would permit the PTO to examine only 10 claims out of all claims filed in all related applications.

**Comment 29.** The PTO lacks statutory authority to promulgate 37 C.F.R. § 1.75(b) as proposed. 35 U.S.C. § 131 requires "The Director shall cause an examination to be made of the application." The PTO cites no authority for the notion that the Director may cause on examination to be made of only part of the application. The law is clear that the PTO's "administrative convenience" – the only reason cited in the Notice – *cannot* be a basis for denying examination, or for rejecting parts that have not been examined. *In re Weber*, 580 F.2d 455, 458, 198 USPQ 328, 331-32 (CCPA 1978) ("As a general proposition, an applicant has a right to have *each* claim examined on the merits. ...in drawing priorities between the Commissioner as administrator and the applicant as beneficiary of his statutory rights, we conclude that the statutory rights are paramount." emphasis in original)

**Comment 30.** The proposed rule package is incomplete, because it makes no mention of how final rejection practice would apply to claims that have not been examined. The Notice contains no mention of how proposed Rule 1.75(b) interacts with final rejection practice – it's apparent that no one has thought this through. Rule 1.75(b) simply cannot work.

Under current statute – which the PTO has no authority to change by rule – the PTO lacks authority to finally reject portions of the application that have not been examined. 35 U.S.C. § 131, § 132; *In re Oetiker*, 977 F.2d 1443, 1445-46, 24 USPQ2d 13443, 1444 (Fed. Cir. 1992) ("the examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability. ... If examination at the initial stage does not produce a *prima facie* case of unpatentability, then without more the applicant is entitled to grant

f the patent."); *Weber*, 580 at 458, 198 USPQ at 331-32 ("[An] applicant has a right to have each claim examined on the merits."). Under proposed § 1.75(b) in its current form, if the PTO only examines 10 claims of a 60-claim application, an applicant will have a statutory right to demand examination of another 10 claims, and another, and another – all on the original filing fee – before the PTO can finally reject the application as a whole. At each stage, the applicant can amend all claims, both those designated and those not designated, and demand examination. Until the PTO examines and rejects an entire application, an applicant has a statutory right to redesignate claims and request further examination until all claims have been examined at least twice.

**Comment 31.** Proposed § 1.75(b) will turn appeals into fiasco proceedings. An appellant will be entitled to designate all claims as standing separately. In the absence of any statement of a rejection, all an applicant need to is state the text of the claim, and that the examiner stated no *prima facie* rejection. The Board will then have to consider every single claim separately. Because the proposed rule fails to consider the effect on the efficiency of the overall process, it will generate inefficient results.

### C. "Representative Claims" Practice Becomes More Appropriate as a Proceeding Progresses, but Is a Total Mismatch for Examination of First Instance

**Comment 32.** In the U.S. legal system, no legal proceeding forces a party to bind himself to a position when most of the important facts are unknown. Most procedural rules take a balanced approach to requiring parties to gradually narrow issues, and take binding positions only when the relevant facts are in. Binding a party to a position too early is unfair and results in bad justice in every other context; it's unfair and bad justice in the Patent Office.

At 71 Fed. Reg. 62 col. 2, the Office compares the proposed designation of claims to the "representative claim" practice common before the Board and in the courts. The analogy is inapt. "Representative claims" are useful at late stages of a proceeding, when all the facts have been developed. For example, by definition, an appeal only occurs after a "clear issue has been developed for appeal." MPEP § 706.07. Similarly, in a litigation, "representative claims" are designated after extensive discovery, exchange of expert reports, and the accused infringer's designation of prior art under 35 U.S.C. § 282. Solicitor Whealan will confirm that a patentee almost ***never*** makes a binding commitment to "representative claims" immediately on filing a civil complaint – exceptions arise ***only*** when the patentee has been able to thoroughly research both the accused product and prior art before filing suit.

Proceedings of first instance, such as examination, are designed to develop facts, and to identify and narrow issues. The current *prima facie* "burden of coming forward" rules of examination parallel the burdens in every other legal context – the examiner must come forward with evidence and provide enough information to guide the applicant's next step. It is entirely possible that there is some useful way to focus examination **before the first prior art is identified**, but the "Examination of Claims" package is neither logical, meaningful, or legal as a hard-edged rule.

By *de facto* deferring examination of claims that will likely be the patentable claims, and allowing examiners to keep their bargaining positions hidden, this proposal will easily add tens of millions of dollars to annual prosecution costs, and destroy tens, or perhaps hundreds of

millions of dollars of business value per year by either delaying issuance of claims needed to protect a market, or forcing cancellation of claims that should be patentable. About 20% of these costs will fall on small businesses.

**D. 71 FR 61, Proposed 37 C.F.R. § 1.75(b)(2) – Independent Claim Fees for Dependent Claims**

**Comment 33.** The first sentence of proposed 37 C.F.R. § 1.75(b)(2) notes that a claim that incorporates less than all of a prior claim is an independent claim, and will be charged the relevant fee. This is merely a statement of current law. A claim that does not include an entire claim by reference is not a § 112 ¶ 4 dependent claim, and therefore is subject to the fee for independent claims.

**Comment 34.** The second sentence, regarding proposing to charge the higher independent claim fee for certain dependent claims, is beyond the PTO's statutory authority. The terms "independent claim" and "dependent claim," and the respective associated fees, are set by statute. The PTO lacks authority to redefine them by rule.

