-----Original Message-----
**From:** James Bonnamy [mailto:bonnamyj@msu.edu]
**Sent:** Wednesday, May 03, 2006 11:46 PM
**To:** AB93Comments
**Subject:** 37 C.F.R. Part 1 Proposed Changes Comments

Dockets.Justia.com

# APPLICANT'S

# DUTY OF CANDOR VIS-À-VIS

# USPTO CONTINUATION-IN-PART

# EXAMINATION

By: Hal Milton
and student
James P. Bonnamy

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................1

    A.   Continuing Applications ..........................................................1

        1.   A Continuing Application Defined ....................................1

        2.   A Continuation-In-Part....................................................1

    B.   A False "CIP" As Compared to a True CIP ...............................2

        1.   All Claims Recite the New Subject Matter of a "CIP" .........2

        2.   Parent Inventor is not an Inventor of the New Subject Matter of a "CIP" ......................................................................2

        3.   Overlooked Prior Art Effective Against A "CIP".................4

    C.   The Public Burden of a Mis-labeled "CIP"................................4

II.  CURRENT LAW AND NEW SUBJECT MATTER ...............................5

    A.   CIP Prosecution within the USPTO .........................................5

        1.   USPTO Guidelines for Determining New Subject Matter....5

        2.   The USPTO's Reliance Upon A "CIP" Designation by the Applicant......................................................................7

    B.   Federal Law Governing CIP ....................................................8

        1.   Statutes..........................................................................8

        2.   The Tests Developed by the Courts ...................................9

        3.   Inconsistency in Applying Court-Developed Tests ............10

III. THE RESPONSIBILITY TO RELIEVE SOCIETY OF THE BURDEN OF MIS-LABELED "CIP" PATENTS FALLS ON APPLICANT AND USPTO..........14

    A.   Applicants' Duty of Candor ...................................................14

    B.   The USPTO Duty to the Public ..............................................15

IV.  THE PROPOSED CHANGES TO CURRENT CIP APPLICATION PRACTICE ........................................................................16

V.   PROPER CIP APPLICATION PRACTICE.........................................18

i

A.  Applicant Should Designate the Priority of Claims ......................................18

B.  Applicant Should Also Point Out "Inherency" for Priority ...........................19

C.  Applicant Should Notify USPTO of Public Disclosure .................................20

D.  New Inventorship Entity in CIP.................................................................22

VI.  ELECTIVE PROCEDURES TO FACILITATE CIP EXAMINATION .................22

A.  A CIP Should Serve as an Addition to a Generic Invention...........................22

B.  The Filing of a CIP Demands Abandonment of the Parent Application .........................................................................................23

C.  A CIP Should be Filed Via Amendment to the Parent Application..........24

VII.  CONCLUSION ...................................................................................25

ii

## I.   INTRODUCTION

### A.   CONTINUING APPLICATIONS

The practice of filing a "continuing" patent application containing a disclosure common to a prior filed, parent application and claiming priority to the filing date of the parent application is a concept that is unique to the United States patent system.

### 1.   A Continuing Application Defined

Under 35 U.S.C. § 120 and 37 C.F.R. § 1.78(a), a continuing patent application filed in the United States Patent and Trademark Office (USPTO) is entitled to the benefit of the earlier filing date of a previously filed nonprovisional application, or international application designating the United States, if the application is filed before the parent application's proceedings are terminated, abandoned, or allowed as a patent; claims the benefit of priority of the parent application; contains at least one inventor named in the previously filed parent application; and contains subject matter disclosed in the parent application in a manner sufficient to satisfy 35 U.S.C. § 112.[1]  The benefit of an earlier filing date is not conferred to any subject matter in a continuing application that would constitute new matter if inserted in the original parent application.

### 2.   A Continuation-In-Part

One form of a "continuing" application recognized by 35 U.S.C. § 120 and 37 C.F.R. § 1.78(a) is a continuation-in-part (CIP) application.  A CIP contains subject matter previously disclosed in a parent application and adds new matter.  Under the Manual of Patent Examination Procedure (MPEP), a CIP is an application containing "some substantial portion or all of the earlier nonprovisional application and *adding matter not disclosed* in the . . . earlier nonprovisional application."[2]  A CIP must satisfy the requirements of a continuing application and can be used to add new technology to the invention originally disclosed in a pending parent application.  It is an important requirement of a CIP that at least one inventor of the new subject matter disclosed in a CIP must also be an actual inventor of the prior art subject matter disclosed

---

[1] 35 U.S.C.A. § 120 (2005); 37 C.F.R. § 1.78(a)(4) (2005).
[2] Manual of Patent Examining Procedure § 201.08 (2005).

1

in the parent application.[3]  Claims in a CIP that are totally supported by the subject matter disclosed in the parent application receive priority of the filing date of the parent application, thereby overcoming "prior art" that might be applicable to the later CIP filing date but not applicable to the parent filing date, referred to as intervening prior art.  However, claims reciting features disclosed for the first time as new subject matter in the CIP are entitled only to the actual CIP filing date and are subject to intervening prior art.

**B.    A FALSE "CIP" AS COMPARED TO A TRUE CIP**

    **1.    All Claims Recite the New Subject Matter of a "CIP"**

Too many patent applications are filed as CIP applications where ALL of the claims recite subject matter disclosed for the first time in the CIP, i.e., none of the claims are entitled to a filing date earlier than the actual filing date of the CIP.  Such applications are mis-labeled as "CIP" applications and are not entitled to the benefit of an earlier filing date conferred by a true CIP designation.  Since all of the claims recite new subject matter and could be rejected over intervening prior art, intervening prior art the USPTO often does not apply, the application is mis-labeled, often intentionally, to avoid a statutory bar known only to applicant.

An example of where this is common is when there is an improvement to the invention disclosed in the parent application.  Because the disclosure of the parent and that of the child are related, the child is oftentimes mis-labeled as a "CIP," although none of the claims of the "CIP" were disclosed in the parent application.  Accordingly, the claims of the "CIP" do not deserve the priority date of the parent application.

    **2.    Parent Inventor is not an Inventor of the New Subject Matter of a "CIP"**

Many patent applications are filed as CIP applications adding at least one inventor of the parent to a different inventor of a new invention disclosed in the new subject matter of the "CIP" in order to fulfill the common inventorship entity required by 35 U.S.C. § 120 and 37 C.F.R. § 1.78(a). In many situations where a new inventor conceives new subject matter to a prior

---

[3] 35 U.S.C.A. § 120 (2005); 37 C.F.R. § 1.78(a)(4) (2005).

2

invention, the prior inventors are combined with the new inventor in the "CIP" to prevent the parent application from being applied as prior art to the "CIP" claims which recite the old subject matter plus the new subject matter of the "CIP." In other words, the invention of the parent was, in fact, prior art to the new invention of the new subject matter, i.e., the inventor in the parent made no contribution to the new subject matter.

A typical example of an error in inventorship occurs where inventors A and B invent a four wheeled, steerable vehicle powered by an internal combustion engine through a manual transmission, and thereafter a co-worker, C, invents and substitutes an automatic transmission in the vehicle, i.e., a new species. In many situations where C invents the automatic transmission while a U.S. patent application is pending in the names of A and B, a "CIP" is filed adding the new subject matter of the automatic transmission. The "CIP" frequently names the inventors A and B of the parent application along with C as the inventorship in the "CIP." This is simply inappropriate when neither A nor B had any input whatsoever in conceiving the automatic transmission. This mis-naming of inventors also avoids the issue in the USPTO of whether the substitution of the automatic transmission is obvious over the manual transmission of A and B. Clearly, had C invented the automatic transmission where A and B worked for a competitor, neither A nor B would be added to C's automatic transmission application as inventors. To the contrary, A and B's vehicle with the manual transmission would be prior art to C's vehicle with an automatic transmission. Also, if C invented the automatic transmission for the vehicle after A and B's manual transmission was public, e.g., in their issued patent, neither A nor B would be named as co-inventors with C in his application. It is only when C invents his automatic transmission while the patent application of A and B is still pending that A and B can be added to C's automatic transmission application to label it as a "CIP" to avoid an issue of patentability over the manual transmission of the parent. This is a situation where the "CIP" does not meet the requirement for a continuing application to include at least one inventor named in the parent application as an inventor in the new subject matter. Such a "CIP" application is not a true CIP and is not entitled to the filing date of the prior application. In fact, the prior application is prior art to the "CIP," again prior art the USPTO often does not apply.

3

### 3.    Overlooked Prior Art Effective Against A "CIP"

The USPTO normally does not challenge the claim of priority to the filing date of the "parent" application when a "CIP" is filed and frequently does not apply prior art effective against the actual CIP filing date. As pointed out above, there may be intervening prior art, and/or the parent application may, in fact, be prior art to the claims of the mis-labeled "CIP." In other words, the USPTO relies upon the "CIP" designation made by applicants and their attorneys and may not apply the invalidating prior art. This has resulted in defective patents that present fact issues, as distinguished from legal issues, that inhibit commerce and unnecessarily burden the courts.

