# THE WEBB LAW FIRM

WILLIAM H. LOGSDON
RUSSELL D. ORKIN
DAVID C. HANSON
RICHARD L. BYRNE
KENT E. BALDAUF
BARBARA E. JOHNSON
PAUL M. REZNICK
JOHN W. MCILVAINE III
JULIE W. MEDER
LESTER N. FORTNEY
KENT E. BALDAUF, JR.
KIRK M. MILES
RANDALL A. NOTZEN
JAMES G. PORCELLI
CHRISTIAN E. SCHUSTER
ANN M. CANNONI
NATHAN J. PREPELKA

700 KOPPERS BUILDING
436 SEVENTH AVENUE
PITTSBURGH, PA 15219
TELEPHONE 412-471-8815
FAX 412-471-4094
E-MAIL webblaw@webblaw.com

PATENT, TRADEMARK & COPYRIGHT LAW

WILLIAM H. WEBB (1929-1997)
FREDERICK B. ZIESENHEIM (19

J. MATTHEW PRITCHARD IV
SEAN M. CASEY (OH AND CA ONLY)
DEBRA Z. ANDERSON
PATRICIA A. OLOSKY
ALEXANDER DETSCHELT
GWENDOLYN R. ACKER WOOD
CRAIG M. WALLER

PATENT AGENTS
JAMES J. BOSCO, JR.
RYAN J. MILLER

OF COUNSEL
DONALD C. LEPIANE
DARRELL E. WILLIAMS

May 3, 2006

Robert J. Spar, Director
Office of Patent Legal Administration
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Re:     Comments on Changes to Practice for the Examination of Claims
in Patent Application
Federal Register Volume 71, No. 1, Page 61, Tuesday, January 3,
2006

Dear Mr. Spar:

The Webb Law Firm is a mid-sized law firm with a domestic and international practice in intellectual property representing a diversity of clients ranging from large corporations to individual inventors. We have the following comments based upon our experience with such clients.

The Office has proposed focusing its initial examination on no more than ten claims designated by the Applicant as representative claims or, in the alternative, more claims will be examined if the Applicant provides an Examination Support Document that covers all of the independent claims and the dependent claims designated for initial examination.

Problem:     Some Applicants are submitting too many claims for Examiners to perform a reasonable search and examination within their allotted time. Under 35 U.S.C. §131, the Director shall cause an examination to be made of the application and the alleged new invention and if upon such examination it appears that the applicant is entitled to a patent under the law, the Director shall issue a patent therefor. Requiring the Applicant to designate ten representative claims which will be examined finds no support in the statute since the invention is defined by all of the claims.

Dockets.Justia.com

THE WEBB LAW FIRM

Robert J. Spar, Director                     -2-                     May 3, 2006

      Suggestion:    We suggest focusing more upon the individual applications containing excessive claims rather than forcing the entire patent community to modify its practice in a manner that is neither supported by statute nor will truly reduce the pendancy and backlog of applications before the Office. The action of a few applicants should not be the basis for limiting a practice which has been acceptable for many years. In our experience, patent applications that have twenty or fewer claims are sufficient for the large majority of the applications we prepare. For applicants who believe that more than twenty claims are desired or necessary, consideration should be given to providing additional time for the Examiner to act. An additional fee is already being charged for examination of additional claims.

      This limitation of ten representative claims, coupled with the concurrently proposed restriction for continuation practice places the applicant in a difficult position. If all ten representative claims are rejected in a first Office Action, the Applicant may submit an Amendment limiting those rejected claims with the features of other dependent claims that were presented but not examined in the originally filed application. Now, when the applicant, who in the past would have received a non-final Office Action, receives a Final Office Action for claims that rightfully should have been examined with the first office action, he or she may well be pushed into filing an RCE to have the claims examined.

      Problem:    Applicants may circumvent the requirement to select ten representative claims for examination in a United States application.

      Suggestion:    Until such limitations are placed on PCT applications, Applicants may file a PCT application with as many claims as they wish, designating the US as the searching authority. In essence, that will provide to the Applicant a United States examination with which he or she may then enter the national stage in the United States. This does not relieve the burden for the Office, but provides to the Applicant an examination performed by United States Examiners.

      Problem:    The representative claim requirement will be retroactive for all applications for which a first Office Action on the merits has not been mailed as of the date the new rule may go into effect.

      Suggestion:    Although we oppose the limitation of ten representative claims, if this limitation is implemented, it should not be retroactive. Applicants have invested substantial time and money in developing independent and dependent claims with the belief all of the claims will be examined in a first Office Action on the merits. Some of these applications were filed as long as four years ago. It is not fair to change the rules on those Applicants. These Applicants should not be blindsided by an attempt to remedy this problem. Applicants have already paid excess claim fees implemented in 2005 and have every right to expect that each claim will be fairly examined.

      Problem:    Although the Office will, under the current rules, permit applications to be filed with more than ten representative claims, it will require the Applicant to

THE WEBB LAW FIRM

Robert J. Spar, Director                           -3-                                   May 3, 2006

submit an examination support document (ESD), through which the Applicant submits the results of any pre-examination search, as well as provides extensive details on how the references identified within the search are relevant to the pending claims.