**E. Proposed 37 C.F.R. § 1.105(a)(1)(ix), Requiring Applicant to Identify Related Applications**

**Comment 35.** Requiring identification of related or overlapping applications is perfectly reasonable. Indeed, from an applicant's point of view, it's crucial. *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367-68, 66 USPQ2d 1801, 1808 (Fed. Cir. 2003) (suggesting that failing to bring an application to the attention of an examiner of a related application might be inequitable conduct, MPEP 2001.06(b) notwithstanding).

**F. Proposed 37 C.F.R. § 1.261(a) is Unwise – It Imposes Burdens Far Beyond Any Conceivable Savings**

**Comment 36.** Proposed 37 C.F.R. § 1.261 would permit the Office to withhold examination of most of an application unless an applicant to "[identifies] all the limitations of the independent claims and designated dependent claims that are disclosed by [each reference provided on an the reference" and provides "a detailed explanation of how each of the independent claims and designated dependent claims are patentable over the references cited with the particularity required by § 1.111(b) and (c)."

A simple consideration of the practical numbers shows that this proposal is simply ridiculous.

The commercial practical reality is that applicants generally commission prior art searches for their most commercially important inventions. Such a search generally turns up 10 to 30 references. There will also likely be several applications filed to interrelated features, and the examiners of these applications may well turn up 10 or 15 references in each of these. Thus, **for reasons that are entirely good proper in light of the public policy underlying the patent system,** there may well be 100 references cited in an important patent application.

For reasons set out in §§ II.D.1 and Background Observation: Large Applications Are Good, and Are Filed Only for Reasons that Advance the PTO's Mission – The PTO's Efforts to

Discourage and Burden Them Lack Rational BasisIII.A, an important patent application may well have 100 claims – not out of any nefarious motive, but simply because the law demands many claims in order to adequately protect the invention in light of various legal doctrines and uncertainties.

Thus, applications directed an important inventions reasonably commonly include 100 claims and 100 references supplied by IDS. The proposal ***selectively burdens the most commercially important patent applications***, and could easily require **10,000 showings.**

The costs do not end there. Each of these showings must be written ***very*** carefully, much more carefully than the typical Office Action. In many cases, each would take between an hour and three hours of attorney time - $200 to $1800.

Thus, the proposal would raise costs by ***hundreds of thousands of dollars*** selectively imposed on ***the most commercially important patent applications***, the ones that most strengthen the U.S. economy.

In its 2001-02 fee request to Congress, the PTO stated that its adjusted fee schedule matched up to the costs of such applications. If this is not true, then the PTO should readjust its fee schedule, and give examiners examination time corresponding to the increased fees, so that important applications are given the examination they deserve.

**Comment 37.** The proposal expressly requires an applicant to irrelevant issues: in an ESD, the ways in which a reference ***matches*** a claim are irrelevant; the relevant facts are how the reference ***differs***. The proposal could easily add ***hundreds of millions of dollars*** to annual prosecution costs nationally, of ***minimally-productive "busy work."***

**Comment 38.** 20% of the costs mentioned above would likely fall on small businesses.

### G. Proposed 37 C.F.R. § 1.261(a) is Unwise – A Number of the Proposals Here Have Been Tried in the Past, and Found to be Failures

**Comment 39.** Proposed 37 C.F.R. § 1.261 replows ground known to be sewn with failure.

For example, proposed 37 C.F.R. § 1.261(a)(2), (3) and (4) resurrects provisions of 37 C.F.R. § 1.92 and 1.93 that were amended out of these rules in 1992 when they were found to be unworkable. Rule 261 should not repeat mistakes of the past.

The *Festo* line of cases puts great incentives on applicants to do prior art searches. The PTO may be able to come up with reasonable ways to increase these incentives, working with members of the patent bar. However, unilaterally removing the requirement that the PTO follow principles of "compact prosecution" – while maintaining the full burden of compact prosecution on applicants – is inefficient and unfair.

The Notice articulates no underlying facts that suggest that this rule will address the problem articulated, and no "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs*, 463 U.S. at 43. The rule cannot be promulgated on the record made thus far.

## H. Proposed 37 C.F.R. § 1.261(b) and (c), to the Degree it Requires Applicants to Withhold References, is Unwise

37 C.F.R. § 1.261(b) and (c) make it difficult or impossible to submit references in certain circumstances, for example, references relating to dependent claims.

**Comment 40.** Inequitable conduct is a big practical problem for the patent bar – clients' substantive patent rights, and practitioners' licenses to practice, depend on giving the PTO every reference that could conceivably be considered material. Proposed § 1.261(b) and (c) appear to be designed to aggravate the problem, not reduce its impact. The appropriate solution lies in appropriate fee levels, appropriate adjustments of the "counts" awarded to examiners for considering IDS', and various incentives relating to timing of examination. The PTO should not propose penalties that it lacks authority to impose, and should not propose procedures that will simply raise costs for everyone – including the PTO.

**Comment 41.** Proposed 37 C.F.R. § 1.261(b) requires applicants to withhold certain material references from the PTO, for example, documents relating to dependent claims that are not among those designated. This is unwise.

**Comment 42.** The PTO has no authority to abandon an application that meets all statutory requirements for examination, unless and until the application has been twice examined fully. § 1.261(c) exceeds the PTO's authority.