### C.    THE PUBLIC BURDEN OF A MIS-LABELED "CIP"

Commerce may be inhibited by the mere existence of a patent that is labeled as a "CIP" alleging an earlier filing date when there is prior art which invalidates the patent, such as a public use unknown to the USPTO. The expense to invalidate such a "CIP" patent in litigation in a U.S. district court is a great hurdle for a competitor desiring to sell the product covered by the invalid claims of a "CIP" patent. Clearly the existence of a mis-labeled "CIP" patent owned by a large company presents a huge financial hurdle for a new company attempting to enter the marketplace and desiring to litigate the validity of the patent. Even if a competitor or a new company decides to disregard the challenges of patent litigation, the cloud of a lawsuit will discourage investment in the competitor or new company hindering growth and prosperity.

Furthermore, the filing of a parent application which does not include all of the subject matter of a "CIP" claiming priority from the parent, fails to give proper notice to the public. Based on the disclosure in the published parent application, competitors will believe both that any subject matter inherently disclosed but not claimed in that published application is dedicated to the public and also that any subject matter not disclosed is not deemed prior art by that published parent application.

In addition, the existence of mislabeled "CIPs" create an unnecessary burden upon the courts because the priority issues could easily be resolved during prosecution of the CIP application before the USPTO. This "CIP" practice is particularly egregious where an application

is labeled a "CIP" to avoid a statutory bar known only to the applicant relying upon the fact that the USPTO will not question the "CIP" priority status and allow the application to issue as a patent purporting to have a priority date before the defensive statutory bar.    Such patents unnecessarily burden courts with factual laden scientific inquiries.

This paper impugns the current "CIP" practice and suggests procedures for both attorneys and the USPTO to strengthen the examination of patents under 35 U.S.C. § 120 and 37 C.F.R. § 1.78, thereby relieving the courts of factual issues best resolved by the expertise of the USPTO.

## II.    CURRENT LAW AND NEW SUBJECT MATTER

### A.    CIP PROSECUTION WITHIN THE USPTO

#### 1.    USPTO Guidelines for Determining New Subject Matter

The USPTO does guide examiners and practitioners by defining what constitutes new subject matter. According to the MPEP, new subject matter is matter involving a departure from or in addition to the original disclosure.[4]    The disclosure has been defined by the MPEP as comprising of information contained in the specification, drawings, and the original claims.[5] Therefore, an invention disclosed in a CIP application is entitled to the benefit of an earlier filing date if it is properly disclosed in the specification, drawings, or claims of a prior application, and a claim for priority is made which references the prior application.    In order to satisfy the requisite level of disclosure, a patent application may explicitly disclose a device, or disclose a "device that inherently performs a function or has a property, operates according to a theory or has an advantage . . . even though [the application] says nothing explicit concerning [the function, theory, or advantage]."[6]    The MPEP uses the test set forth in *In re Robertson* as its basis for determining whether new matter is inherently described in a prior application.

> To establish inherency, the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill. Inherency,

---

[4] Manual of Patent Examining Procedure § 2163 (2005).
[5] Manual of Patent Examining Procedure § 608.01(l) (2005).
[6] Manual of Patent Examining Procedure § 2163.07(a) (2005) (citing *In re Smythe*, 480 F.2d 1376 (CCPA 1973)).

5

however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.[7]

Based on the above analysis, the MPEP has explicitly stated the rephrasing or rewording of a passage does not constitute new matter so long as the original meaning remains intact.[8] Additionally, corrections of an obvious error in the disclosure do not constitute new matter so long as the error and appropriate correction are readily apparent or "inherent" to one skilled in the art.[9] An illustrative hypothetical regarding inherent disclosure in a parent application was discussed *In re Smythe,* which is referenced by the MPEP:

> If the original specification of a patent application on the scales of justice disclosed only a 1-pound "lead weight" as a counterbalance to determine the weight of a pound of flesh, we do not believe the applicant should be prevented, by the so-called "description requirement" of the first paragraph of § 112, or the prohibition against new matter of § 132, from later claiming the counterbalance as a "metal weight" or simply as a 1-pound "weight," although both "metal weight" and "weight" would indeed be progressively broader than "lead weight," including even such an undisclosed, but obviously art-recognized equivalent "weight" as a pound of feathers. The broader claim language would be permitted because the description of the use and function of the lead weight as a scale counterbalance in the whole disclosure would immediately convey to any person skilled in the scale art the knowledge that the applicant invented a scale with a 1-pound counterbalance weight, regardless of its composition.[10]

Based upon the guidance given by the USPTO in their definition of what constitutes new matter, inherency has been incorporated into the test for determining whether particular subject matter is present in an application. Additionally, it is to be noted that, if the application indicates

---

[7] Manual of Patent Examining Procedure § 2163.07(a) (2005).
[8] Manual of Patent Examining Procedure § 2163.07 (2005).
[9] *Id.*
[10] *In re Smythe*, 480 F.2d 1376, 1384 (CCPA 1973).

6

a feature is essential, removal of that feature in a later, broader claim may not be supported in the CIP application regardless of inherency.[11]

## 2. The USPTO's Reliance Upon A "CIP" Designation by the Applicant

When a CIP application is filed, the USPTO does not determine whether the requirements of 35 U.S.C. § 120 are met;[12] i.e., the USPTO does not compare the disclosure of the CIP to the parent but merely accepts the applicant's designation of a CIP. Even with the overlying statutory requirement of shared subject matter between a CIP and a parent, the MPEP setting forth an explicit definition of what constitutes new matter, and a clear-cut inherency analysis, an examiner is still not required to determine whether an application satisfies 35 U.S.C. § 120. In other words, even though the USPTO has the expertise and the tools, which it uses in some instances to resolve new subject matter issues, it does not examine CIP applications regarding new subject matter issues vis-à-vis 35 U.S.C. § 120. Therefore, simply because there is an affirmative statement from the applicant setting forth a claim of priority for the CIP, a CIP may issue when it is not entitled to the priority of the earlier filing date. This has often resulted in the courts resolving the issues of new subject matter. Specifically, the MPEP provides:

> There is no need for the Office to make a determination as to whether the requirement of 35 U.S.C. 120, that the earlier nonprovisional application discloses the invention of the second application in the manner provided by the first paragraph of 35 U.S.C. 112, is met and whether a substantial portion or all of the earlier nonprovisional application is repeated in the second application in a continuation-in-part situation. Accordingly, an alleged continuation-in-part application should be permitted to claim the benefit of the filing date of an earlier nonprovisional application if the alleged continuation-in-part application complies with the other requirements of 35 U.S.C. 120.[13]

---

[11] Manual of Patent Examining Procedure § 2163.05 (2005).

[12] *Pennwalt Corporation v. Akzona Inc. and Armak Co.*, 570 F. Supp. 1097, 1102 (D. Del. 1983).

[13] Manual of Patent Examining Procedure § 201.08 (2005).

The MPEP guideline allows a CIP to issue as a patent without ever determining the priority date of each claim in the application. A more egregious practice is the filing of a CIP claiming priority of an earlier filed application when, in fact, the two applications share no common subject matter which would support a patentable claim generic to both disclosures. By relying upon the practitioner's designation of a CIP, the USPTO might not apply applicable intervening prior art. This procedure has resulted in numerous instances where courts have been required to resolve factual technical issues by determining whether "CIP" claims are supported by (inherent in) the parent application and therefore entitled to an earlier filing date.

Whether or not a "CIP" claims subject matter originally disclosed in the application from which it claims priority is a question of fact[14] and USPTO Examiners are experts in the art and very capable of deciding these factual issues, and the MPEP guidelines are already in place.

**B.    FEDERAL LAW GOVERNING CIP**

    **1.    Statutes**

There are essentially two statutes that pertain to the addition of subject matter in a patent application.[15]   The first paragraph of 35 U.S.C. § 112, requires a "specification [to] contain a written description of the invention . . . conclud[ing] with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[16]   However, 35 U.S.C. § 132 prohibits the addition of new matter in an application by expressly stating, "No amendment shall introduce new matter into the disclosure of the invention."[17]   While applying these statutes to CIP applications, courts have struggled to consistently determine whether subject matter contained in a CIP is allowable subject matter under 35 U.S.C. § 112 or inadmissible new matter under 35 U.S.C. § 132. If a court finds the new subject matter added and claimed by the CIP was not "inherently" described in the parent application "in such full, clear, concise, and exact terms as to enable any person skilled in the art

---

[14] *Augustine Medical, Inc. v. Gaymar Industries, Inc.*, 181 F.3d 1291 (Fed. Cir. 1999).
[15] The scope of this paper is not intended to deal with new matter in a reissue application, set forth at 35 U.S.C. §251.
[16] 35 U.S.C.A. § 112 (2005).
[17] 35 U.S.C.A. § 132 (2005).

SA050

to which it pertains . . . to make and use the same,"[18] the court will view that subject matter as new matter and reject the application for priority of that claimed subject matter on a § 132 basis. However, if a court finds the new subject matter of the CIP was properly disclosed, or was inherent in the original disclosure, the claimed subject matter will be allowable under § 112 and will be given the benefit of the filing date of the earlier disclosure of the parent application as provided under § 120.