      Suggestion:   We believe there should be no requirement to submit an ESD. For applicants who believe that more than twenty claims, which is the current standard, are desired or necessary, consideration should be given to providing additional time for the Examiner to act. An additional fee is already being charged for examination of additional claims. Preparation of an ESD not only requires extensive time and resources on behalf of the applicant, but furthermore, appears to be a much more extensive analysis than is generally provided by the Examiner in an Office Action. To the extent an Applicant would like a patent to stand on its own with minimal prosecution history, such an ESD is undesirable.

      Overall, we believe that forcing Applicants to select ten representative claims is a draconian solution to address what appears to be a small number of applications that have an excess number of claims. The most effective and practical way to address this problem is to focus upon the relatively few applications being filed with such claims and address them directly.

      Very truly yours,

      /JGP/

      James G. Porcelli

# THE WEBB LAW FIRM

WILLIAM H. LOGSDON
RUSSELL D. ORKIN
DAVID C. HANSON
RICHARD L. BYRNE
KENT E. BALDAUF
BARBARA E. JOHNSON
PAUL M. REZNICK
JOHN W. MCILVAINE III
JULIE W. MEDER
LESTER N. FORTNEY
KENT E. BALDAUF, JR.
KIRK M. MILES
RANDALL A. NOTZEN
JAMES G. PORCELLI
CHRISTIAN E. SCHUSTER
ANN M. CANNONI
NATHAN J. PREPELKA

700 KOPPERS BUILDING
436 SEVENTH AVENUE
PITTSBURGH, PA 15219
TELEPHONE 412-471-8815
FAX 412-471-4094
E-MAIL webblaw@webblaw.com

PATENT, TRADEMARK & COPYRIGHT LAW

WILLIAM H. WEBB (1929-1997)
FREDERICK B. ZIESENHEIM (1958-2004)

J. MATTHEW PRITCHARD IV
SEAN M. CASEY (OHIO AND CA ONLY)
DEBRA Z. ANDERSON
PATRICIA A. OLOSKY
ALEXANDER DETSCHELT
GWENDOLYN R. ACKER WOOD
CRAIG M. WALLER

PATENT AGENTS
JAMES J. BOSCO, JR.
RYAN J. MILLER

OF COUNSEL
DONALD C. LEPIANE
DARRELL E. WILLIAMS

May 3, 2006

Robert J. Spar, Director
Office of Patent Legal Administration
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

> RE:     Comments on Proposed Changes to Practice for Continuing Applications, Request for Continued Examination Practice, Applications Containing Patentably Indistinct Claims as Presented in the Federal Register Volume 71, No. 1 of Tuesday January 3, 2006

Dear Mr. Spar:

The Webb Law Firm is a mid-sized law firm with an exclusive domestic and international practice in intellectual property representing a diversity of clients ranging from large corporations to individual inventors. We have the following comments based upon our experience with such clients:

A primary purpose of the proposed rule changes for continuation practice is to assist the Office with reducing the backlog and the pendency of patent applications filed with the USPTO.

Problem:     The Office has stated that it is impossible to "hire our way out" of this and is committed to hiring 1,000 patent examiners during each of the next four years. However, the Office is experiencing exceptionally high attrition and, as a result, even with such ambitious hiring goals there is concern that only a fraction of those examiners may remain with the Office for a substantial amount of time.

Suggestion:     Regardless of any rule changes that may reduce the number of patent filings, which itself seems to be counter to the goal of the USPTO, or make the examination of patents easier for the Office – any such changes will be meaningless if the Office

Robert J. Spar, Director                    -2-                    May 3, 2006

cannot retain the critical number of Examiners to handle the patent filings. The cost of living in the Washington area, its location on the eastern edge of the United States, and the transient population living in that area are disincentives for many potential employees to consider the Office as a place of employment. Therefore, although it may occur over a long time, we suggest that the Office consider establishing satellite offices in different cities to tap a large resource of talent currently unavailable. Something seems askew when the Office is offered a windfall of new work and tells the customer that it could not manage its affairs (i.e. "cannot hire its way out" of this) and, as a result, restricts the customers' opportunity to give new work to the Office. Hiring and retaining qualified Examiners is imperative to the success of the Office.

Problem:    It appears the challenges the Office is currently facing have developed over the years and, at least in part, because of the significant diversion of funds by the Department of Commerce for unrelated projects.

Suggestion:    For the Office to be a viable operating entity with the ability for long-term planning, it is imperative for this fee diversion to cease.

Problem:    The Office spends a large amount of time examining continuing applications, to the exclusion of examining new applications and, as a result, there is a large backlog of new applications that are not being examined in a timely manner. Under the proposed rules, a second or subsequent continuation or continuation-in-part application and second or subsequent request for examination of an application must include a showing as to why the amendment, argument or evidence presented could not have been previously submitted.

The Office has indicated that about 53,000 requests for continued examination in fiscal year 2005 were received, which accounts for about 30 percent of the Office's examining resources. However, this statistic is silent on the number of those continuing applications that are second or later continuing applications and would be restricted under the proposed changes. Therefore, based upon the statistical information provided by the Office, it is difficult to determine the effectiveness of limiting the filing or a second or later continuation. It seems the number of applications affected by this change may be small. Most of our clients are not willing to put forth the expenses associated with the government fees and the attorney time to file multiple continuations unless their invention is deemed to be very valuable and important. Hence, this filing option should not be restricted.