**Comment 43.** The ESD of Rule 261 will almost never be used: it requires too many admissions against interest, and will render any patent issuing on such an application all but unenforceable. Instead, applicants will reconfigure their applications in ways that still force the PTO to examine the entire application, but at higher cost.

**Comment 44.** By increasing the number of "inequitable conduct" issues litigated, this proposal will increase annual patent litigation costs by several tens of millions of dollars per year. About 20% of this cost will fall on small entities.

## I. Proposed 37 C.F.R. § 1.704(c)(11), Reduction in Patent Term, is Contrary to Statute

**Comment 45.** Patent term adjustment is specified by statute. 35 U.S.C. § 154. 37 C.F.R. § 1.703 attempts to redefine patent term, for example, by attenuating patent term for not filing an ESD within 1 month. § 154(b)(2)(C)(ii) guarantees a minimum of three months to respond before patent term adjustment is lost.

It appears that the entire rule package received insufficient legal consideration before being proposed.

**Comment 46.** Currently, some patents have values of $1 million per day, and these patents often have hundreds of days of term extension. The proposed reductions in patent term will easily destroy ***hundreds of millions*** of dollars in business value annually, and likely ***billions***. Such patents are often owned by universities and small biotech companies. The cost of this proposal on small businesses is easily $100 million per year.

### J. Suggested Refinements to the Proposal If it Is Adopted

**Comment 47.** The rules should be amended to permit a designation of claims, without an examination support document, that varies with the filing fee paid.

For example, the number of claims to be examined without an examination support document could be 30% of all claims, or 10, whichever is greater.

The proposal might work reasonably well in situations where claims are allowed on first examination. In most art units, this is a rarity. The rule should make clarified that no originally-filed claim may be finally rejected until it has been twice examined.

### K. These Proposed Rules Put the PTO at Substantial Financial Risk

**Comment 48.** A great many of the proposals in the two rule packages are either beyond the PTO's legal authority, or arbitrary and capricious. The proposals will lead to substantial Administrative Procedure Act litigation. The PTO will bear perhaps $1 million dollars of annual litigation costs for many years. Very likely, the PTO will be forced to reimburse attorney fees of several million dollars per year under the Equal Access to Justice Act. *Pierce v. Underwood*, 487 U.S. 552, 572 (1988) (where patent expertise is required, the PTO will be ineligible for EAJA fee caps).

## IV. Alternative Proposals.

The problems addressed in the two Notices have well-grounded, and in some cases, legally-mandated solutions. Some are proposed here.

### A. The PTO Should Cut Down "Rework" By Enforcing Its Existing Rules Relating to "Compact Prosecution" and that Office Actions be "Complete," During § 131/132 Examination Phase

As noted above in Comment 1 above, the overwhelming cause of the PTO's "rework" problem is rejections that should not have gotten into a second Office Action – and often lacked colorable basis to be raised in a first. How can the PTO get the "junk rejections" out of its pipeline?

The PTO can cut its "rework" by 10-20% almost instantly by reminding the examining corps that the burden always lies on the PTO to support any factual finding or legal reasoning adverse to an applicant. The PTO lacks the authority to decide against an applicant without substantial evidence, lacks the authority to create new substantive law, lacks the authority to unilaterally abrogate published rules that protect applicants.

Reminding examiners of, and enforcing, the following rules – which already exist - will reduce the number of "junk rejections" by far more than the 5% attributed to these rule packages.

- At least the independent claims should be examined completely. Until a few years ago, most § 102/103 rejections were reasonably complete: phrase-by-phrase, the examiner would both designate portions of the reference relied on, and designate the particular object of the reference thought to correspond to the claim, by giving a reference number or name. *See* 37 C.F.R. § 1.104(c)(2) (for most rejections, requiring <u>both</u> a designation of portions relied on, and an explanation of pertinence). This changed remarkably in about 2001. Now 80% of Office Actions treat claims in large phrases, without precise

consideration of individual words, and commonly designate a large chunk of a reference – sometimes over an entire column – without explaining the pertinence to individual claim components. Many examiners consistently address only a few keywords of claims, treating them as free-standing components, and ignoring the interconnections.[18] The consequence is that claim limitations are often simply ignored. The practice of carefully addressing every claim limitation should be restored.

- Perhaps 10% of § 103 rejections state "No prior art discloses or suggests claim limitation x, but it would have been obvious to create x out of thin air because…" This is simply not permitted. *Motorola v. Interdigital Technology Corp.*, 121 F.3d 1461, 1466-67, 43 USPQ2d 1490, 1490-91 (Fed. Cir. 1997) (every element must be met by prior art, even elements that are "well known" standing alone).
- About half of all assertions of "inherency" or "official notice" lack the explanation of "fact or technical reasoning" required by MPEP § 2112 and 2144.03 – examiners frequently and freely create facts out of thin air. *See, e.g.*, 09/611,548, Action of 11/3/03 – over 60 assertions of official notice, after such notice was properly traversed.
- The words "as best understood" should be banned. If an examiner does not understand the subject matter, the examiner should phone for clarification, rather than waste a day writing an Office Action directed to the wrong subject matter. This is particularly acute in the "business methods" art units, where most examiners lack formal training or practical experience to understand the basic vocabulary of finance and business.
- The word "deemed" should be banned. When a PTO employee "deems" something, it is usually an explicit confession that the examiner (or Technology Center Director deciding a petition) lacks any evidence or legal authority. Overwhelmingly, the reason that no evidence or authority can be cited is that the proposition is simply wrong. PTO employees should be instructed that if they cannot identify evidence or legal authority, they cannot rely on bald assertion.