The rule to determine whether subject matter is allowable under § 112 or prohibited under § 132 appears to be straight forward: for a claim in a later filed application to be entitled to the filing date of an earlier application under 35 U.S.C. § 120, the disclosure of the earlier application must reasonably convey to one skilled in the art that the inventor possessed the later claimed subject matter at the time the earlier application was filed.[19]  Said in the converse, a claim in the CIP application cannot embrace an invention not described or inherent in the parent application as filed in order to obtain priority to the parent application, at least when adverse rights of the public have intervened.[20]  However, the application of the straight forward rule by the Court of Appeals for the Federal Circuit has resulted in various conclusions arrived at by different methodologies, all technology or fact dependent.

### 2.    The Tests Developed by the Courts

The federal courts have held that an invention claimed in a CIP is the same subject matter as that disclosed in the parent and thus is "entitled to the earlier filing date of the parent application when the claimed invention is described in the parent specification in a manner that satisfies, inter alia, the description requirement of 35 U.S.C. § 112."[21]  This ruling has been furthered interpreted to define same subject matter as anything that is not new matter. "In other words, a claim complies with 35 U.S.C. § 120 by satisfying the written description requirement of § 112 and acquires an earlier filing date if, and only if, it could have been added to an earlier application *without* introducing new matter."[22]  In other words, subject matter claimed in a CIP is

---

[18] 35 U.S.C.A. § 112 (2005).

[19] *The Gentry Gallery, Inc. v. The Berkline Corporation,* 134 F.3d 1473 (Fed. Cir. 1998).

[20] *Leathem S. Stearn v. Superior Dist. Co.,* 674 F.2d 539, 544 (6th Cir. 1982).

[21] *Therma-Tru Corp. v. Peachtree Doors Inc.,* 44 F.3d 988, 992 (Fed. Cir. 1995).

[22] *Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.,* 112 F.3d 1561, 1564 (Fed. Cir 1997).

9

considered the same subject matter as that originally disclosed in the parent application if the subject matter contained within the CIP could additionally be claimed in the parent application, i.e., the disclosure of the of the parent application adequately supports the claimed subject matter of the CIP in a manner that sufficiently satisfies the § 112 description requirement.

Clearly this leads to a factual determination in determining inherency or equivalents in technical terms, e.g., scientific or engineering terms. The test to determine if subject matter in a CIP is the same subject matter as that depicted by the original application has been stated as "whether the disclosure of the application as originally filed 'reasonably conveys to the artisan that the inventor had possession at the time of the later claimed subject matter[,]' rather than the presence or absence of literal support in the specification for the claim language."[23] The inherency or equivalents test is fact driven in the understanding of a person having ordinary skill in the art. This understanding of a person skilled in the art often results in expensive litigation with experts in the field of art surrounding the converted patent. On the other hand, the USPTO examiners are experts in the pertinent field of art and can decide whether the claims of a CIP application are supported by the parent application and, therefore, entitled to a priority claim.

### 3.    Inconsistency in Applying Court-Developed Tests

In *Narda Microwave Corp. v. General Microwave Corp.*, Narda filed a patent application, the '439 application, for a narrow-band radiation monitor which utilized highly conductive antennas with negligible resistance.[24] While the Narda '439 application was pending, Narda became aware of General's public invention, and thereafter Narda filed a "CIP," the '914 application, for a broad-band radiation monitor that incorporated resistive interaction with incoming radiation and claimed priority of the '439 application.[25] Narda's claim for priority allowed the '914 "CIP" application to overcome General's invention as prior art and issue as the '914 "CIP" patent. In this litigation, General challenged the '914 "CIP" patent's claim to priority so that General's invention was prior art to the '914 "CIP" patent, i.e., an intervening statutory bar.

---

[23] *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 334 F. Supp. 2d 197, 226 (N.D.N.Y. 2004).
[24] *Narda Microwave Corp. v. General Microwave Corp.*, 675 F.2d 542 (2d Cir. 1982).
[25] *Id.* at 548-49.

As a result of the USPTO allowing the CIP to issue without determining whether the '914 "CIP" patent satisfied the requirements for a claim of priority to the parent application under § 120, the court had to resolve the factual question of whether the '914 "CIP" patent claimed the "same" subject matter as the parent application. After an in depth study of microwave radiation and a thorough analysis of the parent '439 application's disclosure, the court held "[t]he use of high resistance in the '914 patent distinguished it significantly from Narda's '439 parent application" and therefore was not entitled to the filing date of the '439 parent application.[26]  In fact, not a single claim in the '914 "CIP" patent was held to be supported by the '439 parent application, and as a result, the entire '914 "CIP" patent was found to be invalid as having been anticipated by General's intervening invention.[27]

The '914 "CIP" patent was initially filed as a "CIP" for the sole purpose of gaining priority over General's intervening invention. It was in no sense a continuation of the invention in the '439 patent, it was an independent invention; an independent invention first made by General, perhaps not even an invention actually made by the Narda inventors because the invention claimed in the '914 "CIP" application had not been made by an actual reduction to practice before filing the "CIP" application. As an additional matter, because the USPTO respected the claimed priority for the '914 "CIP" patent and used it against General, the original claims of the application to General's invention were amended during prosecution in order to distinguish it from the disclosure in the '914 "CIP" patent. Therefore, under the doctrine of file-wrapper estoppel, General was prevented from arguing the invention in the '914 patent infringed the General patent even though the General patent was found to have anticipated the '914 "CIP" patent.[28]

As a result of the USPTO issuing the '914 "CIP" patent as a "CIP," when it was not a CIP, General was wrongfully forced to limit the scope of its patent and precluded from collecting damages that resulted from Narda's infringement of the General patent. Narda was allowed to unjustly benefit from its false "CIP" claim by being able to freely use the invention of a competitor. This situation could have been avoided if the USPTO would have made the factual

---

[26] *Id.* 548.
[27] *Id.*
[28] *Id. 549.*

determination of whether the claims in the '914 "CIP" application were, in fact, supported by the parent application.

In *Augustine Medical, Inc. v. Gaymar Industries, Inc.*, a CIP application was filed and issued as United States Patent No. 5,405,371 (the '371 "CIP" patent) that claimed priority to a parent application filed on June 10, 1990.[29] The '371 "CIP" patent claimed that only a portion of a warming blanket covers a patient, which was not disclosed in the parent.[30] The applicant argued that the '371 "CIP" patent should be entitled to the priority date of the parent application because the new subject matter was inherent in the parent application since the limitation was reasonably conveyed to one skilled in the art based upon the disclosure of the parent application.

In holding the judgment of invalidity of the '371 "CIP" patent, the court held there was no inherency between the '371 CIP patent and the parent application.[31] Using a blanket to cover a portion of a person, instead of all of a person, was found not to be inherent and recognizable to persons of ordinary skill in the art.

The court also applied an inherency analysis in *Tronzo v. Biomet*, where a "CIP" application included claims to an artificial hip socket having a cup with a generic shape and issued as United States Patent No. 4,743,262 (the '262 "CIP" patent).[32] The "CIP" application recited the shape as "a spherical, conical, trapezoidal, or other suitable outer surface." The parent patent describes the shape as a "trapezoid," a "truncated core," or a cup of "conical shape;" all used to describe the same cup, and not three different cup species. It was conceded that intervening prior art would invalidate these generic claims. The Court of Appeals for the Federal Circuit concluded that the specification of the parent application did not meet the written description requirement of 35 U.S.C. § 112 and that the generic "CIP" claims were not entitled to the parent application's filing date.[33] In reaching this conclusion, the court determined the disclosure of the generic shape was not inherently disclosed in the parent application. The court stated "[a] disclosure in a parent application that merely renders the later-claimed invention

---

[29] *Augustine Medical, Inc. v. Gaymar Industries, Inc.*, 181 F.3d 1291 (Fed. Cir. 1999).
[30] *Id.*
[31] *Id.* at 1303.
[32] *Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998).
[33] *Id.*

12

obvious is not sufficient to meet the written description requirement; the disclosure must describe the claimed invention with all its limitations."[34] Therefore, it is not permissible to mis-label a "CIP" just to avoid an obviousness issue over an earlier filed application.

In *Kennecott Corp. v. Kyocera International*, a CIP application issued as United States Patent No. 4,179,299 (the '299 CIP patent) and claimed a sintered ceramic body having a predominately equiaxed structure.[35] The '299 CIP patent contains a substantial part of the disclosure of the parent application, plus a photomicrograph and a description of the equiaxed microstructure.[36] However, the words "equiaxed microstructure" were not present in the parent application.[37] Kennecott argued that the microstructure claimed in the '299 CIP patent was inherent in the structure of the product disclosed in the parent application and that the '299 CIP patent should therefore be entitled to the benefit of the earlier filing date.[38] Kyocera claimed the specification of the parent application was silent as to the microstructure of the product and one would not know whether the product had the claimed microstructure merely by reading the specification of the parent application.[39]

The court concluded that an inherent property of a product first disclosed in a subsequent patent application does not deprive that product of the benefit of an earlier filing date, nor does the inclusion of a recitation of that property in later filed claims change this result, stating that one skilled in the art could readily determine that the microstructure was present in the product even though it was not described in the specification of the parent application.[40]

In *In re Smythe*, the court determined whether the use of the term "inert fluid" in the claim was supported by the specification which described "air or other gas."[41] The court concluded that the use of the "inert fluid" would naturally occur to one skilled in the art upon

---

[34] Id at 1158.
[35] *Kennecott Corporation, v. Kyocera International, Inc., 835 F.2d 1419 (Fed. Cir. 1987).*
[36] *Id.* at 1420.
[37] *Id.*
[38] *Id.* at 1421.
[39] *Id.*
[40] *Id.* at 1422.
[41] *Id.* at 1382.

reading the description of the use of "air or other gas."[42]  By inference, the court resolved the fact issue by determining that a man skilled in the pertinent art would interpret "air or other gas" to inherently include or be equivalent to an "inert fluid."