From our experience, most continuations are filed in the form of RCEs. The time an Examiner takes to evaluate an RCE is in general substantially less than the time required to examine a new application. As a result, it would appear that an RCE not only requires significantly less effort on behalf of the Examiner, but furthermore, provides significant revenue to the Office.

In the instance where a client wishes to file a second or subsequent continuation, as an advocate for our client we would file a petition presenting reasons why such an application

THE WEBB LAW FIRM

Robert J. Spar, Director                    -3-                    May 3, 2006

could not have been presented earlier. As a result, there will be an increase in the petitions filed, and to a degree, work within the Office would merely be shifted to a different group.

Furthermore, there appears to be no statutory support for such a change.

Suggestion:   The client is paying a new and substantial filing fee for each continuation. Use this income to address the problem. If the income does not adequately reflect the cost/effort put forth by the Office, revisit the amount of the fee.

Overall, we do not believe a blanket restriction on continuation practice will provide a long-term solution to reducing the pendency and backlog of patent applications before the Office. Hiring and retaining a larger, competent examining corps, establishing satellite locations in cities having a lower cost of living, and if absolutely necessary, consider charging an enhanced fee for second and subsequent continuing applications may be implemented to remedy a problem that has been long in the making.

Respectfully submitted,

/JGP/

James G. Porcelli

JGP:cac

Comment Info: =================

General Comment: I am responding to your Notice of Proposed Rulemaking published January 3, 2006,
71 Federal Register 48.

I am an inventor having claimed small entity status. With all due respect, I believe the agency has significantly underestimated the impact of this proposed rulemaking on small businesses. The reasons apparently presented by the agency for this claim are that the number of continuation applications received from small entities in 2005 number in ?only? the tens of thousands.

The impact on those tens of thousands each year in the past and in the future would be devastating and the changes would be felt far more severely by small businesses than by larger businesses.

The proposed rulemaking makes reference to Patent Office fees required in an apparent effort to show that these fees will not severely impact small businesses. But, the Patent Office fees are just a tiny fraction (indeed, less than the tip of the iceberg) of the impact on small businesses. The far greater costs are the legal fees and time commitments that the rules changes would impose. It is clear to me that the new rules would require a far greater expenditure of time and money very early in the patent prosecution process. Attaining the right claims ? claims specific enough to be justified by the inventor?s novel disclosure but general enough to capture everything that is novel ? is a daunting process. There is far less room for error or uncertainty given the far more limited ability to seek continuations. This puts much greater emphasis on the input of top notch (and top cost) legal advice early on in the process. It is simply unrealistic to assume that an inventor could realistically attain the strongest justifiable claims either through the inventor?s own drafting or by relying on the PTO to draft claims for the inventor. As a pragmatic matter, the proposed rules would require that the inventor navigate this daunting process with a much greater commitment of time and money upfront.

Big businesses have the luxury of deep pockets to finance huge legal fee budgets. Also, the immediate time cost of keeping inventors involved in the application process (in order to clearly, solidly, and extensively establish all the possible claims that the inventor could be allowed) can be much more easily absorbed by big business. Small businesses and solo inventors do not have this luxury. Currently, small inventors might submit a specification with claims that just don?t properly capture the essence of their invention ? the claims might be too broad to be justified upon close inspection and/or too narrow to give the strength justified by the inventor?s description of the invention. The process of deriving the appropriate claims can be long and complex. Under current rules, if a small inventor is able to devote only little (if any) funds to high-priced legal talent, the prospect of continuations allows the inventor to make attempts at capturing the right claims while also giving further time to further commercialize the invention in order to raise additional funds to complete the patent process. These smaller entities would now be hit with a double blow ? not only will they need far more money for legal fees upfront, they will also be required to put much greater time into the patent prosecution early on, taking them away from the process of actually trying to commercialize their invention. This double blow could easily preclude many small inventors from seeking or continuing the prosecution of patents and without that crucial patent protection, the invention may never be commercialized. Inventions and patents will become even more something that only big businesses can afford to entertain.

As a case in point, I will this week be submitting a non-provisional utility patent application, having submitted a provisional application almost a year ago. In that interim period of time, I have been attempting to further develop my technology, making it into an actual commercial product, while also trying to sell the product. I could find myself competing against huge, multi-billion dollar companies once knowledge of my invention becomes known. I am simply not

in a position to change my strategy in order to devote the tens of thousands of dollars (or more) that would be needed to seek the best claims that I would reasonably be entitled to. I will make an attempt to draft claims that, based on what I know, are appropriate to what I have disclosed. But, I know the limitations of my own ability in this regard. I have taken some solace in the thought that if I don?t get it right, I am not precluded from eventually getting the patent rights that I am entitled to. I of course realize that the longer the delay in getting claims allowed the shorter the effective term of the patent rights granted. This is a tradeoff I am compelled to face. I am deeply concerned that if the proposed rules are finalized and I cannot commercialize the invention quickly enough, then I will be forever precluded from receiving whatever patent rights I am entitled to and, therefore, the big companies will w in.