Applicants are understandably reluctant to sacrifice important patent rights when an examiner exceeds his/her adjudicatory authority by refusing to meet the minima required by PTO rules. The PTO should not be surprised at the resultant "rework" – any work done poorly the first time has to be redone.

As noted in Comment 1, a former Deputy Assistant Commissioner noted at the New York Townhall that examiners are not accountable for the costs that their bad work imposes on the PTO.[19] Bad work should affect examiners' performance appraisals, promotions, retention and award eligibility.

---

[18] See, *e.g.*, 09/239,194, Office Action of 4/3/2006 (Examiner complains that considering every limitation as required by 37 C.F.R. § 1.104(c)92) is too "burdensome")

[19] *See, e.g., Boundy v. Patent and Trademark Office*, E.D. Va. 03-CV-557A, Defendant [PTO's] Reply to Cross Motion for Summary Judgment (April 23, 2004) (PTO asserts that examiners have "free exercise of their [judgment]" in choosing whether to follow or ignore instructions of the Director in the MPEP and 37 C.F.R. § 1.104).

### B. The PTO Should Remind Its Employees that Procedure Matters

Too many PTO personnel regard procedure as something that simply doesn't matter – when asked to follow the rules, far too many PTO employees simply shrug them off, or make up new ones on the spot.[20] The Supreme Court disagrees. The Supreme Court has often commented that an agency cannot possibly make sound decision on the merits if it ignores procedure – no one can get the right answers if they don't ask the right questions:

> **Due process of law is the primary and indispensable foundation** of individual freedom. … As Mr. Justice Frankfurter has said: 'The history of American freedom is, in no small measure, the history of procedure.' But, in addition, the procedural rules which have been fashioned from the generality of due process are our **best instruments for the distillation and evaluation of essential facts** from the conflicting welter of data that life and our adversary methods present. It is these **instruments of due process which enhance the possibility that truth will emerge** from the confrontation of opposing versions and conflicting data. **Procedure is to law what scientific method is to science.**

*In re Gault*, 387 U.S. 1, 19-21 (U.S. Sup. Ct. 1967) (citations, footnotes, and quotations omitted). When PTO employees believe they can ignore the written rules, there is no framework for dispute resolution, and resolution of disputes drags out prosecution.

As noted above in Comment 1, the error rate in the examining operation is so high that constitutional due process is likely being violated. Though the PTO has published fairly extensive procedural guidance[21] that would, if followed, result in a much lower error rate, the PTO actively refuses to enforce its procedural rules – examiners are given absolute discretion to make up the rules and the law as they go along, and to ignore instructions from the Director or the Federal Circuit.

Very simply, the PTO should make clear to its employees that procedure matters, and that individuals do not have the authority to grant themselves "on the spot" waivers or make up exceptions that do not exist in writing. If the MPEP says that an examiner must make showings A, B and C to reject under section X, the examiner has not done his/her job if A, B or C is omitted. Examiners should not be compensated for work not done, and applicants' patent rights should not be attenuated.

### C. The PTO Should Provide Formal Enforcement of its Procedural Rules Relating to Examination of Claims

More formally, the problems identified in the Notices may be directly remedied by something already required by the administrative law: a procedure analogous to Fed.R.Civ.P. 12(b)(6). Rule 12(b)(6) provides that a civil complaint may be dismissed if the complaint omits pleading of an essential element of a *prima facie* case. At the 12(b)(6) stage, a court makes no attempt to evaluate the merits of a pleading; rather, it merely evaluates completeness. If the complaint is silent where it must speak, the court dismisses *procedurally* – that is, there is no

---

[20] *See, e.g.*, 09/239,194, IFW "Miscellaneous Incoming letter" of 7/24/05 (Summary of Interview with Supervisory Examiner: she states that she does not enforce procedural rules, and would not grant procedural relief); 09/385,394, Interview Summary 12/1/2005 (in a part of the interview not memorialized, Technology Center Director asks "What difference does [a procedural rule] make?")

[21] 37 C.F.R. § 1.104, and Manual of Patent Examining Procedure, Chapter 2100.

determination on the merits, no *res judicata* effect, and the plaintiff is usually free to replead the case. Rule 12(b)(6) enforces the "notice" function of a pleading.

Similarly, administrative law principles obligate the PTO to provide an analogous procedure: where either a 37 C.F.R. rule or the MPEP requires an examiner to address an issue (either a claim limitation, or a legal element of *prima facie* unpatentability), an applicant is entitled to, and must have a procedural venue to obtain, an Office Action that provides "notice" of the examiner's view on every such issue. There is no ***procedural*** right to ***correct*** examination, but there is a ***procedural*** right to ***complete*** examination, and examination consistent with the PTO's own rules[22]. At this procedural stage, the truth or falsity of the examiner's findings need not be tested – but the Office is required to ensure that all *prima facie* findings appear on paper.