As the above decisions indicate, the straight forward rule regarding new subject matter, that the disclosure of the parent application must reasonably convey to one skilled in the art that the inventor possessed the later claimed subject matter at the time the parent application was filed, is not consistently applied and is dependent upon the facts of the art in question.  In short, the cases are fact driven and dependent upon the particular technology or subject matter involved, and perhaps biased by the equities, i.e., the equities of intervening rights.  Such fact questions could be more efficiently and more expertly resolved in the USPTO by the examiners who are most familiar with the terms of the technology being claimed.  Resolving the issue during prosecution would eliminate the uncertainty of what constitutes a valid CIP under § 120, and it could prevent "CIP" patents from issuing that share no similar subject matter with their parent application.  Of course, this can not be accomplished by the USPTO without the cooperation of applicants.

## III.    THE RESPONSIBILITY TO RELIEVE SOCIETY OF THE BURDEN OF MIS-LABELED "CIP" PATENTS FALLS ON APPLICANT AND USPTO

The mis-labeled "CIP" is the result of two deficiencies in the current practice, the first by applicants and the second by the USPTO.  However, in order for the USPTO to fulfill its responsibility to the public, applicants must exercise more candor before the USPTO in the first instance.

### A.    APPLICANTS' DUTY OF CANDOR

Applicants are in a position to know all of the facts surrounding the filing of a "CIP" but do not advise the USPTO of these facts which are relevant to the examination.  For example, a "CIP" is often filed to avoid an intervening statutory bar (prior art) without advising the USPTO of this important fact.  On the face of it, the USPTO, has no reason to question a claim of priority to an earlier filing date.

---

[42] *Id.* at 1383.

Most often, an application is mis-labeled as a "CIP" to acknowledge the addition of new subject matter yet the applicant treats the new subject as being "inherent" in the disclosure of the parent, an apparent inconsistency. The "CIP" is filed with claims using terminology added as new subject matter whereas the applicant believes or advocates that this new terminology is "inherent" in the subject matter of the parent application. However, the applicant does not advise the USPTO of this inconsistency, nor the statutory bar reason for creating the inconsistency. The issue can be very clouded when the new subject matter co-mingles terminology believed to be "inherent" with terminology clearly new subject matter, e.g., an additional species.

Under Rule 56, an "individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability."[43] The USPTO instructs examiners to place importance on this regulation, and it results in the examiners unquestionably relying on many of the designations made by an applicant. In addition to relying on an applicant's designation of what subject matter is entitled to the priority of a parent application, examiners also rely on applicants statements concerning the history of an application or the history of a related application.

The fact that claims presented in a CIP rely on support in the parent application to avoid a statutory bar certainly falls within the "duty to disclose . . . all information . . . material to patentability." This "duty of candor and good faith" inures to the benefit of the public but is only useful to the public if the patent identifies the priority date of each claim in a CIP so that the public can assert intervening prior art. The change to 37 C.F.R. 1.78 addresses this by requiring a designation of claims in a CIP supported by the parent application.

## B.    THE USPTO DUTY TO THE PUBLIC

The purpose of a CIP is to add and claim new subject matter that is patentably indistinct and usually falls under generic claims supported by the parent application. Again, a true CIP contains generic claims supported by the parent and patentably indistinct species or more specific claims supported only by the new subject matter. If the parent is not abandoned it

---

[43] 37 C.F.R. § 1.56 (2005).

15

should contain all generic claims leaving only new matter claims in the "CIP," which is then not a CIP as the claims therein are not entitled to the filing date of the parent. If the so called "CIP" contains only claims supported by the new subject matter, then there may be an issue of patentability of the new subject matter claims over the disclosure of the parent application.

Currently, the USPTO properly does not challenge the designation of a CIP because it relies upon the affirmations of the applicant. However, this failure to examine the propriety of a CIP designation has placed an undue burden upon the public in general, and the courts, in particular. Accordingly, commensurate with applicants' duty to disclose the use of a CIP to avoid a statutory bar, the USPTO should determine whether the claims to which an applicant seeks to attach the priority of a parent application are, in fact, supported by the subject matter of the parent application under 35 U.S.C. § 112.

## IV.    THE PROPOSED CHANGES TO CURRENT CIP APPLICATION PRACTICE

The USPTO has currently proposed several changes to the current continuing application examination practice in order to facilitate and regulate the efficient and proper continuing application examination and issuance. Under 35 U.S.C. § 2(b)(2)(A), the USPTO is granted the authority to establish rules and regulations, not inconsistent with the law, to govern the proceedings in the Office.[44] The USPTO has enacted the authority of this statute as it feels the current unrestricted ability to file multiple continuing applications is significantly increasing the backlog of applications and directly impacting the Office's ability to examine new applications.[45]

The revised rules would require an applicant filing a second or subsequent continuing application to include a statement requiring the approval of the Director explaining why the amendment, argument, or evidence included in the second or subsequent continuing application could not have been submitted in the parent application.[46] Proposed 37 C.F.R. § 1.78(d)(1)(i) would permit an applicant to file a first CIP on an initial application, and it would also allow the applicant to file a second CIP claiming the benefit of the first CIP. However, the proposed rule

---

[44] 35 U.S.C.A. § 2(b)(2)(A) (2005).
[45] Changes To Practice for Continuing Applications, Requests for Continued Examination Practice, and Applications Containing Patentbaly Indistinct Claims, 71 Fed. Reg. 48, 49 (Jan. 3, 2006) (to be codified at 37 C.F.R. pt. 1).
[46] *Id.* 50

would not permit the second CIP to claim the benefit of the initial application without the approval of the Director. On its face, the proposed regulation places no limit on the number of successive continuing applications as long as they are granted the approval of the Director.

In addition to limiting the number of CIPs filed, the proposed rules attempt to aid examiners in distinguishing the subject matter that is entitled to the priority of the parent application from the new subject matter disclosed for the first time in the CIP. Propsed 37 C.F.R. § 1.78(d)(3) would require an applicant filing a CIP to "identify which claim or claims in the continuation-in-part application are disclosed in the manner provided by 35 U.S.C. 112, ¶ 1, in the prior-filed application."[47] If an applicant fails to identify a claim as being entitled to the priority of the parent application, the claim will be treated as having the filing date of the CIP.[48] The proposed rule would not require an applicant to justify or substantiate his or her assertions, but it would allow an examiner to assert intervening prior art against those claims which the applicant does not designate as being entitled to priority.

The revised rules further attempt to limit the current backlog of applications by requiring applicants to submit all patentably indistinct claims in one application unless a good and sufficient reason is shown to allow them to be prosecuted in multiple applications. Proposed 37 C.F.R. § 1.78(f)(3) empowers the Office to require elimination of all patentably indistinct claims from all but one application in the absence of a good and sufficient reason for there being more than one pending nonprovisional application having a common inventor and owned by, or assigned to, the same person which contain patentably indistinct claims.[49] To assist the USPTO in enforcing the proposed 37 C.F.R. § 1.78(f)(3), proposed 37 C.F.R. § 1.78(f)(1) requires an applicant filing a nonprovisional application to identify all other pending nonprovisional applications having an effective filing date within two months of the filing date of the nonprovisional application naming a common inventor and having a common owner or assignee.[50] Furthermore, proposed 37 C.F.R. § 1.78(f)(2) would create a rebuttable presumption that the nonprovisional application contains at least one patentably indistinct claim when the

---

[47] *Id.* at 54.
[48] *Id.*
[49] *Id.* at 55.
[50] *Id.*

conditions of proposed 37 C.F.R. § 1.78(f)(1) are satisfied and the nonprovisional application has the same effective filing date as one of the other identified nonprovisional applications.[51] Proposed 37 C.F.R. § 1.78(f) would require applicants filing multiple applications containing similar disclosures to assist the USPTO in limiting the number of related CIP applications.

## V.    PROPER CIP APPLICATION PRACTICE

A proper CIP practice should begin with the practitioner and be supported by the USPTO, leaving the courts to address only legal issues and not technology issues, i.e., whether something is inherent in a technology or reasonably conveyed to one skilled in the technology.

There are a number of measures applicants can take to facilitate examination by the USPTO.