I should further note that while the proposed rules would severely harm small inventors in general, those rules would be particularly harmful to the small inventors, like myself, that did not have the opportunity to factor in the proposed changes in developing a strategy for commercializing their inventions. These inventors would now be forced to scramble to find the money and devote the additional time to seek appropriate patent protection quickly. For many of us, we will simply not be able to do so and our dreams will be lost.

I would urge you to either drop your proposed changes or, alternatively, to revise your proposals to lessen the blow. One possibility would be to exempt small entities from the proposed changes. If the agency believes that the proposed changes would have a minor  impact on small entities because these entities do not seek many continuations, then granting an exemption to those small entities that do seek continuations should not have much impact on what the agency is seeking to accomplish. Another possibility would be craft a financial hardship exemption from the proposed rule changes. While such an exemption could create a further level of administrative complication (and uncertainty), safe harbors could be created for such an exemption (e.g., the hardship is automatically allowed for entities with less than 5 employees or for small entities with less than $1,000,000 of assets or revenues). A further possibility would exempt small entities from the proposed changes for applications filed prior to the time that the rules become final (i.e., a grandfather clause). This would almost entirely eliminate the unfair burden that arises due to the lack of opportunity to plan for the new rules. And, in time, these applications would be removed from the system. At a minimum, I would urge that you allow present applications some minimum period of time (e.g., at least five years from the time that the rules become final) before the ability to seek continuations is limited. While this possibility stops short of adequately addressing the severe impact of the proposals, it would at least give small inventors some time to plan, budget and adjust to the changes.

Respectfully submitted,

Walter Antognini
New York, NY

**Document ID: PTO-P-2005-0022-DRAFT-0006    Docket ID: PTO-P-2005-0022**

| Details | Submitter Info | Assignment | File Set | Permission | Copy/Move | Rendering | Questions |

**Comment On** [PTO-P-2005-0022-0001 ▼]    Learn more *

**Submitter Information**

*denotes required field*

| | |
|---|---|
| **First Name** | Eurica |
| **Middle Initial** | |
| **Last Name** | Californiaa |
| **Mailing Address** | PO Box 2328 |
| **Mailing Address 2** | |
| **City** | Malibu |
| **Country** | United States ▼    Learn more |
| **State or Province** | California ▼ |
| **Postal Code** | 90265-7328 |
| **Email Address** | stockpotato@yahoo.com |
| **Phone Number** | 310-804-0727    Acceptable format is: ###-###-#### |
| **Fax Number** | |
| **Organization Name** | Juridic Embassy |
| **Submitter's Representative** | |

**Number of Items Received**

| | |
|---|---|
| **Submission Type** | Web ▼ |
| **Number of Items** | 1 |

[ Reset ]    [ Submit ]

Comment Info: =================

General Comment:I strongly oppose the proposed rule changes because they
versely affect
applications submitted by independent inventors prosecuting their own
applications. The ability of examiners to succintly consider the claims i
important. However, in many cases, a dependent claim can save a rejected
independent claim by incorporating its limitations. If examiners were all

reject independent claims without noting for the applicant that a depende
m
is objected to yet would be allowable if written in independent form incl
ll of
the limitations of the base claim, or other dependent claims, it would se

impair the ability of independent inventors to obtain patents in cases wh
patentable subject matter should have been found in their disclosures. In
cases the proposed rule changes would readily cheat independent inventors
prosecuting their own applications. However, if substatially modified to
ly
protect the rights of independent inventors, the proposed changes would n
objectionable in spirit. In effect, independent inventors should be made
from the requirement, and, additionally, examiners should be carefully di
to
ensure that applicants are aware that dependent claims may merely be "obj
to" because they would be allowable if appropriately rewritten in indepen
rm,
depite rejection of the base claim when standing alone. However, even for
applications prosecuted by skilled attorneys, problems would arise. For e

it may be difficult for the attorney to determine whether a dependent cla
d
have been allowable if written in independent form, or if the base claim
needs
to be amended to make the remaining dependent claims allowable as well.
Because the next Office action will likely be made final, the proposed ex
on
practice would cheat applicants, in certain cases, of the ability to make

response to the first Office action. For these reasons, I am strongly opp

the proposed changes in their present form. As Albert Einstein once said,
s
should be as simple as possible, but not any simpler." The importance of
claims in the patent examination process is too important to risk inadequ
oversight based on too much simplification.

Page 1 of 1

**Document ID:  PTO-P-2005-0023-DRAFT-0003    Docket ID:  PTO-P-2005-0023**

Details  Submitter Info  Assignment  File Set  Permission  Copy/Move  Rendering  Questions

**Comment On** PTO-P-2005-0023-0001  Learn more *

**Submitter Information**

* denotes required field

| | |
|---|---|
| **First Name** | Eurica |
| **Middle Initial** | |
| **Last Name** | Californiaa |
| **Mailing Address** | PO Box 2328 |
| **Mailing Address 2** | |
| **City** | Malibu |
| **Country** | United States  Learn more |
| **State or Province** | California |
| **Postal Code** | 90265-7328 |
| **Email Address** | stockpotato@yahoo.com |
| **Phone Number** | 310-804-0727  Acceptable format is: ###-###-#### |
| **Fax Number** | |
| **Organization Name** | Juridic Embassy |
| **Submitter's Representative** | |