This is directly required by well-established administrative law principles. First, a long and unbroken string of Supreme Court cases establish that where an agency has a manual, such as the MPEP, and renders a decision omitting considerations that are specified in that manual, the agency's decision is "illegal and of no effect"[23] This is an entirely different legal analysis than any consideration of the merits: for example, in *Service v. Dulles*, 354 U.S. 363, 374-76 (U.S. Sup. Ct. 1957), the Supreme Court vacated an agency decision because the agency had failed to set forth the reasons required by the agency's manual, but gave the agency leave to remake exactly the same decision on the merits, so long as it did so setting froth the reasons required by the manual.[24] The *Service* Court also makes clear that review for an agency's procedural compliance with its manual creates a right and supports a cause of action totally distinct from any direct review on the merits.

The Federal Circuit has regularly noted that these principles apply to the PTO just as they apply to every other agency of the federal government. For example:

> ... The examiner cannot sit mum, leaving the applicant to shoot arrows into the dark hoping to somehow hit a secret objection harbored by the examiner. The '*prima facie* case' notion ... seemingly was intended to leave no doubt among examiners that they must state clearly and specifically any objections (the *prima facie* case) to patentability, and give the applicant fair opportunity to meet those objections with evidence and argument. To that

---

[22] *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (constitutional due process property rights may arise under agency "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.")

[23] It is well established that when an agency acts contrary to its own manual, the resulting action is "illegal and of no effect." *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959) (emphasis added); *Certain Former CSA Employees v. Dept. of Health and Human Services*, 762 F.2d 978, 984 (Fed. Cir. 1985) (action in violation of agency's own regulation is "illegal and of no effect," emphasis added). The Supreme Court has decided essentially the same issue at least eight times, and has always recognized the distinction between the procedural obligation of an agency to follow its own procedural rules form making certain showings and the obligation of an agency to act correctly on the merits.

[24] *See also D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000) (setting aside agency decision because the agency's reasoning differed from the reasoning set out in the agency's handbook, even though the handbook had never been published in the Federal Register); *New England Tank Industries of New Hampshire v. U.S.*, 861 F.2d 685, 688, 694, 694 n. 17 (Fed. Cir. 1988) (a manual may be binding on the government even though it has not been published with the requisite formalities necessary to give it "force of law" to bind the public).

> extent the concept serves to level the playing field and reduces the likelihood of administrative arbitrariness.

*In re Oetiker*, 977 F.2d 1443, 1449, 24 USPQ2d 1443, 1447 (Fed. Cir. 1992) (Plager, J., concurring, citations omitted).

> The Commissioner has an obligation to ensure that all parts of the agency … conform to official policy of the agency, including official interpretations of the agency's organic legislation.[25] Otherwise the citizenry would be subject to the whims of individual agency officials of whatever rank or level, and the Rule of Law would lose all meaning …

*In re Alappat*, 33 F.3d. 1527, 1580, 31 USPQ2d 1545, 1588 (Fed. Cir. 1994) (*en banc*) (Plager, J., concurring). *In re Piasecki*, 745 F.2d 1468, 1471-73, 223 USPQ 785, 787-88 (Fed. Cir. 1988) teaches that the initial "burden to come forward" is totally separate from the burden of "persuasion," and the burden to come forward is "purely procedural:"

> … the Board evinced misunderstanding of the proper roles of the examiner's *prima facie* case and an applicant's rebuttal evidence. These are purely procedural devices. The concept of *prima facie* obviousness in *ex parte* patent examination is but a procedural mechanism to allocate in an orderly way the burdens of going forward and of persuasion as between the examiner and the applicant.

Both the Supreme Court and Federal Circuit have noted that a party may not simply introduce a reference in evidence and ask the other party and the court to figure out the relevance. The party has a burden to make an element-by-element showing, else the issue fails on procedural grounds. *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 811, 229 USPQ 478, 479 (U.S. Sup. Ct. 1986) (Supreme Court holds that obviousness has separate procedural and substantive components, notes that the Federal Circuit's silence on issues that were procedurally required makes substantive review impossible, and remands after expressly declining to opine on substantive issues); *Koito Mfg. Co. v. Turn-Key-Tech LLC*, 381 F.3d 1142, 1151, 72 USPQ2d 1190, 1197 (Fed. Cir. 2004) (merely placing a reference in evidence but providing no "demonstrate[ion] … how that reference met the limitations of the claims" fell below minimal procedural requirements for preserving an anticipation issue). The same reasoning applies to examiners.

Contrary to widely accepted misunderstandings by PTO personnel, the obligation to put something on paper clearly and timely is legally distinct from the question of whether the examiner's findings are right or not. The duty to come forward is procedural, not substantive,[26] and the duty to enforce that procedural obligation lies with the Director, enforceable by Rule 181

---

[25] The Federal Circuit has noted that "The MPEP … is entitled to judicial notice as the agency's official interpretation of statutes and regulations." *Refac Int'l Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1584 n.2 (Fed. Cir. 1996). The parallelism between *Alappat* and *Refac* clarifies that the Federal Circuit considers the MPEP as binding on the agency, and that it is the Director's duty to enforce it.