### A.    APPLICANT SHOULD DESIGNATE THE PRIORITY OF CLAIMS

As the case law exhibits, many applications are filed as "CIP" applications with claims meant to be supported by the parent disclosure and in words that are different but meant to be "inherent" in the original disclosure of the parent, i.e., that the claims meet the requirements of 35 U.S.C. § 112. If the new CIP claim limitations are "inherent," they are entitled to the filing date of the parent. Accordingly, if all of the claims in a "CIP" are meant to rely upon the disclosure of the parent, with the same language or inherent language, the application is really not a "CIP" but is, in fact, a continuation. Therefore, it is incumbent upon the applicant to designate the application a continuation if every claim is meant to rely upon the parent disclosure. If not, because the application also includes claims supported only by the new subject matter added to the "CIP," then the application is truly a CIP. Proposed 37 C.F.R. § 1.78(d)(3) would successfully address and prevent this issue by requiring claims supported by the parent to be identified in the CIP.

By designating an application as a CIP, applicant admits that the application contains new subject matter. It follows, that as a prerequisite to claiming a CIP priority, applicant must identify claims supported only by the newly added subject matter of the CIP. In accordance with

---

[51] *Id.*

18

the proposed 37 C.F.R. § 1.78(d)(3), any claim in a CIP that is not identified as being disclosed in the manner provided by 35 U.S.C. § 112, in the prior application will be treated as entitled only to the filing date of the CIP application.

This election parallels a restriction requirement wherein the applicant must identify the species upon which each claim reads. Such a designation should be repeated for each claim as it may be amended. Designating the claims entitled to an earlier effective filing date would guide examiners by specifically setting forth what prior art is applicable to each claim and would eliminate instances of erroneous "CIP" issuance. This procedure would fall directly under the duty to disclose information material to patentability. In this manner, the issue of whether the alleged claims are supported by the priority date is addressed in the most expertise venue, in the most efficient manner, and long before the public relies on invalid CIP claims.

In summation, the proposed rule to identify claims supported by the parent will force applicants to properly label an application a continuation when all claims are to be supported by the parent, thereby flagging the issue of inherency. The proposed rule will also guide examiners in applying intervening prior art effective against only those claims which are not entitled to the priority of the parent application.

## B.    APPLICANT SHOULD ALSO POINT OUT "INHERENCY" FOR PRIORITY

If the applicant wishes to use new subject matter terminology in the claims of a "CIP" and rely upon the priority of the parent filing date, remarks should be submitted as to why and where the new claim terminology is inherently supported by the subject matter of the parent application in accordance with the first paragraph of 35 U.S.C. § 112. Since the examiners are experts in the art being examined, they are certainly qualified to determine if subject matter is explicitly disclosed or inherent in the parent application. Of course, the applicant would be entitled to submit declarations from those skilled in the art to support the use of alternative and inherent claim terminology. Because it is very difficult for practitioners to foresee variants of an invention or the ultimate scope of an invention, the USPTO should be lenient in allowing alternative or broadening terminology. Clearly, the disclosure of a "lead" weight should support the broadening terminology of a "metal" weight, as "air or other gas" should support "inert

19

fluid." Additionally, all of a blanket covering a patient clearly supports at least a portion of a blanket covering a patient, and a conical cup supports generic terminology that covers "conical" as well as other geometrical shapes.

While proposed rule 37 C.F.R. § 1.78(d)(3) will indicate an applicant's intent to claim the priority of a parent application for a particular claim or claims in a CIP, the proposed regulation doe not go far enough. The proposed regulation must include a requirement to establish a basis for the claim to priority or to substantiate the claim. The examiner will then be able to apply his expertise in the relevant art to determine whether or not the claim to priority is justified. If an examiner merely relies on the applicant's assertion, courts will continually be burdened with the factual inquiries of whether claim terminology is inherently supported by the subject matter of the parent application. The determination of whether subject matter is inherent in a prior disclosure must be made in the venue having the greatest expertise before society is burdened with the consequences of a false "CIP."

## C.    APPLICANT SHOULD NOTIFY USPTO OF PUBLIC DISCLOSURE

In addition to declaring which claims in a CIP are entitled to priority and setting a basis for that priority, the applicant should also advise the USPTO of any public disclosure more than one year prior to the actual filing date of the CIP covered by any claim of the CIP.

Since "[a] patent by its very nature is affected with a public interest[,]"[52] it is important to make sure that patents that issue from the modified CIP practice spring from backgrounds free from fraud or other inequitable conduct and those patents are kept within their legitimate scope.[53]

---

[52] 37 C.F.R. §1.56 (2005). Duty to disclose information material to patentability
    (a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. ...
    ...
    (e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

[53] *Langer, Jr. v. Kaufman*, 59 C.C.P.A. 1261, 1265 (1972). (citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806 (1945)).

The Rule 56 standard is already being applied to various aspects of CIP practice. For example, in *The Li Family Ltd. Partnership*,[54] the court applied the standard to an applicant that withheld from the examiner a board's adverse findings of no priority for the CIP.[55] The court determined that the examiner relied on the applicant's omission in allowing the patent to issue and the court held the resultant patent unenforceable for inequitable conduct.[56]

The standard has also been applied when the practitioner does not cite intervening prior art. This intervening prior art arises between the time of the filing of the parent application and the CIP. Such a violation of the standard arose in *Fox Industries, Inc. v. Structural Preservation Systems, Inc.*, where the intervening prior art was a sales brochure published by the applicant that disclosed each and every feature of the claimed invention.[57] The court held that by not submitting the brochure, the applicant knowingly withheld material prior art from the USPTO and the patent was held unenforceable due to the finding of inequitable conduct.[58] This situation is likely to arise particularly when the prior art is the applicant's own disclosure and when portions of the matter being added are mistakenly relied upon to have priority to the earlier filing date.

An applicant should be required to disclose any public disclosure of any aspect of the invention claimed by the CIP occurring more than one year before the actual filing date of the CIP regardless of whether the applicant believes the claim to priority defeats the prior art reference. An examiner would then be able to determine if the public disclosure constitutes prior art within the meaning of 35 U.S.C. 102(b) in consideration of whether the applicant's designation of priority for a particular claim under proposed 37 C.F.R. § 1.78(d)(3) is substantiated by the disclosure of the parent application.

---

[54] *The Li Second Family Ltd. Partnership v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed. Cir. 2000).

[55] *Id.*

[56] *Id.*

[57] *Fox Indus. Inc. v. Structural Preservation Systems, Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1990).

[58] *Id.* at 803.

### D.    NEW INVENTORSHIP ENTITY IN CIP

Unless all of the same inventors are named in the CIP as are named in the parent application, an applicant should identify for the USPTO the contribution made to the new subject matter by the inventors named in the parent. Ideally, there should be an affirmation by any new inventor added in the CIP (not named in the parent) that the other named inventors common to the inventors of the parent application contributed to the new subject matter, i.e., that they contributed additional claimed subject matter to that which they disclosed in the parent. It must be made clear that the inclusion of the parent inventors in the "CIP" is not just to gain the priority of the parent filing date, and that the prior inventors did, in fact, contribute to the invention of the new subject matter of the CIP, i.e., that all of the inventors named in the CIP did, in fact, contribute to the invention of the new subject matter.

Requiring a positive affirmation by an inventor as to the inventorship would help to eliminate the issuance of "CIP" applications which include listing a prior inventor merely to establish the priority of a parent application. This requirement would help inventors and attorneys alike to understand the true requirements of a CIP.

## VI.    ELECTIVE PROCEDURES TO FACILITATE CIP EXAMINATION

### A.    A CIP SHOULD SERVE AS AN ADDITION TO A GENERIC INVENTION

According to 35 U.S.C. § 112, the claims of a patent application should cover only a single invention. The text of the statute makes it clear that the "specification [of a patent application] shall contain a written description of the invention, . . . [and] the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."[59] The singular form of "invention" dictates an application should contain only a single invention. Additionally, 35 U.S.C. § 121 allows the Director of the USPTO to restrict a patent application to one invention when "two or more independent and distinct inventions are claimed in one application."[60] These statutes indicate a patent application should contain only a single invention. In fact, most countries require one

---

[59] 35 U.S.C.A. § 112 (2005).
[60] 35 U.S.C.A. § 121 (2005).

claim in a single application to be broader than all other claims, thereby distinctly defining the single invention. This form of claim drafting is most easily accomplished by one independent claim followed by dependent claims. Therefore, if an application contains a single invention and a CIP continues that invention, the sole reason for filing a CIP application should be to add patentably indistinct variants, e.g., species, to the generic invention already claimed.

The parent of a CIP should contain at least one generic claim to a generic invention with the CIP adding new subject matter limitations via claims dependent on the generic claim. When evaluating a CIP, the examiner may find alternative and generic terminology in the broadest claims that was not present in the parent application and such should be given priority to the earlier filing date as a generic and inherent term. In fact, the filing of a CIP application should be accepted as a manner in which to set forth alternative or generic terminology not recognized when the parent application was first filed, so long as the new terminology meets the requirements of 35 U.S.C. § 112.