**Number of Items Received**

| | |
|---|---|
| **Submission Type** | Web |
| **Number of Items** | 1 |

Reset    Submit

SA088

Comment Info: ==================

General Comment:As an independent inventor who has self-prosecuted three U.S. pa
tents, I feel the
proposed rule changes will impact me significantly along with my fellow
independent inventors who proceed on their own. I received US 6,285,303 for a
method of converting a truth or logic table from a tabular format into a paramet
er
format; US 6,694,175 for teaching practitioners of in vitro fertilization that t
he
personal body temperatures of pre-implanted infants (i.e., human embryos or
hatchlings) must be monitored distinctly to ensure proper thermoregulation, rath
er
than making the mistake of relying solely on a measure of the environmental
temperature inside an incubator in place of each patient?s temperature; and US
6,959,314 for a method of translating Boolean algebra, the binary language of
computing, into basic algebra, the basic language of mathematics. The latter
patent recently received an honorable mention from the Modern Marvels Invent
Now? Challenge, presented by The History Channel? and Invent Now?, Inc., a
division of the National Inventors Hall of Fame? Foundation. The proposed rule
changes take up the issue of streamlining the patent process and reducing the
backlog of unexamined applications. In certain technology areas, independent
inventors are less likely to benefit from ?patent pending? status compared to th
eir
corporate counterparts because 1) they do not have the resources to market their

inventions on their own, and 2) many serious investors, e.g., corporations, will
not
look at their ideas until they are actually patented. Therefore, it would be of
significant benefit to independent inventors to reduce the time taken to obtain
a
patent. Unfortunately, the proposed rule changes may actually work against
independent inventors who are prosecuting their applications on their own. More
importantly, the proposed rule changes fail to address the bulk of the problem
underlying the backlog. To appreciate the underlying problem, recourse to
statistics is helpful along with insight into the general value of inventions. T
he
Patent Office is a division of the Department of Commerce. The word commerce is
a compound derived from the words ?common? and ?mercy?. Through commerce
we show ?common mercy? for the sum of our needs. Inventions play an important
role in commerce by helping us to satisfy our necessities with remarkable
intelligence. For this reason, a well-constructed patent disclosure contains a
statement of why the invention is needed along with an explanation of how the
invention satisfies the stated necessity. The Department of Commerce and, in
turn, the Patent Office have a compelling interest to promote significant
advancements in the form of new inventions to satisfy our necessities. However,
it
goes without saying that not all inventions are as significant as, say, the ligh
t
bulb. Some inventions take us leaps and bounds beyond where we were before,
while others seem to graft small improvements onto existing ideas. Most
authorities seem to agree that inventions produced by independent inventors
account for about half, or 50%, of the most significant advancements forward. Ye
t,
independent inventors account for only about 8% of the regular (nonprovisional)
applications for utility patent filed at the Patent Office. To examine this cont
rast
statistically, it is helpful to create a statistic called the ?significance rati
o?,
determined as a given group?s share of significant advancements compared to its
share of the number of applications filed. For independent inventors, the
significance ratio is 50/8. In other words, they claim 50% of the most significa
nt
advancements forward, distributed among 8% of the regular applications for utili
ty

led. In contrast, the significance ratio for non-independent inventors

nce they account for the remaining 92% of regular applications filed.
ly, it is found that the significance ratio for independent inventors i

ner than that for non-independent inventors! In other words, applicatio

on, you are 11.5 times more likely to pull a significant advancement ou

labeled ?independent? than you are from the pile labeled ?non-
nt?. This suggests that independent inventors should have pay less than

what their counterparts pay, or the Patent Office should not object to

up to 11.5 times the work in ?dealing? with non-independent inventors,
ir relatively high significance ratio merits the added involvement. At

ce the Patent Office has a compelling interest to promote significant
nts, it behooves the Patent Office to encourage non-independent
to improve the significance of the inventions they submit; the Patent
ould also expedite the applications of independent inventors, as befits

on for their higher significance ratio, for in turn this will shorten t

narket their significant advancements to the public. Perhaps more to th

e Patent Office should discourage large academic institutions and
ons from sending in so many trivial ideas for patenting, which places a

rden on the patenting process itself and slows things down for
On the academic side, the publish-or-perish problem all too often take

of patenting. On the corporate side, a patent provides a relatively
ve yet elegant way to promote employee recognition while at the same
uraging awareness of the importance of intellectual property. These
likely explain the bulk of the backlog, since these entities are not
ed from presenting numerous applications of minimal technological
ngling out large academic and corporate entities within the non-
nt inventor group is important because small entity non-independent
for example, small technology ventures, probably have a higher
nce ratio within the non-independent inventor group. Also, within the
nt inventor group, there are those who are not properly aware of the
f a patent application, and this lowers the significance ratio somewhat

ly, if only large entity non-independent inventors, i.e., big academic

ons and corporations, are compared to independent inventors who
I the meaning of a patent application, then these independent inventors

es roughly around 15-20 times more likely to submit a significant
t, application for application, than their academic and corporate
ts having large entity status! However, in addition to the problem of