[26] *See also Equal Employment Opportunity Comm'n v. Shell Oil*, 466 U.S. 54, 74-75 (1984) interprets the EEOC statute, which is strikingly similar to 37 C.F.R. § 1.104(c)(2) and § 1.113(b), as a "notice" requirement, and specifically states that it is not a "substantive" requirement.

petition. Failure of an examiner to meet that procedural obligation is not appealable[27], and indeed, and examiner's silence often makes meaningful appeal impossible.[28]

35 U.S.C. § 131 requires that the "Director shall cause an examination to be made." An Office Action that is silent on required factors, or otherwise fails to comply with 37 C.F.R. or the MPEP is "illegal and of no effect" under the administrative law, and no examination at all under the patent law. When a claim limitation is totally omitted (in violation of 37 C.F.R. § 1.104(c)(2), MPEP § 2143.03, and Federal Circuit precedent), or the examiner asserts that prior art is "well known" but cites no evidence and gives no explanation in support (in violation of 37 C.F.R. § 1.104(d)(2) and MPEP § 2144.03(B) and (C)), the examiner is silent on the required showing on "reasonable expectation of success" for obviousness (in violation of MPEP § 2142 and 2143.02), etc. an applicant should be able to request that the Office Action be withdrawn and reissued in completed form.[29]

Requiring that Office Actions be complete will immediately cut back immensely on the amount of "rework." Until the PTO ensures that its work product meets the minimum standards required by law, and that every Office Action that goes out is complete, the PTO should not cut back on the few mechanisms applicants have to counter an examiner's failures.

### D. Petitions that Present Significant Legal Issues Should Be Decided by Legally-Trained Ombudsmen, not Technology Center Directors

The PTO should implement an "ombudsman" role somewhat analogous to the "practice specialists" formerly in T.C. 1600, to decide legal issues, including most petitions. Legal decisions should be made by lawyers, not managers.

Currently, the Petitions process is the only mechanism available by rule to compel an examiner to disclose his views, for example, a petition on premature final rejection when an examiner has kept his cards hidden until final or post-final papers. However, with few exceptions, the officials that decide petitions have neither the legal skills nor the incentives to enforce the rules. For example, only a few Technology Center Directors have law degrees, and their compensation structure only provides incentives to deny petitions.

---

[27] *See Ex parte Haas*, 175 USPQ 217, 220 (Bd. Pat. App. 1972) ("If the examiner fails to follow the Commissioner's directions in the M.P.E.P., appellant's remedy is by way of petition to the Commissioner since this Board has no jurisdiction over the examiner's action.") (Lidoff, examiner-in-chief, concurring), *rev'd on other grounds*, 486 F.2d 1053, 179 USPQ 623 (CCPA 1973); *Ex parte Johnson*, http://www.uspto.gov/web/offices/dcom /bpai/decisions/fd000873.pdf at 5 (BPAI 2001) (unpublished) ("We exercise no general supervisory power over the examining corps."); *Ex parte Gambogi*, 62 USPQ2d 1209, 1212 (BPAI 2001) (unpublished) (Board "declines to tell an examiner how to write a rejection.").

[28] *Ex parte Rozzi*, 63 USPQ2d 1196, 1200 (BPAI 2002) (unpublished) (Board refuses to adjudicate where examiner's work is incomplete); *Ex parte Braeken*, 54 USPQ2d 1110, 1113 (BPAI 1999) (same). The Board's statistics web pages suggest that nearly 10% of appeals cannot be adjudicated.

[29] *E.g.*, *Star Fruits v. PTO*, 393 F.3d 1277, 1285, 73 USPQ2d 1409, 1415 (Fed. Cir. 2005) (recognizing the jurisdictional difference between "test[ing] the examiner's theory of the case or the examiner's findings of fact," which are appealable, vs. "guard[ing] against the possibility of arbitrary or capricious behavior by examiners" when no findings appear on paper – which are petitionable).

In a substantial fraction of Decisions on Petition, both those rendered in Technology Centers and in the Petitions Office, the key legal proposition (or definition of key legal terms such as "moot" or "appealable") is based on an unsupported assertion of fact or law, or a recharacterization of the issue presented.[30] In many decisions, the paragraph stating the "legal" principles to be applied cites no authority, makes no attempt to distinguish the precedent cited in the Petition, and creates a new legal principle that is directly contrary to precedent.[31]

Petitions relating to incomplete examination (and other procedural aspects of the examination of claims) should be adjudicated by an ombudsman outside the chain of command of the Deputy Commissioner for Patent Operations. The Office of Ombudsman should be staffed with lawyers, preferably with real-world experience in the practice of law, not senior examiners who have no legal experience. Petitions adjudicators should be accountable for quality of PTO work product instead of production. For example, perhaps the ombudsman should report to the Commissioner for Patents (perhaps Office of GC?)

### E. 37 C.F.R. § 1.111(b) Should be Restored to an "Unduly Interferes" Standard

The need to amend arises for reasons and at times that are beyond applicants' control: prior art comes to light, further R&D reveals that the feature that must be most carefully protected has changed, infringers are detected in the market, the Federal Circuit changes the law, etc. For many years, the rules recognized this reality, and drew a fair deadline for filing amendments: supplemental amendments would be entered unless they "unduly interfere[ ] with an Office action being prepared" *E.g.*, 37 C.F.R. § 1.111(a)(2) (version of 2000). In 2004, Rule 111 was amended to provide that essentially no amendments – or even purely argumentative replies – would be entered after the lapse of the six month statutory period. New Rule 111(b) expressly disregards factors of the PTO's administrative convenience. At the time, the PTO offered no rationale from moving from an "unduly interferes" standard to an arbitrary date cutoff.