Proposed 37 C.F.R. § 1.78(f)(3), which requires applicants to submit all patentably indistinct claims in one application, would effectively reduce the number of patent applications claiming indistinct inventions. However, proposed 37 C.F.R. § 1.78(f)(3) unnecessarily requires the USPTO establish a link between patentably indistinct claims in a CIP and its parent application and require elimination of all patentably indistinct claims from all but one application.

## B. THE FILING OF A CIP DEMANDS ABANDONMENT OF THE PARENT APPLICATION

When an applicant files a CIP continuing the invention claimed in a prior application, the application should not be allowed to receive a second patent covering the same or a patentably indistinct invention as the USPTO set forth in proposed 37 C.F.R. § 1.78(f)(3). Courts' have additionally interpreted 35 U.S.C. 101 to allow anyone who "invents or discovers [to] obtain a patent."[61]   Additionally, courts have held that a "continuing application must be for the same

---

[61] 35 U.S.C.A. § 101 (2005).

invention."[62]  If the parent application is not abandoned, it will logically contain claims covering the subject matter disclosed in that parent application.  If the applicant files a CIP adding new subject matter, and the old subject matter is already covered by the claims of the parent application, only the new subject matter is left to be covered by the claims of the "CIP." However, in this instance the "CIP" application would no longer be a CIP because all of the claims recite new subject matter and would only be entitled to the actual filing date of the alleged "CIP."

No benefit is provided by permitting an applicant to file a CIP and allowing him or her to simultaneously prosecute the CIP contemporaneously with the parent application.  The complete spectrum of subject matter contained within the parent application can be claimed in the CIP and prosecuted in the same application, or the new subject matter can be prosecuted in a new non-continuing patent application, although a terminal disclaimer may be required.  The applicant will not be precluded from obtaining a patent by a prior art reference which is his own.  Under 37 C.F.R. § 1.130, "[w]hen any claim of an application . . . is rejected under 35 U.S.C. 103 on a U.S. patent or U.S. patent application publication which is not prior art under 35 U.S.C. 102(b), . . . and the inventions are owned by the same party, the applicant . . . may disqualify the patent or patent application publication as prior art" by submitting a terminal disclaimer.[63]

The proposed rules should require an applicant to abandon the parent in favor of the CIP instead of prohibiting two patent applications from containing patentably indistinct claims. This would promote efficiency within the USPTO, prevent applicants from filing CIP applications which have no claims with priority to an earlier filing date, and prevent two patents from issuing with patentably indistinct claims.

## C.    A CIP SHOULD BE FILED VIA AMENDMENT TO THE PARENT APPLICATION

Requiring an applicant to identify all other nonprovisional applications having an effective filing date within two months of the filing date of a CIP which also share a common

---

[62]*Indiana General Corp. v. Lockheed Aircraft Corp.*, 249 F. Supp. 809 (S.D. Cal. 1966) rev'd on other grounds, 408 F.2d 294 (9th Cir. 1968).
[63] 37 C.F.R. § 1.130 (2005).

inventor and assignee under proposed 37 C.F.R. § 1.78(f)(1) would help to prevent the filing of multiple patent applications claiming indistinct inventions. However, in order to facilitate examination by the USPTO, and in order to prevent the filing of CIP applications which contain entirely new subject matter, an exact copy of the parent application should be filed with a preliminary amendment adding the new subject matter to the end of the description of the parent and a "RELATED APPLICATION" paragraph at the beginning of the CIP. This new subject matter should equate, expand and correlate terminology between that of the parent and the new subject matter. The examiner may then make a simple comparison to assure that the parent application and CIP do not claim patentably indistinct inventions and that the new subject matter contained within the CIP is explicitly or inherently set forth in the parent application.

## VII.    CONCLUSION

The public is being burdened by a mis-use of the CIP practice which resides in the mis-labeling of an application as a "CIP" to avoid an issue of patentability before the USPTO. When an application is labeled as a "CIP," the USPTO frequently relies upon the date of the parent application and does not apply intervening prior art that is applicable to the actual filing date of the "CIP" application. The USPTO also relies upon the inventorship set forth in such "CIP" applications when, in fact, inventors from the parent application may be included in the "CIP" simply in order to claim priority via a "CIP" label. Patents issued from such mis-labeled "CIP" applications are great deterrents to competitors even though such competitors know of intervening prior art because of the great expense in litigating and proving that particular claims are not entitled to an earlier filing date and, therefore, do not avoid a statutory bar based upon the intervening prior art. The public at large is entitled to have such issues resolved by their USPTO. At present such "CIP" patents are often an impediment to competition that can only be removed by one adverse party carrying a large litigation burden whereas the public at large carries a lesser burden by resolving the issues during prosecution before the USPTO.

Accordingly, procedures should be implemented to strengthen the integrity of the CIP practice. Since many practitioners use the CIP practice to obfuscate the priority claims in a CIP, a CIP application should contain an affirmative statement identifying claims reciting only features supported in the parent application in accordance with 35 U.S.C. § 112, i.e., identify claims allegedly supported by the parent and therefore entitled to the filing date of the parent. As

25

a result, practitioners will be forced to recognize that, if all of the claims find support only in the new subject matter, the application is not, in fact, a CIP, and will not label it as such. The Examiner will then apply prior art based upon the actual filing date of the non-CIP application, thereby reducing the burden on the public and the courts. By rigorously following the CIP practice with one invention per patent, a parent of a CIP application will be abandoned and the CIP will contain both claims enjoying the filing date of the parent and patentably indistinct claims enjoying only the later filing date of the CIP.

In addition, to make sure a mis-labeled "CIP" does not include inventors of the parent simply to attain the priority when, in fact, none of the parent inventors is an inventor of the new subject matter of the "CIP," applicant should be forced to sort out the inventorship before filing. To make sure the inventorship issue has been addressed before filing, applicants should affirm to the USPTO that a new inventor named in the "CIP" co-conceived the new subject matter with at least one of the inventors named in the parent.

In addition, the modified CIP practice should encourage the practitioner to 1) submit a copy of the parent application along with the CIP showing amendments made to parent to attain the CIP; 2) claim any new subject matter in dependent claims; and 3) abandon the parent application. CIP applications that issue under the modified CIP practice will have a greater chance of avoiding litigation and/or withstanding validity and enforceability challenges during litigation. If practitioners abuse the modified CIP practice by omitting or misrepresenting information, then the court will hold the patent unenforceable on the grounds of inequitable conduct.



**INTELLECTUAL PROPERTY LAW ASSOCIATION OF CHICAGO**

P.O. Box 472 • Chicago, Illinois  60690-0472
312-987-1416

May 3, 2006

*2005-2006 Officers*

Mark I. Feldman
*(President)*

Debbie K. Wright
*(President-Elect)*

James R. Sobieraj
*(Vice President)*

Heather C. Steinmeyer
*(Secretary)*

Jeffrey B. Burgan
*(Treasurer)*

*2005-2006 Board of Managers*

Meredith Martin Addy
Sana Hakim
Paul R. Kitch
Edward D. Manzo
Jack D. Nimz
Stephen T. Scherrer
Kevin A. Thompson
Amy Crout Ziegler

Mary Jankousky Schnurr
*(Immediate Past President)*

The Honorable Jon Dudas
Under Secretary of Commerce for Intellectual Property
  and Director of the United States Patent and Trademark Office
Mail Stop Comments
P.O. Box 1450
Alexandria, VA  22313-1450

> ATT:  Robert W. Bahr
>    Senior Patent Attorney
>    Office of the Deputy Commissioner
>    for Patent Examination Policy

>    Comments on Proposed Rules: "Changes to Practice for
>    The Examination of Claims in Patent Applications
>    71 Fed. Reg. 48 (January 3, 2006)

Dear Under Secretary Dudas:

## I.    INTRODUCTION

The following comments are presented on behalf of the Intellectual Property Law Association of Chicago (IPLAC) regarding the United States Patent & Trademark Office's Notice of proposed rule making entitled "Changes to Practice for Examination of Claims . . ." published on January 3, 2006 at 71 Fed. Reg. 61.

IPLAC is the oldest intellectual property law association in the United States with over 1000 members in the Chicago area.  IPLAC's members include attorneys and patent agents in private and corporate practice, in government service and in the academic field, and a large number of IPLAC's members are patent practitioners who are registered to practice before the Patent Office.

IPLAC strongly believes that the proposed rule changes regarding claim examination practice, if enacted, would have a negative impact on applicants, would fail to resolve the Patent Office's problems and would have a negative impact on the public at large.  In addition to providing comments regarding the anticipated impact of the proposed rules, IPLAC submits several alternative suggestions that may be of assistance as the Patent Office evaluates options for solving the problems identified at its recent Town Hall meetings.

IPLAC thanks the Patent Office for providing this opportunity to submit comments regarding the proposed rule changes.

30791701.1

IPLAC thanks the Patent Office for providing this opportunity to submit comments regarding the proposed rule changes.

<u>Initial Comments</u>

Over the past ten years, the number of patent applications being filed has increased while until recently the funding of the Patent Office has not kept pace. There have been a number of reasons for the increase in the number of individual patent applications filed including, *inter alia*, a new fee structure and decisions by the courts narrowing the scope of patents and/or creating more uncertainty over the interpretation of claims. However, doubtless the overwhelming factor contributing to the increase in the number of patent applications being filed is the increased perceived value of U.S. patents.