latively insignificant ideas coming from large academic institutions a

ns, another problem contributing to the low significance ratio of the

t inventor group is the excessive use of continuation-in-part
ns, which large entities can more easily afford compared to small
In effect, this multiplies the number of applications following upon a

rtantly, combined with the number of ?new? applications being submitte

ntities, this also contributes substantially to the backlog. In this r

logistics of continuation-in-part applications needs to be improved, which i

lem affecting inventors of all kinds. Unfortunately, rather than taking a
stics approach, a problem with the present rulemaking suggestion is that it
tes an opportunity for an excuse pattern. In other words, powerful attorneys

d by big academic and corporate institutions will undoubtedly be fluent in t

of making excuses, in contrast to small entity inventors who will be at a
dvantage. Ironically, this places the greater burden on groups that are not

source of the problem in the first place! Accordingly, the logistics of the

osed rulemaking changes are flawed and should be automatically rejected as
ing to address the main sources of the problem of backlog. Taking a deeper
, it is important to consider the ?new matter? problem that often results in

ensome need for a continuation-in-part application in the first place. Two
ples are given to help clarify this problem. For example, I wrote the claims

oolean algebra patent using a style similar to the claims of my earlier logi

e patent. Both sets of claims have a mathematical sound to them. But by the
the latter patent was examined, the Examiner said that the
s ?implemented by a computer? had to be inserted to clarify that this proces

not being performed mentally. I mentioned that my previous patent did not
ire this language. Yet the Examiner informed me that there had been a
ing since then and that this sort of language is now required. Fortunately,

ification had a sentence reading that the invention is best practiced as
oftware implementation?. Without this sentence, the Examiner indicated that
words ?implemented by a computer? would not have found support in the
inal application and would constitute new matter. The application would have

rejected and I would have had to file a continuation-in-part in order to ob

atent! So, to avoid this type of problem, when the applicant and Examiner
agree on a remedy based on ordinary skill, the applicant should submit a
est to add new matter based on ordinary skill, with an appropriate fee, whic

oe variable within a set range depending on the amount of work it will take
Examiner to consider it. (The second example, below, considers a case where
ative new matter is added.) In contrast, as an appropriate test, a continuat

art application should be reserved only for cases in which the proposed new
er added would have resulted in a divisional application had it been include

original. For another example, suppose I write an application in a fast-movi

nology, but by the time the Examiner has a chance to look at it, I realize t

ll need to make a few changes in order to keep the technology up-to-date. So

le a continuation-in-part to add new matter. But then, after I have filed th

inuation-in-part, yet before the Examiner has had a chance to look at it, I
ize I need to make some more changes that will constitute new matter. At tha

:, based on the present rules, I would have to file yet another continuation

. Instead, to avoid this absurdity, the filing date of the original applicat

ld have meaning of protecting inventors who have disclosed their inventions
in one year of the filing date of the original, and it should also establish

priority
for the matter originally disclosed. In each case where new matter is entered in

the original application, the applicant should note whether the new matter is
inventive or based on ordinary skill. If the Examiner and applicant agree that i
t is
inventive, then the date upon which the inventive new matter was added should be

noted in the application for priority purposes. This practice would explicitly r
eflect
the fact that inventive new matter cannot benefit from the original filing date
anyway, even if added in a continuation-in-part application. Again, only in case
s
where inventive new matter would result in a divisional application should a
continuation-in-part be added to the parent application. It may be noted that th
is
limitation will also eliminate the problem of patentably indistinct claims being

present among parent/child applications. However, even with this limitation,
additional limitation is needed regarding the problem of divisional applications

themselves. When approaching a potential need for a divisional application, the
Examiner should first question whether a technical remedy is possible to preserv
e
a single application. This greatly reduces the burden on those who study patents
,
including examiners, since unnecessary divisional or continuation-in-part
applications serve to duplicate the amount of reading required. It also creates
an
added expense of prosecution and maintenance, a problem that especially
impacts small entities such as independent inventors. It may be noted that a
graduated fee scale for adding new matter to the original application will be mo
re
likely to reduce successive additions of new matter than a flat fee for continua
tion-
in-part applications. In other words, each time a request to add new matter to t
he
original application is presented, the fee may be successively increased.
Exceptional cases, where the applicant can show that the need to add new matter
is beyond the applicant?s control, yet will benefit the quality of the disclosur
e, can
be reduced in fee down to the first time fee level, either upon petition or by
approval of the Examiner. Examiners may receive credit for considering ?new
matter requests? in place of giving them credit for considering continuation-in-
part
applications. In conclusion, the proposed rulemaking, though valid in its intent
,
would be better if modified in a manner adapted to 1) promoting an increase in t
he
significance ratio associated with applications, 2) streamlining the way in whic
h
inventive and non-inventive new matter may be added to a single application, and

3) limiting the need for divisional applications. Unfortunately, in its present
form,
the proposed rulemaking will not accomplish these goals and instead will mainly
add burdens to independent inventors and other small entities. For these reasons
,
I strongly oppose the proposed rulemaking, yet at the same time I strongly
encourage the Patent Office to pursue its goal of streamlining the patent proces
s.
Please join me in supporting the vision of working together to achieve cogent, u
p-
to-date, and technologically complete disclosures, without errors, and without
redundancy in view of related parent/child teachings; please also join me in

porting a streamlined way of adding new matter to a singl

employing continuation-in-part applications for this pu

reduce the need for divisional applications.