The difference between old Rule 111 and new Rule 11 is stark: new Rule 111 commits the PTO to <u>wasted work</u>, to <u>examining claims that applicants no longer care about</u>. When amendments must be made after the expiration of the 6-month period, an applicant must wait for a next Office Action – an Action that is known to be a waste – then file the necessary

---

30 In *Ramaprakash v. Federal Aviation Administration*, 346 F.3d 1121, 1122 (D.C. Cir. 2003), now-Chief Justice Roberts noted "Learned Hand once remarked that agencies tend to 'fall into grooves, ... and when they get into grooves, then God save you to get them out.'" *Ramaprakash* struck down an FAA decision that was based on agency "habit," without consideration for the agency's own precedent. Similarly, in the PTO, all too often, decisions on Rule 181 Petitions are based on "folklore" rules handed down from one ill-trained non-lawyer to another, without legal research. *See, e.g.*, 09/385,394, Decision of 11/8/05 (cites not a single precedent that has "force of law" in support of any proposition – precedent is only mentioned in statements that it will not be applied, based on an exception made up out of thin air by the T.C. Director); 09/385,394, Decision on Petition 12/30/2003 (makes up a new definition of "moot," with no citation to authority; subsequent decision of 5/4/2004 expressly refuses to defer to Supreme Court precedent on the issue).

31 09/385,394, Interview Summary 12/1/2005 (T.C. Director states that he refuses to even consider Federal Circuit or PTO precedent – it is not "helpful." "I am going to leave that to the petitions office.")

amendment, and then await examination of the desired claims. Needless to say, sometimes a continuation must be filed to obtain this further examination. The PTO cannot now complain about that too many continuations are filed.

The PTO should "make every effort to become more efficient" by designing its rules so that the total of costs borne by applicants and by the PTO are minimized. If the PTO attempts to simply reduce its own costs, without considering total costs, it will find that its cost cutting attempts are thwarted by operation of the elementary laws of economics.

**F. Alternative Proposals Relating to Fee Structures, Searches of Biotech Inventions, Etc. Have Been Offered In the Past But Are Not Considered in the Notice of Proposed Rulemaking**

A number of proposals have been offered by AIPLA, IPO, Phrma, and similar organizations to deal with some of the issues identified in the Notices of Proposed Rulemaking. The proposals relate to fee levels for large biotech genera, methods by which applicants can provide searches of large genera meeting the PTO's standards, etc.

These alternative proposals are not addressed in the Notice of Proposed Rulemaking, let alone does the Notice explain why the agency proposes to choose as it does. This is a failure of the Agency's duties under the Administrative Procedure Act. The PTO cannot promulgate such rules without the assistance of the public – alternative proposals must be considered. The PTO must address the alternatives offered, and give adequate reasons for whatever rule it eventually adopts. *Motor Vehicle Manufacturers Assn. of the U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 48 (U.S. Sup. Ct. 1983). The PTO must consider all the monetary costs attendant its proposed rule – it may not simply consider its own costs and ignore the costs it imposes on applicants. 463 U.S. at 55. Any rulemaking must address the root causes of problems that are apparent in the PTO's own statistics, discussed in § Comment 1. 463 U.S. at 34. The PTO must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" 463 U.S. at 43. The PTO must "consider[] the relevant factors" and avoid "clear error[s] of judgment." 463 U.S. at 43. The PTO may not "offer[ ] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 463 U.S. at 43.

**G. Examiner "Counts" Should be Calibrated to Work Per Application, Not "Flat Fee"**

The "count" system should be retailored so that counts correlate to the time or work needed to examine an application. One obvious basis for recalibration would be to award "counts" based on the filing fee paid for the claims examined (not including the claims withdrawn by restriction). The current "flat rate" count system introduces all kinds of pernicious incentives – it is not fair to examiners, and it is not fair to applicants. It results in bad work product from the PTO.

In preparing its request to restructure fee levels in 2001-02, the PTO's published documents stated that the PTO did an extensive study of its marginal costs with respect to additional claims, additional pages of specification, and the like. Thus, the PTO's own data gives good reliable instruction on how to fairly apportion the number of counts to examination work.

This will kill many birds with one stone. Restriction requirements will be applied more fairly, with the examiner now having an incentive to keep related claims together where they can be examined efficiently, instead of divided into applications that will be handled less efficiently. Large applications will be given more examination time, so that they can be examined thoroughly, and properly move to allowance, abandonment, amendment or appeal, without the need for several continuations to force a reticent examiner to speak. It will be more fair to examiners. It will be more fair to applicants. It will result in a more efficient allocation of PTO examination resources. Applications that are most likely to be litigated will be the applications that are most thoroughly examined.

The underlying assumption of both Notices of Proposed Rulemaking is that large applications are bad and expensive for the Office. This is misguided and directly harmful to the overall health of the patent system, as explained in § III.A. The assumption appears to be largely an artifact of the "flat rate" allocation of counts for all applications, large or small. Reapportioning counts to application size will properly balance the economic incentives on applicants, examiners, and the Office.

### H. Alternative Proposals for Allowing Applicants to Assist an Examiner in Focusing on the Relevant Issues

Patent attorneys recognize how ***immensely*** difficult it is to pick up a new application written by someone else, to get up to speed quickly, and to identify the key issues. Because it is so difficult, attorneys have developed a number of techniques for doing so. The PTO should view the Patent Bar as a valuable resource for ideas to improve efficiency. A few techniques may be shared here.