Such a trend dovetails with the perceived path by which the United States will maintain itself as a leading economy in the world, as the U.S. migrates from a manufacturing age to that of an intellectual age in which intangible assets such as patents will play a major role. The capital markets have embraced such intangible assets, often valuing companies well above what their tangible assets would dictate.

Despite this change in the U.S. economy, the proposed new rules appear to be designed to stem the increase in patent application filings by making patents less valuable assets and increasing the cost of obtaining them. While increasing costs and decreasing value might reduce the backlog of applications which the Patent Office will need to examine, such an approach seems ill-advised and counterproductive to the overall needs of this country. Moreover, the approaches reflected in the current proposed rule changes will likely have little to no impact on the current backlog of patent applications but will severely increase costs and reduce the value patents. In summary, the proposed solution is far from the win-win solution that the Patent Office should be seeking and may actually be a lose-lose proposition.

## II.    THE PROPOSED RULES WILL NEGATIVELY IMPACT APPLICANTS

By practically limiting the number of independent claims or the number of claims that will be examined in a patent application to ten, the proposed rules will drive up the expense borne by applicants in obtaining patents, delay issuance, and make patent protection less available for the most meritorious of inventions.

The proposed rules work harm on applicants by treating all patent applications the same way, particularly with respect to the amount of resources the Patent Office should devote to each of them, regardless of the relative technological and economic importance of the inventions which they cover. The proposed rules effectively prohibit any patent application from containing more than ten independent claims.

Under the proposed rules, the Office would theoretically permit applications with more than ten claims at one time as long as applicants file an Examination Support Document (ESD). Proposed Rule 1.75(b)(1)(i). But only in the direst of circumstances would any applicant file such a document. This document requires preexamination searches of U.S. patents *and*

30791701.1

published U.S. patent applications *and* "foreign patent documents" *and* "non-patent literature." Proposed Rule 1.261(b). What libraries or collections of "foreign patent documents" and "non patent literature" should be searched to minimally meet this requirement is not stated. Applicants can omit a search in one or more of these categories only if "the applicant can justify with reasonable certainty that no references more pertinent than those already identified are likely to be found in the eliminated source and includes such a justification with the statement required by paragraph (a)(1) of this section" [statement that a preexamination search was made and identifying search logic, classes, subclasses and files]. *Id.* A justification to a "reasonable certainty" is an open invitation to any patent infringement defendant to challenge the enforceability of any patent which eventually issues on the grounds of inequitable conduct and fraud. In effect, no prudent practitioner would exercise this option.

The ESD compels further admissions against interest and prosecution history estoppel by requiring applicants to identify the presence of *each* claim limitation in *each* prior art document submitted under an accompanying information disclosure statement. Proposed Rule 1.261(a)(3). To the extent that practitioners identify claim limitations which are not really there, they open themselves up to estoppel and potential malpractice concerns. To the extent that practitioners do *not* identify such limitations or in their good faith judgment believe that they are not present, practitioners and applicants expose themselves to a later attack on the enforceability of the patent because of inequitable conduct and/or fraud. It is expected that the cost of preparing the proposed ESD, including prior art searches, will be in excess of ten thousand dollars (and perhaps a multiple of this depending on how many claims are at issue) and will be a large fraction of the cost of preparing the patent application itself.

Those inventions which are most deserving of patent protection often differ from the prior art not merely in just *one* way, but often in *several* ways. If the economic importance of the invention warrants it (and it often does), practitioners will draft multiple sets of claims, each of which define over the prior art in different ways. Within each such claim set, practitioners will at least consider whether independent claims should be drawn to (a) a component, (b) a system of which the inventive component is a part, (c) a method of making the invention, and (d) a method of using the invention. Practitioners will also consider whether independent claims of varying breadth (broad, medium, narrow) should be written. These considerations define at least three dimensions of a multi-faceted matrix of potential independent claims, and the total number of independent claims in this multi-dimensional matrix often exceeds ten.

To avoid the legal problems and cost of an ESD, applicants with broad inventions will be forced to do one or both of two things. First, applicants can try filing several patent applications instead of one -- at a considerable duplication of cost and effort (and possible restriction under the Patent Office's other set of proposed rule changes entitled "Changes to Practice for Continuing Applications . . ." published on January 3, 2006 at 71 Fed. Reg. 48). Under the proposed rules, applicants will have to predict (and with 20/20 foresight) what the Office's opinion will be concerning which claims are "patentably distinct" from which others because some of those claims will have to be canceled if "patentably indistinct" claims are found in more than one application. Proposed Rule 1.78(f)(3). How claims are grouped is a highly subjective exercise, to which different examiners will have different opinions, and about which applicants' attorneys can give only the loosest of predictions. Second, an applicant might have to pick and

30791701.1

choose which inventive aspects it wishes to cover, abandoning the rest to the public domain. Thus, by imposing claim number limits or alternatively imposing an onerous requirement for an ESD, the proposed rules discriminate against the most meritorious of inventions and effectively preclude their inventors from obtaining full patent protection.

## III.    THE PROPOSED RULES WILL FAIL TO SOLVE THE PATENT OFFICE'S PROBLEMS

The rule changes proposed by the Patent Office will not solve the backlog problem facing the Office. The proposed rule changes affect a relatively minor portion of total applications filed and may actually increase the Patent Office workload in those applications. Moreover, the applications that will be negatively impacted are precisely those that traditionally have yielded the most significant economic value. IPLAC agrees with the AIPLA comments on this point submitted on April 24, 2006 (page 4) regarding proposed rules involving "Changes to Practice for the Examination of Claims in Patent Applications."

The proposed rule changes require a designation of ten representative claims for initial examination. The Supplementary Information portion of the proposed rules indicates that only a small percentage of patent applications would be affected by the rule change. That information shows that only 2,522 out of 216,327 recently filed non-provisional applications (1.2%) contain more than ten independent claims. However, for many reasons, applicants may also desire to have dependent claims examined. Thus, the number of applications this rule change may impact is considered to be greater.

Applicants already pay substantial fees for independent claims in excess of three and total claims in excess of twenty. These excess claim fees are already considered to more than cover the associated extra expense and burden placed on the Office and the examiners in considering extra claims. The burden of initially searching for subject matter in extra claims and considering those claims proportionally decreases as the number of claims increases, while the revenue generated per claim consistently increases.

The proposed rules will actually exacerbate the Office's workload problems rather than alleviate them. The extra burdens placed on applicants who wish to file more than ten representative claims will force most applicants to file multiple simultaneous applications. This will naturally add to the workload of the Office and the individual examiners. Furthermore, multiple applications may be assigned to different examiners, each of whom would need to review the application and perform a search and examination.

Further, the proposed rule changes limiting the number of examined claims to ten will increase pendency of many applications, lead to greater rather than fewer continuing applications, and/or deprive applicants of the patent coverage to which they are entitled. Take, for example, a modest application filed with thirty claims. Assume that after a thorough examination, some – but not all – of the dependent claims would contain limitations which the assigned examiner would otherwise find allowable. Under the current practice, the allowability of the subject matter of these claims would be identified in the first office action. Under the proposed rules, in preparation of the first office action, only ten claims would be examined. If

30791701.1

The Honorable Jon Dudas
May 3, 2006
Page 5

none of the ten claims includes subject matter that the examiner would find allowable, a rejection of all ten claims would be issued. The applicant would have no way of knowing whether any of the non-designated claims contain allowable subject matter. If the applicant decides that the rejection of the initial ten claims has merit, he may select one limitation from one of the non-designated claims and incorporate that limitation into the pending, designated independent claims. The examiner must then complete a second search to consider the new limitation. If the applicant selected the wrong limitation to incorporate into the independent claim, all claims would be rejected again. Most likely, this rejection would be made final. Even though the patent application as originally filed contained allowable subject matter in the eyes of both the examiner and the applicant, the proposed new rules could easily lead to a situation where the application is placed in a state of final rejection without this fact being recognized by either the examiner or the applicant.

In the least prejudicial manner implemented, the Patent Office would need to change the rules so that an application could no longer be made final until the prior art of record has already been applied to the same set of claims for a second time. Of course, using such an approach, an application may never reach final rejection as an applicant could continually alter the claims in response to each negative office action. Accordingly, pendency of applications would increase.

If, however, the Office permits final second office actions under the above-described circumstance, then the applicant would either have to abandon the application -- forfeiting the otherwise allowable subject matter -- or appeal. Given that the proposed rules only permit a single continued application, the applicant would not want to avail himself of such an option until absolutely necessary -- namely, after losing on appeal. Again, the appeal would lead to greater pendency for this application and an increase in overall use of the appeal process by applicants, leading to even greater delays and more waste of Office resources.

If the applicant loses on appeal, he would have to (1) abandon the application -- forfeiting the otherwise allowable but as yet designated subject matter, (2) use his single allowable continuation, or (3) appeal to the courts. An increased number of appeals to the courts would serve only to drain our country's already overwhelmed judicial resources.