**Document ID: PTO-P-2005-0022-DRAFT-0002     Docket ID: PTO-P-2005-0022**

Details | Submitter Info | Assignment | File Set | Permission | Copy/Move | Rendering | Questions

**Comment On** [PTO-P-2005-0022-0001]  Learn more *

**Submitter Information**

\* denotes required field

| | |
|---|---|
| **First Name** | Anthony |
| **Middle Initial** | P |
| **Last Name** | Venturino |
| **Mailing Address** | Stevens Davis Miller & Mosher, LLP |
| **Mailing Address 2** | 1615 L Street, NW  Suite 850 |
| **City** | Washington |
| **Country** | United States    Learn more |
| **State or Province** | District of Columbia |
| **Postal Code** | 20036 |
| **Email Address** | venturino@stevensdavis.com |
| **Phone Number** | 202-785-0100    Acceptable format is: ###-###-#### |
| **Fax Number** | |
| **Organization Name** | |
| **Submitter's Representative** | |

**Number of Items Received**

| | |
|---|---|
| **Submission Type** | Web |
| **Number of Items** | 1 |

Reset    Submit

SA094

Comment Info: ==================

General Comment:I disagree with the proposal to limit the number of permitted co
ntinuing
applications. This is only going to lead to more appeals which the US Patent
Office is in no position to handle, especially if post grant opposition comes in
to
being.

Applicants often have to take the narrower allowed claims from the first or seco
nd
continuation for business reasons.  Then they go for the broader claims in
subsequent continuations.

I encourage the Patent Office to reduce its backlog but I resent this attempt to

lessen the work of the USPTO at the expense of my client's right to patent his o
r
her invention.

**Document ID: PTO-P-2005-0023-DRAFT-0001     Docket ID: PTO-P-2005-0023**

Details    Submitter Info    Assignment    File Set    Permission    Copy/Move    Rendering    Questions

**Comment On**   PTO-P-2005-0023-0001    Learn more *

**Submitter Information**

* denotes required field

| | |
|---|---|
| **First Name** | Anthony |
| **Middle Initial** | P |
| **Last Name** | Venturino |
| **Mailing Address** | Stevens Davis Miller & Mosher, LLP |
| **Mailing Address 2** | 1615 L Street, NW   Suite 850 |
| **City** | Washington |
| **Country** | United States    Learn more |
| **State or Province** | District of Columbia |
| **Postal Code** | 20036 |
| **Email Address** | venturino@stevensdavis.com |
| **Phone Number** | 202-785-0100    Acceptable |

format is: ###-###-####

| | |
|---|---|
| **Fax Number** | |
| **Organization Name** | |
| **Submitter's Representative** | |

**Number of Items Received**

| | |
|---|---|
| **Submission Type** | Web |
| **Number of Items** | 1 |

Reset    Submit

SA096

Comment Info: ==================

General Comment:It is wrong and counterproductive to limit examination to ten re
presentative
claims.

The effects of prosecution history estoppel demand a broad range of claims.
Likewise the constraints put on reissue applicants by the recapture rule demand
a
broad range of claims because, if an applicant is forced to fall back too far in
a
feature during the original prosecution, the Patent Office will do everything it
can to
prevent recapture.  More intermediate scope claims help avoid falling back too f
ar.

Limiting prosecution to 10 representative claims will also lead to more
continuations than necessary.  An applicant that files 40 product claims which
does not get the selected 10 allowed will go for the next 30 in three respective

continuations of ten claims each if necessary.

The Patent Office has set the fees high enough that it can recover its costs.

I would agree that an examiner forced to examine an application 200 claims has a

problem. However, this is not the case in the vast majority of applications.  Th
us,
the representative number, if you must set a representative number, should at
least be tripled to 30.

While I applaud the USPTO in trying to creatively reduce its backlog,
unreasonably denying applicants, the ability to apply for what they consider the
ir
invention to be is not the answer.

Comment Info: =================

General Comment:As a practicing attorney before the USPTO, I fully understand th
e goal of the
proposed changes to 37 CFR 1.78 in attempting to control the repetitive use of
RCE's and continuing application filings.  In my personal experience; however,
most of the RCE's and continuations I file are in response to FINAL rejections
issued by an Examiner based on COMPLETELY NEW prior art after an
amendment in response to the first office action overcame the initially cited pr
ior
art.  Such final rejections are invariably accompanied by the dismissive boilerp
late
sentence that "Applicant's amendment necessitated the new ground of rejection".

Since the proposed new rule will require a showing by applicant to the satisfact
ion
of the USPTO why any amendment with a second or subsequent RCE or
continuation could not have been filed earlier, applicants will be unduly prejud
iced
if examiners are allowed to continue this practice of final rejections based on
new
prior art previously unseen by the applicant.  Unless of course the USPTO will
accept the same one-sentence rationale as used by the examiners that "the
USPTO's final rejection necessitated the new filing".  Seriously, though, I and
others in this position will have no choice under the proposed rules but to peti
tion
for review of each of these premature final rejections rather than spend our
one 'free' shot at an RCE.  It's hard to see how this will provide for efficient

prosecution.