#### 1. This Area is Far More Amenable to "Soft" Incentive-Based Approaches than to Rule

Some problems are best addressed by rules with mandatory edges and consequences, some are better addressed by assuming that both parties (the examiner and applicant) have goals that are largely aligned, and allowing them to work together to reach that common goal, using whatever techniques work best for those two people, and providing "soft" incentives, for example, accelerated examination.

The Examination Support Document proposal is too rigid. It is ill suited to many cases, and will simply increase costs. As noted in § IV.E, above, when the PTO raises the total net cost of patent prosecution by imposing excessive costs for applicants, the natural laws of economics guarantee that applicants will adapt, and in doing so, will force a substantial fraction of those costs back to the PTO.

As a general rule, when examination begins, both parties are covered in ignorance – neither knows what prior art will develop. Any proposals must address this simple fact – patent examination and prosecution is a process of discovering information, sharing it, and amending to that new information as it arises. The more opportunities the PTO can create for applicants and examiners to communicate, inexpensively and on a best-current-guess, non-binding basis, the better. Like any other research project or negotiation, the parties must be given as much freedom as possible to determine the most efficient way to find the information that they jointly need to make a good decision.

**2. Pre-examination Interviews**

The pre-examination interview pilot program is an extraordinarily hopeful first step. This program should be expanded. Most applicants and attorneys want valid patents, and will happily assist the examiner in whatever way possible in doing a thorough examination. Because applicants are strongly motivated to obtain valid patents, and avoid inequitable conduct, a practice of documenting any focusing suggestions offered by applicants, should be sufficient to keep such processes on the up and up.

Examiners should be encouraged to phone applicants early and often – before first examination, before maintaining a rejection on the same art, etc. In several applications where a new examiner was assigned, and the new examiner was freed from the "no interviews before first Action" policy, he/she was able to interview the attorney as he/she started the case, and the attorney was happy to focus him/her down on the core issues. Things moved along nicely.

**3. The PTO Can Offer Incentives Within its Power to Grant**

The penalties proposed in the Notice of Proposed Rulemaking – refusal to examine claims, etc. are outside the power of the PTO to impose.

However, other incentives are available. The PTO could promise earlier examination for applications that include certain examiner assistance features (though this might give some applicants an improper way to manipulate patent term).

In 2001-02, the PTO stated that the new fee levels were calibrated to the PTO's costs. Further experience may show that that calibration was not accurate. If the PTO now believes that fee levels do not correlate to costs, it should propose a further adjustment.

The patent system is one of the things that has made the United States economy robust. Many of these proposed rules are directly contrary to the public policy underpinnings of the patent system. With few exceptions, they should not be adopted.

Sincerely,

HERITAGE WOODS INC.

**Silverberg, Fred**

**From:** Metzger, David R.
**Sent:** Wednesday, May 03, 2006 2:19 PM
**To:** 'Robert.Clarke@uspto.gov'
**Subject:** Comments on Proposed Changes to Practice for the Examination of Claims in Patent Applications, Notice of proposed rule making

Dear Mr. Clark:

Please find attached my comments regarding the Proposed Changes to Practice for the Examination of Claims in Patent Applications.

Regards,

David R Metzger

David R. Metzger
Sonnenschein Nath & Rosenthal LLP
7800 Sears Tower
Chicago, IL 60606
Tel. 312-876-8000
Direct 312-876-2578
Fax 312-876-7934



7800 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6404
312.876.8000
312.876.7934 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

**David R. Metzger**
312.876.2578
dmetzger@sonnenschein.com

May 3, 2006

The Honorable Jon Dudas
Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office
Mail Stop Comments
P.O. Box 1450 Alexandria, VA 22313-1450

Attn: Robert W. Bahr
Senior Patent Attorney
Office of the Deputy Commissioner for Patent Examination Policy

Re: Comments on the Proposed changes to Practice for the Examination of Claims in Patent Applications, 71 Fed. Reg. 61 (3 Jan 2006)

Dear Under Secretary Dudas:

This is to express my full support and adoption of the testimony and comments submitted by the American Intellectual Property Law Association (AIPLA) and Mr. Robert Vanderhye in opposition to the above-identified proposed rule-making. I incorporate herein by reference the AIPLA's and Mr. Vanderhye's comments.

I also note that claims are tricky because of the inherent ambiguities in the English language. The English language has long incorporated words from many languages, often with different words having similar but slightly different meanings. Indeed, a given word often can be interpreted differently by different persons. Accordingly, we have long used multiple claim drafting as a way to deal with the possibility of such different interpretations much later in the life of a patent, usually much later that the 2 year window within which a so-called "broadened" reissue can be filed.

May 3, 2006
Page 2

The proposed rule penalizes multiple claiming and will introduce unnecessary and wasteful machinations in order to both limit claims and deal with the peculiarities of the English language. In the end, for the reasons noted by the other commentators, it will not help the USPTO reduce its backlog problem.

For the reasons expressed by the commentators, and the AIPLA's and Mr. Vanderhye's reasons in particular, I submit that the proposed rules not be adopted, but that the USPTO first deal with it internal workforce and funding issues. Patent applicants can ride out a few years of backlog in order to retain our very good system that is highly effective at protecting innovators and their innovations.

Sincerely,

David R. Metzger