If the applicant elects to file a continuation, he is not much better off than when he filed the original application because he does not know if the application contains subject matter on which he and the examiner can reach agreement. If the applicant fails to select the appropriate allowable subject matter to add to independent claims, the process continues as above with the increased chance that the end result will be that the applicant will spend considerable money without getting any patent at all -- even though the application contains allowable subject matter. Even where the applicant selects subject matter from a previously non-designated claim to incorporate into the independent claims and thereby secures a patent, the applicant has lost his right to a patent on all other allowable subject matter which may be contained in the application.

The above example helps demonstrate why the proposed new claim and continuation rules are fundamentally and unacceptably unfair. When an inventor develops something new, the more novel and valuable the discovery is to society, the more likely it will contain many novel and non-obvious features. Under the current U.S. laws - which remain unchanged by the

30791701.1

The Honorable Jon Dudas
May 3, 2006
Page 6

proposed rules - an inventor must promptly file a patent application which explains what has been invented. Because the full scope of the prior art is inherently unknowable (both at the time of filing and later) and because the law requires the application to contain a complete written description of the invention and a disclosure of the best mode(s) known to the inventor for carrying out the invention, an applicant is always best advised to describe the invention in the patent application in as much detail as possible, including all of the new features and all of the ways the inventor envisions that the invention could be made, used or altered. Under current practice, if the applicant has done all of this and has the necessary financial resources available (either at the time of filing or during the pendency of a continuing application), he can attempt to obtain full patent coverage for what he has discovered, including all of the patentable inventions which are disclosed in the original application. Under the currently proposed rules, however, such inventors will almost certainly be denied full protection. Even in circumstances where an inventor has a thorough understanding of all of the relevant prior art that exists in the world before he files his application (which is highly unlikely in reality) and even where the inventor is able to successfully incorporate one category of allowable subject matter in the designated claims of his original application and a second category of allowable subject matter in the designated claims in his single permissible continuing application, he will, nonetheless, be barred from securing protection for any third continuing application or any additional allowable subject matter. This is true even if he has done everything as required by the U.S. patent laws and the proposed new rules. A country so dependent on intellectual assets cannot afford such an outcome.

The proposed rules will also increase the workload of the Office and examiners in other ways. An initial review of the claims in every application will be necessary. Notification of non-compliance will be required for those applications that do not specify representative claims. If the ESD is not filed (which is likely since the proposed rules provide only for a nonextendible one-month time period to supply the ESD, not to mention the associated cost and estoppel considerations), applicants will either voluntarily cancel some claims, file one or more divisional applications or submit suggestions for restriction of the claims, which would require review by an examiner.

IPLAC believes that the examiner is the best person to most efficiently perform the prior art search. In the rare situation where an ESD is submitted, the examiner will still need to review the application and consider the prior art. The examiner will not only need to consider the prior art in the ESD, but also perform another search to ensure a comprehensive search was indeed performed. Thus, examiners will need to do independent searching in addition to evaluating the ESD.

An ESD would also require such a comprehensive search that undoubtedly the search will uncover a large number of prior art documents of marginal materiality. Applicants will feel compelled to submit an Information Disclosure Statement which contains all prior art documents unearthed by the searches for the ESD submission due to inequitable conduct implications – even prior art documents of marginal materiality. This scenario would further burden the Office as the examiner would need to consider references in the ESD as well as the Information Disclosure Statement.

The Honorable Jon Dudas
May 3, 2006
Page 7

Furthermore, the job of searching the prior art and comparing it to the claims of a patent application is the job of the government for which search and examination fees have been paid by the applicants. It would seem illegal to re-allocate this burden to applicants. However, if the Patent Office implements the proposed rule changes and imposes the burden of filing an ESD on an applicant, then at a minimum, no search or examination fee should be due. Also, because the applicant would be performing the job of the Patent Office, the applicant should be reimbursed the costs incurred in preparing such a document. As indicated by the comments provided by the AIPLA, the costs of preparing such a document could easily exceed $18,000. As a result, it seems quite likely that the costs of reimbursing applicants for the expenses they incur in preparing ESDs would significantly deplete the funds available to the Office for hiring and training examiners and hence would be counterproductive.

Finally, as indicated in the comments of the AIPLA, the non-extendable one-month period to file an ESD is clearly too short to prepare such an onerous document.

## IV.    THE PROPOSED RULES WILL NEGATIVELY IMPACT INNOVATION

Limiting patent owners to ten representative claims for examination will lead to several problems and issues for patent owners and, in turn, for the public at large. In many cases, an invention cannot be adequately covered in only ten claims, especially inventions with several parts or innovative concepts. Therefore, patent owners will be forced to file several applications (which may also be restricted by the proposed rule changes) to cover their inventions or prepare and provide the ESD to the Office in order to be able to pursue their rightful additional claims. Either option adds significant cost and time for patent owners and will likely have a negative impact on innovation in this country.

Filing several applications is costly and time consuming not only in preparing and filing the applications but also in prosecuting them and eventually maintaining any issued patents. Additionally, the cost of preparing an ESD, which requires patent owners to provide a detailed search report regarding the claims, identify limitations of the claims in the prior art and explain the patentability of the claims, will be a significant expense (*see* AIPLA comments which indicate that costs could easily exceed $18,000) not to mention an undertaking that will open the door to admissions and limitations which can be used against patent owners in future litigation. The result will be that patent owners will limit the investment of time and money into inventions, negatively impacting the public which will lose out as potentially beneficial inventions are not pursued or pursued only partially.

Also, the significant costs related to the representative claims practice will likely unduly burden the finances of small businesses, independent inventors and start-up companies which usually have limited funds, especially during the early stages of the patent process. Under the proposed rule changes, small businesses and independent inventors will be unable to afford the costs of pursuing their inventions and may be discouraged from using the patent system in view of the financial and procedural burdens they must overcome to obtain adequate patent protection for their inventions. The result will be that small businesses and independent inventors will be less likely to protect their ideas through patents and will be more inclined to avail themselves of other forms of protection such as trade secrets. Such action will limit the inventions made

30791701.1

The Honorable Jon Dudas
May 3, 2006
Page 8

available to benefit the public and will significantly curb innovation. The overall end result is that a significant number of inventions developed by smaller companies and independent inventors, which would normally be made available to the public through the patent process, may remain unknown to the public.

As a result, small businesses and independent inventors may view their best option to be to sell their inventions to larger companies that can afford the costs of obtaining and maintaining patent protection, thereby giving larger companies a greater degree of control over a significant number of the patents issued in the United States. This result would also have a negative impact on the public and innovation.

## V.    CONSTRUCTIVE ALTERNATIVE PROPOSALS

Possible alternative options which the Patent Office may consider as part of its effort to improve quality, efficiency and timeliness of the examination process include:

- Revamping the manner in which job performance of examiners is evaluated (for example, the current system rewards examiners for rejecting applications which extends the pendency of applications and adds to the backlog);

- Securing increased pay for examiners to improve retention;

- Establishing regional affiliate patent offices in other parts of the country where the cost of living is less expensive and to increase the pool of potential examiner candidates;

- Crediting examiners for claims disposed as opposed to and/or in addition to applications disposed;

- Permitting the recent increases in fees for added claims to work their course and reevaluating whether this has led to a reduction in the number of claims to be evaluated by examiners;

- Requiring applications with excess claims over a certain number to submit an independent search report such that not all applications are treated uniformly (given that the Office has indicated that only a small percentage of applications take up significant examiner resources);

- Proposing some more reasonable limit on the number of claims to be initially examined;

- Separating search and examination functions; and

- Implement a procedure where all claims of an application are examined and any desired restriction and/or election requirements must be issued within six months of the filing of the application. No fees for excess claims would be due until some period of time after the issuance of this initial determination. Such a procedure would enable applicants to determine early in the process – before making payments and wasting money on excess

30791701.1

**SA076**

The Honorable Jon Dudas
May 3, 2006
Page 9

claim fees - which claims to continue to pursue in the current application. Such a procedure would further accelerate the examination of any subsequent divisional applications because an applicant could then determine early on in the patent process how many separate divisional or continuation applications he could file.

## VI.    CONCLUSION

The proposed new rules are at odds with each other. The proposed rules regarding continuing applications prohibit the presentation of multiple claims that may be needed to adequately protect an invention in different applications. These rules prohibit or at least inhibit one's ability to voluntarily pursue patentably distinct inventions in separate applications. The safest course under the proposed rule changes is to file all claims including those believed to be patentably distinct in a single application and wait for the Office to issue the restriction requirements it decides are appropriate. The proposed new claim examination rules, however, effectively prohibit full claiming of inventions within a single application. Thus, the most valuable inventions and, hence, those most deserving of extensive patent coverage will instead be less protected and more vulnerable to misappropriation.

IPLAC appreciates the opportunity to offer comments on the proposed rule changes and some constructive alternative proposals for the Office's consideration.

Respectfully submitted,

**THE INTELLECTUAL PROPERTY ASSOCIATION OF CHICAGO**

By: Mark I. Feldman, President

Email: info@iplac.org

SA077