Comment Info: =================

General Comment:The concept is right.   Here are some thoughts:
1.   Maximum claims for standard fee should be 10 (maximum independent claims:
3)
2.   Claims 11-20: cost $5000 for claim 11 and $500 for each of claims 12-20;
Claim 21 costs $5000, etc. (Also, limit the # of cases an inventor/assignee can
have open with extra claims at any given time since for some groups the $ may
not be a consideration)
3.   New definition of applicant bearing the burden for additional claims:  Paten
t
Examiner does a full search and examination on the additional claims instead of
taking the patentability on its face based on a proper search by applicant (we d
on't
want a registration system).  If the additional claims are not patentable there
is a
$25,000 fee for the applicant and a $1000 bonus for the patent examiner.  If a
group has a second case happen like this in a calendar year the second fee is
$30,000 and a $1000 bonus for that examiner, etc...   This will help ensure the
applicant who is sure he has such an important and valuable invention it require
s
more than 10 claims to spend the money to do the leg-work up front.
4.   Eliminate restriction practice.  Make a rule that states only 1 statutory cl
ass
per application (this should reduce pendency by 2-3 months by itself).
5.   New legislation reducing statutory period from 6 months to 3 months. Can onl
y
reopen application after 3 months under extreme circumstance (significant
reduction in pendency this way since many applicants take 6 months in response
to everything and simply pay additional fees).
6.   Assign on Quality review person to a SPE and have that person get to
personally know and interact with the examiners of a particular art unit.   The
Quality review persons goals are aligned to improvements in quality...There is "
us
vs them" thinking at times between Quality reviewers and examiners.  This would
go a long way to help it.
7.   Extreme thought:  Completely revamp the count system.  Get a count for
FAOM, one count for second office action and another for Final
rejection/Allowance.  If no second office action is needed in the case, get 2 co
unts
for rejection/allowance.....Need some expertise in this, but essentially the cou
nt
system should promote reducing the backlog with the highest quality patent.
Getting 4 counts for an RCE where the same rejections are made over and over
compared to an examiner who does 3 very strong FAOM...Question: Who did
more valuable work vs who is a better performer on paper?  The answer should be
the same person, but it is not.
8. Another extreme thought:  Eliminate individual production goals and form grou
ps
of 6 examiners (2 primary, 2 "seasoned" junior examiners, 2 relatively new junio
r
examiners).  This group divides the work amongst themselves to get valuable work

out the door as a group not as individuals.  Take the expected production from t
hat
group today working individually and increase the goal by 3%.  Give a 5% raise f
or
those who volunteer for the new group setting.  Set group goals for bonuses.
There would be 3 of these groups, typically, for an art unit.  An art unit would
have
1 SPE, 3 groups of 6 examiners, 1 LIE and 1 Quality Review/Training person who
worked directly with the folks and for the SPE.
9. Require electronic filing of applications.  This needs to happen faster and s
hould
be easy to make user friendly for practioners.

10.  Require all prosecution to be done electronically.  Office actions, responses,
and amendments all filed electronically.  This and #9 would probably save 2 weeks
over the life of a prosecution just in mailroom time.

I am a relatively new examiner with a considerable amount of production
environment experience.  I understand that there are some gaps in these points
and would be interested to see others develop them from different perspectives.
The goal is to process quality applications in a timely manner to grant quality
patents.

Comment Info: =================

General Comment:The following suggestion addresses the stated problem of high nu
mbers of
continuation and RCE patent applications.

Summary:  An additional track for patent examination, on Option 3, is proposed
which would give the Customer additional flexibility in requesting priority of
examination.  In many cases, this could result in an extension of the time for
prosecution which would result in a significant re-prioritization of the backlog
 of
applications at the Patent Office.

Patents are filed for a variety of reasons.  In many cases, a continuation or RC
E is
filed in a case which already has allowed claims, but is filed to keep the
prosecution pending (keep the case ?alive?) so that amended claims can be filed
at a later date, for example, to thwart a competitor, or to revise the wording i
n light
of a court decision.  This is a common practice and fills an important customer
need.  The customer in these examples is in no hurray to have the claims
examined, or to have claims allowed.

Customers of the Patent Office presently have essentially two choices for patent

priority:  an accelerated track, and a non-accelerated track where applications
are
considered in the order of filing date.  There are some limited provisions for
suspending prosecution.

The present proposal is to provide at least one additional track:  called an ?op
tion
3? patent application (for the sake of discussion).  When a user selects option
3,
the customer can provide input as to when the customer wishes to receive a first

office action.  For example, an option 3 customer could request to receive a fir
st
office action at the end of two, three, four, five, up to ten or more years.  Un
der
certain conditions, the Patent Office could include as a provision of option 3
applications that they will not receive and patent term adjustment.

Option 3 is for those customers who merely wish to keep the case alive and who
are not in a hurry to have the case examined.  The proposal has some similarity
to the various choices available to a customer of the U.S. Postal Service: e.g.,

first class, priority, and Express mail services, and many other types of servic
es.